# EXHIBIT 1

 

NAME  STEPHEN DALE BARBEE

ADDRESS    417 WALNUT CREEK

AZLE TX 76020

RACE W   SEX M   AGE 37   DOB  3/30/1967

CASE NO.  0967589   DATE FILED    2/24/2005

CID NO.    0206534

OFFENSE  MURDER-CAPITAL (AFTER 9/1/99)

DATE  2/19/2005

I.P.  JAYDEN UNDERWOOD, LISA UNDERWOOD

AGENCY  Fort Worth PD

OFFENSE NO.  05021957

COURT 297th District Court

COMPLAINT NO.  0967589

---

**IN THE NAME AND BY AUTHORITY OF THE STATE OF TEXAS:**

Before me, the undersigned Assistant Criminal District Attorney of Tarrant County, Texas, this day personally appeared the undersigned affiant, who upon his oath says that he has good reason to believe and does believe that in the County of Tarrant and State of Texas STEPHEN DALE BARBEE, hereinafter called Defendant, in the County of Tarrant and State aforesaid on or about the 19th day of February 2005, did

THEN AND THERE INTENTIONALLY CAUSE THE DEATH OF AN INDIVIDUAL,  LISA UNDERWOOD, BY SUFFOCATING HER WITH HIS HAND, AND DID THEN AND THERE INTENTIONALLY CAUSE THE DEATH OF AN INDIVIDUAL, JAYDEN UNDERWOOD, BY SUFFOCATING HIM WITH HIS HAND, AND BOTH MURDERS WERE COMMITTED DURING THE SAME CRIMINAL TRANSACTION,

Filed (Clerk's use only)

**FILED**
THOMAS A. WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

FEB 2 5 2005

TIME_____4AM_____

BY_____AC_____ DEPUTY

AGAINST THE PEACE AND DIGNITY OF THE STATE.

Sworn to and subscribed before me on this the   25 day of  FEB 2005

_____
Affiant

COMPLAINT

_____
Assistant Criminal District Attorney of
Tarrant County, Texas

**16**

NAME   STEPHEN DALE BARBEE

ADDRESS   417 WALNUT CREEK

       AZLE TX 76020

RACE  W   SEX M   AGE 38   DOB  3/30/1967

CASE NO.  0967589   DATE FILED   2/24/2005

CID NO.   0206534

OFFENSE  MURDER-CAPITAL (AFTER 9/1/99)

DATE  2/19/2005

I.P.  JAYDEN UNDERWOOD, LISA UNDERWOOD

AGENCY  Fort Worth PD

OFFENSE NO.  05021957

COURT  213th District Court

INDICTMENT NO.  0967589  D

IN THE NAME AND BY AUTHORITY OF THE STATE OF TEXAS:

**THE GRAND JURORS OF TARRANT COUNTY, TEXAS,**

duly elected, tried, empaneled, sworn, and charged to inquire of offenses committed in Tarrant County, in the State of Texas, upon their oaths do present in and to the   **CRIMINAL DISTRICT COURT NO. 4**

of said County that STEPHEN DALE BARBEE, hereinafter called Defendant, in the County of Tarrant and State aforesaid, on or about the 19th day of February 2005, did

THEN AND THERE INTENTIONALLY OR KNOWINGLY CAUSE THE DEATH OF AN INDIVIDUAL, LISA UNDERWOOD, BY SMOTHERING HER WITH THE WEIGHT OF HIS BODY OR WITH AN OBJECT UNKNOWN TO THE GRAND JURY OR BY A COMBINATION OF THE TWO. AND, DURING THE SAME CRIMINAL TRANSACTION, THE DEFENDANT INTENTIONALLY OR KNOWINGLY CAUSED THE DEATH OF ANOTHER INDIVIDUAL, JAYDEN UNDERWOOD, BY SMOTHERING HIM WITH HIS HAND,

Filed (Clerk's use only)

FILED
THOMAS A. WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

APR 27 2005

TIME  3:00
BY _____ DEPUTY

AGAINST THE PEACE AND DIGNITY OF THE STATE.

Criminal District Attorney
Tarrant County, Texas
INDICTMENT - ORIGINAL

Foreman of the Grand Jury



**8**

NAME  STEPHEN DALE BARBEE

ADDRESS   417 WALNUT CREEK

AZLE TX 76020

RACE W   SEX M   AGE 38   DOB 3/30/1967

CASE NO. 1004856   DATE FILED   12/20/2005

CID NO.   0206534

OFFENSE  MURDER-CAPITAL (AFTER 9/1/99)

DATE  2/19/2005

I.P.  LISA UNDERWOOD, JAYDEN UNDERWOOD

AGENCY Fort Worth PD

OFFENSE NO.  05021957

COURT 213th District Court

**DIRECT REINDICTMENT**

*0967589D*

INDICTMENT NO. 1004856

---

IN THE NAME AND BY AUTHORITY OF THE STATE OF TEXAS:

THE GRAND JURORS OF TARRANT COUNTY, TEXAS,

duly elected, tried, empaneled, sworn, and charged to inquire of offenses committed in Tarrant County, in the State of Texas, upon their oaths do present in and to the

CRIMINAL DISTRICT COURT NO. 1

of said County that STEPHEN DALE BARBEE, hereinafter called Defendant, in the County of Tarrant and State aforesaid, on or about the 19th day of February 2005, did

THEN AND THERE INTENTIONALLY OR KNOWINGLY CAUSE THE DEATH OF AN INDIVIDUAL, LISA UNDERWOOD, BY SMOTHERING HER WITH THE WEIGHT OF HIS BODY OR WITH AN OBJECT UNKNOWN TO THE GRAND JURY OR BY A COMBINATION OF THE TWO, AND DURING THE SAME CRIMINAL TRANSACTION, THE DEFENDANT INTENTIONALLY OR KNOWINGLY CAUSED THE DEATH OF ANOTHER INDIVIDUAL, JAYDEN UNDERWOOD, BY SMOTHERING HIM WITH HIS HAND OR BY A MEANS UNKNOWN TO THE GRAND JURY OR BY A COMBINATION OF THE TWO,

Filed (Clerk's use only)

FILED
THOMAS A. WILDER, DIST. CLERK
TARRANT COUNTY TEXAS

DEC 20 2005

TIME  3:30

BY _____ DEPUTY

AGAINST THE PEACE AND DIGNITY OF THE STATE.

Criminal District Attorney
Tarrant County, Texas
INDICTMENT - ORIGINAL

Foreman of the Grand Jury



**2**

# EXHIBIT 2

CASE NO. 0967589

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE ___213th___ |
| VS. | § § § | DISTRICT COURT  OF |
| STEPHEN DALE BARBEE | § § § | TARRANT COUNTY, TEXAS |

### ORDER APPOINTING COUNSEL FOR THE DEFENDANT

On this day, it being made known and appearing to the Court that the Defendant is without counsel of his own selection to represent him herein, and that he is too poor to employ counsel, or give security therefor, to represent him herein and the Defendant having requested that an attorney be appointed to represent him in the above styled and numbered cause.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED by the Court that _____ WILLIAM H. RAY _____ a regularly licensed and practicing attorney is hereby appointed to represent the Defendant as his attorney, and said Attorney is hereby authorized to proceed to perform the duties of the Attorney for the defendant in this cause.

_____
PRESIDING JUDGE

_2/25/05_
SIGNED DATE

**20**

CASE NO. ___0967589_____

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE ___213th_____ |
| VS. | § | DISTRICT COURT   OF |
| __STEPHEN DALE BARBEE__ | § | TARRANT COUNTY, TEXAS |

### ORDER APPOINTING CO-COUNSEL FOR THE DEFENDANT

On this day, it being made known and appearing to the Court that the Defendant is without counsel of his own selection to represent him herein, and that he is too poor to employ counsel, or give security therefor, to represent him herein and the Defendant having requested that an attorney be appointed to represent him in the above styled and numbered cause.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED by the Court that _____TIM MOORE_____, a regularly licensed and practicing attorney is hereby appointed to represent the Defendant as his attorney, and said Attorney is hereby authorized to proceed to perform the duties of the Attorney for the defendant in this cause.

_____
PRESIDING JUDGE

___3/4/05_____
SIGNED DATE

**30**

CASE NO. _IOO4856R_

THE STATE OF TEXAS

VS.

_STEPHEN DALE BARBEE_

§
§
§
§
§
§
§

IN THE _213th_

DISTRICT COURT   OF

TARRANT COUNTY, TEXAS

### ORDER APPOINTING COUNSEL FOR THE DEFENDANT

On this day, it being made known and appearing to the Court that the Defendant is without counsel of his own selection to represent him herein, and that he is too poor to employ counsel, or give security therefor, to represent him herein and the Defendant having requested that an attorney be appointed to represent him in the above styled and numbered cause.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED by the Court that _WILLIAM H. RAY_, a regularly licensed and practicing attorney is hereby appointed to represent the Defendant as his attorney, and said Attorney is hereby authorized to proceed to perform the duties of the Attorney for the defendant in this cause.

_____
PRESIDING JUDGE

_1/3/06_
_____
SIGNED DATE

**279**

CASE NO. 1004856R

| THE STATE OF TEXAS | § | IN THE 213th |
| VS. | § | |
| STEPHEN DALE BARBEE | § | DISTRICT COURT OF |
| | § | TARRANT COUNTY, TEXAS |

### ORDER APPOINTING CO-COUNSEL FOR THE DEFENDANT

On this day, it being made known and appearing to the Court that the Defendant is without counsel of his own selection to represent him herein, and that he is too poor to employ counsel, or give security therefor, to represent him herein and the Defendant having requested that an attorney be appointed to represent him in the above styled and numbered cause.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED by the Court that _____ TIM MOORE _____, a regularly licensed and practicing attorney is hereby appointed to represent the Defendant as his attorney, and said Attorney is hereby authorized to proceed to perform the duties of the Attorney for the defendant in this cause.

_____
PRESIDING JUDGE

1/3/06
_____
SIGNED DATE

**280**

# EXHIBIT 3

Stephen Barbee # 0206534-55A
Tarrant Count Jail
100 N. Lamar
Fort Worth, TX. 76102

Dear Honorable Judge Gill,

I was appointed atttorney Bill Ray and attorney Tim Moore to represent me on the capital murder charge that is now pending before your Court.  I think that it is very important that I address some serious issues that have occurred between the attorneys and myself.  There is a complete break-down in communication between both attorneys and myself.

I was told from the beginning that the attorneys would keep me advised on the proceedings and involve me with my own defense, however both attorneys have such attitudes with me that it has rendered me incapable of assisting in my own defense.  I suffered a severe head injury one month before my arrest and have suffered almost daily from migraine headaches.  I have been given different medications some of which I do not know what they were, but I can say that the medications made me unable to think properly.  The medicai in the jail have been very cooperative with me in trying to resolve the medication issues.

It is my understanding that I am entitled to a fair trial and have been appointed defense attorneys to represent my best interests.  To date the thing that I fear most is my attorneys.  They have been disrespectful to me, they have used intimidation and fear against me.  Mr. Ray and Mr. Moore both have reminded me of their heavy case loads which causes me great fear that they do not have the time to handle my case properly.

I must at this time go on record stating my legal concerns.

Respectfully,

*Steph Bal*   June 22, 2005

Stephen Barbee

cc: Criminal Court of Appeals
    Texas State Bar
    Attorney Bill Ray
    Attorney Tim Moore
    file

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

JUL - 7 2005

TIME _____ 2:58 pm
BY _____ DEPUTY

48

Dear MR Bill Ray

I want for you to contact someone
for my help, for my case.
His Name is, Greg Peshea
      with — Poland and Heart
            Denver Co.

I want this ATT to help in anything I need,
in any way.

I also want you to contact John Niland
with the Texas Defenders Services.
I want his help aswell.

Thank You for doing as I have
asked.

            Steph Bal

            June 19, 2005

**49**

June 22, 2005

Dear MR. Ray,

I am asking you to please consider these people to help us on my case. They both are offering free help. Frankly, I need all the help I can get.

You and mr moore, once told me that the policeman who told me what he did and how he did it, was going to get into trouble. The other day Tim moore was smiling saying they will just lie in court.

I don't find that funny at all, and why would you say something if it wasn't true!

I don't need all that extra stress added to this.

Please call these people —

If you're still saying I don't have a chance, what will it hurt for the extra help then.

Greg Piche with Pollard and Hart, Denver Co.

John F Niland, Texas Defenders Services.

Please MR. Ray I Need the help.

Stephen Bah

50

0967589D

Stephen Barbee #0206534   56B
Tarrant County Jail
100 N. Lamar
Fort Worth, TX.  76102

**FILED**
THOMAS A. WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

SEP 23 2005

TIME_____11:20 Am____

BY_____DEPUTY

September _19_, 2005

Dear Judge Gill.

Please be advised that I wish at this time to dismiss both of my attorneys Mr. Bill Ray and
Mr.Tim Moore.  There has and contiues to be a serious breakdown in communication, and I no
longer want them to represent me on the charge that I am in custody for.

Sincerely,

Stephen Barbee

cc:  Mr. Bill Ray
      Mr. Tim Moore
      Texas State Bar

*Received by Court*

**54**

# EXHIBIT 4

NO. 1004856

| | |
|---|---|
| THE STATE OF TEXAS | IN THE 213TH DISTRICT |
| VS. | COURT OF |
| STEPHEN BARBEE | TARRANT COUNTY, TEXAS |

**FILED**
THOMAS A. WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

FEB 06 2006

TIME _____ 8̲15̲

BY _____ DEPUTY

## CONSTITUTIONAL AND STATUTORY
## MOTION TO SUPPRESS CONFESSIONS

TO THE HONORABLE ROBERT K. GILL, JUDGE OF THE 213THD DISTRICT COURT:

COMES NOW, the Defendant herein, and move this Court to suppress the alleged confessions in this case, and would show the Court the following:

1.  The Defendant is charged with Capital Murder.

2.  The State of Texas is seeking the Death Penalty.

3.  The Defendant has previously filed a motion to suppress his statement to the police, which alleged that the statement given to the police on February 21, 2005 at the Tyler, Texas Police Department, and consisted of a DVD recorded statement of the Defendant and Fort Worth Police Department Detectives B.A. Jamison and M. J. Carroll, which occurred roughly between the hours of 2026 and 2350 hours on February 21, 2005.

    The Court set a hearing on this motion on February 3, 2006, and did in fact hear the motion on that date. The only person who testified was Detective Carroll. At the time of this motion's filing, the Court has not ruled on the first motion to suppress.

4.  During Detective Carroll's testimony on February 3, 2006, Detective Carroll testified that the Defendant made three additional confessions. The first was during a break after a portion of the DVD recorded confession, wherein the Defendant asked to use the bathroom, hereinafter "bathroom confession". The second was immediately after the bathroom confession and

**305**

consisted of the conversations between Detective Carroll, and Detective Richard Cashell of the Tyler Police Department, and the Defendant in Detective Cashell's office, hereinafter the "office confession". The third was the next day when the Defendant was traveling with Detective Carroll from Tyler to Fort Worth, Texas, hereinafter "the police car confession".

5. Detective Carroll testified that at the bathroom confession, the Defendant had told him that the Defendant and Ron Dodd had conspired to murder Lisa Underwood. The Defendant also allegedly made inculpatory statements concerning how the murders of Lisa and Jayden Underwood were performed. This entire confession was in the bathroom at the Tyler Police Department, and was prior to the confession that was memorialized via the Tyler Police Department recording on DVD that was heard on and recorded on DVD discs.

6. In the office confession, the Defendant allegedly made incriminating statements concerning the location of where the bodies of Lisa and Jayden Underwood were buried and a computer was used to view the areas involved.

7. In the police car confession, the Defendant allegedly made statements concerning the specific location of the bodies.

8. The first time that the Defendant was told about or otherwise heard about the bathroom, office or police car confession was during Detective Carroll's testimony on February 3, 2006. Nowhere in Detective Carroll's report, or in any other document previously provided by the District Attorney, is there any mention of the three aforementioned confessions. Prior to February 3, 2006 the Defendant was unaware of these statements.

9. The statements were obtained in violation of the Defendant's Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and Article 1, Section 10 of the Texas Constitution..



**306**

10. The statements were not taken in compliance with Article 38.22 of the Code of Criminal Procedure.

11. There was no waiver of the rights afforded by the Constitutions of the United States and the State of Texas and Texas Law.

12. The statements were not voluntary.

13. The statements were as a result of improper questioning by the police and only occurred as a direct result of and after the Defendant had invoked his right to counsel.

14. The statements were as a result of an illegal arrest.

<u>PRAYER</u>

Premises considered, the Defendant prays that the Court grant this Motion to Suppress and deny admission of the Defendant's statements before the jury.

RESPECTFULLY SUBMITTED,

WILLIAM H. "BILL" RAY
STATE OF TEXAS BAR NO. 16608700
ATTORNEY FOR DEFENDANT

LAW OFFICES OF WILLIAM H. "BILL" RAY,.P.C.
512 MAIN, SUITE 308
FORT WORTH, TEXAS, 76102
(817) 698-9090, (817) 698-9092, FAX
"WHERE THE WEST BEGINS"

<u>CERTIFICATE OF SERVICE</u>
<u>MOTION TO SUPPRESS CONFESSION</u>

I certify that a true copy of the foregoing Motion was hand delivered to the Office of the Criminal District Attorney of Tarrant County, Texas, on the date shown by the clerk's file stamp.



WILLIAM H. "BILL" RAY



**307**

# EXHIBIT 5

CAUSE NO. 1004856R

| | | |
|---|---|---|
| THE STATE OF TEXAS | X | IN THE DISTRICT COURT |
| VS. | X | TARRANT COUNTY, TEXAS |
| STEPHEN DALE BARBEE | X | 213ᵗʰ JUDICIAL DISTRICT |

COURT'S CHARGE

FILED
THOMAS A. WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

FEB 23 2006

TIME _____ 9:00

BY _____  DEPUTY

MEMBERS OF THE JURY:

The defendant, Stephen Dale Barbee, stands charged by indictment with the offense of capital murder, alleged to have been committed on or about the 19th day of February, 2005, in Tarrant County, Texas. To this charge the defendant has pleaded not guilty.

You are instructed that the law applicable to this case is as follows:

A person commits the offense of murder if he intentionally or knowingly causes the death of an individual. A person commits capital murder if he commits murder as defined above and the person murders more than one person during the same criminal transaction

A person commits the offense of manslaughter if he recklessly causes the death of an individual.

"Individual" means a human being who has been born and is alive.

"Act" means a bodily movement, whether voluntary or involuntary, and includes speech.

A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct, when it is his conscious objective or desire to engage in the conduct or cause the result.

A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to the circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to the result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

1

**390**

A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

Now bearing in mind the foregoing definitions and instructions, if you believe from the evidence beyond a reasonable doubt that on or about the 19th day of February, 2005, in Tarrant County, Texas, the defendant, Stephen Dale Barbee, did then and there intentionally or knowingly cause the death of an individual, Lisa Underwood by smothering her with the weight of his body or with an object unknown to the Grand Jury or by a combination of the two, and during the same crimonal transaction, the Defendant intentionally or knowingly caused the death of another individual, Jayden Underwood, by smothering him with his hand or by a means unknown to the Grand Jury or by a combination of the two, then you will find the defendant guilty of the offense of capital murder as charged in the indictment.

Unless you so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will find the Defendant not guilty of the offense of capital murder as charged in the indictment and next consider whether he is guilty of the lesser included offense of murder.

Now bearing in mind the foregoing definitions and instructions, if you believe from the evidence beyond a reasonable doubt that on or about the 19th day of February, 2005, in Tarrant County, Texas, the defendant, Stephen Dale Barbee, did then and there intentionally or knowingly cause the death of an individual, Jayden Underwood, by smothering him with his hand or by a means unknown to the Grand Jury or by a combination of the two, then you will find the defendant guilty of the lesser included offense of murder.

2

391

Unless you so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will find the Defendant not guilty of the offense of murder as charged in the indictment and next consider whether he is guilty of the lesser included offense of manslaughter.

Now bearing in mind the foregoing instructions, if you believe from the evidence beyond a reasonable doubt, that on or about the 19th day of February, 2005, in Tarrant County, Texas, the defendant, Stephen Dale Barbee, did then and there recklessly cause the death of an individual, Lisa Underwood by smothering her with the weight of his body or with an object unknown to the Grand Jury or by a combination of the two, then you will find the Defendant guilty of the lesser included offense of manslaughter.

If you find from the evidence beyond a reasonable doubt that the Defendant is guilty of capital murder or guilty of murder, but you have a reasonable doubt as to which offense he is guilty, then you must resolve that doubt in Defendant's favor and find him guilty of the lesser included offense of murder.

