# EXHIBIT 39

```
18:00   1              IN THE UNITED STATES DISTRICT COURT
                       FOR THE NORTHERN DISTRICT OF TEXAS
        2                       DALLAS DIVISION

        3

            SANDRA WILSON                (    Number 4: 07-cv-708-A
        4        Movant,                 (
            vs.                          (
        5                                (
            NATHANIEL QUARTERMAN,        (
        6   Director, Texas Department   (
            of Criminal Justice,         (
        7   Correctional Institutions    (
            Division,                    (
18:00   8        Respondent.             (    May 12, 2009

        9

       10   _____

                      Hearing on Writ of Habeas Corpus
       11           Before the Honorable John McBryde

       12   _____

       13   A P P E A R A N C E S:

       14

       15   For the Movant:             RODERICK CHRISTOPHER WHITE
                                        LAW OFFICES Of RODERICK C. WHITE
       16                               316 Hemphill Street
                                        Fort Worth, TX 76104
       17                                   817/335-1585
                                            Fax: 817/335-1592
       18                               Email: roderick@rcwhitelaw.com

       19   For the Respondent:         Joseph Peter Corcoran
                                        Texas Attorney General Office
       20                               PO Box 12548
                                        Austin, TX 78711-2548
       21                                   512/936-1400
                                            Fax: 512/936-1280
       22         Email: joseph.corcoran@oag.state.tx.us Attorney

       23

       24   Reported by:                Cassidi L. Casey
                                        1100 Commerce Street, Rm 15D6L
       25                               Dallas, Texas 75242
                                            214-354-3139
```

```
18:00  1              P R O C E E D I N G S
       2          THE COURT:  Good morning.  Okay.  We're here for
       3  a hearing on a limited issue on Number 4: 07-CV-708,
       4  Sandra.  Wilson against Nathaniel Quartermain, Director
       5  TDC Correctional Institutions Division.
       6          Mr. White, do you have someone with you today?
       7          MR. WHITE:  Yes, sir, Roberta Walker.  She's
       8  been admitted.
       9          THE COURT:  Let's have the client stand and
      10  state her name.
      11          MS. WILSON:  Sandra Wilson, your Honor.
      12          THE COURT:  Mr. Corcoran is the lead attorney
      13  for the respondent.
      14          MR. CORCORAN:  Your Honor, this morning Carole
18:00 15  Callaghan is here, also.
      16          THE COURT:  Let's swear the witnesses, whoever
      17  is here as a witness.
      18          Let's see.  Ms. Wilson, Ms. Ray.  Do you have
      19  witnesses you are going to call?
      20          MR. CORCORAN:  Yes, sir.
      21          THE COURT:  Ms. Wilson and Ms. Ray.
      22          (Sworn)
      23          THE COURT:  I don't know that there is anything
      24  else we need to deal with before we get started with the
      25  testimony.  Are you aware of anything?
```

18:00  1         MR. CORCORAN:  Your Honor, I indicated in our

2  last telephone hearing I wanted to make certain that

3  nothing I do here is considered a waiver of the technical

4  legal defenses under 2254.

5         THE COURT:  Well, I don't know what you are

6  going to do.  So I'm not telling you whether it's a

7  waiver.  I'll tell you when it's over with.

8         MR. CORCORAN:  2254(b)(3) indicates whether the

9  State of Texas waives exhaustion, and I can't do it

10  without explicit waiver, and the cases indicate that --

11         THE COURT:  Have you said what you want to say?

12         MR. CORCORAN:  Yes, your Honor, I have.

13         THE COURT:  Okay.  You can be seated.  Anything

14  else we need to deal with before the evidence starts?

18:00 15         MR. WHITE:  No, sir, to my knowledge.

16         THE COURT:  Okay.  Call your first witness.

17         While she is coming to the stand, both of you

18  have filed an exhibit list, and both sides have indicated

19  they have no objections to the exhibits.  Do you want to

20  offer now all of your exhibits in evidence?

21         MR. WHITE:  Yes, your Honor.

22         THE COURT:  Okay.  I'll receive them all in

23  evidence.  I guess it's 1 through 12, isn't it?

24         COURT:  Did you have any exhibits?

25         MR. CORCORAN:  Yes, sir, 13 through 15

18:00    1            THE COURT:  Do you want to do them out of order?

         2            MR. CORCORAN:  Yes, sir.

         3            THE COURT:  Do you have any problem with that?

         4            MR. WHITE:  No, your Honor.

         5            THE COURT:  I will consider Exhibits 13

         6    through 14 have also been received.

         7            Okay.  You may proceed.

         8                        SANDRA WILSON

         9                     DIRECT EXAMINATION

        10    BY MR. WHITE:

        11        Q    Ms. Wilson, do you understand what we're doing

        12    here today?

        13        A    Yes, sir.

        14        Q    What is your understanding of what we're doing

18:00   15    here today?

        16        A    Trying to see what's going on.

        17            THE COURT:  What did you say you understood it

        18    to be?  Why do you think we're here today?

        19            THE WITNESS:  To see what's going on with me.

        20            THE COURT:  Okay.  That's good enough.

        21    BY MR. WHITE:

        22        Q    You are in prison in the TDCJ, correct?

        23        A    Yes.

        24        Q    And you are in Gatesville; is that right?

        25        A    Yes, sir.

18:00   1        Q     And you are in a special unit for mental health

2   and mentally retarded defendants, are you not?

3        A     Yes, sir.

4        Q     And you have counselors and everything while you

5   are down there?

6        A     Yes.

7        Q     And what medications do you take?

8        A     Haldol, 150 milligrams once a month.  I take

9   Thorazine, Methium and Travasol.

10        Q     Do you know what each of those medications are

11   for?

12        A     For my voices and suicide.

13        Q     And you had your Halydol shot one day last week;

14   is that right?

18:00 15        A     Yes, sir.

16        Q     And the rest of the medications you take on a

17   daily basis?

18        A     Yes, sir.

19        Q     And you have had those medications today?

20        A     Yes, sir.

21        Q     Do they affect your ability to understand my

22   questions?

23        A     Yes, sir.

24              THE COURT:  You don't understand his question

25   fully?

WILSON - DIRECT - WHITE                                6

18:00  1             THE WITNESS:  Just a little bit.

       2             THE COURT:  Well, have you understood all of his

       3     questions so far?

       4             THE WITNESS:  Yes, sir.

       5             THE COURT:  Will you let us know if you don't

       6     understand the question?

       7             THE WITNESS:  Yes, sir.

       8             THE COURT:  Of course, I don't think I will know

       9     when she understands the questions.

      10     BY MR. WHITE:

      11        Q    You listed the medications that you take.  What

      12     are your mental health diagnoses or have the doctors told

      13     you from a mental health standpoint exactly what you have?

      14        A    Paranoid schizophrenia, depression, suicidal and

18:00 15     bipolar.

      16        Q    You are actually now doing a fifteen-year

      17     sentence?

      18        A    Yes, sir.

      19        Q    And you received that sentence in January of

      20     2007?

      21        A    Yes, sir.

      22        Q    Do you remember the hearing that day on January

      23     the 5th?

      24        A    Yes, sir.

      25        Q    Let's go back a little bit before that hearing.

WILSON - DIRECT - WHITE                    7

18:00  1    You were actually arrested on November 7th.  Is that

       2    right?

       3        A    Yes.

       4        Q    And you spent a little time in the Mansfield

       5    Jail, correct?

       6        A    Yes.

       7        Q    And then they eventually took you down to

       8    Tarrant County in downtown Fort Worth; is that right?

       9        A    Yes, sir.

      10        Q    And about how long were you in jail before you

      11    met Mr. Ray?

      12        A    About a week.

      13        Q    And where did you first meet him at?

      14        A    In the holding tank area to get the lawyer

18:00 15    appointed to me.

      16        Q    So he was appointed to you, and that's when you

      17    met with him?

      18        A    Yes, sir.

      19        Q    Do you know how long that conversation was?

      20        A    It was like about two seconds.

      21        Q    Do you recall what was said?

      22        A    He told me that the judge wanted to plea bargain

      23    with me for twelve years, and I told him I didn't want it.

      24        Q    Did you tell him why you didn't want it?

      25        A    I didn't know what they really had on me then.

WILSON - DIRECT - WHITE                          8

18:00  1   I was confused and messed up and stuff.  I hadn't had any

       2   medication or nothing like that.

       3        Q    How long had it been since you had had your

       4   medication?

       5        A    About three weeks.

       6        Q    So you have been off your medicines about three

       7   weeks.  Do you act differently when you don't have your

       8   medicines?  What's the difference?

       9        A    I be very scared around people.  I tries to cut

      10   myself and stuff I get so depressed.  And I just don't

      11   know what to do sometime.  I don't know the right thing to

      12   do.

      13        Q    Did you understand at least the brief

      14   conversation that you had with Mr. Ray that first time you

18:00 15   met him?

      16        A    Yes, sir.

      17        Q    Did you discuss -- On the first day, did you

      18   discuss anything about your mental retardation or mental

      19   health issues?

      20        A    Yes, I told Mr. Ray when I was in the holding

      21   tank, I said "Do you know I'm MHMR and I'm suicidal and

      22   stuff like that?"  He didn't respond to it, what I was

      23   telling him.  So I hung myself in the county jail and woke

      24   up in ICU.  Stayed in ICU for five days.  They returned me

      25   back to the jailhouse.

18:00  1          THE COURT:  Let me interrupt you for a minute.

       2    What is it that you say you told Mr. Ray?

       3          THE WITNESS:  He didn't respond to it.

       4          THE COURT:  What did you tell him?

       5          THE WITNESS:  I was in the hospital for hanging

       6    myself, and I had died, and they brought me back, and when

       7    we went to the judge, I thought he was going to bring it

       8    up, but he didn't say anything about it.

       9          THE COURT:  How long before you met Mr. Ray did

      10    you hang yourself?

      11          THE WITNESS:  He was my lawyer.  I did it while

      12    he was my lawyer.  He come to the county jail to visit me,

      13    and they told him I was in the hospital, and I said "Did

      14    they tell you that I had hung myself and they had to bring

18:00 15    me back to life?"  He didn't respond to any of that.

      16          THE COURT:  Is this conversation the first time

      17    you met him?

      18          MR. WHITE:  I believe she may be confused with

      19    that first conversation, and some of this happened well

      20    after that.

      21          THE COURT:  Well, I'll have to let you clear it

      22    up with her if she is confused.

      23    BY BY MR. WHITE:

      24       Q    Now, the first day you met him you only talked

      25    for a couple of seconds?

WILSON - DIRECT - WHITE                    10

18:00  1        A    Yes, sir.

2        Q    And I know we'll talk more about the suicide

3   attempt and other things that happened in the jail for

4   just a minute.  But right now, the first time you met him

5   you talked for a few seconds, correct?

6        A    Yes.

7        Q    And at the first time you met him, did you tell

8   him about your mental health and retardation?

9        A    Yes, I did.

10       Q    You didn't say anything about suicide because

11  that hadn't yet?

12       A    No.

13       Q    But the first time you did discuss your mental

14  health and mental retardation issues?

18:00 15       A    Yes.

16       Q    And what did he tell you?

17       A    He asked me did I know what I was there for, and

18  I told him yes.  I was charged for a dope case.  And he

19  went out and went in with the judge and came back, and he

20  said he wants you to plea bargain for twelve years, and I

21  said "I don't want to plea bargain because I didn't sell

22  no dope to nobody."  And then I didn't see him until I

23  came out of the hospital.

24       Q    So on the first day you met him when he was

25  talking about the twelve years, did you tell him anything

WILSON - DIRECT - WHITE                    11

18:00  1    about your mental retardation and health?

       2         A    Yes.  I told him I was MHMR, and I had a lot of

       3    psych diagnoses.

       4         Q    But you weren't taking your medications?

       5         A    No, sir.

       6         Q    So you did not take the twelve years that Mr.

       7    Ray was talking about the first day?

       8              THE COURT:  Let me ask her a question.  The

       9    twelve years that you are talking about, did you think

      10    that was for a drug offense or what you had pleaded guilty

      11    to earlier?

      12              THE WITNESS:  The twelve years was the

      13    probation.

      14              THE COURT:  For when they terminated you --

18:00 15              THE WITNESS:  No, no.

      16              THE COURT:  You got deferred adjudication for

      17    some kind of theft?

      18              THE WITNESS:  Robbery by bodily injury.

      19              THE COURT:  That's where you got deferred

      20    adjudication from.  And you were in jail because somebody

      21    said you violated your deferred adjudication, and that's

      22    why you were in jail?

      23              THE WITNESS:  Yes, sir.

      24              THE COURT:  Did you understand the twelve years

      25    was what the judge was offering to sentence you for the

WILSON - DIRECT - WHITE                    12

18:00   1    robbery?

      2            THE WITNESS:  Yes.

      3            THE COURT:  Is that what you understood?

      4            THE WITNESS:  Yes, sir.

      5            THE COURT:  Because you were subject to having

      6    your deferred adjudication or probation revoked?

      7            THE WITNESS:  But at the time I thought I was

      8    going for the dope case at the time.  And then after the

      9    dope case got dismissed and then the judge told Mr. Ray to

    10    stand up, and we stood up, and he said anything else you

    11    want to say on her behalf.

    12            THE COURT:  Well, we're getting ahead.  I'm

    13    trying to find out if there was anything else besides the

    14    twelve years.  At the time you didn't think that was for a

18:00 15    drug case, did you?

    16            THE WITNESS:  I thought it was a drug case.

    17    They didn't say nothing about the probation hearing.

    18            THE COURT:  You mean when Mr. Ray came to see

    19    you, you thought he was representing you in the drug case;

    20    is that correct?

    21            THE WITNESS:  Yes, sir.

    22            THE COURT:  Was he, in fact, representing her in

    23    the drug case?

    24            MR. WHITE:  I believe so, your Honor.

    25            THE COURT:  And you thought the twelve years was

WILSON - DIRECT - WHITE                          13

18:00  1   for the drug case?

       2              THE WITNESS:  Yes, sir.

       3   BY MR. WHITE:

       4      Q     So after that first time -- After the first time

       5   you met Mr. Ray, you didn't take the twelve years, and

       6   they take you back to the jail?

       7      A     Yes, sir.

       8      Q     Did they put you in the regular jail with all

       9   the rest of the women or some sort of a special floor or

      10   special place?

      11      A     They put me in with all the womens.

      12      Q     And how did you do when you were in there with

      13   all the women?

      14      A     That's where I got depressed, and I hung myself.

18:00 15      Q     And that would have been sometime around the 1st

      16   of December?

      17              MR. CORCORAN:  Your Honor, may I object for

      18   leading purposes.

      19              THE COURT:  Well, he's been testifying for her

      20   ever since it started.

      21              MR. CORCORAN:  Well, I wanted to see where this

      22   went but --

      23              THE COURT:  I think we better let her testify on

      24   her own, Mr. White.  I understand the problem, and I may

      25   allow some leading.

WILSON - DIRECT - WHITE                      14

18:00   1    BY MR. WHITE:

        2        Q    What happened while you were in jail around the

        3    1st of December?

        4        A    I got depressed, and I went upstairs, tore my

        5    sheet and tied it around my neck tight, and the next thing

        6    I knew I woke up in the ICU.

        7        Q    At the hospital?

        8        A    Yes, sir.

        9        Q    And what happened while you were at the

       10    hospital?

       11        A    I had several doctors took X-rays of my neck,

       12    and I punched a disk out the back of my neck, and they

       13    said I needed surgery.  In the meantime, they gave me a

       14    brace to wear around my neck.  So when I pulled chain at

18:00  15    TDC, I had the brace around my neck.

       16        Q    Did you have medication at the hospital?

       17        A    Yes, sir.

       18        Q    What was that medication?

       19        A    The same kind I was taking, the Halydol and

       20    Thorazine and stuff.

       21        Q    Why did you get depressed and try to hang

       22    yourself in jail?

       23        A    Behind this case because I knew I wouldn't admit

       24    to it.

       25        Q    And how long were you in the ICU?

18:00  1        A    Five days.

       2        Q    And then where did they take you?

       3        A    Back to Tarrant County.

       4        Q    How long before you get back to Tarrant County

       5   is it before you saw Mr. Ray?

       6        A    I seen Mr. Ray a couple of days after I got

       7   back.  He come and visited me.

       8        Q    Tell me about that conversation.  What did you

       9   all talk about?

      10        A    He was telling me about my case and stuff, and I

      11   was trying to tell him about what happened to me, and he

      12   acted like he wasn't concerned about it.  He kept going

      13   over something.  I don't know what it was.  But I tried to

      14   tell him I needed help.  I tried to kill myself, and I

18:00 15   needed to go to the doctor or state hospital or somewhere.

      16   But he acted like he wasn't concerned about my

      17   retardation.

      18        Q    Did you have that collar on your neck?

      19        A    Yes, sir.

      20        Q    Describe that collar for me.

      21        A    It was a thing around my neck, and it was blue

      22   and white and held my chin up and lifted the back of this

      23   up, and he didn't even ask me what it was when he seen me,

      24   what happened.  I told him.

      25        Q    If anybody looked at you, could they have seen

WILSON - DIRECT - WHITE                    16

18:00  1      that collar?

       2              THE COURT:  Had you wore a collar sometime

       3      before that?

       4              THE WITNESS:  No, sir.  No, sir.

       5              THE COURT:  Okay.

       6      BY MR. WHITE:

       7          Q    What else did you talk about on that meeting

       8      after you came back from the hospital?

       9          A    He told me I was going to court and what day,

      10      and when that day came, I went to court, and we was in

      11      front of the judge, and the judge asked me some questions.

      12          Q    Let me stop you for a second.  That is when you

      13      all go to court a couple of days later, right?

      14              MR. CORCORAN:  Objection, your Honor.

18:00 15              THE COURT:  Well, I think maybe that was okay.

      16      But really don't lead her too much.  Ask her the question

      17      again in such a way that it's not you testifying.