If you find from the evidence beyond a reasonable doubt that the Defendant is guilty of capital murder or murder on the one hand, or of manslaughter on the other hand, but you have a reasonable doubt as to which offense he is guilty, then you must find the Defendant guilty of the lesser included offense of manslaughter.

If you have a reasonable doubt as to whether Defendant is guilty of any offense defined in this charge, then you should acquit the Defendant and say by your verdict "Not Guilty."

In a criminal case the law permits a defendant to testify in his own behalf but he is not compelled to do so, and the same law provides that the fact that a defendant does not testify shall not be considered as a circumstance against him. You will, therefore, not consider the fact that the defendant did not testify

3

**392**

as a circumstance against him; and you will not, in your retirement to consider your verdict, allude to, comment on, consider, or in any manner refer to the fact that the defendant has not testified.

All persons are presumed to be innocent, and no person may be convicted of an offense unless each element of the offense is proved beyond a reasonable doubt. The fact that the defendant has been arrested, confined, or indicted for or otherwise charged with the offense gives rise to no inference of guilt at the defendant's trial.

The law does not require a defendant to prove his innocence or produce any evidence at all. The presumption of innocence alone is sufficient to acquit the defendant unless the jurors are satisfied beyond a reasonable doubt of the defendant's guilt after careful and impartial consideration of all the evidence in the case.

The indictment in this case is no evidence whatsoever of the guilt of the defendant. It is a mere pleading necessary in order to bring this case into Court for trial, and you will consider it for no purpose at all.

You are charged that it is only from the witness stand that the jury is permitted to receive evidence regarding the case, or any witness therein, and no juror is permitted to communicate to any other juror anything he may have heard regarding the case or any witness therein, from any other source than the witness stand.

Your verdict must be by a unanimous vote of all members of the jury. In deliberating on the case you are not to refer to or discuss any matter or issue not in evidence before you.

You are the exclusive judges of the facts proven, of the credibility of the witnesses and of the weight to be given to their testimony, but you are bound to receive the law from the Court, which is herein given, and be governed thereby.

4



**393**

Any further communication must be in writing by your foreperson through the bailiff to the Court, except as to your personal needs which may be communicated orally to the bailiff in charge.

After you retire to the jury room, you should select one of your number as your foreperson. It is his or her duty to preside at your deliberation, vote with you, and when you have unanimously agreed upon a verdict, to certify to your verdict by using the appropriate form and signing the same as your foreperson.

Bob Gill, Judge
213th District Court

5

**394**

# EXHIBIT 6

CAUSE NO. 1004856R

| THE STATE OF TEXAS | X | IN THE DISTRICT COURT |
| VS. | X | TARRANT COUNTY, TEXAS |
| STEPHEN DALE BARBEE | X | 213ᵀᴴ JUDICIAL DISTRICT |

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

FEB 24 2006

TIME _____ 5/0

BY _____ DEPUTY

**COURT'S CHARGE ON PUNISHMENT**

MEMBERS OF THE JURY:

You have found the defendant, Stephen Dale Barbee, guilty of the offense of capital murder. You are instructed that a sentence of *imprisonment in the* Institutional Division for life or a sentence of death is mandatory on conviction for capital murder. In order for the court to assess the proper punishment, certain special issues are submitted to you. Before answering these special issues you will consider the following instructions.

I.

In arriving at the answers to the special issues submitted, it will not be proper for you to fix the same by lot, chance or any other method than by a full, fair and free exchange of the opinion of each individual juror.

II.

In deliberating on Special Issue No. 1, the jury shall consider all evidence admitted at the guilt or innocence stage and the punishment stage, including evidence of the defendant's background or character or circumstances of the offense that militates for or mitigates against the imposition of the death penalty.

1



**400**

### III.

You are instructed that in answering Special Issue No. 1 the State has the burden to prove beyond a reasonable doubt that the answer should be "Yes." The jury may not answer Special Issue No. 1 "Yes" unless the jury agrees unanimously on the answer.

You are instructed that in answering Special Issue No. 1, the jury may not answer "No" unless ten or more jurors agree. The jurors need not agree on what particular evidence supports a "No" answer. If any juror has a reasonable doubt as to his answer to this special issue, the juror shall vote "No."

**SPECIAL ISSUE NO. 1.**

Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

ANSWER: __Yes__   ("Yes" or "No")

### IV.

If the jury has answered Special Issue No. 1 "Yes", the jury will answer Special Issue No. 2. If, however, the jury has answered Special Issue No. 1 "No," the jury will not answer Special Issue No. 2.

You are instructed that in answering Special Issue No. 2, you shall answer the issue "Yes" or "No." You may not answer the issue "No" unless the jury unanimously agrees, and you may not answer the issue "Yes" unless ten or more jurors agree. The jury need not agree on what particular evidence supports a "Yes" answer on this issue. In deliberating on Special Issue Number 2, you shall consider mitigating evidence to be evidence that a juror might regard as reducing the

2

**401**

defendant's moral blameworthiness.

**SPECIAL ISSUE NO. 2.**

Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

ANSWER: __*No*__ ("Yes" or "No")

**V.**

If the jury returns an affirmative finding on Special Issue No. 1 and a negative finding on Special Issue Number 2, the Court shall sentence the Defendant to death. If the jury returns a negative finding on Special Issue Number 1 or an affirmative finding to Special Issue Number 2, the Court shall sentence the Defendant to confinement in the Institutional Division of the Texas Department of Criminal Justice for life.

**VI.**

In a criminal case the law permits a defendant to testify in his own behalf but he is not compelled to do so, and the same law provides that the fact that a defendant does not testify shall not be considered as a circumstance against him. You will, therefore, not consider the fact that the defendant did not testify as a circumstance against him; and you will not, in your retirement to consider your verdict, allude to, comment on, consider, or in any manner refer to the fact that the defendant has not testified.

**VII.**

Under the law applicable in this case, if the defendant is sentenced to imprisonment in the

3



**402**

institutional division of the Texas Department of Criminal Justice for life, the defendant will become eligible for release on parole, but not until the actual time served by the defendant equals 40 years, without consideration of any good conduct time. It cannot accurately be predicted how the parole laws might be applied to this defendant if the defendant is sentenced to a term of imprisonment for life because the application of those laws will depend on decisions made by prison and parole authorities, but eligibility for parole does not guarantee that parole will be granted.

You are the exclusive judges of the facts proven, of the credibility of the witnesses, and of the weight to be given their testimony, but you are bound to receive the law from the Court which is herein given you, and be governed thereby.

In deliberating on this case, you shall consider the charge as a whole and you must not refer to or discuss any matters not in evidence before you.

You must not consider nor mention any personal knowledge or information you may have about any facts or person connected with this case which is not shown by the evidence. You shall not consult law books or anything not in evidence.

Any further communication must be in writing signed by your foreperson through the bailiff to the Court, except as to your personal needs which may be communicated orally to the bailiff in charge. Do not attempt to talk to the bailiff, the attorneys or the Court regarding any questions you may have concerning the trial of the case.

After argument of counsel, you will retire and consider your answer to the special issues submitted to you. It is the duty of your foreperson to preside in the jury room and vote with you on the answers to the special issues submitted. When you have reached a verdict, you shall use the

4

**403**

blanks provided following each special issue to indicate your answers to the special issues, and your foreperson should sign the attached form certifying to your verdict.

ROBERT K. GILL, JUDGE

5

**404**

## CERTIFICATE

We, the jury, having answered the foregoing issues, return the same into Court as our verdict.

FOREPERSON OF THE JURY

6

**405**

# EXHIBIT 7

THE STATE OF TEXAS                    IN THE 213TH DISTRICT

VS. NO. 1004856R                      COURT OF

STEPHEN DALE BARBEE                   TARRANT COUNTY, TEXAS


### CAPITAL JUDGMENT


On January 5, 2006, this cause was called for trial and the State appeared by her Criminal

District Attorney, Assistants Kevin Rousseau and Dixie Bersano, and the attorneys for the Defendant,

STEPHEN DALE BARBEE, Honorables William H. Ray and Tim Moore, and announced ready for

trial; and the State having made known that it would seek the Death Penalty in this case and the

Defendant having been heretofore arraigned; and it appearing to the Court that the Defendant was

mentally competent and the Defendant having been charged in the indictment with Capital Murder;

thereupon, a Jury of good and lawful men and women, to-wit: Foreperson, and eleven others, having

been duly selected, impaneled, and sworn, as the law directs, and the said Criminal District Attorney

read to the Jury, Count One of the indictment herein, and the Defendant entered his plea of Not Guilty to

Count One of the indictment hereto; and the Jury, after hearing the evidence, and being duly charged by

the Court, retired to consider its verdict, and after deliberation, returned in open court on the 23rd day of

February, 2006, the following verdict, to-wit:


### VERDICT FORM

We, the Jury, find the defendant, STEPHEN DALE BARBEE, guilty of the offense of
Capital Murder as alleged in the indictment.

Signed: Foreperson


And the Jury, having all the evidence, and being duly charged by the Court, retired to consider its

verdict, and after due deliberation, returned into open Court, on the 27th day of February, 2006, their

answers to the following Special Issues, and their verdict:

**408**

## SPECIAL ISSUE NO. 1

Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

      ANSWER: **YES**  ("Yes" or "No")

## SPECIAL ISSUE NO. 2

Whether, taking into consideration all of the evidence, including the circumstance of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

      ANSWER: **NO** ("Yes" or "No")

We, the jury, having unanimously agreed upon the answer to the foregoing Special Issues, do hereby return the same into court as our verdict.

Signed: Foreperson

And the Court, having duly polled the Jurors individually at the request of the Defendant, and all Jurors having affirmed their individual verdicts, the Court duly accepted the verdicts and ORDERED the same to be filed.

Upon receipt of the Jury Verdict, the Court then proceeded to sentence the Defendant, STEPHEN DALE BARBEE, as follows, to-wit:

The Defendant, STEPHEN DALE BARBEE, was asked by the Court, whether he had anything to say why sentence should not be pronounced against him, and the Defendant answered nothing in bar thereof;

The Court proceeded, in the presence of the said Defendant, STEPHEN DALE BARBEE and his counsel of record, to pronounce sentence against him as follows:

It is the ORDER of the Court, that you, STEPHEN DALE BARBEE, having been adjudged by the Jury to be guilty of the offense of Capital Murder, and the Jury having answered Special Issue No. 1 "YES" and Special Issue No. 2 "NO", and it being mandatory that your punishment be death, it is therefore the ORDER of this Court that your punishment shall be DEATH, and that on a date to be determined by this Court upon Mandate of Affirmance issued by the Texas Court of Criminal Appeals at

**409**

the State Penitentiary at Huntsville, you shall be caused to die by intravenous injection of a substance or

substances in a lethal quantity sufficient to cause your death and until you, the said STEPHEN DALE

BARBEE , are dead; said execution procedure to be determined and supervised by the Director of the

Institutional Division of the Texas Department of Criminal Justice, and the Clerk of the Court is

ORDERED  to issued a Death Warrant in accordance with this sentence, directed to the Director of the

Institutional Division of the Texas Department of Criminal Justice.


2/27/06
DATE SIGNED

HON. ROBERT K. GILL, PRESIDING JUDGE
213TH DISTRICT COURT OF
TARRANT COUNTY, TEXAS


**410**

CASE NO. 1004856R

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 213TH DISTRICT |
| VS. | § | COURT OF |
| STEPHEN DALE BARBEE<br>SID 07472164<br>TRN 0101211309 TRS D001 | § | TARRANT COUNTY, TEXAS |

**JUDGMENT ON JURY VERDICT OF GUILTY**
**PUNISHMENT FIXED BY COURT OR JURY - NO PROBATION GRANTED**

| | | | | |
|---|---|---|---|---|
| Judge Presiding | : HON. ROBERT K. GILL | Date of Judgment | : | FEBRUARY 27, 2006 |
| Attorney for State<br>District Attorney | : TIM CURRY | Assistant District<br>Attorney | : | KEVIN ROUSSEAU<br>DIXIE BERSANO |
| Attorney for Defendant | : WILLIAM H RAY<br>TIM MOORE | Charging Instrument: | | INDICTMENT |

| Offense Date | Convicted Offense |
|---|---|
| FEBRUARY 19, 2005 | CAPITAL MURDER |

| Degree | Count | Plea |
|---|---|---|
| CAPITAL | ONE | NOT GUILTY |

| | |
|---|---|
| Findings on<br>Deadly Weapon | : NONE |
| Plea to Enhancement<br>Paragraph(s) | : NONE |
| Plea to Habitual<br>Paragraph(s) | : NONE |
| Findings on Enhancement/<br>Habitual Paragraph(s) | : NONE |
| Jury Verdict | : GUILTY |
| Punishment Assessed By | : JURY |
| Date Sentence Imposed | : FEBRUARY 27, 2006      Date to Commence : FEBRUARY 27, 2006 |
| Punishment<br>Place of Confinement | : COUNT ONE - DEATH<br>: INSTITUTIONAL DIVISION OF THE TEXAS DEPARTMENT OF CRIMINAL JUSTICE |

| | | | |
|---|---|---|---|
| Time Credited | : 371 DAYS | Court Costs | : $273.00 |
| Reparation | : NONE | Restitution | : NONE |

On this day, set forth above, this cause came for trial, and the State appeared by the above-named attorney, and the Defendant appeared in person in open court, the above-named counsel for Defendant also being present, or, where a Defendant is not represented by counsel, that the Defendant knowingly, intelligently, and voluntarily waived the right to representation by counsel; and the said Defendant having been duly arraigned and it appearing to the Court that Defendant was mentally competent, and having pleaded as shown above to the indictment herein, both parties announced ready for trial and thereupon a jury, to-wit, the above named foreman and eleven others, was duly selected, impaneled and sworn, who having heard the indictment read and the Defendant's plea thereto, and having heard the evidence submitted, and having been duly charged by the Court, retired in charge of the proper officer to consider the verdict, and afterward were brought into Court by the proper officer, the Defendant and Defendant's counsel being present, and returned into open court the verdict set forth above, which was received by the Court, and is here now entered upon the minutes of the Court as shown above.

Thereupon, the Defendant elected to have punishment assessed by the above shown assessor of punishment, and when shown above that the indictment contains enhancement paragraph(s), which were not waived, and alleges Defendant to have been convicted previously of any felony or offenses for the purpose of enhancement of punishment, then the Court asked Defendant if such allegations were true or false and Defendant answered as shown above. And when Defendant is shown above to have elected to have the jury assess punishment, such jury was called back into the box and heard evidence relative to the question of punishment and having been duly charged by the Court, they retired to consider such question, and after having deliberated, they returned into

VOLUME  PAGE A OF CASE NO. 1004856R               TRANS NO. 3

**411**

Court the verdict shown under punishment above; and when Defendant is shown above to have elected to have punishment fixed by the Court, in due form of law further evidence was heard by the Court relative to the question of punishment and the Court fixed the punishment of the Defendant as shown above.

    IT IS THEREFORE CONSIDERED AND ORDERED by the Court, in the presence of the Defendant, that the said judgment be, and the same is hereby in all things approved and confirmed, and that the Defendant is adjudged guilty of the offense set forth above as found by the verdict of the jury, as set forth above, and said Defendant be punished in accordance with the Jury Verdict or the Court's Finding, as shown above and that the Defendant is sentenced to a term of imprisonment or fine or both, as set forth above, and that said Defendant be delivered by the Sheriff to the Director of the Institutional Division of the Texas Department of Criminal Justice, or other person legally authorized to receive such convicts for the punishment assessed herein, and the said Defendant shall be confined for the above named term in accordance with the provisions of law governing such punishments and execution may issue as necessary.

    And, if shown above that the Defendant has been duly and legally convicted of a prior offense by showing the court, cause number, and offense, together with the punishment for such offense and date Defendant was sentenced for such offense in accordance with such conviction, then it is further ORDERED AND ADJUDGED that the punishment herein adjudged against said Defendant shall begin when the judgment in such prior offense, when shown above, shall have ceased to operate.

    And the said Defendant is remanded to jail until said Sheriff can obey the direction of this judgment.

_____
PRESIDING JUDGE

Date Signed   :  FEBRUARY 27, 2006

Notice of Appeal   :  _____

Mandate Received   :  _____

VOLUME PAGE B OF CASE NO. 1004856R

**412**

## VERDICT FORMS

We the Jury find the Defendant guilty of the offense of capital murder as charged in the indictment.

_David M. Witt_
Foreperson

-OR-

We the Jury find the Defendant guilty of the lesser included offense of murder.

_____
Foreperson

-OR-

We the Jury find the Defendant guilty of the lesser included offense of manslaughter.

_____
Foreperson

-OR-

We the Jury find the Defendant not guilty.

_____
Foreperson

6

**395**

# EXHIBIT 8



# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### No. AP-75,359

### STEPHEN DALE BARBEE, Appellant

### v.

### THE STATE OF TEXAS

### ON DIRECT APPEAL
### FROM CAUSE NO. 1004856R IN THE 213ᵀᴴ DISTRICT COURT
### TARRANT COUNTY

**HOLCOMB, J., delivered the opinion of the unanimous Court.**

In February 2006, appellant was convicted of capital murder. TEX. PEN. CODE §
19.03(a). Based on the jury's answers to the special issues set forth in Texas Code of
Criminal Procedure Article 37.071, sections 2(b) and 2(e), the trial judge sentenced appellant
to death. Art. 37.071, § 2(g).[1]  Direct appeal to this Court is automatic. Art. 37.071, § 2(h).

---

[1] Unless otherwise indicated, all references to Articles and Sections refer to the Texas
Code of Criminal Procedure and the Texas Penal Code, respectively.

BARBEE--2

After reviewing appellant's nine points of error, we find them to be without merit. Consequently, we affirm the trial court's judgment.

## STATEMENT OF FACTS

Appellant was charged with murdering Lisa Underwood and her seven-year-old son, Jayden Underwood, during the same criminal transaction.   TEX. PEN. CODE § 19.03(a)(7)(A).  Lisa owned a bagel shop in Fort Worth with her friend Holly Pils.  Pils testified that appellant, who was married, had been a customer at the bagel shop and that he and Lisa began a personal relationship in Fall 2003.  They stopped seeing each other at the end of 2003, and Lisa began dating another man at the beginning of 2004.  She was still dating the other man when she resumed her relationship with appellant in July 2004, and she became pregnant around that time.  She informed both men that she was pregnant but told appellant that she believed he was the father of the unborn child.  She told Pils that she wanted her baby to have health insurance and that she had discussed the matter with appellant.

Pils testified that Lisa, who was more than seven months pregnant, stayed home from work on Friday, February 18, 2005, because she had a cold.  Pils planned to host a baby shower for Lisa at the bagel shop the next day.  Lisa told Pils that she was feeling better, that she was excited about the baby shower, and that she planned to arrive at the bagel shop shortly before 4:00 p.m. on Saturday, February 19th.

At approximately 3:00 on Saturday morning, Denton County Deputy Sheriff David

BARBEE--3

Brawner saw a man walking along the service road of Interstate Highway 35.   Brawner stopped his patrol car behind the man and activated his overhead emergency lights and his "in-car video camera system."   It was cold outside, and it had been raining.   Brawner testified that the man's clothes were "very wet" and that he was "covered in mud."   When Brawner asked the man for identification, he said that he had left his wallet at his friend's residence nearby.   He gave the officer a false name and date of birth and "took off running on foot" when Brawner spoke with dispatch in an effort to verify the information.   Brawner ran after the man, but he disappeared into a thickly wooded area.   Brawner and other officers searched the area for hours but were unable to locate the man.   Brawner later identified the man as appellant in a photo spread.[2]

The police were contacted after Lisa failed to show up for her baby shower later that day.   There were no signs of forced entry at Lisa's house.   Jayden's shoes were on top of the fireplace hearth, and his glasses had been left next to his bed.   There was blood in the living room on the entertainment center, the walls, and a fitted couch cover.   It appeared that someone had attempted to clean and conceal a saturation blood stain on the living room floor. Lisa's car was gone, and there was blood on the floor in the garage.   Lisa's DNA profile was consistent with the blood stains in the house and the garage.   Her personal home computer

---

[2] Brawner testified that he was "100 percent positive" or "110 percent positive" when he identified appellant in the photo spread.   However, Detective Michel Carroll of the Fort Worth Police Department had a different opinion regarding Brawner's level of certainty.   Carroll testified that Brawner's identification of appellant "wasn't good enough" for an arrest and conviction, but it was good enough to cause Carroll to be more suspicious of appellant.

BARBEE--4

showed that she logged on to the internet at 11:22 p.m. on February 18 and logged off at 12:02 a.m. on February 19. The last website she visited was "birthplan.com."

On February 21, Lisa's Dodge Durango was found in a creek approximately 300 yards from where Officer Brawner had encountered appellant two days earlier. The front end of the vehicle was submerged in the creek. The windows were down and the hatchback was up. There was a bottle of cleaning solution in the cargo area of the vehicle. Lisa's car keys and purse were located nearby.