      18      BY MR. WHITE:

      19          Q    After the meeting -- after you came back --

      20      After that meeting, when was the next time you saw Mr.

      21      Ray?

      22          A    In court.

      23              THE COURT:  How long was that between the last

      24      time you saw Mr. Ray?  And you told us about him seeing

      25      you in the neck brace.  How long was it between that time

WILSON - DIRECT - WHITE                    17

18:00  1    and the court?

2                THE WITNESS:  About a week, Judge.

3    BY MR. WHITE:

4        Q    Do you talk to him before you actually go in the

5    courtroom and see the judge?

6        A    Yes, sir.  I asked him what I was going to court

7    for, and he said the dope charge.

8                THE COURT:  Where were you when you talked to

9    him?

10                THE WITNESS:  In the holding cell.

11                THE COURT:  Right outside the courtroom?

12                THE WITNESS:  Yes, sir.

13    BY BY MR. WHITE:

14        Q    Did you still have your collar on?

18:00 15        A    Yes, sir.

16        Q    Did you talk about that?

17        A    "I tried to hang myself, Mr. Ray."  He said "I

18    seen, I seen, I seen."

19        Q    What did you tell him about why you had the

20    collar on?

21        A    I told him that I had hung myself.  He didn't

22    seem concerned, so I didn't say no more about it.

23        Q    So you go out and you have a hearing about your

24    probation.  Did you know that it was about your probation?

25        A    No.  We went to the hearing for the dope case.

18:00   1        Q    And what happened at that hearing?

        2        A    Mr. Ray had me up on the witness stand and

        3   testify about the dope case, how the two gentlemens had

        4   come in and testified.  I wasn't understanding they was

        5   taking me to trial for my probation thing because he

        6   didn't mention it to me, and then the judge told us to

        7   step out, and he came and got me when the judge got ready,

        8   and the judge said Ms. Wilson and he said yes and he said

        9   what he had to say.  I can't remember anything.  So before

       10   I went up there, I said Mr. Ray, "Are you going to tell

       11   them about my neck and stuff and I suicided and mentally

       12   retarded?"  But he never said anything back.  So after

       13   that the judge left and went to the chambers and whatever,

       14   and he came back, and Mr. Ray told me to stand up, and I

18:00  15   stood up, and the judge said "I'm giving you fifteen years

       16   in TDC and I was like "Fifteen years?  What did I do to

       17   get fifteen years?"  He just didn't help.

       18        Q    What happens after you leave the courtroom?  Do

       19   you speak with Mr. Ray again?

       20        A    No, sir, they took me back upstairs.

       21        Q    Have you spoken with Mr. Ray since?

       22        A    No.  This is the first time I have seen him

       23   since I have been back today.

       24        Q    What happens in the jail after you get back from

       25   the court?

WILSON - DIRECT - WHITE                    19

```
18:00  1        A    What happened?

       2        Q    Yes, ma'am.

       3        A    I was in the pink room.  That's a suicidal room,

       4   no sheets or nothing.  Three days later I was shipped to

       5   TDC.

       6             THE COURT:  Mr. White, help me with something.

       7   Was she ever tried for the drug offense that she's told us

       8   about?

       9             MR. WHITE:  No.  If you look at our stipulations

      10   that offense was ultimately dismissed on the 8th of

      11   January.

      12             THE COURT:  Did she ever appear in court in

      13   connection with that offense?

      14             MR. WHITE:  Not to my knowledge, your Honor.

18:00 15             MR. CORCORAN:  We can ask Mr. Ray, but I'm not

      16   aware of any appearance as to that.

      17   BY MR. WHITE:

      18        Q    So how many times did you attempt to commit

      19   suicide while you were in the county jail?  Once before

      20   your hearing and once after?

      21             MR. CORCORAN:  Objection, your Honor, again,

      22   he's leading the witness with respect to the dates.

      23             THE COURT:  Well, I'm not sure that the after

      24   has too much relevance anyway, does it?

      25             MR. WHITE:  I'll move on, your Honor
```

WILSON - DIRECT - WHITE                    20

18:00   1   BY MR. WHITE:

        2        Q    Ms. Wilson, when you came back from the hospital

        3   after committing suicide, where did they place you in the

        4   jail?

        5        A    In the pink room.

        6        Q    What is your understanding of what the pink room

        7   is?

        8        A    It's for me not to commit suicide.  It was just

        9   a room with a floor.  No cover, no nothing.

       10        Q    How long do you remember being in that pink

       11   room?

       12        A    I was in there about two weeks.

       13        Q    And who came to visit you during that two-week

       14   period while you were on suicide watch?

18:00  15        A    Nobody.

       16        Q    You don't recall Mr. Ray seeing you?

       17        A    He didn't see me.

       18        Q    How long was it after you got out of the pink

       19   room before you saw Mr. Ray?

       20        A    When they came and got me and took me to court

       21   and I seen him down there in the chambers thing, the

       22   holdover tank.

       23             THE COURT:  That was the next time you saw Mr.

       24   Ray after you got out of the pink room?

       25             THE WITNESS:  Only time.

18:00  1          THE COURT:  Is when you were in the courtroom in

     2   the holding cell off the courtroom?

     3          THE WITNESS:  Yes, sir.

     4          THE COURT:  Did you go in the pink room as soon

     5   as you got out of the hospital?

     6          THE WITNESS:  Yes, sir, I did, Judge.

     7          THE COURT:  You must not have seen Mr. Ray after

     8   you got out of the hospital until you went to the Court.

     9   Is that right?

    10          THE WITNESS:  Yes, sir.

    11          THE COURT:  Had you seen him any before you went

    12   in the hospital?

    13          THE WITNESS:  No, sir.

    14          THE COURT:  Hadn't seen him at all before you

18:00 15   went to the hospital?

    16          THE WITNESS:  When I went to the jailhouse to

    17   the county, they take you downstairs and appoint you a

    18   lawyer, and that's when I got to know Mr. Ray.

    19          THE COURT:  How long was that -- Was that before

    20   or after you went into the hospital?

    21          THE WITNESS:  I think it was before.

    22          THE COURT:  So you did see him before?

    23          THE WITNESS:  I think it was.

    24          THE COURT:  Are you sure?

    25          THE WITNESS:  I can't remember.  I'm on

WILSON - DIRECT - WHITE                                22

18:00  1    medication messing with my mind.

        2              THE COURT:  Go ahead.

        3              MR. WHITE:  I pass the witness.

        4              THE COURT:  Do you have any questions you meant

        5    to ask?

        6              MR. CORCORAN:  Your Honor, we pass the witness.

        7    No questions.

        8              THE COURT:  Okay.  Call your next witness.

        9              Let me ask you one other question before you

       10    step down.  When the judge revoked your probation or

       11    whatever you call it, your deferred adjudication -- when

       12    the judge revoked that, what did you understand he did it

       13    for?  What had you done to cause him to do that?

       14              THE WITNESS:  I didn't understand it at all.  I

18:00 15    didn't understand nothing what they was doing.

       16              THE COURT:  Did you think it was because of that

       17    drug deal?

       18              THE WITNESS:  Yes, sir.

       19              THE COURT:  You thought that's why he revoked

       20    it?

       21              THE WITNESS:  Yes, sir.

       22              THE COURT:  Why did you think you got a fifteen

       23    year sentence?

       24              THE WITNESS:  Missing three reports reporting

       25    because they throwed the dope case out.

18:00  1                  THE COURT:  Pardon?

       2                  THE WITNESS:  Behind the dope case, they throwed

       3      it out.  They got me for three times missing reporting.

       4                  THE COURT:  You think they threw out the dope

       5      case?

       6                  THE WITNESS:  And then a probation violation.

       7                  THE COURT:  You didn't report three times to the

       8      probation officer?

       9                  THE WITNESS:  I didn't report three months to

      10      the probation officer.

      11                  THE COURT:  You think that's why you got a

      12      fifteen-year sentence?

      13                  THE WITNESS:  Yes, sir.

      14                  THE COURT:  Not from the drug deal.

18:00 15                  THE WITNESS:  Yes, sir.

      16                  THE COURT:  You knew that at the time you got

      17      sentenced?

      18                  THE WITNESS:  Yes, sir.

      19                  THE COURT:  And you knew you were being

      20      sentenced for the original robbery because you violated

      21      your probation?

      22                  THE WITNESS:  Yes, I missed reporting three

      23      months, and they denied my probation.

      24                  THE COURT:  Okay.  You can step down.

      25                  MR. WHITE:  Your Honor, I rest.

18:00   1              THE COURT:  Okay.  I thought you were calling

        2   Mr. Ray.  Do you have any evidence you want to offer?

        3              MR. CORCORAN:  Yes, your Honor.  We call Mr.

        4   Ray.

        5          (Sworn)

        6                      MR. WILLIAM RAY

        7                    DIRECT EXAMINATION

        8   BY MR. CORCORAN:

        9       Q     Could you please state your name?

       10       A     William Ray.

       11       Q     And what is your occupation?

       12       A     I'm an attorney.

       13       Q     And were you a criminal defense attorney in the

       14   time frame we were just discussing, late 2007, 2006?

18:00  15       A     Yes, I was.

       16       Q     And at the time, did you represent a woman named

       17   Sandra Wilson?

       18       A     I did.

       19       Q     And can you describe her?

       20       A     Seated at the counsel table behind you.  Third

       21   from my left, wearing a light tan colored --

       22              THE COURT:  The one that just got off the

       23   witness stand?

       24              THE WITNESS:  Yes, sir.

       25              THE COURT:  He's identified her.

RAY - DIRECT - CORCORAN                    25

18:00   1   BY MR. CORCORAN:

2          Q     Before we get into the details, can you give us

3   an overview of the purpose of your representation of Ms.

4   Wilson?

5          A     I was appointed to represent Ms. Wilson.  She

6   had a probation violation which was the primary reason I

7   was appointed to represent her.  She also had a drug case

8   that was mentioned this morning, and I was appointed on

9   both of those cases.  Judge Gill -- I was not a public

10   defender per se like they have -- an assigned public

11   defender.  Judge Gill would appoint me on people who had

12   additional violations, and he would appoint me on those

13   cases at that time.

14          Q     If there was a deferred adjudication in Judge

18:00  15   Gill's court, how would that work if there was a new

16   charge?

17          A     Well, what happened, in Tarrant County there is

18   a rotating basis of people that are appointed, and judges

19   can go outside that rotation and appoint people outside

20   the wheel.  Judge Gill appointed me and other judges would

21   appoint other lawyers on people that had probation

22   violations because those cases they never had a jury

23   trial, and they were typically all settled without a

24   trial.  And he would appoint me outside the process, which

25   the law allowed him to do.

18:00   1          Q     Do you remember the date that you were

        2     appointed?

        3          A     I do.   I was appointed to represent Ms. Wilson

        4     on November 13, 2006.

        5          Q     What was the nature of that initial contact?

        6     Did you see her before that date?

        7          A     We never met before that.

        8          Q     Did you see her on that date?

        9          A     Yes.

       10          Q     Where would that have been?

       11          A     In the hold-over cell adjacent to the courtroom.

       12     I think that's what she mentioned.   And what happened is

       13     there would be a list of people that he would have set

       14     that day, and he would have people in custody brought over

18:00  15     from the jail, and if they didn't have a lawyer, he would

       16     appoint a lawyer or see if they wanted to hire a lawyer.

       17     There was a couple of different choices.   They would fill

       18     out paperwork or the bailiffs would go over it with them,

       19     and if they qualified for a court-appointed lawyer -- and

       20     most people in jail did -- he would appoint a lawyer.

       21          If it was a probation violation, he would

       22     generally appoint me.   Another type of case, in other

       23     words, a new offense and not necessarily a probation

       24     violation, sometimes he would appoint me and sometimes

       25     appoint other lawyers.

RAY - DIRECT - CORCORAN                    27

18:00   1          THE COURT:  Why did he prefer to appoint you?

2    How did that process develop?

3          THE WITNESS:  He had this process with two other

4    lawyers prior to me, and both of those lawyers decided

5    they wanted to change their practice a little bit.  At one

6    point in time similar to the federal public defender, it

7    was a county paid position, and a lady had that.  Her name

8    was Roxanne Robinson.  And that was eliminated before I

9    started, and he would just appoint me because he felt like

10   I took care of my business pretty well.

11         THE COURT:  He knew your history?

12         THE WITNESS:  Yes, sir.

13         THE COURT:  How long was that going on before

14   you were court-appointed to represent Ms. Wilson?

18:00  15         THE WITNESS:  He probably started that in 2001,

16   2002.

17         THE COURT:  How many a week would you handle on

18   this kind of a procedure?

19         THE WITNESS:  Anywhere from four or five to ten

20   to fifteen.

21         THE COURT:  Go ahead.

22   BY MR. CORCORAN:

23     Q    When you did this for Judge Gill, what was the

24   total number of cases approximately that you did in front

25   of him?

18:00   1        A    I can't tell you exactly, but I think it's about

2    four or five hundred.

3        Q    Let me ask you this.  Was it November 17?

4        A    13.

5        Q    Had you -- Actually, let me take a step back.

6    How did it work with respect to a revocation?  Did you

7    negotiate with the prosecutor or how did that work?

8        A    In Judge Gill's court, what would happen is the

9    probation officer would bring their files over to the

10   court.  He would look at the files, and he would write

11   whatever his offer was in the file.  In his court as

12   opposed to other courts, there was no interaction with the

13   prosecutors.  They didn't enter into the conversation

14   unless it became a contested matter.  So to answer your

18:00   15   question more specifically, Judge Gill made the offers and

16   the negotiations, if there was any, and quite frankly,

17   there wasn't much was directly between myself and Judge

18   Gill.

19        THE COURT:  How did you know what the offer was?

20        THE WITNESS:  He would tell me.  He would write

21   it in the file, and it was generally in a specific part of

22   the file.  He wrote it down, and I knew what it was.

23        THE COURT:  Did it depend on whether the person

24   confessed?

25        THE WITNESS:  Depended on what they were on

18:00    1     probation for and what the new allegation was.

         2               THE COURT:  What was the range?  Was it always

         3     close to twelve years?

         4               THE WITNESS:  In that type of case -- And I have

         5     given counsel some of those as your exhibits -- he would

         6     almost always if a person had a robbery deferred

         7     adjudication and they had a new offense, the offer was

         8     almost always twelve years, and it was even predictable.

         9     I never bet anybody, so to speak, but I was pretty close

        10     to doing it after three or four years.  I knew about what

        11     he was doing to do.

        12     BY MR. CORCORAN:

        13          Q    At the first meeting, November 13, had you

        14     looked at this file and did you know what the offer was at

18:00   15     that time?

        16          A    I knew the offer.  And I spoke with Judge Gill,

        17     and then I went and spoke with Ms. Wilson.

        18          Q    Did you communicate that?

        19          A    Yes.

        20               THE COURT:  Was that in the holding cell?

        21               THE WITNESS:  Yes.

        22               THE COURT:  Was that the day of the hearing?

        23               THE WITNESS:  No, sir.  The day I was initially

        24     appointed.  Sometimes he accepted the offer and we plead

        25     it right then.  Sometimes people wanted to think about it,

18:00  1    and Judge Gill would typically leave that offer open until

       2    the day of the hearing.

       3            THE COURT:  What was the purpose of her being

       4    there that day?  Like an initial appearance?

       5            THE WITNESS:  Yes, sir.  Sometimes they will set

       6    a bond if there is a bond set, but it's the basic first

       7    appearance.

       8    BY MR. CORCORAN:

       9        Q    And before I get into the details of this case,

      10    just based upon your experience in the potentially

      11    hundreds of cases you have done in front of Judge Gill --

      12    if there was a motion to adjudicate and deferred probation

      13    and in this case it was a second degree felony, two years

      14    to twenty years, did he peek at the prior case to see what

18:00 15    the prior sentencing range was?

      16            MR. WHITE:  Objection, your Honor.  Speculation.

      17            THE COURT:  I'll overrule the objection.

      18        A    I can't say that he did that in every case, but

      19    in the probation file there was a copy of the offense

      20    report, and sometimes he would be reviewing those.  He

      21    would review those probation files when he was sitting

      22    there, in front of him, and sometimes I might walk down

      23    the hall to talk to somebody else.  I was not

      24    automatically there when he was reviewing them, but they

      25    were there for him to look at.

18:00   1              THE COURT:  You say you learned twelve years was

        2     what he would offer in a robbery, probation violation.

        3     What was the range for failure to report?

        4              THE WITNESS:  Between five and seven years.  If

        5     it was a person that didn't report for a year -- They

        6     typically didn't put out a report until they have missed

        7     three times.  Sometimes they say you do a weekend in jail,

        8     and it never got to me.  But after the third month on a

        9     warrant -- If they caught them pretty quick, his offer

       10     would be a little lower because they wouldn't have missed

       11     as many months.

       12              THE COURT:  Five to?

       13              THE WITNESS:  Eight.  In that area.

       14     BY MR. CORCORAN:

18:00  15         Q    Directing you to November 13, did she indicate

       16     that she wanted to accept the offer?

       17         A    She said she did not want to accept the offer.

       18         Q    Did she indicate to you at that time any mental

       19     issues she had?

       20         A    I don't have any specific recollection of her

       21     telling me that she was mentally ill.  She could have very

       22     well have said the things she said she did.  If she had,

       23     she would have caused me to take a certain course of

       24     action.  She could have said MHMR.

       25         Q    Well, your recollection of interacting with her,

RAY - DIRECT - CORCORAN                    32

18:00  1    did alarm bells go off when you interacted with her in

       2    terms of competency?

       3        A    No, if she had said those things -- And I'm not

       4    saying she didn't.  We would have conversation about

       5    whether I thought she was competent and whether she had

       6    any defenses that might apply.  People sometimes say I

       7    don't know what we're doing here and I don't know what

       8    this is all about.  And Judge Gill was pretty good about

       9    taking those out of the loop.