On the same day that Lisa's car was found, Detectives Michel Carroll, John McCaskell, and Brian Jamison of the Fort Worth Police Department traveled to Tyler to speak with appellant, his wife Trish Barbee, and his co-worker Ron Dodd. The detectives initially talked to them in the parking lot of a Wal-Mart, but later asked them to come to the Tyler Police Department for further questioning. At the police department, Carroll and Jamison interviewed appellant in one room, and McCaskell interviewed Dodd in another room. Appellant received his *Miranda* warnings and his interview began at about 7:45 p.m.[3] In this interview, which was recorded on a digital video disc (DVD), appellant said that he worked cutting down trees in Tyler during the day on February 19. He said that he drove to his home in Fort Worth that evening and that he went over to Dodd's house later that night to work on the truck that they used as their business vehicle. He left Dodd's house at around 2:00 or 3:00 a.m. It took over an hour for him to drive home because the truck was

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

"sputtering" and "leaking oil." His wife was asleep when he arrived home, and he slept on the couch so he would not wake her. He acknowledged that he had dated Lisa and that she had informed him he might be the father of her unborn child, but he claimed that he had not seen or heard from her in a while. He eventually acknowledged that he had been stopped by a police officer in Denton County at around 3:00 a.m., that he had given the officer a false name and date of birth, and that he had run away from the officer.

Carroll testified that he excused himself to observe McCaskell's interview with Dodd, then he returned to appellant's interview room and asked, "Does FM 407 sound familiar to you?" He placed photographs of Lisa and Jayden on the table and walked out of the room, leaving appellant alone. Appellant later opened the door and asked to use the men's room. Carroll accompanied him to the bathroom where they had an un-recorded conversation for about forty-five minutes to one hour. Carroll testified that he told appellant that Dodd was "going to lay this whole thing in [appellant's] lap" and that "Lisa's family needed closure." Appellant made comments "about being locked up [for] the rest of his life" and said that he understood the need for closure because he had lost a family member. Appellant told Carroll that "he and Dodd actually created a plan to go kill Lisa" because "Lisa wanted to use his name on a birth certificate or she was trying to take money from him, she was going to ruin his family, his relationship with his wife, Trish, and he did not want that to happen." Appellant said that he dropped his car off at Dodd's house and then Dodd drove him to Lisa's house. Dodd left, and appellant went inside and tried to "pick a fight" with her. He

was unable to provoke a fight, so he called Dodd to pick him up.  He later had Dodd take him back to Lisa's house.  This time, "he was able to get her upset enough that he could start a fight with her."  He wrestled her to the ground and "held her face into the carpet until she stopped breathing."   Jayden came into the room and was "crying" and "emotional." Appellant said he walked up to Jayden, placed his hand over his mouth and nose, and "held it there until he stopped breathing."  Afterwards, appellant "tried to clean up the house" and "tried to cover a blood spot with a piece of furniture."  He placed the bodies of Lisa and Jayden into Lisa's car and drove to "a road off of FM 407 where they buried both their bodies."  He said that he used a shovel Dodd had given to him and that he buried the bodies in a shallow grave and placed debris on top of it.  He then drove Lisa's car to another location and "stopped it just short of the creek."  After relating this story, appellant agreed to have another digitally recorded video interview with Carroll.

Carroll testified that he and appellant left the bathroom and went to Detective Richard Cashell's desk where appellant assisted them in mapping out the location where he had buried the victims.  They used "MapQuest" to "get a map of that area" and appellant showed them "the roads that he traveled" and where he "put the victims' bodies."  Carroll and appellant then went back to the interview room where appellant gave his second digitally recorded video statement shortly after 11:00 p.m.

After Carroll interviewed appellant, he left the interview room and spoke with appellant's wife, Trish Barbee.  Carroll told Trish that appellant had confessed to killing Lisa

and that he wanted to talk to her. Trish wanted to speak with appellant, so Carroll brought her to the interview room. Carroll remained outside, and the digital video recorder continued running as appellant and Trish conversed. Trish asked appellant what happened. Appellant explained that Lisa called him and threatened him, so he went to her house and tried to talk to her. He said that Lisa said she would "ruin" him and that she fought with him and kicked him. He explained that he "held her down too long" and that he "didn't mean for her to stop breathing."

Carroll testified that appellant spent that night in the Smith County Jail. The next morning, he rode with Carroll and Officer Mark Thornhill and directed them to the location of the bodies. Carroll testified that appellant stated, "[W]hen I take you to the bodies, I don't want to see the bodies, and I don't want the media to see me." When they got closer to the location, appellant told the officers to take a different exit and "took [them] a back route to the same location." When they arrived, appellant sat in the car and directed them to the grave by yelling out the window. Carroll testified that Dodd had already taken police to "the same area," but that the bodies were not located until appellant arrived. The bodies were located in a shallow grave that had tree limbs placed on top of it.

The medical examiner who performed Lisa's autopsy testified that Lisa suffered facial abrasions and contusions and a broken arm. She had bruises on both sides of her back that could have been caused by being hit or by having "external force applied over a longer period of time." Her injuries were consistent with a person holding her down and stopping her from

BARBEE--8

breathing. The cause of her death was "traumatic asphyxiation," and the manner of her death was homicide. Lisa was pregnant with a healthy female fetus that appeared to be around seven months gestational age. The cause of the fetus' death was "fetal asphyxiation" resulting from "maternal asphyxiation."

The medical examiner who performed Jayden's autopsy testified that Jayden had a large bruise above his right temple that was "due to some sort of impact to the head." He had bruises on his back and abrasions on his back, arm, hip, and leg. He had bruises on his lips and gums that appeared to be "caused by some sort of compression, some object put over the area of the mouth and pressing on the mouth and compressing the lips against the underlying teeth." The medical examiner testified that Jayden's injuries were consistent with: someone placing a hand over Jayden's mouth and nose; someone pressing Jayden's face against a flat surface; or, someone pressing Jayden's face against a surface that "gives if you push against it," like a couch or a carpeted floor. He determined that the cause of Jayden's death was "asphyxia by smothering" and the manner of his death was homicide.

At punishment, the State presented the testimony of appellant's ex-wife, Theresa Sue Barbee. Theresa testified that she was married to appellant from 1996 to 2003 and that he physically assaulted her during the course of their relationship. During one of their fights, she suffered a "bad concussion." Appellant sat in another room eating ice cream while she was bleeding and unconscious, and he made her drive herself to the hospital when she awoke. Theresa also testified that appellant told her and others that he was going to put her

BARBEE--9

"through a [wood] chipper."

Theresa further testified that she was dating Dodd at the time of the instant offense. She testified that appellant and Dodd had been at her house on the night of Friday, February 18, 2005. Dodd and appellant left in Dodd's truck sometime after 10:00 p.m., and Dodd returned alone shortly thereafter. As soon as Dodd returned, appellant called him. Dodd left again and returned with appellant about fifteen minutes later. At around 3:00 a.m., appellant called Dodd and Theresa heard appellant say "come and help him" and that "[h]e ran out of gas." Dodd left and Theresa went to sleep. When she next saw appellant on Sunday morning, he cried and said that "his life was over with." Theresa mentioned the missing woman and asked, "What have you done?" Appellant said, "Help me," and that he "was guilty until proven innocent." Appellant later called Theresa and said that he had confessed to police. He was crying and said that "he didn't mean to" and that he "went over there to talk to her . . . and do the right thing . . . [and] they got into a fight . . . she hit him, and they just got into it." Theresa asked, "What about the boy?" Appellant replied that "he didn't mean to" and "he was just trying to keep him quiet." Theresa asked him if Dodd was involved, and he said "Ron's mistake was picking him up." Appellant later kept changing his story and saying that he did not do it. When Theresa later visited appellant in jail, he held up a piece of paper asking her to say that Dodd did it and set him up. She started crying and left. Appellant had her removed from his visitors list following that encounter.

BARBEE--10

The State also presented the punishment testimony of Marie Mendoza, who briefly worked with appellant at the United Parcel Service in 2000 or 2001. Mendoza testified that appellant called her often and claimed that he was not married. When he told her that he had a tree-trimming business, Mendoza asked him to come to her house and give her an estimate. She came home one day and found that he already trimmed her trees without giving her an estimate first. She spoke to him on the telephone a few days later, telling him that she was not interested in a relationship and offering to pay him for his work. Appellant responded with a "big outburst" and yelled and cursed at Mendoza. He called her a "fucking bitch" and said, "I go out there and trim your trees and this is what I get in return?" Following that incident, Marie had no further contact with appellant and never saw him at work again.

## SUFFICIENCY OF THE EVIDENCE

In point of error one, appellant argues that the evidence is legally insufficient because the State failed to prove that the grand jury exercised due diligence in determining the manner and means used to cause Jayden's death. The indictment alleged, in pertinent part:

> . . . and during the same criminal transaction, the defendant intentionally or knowingly caused the death of another individual, Jayden Underwood, by smothering him with his hand or by a means unknown to the grand jury or by a combination of the two[.]

Appellant asserts that the evidence at trial "conclusively established the manner and means used to facilitate Jayden Underwood's death," relying specifically on the following testimony by Detective Carroll:

> [PROSECUTOR]: Did [appellant] say anything about Jayden?

BARBEE--11

> [CARROLL]:  He did.  He said that while he was in the process of killing Lisa, Jayden came to the front room, the room where he was fighting with Lisa, and Jayden was crying, [was] emotional.  He looked up and saw Jayden standing there and he paused.
>
> So I asked him, "How did you kill Jayden?"  He said, "I walked up to him and I placed my hand over his mouth and nose and held it there until he stopped breathing."

Citing *Hicks v. State,* 860 S.W.2d 419 (Tex. Crim. App. 1993), appellant argues that because Detective Carroll's testimony conclusively established the manner and means used to cause Jayden's death, the State was required to prove that the grand jury used due diligence in attempting to ascertain the manner and means.[4]  The State called the grand-jury secretary to testify at trial, but appellant asserts that his testimony was insufficient to show that the grand jury exercised due diligence in attempting to ascertain the manner and means used to cause Jayden's death.

As we stated in *Rosales v. State,* 4 S.W.3d 228, 231 (Tex. Crim. App. 1999), "the rule in cases like *Hicks* is no longer viable in light of our decision in *Malik*."  *See Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)(holding that sufficiency of the evidence should be measured by the elements of the offense as defined by the hypothetically correct jury charge for the case).  Further, like the jury in *Rosales,* the jury in appellant's case was charged in the disjunctive.  4 S.W.3d at 231.  The evidence presented at appellant's trial

---

[4]  The State disagrees that Carroll's testimony conclusively established the manner and means of Jayden's death, pointing out that the medical examiner testified that Jayden's injuries were consistent with three possible scenarios:  someone placing a hand over Jayden's mouth and nose; someone pressing Jayden's face against a flat surface; or, someone pressing Jayden's face against a surface that "gives if you push against it," like a couch or a carpeted floor.

supported the theory that appellant caused Jayden's death by smothering him with his hand. *See id., citing Kitchens v. State,* 823 S.W.2d 256, 258-59 (Tex. Crim. App. 1991)(holding that when a jury returns a general guilty verdict on an indictment charging alternative theories of committing the same offense, the verdict stands if evidence supports any of the theories alleged). The evidence, viewed in the light most favorable to the verdict, was sufficient to enable any rational trier of fact to find the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 319 (1979). Point of error one is overruled.

In point of error two, appellant claims that the evidence is factually insufficient to support his capital murder conviction. Evidence that is legally sufficient may be factually insufficient if it is so weak that the jury's verdict seems clearly wrong and manifestly unjust, or whether, considering conflicting evidence, the jury's verdict, though legally sufficient, is nevertheless against the great weight and preponderance of the evidence. *Watson v. State,* 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006). A factual-sufficiency review requires the reviewing court to consider all of the evidence. *Marshall v. State,* 210 S.W.3d 618, 625 (Tex. Crim. App. 2006), *cert. denied,* 128 S. Ct. 87 (2007). A clearly wrong and unjust verdict occurs where the jury's finding is manifestly unjust, shocks the conscience, or clearly demonstrates bias. *Sells v. State,* 121 S.W.3d 748, 754 (Tex. Crim. App. 2003).

Appellant claims that the evidence is factually insufficient because the State's case was circumstantial and did not include eyewitnesses or forensic evidence connecting

BARBEE--13

appellant to the crime.  However, we have held that circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt.  *Clayton v. State,* 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *Guevara v. State,* 152 S.W.3d 45, 49 (Tex. Crim. App. 2004).

Appellant admitted to police that he killed Lisa and Jayden, that he attempted to clean up the crime scene, and that he disposed of their bodies and Lisa's car afterwards.  The physical evidence corroborated his confession.  When appellant was stopped by a police officer at 3:00 a.m. in close proximity to the area where Lisa's car was later found, his clothes were covered in mud and he gave the officer a false name and birth date before running away from him.  Lisa's friend Holly Pils confirmed that Lisa had been in a relationship with appellant and that she believed that he was the father of her unborn child. Appellant told police that he did not want his wife to find out about Lisa's pregnancy, and he confirmed this during a recorded conversation with his wife.  He accurately described the location where the bodies were buried, and he led police to the burial site.  This evidence was not so weak that the jury's verdict seems clearly wrong and manifestly unjust. *Watson,* 204 S.W.3d at 414-15.  Even considering conflicting evidence, the jury's verdict was not against the great weight and preponderance of the evidence.  *Id.*  Point of error two is overruled.

In point of error eight, appellant contends that the evidence was legally insufficient to support the jury's affirmative answer to the future-dangerousness special issue.  We view the evidence in the light most favorable to the jury's finding and determine whether any

rational trier of fact could have found beyond a reasonable doubt that there is a probability that appellant would commit criminal acts of violence that would constitute a continuing threat to society. *Jackson v. Virginia,* 443 U.S. 307 (1979).

Appellant committed the murders of a pregnant woman and her seven-year-old son. *See Hayes v. State,* 85 S.W.3d 809, 814 (Tex. Crim. App. 2002)(stating that the circumstances of the offense alone may be sufficient to support an affirmative answer to the future dangerousness special issue). He admitted planning Lisa's murder in order to avoid being named as the father of the unborn child. He attempted to conceal his crime and successfully evaded a police officer shortly after disposing of the bodies. The State presented further evidence at punishment that appellant verbally attacked a former co-worker and physically assaulted his ex-wife and threatened to put her "through a [wood] chipper." Both the facts of the instant offense and the other evidence showing appellant's escalating pattern of violence are legally sufficient to support a finding of future dangerousness. Point of error eight is overruled.

## VOIR DIRE

In point of error three, appellant contends that the trial court erroneously denied his challenge for cause to veniremember Denise Anderson. Appellant asserts that the trial court should have granted his challenge for cause to Anderson because she had formed an opinion about appellant's guilt based on media reports prior to trial. A veniremember is challengeable for cause if she has formed in her mind "such a conclusion as to the guilt or

BARBEE--15

innocence of the defendant as would influence [her] in finding a verdict." *See* Art. 35.16(a)(10).

We review a trial court's ruling on a challenge for cause with considerable deference because the trial court is in the best position to evaluate a veniremember's demeanor and responses. *Colburn v. State,* 966 S.W.2d 511, 517 (Tex. Crim. App. 1998). We will reverse a trial court's ruling on a challenge for cause only if a clear abuse of discretion is evident. *Id.* When a veniremember's answers are vacillating, unclear, or contradictory, we accord particular deference to the trial court's decision. *Id.* A veniremember is not challengeable for cause merely because she has heard news reports about the crime or the suspect. *Ladd v. State,* 3 S.W.3d 547, 561 (Tex. Crim. App. 1999), *citing Macias v. State,* 733 S.W.2d 192, 193 (Tex. Crim. App. 1987).

When initially questioned by the prosecutor, Anderson stated that she had seen news reports about the case on the television "at least a year" ago. The prosecutor questioned her further about this issue:

Q.   So what I want to know is have you already decided or do you have an opinion that [appellant] is guilty right now?

A.   Truthfully, the way things have been played out it seems like that's a great possibility.

Q.   Uh-huh.

A.   But I don't necessarily feel like I would -- I don't feel like I know everything.

Q.   Okay. Do you feel like you actually know anything?

BARBEE--16

A.   No, I don't feel like I know anything.

Q.   You have heard police -- you have heard -- tell me what you have heard.

A.   I just remember about a girl that was pregnant had gone missing.  And then it seemed like they found her three days later and her boyfriend and his friend were involved and -- or the friend was involved in discovering where she was thrown.  That's all I remember.

Q.   Do you remember anything about the victim?

A.   I remember that she was excited about going to her baby shower. Because during the time that she was missing they kind of questioned if she was depressed and if she would have left, seemed like the report did.  And her friend or coworker or something said no, in fact, she was excited about having this baby and going to a baby shower.

Q.   So that's what sticks in your mind?

A.   That's what sticks in my mind.

Q.   Do you remember anything -- you said the friend or the boyfriend.  Do you remember anything specifically about the friend or the boyfriend?

A.   No.  I remember that it seemed like the friend didn't have any idea what was going on or something.  But that he had been asked to borrow his truck or something the actual night or day she was missing or time. And the only other thing that stands out it seems like I remember hearing something about a T-shirt.

Q.   Do you remember what you heard about a T-shirt?

A.   I can't remember -- I can't remember if they found a T-shirt -- or I don't remember.  I just remember a T-shirt.

                    *             *             *

Q.   But obviously if you come into this -- if you already have an opinion as to this man's guilt, we need to know about it now.

BARBEE--17

A.   I don't have an opinion because, again, I don't feel like I know all the facts. I was very sympathetic towards the girl being pregnant and excited about a baby, and I think that's why it stood out to me.

Q.   And all those feelings were based on news reports?

A.   Yes.

Q.   Okay. Have you ever known news reports to be wrong?

A.   Of course.

                    *              *              *

Q.   Could you set aside anything you might have heard in the news media and just come in here and base your opinion in this case strictly on what's presented in the courtroom?

A.   Yes, I could.

                    *              *              *

Q.   Can you just base -- wait until you get in here before you actually know something?

A.   Yes.

Q.   Okay. We don't ask you to -- to, you know, blank your mind.

A.   Uh-huh.

Q.   But we do ask you to not consider anything else you might have heard. We live in a media age. People hear things.

A.   Right.

Q.   Unless they live under a rock.

A.   Right.

BARBEE--18

Q.    But, you know, that can have an effect on a trial and we don't want that
to happen.

A.    Right.

Q.    Can you -- do you think you could block that out and just -- and just get
your evidence and . . . any opinions you form, form them based on the
evidence in the courtroom?

A.    Yes, I could.

On voir dire examination by defense counsel, Anderson stated that she had watched

television news coverage "probably about two or three times during the course of [the victim]

being missing." She heard on the news reports that the missing woman was not married, that

she had been excited about attending her baby shower, that her boyfriend had borrowed a

truck from a friend about the time that she went missing, and that the friend seemed to have

no idea what was going on "but somehow he knew where she was dumped." At that time,

based on the news reports, Anderson felt that the boyfriend was involved because "most

crimes are done by people that know you." Defense counsel continued to question her as

follows:

Q.    Well, how are [you] going to be able -- and I don't know if you can
-- to distinguish a fact that you hear at this trial versus one of these
facts that you heard on the news if they're very similar to each other but
maybe not exactly the same?  You understand what I am saying?

A.    Yes, I do.  I think probably -- I mean, you know, if you think I am the
right juror for them, but I think I would be able to do it because I don't
trust all the news reports and the way they -- you know, their take on
things.  And I wasn't -- I wasn't real interested after she was found.

Q.    Well, but you were interested enough to watch it enough to form an

BARBEE--19

opinion that [appellant] is involved?

A.     Yes.

Q.     Okay.

A.     Well, because that was the end of it, you know.  That was the end of
       when she was found.

                    *                *                *

Q.     I know you want to be able to feel what you saw then and the opinions
       you reached then are not going to figure in to the opinions that you
       reach based on what you hear in the courtroom.

A.     Right.

Q.     Okay.  But, quite frankly, you have heard a lot of things and came to a
       pretty strong conclusion.

A.     Right.

                    *                *                *

Q.     And so the question then becomes . . . what guarantee do I have that
       you are really not going to be considering that?  It's one thing for you
       to say, well, I am going to do it.  I don't question your will.  What I
       question is your subconscience --

                    *                *                *

A.     I see.  And that's -- I mean, I don't really know how to tell you that I
       think I could do it other than I am a person who follows rules and tries
       really hard . . . But I can't tell you that I'm going to be able to put it
       through my mind other than the fact that I don't feel like at the time I
       knew all the facts.  I just remember feeling very strongly concerned for
       this girl because she was pregnant.  And I don't know if that's because,
       you know, I am a mom or whatever.  And then once she was found . .
       . I was just glad that there was an end to it.