      10        Q    So you might have brought that up with Judge

      11    Gill if you believed there was an issue?

      12        A    Sure.  And he would take them out of the loop of

      13    having a hearing which the hearings were accelerated.

      14    This is actually a little longer period of time before the

18:00 15    final hearing.  If a person was incompetent or I thought

      16    so, he would say fine, and he would appoint a psychologist

      17    to see them in the jail, and we would deal with that,

      18    depending on the report.

      19             THE COURT:  Are you talking about competent to

      20    participate in the hearing?

      21             THE WITNESS:  Yes, sir.

      22             THE COURT:  As opposed to general mental health?

      23             THE WITNESS:  That's correct.

      24    BY MR. CORCORAN:

      25        Q    With respect to general mental health, what is

18:00  1    your sense based upon the number of cases you have done in

       2    front of Judge Gill about how mental health might be a

       3    factor in his decision?

       4        A    If the person was sane and competent, my

       5    experience was it didn't make a whole lot of difference.

       6            THE COURT:  Well, let me ask you what category

       7    you would put this defendant in, assuming she's mentally

       8    retarded and has a schizoaffective disorder, anti-social

       9    disorder and borderline bi-polar?

      10            THE WITNESS:  I would have had concern about

      11    those.  However, my experience is with Judge Gill it

      12    wouldn't have made much difference.

      13            THE COURT:  You would have had concern?

      14            THE WITNESS:  If I had known -- and I didn't --

18:00 15    I would have asked Judge Gill refer her to a psychologist

      16    and he would have had somebody go see her, and we would

      17    have been right back when she was competent.

      18    BY MR. CORCORAN:

      19        Q    Did she have an opinion with reference to her

      20    defense or what she wanted to do?

      21        A    She provided the name of a codefendant in her

      22    case.  I don't remember if it was that day or a subsequent

      23    day, but at some day prior to the hearing she told me -- I

      24    think it was the day I visited her in the jail which may

      25    have been in the jail.  I'm a little unclear on that.  But

18:00   1   there was a point in time when I talked to her which may

2   have been that day, but it could have been a later day,

3   and she indicated to me she had a witness which was the

4   codefendant in the case, and he actually testified at the

5   hearing, and she indicated that he would say "These were

6   my drugs, I was the one selling the drugs," which is what

7   he said.  I had him brought to court, was my recollection.

8   He had already been sentenced, and I asked him "Ms. Wilson

9   said that you will take the rap for her," and he did.  He

10   testified.

11         Q   Did you explain the purpose of the hearing, the

12   hearing to dispose of the new charges, or how did you

13   explain that?

14         A   Well, what I would have told her was the hearing

18:00 15   or the trial on her new case wouldn't necessarily take

16   place before the hearing.  The revocation was going to be

17   heard, and at that time the new allegations would be part

18   of it.

19         Q   Did she have any point of view with respect to

20   the technical violations on the motion to adjudicate?  Did

21   she ask you to do anything or advance any theory?

22         A   You are talking about not reporting?

23         Q   Yes.

24         A   She admitted she didn't reported.  She didn't

25   argue about that.  The petition alleged the new offense

18:00   1    and alleged she didn't report, but it also alleged a

        2    nonreporting which was like the next day or right

        3    afterwards, and when she pled and they go over the

        4    accusations with you, she had indicated that accusation

        5    was not true, but the allegation of not reporting for the

        6    two or three months was true.

        7               THE COURT:  Did he revoke her on the one she

        8    actually admitted?

        9               THE WITNESS:  That's correct.  Failure to

       10    report.

       11    BY MR. CORCORAN:

       12         Q    Direct your attention to the new offense

       13    allegations.  Did Judge Gill find that true?

       14         A    He found that not true.

18:00  15         Q    And what was your sense of the rationale for

       16    that?

       17         A    He found that was not true because the State --

       18    Right at the beginning of the hearing, the State asked to

       19    amend their petition to allege constructive transfer as

       20    opposed to actual transfer, and I didn't have any

       21    objection to that.  But in the hearing, at the end of it,

       22    he called somebody on the phone or looked something up

       23    himself.  He came back and found that transfer not to be

       24    true, and it happened on this case or the one prior to

       25    this.

RAY - DIRECT - CORCORAN                    36

18:00  1          The reason he did that --

       2                MR. WHITE:  Objection.  Speculation.

       3                THE COURT:  Well, if you don't know which case

       4     it was for sure, it would be speculation.

       5                MR. CORCORAN:  May I ask him to explain what he

       6     thought the judge was doing?

       7                THE COURT:  Well, are you telling us you are not

       8     sure if it was this case or the prior case?

       9                THE WITNESS:  Well, the reasoning is the same.

      10                THE COURT:  That it happened in this case?

      11                THE WITNESS:  Yes, sir.

      12                THE COURT:  Go ahead.

      13                THE WITNESS:  With the constructive delivery,

      14     there is an added element.  The State has to prove that

18:00 15     the defendant had some ownership or proprietary interest

      16     in the drug.  Whereas, actual transfer you can be the

      17     party, the person standing in the street.  But if they

      18     allege constructive transfer, which is what they did or

      19     they changed it to, the State would have to prove Ms.

      20     Wilson had some knowledge or ownership of how the drug

      21     transaction worked, and that's not true.

      22                THE COURT:  We're going to take a brief recess.

      23                (Recess)

      24                THE COURT:  Let me ask you a question before you

      25     get started.  Did Judge Gill -- did he have a standard

RAY - DIRECT - CORCORAN                    37

18:00  1    sentence that he imposed under certain circumstances?  You

2    told me about his plea offers were standard.

3              THE WITNESS:  Yes, sir.

4              THE COURT:  Did he also have standard sentences?

5              THE WITNESS:  In some cases he did.

6              THE COURT:  What was his standard sentence in

7    somebody who had robbed somebody and got deferred

8    adjudication and then dealt in drugs?  What was his

9    sentencing under those circumstances?

10             THE WITNESS:  I'm assuming a new felony, fifteen

11   years.

12             THE COURT:  What was his sentence if she had the

13   robbery and then the technical violations she admitted to?

14             THE WITNESS:  That was a little less specific,

18:00 15   but it would have been somewhere between five and eight

16   years, if that had not been an allegation in this case.

17             THE COURT:  And of course, both of my last

18   questions assumed she rejected his plea offers, and you

19   answered on that basis.

20             THE WITNESS:  Yes, sir.

21             MR. CORCORAN:  Your Honor, may I approach the

22   witness?

23             THE COURT:  Yes.

24   BY MR. CORCORAN:

25        Q    Let me refer you to what has been marked as

CASSIDI L. CASEY, CSR, 214-354-3139
UNITED STATES DISTRICT COURT

18:00  1      Exhibit 13.  It refers to Steven Forrest Eaton.  Is that

       2      correct?

       3          A    Yes, sir.

       4          Q    Can you explain those handwritings and markings?

       5          A    In the bottom right-hand corner of Exhibit 13,

       6      this is a copy of the State's third petition to proceed to

       7      adjudication, and that's my handwriting and what I wrote

       8      was contract "CT" which means Court, 3-5-07, which was the

       9      day that Judge Gill made the offer on his case which would

      10      have been twelve years, TDC.

      11          Q    In terms of how this relates to Ms. Wilson, can

      12      you explain the connection?

      13          A    Well, burglary of habitation is typically second

      14      degree felony which is what he was on probation for.  His

18:00 15      case was 2004, new drug offense, and Judge Gill's offer

      16      was twelve years.

      17               In Ms. Wilson's case she was on probation for

      18      robbery which is also a second degree felon, and she had a

      19      new drug offense, and Judge Gill's offer was the same.

      20          Q    Exhibit 13 on the third page, can you explain

      21      what the writing there means?

      22          A    The third page is my fee voucher that we use in

      23      the courts, and it has the case number of the court; the

      24      defendant's name, Steven Eaton, the day I was appointed,

      25      the number of appearances I had on that case, the type of

RAY - DIRECT - CORCORAN                    39

18:00  1   offense which I would just put revocation, if that's what

2   it was.  And in the middle of the page what I did is draw

3   a line -- Typically that line was kind of at a forty-five

4   degree angle.  I would put the date, the sentence which in

5   this case was March 14 of 2006, sixteen years, TDC then

6   what I wrote underneath is "no guns/enhance."  And what

7   that means is I told Mr. Eaton that he could no longer

8   possess a firearm or ammunition for the rest of his life,

9   and if he ever got another case, this case could be used

10  to enhance his punishment.  Up above that there is a

11  triangle which stands for defendant.  And he indicated he

12  wanted to appeal, and the next note is I told -- And the

13  defendant was told and I would have told him in his

14  instance that he didn't have much of an appellate right

18:00 15  since he was on deferred adjudication.

16      Q    Now, directing you to Exhibit 14 which believe

17  refers to John Henry Ogle.  Is that your handwriting on

18  Page 1 again on Number 14?

19      A    Yes, it is.  On Mr. Ogle's case, the State's

20  seconds amended petition to proceed to adjudication, he

21  was on probation for indecency with a child, second

22  contact which is a felony.  It was on deferred

23  adjudication.  He was alleged to have committed two new

24  offenses.  The judge's offer was twelve years TDC.

25      Q    And on the fifth page -- So this would be

18:00  1    Exhibit 14, fifth page, what do the written notes there

2    mean?  Are those your handwriting?

3         A    Yes, of course, it's got his full name and the

4    day I was appointed and the number of appearances.  On

5    7-18 and it looks like 2000, but it has to be 2006.  He

6    got twelve years TDC.  I also explained to him that he

7    could not possess a firearm.  That's where it says "no

8    guns" and the notes underneath that -- it says "life," and

9    it means either life registration which I would have told

10    him about, but he would have already been under that, but

11    also the way the sentencing statute works for this offense

12    is if he gets another sexual offense I would have told him

13    that it would be an automatic life sentence.  I didn't

14    always tell people that, but if I wrote it down, I told

18:00 15    him.

16              THE COURT:  Do you have something similar to

17    what we have looked at related to Ms. Wilson?

18              THE WITNESS:  Yes, sir.

19              THE WITNESS:  It's Page 3 of Exhibit 12.

20              THE COURT:  Exhibit 12.

21              MR. CORCORAN:  Yes, sir.

22              THE COURT:  Go ahead.

23    BY MR. CORCORAN:

24         Q    On Page 12, is that your handwriting on the

25    first page?

18:00  1       A     Yes, sir.

2       Q     And again, can you say what that indicates?

3       A     That would have been on November 13, 2006, Judge

4   Gill's offer was twelve years TDC.

5             THE COURT:  Let me interrupt you a minute.  Does

6   anyone have access to what Judge Gill writes that twelve

7   years on?  You said he writes it on something.

8             THE WITNESS:  He writes it in the probation

9   file.  Anybody that wants to look at it can.

10            THE COURT:  Is that part of the record in this

11  case, Judge Gill's notation?

12            MR. CORCORAN:  I don't think it is, your Honor.

13            THE COURT:  Go ahead.

14  BY MR. CORCORAN:

18:00 15       Q     And then I think it's the third page.  It's your

16  fee voucher.  What page number is that?

17       A     Page 3 of Exhibit 12.

18       Q     Explain the handwriting.

19       A     Case number, her name, date of appointment I

20  have 12-18-2006 which is not correct.  The revocation and

21  number of appearances.  And then where the line and date

22  was, disposed was January 5 of 2007 she got a fifteen-year

23  TDC sentence, and then I wrote the defendant was pissed.

24       Q     What do you mean by that?

25       A     After the hearing -- which is when this is

18:00  1    happening if a person is pleading.  But after the hearing

2    I will go back and tell them what their situation is and

3    whether it can be used to enhance their punishment.  And

4    when I tried to talk to Ms. Wilson she was mad.  So I

5    didn't tell her those things.

6              THE COURT:  What does that mean right there?

7              THE WITNESS:  That's four times I went to court.

8    That was the way I was paid.  If I did any out-of-court

9    time since I did some of them, he paid me based on

10   appearances, and that kind of took all of that into

11   consideration.  If I went to the jail and spent half an

12   hour, that wouldn't have been on there.

13             THE COURT:  Well, why would you have four on

14   here?

18:00  15            THE WITNESS:  Initial appearance, the case was

16   set on the 18th of December.  We were going to have a

17   hearing that day, but the State got a continuance.  One of

18   their police officers couldn't be there, and it was reset

19   to January.  And I initially thought that I had gone to

20   see her in the jail on December 12, but a couple of days

21   ago when I was looking at my notes again I found a note

22   that said expand.  When I looked at this, Exhibit 12, Page

23   3, that means I was in court four times.  So that

24   conversation must have happened in court for certain.

25   Four appearances is what it stands for.

18:00   1           THE COURT:  Well, you have to go to court on the

        2   occasion the State got a continuance.  You have an

        3   appearance that time and the final time?

        4           THE WITNESS:  What I believe, Judge, is the 12th

        5   of December we also went to court.  I had a conversation

        6   with her on that day.  I thought it was in the jail when I

        7   look at my notes.  It would have been to either plead the

        8   case -- Sometimes they set the cases when they think they

        9   are a plea, and they turn out not to be.  I thought that's

       10   what happened this morning.  But on my note which I gave

       11   counsel this morning, it has two or three other people's

       12   names, and I talked about how they wanted to handle their

       13   cases.

       14           THE COURT:  Do you remember her wearing a neck

18:00  15   brace?

       16           THE WITNESS:  I didn't remember it until Mr.

       17   Corcoran reminded me it was in the testimony.  I don't

       18   specifically remember it, but it's got to be true because

       19   two of the witnesses identified her as the lady in the

       20   neck brace.

       21           THE COURT:  Nobody described her on some prior

       22   conduct of having a neck brace?

       23           THE WITNESS:  No, just at the hearing.  I don't

       24   know that she did or didn't.  She said she had it in the

       25   jail.  That could very well be true.

18:00   1   BY MR. CORCORAN:

        2        Q     Referring your attention to Exhibit 15, I

        3   believe that refers to Penny McGee.  Could you explain

        4   Exhibit 15, what your marks mean?

        5              THE COURT:  If you had, it wouldn't do any good

        6   because I can't read mine.

        7              THE WITNESS:  I can tell you what that is.  I

        8   have a better copy.  What I did, the copy I originally

        9   sent you and Mr. White, that's my fee voucher for that

       10   day.

       11              I printed out another one, and I sent it to you

       12   all on Friday.  I printed that out from the county's which

       13   I have access to, the document that you have which is the

       14   one that's all discolored.  That's the one that went

18:00  15   through a scanner at my office.  That's the only copy I

       16   have which is accurate.  I included the judgment which

       17   shows what his sentence was which is on that document, but

       18   you can't hardly read it.

       19        Q     Is Penny a male or female?

       20        A     Penny is a male.

       21              MR. CORCORAN:  Your Honor, I think I gave the

       22   exhibit I was going to hand to you to Mr. Ray.  We got

       23   some documents from Mr. Ray.

       24              THE COURT:  You are adding an exhibit?

       25              MR. CORCORAN:  I believe Mr. White has no

18:00   1       objection.

        2                   MR. WHITE:  We have no objection.

        3                   THE COURT:  What are you going to call 16?

        4                   MR. CORCORAN:  Mr. Ray.

        5                   THE WITNESS:  16 is several different things.

        6       You want me to explain what they are?

        7                   MR. CORCORAN:  It if that's okay, your Honor.

        8                   THE COURT:

        9                   MR. CORCORAN:  Let's call them Bill Ray notes.

       10       BY MR. CORCORAN:

       11           Q    Mr. Ray, can you quickly go through Exhibit 16

       12       and I'll stop you or the Court will stop you if we have

       13       any questions.  I don't want to take too much time with

       14       this.  Can you explain what it is?

18:00  15           A    The first page is what's called a tracking log.

       16       The bailiffs in the county have to send a request to get

       17       somebody out of the jail.  This is a request to the jail

       18       to get them ready to bring them over.  It has various

       19       people's names.  Some of them are my clients, and some are

       20       another person's client.  The third one down is Brian

       21       Jones.  He had question marks and then probation

       22       revocation.  I may very well have ended up representing

       23       that guy.

       24           A    Then right under that J. Harding.  That was his

       25       client.  The next page, it's two petitions to proceed to

18:00   1    adjudication on a Bernard Hightower.  He was on probation

        2    for two aggravated robberies, and it was alleged that he

        3    committed a new offense, and Judge Gill's offer was twenty

        4    years on those cases.  The following page is the county

        5    printout from the county computer.  This is page 16-6 that

        6    just has Mr. Hightower's criminal record in the county.

        7    16-7 and 8 deal with his specific robbery case.  16-9 is

        8    the pay voucher for Mr. Hightower, and then 16-10 and 11

        9    are the notes on the hearing we had in the hearing on

        10   Penny McGee's case.  These are the notes I took during the

        11   revocation hearing.

        12   BY MR. CORCORAN:

        13        Q    Can you explain what your symbols mean?  What's

        14   going on on Pages 10 and 11?

18:00   15        A    Mr. McGee was charged with a new offense of

        16   assault which I believe was his girlfriend, and we had a

        17   hearing on that, and the police testified.  I believe

        18   there was two police officers that testified.  She, the

        19   victim in that case, did not testify.  She either didn't

        20   come to court or they couldn't find her or uncooperative.

        21   But the police were allowed to testify, and you can see on

        22   there where I made on objection which is referenced "OBJ"

        23   and then "H" which is about the middle of Page 16-10.  The

        24   judge overruled that objection, and I was allowed a

        25   running objection to what the officers were talking about

18:00   1   as far as what she told them which is what the State

2   needed to prove, that Mr. McGee assaulted his girlfriend

3   or wife or whatever she was.  The point in all of that was

4   that this lady didn't come to court, and yet Mr. McGee's

5   probation was still revoked.

6         Q     Direct your attention to Exhibit 17.

7               THE COURT:  What are we going to call it?

8               MR. CORCORAN:  Additional Bill Ray notes.

9               THE COURT:  Bill Ray Notes Number 2.  16 and 17

10   are admitted.  I assume there is no objection.