BARBEE--20

Defense counsel later asked Anderson if she could answer the mitigation question "in such a way as to give a life sentence, given the fact that you have already had some opinions about this?" Anderson replied, "I think that I could say yes to a life sentence, because, again, I don't feel that I really know all the details and facts of the case."

Defense counsel challenged Anderson for cause and the trial court ruled as follows:

The Court, when she began to go into all this, I took - - I observed her completely and totally the whole time. I have listened to what she had to say. I vacillated as she vacillated. And I feel like frankly that based upon what I have observed that I am going to overrule the challenge and she will be juror number 42. And it's based strictly on what I saw today and what I observed her to do.

We defer to the trial court's ruling. Anderson acknowledged that she had learned some things about the case and had developed an opinion about the boyfriend's guilt when she watched television news coverage for a few days about a year prior to trial. However, she maintained that she did not know all of the facts and that she had known news reports to be wrong. She stated that she could set her knowledge and opinions aside and base her verdict solely on the evidence presented at trial and that she could even vote for a life sentence if the punishment evidence warranted it. The totality of her voir dire testimony indicates that any conclusion she had formed about appellant's guilt would not influence her verdict. The trial court did not clearly abuse its discretion in denying the challenge for cause. Point of error three is overruled.

## ADMISSIBILITY OF ORAL STATEMENTS

BARBEE--21

In points of error four, five, and six, appellant asserts that the trial court abused its discretion in denying his motion to suppress "three separate inculpatory statements": (1) appellant's oral statement to Detective Carroll in the bathroom of the Tyler Police Department, in which he admitted killing Lisa and Jayden; (2) appellant's oral statement to Detective Carroll at Detective Cashell's desk, in which he described where the victims' bodies were buried and helped to produce a map of that location; and (3) appellant's oral statement to Detective Carroll on the way to the burial site the next morning, in which he pointed out the specific location of the bodies and expressed concerns about viewing the bodies and being seen by the media. Appellant specifically asserts that these statements were inadmissible under Article 38.22, Section 3(a), which provides:

> No oral or sign language statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless:
>
> (1) an electronic recording, which may include motion picture, video tape, or other visual recording, is made of the statement;
>
> (2) prior to the statement but during the recording the accused is given the warning in Subsection (a) of Section 2 above and the accused knowingly, intelligently, and voluntarily waives any rights set out in the warning;
>
> (3) the recording device was capable of making an accurate recording, the operator was competent, and the recording is accurate and has not been altered;
>
> (4) all voices on the recording are identified; and
>
> (5) not later than the 20th day before the date of the proceeding, the attorney representing the defendant is provided with a true, complete,

and accurate copy of all recordings of the defendant made under this
article.

Oral confessions are generally inadmissible unless there is compliance with all
portions of Section 3(a).  Art. 38.22, § 3(e); *Woods v. State,* 152 S.W.3d 105, 116 (Tex.
Crim. App. 2004); *Moore v. State,* 999 S.W.2d 385, 400 (Tex. Crim. App. 1999).  However,
an exception set out in Section 3(c) provides:

> Subsection (a) of this section shall not apply to any statement which contains
> assertions of facts or circumstances that are found to be true and which
> conduce to establish the guilt of the accused, such as the finding of secreted or
> stolen property or the instrument with which he states the offense was
> committed.

Art. 38.22, § 3(c).  Under this exception, oral statements asserting facts or circumstances
establishing the guilt of the accused are admissible if, at the time they were made, they
contained assertions that were unknown by law enforcement but were later corroborated.
*Woods,* 152 S.W.3d at 117; *Moore,* 999 S.W.2d at 400-01.  Such oral statements need only
circumstantially demonstrate the defendant's guilt.  *Id.*  Furthermore, if such an oral
statement contains even a single assertion later found to be true and conducive to establishing
the defendant's guilt, then the statement is admissible in its entirety.  *Id.*

The trial court held a hearing on appellant's motion to suppress his statements.  The
evidence at the suppression hearing showed that appellant and Dodd were questioned
separately at the Tyler Police Department.  Detective McCaskell interviewed Dodd, and
Detective Carroll observed a portion of that interview.  McCaskell testified that Dodd "had
an idea of where [appellant] had last been seen with the remains of Lisa and Jayden."  Carroll

testified that Dodd told McCaskell that he had seen appellant with the bodies before he buried them and that the bodies had been buried near "FM 407" in Fort Worth. McCaskell testified that Dodd agreed to show him the location where he thought the bodies might be buried. They left the Tyler Police Department about 9:50 p.m. and they arrived at that location about 1:00 a.m. Prior to their arrival, McCaskell was informed that appellant "had confessed and had said that the bodies were buried in that same general area." McCaskell was unable to locate the bodies because "[t]he details that [he] received were fairly generic" and "it was very dark when [they] got there," despite the fact that they were "[p]robably a few hundred yards" from where the bodies were ultimately found.

Carroll testified at the suppression hearing that he and appellant went into the bathroom at the Tyler Police Department at about 8:30 p.m. During their bathroom conversation, which lasted about forty-five minutes to an hour, appellant told Carroll how he had killed the victims and where he had buried them. After their bathroom conversation, they went to Detective Cashell's desk "because [appellant] agreed to show [them] on a map exactly where the bodies had been buried." They "got on MapQuest on the computer" and appellant "pointed out to [them] where the bodies were." Carroll called Sergeant John David Thornton around 11:30 p.m. and relayed to him appellant's description of the burial location.

Thornton testified that police thereafter searched the area described by Dodd and appellant but were unable to locate the bodies. He testified, "[W]e originally couldn't find the exact location based on the information we were getting, but we thought we were in the

right location, and that would have been finally somewhere around 2:00 or 3:00 in the morning." Shortly after daylight, Thornton and another officer made a "walk-through" of the area. They did not locate the bodies, although they "walked within 20 to 30 feet" of where the bodies were later found.

Carroll testified that appellant rode back to Fort Worth with him and Officer Thornhill later that morning. Appellant agreed to take them to where the victims were buried. They made "small talk" on the way and appellant expressed that he did not want "to see the bodies" or "to be seen by the media." Before they reached the highway exit they planned to take, appellant "guided [them] in through a back way to the same location." Carroll further testified:

> So as we pulled in -- the night before he described that as we pull into this gate, just about a few yards into the gate to the left there will be two barbed-wire fences. Over that second set of barbed-wire fences will be some shrubbery and a fresh dug grave he described and loose shrubbery on top of it.
>
> As we entered the gate and drove a little bit to the left, I saw such a mound of debris, but farther down I saw a second such description.
>
> So [appellant] said -- he looked at that one and made the comment to me that he thought that was it. Then he said, "Wait, wait. Go further down."
>
> So we drove to the second mound. We looked at that one for a minute and then [he] said, "No, back up." So we started to back up.
>
> At that point I got out of the truck and went over the fence. As I went over the fence, [appellant] is yelling instructions to me; also Officer Thornhill is standing near the truck, so he's relaying information to me also of what he's telling me, to walk further to my left, walk further to my left as I was going back toward that first mound of debris, and that's where I found the bodies.

Following the suppression hearing, the trial court made findings of fact and conclusions of law regarding appellant's unrecorded oral statements "in the restroom," "while employing the computer to explain the location of the bodies," and "on the way back to Fort Worth on February 22 directing the detectives to the location of the bodies." The trial court concluded that the statements were admissible because they "were revealed by the evidence to be true and conduced to establish the guilt of the Defendant by leading to the finding of evidence previously unknown to law enforcement officers."

Appellant alleges that the Section 3(c) exception does not apply to his oral unrecorded statements. This exception applies to "any statement which contains assertions of facts or circumstances that are found to be true and which conduce to establish the guilt of the accused such as the finding of secreted or stolen property or the instrument with which he states the offense was committed." *Dansby v. State*, 931 S.W.2d 297, 298 (Tex. Crim. App. 1996). "Found to be true" means facts about which the police were unaware at the time of the confession which are later, after the confession, found to be true. *Id.* at 298-99. Appellant argues that Dodd told police where the bodies were buried before appellant did; thus, appellant's statement did not contain facts unknown to police and later found to be true.

We previously addressed similar facts in another case:

In *Santana v. State*, 714 S.W.2d 1 (Tex. Crim. App. 1986), police questioned both Santana and his codefendant independently when both were arrested shortly after a robbery-murder. The codefendant was interviewed first and told police the murder weapons could be found in a field. Santana also told police

the location of the weapons.  Later, the guns used in the murder were found in the field both men had described.  Santana argued that his oral statement did not fit within the exception of section 3(c) because police already knew the location of the weapons when they questioned him, having learned this information from their prior interview of the codefendant.  We rejected this claim, holding that until police actually found the weapons, they were unable to verify the truth of Santana's and his codefendant's assertions;  thus, neither statement was "found to be true" until the discovery occurred.

*Dansby,* 931 S.W.2d at 299.  In *Santana,* we stated: "The fallacy with appellant's argument is that at the time appellant gave his oral statement, the police had not ascertained that [his co-defendant's] statement as to the location of the weapons was true."  714 S.W.2d at 14.

Here, the police had not ascertained Dodd's statement to be true at the time appellant gave his oral statement.  The police did not locate the bodies until appellant came to the scene the next morning and specifically pointed out the grave.[5]  As we said in *Santana,* "This situation falls directly into the category of admissible statements outlined in Article 38.22, Section 3(c)." *Id.*  The trial court did not abuse its discretion in admitting appellant's oral statements.

Points of error four, five, and six are overruled.

SPOUSAL PRIVILEGE

In his seventh point of error, appellant claims that the trial court violated his confidential communication privilege by admitting the digitally recorded video conversation between him and his wife Trish at the Tyler Police Department.  Rule 504 of the Texas Rules of Evidence provides that a person has a privilege during marriage and afterwards to refuse

---

[5]  In *Santana,* the defendant "did not add any additional information to the statement already obtained from [his co-defendant]."  14 S.W.2d at 14.  Here, it appears that appellant's description of the burial location was more detailed than the one given by Dodd.

to disclose and to prevent another from disclosing a confidential communication made to the person's spouse while they were married. TEX. R. EVID. 504(a)(2). A communication is confidential if it is made privately by any person to the person's spouse and it is not intended for disclosure to any other person. TEX. R. EVID. 504(a)(1). An exception applies "[i]n a proceeding in which the party is accused of conduct which, if proved, is a crime against the person of the spouse, any minor child, or any member of the household of either spouse." TEX. R. EVID. 504(a)(4)(C).

Following the suppression hearing, the trial court made findings of fact and conclusions of law, which stated in pertinent part (with citations omitted):

> The conversation between the Defendant and his wife, Trish, which was recorded and admitted into evidence was not a privileged confidential communication between husband and wife under Texas Rules of Evidence 504. There is an exception to the spousal privilege where the defendant is charged with a crime against a minor child. The spousal privilege does not prohibit the introduction of evidence of out of court statements made by the spouse. The Defendant was aware that he was being recorded. The Defendant had no right or expectation of privacy in the situation of his confinement when the conversations with his wife took place. The statements made by the Defendant during this segment of the DVD were not the product of custodial interrogation.

Appellant disputes that his conversation with his wife Trish fell under the "crime against any minor child" exception to the confidential communication privilege. Appellant asserts that the exception does not apply here because Trish was unaware at the time of their conversation that appellant was accused of killing a minor child.[6]

---

[6] Appellant relies on the following testimony of Detective Carroll on direct examination
(continued...)

BARBEE--28

The conversation between appellant and Trish was not made "privately." *See* TEX. R. EVID. 504(a)(1). Their conversation took place in a police station interview room while the digital video recorder was running. *See State v. Scheineman*, 77 S.W.3d 810, 812-813 (Tex. Crim. App. 2002). Even if the conversation could be considered a privileged "confidential" communication, it would still be admissible pursuant to the exception for a crime against any minor child. Appellant was accused of conduct which, if proved, constituted a crime against a minor child, seven-year-old Jayden. *See* TEX. R. EVID.

---

[6](...continued)
by the prosecutor during the guilt/innocence phase of trial:

Q.   So [Trish] enters the room. How did that come to be?

A.   After I had completed my interview, she wanted to talk to [appellant]. I told him that she could come in and talk to him. He had already confessed to killing Lisa, Jayden; and I went out and met with her in the lobby, told her what had happened, he wanted to speak to her, asked her if she wanted to speak to him; she said she did.

Q.   Is that the matter that he was just referring to, "Can I talk to her, please?" Is that what he was talking about?

A.   Yes.

Q.   Before you escorted her into that room, did you tell her that he had confessed to killing Lisa?

A.   Yes.

Q.   Did you tell her before she entered that room that he had confessed to killing Jayden?

A.   No.

We further note that appellant and Trish talked about Lisa's murder during their recorded conversation, but they made no mention of Jayden's murder.

BARBEE--29

504(a)(4)(C).  Trish's ignorance of this fact is of no consequence.  The applicability of this exception does not depend on the knowledge of appellant's spouse.  Point of error seven is overruled.

## CONSTITUTIONALITY OF ARTICLE 37.071

In his ninth point of error, appellant claims the Texas death penalty statute violates the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because it fails to require the State to prove the mitigation issue beyond a reasonable doubt, citing *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002).  We have previously rejected this claim, and we decline to revisit it here.  *Crutsinger v. State*, 206 S.W.3d 607, 613 (Tex. Crim. App.), *cert. denied,* 127 S. Ct. 836 (2006); *Blue v. State*, 125 S.W.3d 491, 500–01 (Tex. Crim. App. 2003).  Point of error nine is overruled.

We affirm the judgment of the trial court.

DELIVERED DECEMBER 10, 2008

DO NOT PUBLISH

# EXHIBIT 9



# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

### NO. WR-71,070-01

### EX PARTE STEPHEN DALE BARBEE

### ON APPLICATION FOR WRIT OF HABEAS CORPUS IN CAUSE NO. 1004856R IN THE 213TH JUDICIAL DISTRICT COURT TARRANT COUNTY

*Per Curiam.*

## O R D E R

This is a post-conviction application for writ of habeas corpus filed pursuant to the provisions of Texas Code of Criminal Procedure article 11.071.

In February 2006, a jury convicted Applicant of the offense of capital murder. The jury answered the special issues submitted under Article 37.071 of the Texas Code of Criminal Procedure, and the trial court, accordingly, set punishment at death. This Court affirmed Applicant's conviction and sentence on direct appeal. *Barbee v. State,* No. AP-

Barbee - 2

75,359 (Tex. Crim. App. December 10, 2008).

Applicant presents four allegations in his application in which he challenges the validity of his conviction and resulting sentence. The trial court did not hold an evidentiary hearing. The trial court adopted the State's proposed findings of fact and conclusions of law recommending that the relief sought be denied.

This Court has reviewed the record with respect to the allegations made by applicant. We adopt the trial judge's findings and conclusions. Based upon the trial court's findings and conclusions and our own review, the relief sought is denied.

IT IS SO ORDERED THIS THE 14TH DAY OF JANUARY, 2009.


Do Not Publish

# EXHIBIT 10

Case 4:09-cv-00074-Y   Document 25-1   Filed 10/04/10   Page 73 of 114   PageID 600

**Star-Telegram** com

Posted on Wed, Feb. 23, 2005

# Bodies of missing mom, child found near Justin, Texas

Woman's ex-boyfriend leads authorities to grave

By MELODY McDONALD and DEANNA BOYD
Fort Worth (Texas) Star-Telegram

**DENTON COUNTY -** The bodies of a missing pregnant woman and her 7-year-old son were found Tuesday after the father of the unborn baby led authorities to their shallow grave off a rural road near Justin.

Stephen D. Barbee, 37, had told homicide detectives that he suffocated ex-girlfriend Lisa Underwood and Jayden, her son from another relationship, after arguing with her over his refusal to leave his wife.

Barbee, who worked in the concrete and tree-clearing business, was arrested in Tyler on a capital murder warrant early Tuesday after making the admission. He was being held in the Mansfield Jail, with bail set at $2 million.

Police turned their attention to Barbee on Saturday shortly after finding blood on the carpet, walls and furniture of Underwood's house in the 3700 block of Chaddybrook Lane.

After determining that Barbee was the father of Underwood's unborn child, police questioned him about the missing woman and her son. He told investigators that he was at his business partner's home at the time of their disappearance.

On Monday night, Barbee's story changed.

Fort Worth police officers had traveled to Tyler, near where Barbee had told police he would be clearing trees if they needed to talk to him again.

This time, Barbee admitted that he had killed the mother and son.

According to an arrest warrant affidavit, he told Detective Mike Carroll that Ron Dodd, a friend and business associate, had dropped him off at Underwood's house late Friday.

Barbee told police that he and Underwood, who was seven months pregnant with his daughter, began to argue and that Underwood kicked him in the leg, Carroll wrote in the affidavit.

Barbee said he punched Underwood, 34, several times in the face, causing her nose to bleed, then held her down and suffocated her, the affidavit states.

At some point, Jayden ran into the room screaming, and Barbee used his hand to cover the boy's mouth and nose until he was dead, according to the affidavit.

Barbee loaded the bodies into the back of Underwood's sport utility vehicle, drove to a deserted location in Denton County and buried them together, the affidavit states.

On Tuesday morning, Barbee was taken from Tyler to Fort Worth. Later, shackled and handcuffed, he led investigators to the grave.

Throughout the day, friends of the victims stopped by Boopa's Bagel Deli, which Underwood co-owned, to place memorials. On Tuesday night, classmates and friends of Jayden gathered outside the deli for a candlelight vigil.

Brittany Bumgarner, a first-grader at North Riverside Elementary School, where Jayden was also a student, placed a card she made among the flowers, balloons and candles that were piled in front of the deli.

Case 4:09-cv-00074-Y   Document 25-1   Filed 10/04/10   Page 74 of 114   PageID 601

Brittany's mother, like other parents at the vigil, struggled to explain to her children how and why the events occurred.

"I'm trying the best that I can," said Heather Bumgarner, who was also accompanied by her 10-year-old son, Chris, a fourth-grader at the school.

"I tell them that they are in a better place," Bumgarner said.

## Barbee's associate

Barbee was not the only one who knew what had happened to Underwood and her son, police said.

Dodd told police that he saw the bodies in the back of Underwood's Dodge Durango and that Barbee told him what had happened.

On Monday, Dodd gave a detailed statement to Fort Worth homicide Detective John McCaskill in Tyler. His account differed slightly from Barbee's. In it, he said he and Barbee were hanging out at Dodd's home early Saturday when Barbee asked him to drop him off at an elementary school on Old Denton Road.

After he did so, Dodd said, Barbee called a short time later, wanting to be picked up at the same location.

In the car, according to the affidavit, Barbee told Dodd that he visited a female friend whom he had impregnated and said, "I just can't do it."

"Dodd assumed he meant that he was going to break up with the female friend," the affidavit states.

A short time later, Barbee asked Dodd to take him back to the area, the affidavit states.

Later, Dodd said, Barbee called him again, this time asking him to bring a can of gasoline to Farm Road 407 east of Justin.

"We went driving around and ran out of gas," the affidavit quotes Barbee as telling Dodd.

When Dodd arrived, he gave Barbee the gas can, then opened the SUV's hatchback and saw the bodies of a woman and a boy, he told police.

Shaken, Dodd left the scene because he did not want to get involved, the affidavit states.

But later, Dodd said, Barbee called again, saying that his truck had broken down south of Denton on Interstate 35W and that he needed a ride.

Dodd told investigators that he went to that location but drove away when he saw Barbee being questioned by a law enforcement officer.

According to the affidavit, a Denton County sheriff's deputy had spotted a man walking along the northbound service road of the interstate at Vintage Drive about 3 a.m. Saturday, not far from where a farmer would later find Underwood's SUV.

The man identified himself to the deputy as David Weekly and gave a false birth date before fleeing east into a wooded area. Deputies couldn't find him.

Barbee later admitted to detectives that he was the man who had run away, the affidavit states.

Dodd told police that after receiving another call from Barbee, he picked up his friend in the area where he had seen Barbee talking to the deputy. He said Barbee then told him that he had killed the woman and child and dumped their bodies near Farm Road 407 where he had run out of gas.

Homicide Sgt. J.D. Thornton said it is unknown whether Dodd will be charged in the case.

"We're still investigating his role in the entire incident," Thornton said.

Case 4:09-cv-00074-Y   Document 25-1   Filed 10/04/10   Page 75 of 114   PageID 602

## Friends left to cope

A friend said Underwood and Barbee met at Boopa's Bagel Deli, a popular breakfast and lunch spot in north Fort Worth.

Barbee was a regular at the deli, which Underwood co-owned with Holly Pils.

"They were romantically involved last year and then went their separate ways," said Debbie Lindley, a friend of Underwood's.

Although they broke up, Lindley said, Underwood and Barbee still saw each other occasionally. When Underwood unexpectedly became pregnant about seven months ago, Lindley said, Underwood told Barbee about the baby.