11              MR. WHITE:  No objection, your Honor.

12              THE COURT:  All right.

13   BY MR. CORCORAN:

14         Q     Can you quickly go through that?  Explain why

18:00  15   you gave that to us.

16         A     I gave it to you this morning.  You have written

17   16 on top of it.

18         Q     I'm sorry.  It's 17.

19         A     I gave this to you this morning.  It's also got

20   a letter that I wrote to you and Mr. White.  Contained in

21   this exhibit is the State's petition and fee voucher for

22   Mr. Madale Johnson, I think is the way he said his name.

23   Mr. Johnson was on deferred adjudication for robbery and

24   had a misdemeanor offense.  Mr. Tyson Murty was the same

25   situation.  He was on deferred adjudication for robbery

18:00  1    and had a new DWI offense, and those particular pages will

2    show in Mr. Johnson's case he was offered five years by

3    Judge Gill, and he accepted the offer that day.  So we

4    didn't have a hearing for him.  Mr. Johnson was also

5    offered seven years.  He was on probation for robbery, had

6    a new DWI, and he had an offer on that day and received a

7    seven-year sentence.

8         Then I provided another one of these tracking

9    sheets which is on the top of Exhibit 16.  It's a similar

10   sheet.  This is one for December 18, which of course has

11   Ms. Wilson's name on it as well as other persons, and it's

12   just another illustration of how many cases were done in

13   that court and who their lawyers were.

14        The next page is date 12-12-06, and this is the

18:00 15   document I mentioned to you a minute ago that I saw that I

16   thought was made in the jail.

17        But if I billed for appearance that would have

18   to have been in the court where I saw Ms. Wilson and at

19   least four other persons.  That's when she told me that

20   Reggie Johnson -- which is the person that testified that

21   had already been convicted of the offense -- that he would

22   say it was all his drugs and his doing.  That's where I

23   located him.  His county ID and his lawyer's number are on

24   that list.  And that is where I found it.  It may have

25   been that we were going to have that hearing that day, but

18:00   1    she would have been in the hospital.  I don't remember.

       2    That wouldn't be accurate.  I would have talked to her.

       3    Maybe she told me the witness' name, and we reset it.  We

       4    would have had some conversation that day about her giving

       5    me that name.

       6           Then the next page is my printout from my office

       7    schedule for December 14 which just shows the list of

       8    cases set that day as well as December 18 which would have

       9    been one of the last days of the year for Judge Gill's

      10    court.

      11           The following page is Ms. Wilson's, and it's

      12    actually two pages of her county case list which shows the

      13    cases she had and the dispositions.  On the right-hand

      14    side I looked up on the county computer to see what

18:00 15    sentences she got prior to my representing her, and on the

      16    next page it includes her delivery case which at the time

      17    was not disposed of.  It was dismissed January 8th of

      18    2007, and in the last page is the specific case printout

      19    for her deferred adjudication case, the one she got

      20    revoked on and sentenced to fifteen years.

      21       Q    The new offense was dismissed after --

      22       A    Judge Gill found that not to be true, and they

      23    would probably have dismissed it anyway.  She had already

      24    been revoked and sent to the penitentiary.  Typically what

      25    if the DA's office would do is if the person said it was

18:00  1    not true and they were going to have prove it at trial,

       2    they would dismiss it.  They may have dismissed it or

       3    because arguably they were estopped from arguing --

       4    collateral estoppel is what I'm saying.

       5         Q    One last question.  Did she manifest that you

       6    defend the case a certain way?

       7         A    She wanted Reggie brought to court.  She was

       8    specific about that.  I would not have hunted him down or

       9    had him brought to court had she not said something about

      10    it.

      11              MR. CORCORAN:  Your Honor, pass the witness.

      12              THE COURT:  Do you have any questions?

      13              MR. WHITE:  Yes, your Honor.

      14              THE COURT:  Okay, while you are getting up

18:00 15    there, let me ask a question or two.

      16              Say she told you she had mental problems.  You

      17    told us one of the things you would have done is told the

      18    judge, and he probably would have appointed somebody to

      19    examine her.

      20              THE WITNESS:  He would have.

      21              THE COURT:  Would you have done anything else

      22    such as trying to get an evaluation?

      23              THE WITNESS:  It would have been depended on the

      24    case.  If she said all the things she said here, I would

      25    have got a psychologist and have gotten the records, and

18:00  1      he would have called me and said this is the situation,

       2      and depending on the nature of it, we might or might not

       3      have done that.  And those records are relatively easy to

       4      get, Tarrant County MHMR.

       5            THE COURT:  Would they also be at Peter Smith?

       6            THE WITNESS:  Sometimes they are, and sometimes

       7      they are not.  If you break your leg in the jail, they are

       8      going to take you to Peter Smith.  But the Sheriff's

       9      Department, MHMR or Peter Smith.

      10            THE COURT:  What would likely have happened if

      11      it was concluded that she had bad problems that could have

      12      explained why she didn't report?

      13            THE WITNESS:  We would have had a hearing, and

      14      if she had some reason to not have reported -- that might

18:00 15      have gone along with that -- Judge Gill would have done

      16      that.  She testified that her house burned.

      17            THE COURT:  Go ahead.

      18                      CROSS EXAMINATION

      19      BY MR. WHITE:

      20       Q     You are aware of the difference between

      21      competency and mitigation evidence, right?

      22       A     Yes.

      23       Q     What is the difference?

      24       A     Competency means whether or not you have a

      25      rational and factual understanding of the proceedings

RAY - CROSS - WHITE                                    52

18:00  1    against you and whether or not you can communicate and

       2    discuss those matters with your lawyer.  Mitigation would

       3    be to lessen the punishment, if any.

       4         Q    And I know we have talked a lot about her

       5    competency.  Let's talk a little bit more about her

       6    mitigation.  In your experience with Judge Gill, does he

       7    make every effort to follow the law?

       8         A    I would say so.

       9         Q    And you understand -- How long have you been

      10    practicing law?

      11         A    November of 1985 so twenty-four years in

      12    November.

      13         Q    And you understand that a judge has to consider

      14    what evidence you put on as the lawyer in a criminal

18:00 15    defense case?

      16         A    That's correct.

      17         Q    And if you put on mitigation evidence, that's

      18    something the judge many have to consider?

      19         A    That's correct.

      20         Q    Now, you have also shown us some different

      21    examples of what Judge Gill would do in various cases that

      22    you have handled before him.

      23         A    That's correct.

      24         Q    Do you recall if any of these people had mental

      25    health and mental retardation issues that Ms. Wilson had?

18:00  1     A   I don't believe any of them were mentally

2   retarded.  Penny McGee had kind of a hard time.  He didn't

3   like the offer that Judge Gill made him, and that happened

4   a lot in these kinds of cases.  None of those people were

5   incompetent.

6        Steven Eaton had some issues with drug usage

7   that affected his ability to do probation, but none of

8   them incompetent, and none of them mentally retarded, and

9   none of them that would have the similar restriction that

10   Ms. Wilson described today.

11     Q   And some of the restriction that Ms. Wilson

12   described today, would you in your training and experience

13   describe that as potentially mitigating evidence?

14     A   I would think it would be.  I was not aware of

18:00 15   that situation, and if I had been, we might have done

16   that.  Her primary focus was I didn't do this.  The other

17   guy sold the dope, and that's what we showed.

18     Q   Now, at a revocation hearing there is at least

19   two parts.  The first part is are the allegations true,

20   correct?

21     A   Yes.

22     Q   And what is the second part?

23     A   To decide the punishment.  It basically follows

24   the track of a jury trial.

25     Q   So in that second part is where a criminal

18:00   1   defense lawyer would put on any explanation for the

2   violations?

3       A    That's correct.

4       Q    That's where you would have put on mitigation

5   evidence had you known about it?

6       A    Sort of.  Given the fact that she testified at

7   the hearing, many times what would happen is people would

8   testify about those things at what I am going to call the

9   guilt-or-innocence stage of the hearing.  Didn't always

10   happen as cut and dried as you mentioned.

11       Q    Prior to the hearing, what was your

12   understanding of why Ms. Wilson did not report as alleged

13   in the petition?

14       A    I can't remember specifically what she told me.

18:00  15   Seems like she told me about the issue of the fire.  It

16   was a house that burned up, and I think some of her

17   relatives were killed.

18       Q    And would you consider that to be mitigation

19   evidence as to why someone would not report?

20       A    I don't think -- It wasn't going to get her out

21   of a violation.  And I don't mean to be crass about it,

22   but it wasn't going to make a lot of difference to Judge

23   Gill because she missed more than one reporting.  The way

24   he saw it is the fire happened on Day 1, what did you do

25   the other twenty-nine days of the month?  He would never

RAY - CROSS - WHITE                    55

18:00   1    have said that, but that's where he would have been coming

        2    from.

        3         Q    Did you do any investigation into the fire

        4    situation she told you about?

        5         A    No.

        6         Q    Did you do any investigation into her mental

        7    health issues?

        8         A    No.

        9         Q    Mental retardation issues?

       10         A    No.

       11         Q    You saw that she had on a collar at the hearing?

       12              THE COURT:  He said he didn't remember.

       13    BY MR. WHITE:

       14         Q    When you go to the jail to visit someone, you

18:00  15    have to fill out a little orange card.  Is that right?

       16         A    Yes.

       17         Q    And what is the purpose of that card?

       18         A    The jail keeps it so there is a record of who

       19    went to see a person in jail.

       20         Q    And when they went to see them?

       21         A    That's right.

       22         Q    Go to 321 of Exhibit 1?

       23         A    Okay.

       24         Q    Tell me what that is.

       25         A    That is a jail visitation card for Sandra Wilson

RAY - CROSS - WHITE                    56

18:00  1    that I filled out.  Everything -- the floor, the date of

       2    birth, the number above Wilson, her last name, is going to

       3    be her county ID number.  I don't believe that's my

       4    handwriting.  I wrote "Atty" which means representing her

       5    as an attorney.  The purpose was a legal visit in the

       6    attorney's booth.  And my signature and my printed name.

       7    And I would have written the date which would have been

       8    December 12 of 2006 and the approving authority and time

       9    in would be written in by whoever was working at the jail.

      10         Q    Would that cause you to believe that you visited

      11    her in the jail in December of 2006?

      12         A    That's right.

      13         Q    You testified about some handwritten notes.  I

      14    believe it was Exhibit 17 dealing with 12-12-06, Page 12

18:00 15    or 13.

      16         A    It's 17-12.

      17         Q    Looking at that exhibit, you have some notes

      18    there relating to Sandra Wilson, and it also says

      19    12-12-06?

      20         A    That's correct.

      21         Q    Coupling that with Page 321 out of Exhibit 1,

      22    wouldn't it be fair to assume that you went to the jail to

      23    visit her on 12-12-06?

      24         A    I believe that's correct.

      25         Q    And in fact, she had on that collar when you

RAY - CROSS - WHITE                              57

18:00  1    went to visit her?

2          A     She could have very well.

3          Q     Did you ask her about it?

4          A     I don't remember if she had it on or not.  If

5    she had it on, I saw it.  I just don't remember it.  I'm

6    not calling her a liar.  I just don't remember.

7                THE COURT:  What does chronic mean?

8                THE WITNESS:  I looked at that, and I thought

9    she told me it was a chronic drug user.

10                THE COURT:  Codefendant SM.

11                THE WITNESS:  That's say, codefendant will say

12    she had nothing to do with it.

13                THE COURT:  And she told you that on December

14    12?

18:00  15                THE WITNESS:  That's correct.  It was that day

16    or some day before that because I had to figure out where

17    he was.

18                THE COURT:  It looks like you have his name and

19    phone number or --

20                THE WITNESS:  No, county ID number.  That's a

21    number you get when you go to the jail.  It stays with you

22    every time you come down there.  The other number is going

23    to be his case number I believe, and Fred Cummings was his

24    lawyer who was underneath that.  Ultimately, I wouldn't

25    have gotten all of that information from her because she

18:00  1    wouldn't have known it, but I had to track down where he

2    was and get him bench-warranted back or get Judge Gill to

3    keep him in the jail.  And I checked the file, and there

4    wasn't a bench warrant.  So I would have done the other.

5    BY MR. WHITE:

6         Q    I also want to refer your attention to Exhibit

7    1, Page 322.  That's one of those jail cards?

8         A    Yes, sir.

9         Q    And what date on that?

10        A    January 2, 2007.

11        Q    And you went to visit her on that day?

12        A    I went to visit her on that day.

13        Q    Did she have on the collar?

14        A    I don't remember.

18:00  15       Q    She did have on the collar on the 5th?

16             THE COURT:  I think he told us several times he

17   doesn't recall ever seeing her in the collar.  Let's don't

18   keep asking that question if he has already answered it.

19   BY MR. WHITE:

20        Q    Let's start with Exhibit 12.  That's the

21   paperwork for Ms. Wilson?

22        A    That's her petition to proceed to adjudication,

23   yes, sir.

24        Q    Do you know why she did not report on August

25   21st?

RAY - CROSS - WHITE                                    59

18:00   1      A   I read the record and -- I'm talking about the

2   record of the hearing.  Ms. Latham, who was the probation

3   officer, had testified in that hearing that Ms. Wilson was

4   told to report.  Ms. Wilson had told me that she did

5   report because she pled not true to that.  However, Ms.

6   Latham had a document Ms. Wilson had signed that ordered

7   her to report.  I don't have a document.  I don't remember

8   why she didn't report, to answer your question.

9       Q   What about September 2006?

10      A   She had indicated that there was a fire at her

11   residence or a relative's residence.

12      Q   That would have been the same for October 2006?

13      A   I think that's correct.  The record where she

14   testified would have been a much more accurate reason, but

18:00 15  specifically what she told about not reporting I don't

16   remember other than what she would have testified to.

17      Q   Going to Exhibit 13, Mr. Eaton ultimately gets

18   twelve years, right?

19      A   He ultimately got sixteen.  His offer was

20   twelve.

21           THE COURT:  Did he contest his?

22           THE WITNESS:  He did that in final hearing, yes,

23   sir.

24   BY MR. WHITE:

25      Q   What was the result of the finding of his new

18:00  1    offense?  Did Judge Gill find that true or not true?

       2         A    I don't remember.  If I remember correctly, he

       3    had another lawyer representing him on that case.  You

       4    talking about the drug offense?  I think he had another

       5    lawyer, and I want to say dismissed, but I don't know.

       6         Q    If I were to show you the county computer

       7    print-off concerning Mr. Eaton, would that refresh your

       8    recollection as to the result of that new offense?

       9         A    It would.  And I could be wrong in what I just

      10    said.

      11              THE COURT:  Just read it and tell me.

      12              MR. WHITE:  That Mr. Eaton was convicted of a

      13    crime of burglary of a habitation.  The offense date of

      14    the crime was January 5th of 2007 as alleged in this

18:00 15    petition to adjudicate.

      16              THE COURT:  He was convicted of that offense in

      17    a different case?

      18              MR. WHITE:  Yes, in a different cause number.

      19              THE COURT:  Can you accept that?

      20              THE WITNESS:  Sure.  That could be, sure.

      21    BY MR. WHITE:

      22         Q    Going on to 14, Henry Ogle, what was the result

      23    of his new offense?

      24         A    I don't know.

      25         Q    Do you know if he contested his hearing or not?

18:00   1        A    I believe that he settled his case on the eve of

        2   the hearing.  What I mean by that is Judge Gill would

        3   leave his offer open, and if the person came in even on

        4   the day of the hearing they could settle for it at that

        5   time.  I think that's what happened in this case.

        6        Q    And Number 15, Mr. Penny McGee, what was the

        7   result of his new offense?  True or not true?

        8        A    You mean the new offense that was alleged in

        9   this petition?

       10        Q    Yes, sir.

       11        A    Are you asking what happened on that day?

       12        Q    Not so much the facts.  Did Judge Gill find it

       13   true or not true?

       14        A    He found it true.

18:00  15        Q    And ultimately sentenced him?

       16        A    He found the new offense true and sentenced him

       17   on the aggravated assault revocation.

       18        Q    Now, Exhibits 13, 14, 15 are examples that you

       19   testified on direct about what Judge Gill would do in

       20   certain types of cases.

       21             THE COURT:  I think that's what he said they

       22   are.

       23             THE WITNESS:  Yes, sir.

       24             THE COURT:  What's the difference between these

       25   cases and Ms. Wilson's case?

RAY - CROSS - WHITE                          62

18:00  1        A    In her mind -- And I think probably in Judge

       2   Gill's mind -- probably nothing.

       3   BY MR. WHITE:

       4        Q    Isn't it true that in these cases -- 13, 14,

       5   15 even some of the others -- the new offense was found to

       6   be true?

       7        A    That's the difference, yes, sir.

       8        Q    But in Ms. Wilson's case the new offense was

       9   found to be not true?

      10        A    Yes, sir.

      11        Q    And you testified earlier that Judge Gill's

      12   offer depends in part on the new offense?

      13        A    That's correct.

      14        Q    But the new offense here was not true?

18:00 15        A    He found it not true.

      16             THE COURT:  Where is this line of questioning

      17   leading us as far as this procedure is concerned?  You may

      18   be showing that Judge Gill's sentencing scheme is not a

      19   very good one, but I don't know that that's in issue.

      20             MR. WHITE:  Well, your Honor, one of the things

      21   we have to establish is prejudice.  Here is what Judge

      22   Gill would have done, and here is examples of what he

      23   would have done and use these examples of typically what

      24   he would have done.  I have to show the difference between

      25   Ms. Wilson's case and these cases.

18:00  1         THE COURT:  Are you going to show in these other

2    cases that there was some type of evidence about somebody

3    having a mental problem that would explain why he did

4    something different in those cases?  I don't understand

5    where you are heading.

6         MR. WHITE:  It goes to prejudice.  It shows that

7    the evidence they are saying shows no prejudice is

8    distinct from the evidence in this case.