Lindley said Barbee, who was dating another woman at that time, seemed to accept that he was going to be a father.

"He had told Lisa that he told his mom and that his mom was excited about it and his mom wanted to meet her," Lindley said.

Lindley said Underwood was not bothered that Barbee was dating another woman, Patricia Reinhardt, whom he later married.

"She had come to terms that she was pregnant, she was single and she was OK with it," Lindley said. "She was very independent. She raised Jayden on her own, and she was prepared to do that with this baby."

Lindley said she and Underwood took turns caring for each other's children. Lindley's son, Nicholas, and Jayden were best friends who attended the same school and day care, Lindley said.

"I told him Sunday that Lisa and Jayden had gone somewhere, and we didn't know where and that police were looking for them," Lindley said.

After seeing Underwood's SUV on the news, Nicholas thought he had figured out the mystery, she said.

"He said maybe they had gone camping and the crook took all the camping gear and that's why they can't be found," Lindley said.

On Tuesday afternoon, Lindley struggled with how she would tell her son that his favorite playmate was dead.

## Man admits to slayings

Fort Worth police arrested Stephen D. Barbee, 37, at left, on Tuesday after he acknowledged killing Lisa Underwood and her 7-year-old son, Jayden, below.

## How it happened

The sequence of events according to an arrest warrant affidavit:

• Underwood and Barbee, the father of her unborn child, argue sometime between midnight and 3 a.m. Saturday at her house on Chaddybrook Lane in Fort Worth. Barbee punches her several times and suffocates her. When Jayden runs into the room screaming, Barbee puts his hand over Jayden's face until he dies.

• Barbee places the bodies in the back of Underwood's Dodge Durango and drives north to Farm Road 407, west of Interstate 35W, in Denton County. When he runs out of gas, he calls business partner Ron Dodd for help.

• Dodd takes gas to Barbee. Dodd opens the hatchback of the Durango and sees the bodies. Shaken, he leaves.

• Barbee digs a shallow grave off Farm Road 407, near where he ran out of gas, and dumps the bodies into it.

• Barbee leaves the Durango in a creek bed off Farm Road 2449, just east of I-35W, in Denton.

Case 4:09-cv-00074-Y   Document 25-1   Filed 10/04/10   Page 76 of 114   PageID 603

## From argument to arrest:

**According to the arrest warrant affidavit and Star-Telegram interviews**

Late Friday-early Saturday, 3700 block of Chaddybrook Lane, Fort Worth: Stephen Barbee, 37, goes to the house of Lisa Underwood, 34, who is seven months pregnant with his child. After an argument, he beats and suffocates her, then suffocates her 7-year-old son, Jayden.

Midnight-3 a.m. Saturday, North Riverside Elementary School, Fort Worth: Barbee calls business partner Ron Dodd and asks whether he can pick him up. He tells Dodd that he had visited a friend whom he had gotten pregnant. Dodd drives around with Barbee, then drops him off a few blocks from the school, near Underwood's house.

Midnight-3 a.m. Saturday, at Farm Road 407, west of Interstate 35W, Denton County: Barbee calls Dodd again, asking him for help because "we went driving around and ran out of gas." Upon arriving with a can of gas, Dodd sees Barbee standing next to a blue Dodge Durango. He opens the hatchback and sees the bodies of a woman and child. Dodd is shaken and leaves.

Vintage Drive and Interstate 35W, Denton: A Denton County sheriff's deputy sees a man walking along I-35W. The man identifies himself as David Weekly and runs from the deputy, who is unable to find him. Barbee later tells police that he was that man. Barbee calls Dodd again, who goes to pick him up. Barbee tells Dodd that he killed Underwood and Jayden and dumped their bodies along Farm Road 407.

4 p.m. Saturday, Western Center Boulevard and Beach Street, Fort Worth: Underwood fails to show up for her baby shower at Boopa's Bagel Deli, which she co-owns.

4:20 p.m. Saturday, 3700 block of Chaddybrook Lane: Police go to Underwood's house and find a large amount of blood in the living room. Underwood and Jayden are missing, as is Underwood's 2002 Dodge Durango. An Amber Alert is issued.

8 p.m. Saturday, 4100 block of Walnut Creek Court, Fort Worth: After learning that Barbee is the father of Underwood's unborn child, police interview him at his home. Barbee tells them that he was at Dodd's residence when the Underwoods disappeared and that he will be doing work in Tyler on Sunday.

Sunday evening, 4100 block of Walnut Creek Court: Police conduct surveillance at Barbee's house.

9 a.m. Monday, Farm Road 2449, east of I-35W, Denton: A farmer finds Underwood's Dodge Durango in a creek bed.

5 p.m. Monday, Tyler: Dodd, in the area along with Barbee to trim trees, is contacted by Tyler police. Dodd tells Fort Worth detectives, who have traveled to Tyler, that Barbee told him that he had killed Underwood and her son.

11:20 p.m. Monday, Tyler: Barbee is interviewed again by Fort Worth police and tells them that he suffocated Underwood and her son. He is later arrested and held in the Smith County Jail, with bail set at $2 million. Tuesday morning, he is handed over to Fort Worth police.

Between 10 and 11 a.m. Tuesday,

4315 Farm Road 407, west of I-35W: Barbee shows police where he buried Underwood and her son. The bodies are taken to the Tarrant County Medical Examiner's Office.

## RELATED STORIES

- **Friends gather for a candlelight vigil in memory of Lisa and Jayden Underwood. 14A**

- **Reactions to the news of Stephen Barbee's arrest are mixed. 14A**

- **Jayden's family in Missouri mourns loss of 7-year-old. 14A**

*Star-Telegram Researchers Marcia Melton and Cathy Belcher Contributed to This Report.*

Case 4:09-cv-00074-Y  Document 25-1  Filed 10/04/10  Page 77 of 114  PageID 604

*Deanna Boyd, (817) 390-7655* dboyd@star-telegram.com **Melody McDonald, (817) 390-7386** *mjmcdonald@star-telegram.com*

© 2005 Star-Telegram and wire service sources. All Rights Reserved.
http://www.dfw.com

Case 4:09-cv-00074-Y    Document 25-1    Filed 10/04/10    Page 78 of 114    PageID 605

Star-Telegram.com

Posted on Mon, Feb. 21, 2005

# Missing woman's SUV found

### Search to resume Tuesday

By Deanna Boyd and Melody McDonald
Star-Telegram Staff Writers

Police will return to a Denton field Tuesday morning to resume searching for clues in the disappearance of a pregnant Fort Worth woman and her 7-year-old son.

Lisa Leigh Underwood's life revolved around her son.

She spent her nights helping Jayden with his homework and her days working to make sure the 7-year-old wanted for nothing.

She even named her bagel shop after him.

"They are each other's lives," said Marla Hess, Underwood's aunt. "They created a world that no one else can penetrate. We are going to find them together -- regardless."

It's been more than three days since the mother, seven months pregnant with her second child, was last heard from.

Police issued an Amber Alert for the mother and son Saturday after relatives discovered a pool of blood inside Underwood's north Fort Worth home and noticed her sport utility vehicle missing.

On Monday, the search for the pair shifted to Denton after Underwood's blue 2002 Dodge Durango was found abandoned in a creek bed off Farm Road 2449, just east of Interstate 35W.

"It is a major step forward," said Lt. Gene Jones, Fort Worth police spokesman. " Of course, we won't be satisfied until we locate the missing individuals."

The search ended about 6:30 p.m. Monday, with still no sign of the mother and her son. It is expected to resume Tuesday morning.

**SATURDAY was supposed** to be a day of celebration.

Underwood is expecting a little girl, and her friends and family were throwing her a baby shower at Boopa's Bagel Deli, which she co-owned with her best friend, Holy Pils.

Hess, who had traveled from Wichita Falls for the shower, looked forward to trying to pry out of Underwood the name she had chosen for her unborn child.

Because "Jayden" was such an unusual name, family and friends assumed that Underwood had also picked an unconventional name for her daughter.

"She had a name that she wasn't going to tell us," Hess said. "We were going to try to make her."

But Underwood never made it to the party. Now, family members are going to crime scenes and waiting by the phone for news.

Sgt. Rene Kamper, supervisor of the major case unit that is handling the investigation into the disappearance, said police "have not narrowed our scope to any one suspect or any group of suspects at all."

Kamper said police have talked to both Jayden's father and the father of Underwood's unborn daughter and "they are

Case 4:09-cv-00074-Y   Document 25-1   Filed 10/04/10   Page 79 of 114   PageID 606

cooperative."

Hess said Jayden's father, who periodically saw his son, was traveling Monday afternoon from his home in St. Joseph, Mo., to Fort Worth.

Throughout the day Monday, searchers on foot, horseback and with trained bloodhounds and other dogs scoured the pastures and wooded area near where the SUV was found about 8:28 a.m. by a farmer who called Denton police.

Kamper said searchers found the keys to Underwood's SUV but declined to comment on whether blood was found in the vehicle or other evidence found in the vehicle.

The area where the SUV was found is largely isolated farmland, although signs along Farm Road 2449 point the way to a new housing subdivision just north of the area. Monday afternoon, dozens of patrol vehicles, unmarked cars and media trucks lined the rural road.

Meanwhile, about 30 miles away, more police vehicles and yellow crime scene tape encircled the Underwood's modest red brick home in the 3700 block of Chaddybrook Drive.

Neighbors talked quietly outside their homes as children rode bikes and drew on the sidewalks with colored chalk.

The concern on the parents' faces for Lisa and Jayden Underwood was evident.

"They are awesome," neighbor Vicki Wilson said. "They are the nicest people anyone would want to meet. They are very, very sweet."

Wilson said Jayden and the other children often played soccer together or came to her house to play on the swing set or swim in her pool. "He's kind of shy, but he is a smart, intelligent, happy little boy," Wilson said.

Jayden is a first-grader at North Riverside Elementary School. Tuesday, extra counselors will be on hand to talk to the students, said Jason Meyer, spokesman of the Keller school district.

**OUTSIDE Boopa's Bagel Deli**, well-wishers left messages and trinkets of hope.

A large brown teddy bear was propped on a table by the window and several notes were taped to the inside window.

Scrawled in colored markers were the words: "God Bless Lisa and her two little angels." Another one read: "We're praying for you! Lisa, Jayden and Baby Underwood."

On a lined piece of notebook paper was a child's handwriting.

"I'm sure she's OK. I miss her as much as you do. I hope you're going to be OK."

It was signed with a heart and a face with a frown.

Pils said Lisa Underwood had named her bagel shop "Boopa" after a nickname that her mother, Sheila, had bestowed upon her grandson. Jayden was proud to have his nickname adorn his mother's business.

"He wanted to be referred to as one of the owners because he said, `My name is on the building,' " Pils said.

Deli customers knew Jayden and often asked for him by name.

"They would say, `Is Boopa here today?"' Pils said.

Pils said that Jayden often passed the time by helping her and his mother in the shop, situated in the Fossil Creek Plaza at Western Center Boulevard and Beach Street. "He would sweep better than our employees," she said. "He loved being at the bagel shop, he was just a real special guy. I love being around him. He is a joy, just a complete joy."

Pils said Underwood worked hard to provide for her son, who was active in Cub Scouts and soccer and could easily beat Pils in chess.

Case 4:09-cv-00074-Y   Document 25-1   Filed 10/04/10   Page 80 of 114   PageID 607

"He was a wonderful child because she was a wonderful mother."

Pils said Underwood was looking forward to becoming a mother again.

"She felt like, `I have a perfect boy. Now, I want a perfect girl."

*Staff writers Kelly Melhart and Alex Branch contributed to this report.*

© 2005 Star-Telegram.com and wire service sources  All Rights Reserved
http://www.dfw.com

Case 4:09-cv-00074-Y   Document 25-1   Filed 10/04/10   Page 81 of 114   PageID 608

Star-Telegram .com

Posted on Tue, Feb. 22, 2005

# Missing mom's vehicle found

Authorities intensify search in rural area south of Denton

By Deanna Boyd and Melody Mcdonald
STAR-TELEGRAM STAFF WRITERS

Lisa Leigh Underwood's life has revolved around her son.

Until recently, she spent her nights helping Jayden with his homework and her days working to make sure the 7-year-old wants for nothing.

She even named her bagel shop after him.

"They are each other's lives," said Marla Hess, Underwood's aunt. "They created a world that no one else can penetrate. We are going to find them together -- regardless."

It's been more than three days since relatives have heard from the 34-year-old mother, seven months pregnant with her second child.

Police issued an Amber Alert for the mother and son Saturday after relatives discovered a pool of blood inside Underwood's north Fort Worth home and noticed her sport utility vehicle missing.

On Monday, the search for the pair shifted to Denton after authorities found Underwood's blue 2002 Dodge Durango abandoned in a creek bed off Farm Road 2449, just east of Interstate 35W.

"It is a major step forward," said Lt. Gene Jones, a Fort Worth police spokesman. "Of course, we won't be satisfied until we locate the missing individuals."

The search ended about 6:30 p.m. Monday, still with no sign of the mother and her son. It is expected to resume this morning.

## Party planned

Saturday was supposed to be a day of celebration.

Underwood is expecting a little girl, and her friends and family had planned to throw her a baby shower at Boopa's Bagel Deli, which she co-owns with her best friend, Holly Pils.

Hess, who had traveled from Wichita Falls for the shower, looked forward to prying out of Underwood the name she had chosen for her unborn child.

Because "Jayden" is such an unusual name, family and friends assumed that Underwood had also picked an unconventional name for her daughter.

"She had a name that she wasn't going to tell us," Hess said. "We were going to try to make her."

But Underwood never made it to the party.

Now, family members are visiting crime scenes and waiting by the phone for answers.

Sgt. Rene Kamper, supervisor of the major case unit that is handling the investigation into the disappearance, said police "have not narrowed our scope to any one suspect or any group of suspects at all."

Case 4:09-cv-00074-Y   Document 25-1   Filed 10/04/10   Page 82 of 114   PageID 609

Kamper said police have talked to Jayden's father and the father of Underwood's unborn daughter and that "they are cooperative."

Hess said Jayden's father, who periodically saw his son, was traveling Monday afternoon to Fort Worth from his home in St. Joseph, Mo.

A farmer discovered the SUV about 8:28 a.m. Monday and called Denton police.

Throughout the day Monday, searchers scoured nearby pastures and wooded areas, some in helicopters, others on horseback and on foot with trained scent dogs.

Kamper said searchers found the keys to Underwood's SUV but declined to comment on whether they found blood in the vehicle or other evidence inside it.

The area where the SUV was found is largely isolated farmland, although signs along Farm Road 2449 point the way to a new housing subdivision just to the north. Monday afternoon, dozens of patrol vehicles, unmarked cars and media trucks lined the rural road.

Meanwhile, about 30 miles away, more police vehicles and yellow crime scene tape encircled the Underwoods' modest red brick home in the 3700 block of Chaddybrook Lane.

Neighbors talked quietly outside their homes as children rode bikes and drew on the sidewalks with colored chalk.

The concern on the parents' faces for Lisa and Jayden Underwood was evident.

"They are awesome," said neighbor Vicki Wilson. "They are the nicest people anyone would want to meet. They are very, very sweet."

Wilson said Jayden and the other neighborhood children often played soccer together or came to her house to play on the swing set or swim in her pool.

Jayden is "kind of shy, but he is a smart, intelligent, happy little boy," Wilson said.

Jayden is a first-grader at North Riverside Elementary School. Today, extra counselors will be on hand to talk to the students, said Jason Meyer, a spokesman of the Keller school district.

## Customers knew 'Boopa'

Outside Boopa's Bagel Deli, well-wishers left messages and trinkets of hope.

A large brown teddy bear, several notes and balloons graced the window.

Scrawled in colored markers were the words "God Bless Lisa and her two little angels." Another one read: "We're praying for you! Lisa, Jayden and Baby Underwood."

A lined piece of notebook paper bore a child's handwriting: "I'm sure she's OK. I miss her as much as you do. I hope you're going to be OK."

It was signed with a heart and a face with a frown.

Pils said Lisa Underwood had named her bagel shop "Boopa" after a nickname that her mother, Sheila, had bestowed upon her grandson.

Jayden expressed pride in having his nickname adorn his mother's business.

"He wanted to be referred to as one of the owners because he said, 'My name is on the building,' " Pils said.

Deli customers knew Jayden and often asked for him by name.

Case 4:09-cv-00074-Y   Document 25-1   Filed 10/04/10   Page 83 of 114   PageID 610

"They would say, 'Is Boopa here today?' " Pils said.

Pils said that Jayden often passed the time helping her and his mother in the shop, in Fossil Creek Plaza at Western Center Boulevard and Beach Street.

"He would sweep better than our employees," she said. "He loved being at the bagel shop, he was just a real special guy. I love being around him. He is a joy, just a complete joy."

Pils said Underwood has worked hard to provide for her son, who is active in Cub Scouts and soccer and can easily beat Pils at chess.

"He was a wonderful child because she was a wonderful mother."

Pils said Underwood has been looking forward to becoming a mother a second time.

"She felt like, 'I have a perfect boy. Now, I want a perfect girl,' " she said.

Staff Writers Kelly Melhart and Alex Branch Contributed to This Report

*Deanna Boyd, (817) 390-7655 dboyd@star-telegram.com Melody McDonald, (817) 390-7386 mjmcdonald@star-telegram.com*

© 2005 Star-Telegram and wire service sources. All Rights Reserved.
http://www.dfw.com

Case 4:09-cv-00074-Y   Document 25-1   Filed 10/04/10   Page 84 of 114   PageID 611

**Star-Telegram** .com

Posted on Tue, Feb. 22, 2005

## Bodies of missing woman, child found

By **DEANNA BOYD** and **MELODY MCDONALD**
Fort Worth (Texas) Star-Telegram

**FORT WORTH, Texas -** The bodies of a missing pregnant woman and her 7-year-old son were found Tuesday morning off a farm road in North Texas, just hours after police arrested a Fort Worth man and charged him with capital murder in their disappearance.

It was not disclosed how Lisa Underwood, 34, and her son, Jayden, were killed.

Stephen Barbee, 37, who previously had been romantically involved with Underwood, was taken into custody in Tyler in East Texas and held with initial bail set at $2 million. He was later released to Fort Worth police and transported back to Tarrant County in North Texas.

On Monday, police found Underwood's Dodge Durango abandoned in a creek bed east of Interstate 35W in Denton County, about 10 miles north of where the bodies were found in Justin.

Curtis Tally, who owns property adjacent to where the bodies were found, said Tuesday he was driving by the land about 7:30 a.m. local time and was told by police "they had reason to believe the bodies would be down there and wanted to look."

He said police searched his property but left without finding anything about 9:15.

Two hours later, Tally said, police returned to the site and found the bodies on nearby property leased to someone else.

Lt. Gene Jones confirmed an arrest had been made in the case but declined to comment further. It was unknown how police knew Barbee was in Tyler.

Sources said detectives traveled to Tyler on Monday night by helicopter after requesting that Tyler police locate Barbee and take him to their headquarters to be interviewed.

About the same time that Tyler police were taking Barbee into custody, Fort Worth police searched a residence in north Fort Worth, a home where Barbee lived with a woman named Trish.

A neighbor who did not want to be identified said she was awakened by flashing police lights and noise about 3 a.m. Tuesday.

She said officers went to the back of the residence and later came out the front carrying four or five bags of evidence.

The house, she said, had been under police surveillance since Sunday with officers in unmarked vehicles cruising the neighborhood.

About 8 p.m. Sunday, she said, officers came to her home asking "when was the last time I saw them and what kind of cars did they drive."

She said she told them she last saw Barbee earlier Sunday.

At 11 a.m. Monday, she said, she saw officers rummaging through trash bags that had been set curbside outside the residence.

Case 4:09-cv-00074-Y   Document 25-1   Filed 10/04/10   Page 85 of 114   PageID 612

Star-Telegram .com

Posted on Tue, Feb. 22, 2005

# Man charged with double homicide in Texas

ANGELA K. BROWN
Associated Press

**FORT WORTH, Texas -** A man was arrested and charged Tuesday with murdering his pregnant ex-girlfriend and her 7-year-old son, who disappeared from their home over the weekend.

Hours after the arrest, authorities found two bodies matching the description of bagel shop owner Lisa Underwood and her son, Jayden, authorities said.

Stephen Dale Barbee, 37, admitted arguing with Underwood over leaving his wife, according to court papers. Barbee allegedly said he suffocated Underwood, then did the same to the boy after he interrupted the attack.

Court papers said Barbee was the father of Underwood's fetus.

Barbee was arrested in Tyler, where he had been working clearing trees.

Barbee told investigators he put the bodies in the back of Underwood's sport utility vehicle and dug a shallow grave. The SUV was found in a creek near the town of Denton on Monday.