9         THE COURT:  So you are showing their evidence of

10   no prejudice isn't very good?

11        MR. WHITE:  Yes, essentially, your Honor.

12        THE COURT:  I understand what you are doing.

13   BY MR. WHITE:

14        Q    You testified earlier that you go back to Judge

18:00 15   Gill's offers, and he would have the offer written on the

16   probation file?

17        A    Yes.

18        Q    And did you review Ms. Wilson's probation file?

19        A    Yes.

20        Q    And what do you recall was in it?

21        A    It would have -- In her particular case, as I

22   remember it, it wouldn't have been a very thick file

23   because they hadn't seen her since she got put on

24   probation.  In other words, it would have the judgment and

25   sentence of putting her on probation, a copy of the

18:00  1    conditions of probation.  If a person reported, those are

2    forms would be in there.  Since she didn't report, they

3    weren't there.  I don't know that I looked in this in this

4    case.  It would have a copy of the offense report for the

5    robbery that she was on probation for.  It would have a

6    copy of any referrals that they might have sent her to.  I

7    believe it had a copy of the document I mentioned a moment

8    ago that Ms. Latham, who was the probation officer,

9    directed Ms. Wilson to her office on the 1st of August.

10   That would have been in the file.

11             THE COURT:  Do we have any of this material

12   about the conditions?

13             MR. WHITE:  No, your Honor, I don't think so.

14   BY MR. WHITE:

18:00  15        Q    Do you recall there being anything in there

16   concerning her mental retardation and mental health

17   issues?

18        A    I don't recall.

19        Q    So there is no way a judge would have known

20   about it other than you presenting it?

21        A    If it wasn't in there.

22             THE COURT:  We do have that in the record

23   because it's part of the state record that's now part of

24   this record.  Does anybody happen to have that in front of

25   them -- Well, I do have.

RAY - CROSS - WHITE                           65

18:00   1            MR. CORCORAN:  It's not large, your Honor.  It's

2      on Page 30.  There are three volumes to her first habeas

3      application and conditions of supervision.

4            THE COURT:  Let me see that.  You are saying

5      there is no condition about mental health?

6            MR. CORCORAN:  I didn't read it fully.

7            THE COURT:  Are these conditions all pretty much

8      standard, just a printed form?

9            THE WITNESS:  Pretty much.  Unless there is a

10     sex offender, they got another form.  But everybody gets

11     the form you are looking at.

12           THE COURT:  What I'm looking at is Pages 30 and

13     31 of the State habeas records.  One of the conditions is

14     psychological evaluation and treatment.  Project Safer

18:00  15     Neighborhood, whatever that is, and evaluation and testing

16     and treatment for substance abuse.  Makes you wonder about

17     the Probation Office.  I'm handing this back.

18           MR. WHITE:  Proceed, your Honor?

19           THE COURT:  Go ahead.

20     BY BY MR. WHITE:

21        Q    What type of sentencing options did Judge Gill

22     have?  Other than sending her to the penitentiary, what

23     else could he have done?

24        A    Put her back on probation.  Given her some time

25     in jail.  He could have referred her -- If the evidence

18:00   1   had supported it and he wanted to, he could have sent her

         2   to any number of a drug treatment classes.  He could have

         3   amended her probation to a more stringent probation, made

         4   her report more often, made her go to a residential

         5   treatment center.  He could have put her on a MHMR case

         6   load.  Put her on regular probation.  If she was

         7   physically healthy, he could have sent her to boot camp.

         8   A number of things.

         9           THE COURT:  Compared to what you have seen in

        10   other cases, what is the level of severity of the sentence

        11   he imposed on her.

        12           THE WITNESS:  It's about the same.

        13           THE COURT:  It sounds like he has a fixed

        14   routine without taking into account the characteristics of

18:00   15   the individuals.

        16           THE WITNESS:  He's pretty predictable.  And if I

        17   could elaborate, she had been to the penitentiary about

        18   three times before she got this probation.  I don't know

        19   if he looked at that document or not.  That's the last

        20   couple of pages of her case listing.  He may have seen

        21   that and decided she got plenty of chances.  It's not

        22   unheard of, but pretty unique.

        23   BY MR. WHITE:

        24       Q    In that vein of thought, you testified about a

        25   twelve- to fifteen-year range is what Judge Gill would

RAY - CROSS - WHITE                               67

18:00   1   typically do where there is a second offense?

        2       A    If they are on probation, it would be different

        3   because you couldn't give them over ten years, but if they

        4   were deferred and they had a new felony offense, the offer

        5   was almost always twelve years, and if they got revoked,

        6   they would get fifteen years.

        7       Q    The five- to seven-year range, you said that was

        8   for technical violations?

        9       A    That would be for failure to report.  Like not

       10   going to do an assessment which would be a violation.  But

       11   technical violations, yes, sir.

       12       Q    And that was ultimately what Ms. Wilson got

       13   revoked for?

       14            THE COURT:  I think we're beginning to go over

18:00  15   the same things again.

       16            MR. WHITE:  Yes, your Honor.  In light of that

       17   other line of questioning, I just wanted -- May I have a

       18   moment with counsel?

       19   BY MR. WHITE:

       20       Q    In your twenty plus years of practice of law,

       21   you are familiar with the Code of Criminal Procedure?

       22       A    Yes.

       23       Q    And are you familiar with Article 4212 of the

       24   Code of Criminal Procedure?

       25       A    I try to be.  I don't know that I can tell you

18:00  1    everything that's in it.

2        Q    It's basically the article that deals with

3    probation.  Deals with what it takes to get on probation,

4    revoke probation, things of that nature, right?

5        A    That's right.

6        Q    Are you familiar with Section 9 of Article 4212?

7        A    I would have to see it.  I have read the

8    statute, but I don't know specifically what point that

9    makes.

10          THE COURT:  What does it say?

11          MR. WHITE:  It's a little wordy, but it

12    essentially deals with a mandatory mental health

13    evaluation if it's brought to the Court's attention.  If

14    the Court notices it on its own or brought to the Court's

18:00 15    attention through the lawyers or any other parties

16    involved.

17          THE COURT:  What's the purpose of the

18    evaluation?  To see if the person knows what they are

19    doing at the hearing or does it have some other purpose?

20          MR. WHITE:  It could be used in sentencing, in

21    what to do with this person while he's on probation, what

22    to do with this person if they violate probation.

23          THE COURT:  Let me see it.  Which Subsection?

24          MR. WHITE:  9 Subsection (i), your Honor.

25          THE COURT:  That has to do with a presentence

18:00  1   investigation to be conducted in connection with these

2   revocation proceedings?

3       THE WITNESS:  Not that I am aware of.  I think

4   it would have been done at the time she was placed on

5   probation.

6       THE COURT:  When?

7       THE WITNESS:  Back in August of 2006.

8       THE COURT:  Do you know if that applies to this

9   kind of felony?

10       MR. WHITE:  The point is that it could be done.

11       THE COURT:  Well, I think he's already said they

12   would have done it had they called her condition to the

13   attention of the judge, if he had known about it.  Isn't

14   that what you said earlier?

18:00 15       THE WITNESS:  Yes, sir.

16       THE COURT:  He's not taking issue with that.

17   He's saying he knows they would have done it.

18       MR. WHITE:  I want to bring to the attention the

19   Court it is a mandatory provision.  It goes to the

20   prejudice.

21       THE COURT:  Well, his impression is this applies

22   only at the time the defendant pleads guilty.  Is that

23   what you are saying?

24       THE WITNESS:  Well, maybe I misspoke.  That's

25   generally when it's done.  If you have a situation where

18:00   1    that might become applicable at a revocation, it could be.

        2    But typically that's done when a person is first put on

        3    probation.  That doesn't keep me from saying something to

        4    Judge Gill.

        5           THE COURT:  Well, I'm assuming what you said,

        6    that he would have done it.

        7           THE WITNESS:  That's correct.

        8           THE COURT:  Well, I'm trying to decide if this

        9    article has anything to do with our case.  But I will take

       10    it into account.  I'll hand this back to you.

       11           MR. WHITE:  Pass the witness, your Honor.

       12           THE COURT:  Do you have any other questions?

       13           MR. CORCORAN:  Maybe four questions is what I

       14    have.

18:00  15           THE COURT:  All right.

       16                    REDIRECT EXAMINATION

       17    BY MR. CORCORAN:

       18       Q    The first question is you were asked about the

       19    difference between the cases --

       20           THE COURT:  That's a statement.  Ask a question.

       21    I haven't given you time for statements.

       22    BY MR. CORCORAN:

       23       Q    Why do you think Judge Gill sentenced her in the

       24    range as if he found the new offense true?

       25           MR. WHITE:  Objection.

18:00   1      THE COURT:  Overruled.

2      A     Well, he found that allegation not true because

3     of the technical failure of the State to prove what they

4     changed their allegation to.  When they changed it from

5     actual to constructive, that changed the pleading.  It

6     actually added an element to what they had to prove.  He

7     found it not true because of that, not because he didn't

8     think she was there and committed the offense.  That's my

9     opinion.  I went and asked him since I got notice of doing

10    all of this.  He and I talked about this two weeks ago,

11    and that's the impression I had from him as to why he had

12    done it.

13      MR. WHITE:  Objection, hearsay.

14      THE COURT:  You talked to Judge Gill about this

18:00 15   case?

16      THE WITNESS:  I went and talked to him, and I

17    specifically told him the case I represented someone on

18    was having a hearing in your court today.  Here is what

19    happened in this case, and here is what I'm thinking you

20    did, and do you agree or not agree with it.  That was the

21    conversation.  I don't know that I told him Ms. Wilson's

22    name.

23      THE COURT:  Did he agree that he probably took

24    that offense into account?

25      THE WITNESS:  He didn't say that, and I didn't

18:00  1   specifically ask him.  I asked him why he found it not to

       2   be true.

       3        I asked when you amend your pleadings from

       4   actual to constructive, did that add an element, and the

       5   research I had done and was aware of, that's what

       6   happened.  He took a break to go do some research.  And I

       7   said you took a break.  Why did you do that?  And he said

       8   I went to go look something up is what he told me.

       9   BY MR. CORCORAN:

      10        Q    In the Criminal Code of Procedure, the number of

      11   instances where the jail may be required -- or the State

      12   may be required to deal with a mentally retarded person,

      13   were any of those signs in this process with Ms. Wilson?

      14   What are those signs?  What kind of things would you see

18:00 15   if you believed this person to be mentally retarded?

      16        A    There would be things in her file typically.

      17   She would have had a referral to some psychologist

      18   arguably.  There may have been a note or some pleadings

      19   that some lawyer filed previously.  Any one of a number of

      20   things.  As innocent as the bailiff telling you, "Hey,

      21   your guy has something matter with him."

      22             THE COURT:  What kind of a file are you talking

      23   about?

      24             THE WITNESS:  The clerk's file that I might have

      25   looked at or the probation file.  It could be in a variety

18:00   1   of places.  But it mostly starts when I have a

2   conversation with the client.

3            THE COURT:  Well, you have seen Ms. Wilson here

4   today.  Do you remember if she acted the same way then

5   that she acted on the witness stand when you represented

6   her?

7            THE WITNESS:  I believe when we had the hearing

8   and I knew her in 2006-2007 she feels a little more

9   verbose about her statements.  Can I say she wasn't

10   mentally retarded, no, I can't say that.  I don't know.  I

11   just didn't have any indication of it.

12   BY MR. CORCORAN:

13       Q    Would there have been any reason not to raise a

14   mental retardation issue had you known about it in this

18:00  15   case?

16       A    No, not at all.  If I thought for a second she

17   was incompetent, I would have told Judge Gill, and she

18   would have been sent to a psychiatrist and interviewed,

19   and they would have made a recommendation.  It would have

20   been one less thing for me to do.

21       Q    What about mental retardation?  If you had

22   become aware after finding or testing -- Forget competency

23   for a moment.  Would that have been something you would

24   have immediately brought to Judge Gill's attention?

25       A    It could have made a difference.  And I probably

18:00  1      would have.

       2                   THE COURT:  What about telling him she had a

       3      neck brace on because she was recovering from a suicide

       4      attempt?

       5                   THE WITNESS:  I don't know that that would have

       6      made a lot of difference.

       7                   THE COURT:  Would that in all probability have

       8      invoked further inquiry into what her mental condition

       9      was?

       10                  THE WITNESS:  It could have or might not.  From

       11     what you just said, probably not.

       12     BY MR. CORCORAN:

       13        Q     And finally, with respect to mental illness, is

       14     there anything in your understanding of Judge Gill in

18:00  15     terms of how you strategize in a case, if you assumed a

       16     mentally ill person, would that have mattered with Judge

       17     Gill?

       18        A     I guess the best way to answer this is to say he

       19     was going to make some inquiry as to whether the person

       20     was guilty or not guilty or violated their probation, and

       21     that had an awful lot to do with what he did.  And going

       22     back to the issue of constructive versus actual transfer,

       23     I don't think there was a doubt in his mind in doing that

       24     because those police officers testified she was right in

       25     the middle.

RAY - REDIRECT - CORCORAN                    75

18:00  1            MR. WHITE:  Objection.  Speculation.

       2            THE COURT:  I am going to receive it for

       3   whatever it's worth.  I think you have told me that you

       4   thought there was some mental illness there would have

       5   been an inquiry.

       6            THE WITNESS:  Might have depending on the

       7   result.  He would have at least made the inquiry.

       8            THE COURT:  He would have done something

       9   different in the sense that he would have had a

      10   psychiatric evaluation.

      11            THE WITNESS:  I think that's correct, yes, sir.

      12   BY MR. CORCORAN:

      13       Q    And some judge might find aggravating that a

      14   person does not take their prescription medication while

18:00 15   on probation.  Is Judge Gill that kind of judge?

      16            MR. WHITE:  Objection, speculation.

      17            THE COURT:  I think he can say that without

      18   speculating.  What kind of a judge is he?

      19            THE WITNESS:  He's not very forgiving when

      20   people don't do what they are supposed to, and if you are

      21   ordered by a doctor or a judge to take your medicine --

      22   and a lot of people don't do it that I come across in this

      23   business -- he didn't have a lot of sympathy for that.

      24            MR. CORCORAN:  Pass the witness.

      25            THE COURT:  Did you have anymore questions?

RAY - REDIRECT - CORCORAN                76

18:00  1          MR. WHITE:  No, your Honor.

       2          THE COURT:  Okay.  You can step down.  May he be

       3  excused?

       4          MR. WHITE:  Yes, your Honor.

       5          THE COURT:  Did you have any rebuttal?

       6          MR. WHITE:  No, your Honor.

       7          THE COURT:  You may step down, and you are

       8  excused.

       9          MR. WHITE:  Your Honor, we would request a brief

      10  summation.

      11          THE COURT:  Okay.  That's fine.

      12          MR. WHITE:  Your Honor, I want to make sure that

      13  we're talking about the issue here not being competency.

      14  The issue is whether or not Mr. Ray had a duty to

18:00 15  investigate and present mitigating evidence in the

      16  sentencing phase of her trial.  That duty only kicks in

      17  when he has notice.  What do we have concerning his

      18  notice?  One, she tells him in no uncertain terms.  She

      19  said she tells him on a couple of different occasions.

      20  The other thing we have -- while he may not recall it's

      21  clearly in the records, both the medical records and

      22  testimony from court -- that the client has on this big

      23  neck collar.  He's got to ask.  What happened?  Why do you

      24  have on a neck collar?  That would have prompted further

      25  investigation.

18:00   1        THE COURT: Let me ask you this. I haven't

2    studied all of these exhibits in detail. Is it clear that

3    she had the neck collar on because of the injuries she

4    suffered from the suicide attempt in the records?

5        MR. WHITE: That's what the medical records

6    indicate.

7        THE COURT: Do you agree with that?

8        MR. CORCORAN: I don't know that they say it was

9    done to prevent her from doing another suicide.

10       THE COURT: No, I'm talking about it was

11    treatment for an inquiry from committing suicide.

12       MR. CORCORAN: Correct. She was prescribed the

13    neck brace after that suicide attempt.

14       THE COURT: Well, I do have a lot of concern

18:00 15   that he didn't ask her about that. When did she put the

16    neck brace on?

17       MR. WHITE: She got out of the hospital on the

18    6th or 7th of 2006, and he goes to visit her on the 12th

19    of December of 2006 in the jail. And she says she has the

20    collar on on the December 12 jail visit, and the

21    transcript in the jail hearing indicates she has on the

22    collar. There is at least two occasions where she has on

23    the collar.

24       THE COURT: Well, I don't have any hesitancy

25    that he should have asked her why she had that collar on.

18:00  1    I don't have any hesitancy that if he asked her he would

2    have had an obligation to inquire further and he would

3    have discovered that she had a bad mental problem.  Let's

4    start with that.  I'll make those findings.

5          MR. WHITE:  Then that brings us to Ransome, your

6    Honor.  It essentially says when counsel is on notice of

7    potential mitigating evidence counsel is no longer

8    justified in relying exclusively on the defendant for

9    information.

10          THE COURT:  Well, I assumed he got the

11    information from the defendant.  She told him why she had

12    the collar on.  I find that she would have told him if he

13    asked her.  I'm finding if he had done his job, he would

14    have found out from her what the problem was.  He wouldn't

18:00 15    have to go somewhere else.  He could have amplified on his

16    state of knowledge by getting the jail records.  I assume

17    the jail records would show the suicide attempt.

18          MR. WHITE:  Yes.

19          THE COURT:  Did the jail records show that she

20    has mental problems?

21          MR. WHITE:  The jail records make an indication

22    within the medical records by JPS.

23          THE COURT:  She was sent there for the suicide

24    attempt?

25          MR. WHITE:  Yes, your Honor.

18:00    1            THE COURT:  And those records would have showed

2       her mental problems?

3            MR. WHITE:  Yes, sir.

4            THE COURT:  As far as I'm concerned he was on

5       notice of those things because if he had made a proper

6       inquiry, he would have learned of those things.  Where

7       does that take it?