Court papers also revealed that a sheriff's deputy briefly had Barbee in custody early Saturday when he stopped a suspicious man covered in mud. The man ran into the woods and escaped.

Underwood, who was seven months pregnant, was reported missing Saturday along with her son after she failed to show up at her baby shower. A pool of blood was found in her Fort Worth home, but there was no sign of forced entry, police said.

Underwood and Barbee met about two years ago but split up last fall because Barbee had another girlfriend, said Debbie Lindley, a neighbor of Underwood's.

© 2005 AP Wire and wire service sources. All Rights Reserved.
http://www.dfw.com

Case 4:09-cv-00074-Y   Document 25-1   Filed 10/04/10   Page 86 of 114   PageID 613

Star-Telegram.com

Posted on Tue, Feb. 22, 2005

# Police arrest suspect on murder warrant

**By DEANNA BOYD and MELODY McDONALD**
Fort Worth (Texas) Star-Telegram

FORT WORTH -- A Fort Worth man was arrested in Tyler early Tuesday on a capital murder warrant in the abduction of a woman pregnant with his child and her 7-year-old son.

Stephen Barbee, 37, was initially held in Smith County Jail with bail set at $2 million but was later released to Fort Worth police, who were transporting him back to Tarrant County.

Police, meanwhile, continued searching in Denton for Lisa Underwood, 34, and her 7-year-old son, Jayden, concentrating primarily on an area not far from where the woman's car was found Monday.

Lt. Gene Jones confirmed an arrest had been made in the case but declined to comment further.

Sources said major case detectives traveled to Tyler on Monday night by helicopter after requesting that Tyler police locate Barbee and take him to their headquarters to be interviewed by Fort Worth police.

It was unknown how police knew Barbee was in Tyler.

About the same time that Tyler police were taking Barbee into custody, Fort Worth police raided a residence in the 4100 block of Walnut Creek in north Fort Worth, a home where Barbee lived with a woman named Trish.

A neighbor who did not want to be identified said she was awakened by flashing police lights and noise about 3 a.m. Tuesday.

She said officers went to the back of the residence and later came out the front carrying four or five bags of evidence.

The house, she said, had been under police surveillance since Sunday, with officers in unmarked police vehicles cruising through the neighborhood.

About 8 p.m. Sunday, she said, officers came to her home asking "when was the last time I saw them and what kind of cars did they drive."

She said she told them she last saw Barbee earlier Sunday.

At 11 a.m. Monday, she said, she saw officers rummaging through trash bags that had been set curbside outside the residence.

It's been more than three days since relatives have heard from the 34-year-old mother, seven months pregnant with her second child.

Police issued an Amber Alert for the mother and son Saturday after relatives discovered a pool of blood inside Underwood's north Fort Worth home and noticed her sport utility vehicle missing.

On Monday, the search for the pair shifted to Denton after authorities found Underwood's blue 2002 Dodge Durango abandoned in a creek bed off Farm Road 2449, just east of Interstate 35W.

"It is a major step forward," said Lt. Gene Jones, a Fort Worth police spokesman. "Of course, we won't be satisfied until we locate the missing individuals."

The search ended about 6:30 p.m. Monday, still with no sign of the mother and her son, before resuming this morning.

## Party planned

Saturday was supposed to be a day of celebration.

· Police arrest suspect on murder warrant

Case 4:09-cv-00074-Y   Document 25-1   Filed 10/04/10   Page 87 of 114   PageID 614

Underwood is expecting a little girl, and her friends and family had planned to throw her a baby shower at Boopa's Bagel Deli, which she co-owns with her best friend, Holly Pils.

Hess, who had traveled from Wichita Falls for the shower, looked forward to prying out of Underwood the name she had chosen for her unborn child.

Because "Jayden" is such an unusual name, family and friends assumed that Underwood had also picked an unconventional name for her daughter.

"She had a name that she wasn't going to tell us," Hess said. "We were going to try to make her."

But Underwood never made it to the party.

Now, family members are visiting crime scenes and waiting by the phone for answers.

Sgt. Rene Kamper, supervisor of the major case unit that is handling the investigation into the disappearance, said police "have not narrowed our scope to any one suspect or any group of suspects at all."

Kamper said police have talked to Jayden's father and the father of Underwood's unborn daughter and that "they are cooperative."

Hess said Jayden's father, who periodically saw his son, was traveling Monday afternoon to Fort Worth from his home in St. Joseph, Mo.

A farmer discovered the SUV about 8:28 a.m. Monday and called Denton police.

Throughout the day Monday, searchers scoured nearby pastures and wooded areas, some in helicopters, others on horseback and on foot with trained scent dogs.

Kamper said searchers found the keys to Underwood's SUV but declined to comment on whether they found blood in the vehicle or other evidence inside it.

The area where the SUV was found is largely isolated farmland, although signs along Farm Road 2449 point the way to a new housing subdivision just to the north. Monday afternoon, dozens of patrol vehicles, unmarked cars and media trucks lined the rural road.

Meanwhile, about 30 miles away, more police vehicles and yellow crime scene tape encircled the Underwoods' modest red brick home in the 3700 block of Chaddybrook Lane.

Neighbors talked quietly outside their homes as children rode bikes and drew on the sidewalks with colored chalk.

The concern on the parents' faces for Lisa and Jayden Underwood was evident.

"They are awesome," said neighbor Vicki Wilson. "They are the nicest people anyone would want to meet. They are very, very sweet."

Wilson said Jayden and the other neighborhood children often played soccer together or came to her house to play on the swing set or swim in her pool.

Jayden is "kind of shy, but he is a smart, intelligent, happy little boy," Wilson said.

Jayden is a first-grader at North Riverside Elementary School. Today, extra counselors will be on hand to talk to the students, said Jason Meyer, a spokesman of the Keller school district.

## Customers knew 'Boopa'

Outside Boopa's Bagel Deli, well-wishers left messages and trinkets of hope.

A large brown teddy bear, several notes and balloons graced the window.

‘ Police arrest suspect on murder warrant

Scrawled in colored markers were the words "God Bless Lisa and her two little angels." Another one read: "We're praying for you! Lisa, Jayden and Baby Underwood."

A lined piece of notebook paper bore a child's handwriting: "I'm sure she's OK. I miss her as much as you do. I hope you're going to be OK."

It was signed with a heart and a face with a frown.

Pils said Lisa Underwood had named her bagel shop "Boopa" after a nickname that her mother, Sheila, had bestowed upon her grandson.

Jayden expressed pride in having his nickname adorn his mother's business.

"He wanted to be referred to as one of the owners because he said, 'My name is on the building,' " Pils said.

Deli customers knew Jayden and often asked for him by name.

"They would say, 'Is Boopa here today?' " Pils said.

Pils said that Jayden often passed the time helping her and his mother in the shop, in Fossil Creek Plaza at Western Center Boulevard and Beach Street.

"He would sweep better than our employees," she said. "He loved being at the bagel shop, he was just a real special guy. I love being around him. He is a joy, just a complete joy."

Pils said Underwood has worked hard to provide for her son, who is active in Cub Scouts and soccer and can easily beat Pils at chess.

"He was a wonderful child because she was a wonderful mother."

Pils said Underwood has been looking forward to becoming a mother a second time.

"She felt like, 'I have a perfect boy. Now, I want a perfect girl,' " she said.

Staff Writers Kelly Melhart and Alex Branch Contributed to This Report

Deanna Boyd, (817) 390-7655
dboyd@star-telegram.com

© 2005 Star-Telegram.com and wire service sources. All Rights Reserved
http://www.dfw.com

Case 4:09-cv-00074-Y   Document 25-1   Filed 10/04/10   Page 89 of 114   PageID 616

Star-Telegram.com

Posted on Wed, Feb. 23, 2005

# Bodies of missing mom, child found near Justin

**Woman's ex-boyfriend leads authorities to grave**

By Melody Mcdonald and Deanna Boyd
STAR-TELEGRAM STAFF WRITERS

**DENTON COUNTY –** The bodies of a missing pregnant woman and her 7-year-old son were found Tuesday after the father of the unborn baby led authorities to their shallow grave off a rural road near Justin.

Stephen D. Barbee, 37, had told homicide detectives that he suffocated ex-girlfriend Lisa Underwood and Jayden, her son from another relationship, after arguing with her over his refusal to leave his wife.

Barbee, who worked in the concrete and tree-clearing business, was arrested in Tyler on a capital murder warrant early Tuesday after making the admission. He was being held in the Mansfield Jail, with bail set at $2 million.

Police turned their attention to Barbee on Saturday shortly after finding blood on the carpet, walls and furniture of Underwood's house in the 3700 block of Chaddybrook Lane.

After determining that Barbee was the father of Underwood's unborn child, police questioned him about the missing woman and her son. He told investigators that he was at his business partner's home at the time of their disappearance.

On Monday night, Barbee's story changed.

Fort Worth police officers had traveled to Tyler, near where Barbee had told police he would be clearing trees if they needed to talk to him again.

This time, Barbee admitted that he had killed the mother and son.

According to an arrest warrant affidavit, he told Detective Mike Carroll that Ron Dodd, a friend and business associate, had dropped him off at Underwood's house late Friday.

Barbee told police that he and Underwood, who was seven months pregnant with his daughter, began to argue and that Underwood kicked him in the leg, Carroll wrote in the affidavit.

Barbee said he punched Underwood, 34, several times in the face, causing her nose to bleed, then held her down and suffocated her, the affidavit states.

At some point, Jayden ran into the room screaming, and Barbee used his hand to cover the boy's mouth and nose until he was dead, according to the affidavit.

Barbee loaded the bodies into the back of Underwood's sport utility vehicle, drove to a deserted location in Denton County and buried them together, the affidavit states.

On Tuesday morning, Barbee was taken from Tyler to Fort Worth. Later, shackled and handcuffed, he led investigators to the grave.

Throughout the day, friends of the victims stopped by Boopa's Bagel Deli, which Underwood co-owned, to place memorials. On Tuesday night, classmates and friends of Jayden gathered outside the deli for a candlelight vigil.

Brittany Bumgarner, a first-grader at North Riverside Elementary School, where Jayden was also a student, placed a card she made among the flowers, balloons and candles that were piled in front of the deli.

Case 4:09-cv-00074-Y   Document 25-1   Filed 10/04/10   Page 90 of 114   PageID 617

Brittany's mother, like other parents at the vigil, struggled to explain to her children how and why the events occurred.

"I'm trying the best that I can," said Heather Bumgarner, who was also accompanied by her 10-year-old son, Chris, a fourth-grader at the school.

"I tell them that they are in a better place," Bumgarner said.

## Barbee's associate

Barbee was not the only one who knew what had happened to Underwood and her son, police said.

Dodd told police that he saw the bodies in the back of Underwood's Dodge Durango and that Barbee told him what had happened.

On Monday, Dodd gave a detailed statement to Fort Worth homicide Detective John McCaskill in Tyler. His account differed slightly from Barbee's. In it, he said he and Barbee were hanging out at Dodd's home early Saturday when Barbee asked him to drop him off at an elementary school on Old Denton Road.

After he did so, Dodd said, Barbee called a short time later, wanting to be picked up at the same location.

In the car, according to the affidavit, Barbee told Dodd that he visited a female friend whom he had impregnated and said, "I just can't do it."

"Dodd assumed he meant that he was going to break up with the female friend," the affidavit states.

A short time later, Barbee asked Dodd to take him back to the area, the affidavit states.

Later, Dodd said, Barbee called him again, this time asking him to bring a can of gasoline to Farm Road 407 east of Justin.

"We went driving around and ran out of gas," the affidavit quotes Barbee as telling Dodd.

When Dodd arrived, he gave Barbee the gas can, then opened the SUV's hatchback and saw the bodies of a woman and a boy, he told police.

Shaken, Dodd left the scene because he did not want to get involved, the affidavit states.

But later, Dodd said, Barbee called again, saying that his truck had broken down south of Denton on Interstate 35W and that he needed a ride.

Dodd told investigators that he went to that location but drove away when he saw Barbee being questioned by a law enforcement officer.

According to the affidavit, a Denton County sheriff's deputy had spotted a man walking along the northbound service road of the interstate at Vintage Drive about 3 a.m. Saturday, not far from where a farmer would later find Underwood's SUV.

The man identified himself to the deputy as David Weekly and gave a false birth date before fleeing east into a wooded area. Deputies couldn't find him.

Barbee later admitted to detectives that he was the man who had run away, the affidavit states.

Dodd told police that after receiving another call from Barbee, he picked up his friend in the area where he had seen Barbee talking to the deputy. He said Barbee then told him that he had killed the woman and child and dumped their bodies near Farm Road 407 where he had run out of gas.

Homicide Sgt. J.D. Thornton said it is unknown whether Dodd will be charged in the case.

"We're still investigating his role in the entire incident," Thornton said.

Case 4:09-cv-00074-Y   Document 25-1   Filed 10/04/10   Page 91 of 114   PageID 618

## Friends left to cope

A friend said Underwood and Barbee met at Boopa's Bagel Deli, a popular breakfast and lunch spot in north Fort Worth.

Barbee was a regular at the deli, which Underwood co-owned with Holly Pils.

"They were romantically involved last year and then went their separate ways," said Debbie Lindley, a friend of Underwood's.

Although they broke up, Lindley said, Underwood and Barbee still saw each other occasionally. When Underwood unexpectedly became pregnant about seven months ago, Lindley said, Underwood told Barbee about the baby.

Lindley said Barbee, who was dating another woman at that time, seemed to accept that he was going to be a father.

"He had told Lisa that he told his mom and that his mom was excited about it and his mom wanted to meet her," Lindley said.

Lindley said Underwood was not bothered that Barbee was dating another woman, Patricia Reinhardt, whom he later married.

"She had come to terms that she was pregnant, she was single and she was OK with it," Lindley said. "She was very independent. She raised Jayden on her own, and she was prepared to do that with this baby."

Lindley said she and Underwood took turns caring for each other's children. Lindley's son, Nicholas, and Jayden were best friends who attended the same school and day care, Lindley said.

"I told him Sunday that Lisa and Jayden had gone somewhere, and we didn't know where and that police were looking for them," Lindley said.

After seeing Underwood's SUV on the news, Nicholas thought he had figured out the mystery, she said.

"He said maybe they had gone camping and the crook took all the camping gear and that's why they can't be found," Lindley said.

On Tuesday afternoon, Lindley struggled with how she would tell her son that his favorite playmate was dead.

## Man admits to slayings

Fort Worth police arrested Stephen D. Barbee, 37, at left, on Tuesday after he acknowledged killing Lisa Underwood and her 7-year-old son, Jayden, below.

## How it happened

The sequence of events according to an arrest warrant affidavit:

• Underwood and Barbee, the father of her unborn child, argue sometime between midnight and 3 a.m. Saturday at her house on Chaddybrook Lane in Fort Worth. Barbee punches her several times and suffocates her. When Jayden runs into the room screaming, Barbee puts his hand over Jayden's face until he dies.

• Barbee places the bodies in the back of Underwood's Dodge Durango and drives north to Farm Road 407, west of Interstate 35W, in Denton County. When he runs out of gas, he calls business partner Ron Dodd for help.

• Dodd takes gas to Barbee. Dodd opens the hatchback of the Durango and sees the bodies. Shaken, he leaves.

• Barbee digs a shallow grave off Farm Road 407, near where he ran out of gas, and dumps the bodies into it.

• Barbee leaves the Durango in a creek bed off Farm Road 2449, just east of I-35W, in Denton.

## From argument to arrest:

**According to the arrest warrant affidavit and Star-Telegram interviews**

Late Friday-early Saturday, 3700 block of Chaddybrook Lane, Fort Worth: Stephen Barbee, 37, goes to the house of Lisa Underwood, 34, who is seven months pregnant with his child. After an argument, he beats and suffocates her, then suffocates her 7-year-old son, Jayden.

Midnight-3 a.m. Saturday, North Riverside Elementary School, Fort Worth: Barbee calls business partner Ron Dodd and asks whether he can pick him up. He tells Dodd that he had visited a friend whom he had gotten pregnant. Dodd drives around with Barbee, then drops him off a few blocks from the school, near Underwood's house.

Midnight-3 a.m. Saturday, at Farm Road 407, west of Interstate 35W, Denton County: Barbee calls Dodd again, asking him for help because "we went driving around and ran out of gas." Upon arriving with a can of gas, Dodd sees Barbee standing next to a blue Dodge Durango. He opens the hatchback and sees the bodies of a woman and child. Dodd is shaken and leaves.

Vintage Drive and Interstate 35W, Denton: A Denton County sheriff's deputy sees a man walking along I-35W. The man identifies himself as David Weekly and runs from the deputy, who is unable to find him. Barbee later tells police that he was that man. Barbee calls Dodd again, who goes to pick him up. Barbee tells Dodd that he killed Underwood and Jayden and dumped their bodies along Farm Road 407.

4 p.m. Saturday, Western Center Boulevard and Beach Street, Fort Worth: Underwood fails to show up for her baby shower at Boopa's Bagel Deli, which she co-owns.

4:20 p.m. Saturday, 3700 block of Chaddybrook Lane: Police go to Underwood's house and find a large amount of blood in the living room. Underwood and Jayden are missing, as is Underwood's 2002 Dodge Durango. An Amber Alert is issued.

8 p.m. Saturday, 4100 block of Walnut Creek Court, Fort Worth: After learning that Barbee is the father of Underwood's unborn child, police interview him at his home. Barbee tells them that he was at Dodd's residence when the Underwoods disappeared and that he will be doing work in Tyler on Sunday.

Sunday evening, 4100 block of Walnut Creek Court: Police conduct surveillance at Barbee's house.

9 a.m. Monday, Farm Road 2449, east of I-35W, Denton: A farmer finds Underwood's Dodge Durango in a creek bed.

5 p.m. Monday, Tyler: Dodd, in the area along with Barbee to trim trees, is contacted by Tyler police. Dodd tells Fort Worth detectives, who have traveled to Tyler, that Barbee told him that he had killed Underwood and her son.

11:20 p.m. Monday, Tyler: Barbee is interviewed again by Fort Worth police and tells them that he suffocated Underwood and her son. He is later arrested and held in the Smith County Jail, with bail set at $2 million. Tuesday morning, he is handed over to Fort Worth police.

Between 10 and 11 a.m. Tuesday,

4315 Farm Road 407, west of I-35W: Barbee shows police where he buried Underwood and her son. The bodies are taken to the Tarrant County Medical Examiner's Office.

## RELATED STORIES

- **Friends gather for a candlelight vigil in memory of Lisa and Jayden Underwood. 14A**

- **Reactions to the news of Stephen Barbee's arrest are mixed. 14A**

- **Jayden's family in Missouri mourns loss of 7-year-old. 14A**

*Star-Telegram Researchers Marcia Melton and Cathy Belcher Contributed to This Report.*

Case 4:09-cv-00074-Y    Document 25-1    Filed 10/04/10    Page 93 of 114    PageID 620

*Deanna Boyd, (817) 390-7655* dboyd@star-telegram.com **Melody McDonald, (817) 390-7386** *mjmcdonald@star-telegram.com*

© 2005 Star-Telegram and wire service sources. All Rights Reserved.
http://www.dfw.com

Case 4:09-cv-00074-Y   Document 25-1   Filed 10/04/10   Page 94 of 114   PageID 621

Star-Telegram com

Posted on Wed, Feb. 23, 2005

## Associate of suspect arrested on parole violation

By Deanna Boyd and Melody McDonald
Star-Telegram Staff Writers

FORT WORTH _ The man who police say saw the bodies of a pregnant woman and her son shortly after their slayings but never called police was arrested Wednesday on a parole violation warrant.

Ron R. Dodd, 33, was arrested by the U.S. Marshal's task force.

Dodd is a friend and business associate of Stephen D. Barbee, the 37-year-old Fort Worth man who police say admitted suffocating Lisa Underwood, the mother of his unborn child, and Jayden, her 7-year-old son from a previous relationship.

He was being interviewed late Wednesday afternoon by detectives investigating the slayings but had not been arrested in the case.

Dodd told police Monday that he had dropped off Barbee near Underwood's home during the early morning hours Saturday, believing Barbee planned to break up with the pregnant woman.

Dodd told investigators that Barbee later called him for help, stating, "We went driving around and ran out of gas," Barbee's arrest warrant affidavit states.

But Dodd told police that when he arrived at the location off Farm Road 407 near Justin with a can of gas, he opened the back door of Underwood's SUV and saw the bodies of a woman and boy.

Shaken, Dodd told police, he drove away. He said he later picked up Barbee in Denton off Interstate 35W after Barbee called him again, stating that his truck had broken down, the affidavit states.

It was then, he said, that Barbee admitted to him that he had killed the woman and child and dumped their bodies near Farm Road 407 where he had run out of gas.

Police said they had not determined whether they will seek charges against Dodd for not reporting the crime.