8            MR. WHITE:  That brings us to prejudice.  Was

9       she prejudiced by his failure to investigate and present

10      mitigating evidence.  And what did she ultimately get

11      revoked for?  For not reporting on those three occasions

12      listed in the petition.  Mr. Ray testified that in

13      situations where the new offense is not found to be true,

14      Judge Gill's range goes down to five to seven.  He said

18:00   15      five to seven one time and four to eight one time.  But

16      that's considerably lower than what she got.  We

17      speculated a lot on why the new offense was found not to

18      be true.  But the speculation could go the other way.  It

19      could be that he did not believe she was involved in the

20      offense.  The state could have changed their pleadings

21      right before the hearing because they felt like they had a

22      weak case as it was alleged.  We can speculate all day.

23      But what we have clearly is she was revoked for not

24      reporting.  She had some mental health issues, some

25      retardation issues, and those were potential evidence as

18:00    1    to why she didn't report on those three occasions.  And

2    that brings me to the Wiggins case, 539 US 510.  Most

3    specifically here in assessing prejudice we reweigh the

4    evidence in aggravation against the totality of available

5    mitigating evidence.  The other side makes the point if

6    she wasn't taking her medication is that something Gill

7    would have considered potential aggravating.  I'll concede

8    that.  Maybe he did.  Maybe he wouldn't have.  But Wiggins

9    also stands for the proposition that we have to take into

10    totality of available mitigating evidence, and that would

11    have been her mental health condition going back as far as

12    1999 that was available and would all of that have gone a

13    long way in explaining why she didn't report.  The records

14    and exhibits she has also indicate when she self reports

18:00  15    to mental personnel and jail personnel -- why didn't you

16    report during this time -- I was homeless, off my

17    medicines, walking the streets, eating out of trash cans.

18              THE COURT:  She said because the house was

19    burned down.

20              MR. WHITE:  That's what she testified to today,

21    but there are exhibits that indicate additional reasons

22    why she would not have been reporting.  And that is

23    potentially mitigating evidence.  It might not have been

24    to assess a drug charge, but it would have been mitigating

25    to assess why she didn't report.

18:00  1          THE COURT:  Well, how do you justify that she

       2     didn't pay a lot of attention to those things.

       3          MR. WHITE:  Does that excuse the lawyer from

       4     doing his job?

       5          THE COURT:  No, but I have to be convinced it

       6     would make a difference.  I have some concern that with

       7     that judge it really wouldn't have made any difference.

       8     It occurs to me as a possibility.

       9          MR. WHITE:  I can understand that, your Honor.

      10     That's why I bring up Article 4212 of the Code of Criminal

      11     Procedure, and if that is brought to the Court's attention

      12     the court shall -- that's mandatory language.

      13          THE COURT:  Let me say one other thing, and I

      14     can find based on what I have heard that her mental

18:00 15     illness had been made on the record as a result of

      16     knowledge of the suicide attempt, that had the judge been

      17     made aware of those things he would have ordered her to be

      18     evaluated by a psychiatrist or psychologist to determine

      19     what her mental condition was.  I think that's undisputed

      20     from what Mr. Ray says.  Where does that leave us?  What

      21     would he was done when you got the results?

      22          MR. WHITE:  By law he would have considered the

      23     information.

      24          THE COURT:  Well, we have heard it really didn't

      25     make a lot of difference.  He has a certain number of

CASSIDI L. CASEY, CSR, 214-354-3139
UNITED STATES DISTRICT COURT

18:00  1    years he's going to give the people, and he doesn't pay a

2    lot of attention to things we're talking about.

3              MR. WHITE:  We also heard he had arraigned for

4    new offenses and another one for technical violations.

5              THE COURT:  Apparently he didn't pay any

6    attention to the two ranges in this case, and I don't see

7    how knowing her condition would have changed that.

8              MR. WHITE:  I understand the question that you

9    are asking.  I think Wiggins, the case that I cited

10   earlier, says now is the time for you to assess the

11   aggravating and the totality of available mitigation

12   evidence, and now is when you have to make that

13   determination.

14             THE COURT:  I don't think I can decide what

18:00  15   sentence should be imposed.  That's not my job.  I think

16   what Judge Gill did is outrageous, but I don't know that's

17   my job to make that evaluation.

18             MR. WHITE:  There is several ways to define --

19             THE COURT:  In my view what he did is

20   outrageous, not considering her mental condition or

21   retardation.

22             MR. WHITE:  What he did also forecloses her

23   ability to appeal her sentence based upon this

24   information.  There is no record of it at the trial court.

25   Therefore, she couldn't appeal it.

18:00   1          THE COURT:  Okay.  Let's assume that she did not

        2   receive legal representation, that she was denied her

        3   Constitutional right to have adequate legal

        4   representation.  That's just a starting point.  The

        5   question was should I be hearing this hearing, period.

        6   I'm sure I am going to hear about that, whether she was

        7   entitled to a hearing.  2254(e)(2) says "If the applicant

        8   has failed to develop the factual basis of a claim in

        9   State proceedings, the court shall not hold an evidentiary

       10   hearing on the claim unless the applicant shows that.

       11   (ii) a factual predicate could not have previously been

       12   discovered through the exercise of due diligence.

       13          I don't think that's applicable.  And the (B)

       14   part would be facts to be sufficient to establish by clear

18:00  15   and convincing evidence that but for the Constitutional

       16   error -- I'm not sure that's applicable -- that no

       17   reasonable factfinder could find her guilty of failure to

       18   report.  Those are the different parts.  The hard part is

       19   getting around the (d) and (e) parts of 2254.

       20          MR. WHITE:  And in light of our phone conference

       21   I thought that was going to be the thrust of the

       22   post-hearing briefing.

       23          THE COURT:  Well, if you want to do some

       24   post-hearing briefing, I will need some help.  Frankly, I

       25   think your client should be released and have a hearing

18:00   1   before a different judge if he is no longer there.  But

2   I'm not sure how I'm getting there.  Do you have any

3   suggestions?

4          MR. CORCORAN:  No, your Honor, you are

5   absolutely right about 2254(e)(2) and (d) make it

6   difficult for us to get here.  I would like to address

7   that post-hearing briefing.

8          THE COURT:  You all together share the cost of

9   this record so that I will have a record, and if you can't

10   agree to the extent of anything that happened here, you

11   will have a record to give me a reference to.

12          MR. WHITE:  Your Honor, if I may?  By no means

13   am I an expert in post-conviction litigation.  Both Ms.

14   Walker and myself are anxious to do the best we can.

18:00  15   However, we would at a minimum ask for an extended period

16   of time because we are catching up with regard to the

17   basics of post-conviction litigation.

18          THE COURT:  I thought you had become an expert

19   in this case, and I can appoint you again.

20          MR. WHITE:  Well, I'm trying, but it's not what

21   do on a daily basis.

22          THE COURT:  And they will help you.  They will

23   cite some cases you will think about that.

24          MR. WHITE:  I just might need a little extra

25   time.

85

18:00 1          THE COURT:  How much time?

2          MR. WHITE:  Your Honor, honestly I think I need

3     a month.

4          THE COURT:  Okay.  Thirty days after the court

5     reporter has prepared to file the record.  She's filling

6     in for my court reporter, and I'm sure she has a lot of

7     other things to do.  I take it both of you are ordering a

8     record to share equally in the cost.  So I'll give you

9     each thirty days after the record is received for the

10    post-hearing memorandum, and when I see those, I'll decide

11    whether I am going to give each one of you an opportunity

12    to respond to the other.  We have been down this road

13    before in another case, and that is when it is so apparent

14    there is a miscarriage of justice to do it another way

18:00 15   than this.  To me, it's apparent in this case there has

16    been a miscarriage of justice.  Are you ware of any other

17    way to get this done?

18         MR. CORCORAN:  I'm not aware of any other way.

19    You cited the statute.  "The court shall not hold an

20    evidentiary hearing."  It's very difficult to get around

21    these issues.

22         THE COURT:  Well, you don't want to get to hung

23    on technicalities when there is a miscarriage of justice.

24         MR. CORCORAN:  Well, your Honor, I think it's a

25    valid defense, and it's a Congressional mandate.

86

18:00  1              THE COURT:  Well, if we have to go through it we

       2      will, and it may be that Ms. Wilson simply can't get

       3      relief.  If there is a way I can give it to her, I am

       4      going to.  But this is not as clear cut as the last one

       5      that your cocounsel was in.

       6              MS. CALLAGHAN:  No, your Honor, I was in Hamm.

       7              THE COURT:  Not Richards?  Well, this case is

       8      almost as clear cut a miscarriage of justice as Richards.

       9      Okay.  Anything else we need to do today?

      10              MR. CORCORAN:  Not from me, your Honor.

      11              MR. WHITE:  Not from me.  Let me ask you one

      12      other thing.  What if she was not sentenced to a term of

      13      imprisonment?  Where could she have gone?

      14              MR. WHITE:  It's wide open.  He could have made

18:00 15      her go to mental health counseling, in-patient mental

      16      health, Vernon State Hospital.  It's wide open.  She could

      17      have been on probation technically while in the state

      18      hospital.

      19              THE COURT:  Okay.  You all are excused.

      20

      21

      22

      23

      24

      25

# INDEX

ARGUMENT                                                          Page

Movant                                                             75


EXAMINATION                                                       Page

Sandra Wilson
    Direct Examination............................................. 3

William Ray
    Direct By Corcoran.................................................. 23
    Cross By White....................................................... 50
    Re-Direct By Corcoran .............................................. 69


EXHIBITS                                                          Page

Movant's Exhibits

1-12...........................................................3

Respondent's Exhibit

13-14 admitted..................................................  3
16 admitted.................................................... 44

1

2

3                    C E R T I F I C A T I O N

4

5        I, Cassidi L. Casey, certify that during the

6    proceedings of the foregoing-styled and -numbered cause, I

7    was the official reporter and took in stenotypy such

8    proceedings and have transcribed the same as shown by the

9    above and foregoing pages 1 through 103 and that said

10   transcript is true and correct.

11

12       I further certify that the transcript fees and format

13   comply with those prescribed by the court and the Judicial

14   Conference of the United States.

15

16

17                          s/Cassidi L. Casey
                         _____
18                       CASSIDI L. CASEY
                         UNITED STATES DISTRICT REPORTER
19                       NORTHERN DISTRICT OF TEXAS
                         DALLAS DIVISION
20                       CSR NUMBER 1703

21

22

23

24

25

# EXHIBIT 40

U.S. DISTRICT COURT
FILED

AUG 19 2009

CLERK, U.S. DISTRICT COURT
By _____
Deputy

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

SANDRA WILSON,                    §
                                  §
        Applicant,                §
                                  §
VS.                               §   NO. 4:07-CV-708-A
                                  §
NATHANIEL QUARTERMAN, DIRECTOR,   §
TEXAS DEPARTMENT OF CRIMINAL      §
JUSTICE, CORRECTIONAL             §
INSTITUTIONS DIVISION,            §
                                  §
        Respondent.               §

MEMORANDUM OPINION
and
ORDER

After having considered the relief sought by applicant,

Sandra Wilson,[1] in the application she filed December 10, 2007,

for relief under 28 U.S.C. § 2254, as supplemented by her post-

hearing filing, the court has concluded that the application

should be granted for the reasons given below.

I.

Procedural History Leading to the
Hearing Conducted by This Court

On August 18, 2006, applicant entered a plea of guilty to

the offense of robbery in Case No. 1032954W in the District Court

_____

[1]The title of the document filed December 10, 2007, by Sandra Wilson was "Petition for Writ of
Habeas Corpus by a Person in State Custody," and she referred to herself as "petitioner" in the document.
Consistent with the wording of 28 U.S.C. § 2254, the court is referring to the document as an
"application" and is referring to Sandra Wilson as "applicant."

of Tarrant County, Texas, 213th Judicial District.  As authorized

by section 5 of article 42.12 of the Texas Code of Criminal

Procedure, there was not an adjudication of guilt, but applicant

was placed on community supervision for five years.  Thereafter,

on November 13, 2006, the State filed a petition to proceed to

adjudication of guilt and sentencing based on applicant's

allegedly having violated her conditions of supervision by

engaging in an illegal controlled substance transaction on

November 7, 2006, and failing to report to her Supervising

Officer on or about August 21, 2006, and during the months of

September and October 2006.  Bill Ray ("Ray") was appointed by

the state court trial judge to represent applicant in defense of

the petition to proceed.  A hearing was held on the petition on

January 5, 2007.

At the conclusion of the hearing the state court judge found

that applicant had committed the failure to report violations,

but that the alleged controlled substance offense violation was

not true.  The judge then adjudicated applicant guilty of the

robbery offense to which she pleaded guilty on August 18, 2006.

After giving counsel for both sides an opportunity to offer

argument and evidence at the punishment phase, the judge

2

sentenced applicant to a term of imprisonment of fifteen years.
Applicant did not appeal the August 18, 2006, judgment placing
her on deferred adjudication community supervision or the January
5, 2007, judgment adjudicating her guilt and imposing the
sentence.

On August 2, 2007, applicant attempted to file a state
application for writ of habeas corpus, challenging the
adjudication proceeding, which was dismissed September 12, 2007,
by the Court of Criminal Appeals of Texas for non-compliance with
a form requirement.  Then, on October 8, 2007, applicant filed a
second state application, this time challenging her original plea
of guilty, the adjudication proceeding, and her sentence.  The
second application was denied without written order by the Court
of Criminal Appeals on December 12, 2007.

The application now under consideration was docketed
November 20, 2007, by virtue of the filing by applicant on that
date of a document misnamed "Notice of Appeal" together with a
motion for leave to proceed in forma pauperis.  Applicant's
"Petition for Writ of Habeas Corpus by Person in State Custody"
was filed December 10, 2007.

3

On November 17, 2008, United States Magistrate Judge Charles Bleil issued his proposed findings and conclusions and recommendation.  He recommended that applicant's grounds for relief related to her plea of guilty proceeding be dismissed as time-barred, and that her remaining grounds, including the grounds that she was denied constitutional due process and effective assistance of counsel, be denied.  Applicant timely filed on November 24, 2008, objections to the magistrate judge's proposed findings and conclusions and recommendation.

By order signed December 4, 2008, the court accepted the magistrate judge's findings and conclusions and recommendation as to all but applicant's ineffective-assistance-of-counsel ground; dismissed applicant's claims relating to her original guilty plea and the plea proceeding; and, denied relief based on applicant's claims that her sentence was not fair, that she was convicted because the State suppressed favorable evidence, and that the adjudication proceeding violated her constitutional due process and equal protection rights.  The court expressed concern in the order with the failure of Ray to offer any evidence, or otherwise make known to the state court judge, applicant's diminished mental capacity and mental illnesses.  Respondent was directed by

4

the court to file all information in possession of the State

consisting of, or pertaining to, any testing, evaluation, or any

other documentation bearing on applicant's emotional or mental

condition or her intellectual capacity.

Respondent complied with the directive of the December 4

order by filing on January 21, 2009, four volumes of medical and

mental health records pertaining to applicant.  After reviewing

those records, the court concluded that an attorney should be

appointed to represent applicant on her ground that she received

ineffective assistance of counsel because, according to her

claim, her counsel failed to take into account at her revocation

hearing, and to make known to the state court judge presiding

over the hearing, the various mental problems she was having and

her mental shortcomings, including mental retardation.  By order

signed January 22, 2009, the court appoint Roderick C. White

("White") to represent applicant as to those matters.

II.

The Record of the January 5, 2007, Hearing

The transcript of the January 5, 2007, hearing on the

State's petition to proceed to adjudication of guilt and

sentencing is Exhibit 3 to the record of the hearing conducted by

5

this court on May 12, 2009.  Five witnesses were called at the
very brief hearing.  The first two were police officers who gave
testimony in support of the drug offense allegation in the
State's petition.  The third witness was a probation officer who
gave testimony in support of the State's allegations of failures
to report.  Applicant was called by Ray.  He developed through
applicant that she failed to report because her family (her
uncle, auntie, and five-year-old nephew) had just been burned to
death in a house fire, and she did not feel like going.  Their
deaths were in August 2006, and their burial was at the end of
August.  She denied having engaged in the drug transaction.  The
final witness, who admittedly was involved in the drug
transaction, testified that applicant had nothing to do with the
transaction.

During the first phase of the hearing, when the witnesses
were called, no mention was made of applicant's suicide attempt,
mental illness history, or mental retardation.  The only argument
made by Ray on applicant's behalf was to urge the judge not to
find that applicant committed the drug offense.  After having
heard the evidence, the state court judge took a short recess.

The entirety of what happened after the judge returned to the bench is set forth below:

> THE COURT:  Back on the record.
>
> Also based upon the testimony, I find Paragraph 1 of the petition to be not true.
>
> Ms. Wilson, I find you guilty of the offense of robbery causing bodily injury as charged in the felony information in this case.  Does either side have anything else they want to offer at the punishment phase?
>
> MR. VASSAR:  No.
>
> MR. RAY:  No.
>
> THE COURT:  I'm going to set your sentence at 15 years' confinement in the Institutional Division.
>
> Counsel, is there any reason sentence should not be pronounced[?]
>
> MR. RAY:  No legal reason, Judge.
>
> THE COURT:  It will be the Order, Judgment and Decree of this Court that you be sentenced to 15 years' confinement in the Institutional Division and be taken by the sheriff of Tarrant County to the Institutional Division to serve your sentence as required by law.
>
> You have a limited right to appeal, which Mr. Ray can further explain to you.
>
> You will receive credit for the time you have already served in connection with the case that you are entitled to by law.

        She's your prisoner, Sheriff:

Ex. 3 at 13.

    The drug offense that was alleged in the petition to proceed

to adjudication of guilt and sentencing was dismissed on the

State's motion on January 8, 2007.   Ex. 9.

                              III.