"We are speaking with Mr. Dodd and we will make a determination as to our course of action regarding Mr. Dodd or any other person involved in the interview process when the appropriate time comes," said Lt. Gene Jones, a police spokesman.

© 2005 Star-Telegram.com and wire service sources. All Rights Reserved
http://www.dfw.com

Case 4:09-cv-00074-Y   Document 25-1   Filed 10/04/10   Page 95 of 114   PageID 622

Star-Telegram .com

Posted on Wed, Feb. 23, 2005

# Acquaintances' views on suspect differ

By Aman Batheja and Mitch Mitchell
Star-Telegram Staff Writers

Azle residents who watched Stephen D. Barbee grow up expressed disbelief Tuesday that he had been arrested in connection with the death of a pregnant woman and her 7-year-old son.

"As far as I know, he's never been in trouble," said Joyce Admire, who lives across the street from Barbee's parents on Walnut Creek Drive in Azle.

Others, however, paint a different picture of the man accused of killing Lisa Underwood, who was seven months pregnant with his child, and her son, Jayden.

"When I found out that it was Barbee, I wasn't surprised," said Tim Housman, Barbee's one-time neighbor in unincorporated Tarrant County, near Haslet.

Stephen Barbee's parents, Billy and Jackie Barbee, have lived in Azle for about 30 years, Joyce Admire said.

Several neighbors were concerned for the Barbees and how they were coping with the news about their son.

Billy Barbee, retired from Bell Helicopter, suffers from health problems, Jim Admire said. Jackie Barbee is a retired schoolteacher, he said.

Throughout the day, neighbors stopped by to offer support to the Barbees, who declined to comment.

"We wanted to go there and see if they need anything," Joyce Admire said. "We wish there was something we could do to help them."

Stephen Barbee was the baby of the family whose two older siblings earlier died, said Stanley Statch, who grew up next door to the Barbees. A son was killed in a car accident about 20 years ago, and a daughter died of an illness, Statch said.

"The parents are just taking it real hard. That was their last child," said Statch, who works in the pagination department for the *Star-Telegram*.

About once a month, Stephen Barbee would go to the lake with the boat that still sits in the Barbees' driveway, Statch said.

Often during his visits, he would find time to help his father with yardwork, Statch said.

"He was probably one of the last people you'd expect this from," Statch said.

Barbee was involved with at least two companies: a tree-trimming business called All Four Seasons and Cowboy Cutters, which does concrete work.

Both are in Haslet, according to the Texas secretary of state's office.

Housman lived two houses up the street from Barbee and his wife, Theresa. They have since divorced.

Housman said Barbee used to start huge fires, fed with clippings from his tree-trimming service.

Barbee would set the fires in the bar ditch and then leave, Housman said.

"These fires would burn for hours, and there was no one around to make sure that the fire did not get out of control and consume the whole neighborhood," Housman said.

"Barbee was not the most likable of people," he said.

Housman also knew Ron Dodd, the man who provided transportation to Barbee on the day of the killings, according to the arrest warrant affidavit. Dodd moved in with Theresa Barbee after Barbee moved out, Housman said.

The house where Theresa Barbee lives is in the 200 block of Ridge Country Road and is valued at $400,000, according to the Tarrant Appraisal District.

"It was my impression that the two didn't get along," Housman said of Dodd and Barbee.

Randy Voss said he had known Barbee since 1995 and kept in contact with Barbee as he grew his business.

Voss described Barbee as depressed during the time that he knew him, prone to drinking and in trouble with his wife because of his extramarital affairs.

"That was just Stephen's personality," Voss said. "He always wanted to be the wheel. He wanted to run around, buy new cars."

Most recently, Stephen Barbee lived on Walnut Creek Court near Fossil Creek Golf Course, with Patricia Reinhardt.

A neighbor, who asked not to be identified because he lived near Barbee, said he has seemed like a normal, nice guy since moving in about seven months ago.

"There was no drama in this house," the neighbor said. "As far as I've known him, which is since this summer, it's just been him and Trish."

*Mitch Mitchell, (817) 390-7420 mitchmitchell@star-telegram.com*

© 2005 Star-Telegram and wire service sources. All Rights Reserved.
http://www.dfw.com

Star-Telegram .com

Posted on Wed, Feb. 23, 2005

# Authorities: Suspect tells police he suffocated woman, son

By MELODY MCDONALD and DEANNA BOYD
Fort Worth Star-Telegram

**DENTON, Texas -** Stephen D. Barbee, 37, the suspect in the slaying of a pregnant woman and her 7-year-old son in North Texas, told homicide detectives that he suffocated the woman and her son after arguing with her over his refusal to leave his wife.

The bodies of Lisa Underwood, 34, and her son Jayden were found Tuesday after Barbee, the father of the unborn baby, led authorities to their shallow grave off a rural road near Justin in North Texas, police said.

Barbee, who worked in the concrete and tree-clearing business, was arrested in Tyler on a capital murder warrant early Tuesday after making the admission. He was being held in the Mansfield Jail, with bail set at $2 million.

Police turned their attention to Barbee on Saturday shortly after finding blood on the carpet, walls and furniture of Underwood's house in north Fort Worth.

After determining that Barbee was the father of Underwood's unborn child, police questioned him about the missing woman and her son. He told investigators that he was at his business partner's home at the time of their disappearance.

On Monday night, Barbee's story changed.

Fort Worth police had traveled to Tyler, near where Barbee had told police he would be clearing trees if they needed to talk to him again.

This time, Barbee admitted that he had killed the mother and son.

According to an arrest warrant affidavit, he told Detective Mike Carroll that Ron Dodd, a friend and business associate, had dropped him off at Underwood's house late Friday.

Barbee told police that he and Underwood, who was seven months pregnant with his daughter, began to argue and that Underwood kicked him in the leg, Carroll wrote in the affidavit.

Barbee said he punched Underwood several times in the face, causing her nose to bleed, then held her down and suffocated her.

At some point, Jayden ran into the room screaming, and Barbee used his hand to cover the boy's mouth and nose until he was dead, according to the affidavit.

Barbee loaded the bodies into the back of Underwood's sport utility vehicle, drove to a deserted location in Denton County and buried them together, the affidavit states.

On Tuesday morning, Barbee was taken from Tyler to Fort Worth. Later, shackled and handcuffed, he led investigators to the grave.

Throughout the day, friends of the victims stopped by Boopa's Bagel Deli, which Underwood co-owned, to place memorials. On Tuesday night, classmates and friends of Jayden gathered outside the deli for a candlelight vigil.

Brittany Bumgarner, a first-grader at North Riverside Elementary School, where Jayden was also a student, placed a card she made among the flowers, balloons and candles that were piled in front of the deli.

Brittany's mother, like other parents at the vigil, struggled to explain to her children how and why the events occurred.

"I'm trying the best that I can," said Heather Bumgarner, who was also accompanied by her 10-year-old son, Chris, a fourth-grader at the school.

"I tell them that they are in a better place," Bumgarner said.

Barbee was not the only one who knew what had happened to Underwood and her son, police said.

Dodd told police that he saw the bodies in the back of Underwood's Dodge Durango and that Barbee told him what had happened.

On Monday, Dodd gave a detailed statement to Fort Worth homicide Detective John McCaskill in Tyler. His account differed slightly from Barbee's. In it, he said he and Barbee were hanging out at Dodd's home early Saturday when Barbee asked him to drop him off at an elementary school on Old Denton Road.

After he did so, Dodd said, Barbee called a short time later, wanting to be picked up at the same location.

In the car, according to the affidavit, Barbee told Dodd that he visited a female friend whom he had impregnated and said, "I just can't do it."

"Dodd assumed he meant that he was going to break up with the female friend," the affidavit states.

A short time later, Barbee asked Dodd to take him back to the area, the affidavit states.

Later, Dodd said, Barbee called him again, this time asking him to bring a can of gasoline to Farm Road 407 east of Justin.

"We went driving around and ran out of gas," the affidavit quotes Barbee as telling Dodd.

When Dodd arrived, he gave Barbee the gas can, then opened the SUV's hatchback and saw the bodies of a woman and a boy, he told police.

Shaken, Dodd left the scene because he did not want to get involved, the affidavit states.

But later, Dodd said, Barbee called again, saying that his truck had broken down south of Denton on Interstate 35W and that he needed a ride.

Dodd told investigators that he went to that location but drove away when he saw Barbee being questioned by a law enforcement officer.

According to the affidavit, a Denton County sheriff's deputy had spotted a man walking along the northbound service road of the interstate at Vintage Drive about 3 a.m. Saturday, not far from where a farmer would later find Underwood's SUV.

The man identified himself to the deputy as David Weekly and gave a false birth date before fleeing east into a wooded area. Deputies couldn't find him.

Barbee later admitted to detectives that he was the man who had run away, the affidavit states.

Dodd told police that after receiving another call from Barbee, he picked up his friend in the area where he had seen Barbee talking to the deputy. He said Barbee then told him that he had killed the woman and child and dumped their bodies near Farm Road 407 where he had run out of gas.

Homicide Sgt. J.D. Thornton said it is unknown whether Dodd will be charged in the case.

"We're still investigating his role in the entire incident," Thornton said.

A friend said Underwood and Barbee met at Boopa's Bagel Deli, a popular breakfast and lunch spot in north Fort Worth.

Barbee was a regular at the deli, which Underwood co-owned with Holly Pils.

Authorities::Suspect tells police he suffocated woman, son

"They were romantically involved last year and then went their separate ways," said Debbie Lindley, a friend of Underwood's.

Although they broke up, Lindley said, Underwood and Barbee still saw each other occasionally. When Underwood unexpectedly became pregnant about seven months ago, Lindley said, Underwood told Barbee about the baby.

Lindley said Barbee, who was dating another woman at that time, seemed to accept that he was going to be a father.

"He had told Lisa that he told his mom and that his mom was excited about it and his mom wanted to meet her," Lindley said.

Lindley said Underwood was not bothered that Barbee was dating another woman, Patricia Reinhardt, whom he later married.

"She had come to terms that she was pregnant, she was single and she was OK with it," Lindley said. "She was very independent. She raised Jayden on her own, and she was prepared to do that with this baby."

Lindley said she would have known if Underwood had felt threatened by Barbee.

"If she did, she would have let me know. She would have let her mom know," Lindley said. "She would have protected Jayden any way that she could if she would have known something was not right."

Lindley said a strange twist of fate led Jayden to be home at the time that police say Barbee killed the boy and his mother.

The boy usually spent weekends at his grandmother's home because Underwood worked at the bagel shop on Saturdays, she said.

However, Jayden was supposed to attend a friend's birthday party Saturday morning and then his mother's baby shower, after which he would visit his grandmother, Lindley said.

"I would assume that Stephen knows that Jayden was usually not at home with her on the weekends," Lindley said.

Lindley said she doesn't believe that Underwood had ever introduced her son to Barbee.

"She's very protective of her son," Lindley said. "She didn't want someone to come into his life for six months ... and then leave. She wasn't going to put Jayden into that position unless it was the real thing."

Lindley said she and Underwood took turns caring for each other's children. Lindley's son, Nicholas, and Jayden were best friends who attended the same school and day care, Lindley said.

"I told him Sunday that Lisa and Jayden had gone somewhere, and we didn't know where and that police were looking for them," Lindley said.

After seeing Underwood's SUV on the news, Nicholas thought he had figured out the mystery, she said.

"He said maybe they had gone camping and the crook took all the camping gear and that's why they can't be found," Lindley said.

On Tuesday afternoon, Lindley struggled with how she would tell her son that his favorite playmate was dead.

*(Knight Ridder Newspapers researchers Marcia Melton and Cathy Belcher contributed to this report.)*

© 2005 KRT Wire and wire service sources. All Rights Reserved.
http://www.dfw.com

Case 4:09-cv-00074-Y   Document 25-1   Filed 10/04/10   Page 100 of 114   PageID 627

**Star-Telegram.com**

Posted on Wed, Feb. 23, 2005

# Memorials and memories flow at bagel shop

By Leila Fadel and John Gutierrez-Mier
Star-Telegram Staff Writers

**FORT WORTH -** Friends, acquaintances and customers cried together, dropped off flowers and wrote notes throughout the day Tuesday at Boopa's Bagel Deli.

On Tuesday night, in memory of Lisa Underwood and her 7-year-old son, Jayden, dozens of children clutching stuffed animals and handmade cards gathered for a candlelight vigil in front of the deli hoping to comfort one another.

The bodies of Underwood and Jayden were found Tuesday morning in Denton County near Justin. Stephen D. Barbee, the father of Underwood's unborn child, was arrested in connection with the deaths.

Heather Bumgarner, whose daughter, Brittany, attends North Riverside Elementary School where Jayden was also a student, struggled to keep her composure as the first-grader knelt and placed a card she made among a pile of flowers, balloons and candles.

"I'm doing the best that I can in trying to explain why this happened," said Bumgarner, who also brought her 10-year-old son, Chris, to the vigil.

Some of the mourners, such as Frank Drabik, the den leader of Cub Scout Pack 165 based at Jayden's school, remembered him as a typical little boy who liked to laugh and play.

But like other parents, Drabik struggled with how to explain what happened to his four young sons.

"They don't understand why he's gone or what happened," Drabik said. They have religious questions on how or why God let this happen. It's tragic."

Family friend Debbie Lindley thanked the crowd for their support.

"I'm really glad that we have come together during all this," said Lindley, who added that the deli would soon re-open. "All of the flowers and candles are an inspiration."

People streamed to the deli to remember the pair throughout the day.

They recounted stories about ordering an Eggel, a popular breakfast bagel sandwich, and Jayden napping on the couch before school, a blanket pulled over his head.

"She was raising a bagel shop kid," said Mary Ann Bane, a friend and customer of Underwood's for six years. "When you walk in, they know your name and they know your sandwich."

Erin Saylors, 18, drove to the deli to try to fill the emptiness, she said. She had worked at the bagel shop and baby-sat Jayden for more than a year. She would drop him off at school when Underwood couldn't.

"I thought I could find some kind of comfort here," Saylors said, crying. "I'll never get them back."

While making dough and serving bagels, she and other employees would suggest names for Underwood's daughter, who was due in two months. Underwood had liked the name McKinsey, Saylors said.

Ian Korpi, 5, dropped off flowers for Underwood, stickers for Jayden and a pink stuffed bunny for the baby. He didn't quite understand that they had been killed, his mother, Lara Korpi said.

Case 4:09-cv-00074-Y   Document 25-1   Filed 10/04/10   Page 101 of 114   PageID 628

Ian's brother, Phillip, celebrated his seventh birthday Saturday, but Underwood and Jayden failed to show up, Lara Korpi said.

On Saturday afternoon, Korpi took Jayden's goody bag to the planned afternoon baby shower at the bagel shop.

Underwood never arrived.

"We thought she was just late, stuck in traffic," Korpi said. "We're going to miss her. I can just see her in the bagel shop, her making the sandwiches."

Underwood was an active mother as well as a friendly businesswoman. She was involved with the Cub Scouts, was room mother during Jayden's kindergarten year and was in the PTA.

Children, parents and teachers at North Riverside Elementary grappled Tuesday with the deaths, said Jason Meyer, a Keller school district spokesman.

The district brought in a team of crisis counselors to the school, set up safe rooms for students and sent letters home offering parents tips on how to talk to their children.

"He was a very well-liked student," Meyer said. "He was very proud of his work and very eager to please his teacher."

*Leila Fadel, (817) 685-3806 lfadel@star-telegram.com*

© 2005 Star-Telegram and wire service sources. All Rights Reserved.
http://www.dfw.com

Star-Telegram.com

Posted on Thu, Feb. 24, 2005

# Suspect's wife says he's not a murderer

By Melody Mcdonald and Deanna Boyd
Star-Telegram Staff Writers

**FORT WORTH -** Trish Barbee wants the world to know that her husband loves children and is "not capable" of killing a pregnant woman and her 7-year-old son.

"It's impossible," Barbee said in a tearful interview Wednesday night. "He is the sweetest man in the world."

Stephen D. Barbee, 37, her husband of two months, is in the Mansfield Jail, accused of capital murder in the slayings of Lisa Underwood, 34, and her son, Jayden.

"I'm not mad at him," said Barbee, 39. "I don't hate him. I still love him."

Barbee said that she talked to her husband in jail Wednesday for the first time since his arrest Tuesday in Tyler and that he was doing "awful."

"He said everyone has this all wrong," she said. "I said, 'What do you mean?' And he just started crying. He just kept saying how much he loved me."

Barbee said her husband told her that he was not sure he was the father of Underwood's unborn child and that Underwood had been calling him, threatening to tell her about the baby.

"She was trying to blackmail him," Barbee said in an interview with the *Star-Telegram*. "She wanted his money. She said she wanted his business. ... She even said that she wanted to take him to the cleaners."

Investigators in the case gave little credence to Trish Barbee's allegations.

"I wouldn't expect any other response from an accused killer's wife," said Detective R.A. Gallaway of the major case unit.

Homicide Sgt. J.D. Thornton said Barbee's comments didn't "merit a response.

"Actions committed by a suspect in a case like this cannot be reasonably explained or justified," he said.

Barbee said she first learned about Underwood in 2003, a few months after she and Stephen Barbee started dating.

She said Underwood came to Stephen Barbee's apartment and started banging on the door one morning.

"He said it was the girl he used to go out with," Barbee said. "He told her to go away and don't come back."

Later that day, she said, they found a note Underwood had stuck under a windshield wiper on Stephen Barbee's car.

"She said on the note: 'How come you haven't called me? Why haven't you returned my calls? What did I do wrong?' " Barbee said. "She wrote, 'Please call me,' and she underlined it. She signed it Lisa."

Barbee said Stephen Barbee, a former reserve police officer in Blue Mound, told her that he had dated Underwood a few times and that the woman now wouldn't leave him alone.

"I asked him if he told her about me and he said, 'Yes.' "

She said that she and Stephen Barbee got married in Las Vegas in December and that she had no idea Underwood was still calling her husband. She said she didn't learn that Underwood was pregnant until police came to talk to her husband Saturday night, after Underwood and her son were reported missing.

Barbee said she asked her husband who they were talking about and he said it was the same woman who had banged on his apartment door.

"That is all he told me at that time," she said.

On Monday, Barbee said, she and her two children accompanied Stephen Barbee to Tyler, where he was cutting trees.

She said police called them on a cellphone and they met the officers at the Tyler police station. There, Barbee said, her husband was interviewed for three and half hours before being arrested.

Barbee said her husband told her after his arrest that he had been keeping the phone calls a secret because "he thought I would leave him.

"He said he couldn't live without me. He said he was sorry. He didn't mean to hurt me."

Barbee, who works as a secretary for a Fort Worth law firm, said her husband told her that Underwood had told him another man was the father of her unborn child.

Nevertheless, Barbee said, her husband told her that he went to Underwood's home Friday night to talk to her about the pregnancy and, perhaps, child support.

"He wanted to talk to her and work something out," Barbee said. "She started arguing with him and yelling at him. She hit him and kicked him and he said she wouldn't stop.

"That's all I'm going to tell you that he said."

Gallaway, a lead investigator in the case, said allegations that Underwood attacked Stephen Barbee appear untrue.

"I'm confident that the evidence presented to the district attorney's office will contradict that statement," Gallaway said.

Debbie Lindley, a close friend of Underwood's, vehemently denied the accusation that Underwood was harassing Stephen Barbee or trying to blackmail him.

Lindley said the only thing that Underwood ever asked of Barbee was that he provide health insurance for the baby.

"If you call asking for medical care for your unborn child 'blackmailing,' then that's what she was asking for," Lindley said.

Lindley said Underwood had no reason to demand money from Barbee.

"She had a house. She'd lived there for three years. She was able to pay her bills. She lived independently. ... She was making it on her own just fine. Why would she do that?"

Barbee said she met Stephen Barbee 13 or 14 years ago when he worked with her ex-husband, Michael Reinhardt, who is the father of her two children.

Barbee and Reinhardt divorced in 2001 and, in September 2003, she and Stephen Barbee reconnected.

"We got to talking and he knew I was divorced," she said. "He asked me out and we started dating."

She characterized Barbee as a romantic who often brought her flowers.

"He called me all day everyday, He just wanted to hear my voice."

She said he adores her 6-year-old son and 9-year-old daughter, as they do him.

Case 4:09-cv-00074-Y   Document 25-1   Filed 10/04/10   Page 104 of 114   PageID 631

"He is absolutely the most wonderful man in the world," she said. "He loves those kids and they love him so much. He is not capable of this. He is just not. He wouldn't hurt a fly, and he loves children."

In fact, Barbee said, the couple were planning on having a child of their own.

Barbee stressed that her husband is not a violent man.

"He and I have never had a fight," she said. "... He has never even yelled at me."

"All he cares about is taking care of me and making sure we're comfortable," she said. "I don't think he did this. It's impossible. I'm not supposed to talk to anyone, but I can't stand for people to think he's bad because he is not."