              The Hearing Conducted by This Court

    On May 12, 2009, the court conducted a hearing on the

application.   While the hearing dealt primarily with applicant's

ineffective-assistance-of-counsel ground, the court also received

evidence pertaining to an unusual procedure the state court judge

followed in determining the sentence to be imposed.   The

following under this heading is a brief summary of the hearing

evidence pertinent to those subjects:

A.    Jail, Hospital, and Prison Records

    Among the exhibits received at the hearing were records of

the jail where applicant was confined during the weeks leading up

to and immediately after her revocation hearing; records of John

Peter Smith Hospital, to which applicant was taken following her

suicide attempt on December 2, 2006, while in jail; mental health

records pertaining to her care and treatment in the penitentiary

unit to which she was sent after her supervised release

                              8

revocation on January 5, 2007; and, mental health records of Texas Department of Criminal Justice pertaining to applicant both before and after she was sentenced on January 5, 2007.

The jail records show that applicant tried to commit suicide on December 2, 2006, by hanging herself, Ex. 1 at 81-87, 89-93, and that she was taken to John Peter Smith Hospital for treatment, id. at 81, 92.  The records of John Peter Smith Hospital pertaining to applicant's admission there on December 2, not only disclose applicant's December 2 suicide attempt, Ex. 2 at 72, 89, 92, but they also disclose the existence of applicant's mental problems, see e.g., id. at 89 (saying that applicant had "long standing history of mental illness characterized by hallucinations, delusions, and depression"). One of the consulting physicians "strongly recommended psychiatric evaluation & treatment."  Id. at 82.

While in the hospital, applicant wrote a letter to one of the doctors informing him that she needed help because she had a "real bad mental problem."  Id. at 91.  She went on to describe serious sexual assaults she suffered as a child and to relate that she had just lost an uncle, aunt, and five-year-old nephew in a fire.  Id.  She told the doctor that she needed someone to listen to her because of a need to be put someplace where she

9

could get help.  Id.  Hospital personnel recorded that applicant

was "hearing voices, seeing snakes." Id. at 89.

Applicant's discharge summary dated December 4, 2006, says

that she was discharged wearing a cervical collar, that the

hospital staff recommended that she start taking psychiatric

medication, and that she was to follow-up with her psychiatrist

in the jail following her return to jail. Id. at 9.[2]  The

parties stipulated to the following facts relative to applicant's

suicide attempt and subsequent related events:

> 12-2-06   Suicide Attempt while in Tarrant County Jail.
> Petitioner subsequently taken to John Peter
> Smith Hospital where medical records indicate
> that 1) Petitioner was there from 12-02-06
> until 12-07-06, and that during that time,
> and after medical consultation, she was
> prescribed psychological medications
> (including haldol and risperidol); 2)
> Petitioner self-reported to hospital staff
> that she had been off of her psychological
> medications for approximately one year and
> was not receiving them while in jail; 3)
> Petitioner self-reported to hospital staff
> that she was homeless prior to being
> arrested, and that without her psychological
> medications, Petitioner claimed to hear
> voices telling her to kill herself; 4)
> Petitioner was given a c-collar to wear
> around her neck, to wear at all times,
> although Respondent does not concede that she
> did wear it at all times; 5) JPS Hospital

---

[2]The jail records disclose that when applicant was returned from the hospital to the jail, she was
segregated and put under special observation. Ex. 1 at 294.

> doctors strongly believed that Petitioner
> should receive psychiatric follow-up, at the
> Tarrant county [sic] Jail, and; 6) Petitioner
> was continuously given prescribed medication,
> as of the date she entered the hospital, and
> until the January 5, 2007, revocation
> proceeding.

Joint List of Stipulated Facts at 2.

The records of Texas Department of Criminal Justice show

that in the year 2000, applicant was diagnosed as having a

schizoaffective disorder, bipolar type,[3] and mild mental

---

[3]The diagnostic criteria for schizoaffective disorder, bipolar type, are as follows:

A.     An uninterrupted period of illness during which, at some time, there is either a
       Major Depressive Episode, a Manic Episode, or a Mixed Episode concurrent
       with symptoms that meet Criterion A for Schizophrenia.

Note: The Major Depressive Episode must include Criterion A1: depressed mood.

B.     During the same period of illness, there have been delusions or hallucinations for
       at least 2 weeks in the absence of prominent mood symptoms.

C.     Symptoms that meet criteria for a mood episode are present for a substantial
       portion of the total duration of the active and residual periods of the illness.

D.     The disturbance is not due to the direct physiological effects of a substance (e.g.,
       a drug of abuse, a medication) or a general medical condition.

(continued...)

retardation, and that she was in the mentally retarded offender program.  Ex. 4 at 749-750.  Her mental capabilities were summed up in an evaluation made in September 2000, as follows:

> Patient is a thirty-eight-year old black female in MROP with a diagnosis of schizoaffective disorder, bipolar type and mild mental retardation.  She reportedly has adaptive behavior deficits of poor academic achievement, history of mental illness, no work history, no responsibility of housing and drug abuse history.  Ms. Laney finished the seventh grade in special education and has a 68 IQ score.  She has never had a driver's license or bank account.  Patient has decreased goal directed behavior since she plans on a daily basis.  She was oriented to three spheres and demonstrated concrete thinking patterns.  She seemed easily distracted but attended to the tasks of completing the occupational therapy assessment.[4]

Id. at 734.

Her diagnoses in April 2003 again were a schizoaffective disorder and mild mental retardation, with the added diagnosis of posttraumatic stress disorder.  Ex. 4 at 724.  She was in the mentally retarded offender program at that time.  Id.  The

---

[3](...continued)
  Specify type:

> Bipolar Type: if the disturbance includes a Manic or a Mixed Episode (or a Manic or a Mixed Episode and Major Depressive Episodes)

Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 323 (4th ed. text rev. 2000).

[4]During the year 2003 applicant was using the name Sandra Laney.

parties made the following stipulation relative to items in the

pre-2005 records of Texas Department of Criminal Justice:

> 1999-2004  TDCJ records reflecting Petitioner's custody
> during this time-frame make reference to
> Petitioner's mental health, including
> references to the following:  1) Schizo-
> Affective Disorder, Bipolar Type; 2) Mild
> Mental Retardation; 3) Depression; 4) Post
> Traumatic Stress Disorder; 5) Personality
> Disorder NOS with Antisocial and Borderline
> Features.  During this time period Petitioner
> received mental health treatment and
> medication, including but not limited to,
> lithium, haldol, and trazodone.

> 11-17-99  Petitioner was diagnosed, classified, and
> assigned to the Mentally Retarded Offender
> Program while in TDCJ custody.

Joint List of Stipulated Facts at 1.

B.    Applicant's Testimony

Applicant currently is at Gatesville, Texas, in a special

unit for mentally retarded inmates serving the fifteen-year

sentence she received in January 2007.  She takes Haldol,

Thorazine, Methium, and Travasol for her "voices and suicide."

Tr. of May 12, 2009 Hr'g at 4-5.  Her understanding is that her

problems are "paranoid schizophrenia, depression, suicidal, and

bipolar."  Id. at 6.

When applicant first met her appointed attorney, Ray, he

told her that "the judge wanted to plea bargain with [her] for

twelve years." Id. at 7.  She responded that she did not want
it.  Id.  At that time she told Ray about her mental health,
mental retardation, and that she was suicidal.  Id. at 8, 10.
Ray did not respond to any of those things.  Id. at 8.

She tried to commit suicide around December 1, 2006, because
she was depressed.  Id. at 13.  The next thing she knew after she
tore her sheet and tied it around her neck tight was when she
woke up in ICU at the hospital.  Id. at 14.  When asked why she
was so depressed that she tried to hang herself in jail, she
said, "[b]ehind this case because I knew I wouldn't admit to it."
Id.

Applicant next saw Ray after she was discharged from the
hospital following her suicide attempt.  Id. at 15.  She told him
that she had tried to kill herself and that she needed to go to
the doctor or a state hospital or somewhere, but Ray did not seem
to be concerned.  Id.  She had her neck collar on at that time.
Id.  It was blue and white, and held her chin up.  Id.  During
that meeting, Ray told her the date when they would go to court.
About a week after her second meeting with Ray, she appeared in
court in connection with her revocation proceeding.  When she
talked to Ray in the holdover cell, right outside the courtroom,
she had her neck collar on and she told Ray that she had tried to

14

hang herself, to which he responded "I seen, I seen, I seen."

Id. at 17.  Ray did not seem to be concerned, so she did not say

anymore about it.  Id.

Applicant's perception of what happened at the hearing was

as follows:

> Mr. Ray had me up on the witness stand and testify
> about the dope case, how the two gentlemens had come in
> and testified. I wasn't understanding they was taking
> me to trial for my probation thing because he didn't
> mention it to me, and then the judge told us to step
> out, and he came and got me when the judge got ready,
> and the judge said Ms. Wilson and he said yes and he
> said what he had to say. I can't remember anything. So
> before I went up there, I said Mr. Ray, "Are you going
> to tell them about my neck and stuff and I suicided and
> mentally retarded?" But he never said anything back. So
> after that the judge left and went to the chambers and
> whatever, and he came back, and Mr. Ray told me to
> stand up, and I stood up, and the judge said "I'm
> giving you fifteen years in TDC and I was like "Fifteen
> years? What did I do to get fifteen years?" He just
> didn't help.

Id. at 18.  She was then taken from the courtroom and back to the

jail.  Id.  Applicant has not spoken to Ray since then.  Id.

Three days later, she was taken to the place where she is serving

her sentence.  Id. at 19.

C.   Ray's Testimony

He was appointed by Judge Gill, the state court trial judge,

on November 13, 2006, to represent applicant in her revocation

proceeding.  Id. at 25-26.  Judge Gill regularly appointed him

"outside the process" to represent persons with probation

violations. <u>Id.</u> at 25. The judge started giving him

appointments of that kind in 2001 or 2002. <u>Id.</u> at 27. Ray would

handle anywhere from four to fifteen of those proceedings each

week. <u>Id.</u> He estimated that he has handled four or five hundred

of those proceedings for Judge Gill. <u>Id.</u> at 27-28. Ray first

met applicant in the holdover cell adjacent to the courtroom

after he was appointed to represent her. <u>Id.</u> at 26.

Ray described Judge Gill's method of handling a revocation

hearing as follows:

> In Judge Gill's court, what would happen is
> the probation officer would bring their files over to
> the court. He would look at the files, and <u>he would
> write whatever his offer was in the file</u>. In his court
> as opposed to other courts, <u>there was no interaction
> with the prosecutors</u>. They didn't enter into the
> conversation unless it became a contested matter. So to
> answer your question more specifically, <u>Judge Gill made
> the offers and the negotiations</u>, if there was any, and
> quite frankly, there wasn't much was directly between
> myself and Judge Gill.
>
> THE COURT: How did you know what the offer was?
>
> THE WITNESS: He would tell me. He would write it
> in the file, and it was generally in a specific part of
> the file. He wrote it down, and I knew what it was.
>
> THE COURT: Did it depend on whether the person
> confessed?
>
> THE WITNESS: Depended on what they were on
> probation for and what the new allegation was.

>     THE COURT: What was the range? Was it always close
> to twelve years?
>
>     THE WITNESS: In that type of case -- And I have
> given counsel some of those as your exhibits -- he
> would almost always if a person had a robbery deferred
> adjudication and they had a new offense, the offer was
> almost always twelve years, and it was even
> predictable.  I never bet anybody, so to speak, but I
> was pretty close to doing it after three or four years.
> I knew about what he was going to do.

Id. at 28-29 (emphases added).

Judge Gill's offer for a failure-to-report violation

traditionally was between five and seven years.  Id. at 31.

After having handled revocations for Judge Gill for three or four

years, he knew about what Judge Gill was going to do.  Id.

When he first met with applicant on November 13, he had

looked at the file and knew what the Judge's offer was at that

time.  Id. at 29.  He then spoke to Judge Gill, and went and

spoke to applicant in the holding cell.  Id.  Judge Gill

typically would leave his offer open until the day of the

hearing.  Id. at 29-30.  On November 13, applicant told Ray that

she did not want to accept Judge Gill's offer.  Id. at 31.

At the beginning of the revocation hearing, applicant

admitted to Judge Gill that she committed two of the non-

reporting violations but she denied committing the other and

denied having committed the illegal controlled substance offense

17

described in the petition to proceed.  _Id._ at 34-35.  At the
conclusion of the hearing Judge Gill found that the alleged drug
offense violation was not true, but found that the non-reporting
violations were true.  _Id._ at 33-36.  Under normal circumstances,
Judge Gill's standard sentence for technical violations such as
applicant committed would be somewhere between five and eight
years.  _Id._ at 37.  Normally, his sentence for somebody in
applicant's position would have been fifteen years if he found
that the defendant violated conditions of supervision by dealing
in drugs.  _Id._

Ray does not have a specific recollection of applicant ever
having told him that she was mentally ill.  _Id._ at 31.  She well
could have told him the things she related in her testimony.  _Id._
at 31-32.  If applicant had told him that she had mental
problems, he would have told the judge, and the judge probably
would have appointed somebody to examine her and to make an
evaluation.  _Id._ at 50, 75.  He said that "[i]f [he] thought for
a second she was incompetent, [he] would have told Judge Gill,
and she would have been sent to a psychiatrist and interviewed,
and they would have made a recommendation."  _Id._ at 73.  If
applicant had told him all the things she said in her testimony
at this hearing, he "would have got a psychiatrist and have

gotten the records." Id. When asked what likely would have
happened if the conclusion was reached that applicant had bad
problems that could have explained why she did not report, Ray
responded, "[w]e would have had a hearing, and if she had some
reason to not have reported -- that might have gone along with
that -- Judge Gill would have done that." Id. at 51. If he had
known applicant was mentally retarded, he probably would have
immediately brought that to Judge Gill's attention, and "[i]t
could have made a difference." Id. at 73-74.

If Judge Gill thought a person was incompetent he would
appoint a psychologist to see the person in the jail and would
then deal with the matter, depending on the report. Id. at 32.
His experience with Judge Gill is that a person's mental health
generally did not make a whole lot of difference in Judge Gill's
decision. Id. at 32-33. However, if Judge Gill thought a person
was mentally ill, Judge Gill would have at least made an inquiry
and "would have done something different in the sense that he
would have had a psychiatric evaluation." Id. at 75.

Ray's notes reflect that he had a conversation with
applicant, on December 12, 2006.[5] Id. at 42-43 He does not

_____

[5]The parties stipulated that Ray had jail visits with applicant on December 12, 2006, and January
(continued...)

19

independently recall that applicant was wearing a neck brace when

he saw her, but she must have been wearing one at the January 5,

2007, hearing because the transcript shows that two of the

witnesses who testified at the hearing identified her as the lady

in the neck brace.  Id. at 43.  He visited applicant at the jail

on January 2, 2007.  Id. at 58.  He does not remember whether she

was wearing a neck brace on that date.  Id.

Ray understands that if he puts on mitigation evidence, the

judge has to consider it.  Id. at 52.  He did not make any

investigation into applicant's mental health or mental

retardation issues.  Id. at 55.  He described the sentencing

options Judge Gill had once he decided applicant violated her

conditions as follows:

> Put her back on probation.  Given her some
> time in jail.  He could have referred her -- If the
> evidence had supported it and he wanted to, he could
> have sent her to any number of a drug treatment
> classes.  He could have amended her probation to a more
> stringent probation, made her report more often, made
> her go to a residential treatment center.  He could
> have put her on a MHMR case load.  Put her on regular
> probation.  If she was physically healthy, he could
> have sent her to boot camp.  A number of things.

Id. at 65-66.

---

[5](...continued)
2, 2007.  Joint List of Stipulated Facts at 2.

20

IV.

Proceedings Related to the October 8, 2007,
State Court Habeas Application

Applicant's second state court application complained, inter alia, of the failure of Ray to bring to the state court judge's attention her mental illnesses and condition as factors to consider in adjudications to be made by the state court. The State interpreted applicant's claim on that subject to be that Ray was ineffective because of having "failed to bring forward favorable evidence explaining Applicant's situation and circumstances beyond her control" and in failing "to adequately investigate." Clerk's R. for Writ No. C-213-008242-1032954-B (hereinafter, "St. Habeas R.") at 18, 39.

There was no hearing on the application. On October 19, 2007, the State filed a proposed "Memorandum, Findings of Fact and Conclusions of Law" for possible adoption by the state court. Id. at 39. The proposed Conclusions of Law included the following:

> 12. The two-prong test enunciated in Strickland v. Washington applies to ineffective assistance of counsel claims in non-capital cases. Hernandez v. State, 988 S.W.2d 770, 771 (Tex. Crim. App. 1999). To prevail on his claim of ineffective assistance of counsel, the applicant must show counsel's representation fell below an objective standard of reasonableness, and there is a reasonable

21

probability the results of the proceedings would
have been different in the absence of counsel's
unprofessional errors.  <u>Strickland v. Washington</u>,
466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674
(1984).

. . . .

17.  Applicant has failed to prove that there was
favorable evidence available to explain
Applicant's situation a [sic] circumstances beyond
her control.

18.  Applicant has failed to prove that there was
evidence that her attorney should have presented
to the trial court.

. . . .

20.  Applicant has failed to prove that there was
additional investigation that her attorney should
have conducted.

. . . .

24.  Applicant has failed to prove that her attorney's
representation fell below an objective standard of
reasonableness.

25.  A party fails to carry his burden to prove
ineffective assistance of counsel where the
probability of a different result absent the
alleged deficient conduct sufficient to undermine
confidence in the outcome is not established.  <u>See</u>
<u>Washington v. State</u>, 771 S.W.2d 537, 545 (Tex.
Crim. App. 1989), <u>cert. denied</u>, 492 U.S. 912.

. . . .

29.  Applicant has failed to show that there is a
reasonable probability that, but for the alleged
acts of misconduct, the result of the proceeding
would be different.

22

>    30.   Applicant has failed to prove that she received
>          ineffective assistance of counsel.