## ● Friend of suspect arrested on parole violation. 15A

*Staff Writer Mitch Mitchell Contributed to This Report.*
*Deanna Boyd, (817) 390-7655 dboyd@star-telegram.com Melody McDonald, (817) 390-7386 mjmcdonald@star-telegram.com*

© 2005 Star-Telegram and wire service sources. All Rights Reserved.
http://www.dfw.com

Case 4:09-cv-00074-Y   Document 25-1   Filed 10/04/10   Page 105 of 114   PageID 632

Star-Telegram .com

Posted on Thu, Feb. 24, 2005

# Barbee transferred to county jail

By Deanna Boyd
Star-Telegram Staff Writer

FORT WORTH - A man accused of killing the mother of his unborn child and her 7-year-old son was transferred to the Tarrant County Jail on Thursday after being formally charged with capital murder.

Stephen D. Barbee, handcuffed and wearing blue jeans and a white T-shirt, kept his back to the media as Tarrant County sheriff's deputies escorted him into the jail, ignoring questions by a reporter.

Barbee is being held with bail set at $2 million.

Court documents state Barbee confessed to investigators that he suffocated Lisa Underwood and Jayden, her son from another relationship, after he and Underwood began arguing over his refusal to leave his wife.

Barbee told police he then loaded the bodies of the seven-months pregnant woman and her son into Underwood's sport utility vehicle, drove them to a wooded area near Justin and buried them in a make-shift grave. He then abandoned the SUV in Denton, documents state.

The bodies were found Tuesday morning after Barbee, arrested several hours earlier in Tyler, led authorities to the grave site.

Terry Grisham, executive administrator with the sheriff's department, said Barbee will undergo mental health screening, as is routine.

Barbee will be held in a single cell, a precaution taken, Grisham said, because Barbee is accused of killing a child and unborn child and is "somebody who is a high-profile inmate that a lot of the other inmates might want to gain notoriety by trying to harm."

"That's very standard so he shall be by himself," Grisham said.

Deanna Boyd, (817) 390-7655
dboyd@star-telegram.com

© 2005 Star-Telegram.com and wire service sources. All Rights Reserved
http://www.dfw.com

Star-Telegram.com

Posted on Thu, Feb. 24, 2005

# Man jailed on parole violation

By Deanna Boyd and Melody Mcdonald
Star-Telegram Staff Writers

**FORT WORTH –** The man who police say did not report seeing the bodies of a pregnant woman and her son shortly after they were killed was arrested Wednesday on a parole violation warrant.

Ron R. Dodd, 33, was arrested by the U.S. marshal's task force Wednesday afternoon after going to meet with his parole officer.

Dodd is a friend and business associate of Stephen D. Barbee, the 37-year-old Fort Worth man who police said admitted suffocating Lisa Underwood, the mother of his unborn child, and Jayden, her 7-year-old son from a previous relationship.

Dodd was interviewed late Wednesday afternoon by major case and homicide detectives investigating the slayings. He has not been arrested in connection with the slayings. He was being held in the Tarrant County Jail on Wednesday night without bond.

Dodd told police Monday that he had dropped off Barbee near Underwood's home early Saturday morning, believing that Underwood planned to break up with her.

Dodd told investigators that Barbee later called him for help, saying, "We went driving around and ran out of gas," according to Barbee's arrest warrant affidavit.

But Dodd told police that when he arrived with a can of gas at the location off Farm Road 407 near Justin, he opened the back door of Underwood's sport utility vehicle and saw the bodies of a woman and boy.

Shaken, he drove away, Dodd told police. He said he later picked up Barbee in Denton off Interstate 35W after Barbee called him again, stating that his truck had broken down, the affidavit said.

It was then, he said, that Barbee admitted he had killed the woman and child and dumped their bodies near Farm Road 407, where he had run out of gas.

Police officials said Wednesday that it has not been determined whether they will seek charges against Dodd in connection with the slayings or for not reporting the crime.

"We are speaking with Mr. Dodd, and we will make a determination as to our course of action regarding Mr. Dodd or any other person involved in the interview process when the appropriate time comes," said Lt. Gene Jones, a police spokesman.

In December 1996, Dodd pleaded guilty to aggravated assault in Dallas County and received five years' probation. Five months later, his probation was revoked and he was sentenced to eight years in prison.

Details of that offense were not immediately known.

Mike Viesca, a spokesman for the Texas Department of Criminal Justice, said Dodd was paroled in January 2003.

He was to remain on parole until Dec. 6, 2006.

*Deanna Boyd, (817) 390-7655 dboyd@star-telegram.com Melody McDonald, (817) 390-7386 mjmcdonald@star-telegram.com*

Case 4:09-cv-00074-Y    Document 25-1    Filed 10/04/10    Page 107 of 114    PageID 634

Star-Telegram.com

Posted on Fri, Feb. 25, 2005

# Capital murder charges filed

By Deanna Boyd and Melody Mcdonald
Star-Telegram Staff Writers

**FORT WORTH -** Stephen D. Barbee was formally charged with capital murder Thursday in the death of Lisa Underwood, a woman he once dated who was seven months pregnant, and her 7-year-old son, Jayden.

The Tarrant County district attorney's office has not decided whether to seek the death penalty, said Assistant District Attorney Kevin Rousseau, who will prosecute Barbee.

Capital murder is punishable by life in prison or death by lethal injection.

"There is a formal review process for all capital murders," Rousseau said. "There is a committee made up of senior management in our office, and the decision will be made by them. I don't know when that will be."

Prosecutors can file a capital murder charge when more than one person is killed in the same incident.

Barbee was transferred Thursday morning from the Mansfield Jail to the Tarrant County Jail, where he will be held in a one-person cell because he is a high-profile inmate. His bail is $2 million.

"A lot of the other inmates might want to gain notoriety by trying to harm" Barbee, said Terry Grisham, a spokesman for the Tarrant County Sheriff's Department.

Wearing bluejeans, a white T-shirt and unlaced hiking boots, a handcuffed Barbee kept his back to reporters and photographers as sheriff's deputies escorted him into the jail, ignoring questions.

When Barbee was booked into jail, Grisham said, he was asked to surrender a Tarrant County identification card he had been issued when his company, Cowboy Cutters, was hired to do concrete work at one of the jails.

Grisham said Barbee will undergo a routine mental health screening.

According to investigators, Barbee, 37, confessed that he suffocated Underwood and Jayden after arguing with Underwood about his refusal to leave his wife. He then buried their bodies in Denton County, police reported.

Autopsies conducted by the Tarrant County Medical Examiner's Office indicate that Underwood and Jayden were suffocated, said police Sgt. Rene Kamper of the major case unit.

Kamper said there was no apparent trauma to the fetus, which apparently died from a lack of oxygen. DNA tests are being done to determine who the baby's father is, Kamper said.

Trish Barbee, who married Stephen Barbee in December, told the *Star-Telegram* on Wednesday that her husband does not know whether he was the father.

Thursday afternoon, Fort Worth Fire Department divers found Underwood's purse in a creek near where the bodies were found, Kamper said.

According to a search warrant obtained by the *Star-Telegram* on Thursday, police seized carpet, a couch cover and blankets from the couch of Underwood's home, all stained with blood.

Police also seized more than 60 other items from the home, from Underwood's sport utility vehicle and in the area near where the SUV was found Monday, the documents show.

Capital murder charges filed

Barbee does not appear to have a criminal record. But in 2003, the Sheriff's Department investigated a complaint that Barbee assaulted a guest at a July 4 party at the Haslet home he shared with Theresa Barbee, his ex-wife.

Johnny Garrett, 32, said Thursday that he met Barbee for the first time at the party, which he attended with Theresa Barbee's cousin and a friend.

Barbee struck him in the face without provocation, Garrett said.

"I felt like I had walked into a swarm of bees," Garrett said. "In the split second, I felt the rage in that man. I'm not a weak person, but I was caught off guard."

Garrett said his brothers took him the hospital. He had a broken nose, a collapsed sinus and crushed bones around his left eye.

In the Sheriff's Department incident report, however, witnesses had differing accounts. One person told an investigator that Garrett had started the fight after Barbee told Garrett's friend to stop dancing provocatively in front of children.

"The district attorney, because of the conflicting statements, declined to prosecute," Grisham said.

Garrett said he was told that the district attorney's office thought it was a "mutual combat" situation.

Barbee was a reserve officer for the Blue Mound Police Department from August 1991 to 1995, according to the Texas Commission on Law Enforcement Officer Standards and Education.

Lillian Alderete, open records coordinator for the state agency, said records show that Barbee passed the peace officer's exam in March 1991. But he was never commissioned as a peace officer, only as a reserve officer.

Sgt. Alan Coker, a Tarrant County sheriff's deputy who went through the Tarrant County Junior College police academy with Barbee in 1991, said Barbee was an average student who struggled to get through the academy.

"Last time I saw him was 10 years ago," said Coker, who oversees the Sheriff's Department's crime scene investigations.

"He said he gave up his peace officer's license because he could make more money in construction."

*Deanna Boyd, (817) 390-7655 dboyd@star-telegram.com Melody McDonald, (817) 390-7386 jmcdonald@star-telegram.com*

© 2005 Star-Telegram and wire service sources. All Rights Reserved.
http://www.dfw.com

Case 4:09-cv-00074-Y   Document 25-1   Filed 10/04/10   Page 109 of 114   PageID 636

Star-Telegram com

Posted on Fri, Feb. 25, 2005

# Company distances itself from Barbee

**By Melody McDonald and Deanna Boyd**
**Star-Telegram Staff Writer**
FORT WORTH _ As investigators continued searching for evidence Friday, the ex-wife of Stephen Barbee distanced herself and her company from the man charged in the suffocation deaths of a pregnant woman and her 7-year-old son.

"Cowboy Cutters LLC and Theresa Barbee would like to express their shock, sadness and dismay at the disgusting and despicable events that took place and resulted in the murder of three innocent individuals: Lisa Underwood, her unborn child and Jayden Underwood," said Chris Edmonson, a friend of Theresa Barbee.

During Theresa and Stephen Barbee's seven-year marriage, the couple purchased Cowboy Cutters, a concrete cutting and coring business. When they divorced in 2003, each retained 50 percent of the business, according to court documents.

Standing outside the Keller-based business Friday, Edmonson said that Theresa Barbee was too devastated to talk, but she wanted the public to know that her ex-husband's involvement in the business was basically just his name on paper.

"Theresa has managed Cowboy Cutters since a time prior to her divorce from Stephen Barbee and will continue to do so in the future," Edmonson said. "For a long time prior to the most recent tragic events, Stephen Barbee has not been involved in the day-to-day operations of Cowboy Cutters and will not be involved in the future."

Barbee, 37, was arrested Tuesday morning in Tyler, near where he had been cutting trees with friend Ron Dodd. Hours later, Barbee led authorities to the makeshift graves of Lisa and Jayden Underwood off a rural road near Justin. Barbee has been charged with capital murder.

The following day, Dodd, an ex-convict who lives with Theresa Barbee in Haslet and is a field supervisor for Cowboy Cutters, was arrested on a parole violation. Dodd, 33, told investigators that he had given Barbee a ride to Underwood's home and, later, saw the Underwoods' bodies but did not report it.

On Friday, divers returned to a creek near where Underwood and her son were found buried, searching for more evidence. On Thursday, divers located Underwood's purse in the creek.

Mounted patrol officers searched for additional evidence on Friday in Denton near where Underwood's sport utility vehicle had been found abandoned Monday.

Detective R.A. Gallaway said authorities also are searching vehicles connected to the case. The searches include an RV in Tyler, where Barbee, his wife and two stepchildren and Dodd had been staying at the time of Barbee's arrest.

During the news conference Friday, Edmonson said he did not know why Dodd was working with Barbee in Tyler, but said they were not working on behalf of Cowboy Cutters.

Edmonson, whose wife is an employee of Cowboy Cutters, said he last saw Barbee about three months ago. He said he saw Dodd this week, before he was arrested.

"He just said, 'I wasn't involved,'" Edmonson said. "...He was very obviously shaken and upset. He just repeated the story he had given to police."

In addition to knowing Dodd and Barbee, Edmonson said he also knew Lisa and Jayden Underwood. He said he frequented Boopa's Bagel Deli, the shop Underwood co-owned with Holly Pils.

"My thoughts about what happened, I can't even put into words _ disgust and anger at the situation," he said.

He also said he was "shocked" to learn about a relationship between Barbee and Underwood, who had said that Barbee was the father of the unborn child.

"Cowboy Cutters and Theresa Barbee's thoughts and prayers are with the Underwood family and all of their friends and relatives," he said. "May God bless Lisa, her unborn child and Jayden."

A private funeral for Underwood and her son is scheduled for Saturday with a public reception scheduled at 5:30 p.m.

Case 4:09-cv-00074-Y   Document 25-1   Filed 10/04/10   Page 110 of 114   PageID 637

Saturday at Boopa's Bagel Deli.

Pils said the bagel shop, closed since the disappearance of Underwood and her son, would reopen for business on Monday.

**Melody McDonald, (817) 390-7386** mjmcdonald@star-telegram.com

**Deanna Boyd, (817) 390-7655** dboyd@star-telegram.com

© 2005 Star-Telegram.com and wire service sources. All Rights Reserved.
http://www.dfw.com

Friends remember slain mom, son
Page 1 of 1
Case 4:09-cv-00074-Y Document 25-1 Filed 10/04/10 Page 111 of 114 PageID 638

**Star-Telegram.com**

Posted on Sat, Feb. 26, 2005

# Friends remember slain mom, son

By Scott Streater
Star-Telegram Staff Writer

FORT WORTH - Hours after Lisa Underwood and her 7-year-old son, Jayden, were buried in a private service, more than 100 friends and well-wishers gathered Saturday to celebrate the life of their two friends.

The bodies of Lisa Underwood, who was seven months pregnant, and Jayden were found Tuesday morning in Denton County. Stephen Barbee, who police say admitted suffocating the two, has been charged with capital murder.

Despite Saturday's damp weather, dozens crammed into Boopa's Bagel Deli, the popular bagel shop co-owned by Lisa Underwood. They hugged, fought back tears, and talked about the impact Lisa and Jayden Underwood had on their lives.

Cynthia Pigeon said her family was blessed to have known Lisa Underwood.

When Pigeon and her family moved to Fort Worth in August, they stopped to eat at Boopa's. Exhausted from moving boxes and furniture, and with no dishes unpacked, Lisa Underwood handed Pigeon a huge pot of tomato soup, muffins and croissants for her two young sons - at no charge.

Pigeon and her family have been back to eat at the deli every Saturday since.

"Lisa was one of the first people we met in Fort Worth, and her hospitality meant so much," she said, her voice choked with emotion. "So we just wanted to come here today. We just wanted to come and pay our respects."

Scott Streater, (817) 390-7657
sstreater@star-telegram.com

© 2005 Star-Telegram.com and wire service sources. All Rights Reserved.
http://www.dfw.com

Case 4:09-cv-00074-Y   Document 25-1   Filed 10/04/10   Page 112 of 114   PageID 639

Star-Telegram.com

Posted on Sun, Feb. 27, 2005

# Paying Respects

**Friends gather to remember slain mom, son**

By Scott Streater
Star-Telegram Staff Writer

**FORT WORTH -** Hours after Lisa Underwood and her 7-year-old son, Jayden, were buried in a private service, more than 100 people gathered Saturday to celebrate the lives of their two friends.

The bodies of Underwood, who was seven months pregnant, and Jayden were found Tuesday in Denton County. Stephen D. Barbee, who police say admitted suffocating the two, has been charged with capital murder.

Despite Saturday's damp weather, dozens crammed into Boopa's Bagel Deli, the popular bagel shop co-owned by Underwood. They hugged and talked about the impact Lisa and Jayden Underwood had on their lives.

Cynthia Pigeon said her family was blessed to have known Underwood.

When Pigeon and her family moved to Fort Worth in August, they stopped to eat at Boopa's. Exhausted from moving boxes and furniture, and with no dishes unpacked, Underwood handed Pigeon a huge pot of tomato soup, muffins and croissants for her two sons -- at no charge.

Pigeon and her family have eaten at the deli every Saturday since.

"Lisa was one of the first people we met in Fort Worth, and her hospitality meant so much," she said, her voice choked with emotion. "So we just wanted to come here today. We just wanted to come and pay our respects."

*Scott Streater, (817) 390-7657 sstreater@star-telegram.com*

© 2005 Star-Telegram and wire service sources. All Rights Reserved.
http://www.dfw.com

Case 4:09-cv-00074-Y   Document 25-1   Filed 10/04/10   Page 113 of 114   PageID 640

Star-Telegram com

Posted on Sat, Feb. 18, 2006

# Taped confession thrown out of Barbee trial

**By MELODY McDONALD**
**STAR-TELEGRAM STAFF WRITER**

FORT WORTH -- The videotaped confession that police got from a man accused of killing a pregnant woman and her 7-year-old son was obtained improperly and will be inadmissible in his capital-murder trial, a state district judge has ruled.

Jurors will, however, be allowed to hear about incriminating statements that Stephen Barbee made to a homicide detective in the bathroom of the Tyler Police Department two days after Lisa and Jayden Underwood were reported missing.

Judge Bob Gill ruled during a suppression hearing Thursday, five days before trial testimony is expected to begin in Barbee's trial.

Barbee, 38, is accused of suffocating Lisa Underwood, whom he once dated, and her son early Feb. 19, 2005, then burying them together in a shallow grave in rural Denton County.

After the Underwoods disappeared from their north Fort Worth home, police traveled to Tyler, where, according to testimony at the suppression hearing, Barbee and his friend Ron Dodd agreed to meet with Fort Worth detectives Feb. 21, 2005, at the Tyler Police Department.

Homicide Detective Mike Carroll said he had been interviewing Barbee separately for some time when Barbee told him he needed to use the restroom. There, Carroll said, Barbee admitted to the killings.

During the 45-minute conversation, Barbee said he and Dodd came up with the plan to kill Lisa Underwood because she was threatening to break up Barbee's marriage, Carroll testified.

Barbee said that Dodd dropped him off at Lisa Underwood's house early Feb. 19, 2005, but that Barbee couldn't go through with it and left. Barbee said that later, after he declined Dodd's offer to hire a "hit man," Barbee returned to Lisa Underwood's home and picked a fight with her, Carroll testified.

Barbee he said punched her in the nose and held her on the ground until she stopped breathing, Carroll testified. Barbee said that when Jayden entered the room crying, Barbee suffocated him too, Carroll testified.

After the bathroom confession, Barbee, using a mapping program on a computer, showed Carroll the remote area in Denton County where he buried the bodies, Carroll said.

Carroll said Barbee then returned to an interview room, where he gave a video-recorded statement, but said he would not discuss Dodd's involvement.

Before Barbee talked about the crime, Carroll asked whether he wanted an attorney. Barbee said he thought he would like to get one and asked Carroll whether that would be bad, according to testimony.

Carroll said he couldn't give legal advice, and the interview continued.

The next morning, Barbee, in a vehicle with Carroll and a police officer, directed Carroll to the bodies.

During two suppression hearings this month, defense attorneys Bill Ray and Tim Moore asked the judge to throw out all of Barbee's statements to police: the one in the bathroom, the one where Barbee mapped out the location of the bodies, the videotaped statement in the interview room and the statements he made the next day while directing police to the bodies.

The defense said that except for the videotaped confession, there was no record that the other statements existed or were true. Carroll did not document them, and the defense attorneys said they first heard about them during the suppression hearing.

Also, defense attorneys said, Carroll violated Barbee's constitutional rights when he kept interrogating Barbee after Barbee said he might want an attorney.

But prosecutor Kevin Rousseau, who is working with Dixie Bersano, said Barbee never made a "clear and unequivocal" request for an attorney during his videotaped statement, as required by law. Rousseau said the other statements were also admissible because they were found to be true. Rousseau pointed out that Barbee later led police to where he had told them the bodies would be.

Gill threw out the videotaped statement, which would have been powerful evidence in front of the jury -- a setback for the prosecution. But Gill is allowing the jury to hear about the other incriminating statements that Barbee made to Carroll, which are undocumented, a decision that will make the defense attorneys' job more challenging.

Before testimony begins, Gill is also expected to decide whether jurors will be allowed to see an incriminating videotaped conversation between Barbee and his wife in the interview room in Tyler before his arrest.

If convicted of capital murder, Barbee would face the death penalty.

Ron Dodd, who in a hearing this month exercised his Fifth Amendment right to remain silent, has been charged with two counts of tampering with physical evidence in Denton County on allegations that he helped Barbee conceal the bodies.

Dodd, 34, remains free on bail, awaiting trial.

*Melody McDonald, (817) 390-7386 mjmcdonald@star-telegram.com*

© 2006 Star-Telegram and wire service sources. All Rights Reserved.
http://www.dfw.com