Id. at 44-45.

By order signed November 5, 2007, the state trial court

(acting through a judge different from the one who presided over

applicant's revocation hearing) adopted the State's proposed

Memorandum, Findings of Fact and Conclusions of Law as his own,

and recommended to the Court of Criminal Appeals of Texas that

the relief sought by the application be denied.   Id. at 48.   The

Court of Criminal Appeals of Texas denied the relief "WITHOUT

WRITTEN ORDER ON FINDINGS OF TRIAL COURT WITHOUT HEARING" on

December 12, 2007.   Clerk's R. for Case No. WR-68,309-02.

V.

Analysis

A.   Ray's Representation of Applicant was Constitutionally
     Ineffective

In order to prevail on an ineffective-assistance-of-counsel

ground, applicant must show (1) that her counsel's performance

fell below an objective standard of reasonableness and (2) that

there is a reasonable probability that, but for her counsel's

unprofessional errors, the result of the proceedings would have

been different.   Strickland v. Washington, 466 U.S. 668, 688, 694

(1984).   "A reasonable probability is a probability sufficient to

23

undermine the confidence in the outcome." Id. at 694.  Both

prongs of the Strickland test must be met to demonstrate

ineffective assistance.  Id. at 697.

To establish the first prong, applicant must overcome a

strong presumption that her counsel's conduct falls within the

wide range of reasonable professional assistance.  Id. at 689.

Judicial scrutiny of counsel's conduct must be highly

deferential, with every effort made to avoid the distorting

effects of hindsight.  Id.  "It is not enough to show that some,

or even most, defense lawyers would have handled the case

differently."  Green v. Lynaugh, 868 F.2d 176, 178 (5th Cir.

1989).  For the second prong, applicant must show that her

counsel's errors were so serious as to "deprive [her] of a fair

trial, a trial whose result is reliable."  Strickland, 466 U.S.

at 687.  Both prongs are satisfied by the evidence received at

the May 12, 2009, hearing.

The court is satisfied that Ray had sufficient information

in advance of the January 5, 2007, hearing to know that there was

available evidence that applicant had mental shortcomings.  She

told him that she had attempted to commit suicide, had mental

illnesses, and was mentally retarded.  Ray did not take an

interest in any of those things, and did not seek to acquire any

24

knowledge about them. If he had been providing applicant with
the kind of legal assistance to which she constitutionally was
entitled, he would have made further inquiry, including obtaining
and studying the jail records, the records of John Peter Smith
Hospital,[6] and applicant's prison records. Had he done so, he
would have found that there was an abundance of evidence that
could be used in an attempt to persuade Judge Gill not to revoke
applicant's term of supervision or, at the very least, to impose
a sentence much less severe than imprisonment for fifteen years.
Ray's failure to do those things was not the result of any trial
strategy or reasoned decision on his part. His conduct fell
below an objective standard of reasonableness, and was outside
even the widest range of reasonable professional assistance.
Ray's conduct amounted to ineffective assistance of counsel that
permeated the entire revocation proceeding. In making these
findings, the court has been highly deferential in its evaluation
of Ray's conduct, and has made every effort to avoid the
distorting effects of hindsight. The strong presumption that
Ray's conduct falls within the wide range of reasonable

---

[6]John Peter Smith Hospital is the county hospital located in the same general area of Fort Worth
as the county jail and courthouse. The court judicially knows that the hospital records would have been
readily available to Ray if he had requested them pursuant to an authorization signed by applicant.

professional assistance has been overcome by the record in this action.

The court has concluded, and finds, that there is a reasonable probability that, but for the unprofessional conduct of Ray in failing to acquire and bring to Judge Gill's attention the available information about applicant's suicide attempt, mental illness, and mental retardation, Judge Gill would have taken action different from the action he took. At the very least, Judge Gill would have ordered a psychological or psychiatric evaluation of applicant, and would have had complete information about her mental illnesses and mental retardation before making the decisions he made on January 5, 2007.

There is a reasonable probability that, had Judge Gill known what he would have known about applicant if Ray had provided applicant proper legal representation, Judge Gill would have refrained from revoking her supervision and, instead, would have modified the terms of supervision to include appropriate care and treatment for applicant. There is a high probability that if Judge Gill had known what Ray should have brought to his attention about applicant's mental health and intellectual limitations, Judge Gill would not have sentenced her to prison

26

or, if he did, would have imposed a sentence of a much shorter
duration than fifteen years.

A criminal defendant has the right to the effective
assistance of counsel, for, as the Supreme Court explained in
Strickland:

> The Sixth Amendment recognizes the right to the
> assistance of counsel because it envisions counsel's
> playing a role that is critical to the ability of the
> adversarial system to produce just results.  An accused
> is entitled to be assisted by an attorney, whether
> retained or appointed, who plays the role necessary to
> ensure that the trial is fair.
>
> For that reason, the Court has recognized that the
> right to counsel is the right to the effective
> assistance of counsel.

466 U.S. at 685-86 (internal quotation marks omitted) (quoting
McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970)).  Counsel
"can also deprive a defendant of the right to effective
assistance, simply by failing to render adequate legal
assistance."  Id. at 686 (internal quotation marks omitted)
(quoting Cuyler v. Sullivan, 446 U.S. 335, 344 (1980)).

For the reasons given above, Ray deprived applicant of her
right to effective assistance of counsel by his failure to render
adequate legal assistance to her.  Ray failed to play the role
necessary to ensure that applicant's revocation hearing was fair.

27

He failed to play the role that is critical to the ability of the
adversarial system to produce just results.

B.   A Hearing on the Application was Appropriate

This case is governed by the Antiterrorism and Effective
Death Penalty Act ("AEDPA"), under which certain factors must
exist before the court can hold an evidentiary hearing on a
habeas claim "[i]f the applicant has failed to develop the
factual basis of [the] claim in State court proceedings . . . ."
28 U.S.C. § 2254(e)(2).

Respondent takes the position in his post-hearing brief that
the court should not have conducted an evidentiary hearing
because "[applicant] has failed to establish that she was not at
fault in failing to develop the record in the state court
proceeding." Resp't's Post-Hr'g Br. at 6. The court disagrees
with respondent's reasoning. The court is satisfied that
applicant did all she reasonably could have been expected to do
to make known to the state court in her state habeas application
that she had mental problems and limitations that Ray should have
brought to the state court's attention at the revocation hearing.
Obviously she had the assistance of another inmate in the

preparation of her state court application,[7] St. Habeas R. at 4;
and, she and whoever prepared the application for her might well
have assumed, and undoubtedly did assume, that the state habeas
judge would take notice of the contents of her official jail
records, the official records of John Peter Smith Hospital (which
are an extension of her jail records), and the official prison
records concerning her mental illnesses, her intellectual
limitations, and her suicide attempt.

While inartfully presented, applicant requested in her state
habeas papers that she be given an evidentiary hearing.  St.
Habeas R. at 14.  The state habeas judge simply disregarded her
request.[8]  Id. at 48.  If she had been given a hearing, even with
her limited financial and intellectual resources, she could and
probably would have put in the habeas record evidence of her

---

[7]When applicant pleaded guilty on August 18, 2000, her then attorney wrote on the Written Plea
Admonishments that applicant was "illiterate and he read the document to her." Ex. 8 at 3. In applicant's
state habeas application she disclosed that she was mentally retarded and unable to read or write. St.
Habeas R. at 4.

[8]The court recognizes that the Fifth Circuit said in Dowthitt v. Johnson, 230 F.3d 733, 758 (5th
Cir. 2000), that "[m]ere requests for evidentiary hearings" are insufficient for an applicant to diligently
pursue the factual development of his claim. The court does not suggest that applicant's request for an
evidentiary hearing is the only act by which she exercised diligence. As opposed to the Dowthitt facts,
the court finds that applicant (who told the state habeas court under penalty of perjury that (1) she was
mentally retarded, (2) she was unable to read or write, (3) a prison counselor was preparing her habeas
application for her, (4) she was confined to a mentally retarded offender program, (5) she had a history of
mental illness, (6) she needed psychiatric care, and (7) she tried to hang herself) was justified in not
attempting to retrieve and attach the hundreds of pages of her mental health records to her application.
Also distinguishable from Dowthitt is the fact that the State had in its actual or constructive custody
most, if not all, of the evidence supporting applicant's claim.

mental illness and her mental retardation, by her own testimony if through no other means. Applicant was not afforded by the state habeas court any opportunity to provide evidentiary support for her ineffective-assistance-of-counsel claim beyond her verification on her state habeas application.

Section 2254(e)(2)'s restriction on the grant of a hearing applies only if "the applicant has failed to develop the factual basis of a claim in State court proceedings." McDonald v. Johnson, 139 F.3d 1056, 1059 (5th Cir. 1998) (quoting 28 U.S.C. § 2254(e)(2)). A "petitioner cannot be said to have failed to develop a factual basis for his claim unless the undeveloped record is a result of his own decision or omission." Id. (internal quotation marks omitted). The need to develop a record in this action on applicant's ineffective-assistance-of-counsel claim was not the result of applicant's own decision or omission.[9]

---

[9]There could be an issue as to why the state habeas court failed to develop a record through a hearing or otherwise. Sections 3(c) and (d) of article 11.07 of the Texas Code of Criminal Procedure impose on the state habeas judge the following potentially pertinent duties once an application for writ of habeas corpus in a non-death penalty case is filed:

> (c)    Within 20 days of the expiration of the time in which the state is allowed to answer, it shall be the duty of the convicting court to decide whether there are controverted, previously unresolved facts material to the legality of the applicant's confinement. . . .

(continued...)

Therefore, in determining to have a hearing, this court was guided by the principles announced by the Supreme Court in <u>Townsend v. Sain</u>, 372 U.S. 293, 312-13 (1963), and by Rule 8(a) of the Rules Governing Section 2254 Cases in the United States District Courts, which provides that "[i]f the petition is not dismissed, the judge must review the answer, any transcripts and records of state-court proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted." 28 U.S.C. foll. § 2254 Rule 8(a); <u>see</u> <u>McDonald v. Johnson</u>, 139 F.3d at 1060; <u>see also</u> Randy Hertz & James L. Liebman, <u>Federal Habeas Corpus Practice and Procedure</u> § 20.1b 892 (5th ed. 2001).

---

[9](...continued)

    (d)    If the convicting court decides that there are controverted, previously unresolved facts which are material to the legality of the applicant's confinement, it shall enter an order within 20 days of the expiration of the time allowed for the state to reply, designating the issues of fact to be resolved. To resolve those issues the court may order affidavits, depositions, interrogatories, additional forensic testing, and hearings, as well as using personal recollection.

Tex. Code Crim. Proc. Ann. art. 11.07 §§ 3(c) & (d) (Vernon Supp. 2008). The allegations of the application filed October 8, 2007, quite clearly raised issues of fact relevant to applicant's ineffective-assistance-of-counsel claim. If those facts were not to be deemed admitted for habeas purposes, it would seem that they would be viewed to be previously unresolved controverted facts material to the legality of applicant's confinement. Thus, it appears that the logical action for the state habeas court to have taken would have been to order a hearing or to direct the filing of supporting documentation. The thought occurs to the court that an applicant could reasonably assume that the state court would take action of that kind.

C.   This Court is Not Bound by the Findings and
     Adjudications of the State Court on the Ineffective-
     Assistance-of-Counsel Ground

     Under the AEDPA, the court may not grant habeas relief after

an adjudication on the merits in a state court proceeding unless

the adjudication of the claim (1) "resulted in a decision that

was contrary to, or involved an unreasonable application of,

clearly established Federal law, as determined by the Supreme

Court of the United States" or (2) "resulted in a decision that

was based on an unreasonable determination of the facts in light

of the evidence presented in the State court proceeding."  28

U.S.C. § 2254(d).

     This court can "grant the writ if the state court identifies

the correct governing legal principle from this Court's decisions

but unreasonably applies that principle to the facts of

petitioner's case."  Wiggins v. Smith,  539 U.S. 510, 520 (2003)

(internal quotation marks omitted) (quoting Williams v. Taylor,

529 U.S. 362, 413 (2000)).  "In other words, a federal court may

grant relief when a state court has misapplied a governing legal

principle to a set of facts different from those of the case in

which the principle was announced."  Id. (internal quotation

marks omitted) (quoting Lockyer v. Andrade, 538 U.S. 63, 76

(2003)).  But, "[t]he question under AEDPA is not whether a

32

federal court believes the state court's determination was incorrect but whether that determination was unreasonable--a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007).  The court has concluded that the state court's rejection of applicant's ineffective-assistance-of-counsel ground involved an unreasonable application of clearly established federal law, as determined by the Supreme Court.

While the state court here correctly identified principles adopted by the Supreme Court in Strickland, it unreasonably applied them to the facts of this particular case.  See Perez v. Cain, 529 F.3d 588, 594 (5th Cir. 2008); see also Harrison v. Quarterman, 496 F.3d 419, 424 (5th Cir. 2007) ("A decision constitutes an 'unreasonable application' of clearly established federal law if it is 'objectively unreasonable.'").  In this case, the determinations of the state court as to applicant's ineffective-assistance-of-counsel ground were objectively unreasonable.

Any presumption of correctness of determinations made by the state court relevant to applicant's ineffective-assistance-of-counsel ground has been rebutted by clear and convincing evidence.  See 28 U.S.C. § 2254(e)(1).

33

D.   Underline{Conclusion}

For the reasons given above, Ray deprived applicant of her right to effective assistance of counsel.  He failed to play the role that is critical to the ability of the adversarial system to produce just results.

Therefore, the court is conditionally granting applicant's application for writ of habeas corpus.  The Judgment Adjudicating Guilt signed by Judge Gill on January 5, 2007, in Case No. 1032954W on the docket of the 213th District Court of Tarrant County, Texas, and dated that same date (which had the effect of revoking applicant's community supervision, adjudicating applicant guilty of the offense of robbery causing bodily injury, and sentencing applicant to a term of 15 years of confinement in the Institutional Division of the Texas Department of Criminal Justice) is being vacated.  The court is ordering that, within sixty days of the signing of this order, the State either rehear the petition to proceed to adjudication of guilt and sentencing filed on November 13, 2006, or dismiss that petition; and, the court is requiring the State to notify applicant and this court of its intention within twenty days of the date of the signing of this order.

34

VI.

**The Ground for Habeas Relief Applicant is Seeking
to Urge Based on the State Court Trial Judge's
Inappropriate Conduct in Conducting Plea Negotiations
With Applicant, Through Ray**

After having heard Ray's testimony at the May 12, 2009,

hearing concerning Judge Gill's practice of plea bargaining with

criminal defendants, including the testimony that, through Ray,

Judge Gill plea bargained with applicant, the court realized that

there might well be basis for another claim to be asserted by

applicant in her habeas application. By order signed June 30,

2009, the court directed the parties to submit briefing on the

issue of whether the court could entertain such a claim even

though applicant did not raise it before the state court.

Applicant responded to the order with a motion for leave to

amend her application by adding an additional claim based on

Judge Gill's plea bargaining activity. The additional claim, if

the amendment were to be allowed, would be that applicant was

denied her due process right to have her case decided by an

impartial tribunal as guaranteed by the United States

Constitution. In her brief in support of her motion to amend,

applicant asserted that she had good cause for failing to raise

her due process claim in state court because the factual basis

35

for the claim was not available to her until the May 12, 2009,

hearing. She went on to argue that "[b]ecause her claim is one

touching on fundamental fairness--that she was denied her right

to be adjudicated by an impartial tribunal--it rises to the level

of a structural error requiring reversal," and that "[p]rejudice

of this magnitude is sufficient to excuse the exhaustion

requirement." Br. in Supp. of Mot. to Amend at 3. Applicant

alternatively moved for a stay and abeyance so that she might

present her new claim to the state court. Respondent opposed the

filing of the new claim, but joined applicant in her alternative

request that there be a stay and abeyance.

While the court has a serious concern that applicant was

denied due process because of Judge Gill's plea bargaining

practice, the court has concluded that there is no reason for it

to rule on the motion for leave to amend or the alternative

request for stay and abeyance. If respondent does not appeal

from this court's ruling granting the application based on

applicant's ineffective-assistance-of-counsel ground, or if the

Fifth Circuit affirms this court's ruling and there is no

reversal by the Supreme Court, the motion to amend and the

alternative request for stay and abeyance will be moot.

Therefore, the court, in effect, is severing those matters from

the ineffective-assistance-of-counsel ruling, with the thought

that they will be revisited at a later date if necessary.

VII.

<u>Order</u>

The court ORDERS that applicant's application for relief

under 28 U.S.C. § 2254 be, and is hereby, conditionally granted.

The court further ORDERS that the Judgment Adjudicating

Guilt signed by Judge Gill on January 5, 2007, in Case No.

1032954W on the docket of the 213th District Court of Tarrant

County, Texas, and dated the same day (which had the effect of

revoking applicant's community supervision, adjudicating

applicant guilty of the offense of robbery causing bodily injury,

and sentencing applicant to a term of fifteen years of

confinement in the Institutional Division of the Texas Department

of Criminal Justice) be, and is hereby, vacated, and that the

rulings made by Judge Gill from the bench on January 5, 2007, in

Case No. 1032954W on the State's Petition to Proceed to

Adjudication, other than his ruling that the charge that

applicant committed a drug offense was not true, be, and are

hereby, vacated.

The court further ORDERS that within sixty days of the date

of the signing of this order the State either cause a new hearing

37

to be conducted on such petition to proceed or cause such petition to be dismissed with prejudice.

The court further ORDERS that within twenty days of the date of the signing of this order the State notify applicant and this court of its intention relative to the conduct of such a new hearing.

The court determines that there is no just reason for delay in, and hereby directs, entry of final judgment as to the rulings expressed above in this order and the rulings expressed in the order signed by the court on December 4, 2008, in this action.

SIGNED August 19, 2009.

_____
JOHN McBRYDE
United States District Judge

38