**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN  DISTRICT OF TEXAS
FORT WORTH  DIVISION**

| | | |
|---|---|---|
| **STEPHEN DALE BARBEE,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| **vs.** | § | **Civil Action No. 4:09-cv-074-Y** |
| | § | |
| **WILLIAM STEPHENS,** | § | |
| **Director,** | § | |
| **Texas Department of Criminal** | § | |
| **Justice, Correctional Institutions** | § | **(Death Penalty Case)** |
| **Division,** | § | |
| **Respondent** | § | |
| | § | |

**FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
(Post-Exhaustion)**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Petitioner Stephen Dale Barbee  is currently confined in the Polunsky  Unit of the Texas

Department of Criminal Justice, Livingston, Texas, in the custody of the Respondent, the Director

of the Correctional Institutions Division of the Texas Department of Criminal Justice.  Mr. Barbee

is confined  in violation of the Constitution and laws of the United States, and files this First

Amended  Petition  for a Writ of Habeas Corpus pursuant to 28 U.S.C. §2254 *et. seq.* in order to

secure the reversal of his capital murder conviction and sentence of death, and for his release from

confinement.[1]

---

[1] Mr. Barbee's initial petition and exhibits in support of that petition were filed in this
Court on November 10, 2010. (Docket Nos. 24-29.)  On May 5, 2011, this Court stayed
proceedings and held the petition in abeyance in order to allow Mr. Barbee to exhaust his issues
in state court in a subsequent petition. (Docket No. 47.)  This "First Amended Petition" is filed
following the state court's dismissal of the subsequent petition.

In support thereof, Mr. Barbee would show the following:

## I.

## JURISDICTION AND PROCEDURAL HISTORY

Mr. Barbee ("Petitioner") invokes the jurisdiction of this Court pursuant to 28 U.S.C. §2254 *et. seq.* Petitioner is a citizen of the United States and a resident of the State of Texas, and is incarcerated in the custody of Respondent, the Texas Department of Criminal Justice, Correctional Institutions Division. Petitioner is indigent, is represented by undersigned counsel of record and is unable to provide funds for any aspect of his representation.

Petitioner was charged in an indictment, returned on December 20, 2005, with the offense of capital murder (two murders during the same transaction). (Exhibit 1, Indictments of Feb. 25, 2005; April 27, 2005; Dec. 20, 2005.)[2] Tex. Penal Code Ann. Sec. 19.03(7)(A)(Vernon 2003). On Feb. 25, 2005, attorney William H. Ray was appointed to represent Petitioner and on March 4, 2005, attorney Tim Moore was appointed as co-counsel. (Exhibit 2, orders appointing counsel.) On February 23, 2006 Petitioner was convicted by a jury of the offense of capital murder in the 213th Judicial District Court of Tarrant County, Texas, Judge Robert K. Gill presiding. (Exhibit 5, Court's Charge and guilty verdict as guilt/innocence phase of the trial.) The jury subsequently answered the special issues submitted pursuant to Texas Code of Criminal Procedure article 37.071, and pursuant to those answers the trial court set punishment at death on February 27, 2006. (Exhibit 6, Court's Charge on Punishment and verdict; Exhibit 7, Judgment and Verdict.) Tex. Code Crim. Proc. Art.

---

[2] References to "Exhibits" refer to the exhibits previously filed in this matter in support of Petitioner's original petition, Exhibits 1 through 47, and the new exhibits filed with this amended petition. The additional exhibits were all part of the state court record in the subsequent writ proceedings and are numbered beginning at Exhibit 48.

37.071 sec. 2(g).

Petitioner appealed this conviction and death sentence in cause No. AP-75,359. The following issues were raised on direct appeal:

1. The evidence is legally insufficient to support Appellant's conviction for capital murder because the State failed to prove that the grand jury exercised due diligence in determining the manner and means of Jayden Underwood's death.

2. The evidence is factually insufficient to support the jury's conviction for capital murder pursuant to *Clewis v. State.*

3. The trial court abused its discretion by refusing to grant Appellant's challenge for cause on Juror No. 126, Denise Anderson, pursuant to Art. 35.16(a)(10) of the Tex. Crim. Proc. Code Ann. (Vernon 1995)

4. The trial court abused its discretion in denying Appellant's motion to suppress his alleged statement made to Detective Carroll in the bathroom of the Tyler Police Department in violation of Art. 38.22 of the Tex. Crim. Proc. Ann. (Vernon 2001).

5. The trial court abused its discretion in denying Appellant's motion to suppress his alleged statement made to Detective Carroll in an office at the Tyler Police Department in violation of Art. 38.22 of the Tex. Crim. Proc. Code Ann. (Vernon 2001)

6. The trial court abused its discretion in denying Appellant's motion to suppress his alleged statement made to Detective Carroll while traveling to Ft. Worth in an automobile in violation of Art. 38.22 of the Tex. Crim. Code Ann. (Vernon 2001).

7. The trial court abused its discretion in denying Appellant's motion to suppress a recorded conversation with his wife, Trish Barbee, taken at the Tyler Police Department in violation of R. 504 (a) Tex. R. Evid.

8. The evidence is legally insufficient to support the jury's affirmative answer to the first special issue that Appellant "would commit criminal acts of violence that would constitute a continuing threat to society."

9. The Texas death penalty sentencing scheme is unconstitutional as applied to Appellant because it failed to require that the jury was charged on the mitigation issue with the "beyond a reasonable doubt" burden of proof.

On December 10, 2008 the Texas Court of Criminal Appeals affirmed Petitioner's conviction and sentence of death. *Barbee v. State,* No. AP-75,359 (Tex. Crim. App. December 10, 2008)(not designated for publication)(Exhibit 8.)

Petitioner also sought state post-conviction relief and timely filed an application through retained counsel Don Vernay. (Exhibit 11, Petition for Writ of Habeas Corpus, *Ex parte Barbee*).

-3-

The following issues were raised on state post-conviction review:

    1. Ineffective assistance of counsel at the pretrial stage.
    2. Abandonment by counsel at the trial stage
    3. Ineffective assistance of counsel at the punishment phase
    4. Police misconduct (withholding of the complete videotape of the interrogation)
(Exhibit 11.)

      The State filed a reply (Exhibit 12) and the state habeas court, Judge Louis Sturns presiding, found that there were no controverted factual issues (Exhibit 15) and then ordered both parties to file proposed findings of fact and conclusions of law, which they did. (Exhibits 13, 14.)  The state habeas judge, who was not the trial judge,  then adopted verbatim the state's proposed findings of fact and conclusions of law, without changing so much as a comma, despite the existence of controverted factual issues.  (Exhibit 15.)   On January 14, 2009, the Texas Court of Criminal Appeals denied the state post-conviction application for writ of habeas corpus by similarly adopting verbatim the state habeas court's  findings and conclusions.  *Ex Parte Stephen Dale Barbee* , No. WR-71,070-01 (Tex. Crim. App. January 14, 2009)(*per curiam*)(not designated for publication)(Exhibit 9.)

      Mr. Barbee then filed his motion to proceed *in forma pauperis* with a supporting affidavit on February 4, 2009 in this Court.  (Docket No. 3).  Although this Court ultimately denied the motion to proceed *in forma pauperis,* the Court held that "finding does not affect Petitioner's right to the appointment of counsel or to funds for investigative or expert assistance, which is governed by the provisions of 18 U.S.C. § 3599."  (Docket No. 12, Order Clarifying Status, at 2.)

      On October 5, 2009, Mr. Barbee's case became final on appeal when his petition for writ of certiorari from his direct appeal was denied by the United States Supreme Court.  *Barbee v. Texas,* No. 08-10834, *cert. denied,* October 5, 2009. (Exhibit 44, Supreme Court docket sheet.)

      On October 4, 2010, Mr. Barbee filed his federal petition for writ of habeas corpus in this

Court.  (Docket No. 24.)  A few days later, he filed a "Motion to Hold Proceedings in Abeyance to Allow Petitioner to Exhaust Claims in State Court."  (Docket No. 30.)  Respondents filed an opposition to the motion to stay and hold proceedings in abeyance (Docket No. 35) and Petitioner filed a reply to that opposition. (Docket No. 38.)  On January 18, 2011, Respondents filed an answer to the petition for writ of habeas corpus (Docket No. 40, hereafter, "RA") and on March 21, 2011, Petitioner filed a reply to that response. (Docket No. 43).  On May 18, 2011, this Court granted Mr. Barbee's motion for stay and abeyance. (Docket No. 47.)  On June 24, 2011, this Court ordered the state application to be filed by July 18, 2011. (Docket No. 51.)

In accordance with that order, Petitioner filed his state application by July 18, 2011.  On September 14, 2011, the Texas Court of Criminal Appeals issued an order finding that Mr. Barbee's conflict of interest claim (Claim 2) satisfied the subsequent writ requirements of  Tex. Code Crim. Proc. 11.051 Section 5(a) and remanded the application to the trial court for consideration of that single claim.  *Ex parte Stephen Dale Barbee,* No. WR-71,070-02 (Tex. Crim. App. Sept. 14, 2011) at 2.  (Exhibit 48.)  That claim, Claim 2 in both these proceedings and in the state courts,  is whether applicant "was deprived of due process and a fair trial because his attorneys had a conflict of interest."  (*Id.* at 2.)

On remand, the trial court ordered a live evidentiary hearing on that claim.  (*See* Exhibits 49, 50 and 51, transcripts of the hearing and hearing exhibits).  After the hearing,  both parties submitted proposed findings of fact and conclusions of law.  (*See* Exhibit 53 (Petitioner's proposed findings and conclusions) and Exhibit 54 (State's proposed findings and conclusions).[3]  The transcript of the

---

[3]   Petitioner also submitted an "Applicant's Additional Post-Hearing Submission" based on the declaration of Stephen Andrew Hall (Exhibit 55) and the state submitted a reply to that submission, mainly consisting of Mr. Hall's criminal history. (Exhibit 56.)

hearing was filed on March 23, 2012.  The trial court subsequently adopted the State's proposed findings and conclusions verbatim and relief on Claim 2 was ultimately denied by the Court of Criminal Appeals  "[b]ased upon the trial court's findings and conclusions and our own review." The other claims, Claims 1 and 3 through 21 were also dismissed "as an abuse of the writ" because those allegations "do not satisfy the requirements of Article 11.071 Section 5" on May 8, 2013.  *Ex parte Stephen Dale Barbee,* No. WR-71,070-02, at 2. (Tex. Crim. App. May 8, 2013)(Exhibit 52.)

 Mr. Barbee has been represented by the following counsel:

1. William H. "Bill" Ray, Esq.
 515 Main Street, Suite 308
 Fort Worth, Texas 76102
 (Trial counsel, 1st chair)

2. Tim Moore, Esq.
 Attorney at Law
 115 West Second Street, Suite 202
 Fort Worth, Texas 76102
 (Trial counsel, 2nd chair)

3. Mary B. Thornton, Esq.
 3901 Race Street
 Fort Worth, Texas 76111
 (Counsel on direct appeal)

4. Don Vernay, Esq.
 1604 Golf Course Road
 Rio Rancho, NM 87124
 (Counsel on state habeas)

5. William S. Harris, Esq.
 307 West Seventh Street, Ste. 1905
 Fort Worth, Texas 76102
 (Counsel on petition for writ of certiorari, U.S. Supreme Court)

6. A. Richard Ellis, Esq.
 75 Magee Ave.
 Mill Valley, CA 94941
 (Federal post-conviction counsel; counsel in subsequent state proceedings; current counsel)

## II.

## TIMELINESS

Mr. Barbee's first pre-exhaustion petition was timely filed, as it was filed within one year of the denial of Mr. Barbee's Petition for Writ of Certiorari in the United States Supreme Court. (Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2244(d)(1)). As discussed *supra,* Mr. Barbee's state post-conviction application for habeas corpus relief had been filed and denied while the direct appeal was still pending. (*See* Exhibit 11, Mr. Barbee's state habeas application; Exhibit 8, opinion on direct appeal dated Dec. 10, 2008.) Hence no portion of the AEDPA one-year period had elapsed in state court prior to the filing of the state habeas petition. (28 U.S.C. § 2244(d)(1).) This one-year period began to run when Mr. Barbee's appeal became final upon the denial of *certiorari* by the United States Supreme Court on October 5, 2009.[4] (Exhibit 44.)

This first amended petition is also timely filed, as this Court ordered it filed by October 2, 2013. (Court's Order of September 17, 2013.)

---

[4] Not on January 14, 2009, when the Texas Court of Criminal Appeals denied the state post-conviction application for writ of habeas corpus. "A 1-year period of limitation shall apply to an application for a writ of habeas corpus...the limitation period shall run from the latest of--- (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1). Mr. Barbee sought such review, which was denied by the United States Supreme Court on October 5, 2009, the date upon which the judgment on direct appeal became final. (Exhibit 44.) *See, e.g., United States v. Thomas,* 203 F.3d 350, 354-355 (5th Cir. 2000)(if defendant files timely petition for *certiorari* on direct appeal, "time period begins to run when a petition for *certiorari* is denied by the Supreme Court or when the Supreme Court issues a decision on the merits.")

### III.

### INCORPORATION BY REFERENCE

This is Mr. Barbee's first amended application for federal habeas corpus relief and it is an amended version of the petition first filed in this Court on October 4, 2010.  All prior pleadings and exhibits in this matter, including the original petition, all subsequent briefs, motions, replies and responses, and all exhibits and affidavits filed in support of those petitions, briefs, motions, replies and responses are specifically adopted and incorporated herein by reference.  *See King v. Dogan,* 31 F.3d 344, 346 (5th Cir. 1994)("An amended complaint supersedes the original complaint and renders it of no legal effect unless the amended complaint specifically refers to and adopts or incorporates by reference the earlier pleading"); *Boelens v. Redman Homes, Inc.* 759 F.2d 504, 508 (5th Cir. 1985); *Sam v. Louisiana,* 409 Fed. Appx. 758 (5th Cir. 2011).

# IV.

## FACTUAL BACKGROUND

### A.  Introduction.[5]

Mr. Barbee, a successful business owner with no prior criminal record, was arrested and charged with the murder of Lisa Underwood, his ex-girlfriend, and her son Jayden which occurred on February 19, 2005.   Soon after Mr. Barbee's arrest, the police obtained an alleged "confession" which was mainly based on an unrecorded  statement in the police station restroom supposedly given to the investigating officer.  This "confession" was not written up or memorialized until ten months after it was allegedly made.  Because the police threatened him with the death penalty, and out of fear of his co-defendant's threats against his family, Mr. Barbee initially told the officer that the deaths were caused by him, but were accidental and un-premeditated.  Immediately upon his transfer to the county jail, Mr. Barbee recanted this coerced "confession" and has maintained his innocence ever since. Yet his trial attorneys, who where under pressure from the trial court judge to plead the case, failed to take any reasonable steps to establish his innocence or to investigate the facts pointing to the possibility that his employee Ron Dodd had actually committed the murders, as Mr. Barbee has long maintained.

The trial itself was a perfunctory two-and-a-half day affair.  The defense case at the guilt phase was a total of about three transcript pages and the penalty phase presentation omitted almost all of Mr. Barbee's compelling mitigating evidence. His attorneys, against Mr. Barbee's express

---

[5]   This factual summary introduction has been compiled from the record and from the appendices and declarations and other documents which accompany this petition attached hereto as exhibits. The factual summary of the trial which follows this introduction has been compiled from the testimony and evidence introduced at trial, and is not intended as an admission by Petitioner of the veracity of any of that testimony or evidence.

wishes, and without first notifying him, confessed his guilt to the jury in the guilt phase final argument.

Herein, Petitioner presents compelling evidence that he was pressured into "confessing," that he is actually innocent of these murders and was framed, that the State's case lacks coherence and was based almost entirely on a false and coerced confession, and that Mr. Dodd had the motive and has actually subsequently confessed to the murders. It also presents compelling evidence that Mr. Barbee did not receive a fair trial and was deprived of due process through the failure of his attorneys to present his case to the jury at both phases of his trial.

In the initial state habeas proceedings, despite the existence of numerous controverted factual issues, the state habeas judge, who was not the trial judge, rubber-stamped the State's pleadings and proposed orders, without changing a comma. These findings and conclusions were based on, among other things, an affidavit from the trial attorneys that is full of self-serving misrepresentations, illogicalities and inconsistencies. The prosecutor-drafted findings and conclusions, some of which are total nonsense, were eventually adopted verbatim by the Texas Court of Criminal Appeals as a result of these one-sided proceedings which don't even come close to a full and fair review.

Claim 2 involves revelations that show that the trial judge and Petitioner's chief trial attorney had a secret agreement designed to move cases quickly through the court while pressuring defendants into pleading guilty, which is exactly what happened here. When this Court stayed federal proceedings and Petitioner returned to state court, the Court of Criminal Appeals found that this claim met the standards for subsequent writ applications under Tex. Code Crim. Proc art. 11.071 sec. 5(a). The trial court held an evidentiary hearing on the claim but, relying mainly on the testimony of the trial attorneys, denied relief on the claim by again adopting verbatim prosecutor-prepared findings and conclusions. Petitioner shows herein how the holdings as to that claim and

his other claims are flawed both factually and legally, as they are contrary to clearly established federal law and/or an unreasonable determination of the facts.  Mr. Barbee respectfully requests that he be granted relief on his meritorious claims.

### B.  Statement of Facts.

Mr. Barbee was arrested and charged with the capital murder of Lisa and Jayden Underwood which occurred on the evening of February 19-20, 2005.  (24 RR 119-121)(Exhibit 1.)

**i) Suppression hearing.**

On February 3, 2006, a hearing was held in the 213th Judicial District Court of Tarrant County, the Honorable Robert K. Gill, judge presiding (*State v. Barbee,* No. 1004856R) on a hearing on the defense's motion to suppress certain statements of Mr. Barbee. (Exhibit 4, Motion to Suppress).

At that hearing, Ron Dodd was called as a witness and he invoked his rights under the Fifth Amendment. (15 RR 3-4.)[6]

Detective Michael Carroll testified that he was a detective working with the homicide division of the Fort Worth Police Department and had been involved in the investigation of this case. (15 RR 5.)  His first contact with Mr. Barbee was on February 21, 2005, at about 5:40 p.m. in the parking lot of Wal-Mart in Tyler, Texas. (15 RR 6.)  They then went to the Tyler Police Department to interview both Mr. Barbee and his business partner Ron Dodd in more detail. (15 RR 8.)  They arrived at the police station at about 7:30 p.m.  (15 RR 60.)  Stephen Barbee and Ron Dodd were

---

[6]    "RR" refers to the Reporter's Record in this matter, with the volume number preceding the page number. "CR" refers to the Clerk's Record in similar fashion.

then placed in separate interview rooms which were wired for sound and video-recording. (15 RR 10-11.) Detectives Carroll and Jameson conducted the initial interview with Mr. Barbee. (15 RR 12.) Initially, Mr. Barbee was given Miranda warnings and he waived his right to counsel. (15 RR 13.) These warnings were given at about 7:45 p.m. (15 RR 60.) At first, Mr. Barbee began to tell the officers a story that they knew was not true. (15 RR 60-63.) After about 25-27 minutes, there was a break in the recording in order to document some injuries to Mr. Barbee's body. (15 RR 16.) This was about an eight-minute break. (15 RR 17.) During this break, allegedly Det. Carroll told Mr. Barbee that a white male had been stopped and videotaped by a Denton County deputy the night of the murders near the location where the victim's vehicle had been found. Mr. Barbee was told that the deputy was coming to the station to identify the person on the videotape, who had given a fake name and then fled after the deputy tried to identify him. (15 RR 17.) Mr. Barbee then admitted that he was the person who had been stopped by the deputy. (15 RR 17, 62.)

The tape was re-started and Mr. Barbee was confronted with the issue of running from the police. (15 RR 19-20.) Det. Jameson left the interview room and Mr. Barbee was alone in the room for 30 to 35 minutes. (15 RR 22.) At this time, Ron Dodd, being interviewed separately, told the officers the bodies had been left near FM 407, and Det. Carroll went back and asked Mr. Barbee "Does FM 407 ring a bell or sound familiar to you?" (15 RR 22.)

Det. Carroll testified that Mr. Barbee then asked to go to the restroom, and the detective allegedly accompanied him. (15 RR 25-26.) There, the detective told Mr. Barbee that he had admitted to running from the police in an area close to where the victim's vehicle was found and that Ron Dodd was going to testify against him. (15 RR 27.) Then, allegedly Mr. Barbee stated that he had killed Lisa and Jayden in a plan involving Mr. Dodd. (15 RR 29-30.) Det. Carroll claimed that in the restroom Mr. Barbee confessed that he had gone over to Lisa Underwood's house, could not

kill her, and then left.   Mr. Dodd mentioned getting a "hit man" to do it.   Mr. Barbee allegedly

returned, picked a fight with Lisa, killed her and Jayden and then buried their bodies.   (*Id.*)

Supposedly this restroom conversation took about 45 minutes to an hour and no one else entered or

left the restroom while it was taking place.  (15 RR 32.) Also, Mr. Barbee allegedly pointed out to

the detectives where the bodies had been left.  (15 RR 33-34.)[7]

Then Det. Carroll and Mr. Barbee returned to the interview room to put it on tape.  (15 RR

33.)  At this point, Mr. Barbee asked for an attorney.  (15 RR 36, 67-68.)  But, nevertheless, the

recording resumed without an attorney being present.  (15 RR 37.)

The next morning, Det. Carroll, accompanied by Mr. Barbee, drove to Denton County.  (15

RR 41-42.)  The detective had known from about 10 a.m. that morning  that the victim's vehicle had

been recovered, and they drove toward that location.  (15 RR51.)  They were also aware that the

Denton County Sheriff had stopped a man near the location where the victim's vehicle had been

found. (15 RR 53.)

Detective Carroll admitted that the notes upon which he based his testimony were written

two to three weeks before the hearing.  (15 RR 49-50.)

The Court later ruled, at the beginning of Petitioner's trial,  that it would suppress part of the

confession, the portion of Mr. Barbee's statement to Detective Carroll where the defendant asked

for counsel.  (23 RR 2.)

---

[7]   Det. Carroll admitted that this conversation was not recorded.  (15 RR 66.) Nor was it
put into Det. Carroll's first police report.  (15 RR 73-74.)

**ii) Trial.**

**a) The State's case at the guilt/innocence phase.**

Petitioner's trial commenced on February 21, 2006 in Forth Worth, Texas, in the 213th Judicial District Court of Tarrant County, the Honorable Robert K. Gill, judge presiding. (*State v. Barbee,* No. 1004856R.)   Representing the State were Kevin Rousseau and Dixie Lee Bersano of the Tarrant County District Attorney's Office and representing Petitioner were William H. Ray and Tim Moore, court-appointed attorneys.  (23 RR *et. seq.*)

At the outset of the trial, the Court ruled that it would suppress the portion of the defendant's statement to Detective Carroll where the defendant invoked his rights to counsel. (23 RR 2.)  Also suppressed was the defendant's statement when Detective Carroll left the room and the defendant allegedly said something to the effect of "God, what have I done?"  (23 RR 2-3.)  The Court overruled the defense's objections, on the basis of hearsay, to the State's placement of a transcription along the bottom of the DVD and overruled their objection (based on the marital privilege) of a recording of the defendant and Ms. Barbee's conversation.  (23 RR 4.)  The Court also overruled the defense request for a hearing on the qualifications of the experts, as the State had designated nine such people.  (23 RR 5.)  The State filed its witness list late, but the defense objection to fifteen newly-added witnesses was overruled.  (23 RR 6.)

The prosecutor made an opening statement in which he outlined the State's theory of the case. (23 RR 10 *et seq*.)  He asserted that Lisa Underwood, age 34, and her son Jayden Underwood aged 7,  were murdered by Stephen Barbee.  (23 RR 10-11.)  The defense did not offer an opening statement.  (23 RR 19.)

**Paula Hernandez,** of the Fort Worth Police Department, was working as a patrol officer on February 19, 2005.  (23 RR 22.)  At 3 or 4 in the afternoon she responded to a call at Western Center

and Beach Street, the site of Boopa's Bagels.  (23 RR 23.)  She went there  regarding a missing person by the name of Lisa Underwood.  (23 RR 24.)   Officer Hernandez then proceeded to Lisa Underwood's house.  (23 RR 26-27.)  There was no sign of forced entry, but she saw a blood stain on the carpet in the family room.  (23 RR 27-28.)  Four people accompanied her throughout the house before this stain was discovered.  (23 RR 37.)   Under the coffee table was a bigger stain, about three by four feet.  (23 RR 29.)  It looked like somebody had cleaned it with soap.  (23 RR 31.)  The house was then cleared (23 RR 32) and crime scene officers arrived.  (23 RR 34.)  Two or three days later, this officer was involved with the recovery of the victim's Durango SUV.  (23 RR 35.)  However, she made no written report on this case.  (23 RR 36.)

**Holly Pils** was the co-owner of Booga's Bagels with the victim Lisa Underwood.  (23 RR 39.)  She had first hired Lisa Underwood to work at a bagel shop in 1999.  (23 RR 40.)   In 2000, this shop went bankrupt, but she decided to go into business with Lisa at the same location under a new name.  (23 RR 43, 66-67.)   They named it after Jayden, as "Boopa" was his nickname.  (23 RR 43.)  Ms. Pils knew Stephen Barbee as a customer at the shop.  (23 RR 46.)  She also knew that Lisa and Stephen had a relationship during the fall of 2003.  (23 RR 47, 69.)  They split up and  Lisa then dated a man named Ed Rogers from the end of January 2004 until the summer of 2004.  (23 RR 48, 69.)  But she continued to date Stephen Barbee  in the summer of 2004.  (*Id.*)   Lisa got pregnant in July and she believed it was Stephen's baby (23 RR 50) but she wasn't sure.  (23 RR 71.)

In mid-February of 2005, both Lisa and Jayden were ill.  (23 RR 50.)   Jayden had flu-like symptoms and missed school.  (23 RR 50.)  Lisa also felt bad and missed work on Wednesday afternoon, Thursday and Friday, February 16 through the 18th. (23 RR 51-52.) Holly Pils talked with Lisa on the telephone three times on Friday.  (23 RR 53.)  Lisa was starting to feel better.  (23 RR 53-54.)  They last talked about 7:45 p.m. that Friday evening, February 18th. (23 RR 55.)  A baby

shower was planned for the next day at the bagel shop.  (23 RR 55.)  Lisa was to be there a little before 4 p.m.  (23 RR 56.)

Ms. Pils went to work on Saturday.  (23 RR 58.)  She tried to call Lisa but there was no answer.  (23 RR 58.)  Everyone arrived for the baby shower by 4 p.m. but Lisa and Jayden did not show up.  (23 RR 60.)  At about 4:15 they started calling hospitals.  (23 RR 60.)  Lisa's mother went to her house to check on Lisa and then returned.  (23 RR 60.)  At about 4:30 they called the police and they went back to her house.  (23 RR 61.)  Ms. Pils went to Lisa's house around 6:30 or 7:00 but the police were telling everyone to get out as it was now a crime scene.  (23 RR 62.)  Jayden's shoes were seen on the fireplace mantel, where they were normally left so the dog would not chew them.  (23 RR 62.)

**David Brawner,** an employee of the Denton County Sheriff's Office, testified that on February 18, 2005, he was on night duty.  (23 RR 78-79.)  In the early hours of February 19, at about 3 a.m., he was on the I-35 service road heading north towards Denton when he saw an individual walking northbound on the road.  (23 RR 81.)  The area is sparsely populated and he did not see anyone else there.  (23 RR 82.)  The officer pulled up behind him and turned on the lights and video recording system as he thought this was a suspicious person.  (23 RR 82.)  The pedestrian just stopped but did not turn around.  (23 RR 82.)   He was wearing a dark sweatshirt, jeans and tennis shoes.  (23 RR 82.)  The officer got out of his car and noticed that the pedestrian was covered with mud and his clothes were wet.  (23 RR 84, 88.)  The pedestrian said he had an altercation with a friend and his wallet was at the friend's residence.  (23 RR 84.)  The man gave a name, David Weekley, and a date of birth.  (23 RR 84.)  He was about 5 feet 6 inches, 160 pounds, and Caucasian.  (23 RR 86.)  The officer then ran this information through the system.  (23 RR 85.)  Police dispatch said there was no information on this individual and when the officer exited his car

to talk to him about it, the person ran.  (23 RR 87.)  The officer pursued him.  (23 RR 87.)  The individual got tangled in a barbed wire fence  but got out and ran north.  (23 RR 88.)  Other officers joined the hunt  and set up a perimeter. (23 RR 90.)  They searched for two hours but lost him.  (23 RR 91, 111.)

The videotape of this pedestrian stop was introduced into evidence over defense objections. (23 RR93-94, 95.)  It was played for the jury.  (23 RR 99.)  The clock on the tape was not accurate, it was 30 minutes fast.  (23 RR 94.)  The witness identified Mr. Barbee as the man he stopped that night.  (23 RR 95.)

Two days after the flight of the suspicious person, on February 21, Officer Brawner was called out to the scene of the pursuit.  (23 RR 96.)  A Dodge Durango was found part-way in a creek. (23 RR 97, 111.)  It was about 300 yards from where he had stopped the defendant.  (23 RR 114.) The officer was shown a photo spread and he identified Mr. Barbee as the man who had fled.  (23 RR 113.)  He was 100 per cent positive.  (23 RR 113.)

**Troy Lawrence,** a detective with the Forth Worth Police Department, went to the scene where the bodies were recovered.  (23 RR 117.)  He was later called back when divers recovered a purse in the water.  (23 RR 117.)  It was completely waterlogged.  (23 RR 121.)

Mr. Lawrence had been the computer forensics expert for the Fort Worth Police Department since 2000.  (23 RR 123.)  This witness's purpose was to discuss Lisa Underwood's computer.  (23 RR 126.)  He stated that a web page was logged onto at 11:43 p.m. on February 18 and disconnected at 12:02 a.m.  (23 RR 126, 131.)    This computer had been seized by a police detective.  (23 RR 128.)  Lisa was on the computer for about 40 minutes.  (23 RR 131.)  There was no way to tell if Lisa logged off or was automatically disconnected.  (23 RR 134.)  The computer would have to have been used up to 11:52 p.m. as there was a disconnection after ten minutes of inactivity (23 RR 135)

-17-

or, alternatively, she could have been using it until 12:02 a.m.  (23 RR 135.)

**Dr. Marc Krouse** performed the autopsy on Lisa Underwood.  (23 RR 137.)  He was the Deputy Chief Medical Examiner in Fort Worth covering Tarrant, Denton and Parker Counties.  (23 RR 141.)  In a hearing outside the presence of the jury, Dr. Krouse stated that, in his opinion, the cause of death of Ms. Underwood was traumatic asphyxiation by either suffocation or compression, and it was a homicide.  (23 RR 137, 140.)  There were a number of abrasions and bruises to her face and lips.  (23 RR 137.)  There was also evidence of the compression of her teeth against her cheek and bruises under her scalp and on her back.  (23 RR 138.)  She also had a broken forearm just above her wrist and her thumb was also broken.  (23 RR 138, 162, 167.)  The victim was seven and a half months pregnant.  (23 RR 139.)

In front of the jury, Dr. Krouse stated that he was at the scene where the bodies were found under a pile of brush and dirt.  (23 RR 145.)  Lisa Underwood was clothed in underpants and a t-shirt with sleep clothes underneath her body.  (23 RR 146.)  At 3 p.m. that day, there was still a little rigor mortis in her body.  (23 RR 147.)  Normally, rigor mortis disperses in 24 to 36 hours but can last longer in cold environments.  (23 RR 148.)  Cooling causes rigor mortis to persist longer.  (23 RR 148.)

The victim had a black eye, a contusion of the lower lip and face, an abrasion on her cheek and in her armpit, several bruises on her back and on her right wrist.  (23 RR 148-149, 153.)  There were bruises under the scalp and hemorrhage of the muscle that did not show externally.  (23 RR 152.)  Some scratches were caused around the time of death.  (23 RR 155.)  There was evidence of blunt force trauma caused by having a great force applied to her.  (23 RR 155-157.)  However, the witness could not say what type of force caused the injuries.  (23 RR 158.)  As for the compression force required, it had to be sufficient to asphyxiate someone (five to seven minutes of 100 to 300

-18-

or 400 pounds of force)  which would have caused the type of soft tissue injury, and not bony trauma, seen by the witness.  (23 RR 158-159.)   The facial injuries could have been from a moderate blow.  (23 RR 159.)   The external injuries were consistent with blunt force injury.  (23 RR 160.)  The patterned injuries were probably due to pressure or pressure with a blow component to it.  (23 RR 160.)  Force was applied over a very broad area of the victim's back.  (23 RR 160-161.)  The broken bone in her forearm indicates that the force was applied from above, a shearing force.  (23 RR 169-172.)   It would have required several minutes to cause her death, from two to three minutes to seven or eight.  (23 RR 163.)

The body had been secreted and concealed, which, in the witness's opinion, increased the chances it was a homicide.  (23 RR 165.)  The doctor was quite confident that it was a homicide. (23 RR 166.)  He speculated that the bruises on the victim's back could have been caused by someone sitting on her.  (23 RR 174-175.)  The doctor was allowed to answer the speculative question, "is there anything that is inconsistent with Lisa Underwood being beaten followed by or contemporaneous with her face being forced to the floor while her assailant sat or kneeled on her back?"  (23 RR 180.)

The cause of death was traumatic asphyxiation, in the witnesses's opinion.  (23 RR 181.) This involved the fatal deprivation of oxygen to the victim's brain through an obstruction.  (23 RR 182.)  The doctor was also allowed to speculate that "[t]he allegation here is that Lisa's death was caused by smothering her with the weight of a body or with an object that is unknown or by a combination of the two."  (23 RR 183.)   It could take up to seven minutes for death to occur.  (23 RR 184.)  But someone could lose consciousness within seven or eight seconds.  (23 RR 184.)  His opinion was that it would take two or three minutes of applied force to lose consciousness.  (23 RR 185.)  The more the airway is obstructed, the faster it would be.  (23 RR 188.)  The unborn fetus

was seven to seven and a half months of gestational age.  (23 RR 186.)   It would have been a viable fetus had she been born that day.  (23 RR 187.)   Ms. Underwood's  arm may have been struck or punctured with something.  (23 RR 190.)   In the witness' opinion, she was certainly in a fight of some sort as she had a black eye and other bruises.  (23 RR 191.)   Dr. Krause opined that the cause of death was a homicide at the hands of another.  (23 RR 194-196.)   "The other injuries tell me that this happened in the context of an altercation, of a fight, basically."  (23 RR 195.)   There were bruises on the victim's hands.  (23 RR 197.)   The victim may have stopped breathing and started again.  (23 RR 199.)

**Kyle Sullivan,** a Fort Worth police officer, testified as a blood stain analyst.  (23 RR 200-205.)  On February 19, 2005, he was called to the victim's house at 3745 Chaddybrook.   (23 RR 206-207.)  He saw a blood stain on the living room floor and also smaller stains on an entertainment center and a couch cover.  (23 RR 206-208.)   There were also blood stains on the garage floor.  (23 RR 208, 212.)  The next day, this officer returned to the house and made a videotape.  (23 RR 211.)

It appeared to the witness that an attempt had been made to clean up or wipe the carpet in the area of the blood stain.  (23 RR 216.)   It was a saturation stain which indicated that someone above it was bleeding.  (23 RR 217.)   There also appeared to be a "cast off" blood stain on the walls.  (23 RR 219.) Some of the blood drops on the cushions appeared to be just straight down.  (23 RR 221-222.)   There was also blood on the interior of the door knob.  (23 RR 223.)   Another stain appeared to be from a hair swipe across the floor.  (23 RR 224.)   The witness also collected latent prints from the house.  (23 RR 225-226.)   In all, 64 prints were taken and 27 swabs of what might be blood.  (23 RR 247.)   The evidence was turned over to the Fort Worth Police crime lab.  (23 RR 245, 249.)

On February 21, 2005, the witness went to the suspect Stephen Barbee's house at 4108 Walnut Creek and looked in the trash but found nothing significant. (23 RR 227.)

When the victim's vehicle, the Durango, was found in the creek, Officer Sullivan inspected it. (23 RR 229.) He found a Windex window cleaning solution on the seat. (23 RR 231.) A brown leather purse belonging to the victim was also recovered. (23 RR 233.) The witness also took five swabs from the Durango and turned them over to the crime lab. (23 RR 251.)

Next, Officer Sullivan went to an address, 4315 Farm-to-Market Road 407, that was believed to be a possible burial place of the victims. (23 RR 236.) The next day, the burial site was found and photos were taken of the recovery of the victims from that site. (23 RR 237.)

**Laurie Scheieirn,** a Fort Worth police officer, testified that on February 21, 2005 she was sent to a location in Denton, Texas, where a vehicle had been found in a creek. (24 RR 3-4.) A couple of pieces of blue denim had been found nearby on a fence-post barbed wire. (24 RR 4.) She took photos of that and other evidence. (24 RR 5-7.) Two pieces of duct tape were found near where the victim's bodies were recovered. (24 RR 9.) The duct tape was sent to the property room. (24 RR 16.)

**Joel Downs** served on the grand jury that indicted Mr. Barbee. (24 RR 20-21.) The indictment read that "Jayden Underwood was killed by smothering him with a hand or by a means unknown to the grand jury" and that "Lisa Underwood was smothered with the weight of a body or with an object unknown to the grand jury or a combination of the two." (24 RR 21, 26.) They voted a true bill in this case. (24 RR 22.)

**Connie Patton,** a DNA tester for the Tarrant County Medical Examiner's Office, testified out of the presence of the jury that she ran the tests for blood. (24 RR 28.) The tests were positive on swabs from door knobs, the wall, a blanket, the carpet, and tissue paper. (24 RR 28.) There

-21-

were negative tests from the north living room wall, a bathtub water knob, the garage opener, blue jeans, socks, the two pieces of duct tape, the steering wheel, and swabs from the garage floor. (24 RR 29.)  There were no findings of sexual assault on either victim. (24 RR 30.)

Blood matching Lisa Underwood's DNA was found on the car door knob, and the east living room wall. (24 RR 31.)  Stephen Barbee and Ronald Dodd were excluded as possible contributors to male DNA found on the couch cover. (24 RR 32.)  Jayden's DNA profile was found on the tissue paper. (24 RR 32.)

In the presence of the jury, Ms. Patton testified that she took some swabs from the deadbolt knob, the east living room wall, and they matched the DNA profile of Lisa Underwood. (24 RR 42.) A swab from the garage floor and the entertainment center also matched her DNA profile. (24 RR 44.)  Various swabs from the Dodge Durango were also offered in evidence. (24 RR 46.)  However, no conclusions could be made about them. (24 RR 47-48.)  A hair root on the duct tape was found to fit Jayden Underwood's DNA profile. (24 RR 50.)  A blood stain was found on the couch cover, but both Mr. Barbee and Mr. Dodd were excluded as being possible contributors. (24 RR 50.)  Lisa Underwood tested negative for sexual assault. (24 RR 51.)  Other items, such as the blue jeans, were also tested with negative results. (24 RR 53.)

On cross examination, the witness stated that skin cells could be expected to adhere to the duct tape if it was on a person for several hours. (24 RR 58.)  Both Mr. Barbee and Mr. Dodd were excluded from all profiles she took. (24 RR 60.)

After the testimony of this witness, a stipulation was received that evidence samples were also received from the fingernails of Jayden and Lisa and nothing linking Mr. Barbee or Mr. Dodd to them was found. (24 RR 63-64.)

**Michael Carroll,** a Fort Worth homicide detective, testified that he was the lead detective in this case. (24 RR 68-69.)   He first became involved when the vehicle was recovered. (24 RR 70.)   He was asked to go to Tyler to interview Mr. Barbee and Mr. Dodd. (24 RR 70.)   Another detective, Dick Galloway, eventually became the lead detective. (24 RR 71.)   According to the witness, Det. Galloway's notes were not detailed and some of the times were incorrect, so Detective Caroll later corrected them in his report. (24 RR 74.)   His interview of Mr. Barbee was recorded. (24 RR 74.)   Detective Carroll admitted that in order to get to the truth, he sometimes lies to the person under investigation. (24 RR 75.)

Detective Carroll first went to the vehicle recovery site. (24 RR 76.)   He had heard of the incident involving the Denton County officer who made an investigative  stop close to where the vehicle was recovered and he knew that the deputy involved had made an identification of Mr. Barbee from a photo spread. (24 RR 78.) Due to that identification, Detective Carroll became more suspicious of Mr. Barbee. (24 RR 79.)

They went to Tyler to interview him (24 RR 80) and they met in a Wal-Mart parking lot. (24 RR 82.)   First they taped an interview with Mr. Barbee's wife Trish Barbee, to find out when she had last seen him that night. (24 RR 82.) Ron Dodd and Stephen Barbee then drove to the Tyler Police Station because Det. Carroll wanted to interview them in a proper place. (24 RR 83.)   Mr. Dodd and Mr. Barbee were placed in different rooms in the police station. (24 RR 84.)

Mr. Barbee was cooperative and was read his Miranda rights. (24 RR 85.)   The interview was recorded. (24 RR 85.)   The interview was received in evidence over defense objections (24 RR 86) and it was played for the jury. (24 RR 88.)

The detectives had learned that the person who ran from the officer that night had cut his leg. (24 RR 89.)   At this point, the detectives were fairly certain that Mr. Barbee was the person who had

run from the deputy on the might in question.  (24 RR 89-90.)  Det. Carroll told him that they had

a video of a person running and that an officer from Denton County was going to look at him to see

if he could identify Mr. Barbee.  (24 RR 90.)  At that point, Mr. Barbee admitted he ran.  (24 RR

90.)  Mr. Barbee had injuries to his arms and legs.  (24 RR 91.)  Then there was an eight-minute

break in the tape recording.  (24 RR 91-92.)

      Detective Jameson was talking with Mr. Barbee and Det. Carroll was upset as it had been

planned that both of them would leave the room together.  (24 RR 94.)  Det. Carroll talked to his

superiors about getting a warrant for Mr. Barbee's arrest based on his confession to running.  (24

RR 95.)  The detective also wanted to know what Mr. Dodd was telling Det. McCaskill.  (24 RR 95.)

In that interview with Mr. Dodd, they learned about the location of the bodies and then Det. Carroll

went back to Mr. Barbee and asked "Does FM 407 sound familiar to you?"  (24 RR 98.)

      Then Mr. Barbee allegedly asked to go to the restroom.  (24 RR 99.)  In the restroom, Det.

Carroll allegedly told Mr. Barbee that "Dodd's going to lay this whole thing in your lap" and "Dodd

is basically saying you are a cold-blooded killer." (24 RR 100.)  Detective Carroll admitted that this

was not true.  (24 RR 101.)  The detective also told Mr. Barbee that Lisa's family needed closure.

(24 RR 102.)  According to Detective Carroll, Mr. Barbee then told him the following: that he was

going to jail for the rest of his life and that he and Dodd had created a plan to kill Lisa as she was

trying to take money from him and ruin him and his relationship with his wife.  (24 RR 102-103.)

He believed that  Lisa was carrying his child.  (24 RR 103.)  Barbee was going to drop his car off

at Dodd's house, go to Lisa's house and pick a fight with her.  (24 RR 103.)   Then he was going

to put her body in her vehicle and drive it up north with Dodd following and then dispose of the

body.  (24 RR 103.)  But she wouldn't pick a fight and Barbee left the house, called Dodd and said

he couldn't do it.  (24 RR 103.)  Barbee then changed his mind and Dodd took him back to Lisa's

house. (*Id.*)  Lisa got upset, Barbee wrestled her to the ground and held her face down to the carpet until she stopped breathing.  (24 RR 104.)  Jayden came in and started crying and he was smothered. (24 RR 105.)

Then Barbee put the bodies into Lisa's SUV and drove it to a road off FM 407 where they buried both bodies.  (24 RR 105.)  Barbee also allegedly said that he tried to clean up the house with a solvent and covered a blood spot with furniture.  (24 RR 106.)  He also described where the bodies were buried.  (24 RR 106.)  Through these directions, the detective went to the location and found the bodies.  (24 RR 107.)  Dodd supposedly provided Barbee with shovels.  (24 RR 108.)  Barbee also said he had parked Lisa's car near the creek but not in it.  (24 RR 109.)  He then agreed to put this bathroom conversation on tape but he did not want to talk about Ron Dodd's involvement. (24 RR 109.)  This unrecorded restroom interview took about 45 minutes to an hour.  (24 RR 110.)  Det. Carroll admitted he did not take notes during this restroom conversation.  (24 RR 111.)

They went back to Det. Cashell's desk to use a computer to obtain a location for the bodies. (24 RR 112.)   Barbee gave very specific information as to where the bodies were. (24 RR 113.) Then they continued the conversation on tape.  (24 RR 115.)  This was played for the jury.  (24 RR 117.)  Mr. Barbee's wife Trish entered the room and was told that he had confessed to killing Lisa but not  Jayden.  (24 RR 118.)  Eventually Mr. Barbee was arrested.  (24 RR 120-121.)

The next day, Mr. Barbee and the detectives drove to the spot Barbee described as the burial site.  (24 RR 122, 146.)   In the pickup, Barbee said he did not want to see the bodies and he didn't want to see the media.  (24 RR 123.)  As they got closer, Barbee had them change their route and they went through a back way.  (24 RR 125.)  The police had diverted the media elsewhere.  (24 RR 125-126.)   There were two piles of rubble and the detective saw Lisa's clothes protruding from the earth.  (24 RR 130.)  Both bodies were recovered.  (24 RR 130.)

On cross examination, Det. Carroll stated that Det. Galloway was the lead detective on the case. (24 RR 134.)  Det. Carroll admitted that his report was not detailed in regard to the alleged bathroom interview at the Tyler Police Department. (24 RR 134.)  Nor did Det. McCaskill's report have enough detail about the alleged bathroom interview. (24 RR 135.)  The only report that was generated was a five page report in December 2005, ten months after the incident. (24 RR 136.) There were some inaccuracies in Detective McCaskill's report, such as that he spoke with Barbee at 18:55, but actually they were still at the Wal-Mart at that time. (24 RR 136-137.)  There was no video or audio equipment in the bathroom nor did he take notes. (24 RR 138, 144.)  In the report, there were no details about the plan between Dodd and Barbee. (24 RR 140.)  The witness stated that it was legal to lie to a suspect to induce him to confess. (24 RR 142.)  Once he confessed, Mr. Barbee began crying. (24 RR 145.)  At a prior hearing, the witness said Mr. Barbee told him he had held Lisa down too long. (24 RR 148.)  The witness agreed to tell the district attorney that Barbee was remorseful in order for him to cooperate in finding the bodies. (24 RR 150.)

**Dr. Lloyd White,** a deputy Tarrant County Medical Examiner, testified that he performed an autopsy on Jayden Underwood on February 23, 2005. (24 RR 155.)  The witness observed a bruise on his upper left back, an abrasion just below the top of the shoulder, scratches on the calf, discoloration around the right eye, contusions on the lips and "small pinpoint hemorrhages that are associated with increased pressure in the chest and are sometimes seen with asphyxial death, or death due to lack of oxygen, associated with increased pressure on the chest." (24 RR 156, 162.)

Dr. White testified that "petechiae" are "little pinpoint hemorrhages" sometimes seen "around the face and sometimes on the internal organs in association with asphyxial death, such as strangulation where the neck is constricted." (24 RR 156-157.)  The witness speculated that the bruises of the membranes "could" have been the source of blood fluid in the mouth. (24 RR 157.)

The injuries to the lips and gums are caused by compression, "some object put over the area of the mouth pressing on the mouth and compressing the lips against the underlying teeth." (24 RR 158.) Scrapes and scratches appeared to be antemortem, caused before death. (24 RR 159.)

In Dr. White's opinion, the cause of death was "asphyxia by smothering...obstruction or occultation of the airway externally by something being put over the face and the mouth so that adequate oxygen and air is not supplied to the organs and tissues of the body." (24 RR 160.) Something hit the victim in the head, causing a hemorrhage, before he died. (24 RR 163.) There were also abrasions and scratches that were probably not caused before death. (24 RR 163.) The manner of death was homicide. (24 RR 160.) The witness said that he could not determine whether the death was caused by a hand over his mouth, or his mouth being pressed against a couch or a carpeted floor. (24 RR 166-167.) There was no evidence that Jayden had been bound with tape. (24 RR 167.)

The State rested after this witness. (24 RR 169.)

The defense asked for an instructed verdict based on a lack of evidence that Lisa or Jayden Underwood were killed or transported in Tarrant County. (24 RR 169.) The motion was denied. (24 RR 169.) The defendant also moved for an instructed verdict on capital murder due to a lack of evidence that the defendant acted intentionally or knowingly, and this too was denied. (24 RR 169.)

**b) The defense case at the guilt/innocence phase.**

The defense called **Ron Dodd,** outside the presence of the jury.  (24 RR 170.)  Mr. Dodd invoked his rights under the Fifth Amendment.  (24 RR 170.)

Then the defendant stated that he did not want to testify.  (24 RR 171-173.)

**Stanley Keaton** was called as a defense witness.  (24 RR 174.)  He was the defense investigator and served subpoenas for cell phone records from the City of Fort Worth on February 21 through February 22, 2005.  (24 RR 175.)  He also requested policies and procedure manuals relating to taking statements and confessions from witnesses and suspects.  (24 RR 175-176.)  These records were admitted into evidence.  (24 RR 177.)

The defense then rested.  (24 RR 176.)

The state argued that Mr. Barbee committed the murders.  There was a running defense objection to the comments allegedly made by Mr. Barbee.  (25 RR 6.)  Defense counsel confessed Mr. Barbee's guilt to the jury without his permission and argued that the killings were not intentional.  (25 RR 8-18.)

Mr. Barbee was found guilty of capital murder on February 23, 2006.  (25 RR 24-25.)

**c)  The prosecution's case at the punishment phase.**

The punishment phase of the case began the same day the guilty verdict was returned.  (25 RR 27.)

**Theresa Barbee,** Mr. Barbee's ex-wife, testified for the State.  (25 RR 28.)  Stephen and Theresa were married from 1996 until December of 2003.  (25 RR 29.)  They owned several businesses together.  (25 RR 29.)  "All Four Seasons" was a tree service that developed into a larger

-28-

entity that did tree cutting and removal for the State Department of Transportation. (25 RR 30.) They also owned "Cowboy Cutters," a concrete cutting business. (25 RR 30-31.) All Four Seasons did well and was awarded government contracts. (25 RR 32.) But when they acquired Cowboy Cutters, things went downhill. (25 RR 33.) They borrowed a million dollars to buy the business. (25 RR 33.)[8]

Stephen allegedly assaulted his wife Theresa twice in the course of the marriage. (25 RR 34.) The first fight occurred when they were living in an apartment in Forth Worth, and the next one was when they lived in a metal building they had bought for the company. (25 RR 34-36.) The police were called both times, but Teresa did not have any injuries. (*Id.*) The defense objected to these instances because of an untimely-filed "Notice of Extraneous Offenses." (25 RR 38.)

The next fight involved Mr. Barbee knocking something off the wall and it accidentally hit Theresa. (25 RR 40.) As she was knocked unconscious, she asked to be taken to a hospital, and when he refused, she drove herself. (25 RR 42.) She had a concussion. (25 RR 43.) Stephen later showed up at the hospital. (25 RR 44.)[9]

The next fight was in 2002 when Theresa admitted she egged him on and Stephen hit her in the arm. (25 RR 45.) She suffered a bruise. (25 RR 45.) Another incident was recalled from 2003 when she hit Stephen at a party and he left her for good. (25 RR 47-48.) He did not move back to

---

[8] Theresa had previously worked as an airline stewardess but was injured on the job. (25 RR 148.)

[9] The witness also testified about Stephen once joking about throwing her through the wood chipper and on July 4, 2003, when he said it, she thought he was serious. (25 RR 64-65.) But at the grand jury hearing, Theresa had earlier testified that she did not think Stephen was serious when he said this at the July 4th party. (25 RR 65-67.)

the house.  (25 RR 48, 68.)[10]   All told, they had 3 or 4 fights.  (25 RR 67-68.)

Theresa recalled another incident about one year after their marriage when Stephen's car was cut off by a careless driver, and he became angry and followed the driver.  (25 RR 50-52.)  Stephen threw a punch at the driver through the window.  (25 RR 51.)

At the time of the murders, Theresa's boyfriend was Ron Dodd.  (25 RR 52.)  They met in 2003 when Stephen hired him in the concrete business.  (25 RR 52.)  Mr. Dodd left the company and then returned.  (25 RR 53.)  In December of 2003, Theresa was divorced from Mr. Barbee and she started dating Mr. Dodd almost immediately, at the beginning of 2004.  (25 RR 53-54.)  Later on, he moved into her house.  (25 RR 54.)  At the time of the trial, Mr. Dodd was charged with tampering with the evidence and faced up to 20 years in prison.  (25 RR 55.)

Theresa and Stephen's divorce was on the grounds of incompatibility.  (25 RR 56.)  Mr. Barbee had been close to his sister Cathy, who died shortly after giving birth to a daughter, and to his brother David, who  died at the age of 21. (25 RR 58.)   At the time of the trial, Theresa had come to own Cowboy Cutters; All Four Seasons was no longer operating.  (25 RR 58.)   Theresa admitted that she took papers to Stephen when he had been in jail three or four days and had him sign over the businesses to her.  (25 RR 59-61.)  She claimed the business was not worth anything at that time.  (25 RR 62.)

When Lisa and Jayden were killed on February 14, 2005, Stephen was working for All Four Seasons  (25 RR 71)  with Ron Dodd.  (25 RR 74.)  At that time, there were problems between her and Trish, Stephen's new wife,  and Stephen's mother.  (25 RR 74.)  There was also an ongoing fight about money that week.  (25 RR 75.)   Ron was also working in the concrete business.  (25 RR

---

[10]   The house in question was 4000 square feet with a movie room and a pool.  (25 RR 63.)  Stephen's mother helped them pay for it.  (25 RR 63.)

75.)   That week, Stephen was upset because he was told that his father had colon cancer.  (25 RR

75.)  Stephen was also having headaches because he had been in an accident several weeks earlier.

(25 RR 76.)  Ron Dodd had caused a  pipe to fall and it hit Stephen in the head.  (25 RR 77.)  It

weighed 400 or 500 pounds and he had to go to the hospital.  (25 RR 77.)  As a consequence of this

accident, Stephen had been knocked unconscious and some thought he was dead.  (25 RR 77.)  In

early 2003, Stephen had tried to commit suicide.  (25 RR 78.)  Theresa found him lying face down

in the pool, and pulled him out and he was taken to the hospital.  (25 RR 79-81.)

On February 18, 2005, Ron, Stephen, Ron's son and Theresa went  to dinner and returned

at about 10 p.m. (25 RR 82, 104.)   Theresa later saw Ron and Stephen in the metal building.  (25

RR 83.) They left together around that time and were gone a short time.  (25 RR 88.)  They returned

and were at the house for several hours, talking on the driveway.   (25 RR 90, 104.)   At about 3

a.m., Theresa woke Ron up and told him that Stephen was calling.  (25 RR 90.)   She heard Stephen

say that he needed help as he had run out of gas.  (25 RR 90.)  Ron left the house after 3 a.m.  (25

RR 90.)  At this time, Theresa did not know about Stephen's involvement with Lisa Underwood.

(25 RR 85.)

Theresa next saw Ron Dodd on Saturday afternoon.  (25 RR 91.)  She saw Stephen on

Sunday and he was upset and crying.  (25 RR 91.)  He said his life was over.  (25 RR 91.)  Two

police officers had been to Theresa's house asking about Stephen and his Corvette.  (25 RR 91.)

There was an Amber Alert out for Lisa and her son, as they were missing. (25 RR 92.)  At this time,

Stephen told Theresa that Lisa was the girl who worked at the bagel store and who came to the metal

building and was screaming at him.  (25 RR 92.)

Stephen asked for Theresa's help that Sunday.  (25 RR 93.)  He would not say why he thought his life was over, but Theresa drew some conclusions after she saw the reports on television.  (25 RR 93.)  That day, Stephen told her to get the businesses out of his name.  (25 RR 93.)  Stephen said he was going to talk to the police.  (25 RR 94.)  Later, he told her he had confessed, that "he had to."  (25 RR 94.)  He said "he didn't mean to do...He went over there to talk to her and do the right thing...and...they got into a fight.  And they...she hit him, and they just got into it.  And before he knew it, he had held her down."  (25 RR 95.)  Stephen also said he was trying to keep the boy quiet.  (25 RR 95.)   He also allegedly said Ron didn't have anything to do with it, "the only thing...Ron's mistake was picking him up."  (25 RR 95.)

Theresa next talked to Stephen at the Mansfield jail.  (25 RR 96.)  His family was there.  (25 RR 97-98.)  He said that he didn't do it, that "it was some mistake."  (25 RR 98.)

Theresa said that after that, she visited Stephen in jail weekly.  (25 RR 86, 98-99.)  His story changed, and he said he didn't do it but he admitted cleaning up.  (25 RR 100.) Another time he said Ron Dodd did it.  (25 RR 99-100.)  Stephen said he wished he had not divorced her.  (25 RR 100.) Theresa stopped seeing him because he wanted her to say that Ron did the murders.  (25 RR 101.)[11] He wanted her to call the attorneys and tell them that Ron had set him up.  (25 RR 101.)  He held up a piece of paper outlining this.  (25 RR 102.)   But she admitted she never showed this to Stephen's attorneys.  (25 RR 103.)

Theresa admitted that their fights were not all his fault.  (25 RR 87.)  When they were married, they attended church and were in charge of the children's church activities.  (25 RR 106.) They also raised money for the church.  (25 RR 107.)

---

[11]   Dodd told Theresa that he had nothing to do with the murders but admitted picking up Stephen.  (25 RR 72.)

**Marie Mendoza,** the owner of a cleaning service and an employee of UPS, knew Stephen Barbee when he worked part-time for UPS five or six years prior to the trial. (25 RR 109.)  They talked about their respective businesses.  (25 RR 111-112.)  Stephen told Ms. Mendoza that he was not married, but sometimes she would hear female voices when he called.  (25 RR 117.)  The witness asked for an estimate on some tree work.  (25 RR 113.)  Stephen went ahead and actually trimmed the trees before giving the estimate.  (25 RR 113-114.)   Ms. Mendoza told Stephen that she was not interested in starting a relationship.  (25 RR 118.)  Stephen then had an outburst and said some "mean" things to her.  (25 RR 118.)  Based on this one incident, she thought he was mean and cruel.  (25 RR 119.)

After this witness, the State rested.  (25 RR 121.)

### d) The defense case at the punishment phase.

The defense called **Nancy Cearly,** an administrator of a religious college and a pastor's wife. (25 RR 122.)  She met Stephen at a  church in Azle, Texas.  (25 RR 122.)  The Barbee family, Bill and Jackie Barbee, began attending the church in 1989.  (25 RR 123.) She also knew Stephen and Theresa.  (25 RR 124.)  Ms. Clearly attended and performed the wedding of Steve and Theresa Barbee.  (25 RR 124.)  The Barbees became the children's church leaders.  (25 RR 125.)  They did that for several years.  (25 RR 126.)  They also hosted puppet shows for the children.  (25 RR 127.) Ultimately, there were 75 or 80 kids in this program.  (25 RR 131.)   There were never any complaints.  (25 RR 127.)  The witness visited Mr. Barbee in jail every week and brought him books and a Bible.  (25 RR 127.)

**Jackie Barbee,** Stephen's mother, testified that at the time of the trial, Stephen was 38 years

-33-

old.  (25 RR 134.)  Her daughter Catherine died when she was 20, and her son David also died at the age of 20 when he was in a car accident.  (25 RR 136.)  Stephen was 14 and 16 years old at the time of these deaths.  (25 RR 136.)

Stephen attended schools in Azle, Texas, but he did not graduate from high school because, after David died, Stephen shut down.  (25 RR 138.)  The witness was shown some family photos which she identified.  (25 RR 139-143.)

After high school, Stephen wanted to be a policeman.  (25 RR 144.)  He worked for the Blue Mound Police Department for two and a half years.  (25 RR 145.)  He then started a tree cutting business which became "All Four Seasons."  (25 RR 146-147.)

Mrs. Barbee had been visiting Stephen in jail once a week, the maximum permitted.  (25 RR 150.)

**Mary Hackworth,** Stephen's sister, testified  that she loved and supported him.  (25 RR 153-154.)       **Jennifer Cherry**, Stephen's niece, testified that she was very close to him, that he was almost like a brother, and that she loved him.  (25 RR 156-157.)

**Ashley Vandiver** testified that she was a friend of Stephen and they met at church.  (25 RR 161.)  He was a youth minister and a good friend.  (25 RR 162-164.)  She has visited him in jail.  (25 RR 164.)

**Denise Morrison** testified that she met Stephen at Six Flags about five and a half years prior to the trial.  (25 RR 168.)  They became romantically involved after his divorce.  (25 RR 168.)  They did not get married as Stephen wanted a child but Ms. Morrison already had a child and did not want another.  (25 RR 169.)  They remained good friends and she has been to visit him in the jail.  (25 RR 170.)  When they first met, she did not know he was married until he told her a few days later.  (25 RR 171-172.)  She did not believe Stephen committed the murders.  (25 RR 174-175.)

**Susan Evans,** a former senior warden of several penal institutions of the Texas Department of Criminal Justice, was called as a witness by the defense. (26 RR 2-3.) She testified regarding prison conditions in Texas and the requirements to become a prison guard. (26 RR 4 *et. seq.*) Their duties and responsibilities were explained. (26 RR 5-16.) The guards are trained to search for contraband, to respond to emergencies, first aid, to respond to riots and security issues, to recognize extortion attempts. (26 RR 5-16.) They are also trained in survival and restraint tactics, firearm safety, searches, and all of this is regularly tested and evaluated. (26 RR 18-26.) Ms. Evans outlined the testing procedures and the hours of education required. (26 RR 26-30.)

She also testified regarding the prison classification system. (26 RR 33.) Some prisoners are isolated and have restricted access to parts of the prison. (26 RR 33-38.) General Population Levels range from G1 to G5, the higher numbers being the more restrictive. (26 RR 42.) A person who goes to the penitentiary for murder could never be a G1. (26 RR 43.) A person who is convicted of murder could be classified as a G2. (26 RR 45.) Offenders committed to TDCJ for G3 offenses of 50 years or more must serve at least five years before they can go to G2 level. (26 RR 46.) A prisoner who has a security precaution on him cannot be a G2. (26 RR 47.) Offenders with a sentence of 50 years or more who are higher than a G3 can go down to G3 level. (26 RR 48.) If the prisoner commits assaults or engages in violence, they can be moved higher into a more restrictive classification status. (26 RR 49.) A G5 is a prisoner who has attempted escape or assaulted an officer. (26 RR 51.)

The men on death row are at the Polunsky Unit, a new prison. (26 RR 53.) The defense then showed a tape of the Connally Unit. (26 RR 55.)

Defense counsel then asked about specific differences of death row from the general population. (26 RR 55.) The witness testified that everyone on death row is in the same

classification.  (26 RR 57.)  The defense counsel mentioned a person, Martin Gerule, who escaped

from death row.  (26 RR 57.)  According to the witness, visitation on death row is non-contact.  (26

RR 58, 60.)  Death row inmates take recreation singly, and not in a group.  (26 RR 60.)  They spend

23 hours a day in their cell.  (26 RR 60.)  Their meals are served in the cell.  (26 RR 60.)  "Someone

watches them the whole time."  (26 RR 61.)  The witness commented on the tape the Connally Unit.

(26 RR 62-65.)  The witness stated that two officers are required to be present when the inmates are

being moved within the prison. (26 RR 66.)

     The inmates in general population have television in the day room.  (26 RR 70.)  The witness

testified that those who were convicted of a violent crime are not always the worst inmates in prison.

(26 RR 72.)  "Generally they are under a very controlled environment."  (26 RR 72.)

     The witness said that prison is a hazardous work environment.  (26 RR 74.)  The current

rules for changes in prisoner status are subject to revision.  (26 RR 76.)  To be placed in

administrative segregation takes several bad acts.  (26 RR 83.)  The witness admitted that there were

seven people who escaped from the Connally Unit, the same unit that was the subject of the

videotape, in 2000.  (26 RR 84.)  They all eluded capture and they were all walking around the

streets and they murdered a police officer.  (26 RR 84-86.)  There were 19,000 disciplinary

convictions for assaults in the Texas prison system in 2005.  (26 RR 88.)  The prosecution asked

about reports of prior assaults and a rape of a corrections officer.  (26 RR 90.)

     On re-direct, the witness stated that the restrictions on custody have become more strict in

the last 20 years.  (26 RR 92.)

     The witness also stated that murderers are sometimes the best trustees.  (26 RR 94-95.)

     **Christy McKemson** testified that she knew Stephen through her ex-boyfriend who worked

for him.  (26 RR 98.)  She was there to support him.  (26 RR 99.)

**Jerry Jones,** a jail officer for the Tarrant County Sheriff's Department, had not come into contact with Stephen in the jail, but knew him from dating his sister in high school.  (26 RR 100.) He also knew Stephen's parents.  (26 RR 101.)  According to Mr. Jones, their health has been affected by what has happened.  (26 RR 102.)

**David Derusha,** a bailiff in the trial court, was assigned to bring Stephen from the jail to the courtroom.  (26 RR 103-104.)  Stephen had never been a problem during the trial.  (26 RR 105.)

The defense rested.  (26 RR 105.)


**e) The State's case on rebuttal at the punishment phase.**

**Bruce Cummings**, a private investigator, testified that he knew Lisa and Jayden Underwood because Jayden was a player on a soccer team that he coached.  (26 RR 106.)

The state and the defense closed.  (26 RR 109.)  Mr. Barbee stated that he did not want to testify.  (26 RR 110.)

The defense objected to the 10-2 rule in that the jury was not told that if one juror did not want to sentence the defendant to death.  (26 RR 111.)  The other objection was the lack of a burden of proof as to Special Issue No. 2.  (26 RR 111-112.)  Both objections were overruled.  (26 RR 112.)

After final argument, the jury answered Special Issue No. 1, the future dangerousness issue, in the affirmative.  (27 RR 24.)(Exhibit 6.)   They answered Special Issue No. 2, the mitigation issue, in the negative.  (27 RR 24.)(Exhibit 6.)   Mr. Barbee was sentenced to death. (Exhibit 7.)

**iii) State post-conviction.**

An evidentiary hearing was held in the trial court on February 22 and 23, 2012.  Since this hearing was limited to Claim 2, the conflict of interest claim, the factual summary of that hearing is presented *infra,* in the summary of facts in support of Claim 2.

**V.**

**THE STANDARD OF REVIEW UNDER §2254(d)**

This Petition considers both the merits of Mr. Barbee's claims and how they meet the

heightened standards of review of 2254(d), if those standards apply to his case.  In light of *Cullen*

*v. Pinholster*, 563 U.S. __, 131 S.Ct. 1388 (2011) and *Harrington v. Richter*, 562 U.S. __, 131 S.

Ct. 770 (2011), "merits" review arguably encompasses separate but related inquiries, as described

below.

**A.  Introduction.**

The statutory authority of federal courts to issue a habeas writ for persons in state custody

is 28 U.S.C. §2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA").

Under 28 U.S.C. § 2254(a), a federal court may "entertain an application for a writ of habeas corpus

. . . only on the ground that [a petitioner] is in custody in violation of the Constitution or laws or

treaties of the United States."  Under 28 U.S.C. § 2254(d), however, such an application "shall not

be granted with respect to any claim that was adjudicated on the merits in State court proceedings

unless the adjudication of the claim . .

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme Court
> of the United States. . . (2) . . . resulted in a decision that was based on an
> unreasonable determination of the facts in light of the evidence presented in the State
> court proceeding.

As the Supreme Court explained in *(Terry) Williams v. Taylor*, 529 U.S. 362, 412 (2000),

this operates as a "constraint on the power of a federal habeas court to grant ... the writ" in cases in

which the federal court has found constitutional error.  Regarding the order in which a federal court

addresses the merits and the § 2254(d) determination, the Supreme Court has made clear that

"AEDPA does not require a federal habeas court to adopt any one methodology." *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003). Within the Supreme Court's own jurisprudence the analysis of whether § 2254(d) operates in a given case to bar relief is often preceded by a traditional analysis of the merits of the underlying constitutional claim. *See, e.g., Weeks v. Angelone*, 528 U.S. 225 (2000); *Ramdass v. Angelone*, 530 U.S. 156 (2000); *Penry v. Johnson*, 532 U.S. 782 (2001). Thus, although one could argue that the question whether relief for an otherwise meritorious constitutional violation under § 2254(a) is barred by operation of § 2254(d) is a matter to be raised by the Respondent, *cf. O'Neal v. McAnich*, 513 U.S. 432 (1995) (analogizing the State's harmless error argument to an affirmative defense), Mr. Barbee will combine a discussion of the law governing the alleged constitutional violations with the discussion of the reasonableness or unreasonableness of the prior state court adjudications, where applicable.[12]

The AEDPA deferential standard of review applies only to claims that were actually "adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d). Where the state courts did not reach a federal constitutional issue, "the claim is reviewed *de novo*." *Cone v. Bell,* 556 U.S. 449, 472 (2009)("Because the state court did not decide whether Porter's counsel was deficient, we review this element of Porter's claim *de novo*"); *Graves v. Dretke,* 442 F.3d 334, 339 (5th Cir. 2006). Where no state court has squarely addressed the merits of a habeas claim, "we review the claim under the pre-AEDPA standard of 28 U.S.C. § 2243, under which we dispose of the matter as law and justice require." *Toliver v. Pollard,* 688 F.3d 853, 859 (7th Cir. 2012); *Porter v. McCollum,* 130 S. Ct. 447, 452 (2009)(*per curiam*). The operative decision under review is that of

---

[12] As the Fifth Circuit has noted, "AEDPA limits our review to the reasonableness rather than the correctness of the state court's decision..." *Goodrum v. Quarterman,* 547 F.3d 249, 266 (5th Cir. 2008).

the last state court to address a given claim on the merits. *Greene v. Fisher,* 132 S. Ct. 38, 45 (2011). Here, the "last state court" would be the Texas Court of Criminal Appeals ("CCA") for those issues brought on direct appeal, and, as for the issues brought on state habeas, both in the initial and the subsequent application, the trial court's findings of fact and conclusions of law, as adopted by the CCA.

As will be discussed herein as to the individual claims, many of Mr. Barbee's claims were found to be procedurally defaulted because they were not brought in the initial state habeas petition and when they were brought in the subsequent petition, they were found not to meet the standards for subsequent application claims. These claims were therefore never adjudicated on the merits. As to the three record-based assertions of ineffective assistance brought in the initial state habeas proceedings (Claims 1, 2, and 3 in that state petition), the trial court adopted the prosecutor's conclusions of law that the claims should be denied on the merits. (Exhibits 14 and 15.) The CCA than adopted the "trial judge's [sic] findings and conclusions." *Ex parte Stephen Dale Barbee,* No. WR-71-071-01, at 2. (Exhibit 9.)

As to the claims first brought in Mr. Barbee's subsequent habeas application (most of the claims considered herein), on September 14, 2011 the CCA held that only the conflict of interest claim (Claim 2) satisfied the requirements of Article 11.071 Sec. 5 and remanded it to the trial court. *Ex parte Stephen Dale Barbee,* No. WR-71,070-02, at 2. (Exhibit 48.) After an evidentiary hearing limited to this claim (Exhibits 49, 50 and 51, transcripts of the hearing and hearing exhibits), both parties submitted proposed findings of fact and conclusions of law. (*See* Exhibit 53 (Petitioner's

proposed findings and conclusions) and Exhibit 54 (State's proposed findings and conclusions).[13] The trial court subsequently adopted the State's proposed findings and conclusions verbatim and relief on Claim 2 was ultimately denied "[b]ased upon the trial court's findings and conclusions and our own review."  The other claims, Claims 1 and 3 through 21 were also dismissed "as an abuse of the writ" because those allegations "do not satisfy the requirements of Article 11.071 Section 5." *Ex parte Stephen Dale Barbee,* No. WR-71,070-02, at 2. (Tex. Crim. App. May 8, 2013)(Exhibit 52.)

In answering Petitioner's initial federal petition, the Director claimed that only Claims 3(a), 4(b), 5(d), 13 and 19 were reviewed on the merits and exhausted. *See* Docket no. 40, RA at 17. He also argued and conceded, somewhat inconsistently, that several additional claims—Claims 5(b) (RA at 41-46) , 5(c) (RA at 41-46) , 5(f) (RA at 57-75), and Claim 15 (RA at 76)—were brought in the initial state court proceedings and were denied on the merits and hence exhausted.  All claims presented herein are now exhausted, as those that were not previously presented on direct appeal or in the initial state habeas application were brought in the subsequent state application.  A discussion of the procedural posture of all claims and how they were presented to the state courts is provided *infra* as to each individual claim and sub-claim.

Article 11.071 §5(a) has three parts: Subsection (a)(1) provides that the merits of the claim may not be considered and relief on the claim may not be granted unless the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application because the factual or legal basis for the claim was

---

[13]   Petitioner also submitted an "Applicant's Additional Post-Hearing Submission" based on the declaration of Stephen Andrew Hall (Exhibit 55) and the state submitted a reply to that submission, mainly consisting of Mr. Hall's criminal history. (Exhibit 56.)

unavailable on the date the applicant filed the previous application.  Subsection (a)(2) provides that the merits of the claim may not be considered and relief may not be granted unless the application contains sufficient facts establishing that by a preponderance of the evidence, but for a violation of the United States Constitution, no rational juror could have found the applicant guilty beyond a reasonable doubt.  Subsection (a)(3) provides that the merits of the claim may not be considered and relief may not be granted unless the application contains sufficient specific facts establishing that by a preponderance of the evidence, but for a violation of the United States Constitution, no rational juror could have answered in the state's favor one or more of the special issues that were submitted to the jury in the applicant's trial under Article 37.071 or 37.0711.

When the Texas Court of Criminal Appeals dismisses a subsequent habeas petition and gives no reason beyond citing to Art. 11.071 §5(a), it is unclear whether the State court dismissed the claims on procedural grounds or on the merits.  *See Balentine v. Thaler,* 626 F.3d 842, 851-857 (5th Cir. 2010), *cert. denied,* ___U.S.___, 131 S. Ct. 2992 (2011).  In this circumstance, this Court must determine whether the state court's decision was based on procedural grounds or on the merits and also determine the adequacy and independence of any possible state law ground when it is not clear from the face of the opinion.

Here, the analysis should begin with examining the subsequent state petition to ascertain what subsection of Art. 11.071 §5(a) Mr. Barbee relied on in arguing that his claims should be considered on the merits.  Mr. Barbee made clear to the state courts that he relied on all three subsections of  §5(a):

> Applicant has met the requirements for a subsequent writ application under Tex. Code Crim. Proc. art. 11.071 sec. 5(a)(1), (2) and (3).  There are three well-established exceptions to the bar on subsequent writs contained in article 11.071 sec 5(a).  That section reads as follows:

If a subsequent application for a writ of habeas corpus is filed after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent application unless the application contains sufficient specific facts establishing that:

(1) the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application;

(2) by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt; or

(3) by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues that were submitted to the jury in the applicant's trial under Article 37.071 or 37.0711. Tex. Code Crim. P. art. 11.071 sec. 5(a).

Exception 5(a)(1) applies here in light of the newly-available evidence of the conflict of interest of Mr. Barbee's trial counsel, as summarized *supra* and discussed in detail in Claim Two. The evidence of a conflict of interest *could not* have been presented earlier, as it came to light only after the initial state application had been filed. Exception 5(a)(2) applies to Mr. Barbee's claim of actual innocence (Claim One). The actual innocence claim was not presented previously in State court, contrary to Mr. Barbee's express wishes.

Other claims also meet some of the art. 11.071 sec. 5(a) exceptions to the bar on subsequent writs. Claim Three (ineffective assistance of counsel at the pre-trial stage) meets the art. 11.071 sec. 5(a)(2) exception; Claim Four (ineffective assistance of counsel at the guilt-innocence phase of the trial) also meets the art. 11.071 sec. 5(a)(2) exception; and Claim Five (ineffective assistance of counsel at the punishment phase of the trial) meets the art. 11.071 sec. 5(a)(3) exception. These claims and the reasons they meet these exceptions are discussed in further detail herein. Claims Six (unfair pre-trial publicity) and Seven (ineffective assistance of counsel for failure to file a motion for change of venue) meet the 11.071 sec. 5(a)(2) and (3) exceptions, as Applicant shows herein the tremendous adverse effect the publicity and hostile trial atmosphere had on his trial, rendering it unfair and the results unreliable. Claim Eight also meets the sec. 5(a)(2) and (3) exceptions, as it represents an opportunity for this Court to correct its earlier dismissal of Applicant's initial writ application, which was based on erroneous trial court findings which misled the Texas Court of Criminal Appeals.

(Petitioner's subsequent state writ application, at pages 6-7; *see also* the discussion of these grounds at pages 7-16 of that application.)

In the subsequent state application, Claims 1 and Claims 3 though 21 were denied purely on

-44-

procedural grounds, as the CCA stated that they "do not satisfy the requirements of Article 11.071, Section 5" and "[t]herefore, we dismiss those allegations as an abuse of the writ. *Ex parte Stephen Dale Barbee,* No. WR-71,070-02, at 2. (Tex. Crim. App. May 8, 2013)(Exhibit 52.)  As to Claim 2, it was denied on the merits "[b]ased upon the trial court's findings and conclusions and our own review."  *Id.*  However, some of these claims had previously been denied on the merits on direct appeal or in the initial state habeas proceedings.

As to the denial of Claim 1, it is not subject to procedural default as it is a "gateway" claim. As to Claim 2, it was found to meet the criteria of  Article 11.071, Section 5 but denied on the merits, and Mr. Barbee will show that denial does not comport with 2254(d)(1) and d(2). As to Claims 3, 4, and 5, they assert ineffective assistance of trial counsel, and "cause and prejudice" for their default is asserted in the discussion below at Sections C through F and also in Section G which deals with the exceptions the Supreme Court has defined in *Martinez v. Ryan,* 132 S. Ct. 1309 (2012)  and *Trevino v. Thaler,* 133 S. Ct. 1911 (2013), which establish "cause" for any default. Claim 1 also establishes the "miscarriage of justice" exception to procedural default.  *Ruiz v. Quarterman,* 460 F.3d 638, 642-643 (5th Cir. 2006).

As to many of his claims, Mr. Barbee met the standards for subsequent state applications, and  argued that any failure to present them initially was due to the failure of initial state habeas counsel to do so.  *See* Petitioner's subsequent state application at 9, 16-18, and also in the discussions of the individual claims of ineffective assistance of counsel.  As to Claim 2, Petitioner has shown that it was an unreasonable determination of both the facts and the law under the 2254(d) standards.  In addition, even if the State was entitled to benefit from the sham initial state writ proceedings, Mr. Barbee has *also* shown "cause and prejudice" *and* a fundamental miscarriage of justice (his claim of actual innocence) sufficient to excuse any procedural default.  As to all of the

ineffective assistance of trial counsel claims, Claims 3, 4, and 5, any procedural default is excused under the exceptions the Supreme Court has defined in *Martinez v. Ryan,* 132 S. Ct. 1309 (2012) and *Trevino v. Thaler,* 133 S. Ct. 1911 (2013), as discussed in the next section.   As to many of the claims that were first presented to the state court in the subsequent state habeas application and denied solely on procedural grounds, 2254(d) does not apply and review is *de novo* in this Court.   The "prejudice" component of "cause and prejudice" is discussed in the factual summary of each claim or sub-claim.

For most claims, the analysis that the state court ruling was objectively unreasonable will also entail an analysis of why Mr. Barbee should prevail on the merits.   For many claims and sub-claims, a finding that the state court decision lacked a reasonable basis upon which to base its holding will mean that Mr. Barbee is entitled to *de novo* review of the merits of the claim(s)  in question and/or further factual development in this Court.   It must be noted, however, that with regard to all extra-record claims, the State has not yet filed its answer to this first amended petition, and therefore has not yet either admitted nor denied any of the alleged facts. Thus, in some respects, this discussion of the procedural defenses must necessarily be preliminary.   Additional discussion of the significance of the facts alleged or proven, and any available procedural defenses, must necessarily await the State's answer and/or further factual development in this Court, such as an evidentiary hearing or depositions.

Recently, in *Cullen v. Pinholster*, 563 U.S. __ 131 S.Ct. 1388 (2011), the Supreme Court held that "§2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Id*. at 1398.  When a federal habeas court is called upon to apply § 2254(d)(1), *Pinholster* held, the court's assessment of the reasonableness of the state court's adjudication must

be determined on the basis of the facts that were before the state court. *Id*. at 1400. All the claims and exhibits presented herein were previously presented to the state courts, so *Pinholster* will not circumscribe this Court's review.

### B. The 2254(d) standards.

Application of § 2254(d) in light of *Pinholster* should be considered in the statute's constitutional and historical context. *Panetti v. Quarterman*, 551 U.S. 930, 945-46 (2007) ("purposes [of statute], and the practical effects of our holdings, should be considered when interpreting AEDPA"). *Pinholster* stresses that § 2254(d) review is distinct from the question raised under § 2254(a), *viz.* whether the petitioner has demonstrated that he is in custody in violation of the Constitution of the United States. 131 S. Ct. at 1398. That interpretation is consistent with earlier cases.[14]

In §§ 2254(d)(1) and (d)(2), Congress established two broad sets of conditions under which a federal habeas court could grant relief for a constitutional violation. Congress stated these conditions in the disjunctive, leaving federal habeas courts alternatives for the exercise of their power to remedy constitutionally infirm state-court judgments. *Detrich v. Ryan*, 619 F.3d 1038, 1059-60 (9th Cir. 2010), *vacated on other grounds*, *Ryan v. Detrich*, 131 S.Ct. 2449 (2011); *see also*

---

[14]   *See*, *e.g.*, *Fry v. Pliler*, 551 U.S. 112, 119 (2007) (§ 2254(d) "sets forth a precondition to the grant of habeas relief . . . not an entitlement to it"); *Carey v. Musladin*, 549 U.S. 70, 74 (2006) (explaining that § 2254(d) must be satisfied before "federal habeas relief may be granted"); *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) ("Relief may not be granted unless" § 2254(d) is satisfied); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) ("The requirements for habeas relief established by 28 U.S.C. § 2254(d) are thus satisfied"); *Bell v. Cone*, 535 U.S. 685, 694 n.2 (2002) (referring to § 2254(d) as a "statutory provision governing respondent's ability to obtain federal habeas relief"); *(Terry) Williams v. Taylor*, 529 U.S. 362, 412 (2000) (§ 2254(d) "places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court").

*Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (granting relief after finding petitioner satisfied (d)(2) without mentioning (d)(1)); *cf. Garcia v. United States*, 469 U.S. 70, 75 (1984) ("terms in question are made separate and distinct from one another by Congress' use of the disjunctive").[15]

The distinction AEDPA's drafters created between the core question of habeas corpus law – whether the petitioner's custody is lawful – and whether the habeas court must deny relief out of deference to the state court responsible for that allegedly unlawful custody presents several constitutional questions. Petitioner addresses those issues as well as the doctrinal origins of AEDPA's scheme *infra*, and at various points in this petition.

### 1. Review of a State Court's Decision under § 2254(d)(1)

"The writ of habeas corpus stands as a safeguard against imprisonment of those held in violation of the law. Judges must be vigilant and independent in reviewing petitions for the writ, a commitment that entails substantial judicial resources."[16] *Harrington v. Richter*, 536 U.S. ___, 131 S. Ct. 770, 780 (2011). As the Supreme Court has emphasized, the deference § 2254(d) requires

---

[15]   In *Jefferson v. Upton*, 560 U.S. ___, 130 S. Ct. 2217 (2010), the Court reversed an Eleventh Circuit decision that failed to consider alternative grounds for overcoming the presumption of correctness under the pre-AEDPA § 2254(d). The Court emphasized that Congress had adopted eight alternative means of overcoming the presumption and stated them in the disjunctive. 130 S. Ct. at 2221. The Court held "the Court of Appeals did not properly consider the legal status of the state court's factual findings" when it considered only one of the eight enumerated exceptions despite the petitioner having argued that others applied. *Id.* at 2222-23.

[16]   *See also*, *Murray v. Carrier*, 477 U.S. 478, 500 (1986) ("'The writ of habeas corpus is the fundamental instrument for safeguarding individual freedom against arbitrary and lawless state action.'") (*quoting Harris v. Nelson*, 394 U.S. 286, 290-291 (1969)); *Harris*, 394 U.S. at 292 ("There is no higher duty of a court, under our constitutional system, than the careful processing and adjudication of petitions for writs of habeas corpus, for it is in such proceedings that a person in custody charges that error, neglect, or evil purpose has resulted in his unlawful confinement and that he is deprived of his freedom contrary to law.").

"does not imply abandonment or abdication of judicial review." *Miller-el v. Cockrell*, 537 U.S. 322, 340 (2003).  On the contrary, recent cases such as *Richter* and *Cullen v. Pinholster*, 563 U.S. ___, 131 S. Ct. 1388 (2011), make clear that AEDPA added a layer of judicial review – "§ 2254(d) review" – that a state court decision must survive in order to receive deference.

The means by which a federal habeas court discharges its duty may vary depending upon the circumstances of the case.  "AEDPA does not require a federal habeas court to adopt any one methodology" for applying § 2254(d).  *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).  Such a limitation on federal courts' vigilance and independence would violate the separation of powers doctrine.  *See infra*.

Like any Supreme Court case, *Cullen v. Pinholster*, 563 U.S. ___, 131 S. Ct. 1388 (2011), decided the questions on which certiorari was granted.  *Glover v. United States*, 531 U.S. 198, 205 (2001) ("As a general rule . . . we do not decide issues outside the questions presented by the petition for certiorari."); Sup. Ct. R. 14.1(a).  The Court in *Pinholster*

> granted certiorari to resolve two questions.  First, whether review under [28 U.S.C.] § 2254(d)(1) permits consideration of evidence introduced in an evidentiary hearing before the federal habeas court.  Second, whether the Court of Appeals properly granted Pinholster habeas relief on his claim of penalty-phase ineffective assistance of counsel.
> 131 S. Ct. at 1398.

In addressing the first question – review under § 2254(d)(1) generally – the Court observed that § 2254(d)(1) is one of "several limits on the power of a federal court to grant an application for a writ of habeas corpus on behalf of a state prisoner."  *Id*.  Review under § 2254(d)(1), or "§ 2254(d)(1) review," is distinct from the question presented by § 2254(a), which is whether the petitioner "is in custody in violation of the Constitution or laws or treaties of the United States."

-49-

*Id.*[17]  This distinction is written into the structure of § 2254, including the prerequisite for the application of § 2254(d), that the state court adjudicated the claim on the merits.  Where that prerequisite is absent, the federal court conducts review *de novo*.  *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) ("our review is not circumscribed by a state court conclusion with respect to prejudice, as neither of the state courts below reached this prong of the *Strickland* analysis"); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (citing *Wiggins*) ("Because the state courts found the representation adequate, they never reached the issue of prejudice, and so we examine this element of the *Strickland* claim de novo.") (internal citation omitted).  *Cf. Wiggins*, 539 U.S. at 527-28, 531 (holding state court's determination of fact was unreasonable and that Court "therefore must determine, de novo" what the facts were).

In answer to this first question, *Pinholster* "h[eld] that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."  131 S. Ct. at 1398.  The statute's "backward-looking language requires an examination of the state-court decision at the time it was made."  *Id.*  "[R]eview under § 2254(d)(1) focuses on what a state court knew and did." *Id.* at 1399.

When a federal habeas court is called upon to apply § 2254(d)(1), *Pinholster* held, the court's examination of the reasonableness of the state court's adjudication must be based on the facts that were before the state court.  *Id.* at 1399.  Where a claim presents mixed questions of law and fact,

---

[17]  *See also  Danforth v. Minnesota*, 552 U.S. 264, 270 (2008) (discussing distinction between violations of constitutional rights and redressibility of such violations in habeas cases); *Panetti*, *supra*, 551 U.S. at 953 (when "requirement set forth in § 2254(d)(1) is satisfied … federal court must then resolve the claim without the deference AEDPA otherwise requires"); *Gonzalez v. Crosby*, 545 U.S. 524, 532 n.4 (2005) (defining "merits" decision in habeas case as "determination that there exist or do not exist grounds entitling a petitioner to habeas corpus relief under 28 U.S.C. §§ 2254(a) and (d)"); 28 U.S.C. §§ 2241(c), 2243, cl. 1.

such as a claim under *Strickland v. Washington*, 466 U.S. 668, 698 (1984), the Court held, as it had

eleven years earlier, under § 2254(d)(1), if the state court decision identifies the correct governing

legal principle in effect at the time of its decision, the federal court must ask whether the state court

unreasonably applied that principle to the facts of the prisoner's case. *Id.*, 131 S. Ct. at 1399, *citing*

*(Terry) Williams v. Taylor*, 529 U.S. 362, 413 (2000).  But what constitutes the factual record that

was before the state court?

In answering that question, *Pinholster* followed a long line of cases in which the Court

examined state post-conviction cases in order to inform the federal habeas court's understanding of

what the state court knew and did.  Regarding summary review of claims, *Pinholster* observed,

> It appears that the court generally assumes the allegations in the petition to be true,
> but does not accept wholly conclusory allegations, *People v. Duvall*, 9 Cal.4th 464,
> 474, 37 Cal.Rptr.2d 259, 886 P.2d 1252, 1258 (1995), and will also "review the
> record of the trial ... to assess the merits of the petitioner's claims," [*In re*] *Clark*,
> *supra*, [5 Cal.4th 750] at 770, 21 Cal.Rptr.2d 509, 855 P.2d, at 742 [1993].
> 131 S. Ct. at 1402 n.12.

The Court surmised that in a habeas case, the factual record against which the reasonableness

of the state court's adjudication is judged includes the allegations of the state habeas petition, its

exhibits, and the record on appeal.  *Pinholster*, at 1402 n.12.  As discussed more *infra*, the Supreme

Court did not have occasion to decide whether the state court in question [in *Pinholster,* the

California Supreme Court] may have based its decision on an unreasonable determination of the

facts.

That is the extent of *Pinholster*'s holding regarding the application of § 2254(d)(1).  Once

the court has conducted the requisite "thorough review of the state court record," 131 S. Ct. at 1402,

it must apply *either* the contrary-to standard, or the objective standard of reasonableness the Court

adopted in *Terry Williams*, or both.[18]  *Id.* at 1399; *see also Terry Williams*, 529 U.S. at 404-05

("2254(d)(1) defines two categories of cases in which a state prisoner may obtain federal habeas

relief with respect to a claim adjudicated on the merits in state court" and lower court "properly

accorded both the 'contrary to' and 'unreasonable application' clauses independent meaning").  The

Court in *Pinholster* did not have occasion to apply § 2254(d)(1)'s contrary-to clause, which the

statute lists in the disjunctive.  This case does require consideration of that clause.

In order for a state court's decision to be contrary to law it "must be substantially different

from the precedent of [the Supreme] Court."  *Terry Williams*, 529 U.S. at 405.  Where a "state court

applies a rule that contradicts the governing law," its decision "will certainly be contrary to . . .

clearly established precedent."  *Id.*  "A state-court decision will also be contrary to [the Supreme]

Court's clearly established precedent if the state court confronts a set of facts that are materially

indistinguishable from a decision of this Court and nevertheless arrives at a result different from our

precedent."  *Id.* at 406.

*Terry Williams* held the Virginia Supreme Court's reliance upon *Lockhart v. Fretwell*, 506

U. S 364 (1993), as one among other reasons to reject an ineffective-assistance claim, was "both

contrary to and involving an unreasonable application of the standard set forth in *Strickland*."

*Panetti*, 551 U.S. at 953.  In *Terry Williams* the state court's decision was both contrary to and

involved an unreasonable application of *Strickland* insofar as it was informed by the "erroneous

view that a 'mere' difference in outcome is not sufficient to establish constitutionally ineffective

assistance of counsel."  *Williams*, 529 U.S. at 397; *id.* at 413 (O'Connor, J., concurring).

---

[18]  *See also Cavazos v. Smith*, 565 U.S. ___, 132 S. Ct. 2 (2011) (*per curiam*) (observing
that federal habeas relief is available "only if the state court decision was 'objectively
unreasonable'") (quoting *Renico v. Lett*, 599 U.S. ___, 130 S. Ct. 1855, 1862 (2010)).

The "contrary to" clause applies when a state court's decision relied to any extent on a legal standard that substantially differs from the clearly established Supreme Court precedent governing the petitioner's claim.  In *Terry Williams*, Justice O'Connor, the author of the standard for applying § 2254(d)(1), rejected the dissent's argument that the Virginia Supreme Court cited the correct legal standard for determining prejudice.  The majority observed, "[i]t is impossible to determine . . . the extent to which the Virginia Supreme Court's error with respect to its reading of *Lockhart* affected its ultimate finding that Williams suffered no prejudice."  529 U.S. at 414.  It nevertheless held AEDPA was satisfied.  *Id.*

That federal habeas review of claims previously adjudicated on the merits in state court involves the sort of two-tiered analysis described above – as opposed to a more superficial "reasonableness" examination suggested by terms like "deference" or "standard of review" – is confirmed by the Supreme Court's decisions granting relief in cases governed by § 2254(d).  For example, in both *Rompilla* and *Wiggins*, *supra*, the Court first undertook its own detailed review of the merits of the petitioners' contentions that their trial counsel were ineffective for failing to adequately investigate, *Rompilla*, 545 U.S. at 381-387; *Wiggins*, 539 U.S. at 519-527, and then performed a careful analysis of the ways in which the state courts' decisions rejecting the petitioners' claims were based on an "unreasonable determination of the facts," and involved an "unreasonable application of" federal law.  *Rompilla*, 545 U.S. at 389-390; *Wiggins*, 539 U.S. at 527-534.  The Court took the same approach in *Miller-El v. Dretke*, 545 U.S. 231 (2005), again conducting a painstaking evaluation of the merits of the petitioner's claim under *Batson v. Kentucky*, 476 U.S. 79 (1986), before further concluding that the state court's rejection of that claim was based on an "unreasonable determination of the facts in light of the evidence presented in the state court

proceeding," such that federal habeas relief was appropriate. The Court used the same framework in *Porter v. McCollum*, 558 U.S. ___, 130 S. Ct. 447 (2009) – first conducting a careful review of the mitigating evidence Porter claimed his trial counsel ineffectively failed to uncover and present during the penalty phase of his capital trial, before then determining that the state court's decision that Porter suffered no prejudice was an unreasonable application of federal law.

This petition follows the Supreme Court's model. Whether a federal claim was well-pleaded to the state court is itself a federal question, which this Court must answer. *See*, *e.g.*, *Carter v. Texas*, 177 U.S. 442, 447 (1900) ("[T]he question whether a right or privilege, claimed under the Constitution or laws of the United States was distinctly and sufficiently pleaded and brought to the notice of a state court, is itself a Federal question, in the decision of which this court, on writ of error, is not concluded by the view taken by the highest court of the state."); *Staub v. City of Baxley*, 355 U.S. 313, 318 (1958) ("'Whether a pleading sets up a sufficient right of action or defense, grounded on the Constitution or laws of the United States, is necessarily a question of federal law and, where a case coming from a state court presents that question, this court must determine for itself the sufficiency of the allegations displaying the right or defense, and is not concluded by the view taken of them by the state court.'") (quoting *First National Bank of Guthrie Center v. Anderson*, 269 U.S. 341, 346 (1926)).[19]

### 2. Review of a State Court's Decision under § 2254(d)(2)

#### a. Scope of the Factual Record

*Pinholster* concluded that the record a federal court may consider for purposes of

---

[19]   *See also Davis v. Wechsler*, 263 U.S. 22, 24 (1923); *Schuylkill Trust Co. v. Pennsylvania*, 296 U.S. 113, 122-123 (1935); *Lovell v. City of Griffin*, 303 U.S. 444, 450 (1938).

§ 2254(d)(1) review is limited to the factual record that was before the state court.  In reaching the conclusion that § 2254(d)(1) review is backward-looking, the Court drew on § 2254(d)(2)'s express prescription for the reasonableness determination to be made "'in light of the evidence presented in the State court proceedings.'"   131 S. Ct. at 1400 n.7 (quoting § 2254(d)(2)).   That explicit reference to the state-court record supported the inference that § 2254(d)(1)'s reasonableness determination also should be based on the evidence presented in state court.   Thus, in general, the statute limits review of the reasonableness of a state-court factual determination to "the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).

Section 2254(d)'s  backward-looking language extends the principle underlying the exhaustion doctrine.  What matters for purposes of exhaustion is what the petitioner presented and not what the state court did or did not do with a claim.  *Smith v. Digmon*, 434 U.S. 332 (1978); *Dye v. Hofbauer*, 546 U.S. 1, 3 (2005).  Similarly, the allegations and supporting documents presented in state court are what matters for purposes of the evidentiary record in § 2254(d)(2) review and not the status of item as "evidence."   As long as factual matter introduced in federal court was part of the "evidence presented" in state court, this Court may consider it in its review under § 2254(d)(2).

A federal court may not grant habeas relief unless the petitioner "has exhausted the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1)(A). Petitioner presented all claims herein to the state courts in his subsequent state petition and some claims were also presented on direct appeal and in the first state habeas application.  Hence all claims are exhausted.

### b.  Application of § 2254(d)(2) in this Case

There are several circumstances in which a state court's factual determination will be held unreasonable.  Federal habeas courts first conduct "intrinsic review of a state court's processes" for

determining the facts.  *Taylor v. Maddox*, 366 F.3d 992, 999-1000 (9th Cir. 2004).  A challenge to

the intrinsic reasonableness of a state court's factual determination

> may be based on the claim that the finding is unsupported by sufficient evidence,
> *see, e.g., Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 2538–39, 156 L.Ed.2d 471
> (2003); *Ward v. Sternes*, 334 F.3d 696, 705-08 (7th Cir. 2003), that the process
> employed by the state court is defective, *see, e.g., Nunes v. Mueller*, 350 F.3d 1045,
> 1055–56 (9th Cir. 2003); *Valdez v. Cockrell*, 274 F.3d 941, 961–68 (5th Cir. 2001)
> (Dennis, J., dissenting), or that no finding was made by the state court at all, see, e.g.,
> *Weaver v. Thompson*, 197 F.3d 359, 363 (9th Cir. 1999); *cf. Wiggins*, 123 S.Ct. at
> 2539–41.

*Taylor v. Maddox,* at 999.  As with review under § 2254(d)(1), this review "must be particularly

deferential to . . . state-court colleagues" such that the federal court "must be satisfied that any

appellate court to whom the defect is pointed out would be unreasonable in holding that the state

court's fact-finding process was adequate."  *Id*. at 1000; *cf. Pinholster*, 131 S. Ct. at 1399.

> [A]s the Supreme Court pointed out in *Miller–El v. Cockrell*, 537 U.S. 322, 123 S.Ct.
> 1029, 154 L.Ed.2d 931 (2003), "Deference does not by definition preclude relief. A
> federal court can disagree with a state court's credibility determination and, when
> guided by AEDPA, conclude the decision was unreasonable." *Id.* at 340, 123 S. Ct.
> 1029.  Indeed, the Supreme Court, our court and other circuits have all found the
> standard met.  *See Wiggins*, 123 S.Ct. at 2538–39.

*Taylor* at 1000.

Just as there is no single way to conduct review under § 2254(d)(1), *Lockyer*, *supra*, 538 U.S.

at 71,

> intrinsic challenges to state-court findings pursuant to the 'unreasonable
> determination' standard come in several flavors, each presenting its own peculiar set
> of considerations.  No doubt the simplest is the situation where the state court should
> have made a finding of fact but neglected to do so.  In that situation, the state-court
> factual determination is perforce unreasonable and there is nothing to which the
> presumption of correctness can attach.  *See, e.g., Wiggins*, 123 S.Ct. at 2539–40;
> *Killian v. Poole*, 282 F.3d 1204, 1208 (9th Cir. 2002); *Weaver*, 197 F.3d at 363;

*Nunes*, 350 F.3d at 1055. A somewhat different set of considerations applies where the state court does make factual findings, but does so under a misapprehension as to the correct legal standard. *See, e.g.*, *Caliendo v. Warden*, 2004 WL 720362, at *6 (9th Cir. Apr.5, 2004); *Fernandez v. Roe*, 286 F.3d 1073, 1077 (9th Cir. 2002); *Wade v. Terhune*, 202 F.3d 1190, 1197 (9th Cir. 2000). Obviously, where the state court's legal error infects the fact-finding process, the resulting factual determination will be unreasonable and no presumption of correctness can attach to it.

Closely related to cases where the state courts make factual findings infected by substantive legal error are those where the fact-finding process itself is defective. If, for example, a state court makes evidentiary findings without holding a hearing and giving petitioner an opportunity to present evidence, such findings clearly result in an "unreasonable determination" of the facts. *See, e.g.*, *Weaver*, 197 F.3d at 363; *Nunes*, 350 F.3d at 1055; *cf. Bryan v. Mullin*, 335 F.3d 1207, 1215–16 (10th Cir.2003) (declining to apply presumption where state court failed to hold an evidentiary hearing).[20] *But see Valdez*, 274 F.3d at 948–50 (sections 2254(d)(2) and (e)(1) apply despite defects in the state-court hearing). Similarly, where the state courts plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable. *See, e.g.*, *Wiggins*, 123 S.Ct. at 2538–39; *Hall [v. Comm. Corrections]*, 343 F.3d [976,] 983. And, as the Supreme Court noted in *Miller–El*, the state-court fact-finding process is undermined where the state court has before it, yet apparently ignores, evidence that supports petitioner's claim. *Miller–El*, 537 U.S. at 346, 123 S. Ct. 1029 ("Our concerns are amplified by the fact that the state court also had before it, and apparently ignored, testimony demonstrating that the Dallas County District Attorney's Office had, by its own admission, used this process to manipulate the racial composition of the jury in the past."); *accord Collins v. Rice*, 365 F.3d 667, 685 (9th Cir. 2004).

*Taylor*, 1000-01.

As with review under § 2254(d)(1), review under § 2254(d)(2) must be based upon what the

state court knew and did, and that assessment must be made in accordance with state law. Absent

evidence of arbitrary or discriminatory action, federal habeas courts are bound by state supreme

---

[20]   A hearing was held here only on Claim 2. Petitioner requested a hearing on additional issues of controverted issues of material fact, Claims 1 and Claims 3 through 8, but this was denied. *Ex parte Stephen Dale Barbee,* No. WR-71,070-02, at 2. (Exhibit 48.)

court decisions on state law, *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975), and must presume state court judges follow state procedural law in reaching their decisions, *Black v. Romano*, 471 U.S. 606, 615 (1985).

To the extent the CCA's assuming the truth of Petitioner's allegations constitutes a "factual determination," that determination is entitled to a presumption of correctness. 28 U.S.C. § 2254(e)(1); *Burger v. Zant*, 498 U.S. 433, 436 (1991) (*per curiam*) (state court findings favorable to petitioner and adverse to State presumed correct).

### C. State Court Holdings.

### 1. Introduction.

"Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision." *Richter*, 131 S. Ct. at 786. In order to follow *Pinholster*'s prescription that "review under § 2254(d)(1) focus[] on what the state court knew and did," 131 S. Ct. at 1399, it is necessary to examine the state law that governed the decision under review in this case. *Pinholster* at 1402 n.12. Review under § 2254(d)(1) also requires the federal court to examine what "arguments or theories...could have supported the state court's decision." *Richter,* 131 S. Ct. at 786.

In view of these issues, this Petition presents substantial, strong evidence that the CCA either applied legal standards that are contrary to clearly established federal law, unreasonably applied the correct legal standards, misapplied their own subsequent petition standards, or either did not resolve factual disputes or did so in ways the Supreme Court and Fifth Circuit have held are unreasonable. Mr. Barbee  also requests discovery and an evidentiary hearing so that he may complete the available evidence and present it.

-58-

### 2. 2254(d) and ineffective assistance of counsel claims.

Where the U.S. Supreme Court has reviewed ineffective-assistance allegations for facially sufficiency, it has found viable claims on far less a showing than Mr. Barbee makes as to many of the claims discussed in this Petition.  For example, in *Kimmelman v. Morrison*, 477 U.S. 365 (1986), the court found facially sufficient evidence of deficient performance on the basis of the trial record.  It showed defense counsel learned during trial that a bed sheet had been seized from the defendant's apartment without a search warrant.  477 U.S. at 368-69.  Trial counsel had not moved to suppress the sheet within the time prescribed by state law because he "had never asked for *any* discovery," although he had been on notice earlier that the sheet had been seized and tested in a laboratory.  *Id.* at 369 (emphasis in original).  The Supreme Court found the record showed trial counsel's performance was "unreasonable, that is, contrary to prevailing professional norms." *Id.* at 385. The Court found the record "adequate for our application of *Strickland*'s competency standard," but "incomplete with respect to prejudice."  *Id.* at 390.  The record was sufficient to indicate the seizure of the sheet was illegal but the Court held the State was "entitled to an opportunity to establish that [the] search came within one of the exceptions . . . to the Fourth Amendment's prohibition against warrant less searches."  *Id.* at 390-91.  The Court remanded the case back to federal court for further proceedings on the prejudice question.  *Id*. at 390.  In doing so the court noted

> [the habeas petitioner] may be unable to show that absent the evidence concerning the bed sheet there is a reasonable probability that the trial judge would have had a reasonable doubt as to his guilt.  If [the habeas petitioner] could not make this showing, a matter on which we express no view, there would of course be no need to hold an evidentiary hearing on his Fourth Amendment claim.

*Id*. at 387.

In *Padilla v. Kentucky*, 559 U.S. ___, 130 S. Ct. 1473 (2010), the Supreme Court held that defense counsel's failure to provide accurate advise about the risk a conviction would carry for him to be deported was facially sufficient evidence of deficient performance.[21]   Padilla, a lawful permanent resident charged with drug-related offenses accepted a plea bargain after his attorney advised him that he would not be deported because he had been in the United States for a long time. *Id.*, 130 S. Ct. at 1478.  In fact the plea made deportation "virtually mandatory."  *Ibid*.  In state post-conviction proceedings, Padilla claimed he would have insisted on going to trial if he had known the truth.  *Ibid.*  The state court summarily, but with explanation, held Padilla failed to state a claim under the performance prong of *Strickland* because defense counsel had no duty to advise him about what it considered a collateral consequence of conviction.  *Ibid.*; *id.* 130 S. Ct. at 1481.  The Supreme Court granted *certiorari* "to decide whether, as a matter of federal law, Padilla's counsel had an obligation to advise him that the offense to which he was pleading guilty would result in his removal from this country."  *Id*. at 1479.  It held that *Strickland* applied, *id.* at 1482, and that Padilla's counsel's performance had been unreasonable under prevailing professional norms.  *Id.* at 1482-83.

Apart from a discussion of immigration law, the Court's reasoning was straightforward.  It did not matter whether deportation was a collateral consequence of conviction, what mattered were (1) the ABA Standards and those of other treatises and bar organizations, *id.* at 1482-83; (2)  the importance to Padilla of what he faced, *id.* at 1483; and (3) that the law was clear that Padilla would

---

[21]   The Supreme Court has repeatedly relied upon its own recent decisions applying *Strickland* when assessing whether an earlier state court decision satisfied § 2254(d).  *See, e.g.*, *Porter v. McCollum*, 558 U.S. ___, 130 S. Ct. 447, 452-53 (2009) (citing *Williams v. Taylor*, 529 U.S. 362, 396 (2000), and *Wiggins v. Smith*, 539 U.S. 510, 524 (2003));  *Bobby v. Van Hook*, 558 U.S. ___, 130 S. Ct. 13, 17 (2009) (*per curiam*) (citing *Wiggins*); *id.* at 18 (citing *Williams*, 529 U.S. at 395; *Rompilla v. Beard*, 545 U.S. 374, 387 (2005) (citing *Wiggins*).

face some consequences to his immigration status, *id.* at 1483.  Based on that alone, the Court held:

> Accepting his allegations as true, Padilla has sufficiently alleged constitutional deficiency to satisfy the first prong of *Strickland*. Whether Padilla is entitled to relief on his claim will depend on whether he can satisfy *Strickland*'s second prong, prejudice, a matter we leave to the Kentucky courts to consider in the first instance.

*Id.* at 1483-84.  *See also id.* at 1486-87 ("Taking as true the basis for his motion for postconviction relief, we have *little difficulty* concluding that Padilla has sufficiently alleged that his counsel was constitutionally deficient.  Whether Padilla is entitled to relief will depend on whether he can demonstrate prejudice as a result thereof, a question we do not reach because it was not passed on below.") (emphasis added).

In *Terry Williams*, *supra*, the Court illustrated the meaning of § 2254(d)(1)'s "contrary to" clause with the example of a state court "reject[ing] a prisoner's claim of ineffective assistance counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different," as opposed to *Strickland*'s reasonable-probability standard.  529 U.S. at 405-06.

### 3. Application of State-law Standards to Federal Claims.

§ 2254(d) applies only to claims that were adjudicated on the merits, that is, their merits under the applicable *federal* law.  *Pinholster*, 131 S. Ct. at 1399-1400 (distinguishing case where federal claims was procedurally defaulted such that § 2254(d) did not apply); *Richter*, 131 S. Ct. at 784.  As the Supreme Court recently restated,

> When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.  *Cf. Harris v. Reed*, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis).  [¶]  The presumption may be overcome

when there is reason to think some other explanation for the state court's decision is more likely.  *See*, *e.g.*, *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).

*Richter*, 131 S. Ct. at 785-86.


### D. Constitutional and Equitable Issues Related to the Application of §2254(d).

### 1. Constitutional Questions.

#### A.  AEDPA's Origin and Aftermath.

The AEDPA statute's meaning and application continues to confound courts.  The Supreme Court has found that "in a world of silk purses and pigs' ears, the Act is not a silk purse of the art of statutory drafting."  *Lindh v. Murphy*, 521 U.S. 320, 335 (1997).

The partisan opportunism that gave birth to AEDPA helps explain why a statute that attempts to constrain both the constitutionally protected writ of habeas corpus and the independence of federal judges has led to what scholars have described as "chaos,"[22] an "intellectual disaster area,"[23] "a charade,"[24] and "so unworkable and perverse that reformers should feel no hesitation about scrapping large chunks of it."[25]  One of AEDPA's chief sponsors declared that under it "things have

---

[22]  Larry W. Yackle, *State Convicts and Federal Courts: Reopening the Habeas Corpus Debate*, 91 Cornell L. Rev. 541, 542, 553 (2006).

[23]  Yackle, 91 Cornell  L. Rev. at 553 (quoting Larry W. Yackle, *The Figure in the Carpet*, 78 Tex. L. Rev. 1731, 1756 (2000)).

[24]  Joseph L. Hoffmann & Nancy J. King, *Rethinking the Federal Role in State Criminal Justice,* 84 N.Y.U. L. Rev. 791, 816 (2009).

[25]  Andrew Hammel, *Diabolical Federalism: A Functional Critique and Proposed Reconstruction of Death Penalty Federal Habeas*, 39 Am. Crim. L. Rev. 1, 42 (2002).

gotten worse, not better."[26]

The Supreme Court repeatedly has had to "resist[] an interpretation of the statute that would produce troublesome results, create procedural anomalies, and close our doors to a class of habeas petitioners seeking review without any clear indication that such was Congress' intent." *Panetti*, 551 U.S. at 946 (internal quotation marks and citations omitted). While it is settled that a court should not recognize the progenitors of a bill as authorities on the meaning of an act, *Graham County Soil and Water Conservation Dist. v. U.S. ex rel. Wilson*, 130 S. Ct. 1396, 1408-09 & n.17 (2010) (refusing to consider letter by statute's drafters purporting to clarify statute's meaning), AEDPA's origins explain the need to exercise care in applying the act to avoid perverse, inequitable or unconstitutional results.[27]

## 2. Avoiding an Unconstitutional Interpretation.

The Supreme Court interprets § 2254(d) in the context of other provisions of § 2254 and the habeas corpus law that preceded AEDPA. *Pinholster*, 131 S. Ct. at 1399-1400; *Michael Williams*, 529 U.S. at 432-33; *Terry Williams*, 529 U.S. at 408-12; *Felker v. Turpin*, 518 U.S. 651, 658-61 (1996). By doing so, the Court finds § 2254(d) represents "Congress' intent to channel prisoners' claims first to the state courts." *Pinholster*, 131 S. Ct. at 1398-99. Section 2254(d), like most other

---

[26] Marcia Coyle, *Congress Looks at More Limits on Habeas*, Nat'l L.J., July 25, 2005, at 18 (quoting Sen. Jon Kyl R-AZ)).

[27] *See*, *e.g.*, *Holland v. Florida*, 560 U.S. ___, 130 S. Ct. 2549, 2568 (2010) (Alito, J., concurring) (rejecting State's "perverse" argument that petitioner should have been heard only through attorney who abandoned him); *Panetti*, *supra*, 551 U.S. at 943 (quoting *Stewart v. Martinez-Villareal*, 523 U.S. 637, 644 (1998), for proposition that State's interpretation of § 2244(b) would lead to "'far reaching and seemingly perverse'" result of executing incompetent inmate because he could not raise unripe claim); *cf.* Brief of California Attorney General as *amicus curiae* in *Martinez-Villareal*, 1997 WL 744599 (arguing Congress properly withdrew federal courts' jurisdiction to prevent wrongful execution of incompetent person).

modifications of federal habeas law that date from the 1970s forward, is animated by concerns over comity, finality and federalism. *Id.* at 1401 (citing earlier cases).

The concern over comity was most dramatically expressed by Justice Jackson in his concurring opinion in *Brown v. Allen*, 344 U.S. 443, 536-40 (1953). More commonly, comity has been described as an effort to avoid results that "would be unseemly in our dual system of government" because the state courts did not first have the opportunity to correct alleged errors. *Duckworth v. Serrano*, 454 U.S. 1, 4 (1981). Concern over comity was not to be found in the habeas statutes that existed from 1867 through 1965. Yet it gained sway over the express Congressional intent that federal courts ensure that no one is in state custody pursuant to a judgment that violated the Constitution, *Fay v. Noia*, 372 U.S. 391, 424 (1963), when the Court began to rely on the Supremacy Clause's demand that federal law be supreme in state courts. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 259 (1973) (Powell, J., concurring) ("It is the sworn duty of these [state] courts, no less than federal ones, to safeguard personal liberties and consider federal claims in accord with federal law."). Therein lies a tension between the political or diplomatic concern over federal-state relations and the equally real concern that state courts do not always respect federal law. *Cf. Walker v. Martin*, 131 S. Ct. 1120, 1130 (2011)(state rule that is applied so as to discriminate against federal claims will not be applied to bar federal habeas review).

Before AEDPA, the Supreme Court endeavored to bring these two poles closer together by respecting state procedural rules, *Wainwright v. Sykes*, 433 U.S. 72 (1977), preventing novel constitutional rules of criminal procedure from upsetting state court judgments that became final before their expression, *Teague v. Lane*, 489 U.S. 288 (1992), and ratcheting up the exhaustion requirement, *Rose v. Lundy*, 455 U.S. 509 (1982). That the Court recognized the tension between

-64-

constitutional-rights enforcement and friendly relations with state courts can be seen in *Rose*'s express desire that "state courts may become increasingly familiar with and hospitable toward federal constitutional issues." *Rose*, 455 U.S. at 519, citing *Braden v. 30th Judicial Circuit Court of Kentucky*, 410 U.S. 484, 490-91 (1973). It can also be seen in the Supreme Court's insistence that federal habeas courts not defer to state court decisions concerning federal law or on mixed questions of law and fact. *See*, *e.g.*, *Strickland v. Washington*, 466 U.S. 668, 689 (1984). Against this historical backdrop it is easy to see how the interpretation and application of § 2254(d) to individual cases pushes the limits of the Supremacy Clause and Congress's power to control the decisions of federal courts on matters of constitutional law. *See O'Brien v. Dubois*, 145 F.3d 16, 21 (3rd Cir. 1998); *Terry Williams*, 529 U.S. at 387 n.13 (Stevens, J., concurring).

It is a historical fact that pique, racism, and local chauvinism have motivated state courts (and sometimes federal courts) to use local practice or belief to frustrate efforts to enforce federal constitutional rights. Examples abound in the Supreme Court's habeas jurisprudence, including cases applying AEDPA, and in the development of other federal civil rights laws. *See*, *e.g.*, *Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007) (overturning AEDPA § 2254(d) decision based on so-called "Texas nexus" requirement for mitigation which had "no foundation in the decisions of this Court"); *Tennard v. Dretke*, 542 U.S. 274, 284 (2007) (same); *Smith v. Texas*, 550 U.S. 297 (2007) (reviewing Texas death sentence for second time because state court applied procedural bar after Supreme Court held petitioner was entitled to relief on merits in *Smith v. Texas*, 543 U.S. 37 (2004)); *Miller-el v. Dretke*, 545 U.S. 231 (2005) (overturning AEDPA § 2254(d) decision that failed to account for racial discrimination in jury selection and that had adopted dissenting opinion from *Miller-el v. Cockrell*, 537 U.S. 322 (2003)); *Ford v. Georgia*, 489 U.S. 411 (1991) (overturning

state court decision that applied procedural bar to claim raised under *Batson v. Kentucky*, 476 U.S. 79 (1991), where procedural rule had not existed previously); *James v. Kentucky*, 466 U.S. 341 (1984) (rejecting application of state procedural rule that placed form over substance of petitioner's federal law claim based on *Carter v. Kentucky*, 450 U.S. 288 (1981)); *Henry v. Mississippi*, 379 U.S. 443, 448-49 (1965) (rejecting state procedural bar to federal claim where application of bar served no legitimate state interest); *Barr v. City of Columbia*, 378 U.S. 146 (1964) (rejecting apparently discriminatory application of state procedural rule to defeat federal claim); *Wright v. Georgia*, 373 U.S. 284, 290-91 (1963) (same); *Staub v. City of Baxley*, 355 U.S. 313 (1958) (same) ; *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958) (rejecting application of state procedural rule applied in manner to frustrate review of federal claim).  Recognizing that these things happen, the Supreme Court announced a rule that "the assertion of Federal rights, when plainly and reasonably made, is not to be defeated under the name of local practice." *Davis v. Wechsler*, 263 U.S. 22, 24 (1923).

In order for § 2254(d) to be constitutional as applied to a state court's judgments, the state courts to which AEDPA channels the presentation of federal constitutional claims must be worthy of the presumption that they hold federal law supreme.  As to some claims, Mr.  Barbee demonstrates that the decision in several claims was based on factual holdings or factual interpretations and/or state law presumptions and interpretations that are inconsistent with the federal law governing his claims.  Were this Court to defer to the CCA's rulings on federal claims on state habeas review, § 2254(d) would be unconstitutional as so applied.

When interpreting or imposing habeas reforms, the Supreme Court has frequently noted the costs associated with habeas review, with some justices going so far as to say there is no social

benefit to federal courts acting as a safeguard against States' failure to give defendants fair trials. *E.g.*, *Teague*, *supra*, 489 U.S. at 389-90; *Mackey v. United States*, 401 U.S. 667, 691 (1971) (Harlan, J., concurring in judgment in part and dissenting in part). These cases reflect the concern that the "relitigation" of claims in federal court "'must inevitably lead to the impairment of the public confidence in our judicial institutions.'" *Brown v. Allen*, 344 U.S. 443, 539 n.13 (1953) (Jackson, J., concurring) (quoting Conference of Chief Justices-1952, 25 State Government, No. 11, p. 249 (Nov. 1952)).

Empirical evidence challenges the Supreme Court's assumptions about the costs and benefits of federal habeas review. Researchers have found that public confidence in the judicial system is *enhanced* by review mechanisms. *See*, *e.g.*, Tom R. Tyler, *Why People Obey the Law* (Princeton U. Press 2006); Tom R. Tyler, *Procedural Justice, Legitimacy, and the Effective Rule of Law*, 30 Crime & Just. 283 (2003); Tom R. Tyler and Yuen J. Huo, *Trust in the Law: Encouraging Public Cooperation with the Police and Courts* (Russell Sage Foundation 1992). The evidence will show that "the procedural justice of experience determines its impact on views about the legitimacy of authority." *Why People Obey the Law* 172. In the present context this means, contrary to the Supreme Court's assumptions, it is the fullness and fairness of the process, not the results, that determines people's confidence in the judicial system. *Trust in the Law* 5, *id.* at 93 ("courts can encourage a more favorable orientation towards the law by exercising procedural fairness"); Tom Tyler & Jeffrey Fagan, *Legitimacy and Cooperation: Why Do People Help the Police Fight Crime in Their Communities?*, 6 Ohio St. J. Crim. L. 231, 240 (2008). Courts lose legitimacy when they do not provide fair mechanisms for reviewing decisions and correcting incorrect or unfair results. *Why People Obey the Law* 119. Where state courts in particular do a poor job of considering

people's rights through full and fair procedures, confidence in them goes down. *Trust in the Law* 192-95.

Specifically, confidence and legitimacy are harmed when courts do not appear to listen to claims, are not respectful of them, are not transparent, when they do not subject themselves to review by others, and when they do not follow their own rules. *Trust in the Law* 53-57. Consistency – the like treatment of similarly situated people – also weighs heavily in people's perception of judicial legitimacy. *Why People Obey the Law* 119. Studies conducted by these scientists find that when judicial procedures lack these qualities, people become less willing to cooperate in the legal process and even become less likely to obey the law themselves.[28]

*Pinholster*'s holding that 2254(d) review must look back at what the state court knew and did illustrates how AEDPA codified the model for federal habeas review championed by Professor Paul Bator. The principle that federal habeas review should not be available where state courts afforded prisoners a full and fair process for hearing and adjudicating federal claims was set forth in his article, *Finality in Criminal Law and Federal Habeas Corpus for State Prisoners*, 76 Harv.

---

[28] As the chief critics of the literature cited here have said,

> Tyler has argued persuasively that law's legitimacy (or at least a perception of it) is critical to a well-functioning criminal justice system and to public safety more generally. Specifically, effective crime control depends on volitional deference to substantive law and to its enforcement and adjudication. And, significantly, perceptions of procedural fairness may well facilitate such deference. *The importance of the legitimacy project cannot, therefore, be oversold.*

Josh Bowers & Paul H. Robinson, *Perceptions of Fairness and Justice: The Shared Aims and Occasional Conflicts of Legitimacy and Moral Credibility* 4, U. Penn. Pub. L. & Legal Theory Research Paper No. 11-13, available at http://ssrn.com/abstract=1814006 (emphasis added).

L. Rev. 441 (1963), which has been influential, although also a source of controversy.[29]

Professor Bator observed that the Constitution itself requires that federal habeas courts in certain circumstances be available not only to review, but effectively correct, violations of law that were inadequately reviewed in state court.

> It is, after all, the essence of the responsibility of the states under the due process clause to furnish a criminal defendant with a full and fair opportunity to make his defense and litigate his case: the state must provide a reasoned method of inquiry into relevant questions of fact and law (including, of course, all federal issues applicable to the case). If a state, then, fails in fact to do so, the due process clause itself demands that its conclusions of fact or law should not be respected: the prisoner's detention can be seen as unlawful, not because error was made as to a substantive federal question fairly litigated by the state tribunals, but because the totality of state procedures did not furnish the prisoner with a fair chance to litigate his case.

Bator, *Finality*, 76 Harv. L. Rev. at 456-57.  Even under the most conservative view of federal habeas review,  a "state appellate court's perfunctory treatment of the [federal] question . . . amounting to nothing more than reliance on the presumptive validity of the trial, was not in fact acceptable corrective process and federal habeas would therefore lie to consider the merits of the claim." *Fay v. Noia*, 372 U.S. 391, 457-58 (1963) (Harlan, J., dissenting).  AEDPA manifestly does not require a petitioner to prove his due process rights were violated before federal courts do not

---

[29]  *See, e.g.*, *Danforth v. Minnesota*, 552 U.S. 264, 272 n.6 (2008) (citing Bator as explanation for habeas jurisprudence development since the mid-Twentieth Century); *Calderon v. Thompson*, 523 U.S. 538, 555 (1998) (quoting Bator on importance of finality); *Custis v. United States*, 511 U.S. 485, 509 (1994) (Souter, J., dissenting) (citing Bator as evidence that majority,  led by Rehnquist, C.J., lost its way); *Wright v. West*, 505 U.S. 277, 285-86 & n.3 (1992) (opn. Thomas, J.) (citing Bator in dispute with Justice O'Connor); *McCleskey v. Zant*, 499 U.S. 467, 478 (1991) (citing Bator on history of federal habeas expansion during and after Reconstruction); Id. at 492 (citing Bator on philosophical justification for prizing finality); *id.* at 518 (Marshall, J., dissenting) (contrasting Majority's view of Bator with Justice Frankfurter's objection that Court "'under the guise of fashioning a procedural rule . . . wipe out the practical efficacy of a jurisdiction conferred by Congress on the District Courts'") (quoting *Brown v. Allen*, 344 U.S. at 498-99 (opn. Frankfurter, J.) (alterations omitted); *Fay v. Noia*, 372 U.S. 391, 421 n.30 (1963); *id.* at 449 n.1 (Harlan, J., dissenting).

have to defer to a state-court adjudication and § 2254(d) must be distinguished from § 2254(b)(1)(B) which waives the exhaustion requirement where there is no effective state corrective process. Rather, § 2254(d) requires petitioners to show the process was either contrary to law or unreasonable.

Where Congress wanted to limit federal habeas corpus review to correcting unconstitutional interference with a state prisoner's ability to raise a claim, it did so by mentioning the Constitution. *E.g.*, 28 U.S.C. §§ 2244(d)(1)(B), 2264(a)(1).  The Supreme Court has held (a) that AEDPA's provisions must be read in relation to each other, *e.g.*, *Pinholster*, 131 S. Ct. at 1399-1400, and (b) that the exclusion of language from one section of AEDPA that is included elsewhere in the Act reflects an intention that the language not be applied out of context, *e.g.*, *Lindh v. Murphy*, 521 U.S. 320, 326-27 (1996).  *See also Pinholster*, 131 S. Ct. at 1400 n.7 ("omission of clarifying language from § 2254(d)(1) just as likely reflects Congress' belief that such language was unnecessary as it does anything else").  Courts interpreting other provisions of the federal habeas statute that reflect the process model have held their language does not require petitioners to show a due process violation before the state court process will be deemed inadequate for purposes of exhaustion. *Jackson v. Duckworth*, 112 F.3d 878, 881 (7th Cir.), *cert. denied*, 522 U.S. 955 (1997) (interpreting 28 U.S.C. § 2254(b)(1)(B)); *see also Young v. Ragen*, 337 U.S. 235, 238-39 (1949); *Harris v. Champion*, 15 F.3d 1538, 1554-57 (10th Cir. 1994); *Hollis v. Davis*, 941 F.2d 1471, 1473-75 (11th Cir. 1991), *cert. denied*, 503 U.S. 938 (1992); *Hawkins v. Fulcomer*, 941 F.2d 246, 250 (3d Cir. 1991); *Brooks v. Jones*. 875 F.2d 30, 31-32 (2d Cir. 1989).  Applying these holdings to the meaning of "unreasonable" in § 2254(d), indicates that a state court's process of adjudicating a claim need not rise to the level of due process violation or be completely ineffectual before a federal court will

move on to conduct de novo review of a claim.

However, Bator's criteria provide some insight into what is necessary for a reasonable adjudication of a federal constitutional claim. "[T]he state must provide a reasoned method of inquiry into relevant questions of fact and law (including, of course, all federal issues applicable to the case)." As reflected in *Pinholster* and elaborated more fully *infra*, the summary disposition to which many of Mr. Barbee's habeas claims were subjected as a result of the trial court signing off verbatim on prosecutor-prepared pleadings, findings and conclusions, without changing so much as a comma, was a limited method of inquiry in which there was no, or very little, judicial inquiry into either the facts or the law, either by the trial court or the CCA.

The Supremacy Clause, U.S. Const. art. VI, places limits on the power of States to impose rules that frustrate the enforcement of federal law in the state courts. *Brown v. Western Ry. of Alabama*, 338 U.S. 294 (1950). The circumstances of *Brown* are similar to the circumstances of this case. In *Brown*, the Georgia courts sustained a general demurrer to a claim raised under the Federal Employers' Liability Act on grounds that the complaint "failed to set forth a cause of action and is otherwise insufficient in law." 338 U.S. at 295 (internal quotation marks omitted). The state court reached its conclusion "by following a Georgia rule of practice to construe pleading allegations 'most strongly against the pleader.'" *Ibid.*

Where state law requires federal constitutional claims to be raised in a particular proceeding, as is the case here,

> Strict local rules of pleading cannot be used to impose unnecessary burdens upon rights of recovery authorized by federal laws. "Whatever springs the State may set for those who are endeavoring to assert rights that the State confers, the assertion of Federal rights, when plainly and reasonably made, is not to be defeated under the name of local practice." *Davis v. Wechsler*, 263 U.S. [22,] 24. *Cf. Maty v. Grasselli*

*Chemical Co.*, 303 U.S. 197, 58 S.Ct. 507, 82 L.Ed. 745.  Should this Court fail to protect federally created rights from dismissal because of over-exacting local requirements for meticulous pleadings, desirable uniformity in adjudication of federally created rights could not be achieved.

*Brown*, 338 U.S. at 298-99.[30]

In short, § 2254(d) must be interpreted to be consistent with the principle that federal rights may not be frustrated, burdened, limited or precluded by state procedural rules.  *See*, *e.g.*, *Felder*, 487 U.S. at 141 ("States may not apply such an outcome-determinative law when entertaining substantive federal rights in their courts").  State courts purporting to competently adjudicate a federal claim must adhere to the procedural obligations that accompany that federal claim.

Whether a federal claim was well-pleaded to the state court or procedurally defaulted is itself a federal question, which this Court must answer.  *See*, *e.g.*, *Carter v. Texas*, 177 U.S. 442, 447 (1900) ("question whether a right or privilege, claimed under the Constitution or laws of the United States was distinctly and sufficiently pleaded and brought to the notice of a state court, is itself a Federal question, in the decision of which this court, on writ of error, is not concluded by the view taken by the highest court of the state"); *Staub*, *supra*, 355 U.S. at 318 ("'Whether a pleading sets up a sufficient right of action or defense, grounded on the Constitution or laws of the United States, is necessarily a question of federal law and, where a case coming from a state court presents that question, this court must determine for itself the sufficiency of the allegations displaying the right or defense, and is not concluded by the view taken of them by the state court.'") (quoting *First*

---

[30]  *See also Ward v. Love County*, 253 U.S. 17, 22 (1920) ("if nonfederal grounds, plainly untenable, may be . . . put forward successfully, our power to review easily may be avoided" which "cannot be disregarded without neglecting or renouncing a jurisdiction conferred by law and designed to protect and maintain the supremacy of the Constitution and the laws made in pursuance thereof.")

*National Bank of Guthrie Center v. Anderson*, 269 U.S. 341, 346 (1926)).[31]

An interpretation of § 2254(d) that required federal courts to defer to novel state-court rules for applying the Constitution also would render the Act an unconstitutional encroachment upon the Judicial Power of Article III of the Constitution. "Interpretation of the law and the Constitution is the primary mission of the [federal] judiciary when it acts within the sphere of its authority to resolve a case or controversy. *Marbury v. Madison*, 1 Cranch 137, 177, 2 L.Ed. 60 (1803) ('It is emphatically the province and the duty of the judicial department to say what the law is')." *Legal Services Corp. v. Velazquez*, 531 U.S. 533, 545 (2001). "Congress cannot wrest the law from the Constitution which is its source. 'Those then who controvert the principle that the constitution is to be considered, in court, as a paramount law, are reduced to the necessity of maintaining that courts must close their eyes on the constitution, and see only the law.'" *Legal Services Corp.*, 531 U.S. at 545, quoting *Marbury*, 1 Cranch at 178.

The power granted under Article III to decide "all cases, in law and equity, arising under this Constitution," is the power "to inquire not only whether the right was denied in express terms, but also whether it was denied in substance and effect, as by putting forward non-federal grounds for decision that were without any fair or substantial support." *Ward v. Love County*, 253 U.S. 17, 22 (1920). Article III gives federal courts the power "not merely to rule on cases, but to *decide* them," which means that the "'judicial Power' is one to render dispositive judgments." *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218-19 (1995). As then-judge Kennedy put it, "If the essential, constitutional role is to be maintained, there must be both the appearance and the reality of control by Article III judges over the interpretation, declaration, and *application* of federal law."

---

[31] *See also*, *Davis v. Wechsler*, *supra*, 263 U.S. at 24; *Schuylkill Trust Co. v. Pennsylvania*, 296 U.S. 113, 122-123 (1935); *Lovell v. City of Griffin*, 303 U.S. 444, 450 (1938)

*Pacemaker Diagnostic Clinic of America, Inc. v. Instro-Medix*, 725 F.2d 537, 544 (9th Cir.) (*en banc*), *cert. denied*, 469 U.S. 824 (1984) (emphasis added).  Accordingly, Congress "cannot . . . indirectly control the *action* of the courts[] by requiring of them a construction of the law according to its own view," *Plaut*, 514 U.S. at 218 (emphasis added), and may not directly control the action of courts "by setting aside their judgments" or directing changed outcomes.  *Id.*, 514 U.S. at 225. To the extent § 2254(d) is read to require a federal court to act as though no constitutional violation occurred in the view of the federal court, the provision violates Article III and the separation-of-powers doctrine.

For analogous reasons, an interpretation of § 2254(d) that required uncritical deference to the CCA's rulings in this case would violate the Suspension Clause of Article I, § 9, cl. 2.  In *Boumediene v. Bush*, 553 U.S. 723, 128 S. Ct. 2229 (2008), the Court struck down a provision of the Military Commissions Act of 2006 on grounds that it denied petitioners access to the habeas *remedy* without providing "a constitutionally sufficient replacement for habeas corpus."  553 U.S. at 792.  The Court "h[eld] that when the judicial power to issue habeas corpus is properly invoked the judicial officer must have adequate authority to make a determination in light of the relevant law and facts and to formulate and issue appropriate orders for relief, including, if necessary, an order directing the prisoner's release."  *Id.* at 787.

Were § 2254(d) interpreted to prohibit this Court from ordering a new trial in this case, AEDPA would "effect an unconstitutional suspension of the writ."  *Id.* at 787.  However, because, the state court process and holdings were both contrary to and an unreasonable application of the clearly established law governing Mr. Barbee's claims, this Court need not hold the statute unconstitutional.  Consistent with *Boumediene*, this Court must provide a forum for *de novo* consideration of Mr. Barbee's federal constitutional claims.

**E. The Applicability of Section 2254(d) to Mr. Barbee's Case.**

**i. Basic principles  of determining the applicability of 2254(d).**

The United States Supreme Court's decision in *Williams v. Taylor*, 120 S. Ct. 1495 (2000), clarified in several ways the standard of review and the methodology to be employed by federal courts entertaining habeas corpus petitions pursuant to 28 U.S.C. §2254.[32]  Under *Williams*, the emphasis of the federal court's inquiry is on the nature and quality of the state court decision. Presented here is  an outline to assist this Court in  determining whether §2254(d)'s standard of review is applicable in this matter, and, if so, whether  the state court's decision denying relief on that claim is contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court.  Following this outline, the procedures are applied to the specifics of Mr. Barbee's case.

> **1.** **Did the last state court to which the claim was presented decide the claim on the merits, as opposed to disposing of the claim on one or more procedural grounds, or not addressing the claim at all?**

Here, the answer depends on when the state claims were denied: on direct appeal, in the first state habeas, or in the subsequent state habeas proceedings. All of the claims denied on direct appeal were, of course, denied on the merits.  *Barbee v. State,* No. AP-75,359 (Tex. Crim. App. December 10, 2008)(not designated for publication)(Exhibit 8).  Those were mainly claims of the insufficiency of the evidence and the failure to suppress the alleged confession.  As to the first round of state

---

[32]The Supreme Court's decision in *Williams* represents a considered rejection of the Fourth, Fifth, Seventh, and Eleventh Circuits' unduly deferential constructions of §2254(d)'s "unreasonable application" standard.  As the Ninth Circuit observed in an early post-*Williams* decision, by repudiating those circuits' subjective no-reasonable-jurist standard in favor of an "objective reasonableness" inquiry, "[t]he Supreme Court . . . chose to adopt the interpretation of AEDPA that espoused the more robust habeas review." *Van Tran v. Lindsey*, ___F.3d___, 2000 WL 622070 at *4 (9th Cir. May 16, 2000)

habeas proceedings, the state trial court adapted verbatim the State's proposed findings of fact and conclusions of law (Exhibit 14.) The CCA than adopted the "trial judge's [sic] findings and conclusions." *Ex parte Stephen Dale Barbee,* No. WR-71-071-01, at 2.[33]   (Exhibit 9.)   In the subsequent state habeas proceedings, all claims except Claim 2 were denied "as an abuse of the writ."   *Ex parte Stephen Dale Barbee,* No. WR-71,070-02, at 2. (Tex. Crim. App. May 8, 2013)(Exhibit 52.)

Thus, Section 2254(d), by its own express terms, does not govern any of the claims brought on only the subsequent state application except for Claim 2, and the federal court's review of those claims is *de novo.*[34]   Petitioner can easily overcome the state court's procedural ruling, *e.g.*, by demonstrating that the state rule applied by the state court was not consistently or regularly applied, *and*  by showing cause and prejudice *and* "that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. 722, 750 (1991).   Merits review of those claims by the federal court is *de novo.* Additionally, as to all claims of ineffective assistance of trial counsel, they qualify due to initial state habeas counsel's ineffectiveness, an exception to procedural default the Supreme Court has recognized in *Martinez v. Ryan,* 132 S. Ct. 1309 (2012)  and *Trevino v. Thaler,* 133 S. Ct. 1911 (2013), as discussed in the next section.

## 2.   Did the state court provide any explanation for its denial of relief on the merits, or was relief denied summarily?

If the state court did *not* provide any explanation for its denial of relief on the merits, then

---

[33]  This was incorrect as the trial judge made no findings and conclusions; they were made by his successor, Judge Sturns.

[34]  There are a few exceptions as to some claims that were brought in the initial state habeas proceedings, such as, but not limited to, Claims 3(a), 4(a), 4(b), 5(b), 5(c), 5(e), 5(f), 9, 10, 13, 15, and 19.  Claims 2 and 8 could not have been in initial state habeas proceedings and Claim 1 is not subject to procedural default.

*Williams* suggests §2254(d) should not govern the federal court's review of the claim. Without an explanation of what federal law the state court applied, and how it applied that law, the §2254(d) analysis exemplified in *Williams* is impossible. As we have seen, it appears that the claims raised on appeal and in the initial habeas application were denied on the merits but all claims except one raised in the subsequent state petition were denied on procedural grounds. Additionally, the trial court signed off verbatim on the State's proposed findings and conclusions, which meant that its own reasoning or explanations are not contained in the ruling. As to each claim, we will thus have to examine the State's proposed findings and conclusions to ascertain the rationale behind the CCA's denial which was based on those findings and conclusions.

> **3.** **Did the state court correctly identify and articulate the legal principles governing the claim?** *Williams*, 120 S. Ct. at 1519 ("A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases").

Answering this question requires a careful review  of  the state court's decision for indications that the state court: identified the wrong precedent; identified the correct precedent but misstated the rule of that precedent; misunderstood the rule established by governing precedent; incorrectly determined that the governing precedent had been modified; or made some other mistake in selecting or stating the governing federal rule. *See generally Williams*, 120 S .Ct. at 1512-1513, 1515 (explaining why state court's decision was objectively unreasonable).[35]  In Mr. Barbee's case,

---

[35]  Another, albeit pre-AEDPA, example of a case that would fit under the Court's "contrary to" analysis is *Stansbury v. California*, 511 U.S. 318 (1994). *Stansbury* held a police officer's subjective and undisclosed view that the person being interrogated was not a "suspect" was irrelevant to the determination whether the individual was "in custody" for *Miranda* purposes. The Court held that the California Supreme Court's analysis was "not consistent in all respects" with the Court's prior decisions which "make clear, in no uncertain terms, that any inquiry into whether the interrogating officers have focused their suspicions upon the individual . . .is not relevant. 511 U.S. at 326

only four federal cases were cited in the findings and conclusions adopted by the trial court (Exhibit 14) and the Texas Court of Criminal Appeals and most of the legal conclusions are largely based on state law. Thus, the amended standard of review under 2254(d) cannot apply.

A state-court decision can be "contrary to" controlling decisions of the U.S. Supreme Court, in the sense of misinterpreting the Supreme Court's precedents, even though the state court's reading of the relevant precedents is supported by a substantial number of other lower-court decisions, including a majority of the federal circuit court opinions on point.  This was the case in *Williams*, in which the Supreme Court  found any notion that *Lockhart v. Fretwell* clarified the *Strickland* standard of prejudice "contrary to" *Strickland* and *Fretwell*, notwithstanding the fact that nine federal circuits had read *Fretwell* as clarifying *Strickland*.

A state-court decision can be "contrary to" a decision of the U.S. Supreme Court, in the sense of misinterpreting the Supreme Court's decision, even though the state court's opinion is susceptible of the reading that this misinterpretation was only an alternative ground for its decision, and that it would have reached the same decision on a proper interpretation of Supreme Court precedent. For instance, the Virginia Supreme Court opinion under review in *Williams* twice stated explicitly that *Strickland* prejudice (a reasonable probability of a different result) had not been shown, *in addition to* invoking the mistaken notion that *Lockhart v. Fretwell* had clarified the *Strickland* standard. As Justice O'Connor explained, however, it was "impossible to determine . . . the extent to which the Virginia Supreme Court's error with respect to its reading of *Lockhart* affected its ultimate finding that Williams suffered no prejudice."  (68 USLW at 4278).  *Williams*, 120 S. Ct. at 1524 (O'Connor, J., concurring in grant of relief).

> **4.     Did the state court correctly apply the governing legal principles to the facts of the claim?**  *Williams*, 120 S. Ct. at 1521 ("a federal habeas court making the 'unreasonable application' inquiry should ask whether the state

-78-

court's application of clearly established federal law was objectively unreasonable"); *id.* at 1522 ("a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.   Rather, that application must also be unreasonable").

Answering this question also requires careful review of the state court's explanation for denying relief.   While *Williams* does not explain what elevated the state court's application of *Strickland v. Washington* in that case from "erroneous[] or incorrect[]" to "objectively unreasonable," the Court's discussion of the merits of Terry Williams' ineffective assistance claim does afford a few examples.

A failure  to consider all record facts legally relevant to the federal question, *Williams*, 120 S. Ct. at 1515;  or a failure  to recognize or appreciate the impact of legal principles made relevant, but not necessarily controlling, by the facts of the case, *see Williams*, 120 S. Ct. at 1516 ("Mitigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case") will mean that the amended 2254(d) does not apply.   In Mr. Barbee's case, only four federal legal precedents were discussed at all and the findings were mainly based on state law; hence the amended standard of review cannot apply.[36]

A state-court decision can be "objectively unreasonable" in finding that prejudice has not been established, or that a federal constitutional error is harmless, even though the evidence against the petitioner is quite compelling.   In *Williams*, the Virginia Supreme Court concluded that the mitigating evidence undeveloped by Williams' trial lawyer was inconsequential in the light of the overwhelming evidence in aggravation, a finding the U.S. Supreme Court subsequently determined to be objectively unreasonable.

---

[36]   *See* discussion, *supra.*

**ii. Application of these principles to Mr. Barbee's case.**

As discussed above, the purpose of the enaction of the AEDPA was to reward state courts for good faith interpretations of federal constitutional law. This is one of the prerequisites for the application of the new standards, and if the state court "adjudication" did not meet this threshold requirement, then there must be *de novo* federal review of a petitioner's constitutional claims. The various deficiencies of the state court findings, discussed below, mean that not only are they not entitled to any "deference" or "presumption of correctness" by this Court, but these deficiencies also preclude the imposition of the AEDPA standard of review to Mr. Barbee's case. Mr. Barbee's state court habeas proceedings utterly failed to meet the threshold requirements, as shown below.

**1)   The state court proceedings in this case do not qualify as an "adjudication on the merits" because they failed to adequately deal with his claims and their basis in federal law, and thus deprived Mr. Barbee of his federal due process rights and his right to an impartial and fair determination of his federal constitutional challenges to his conviction and death sentence.**

In Mr. Barbee's case, the state habeas process was unequivocally deficient, as will be discussed in more detail in this section. Rather than carefully considering the facts and the applicable law and arriving at an independent judicial determination, the state trial court judge simply signed the district attorney's proposed findings of fact and conclusions of law, which was essentially the state's brief with a signature line for the judge. The Texas Court of Criminal Appeals also did not engage in substantive analysis of Petitioner's claims, and in a two page order, merely held that the recommendations of the trial court were supported by the record. Since it is hornbook law "that finding the facts is an important part of the judicial function and that the judge cannot surrender this function to counsel," C. Wright & A. Miller, Federal Practice and Procedure § 2578

(2d ed. 1995),[37] it is Petitioner's contention that the state court's rubber stamp adoption of the State's pleading, and the subsequent rubber stamp adoption of those recommendations by the Texas Court of Criminal Appeals, did not result in a qualifying "adjudication" for purposes of the application of the AEDPA. Another important deficiency is the failure of the state habeas court to hold an evidentiary hearing. Thus, there is no evidence at all of any independent consideration or adjudication of Mr. Barbee's state application at all by the State courts, unless one is to consider this sign-on-the-dotted-line charade an "adjudication." There were also other deficiencies in the state habeas procedures which buttress the conclusion that the state process does not qualify as an "adjudication" for the purposes of the AEDPA, as discussed in this section.

As discussed above, in deciding whether §2254(d) of the AEDPA applies, this Court must first determine whether or not Mr. Barbee's claims have been "adjudicated on the merits" by the state courts. If so, §2254(d) applies; if not, §2254(d) does not apply. A state court has adjudicated

---

[37] *See also Roberts v. Ross*, 344 F.2d 747, 751-52 (3rd Cir. 1965) (it is the judge who must "formulate and articulate his findings of fact and conclusions of law in the course of his consideration and determination of the case and as a part of his decision making process . . ."); *Shaw v. Martin*, 733 F.2d 304, 309, n.7 (4th Cir. 1984) ("The adoption of one party's proposed findings and conclusions is a practice with which we have expressed disapproval on a number of occasions"); *Berger v. Iron Workers Reinforced Rodmen Local 201*, 843 F.2d 1395, 1404 (D.C. Cir. 1988) (citing *Photo Elecs. Corp v. England*, 581 F.2d 772, 777 (9th Cir. 1978)) (when court adopts party's proposed findings wholesale, it raises possibility "that there was insufficient independent evaluation of the evidence and may cause the losing party to believe that his position has not been given the consideration it deserves"); *Andre v. Bendix Corp.*, 774 F.2d 786, 800 (7th Cir. 1985) (quoting *Flowers v. Crouch-Walker Corp.*, 552 F.2d 1277, 1284 (7th Cir. 1977)) ("the resulting findings are 'not the original product of a disinterested mind'"); Stephen B. Bright & Patrick J. Keenan, *Judges and the Politics of Death: Deciding Between the Bill of Rights and the Next Election in Capital Cases*, 75 Boston U. L.Rev. 759, 803-04 (1995) (Describing orders such as the one signed by the judge in petitioner's case as follows: "Such ghostwritten orders are not the impartial findings of disinterested judges, but rather the briefs of advocates, containing one-sided, exaggerated 'findings' that prosecutors have tailored for strategic advantage on appeal and in post-conviction review").

a federal claim on the merits when its disposition of the claim reveals a basis in federal law with sufficient clarity so that the federal habeas court can ascertain it. This, as examined herein, is both the necessary and sufficient condition for according a state-court adjudication the respect which subsections 2254(d)(1) and (2) contemplate.

### 2) Federal constitutional law is not the main focus of the state habeas court's findings and conclusions.

A state court has adjudicated a federal claim on the merits when its disposition of the claim reveals a basis in federal law with sufficient clarity so that the federal habeas court can ascertain it. This, as examined herein, is both the necessary and sufficient condition for according a state-court adjudication the respect which subsections 2254(d)(1) and (2) contemplate. In the state habeas findings in Mr. Barbee's case, however, state law, not federal constitutional law, was the main bases for the decision.[38] Despite the fact that all of Petitioner's state claims were grounded in his federal constitutional rights, **the thirty-two-page state court findings only mention four federal cases.[39]**

Thus, the state habeas court never reached the federal constitutional basis of many of Mr. Barbee's claims. As such, the state habeas process cannot be considered an "adjudication on the merits" for purposes of § 2254(d), and the AEDPA does not apply.

It has frequently been held that when the state court does not reach the federal constitutional questions presented, through denial of the claims based on state law, that the amended standard of review under the AEDPA does not apply. *See, e.g., Green v. Cain,* 1998 WL 259970, at *1 (E.D.

---

[38]   The State's Proposed Findings of Fact and Conclusions of Law adopted verbatim by the trial court   are <u>Exhibits 14</u> (first petition) and <u>Exhibit 54</u> (subsequent petition) herein;  the Order of the Texas Court of Criminal Appeals denying habeas relief is <u>Exhibit 9 </u>(first petition) and <u>Exhibit 52 </u>(subsequent petition).

[39]   Two of them are the generic cases of *Strickland v. Washington* and *Brady v. Maryland.  See* <u>Exhibit 14</u>.

La. May 19, 1998) ("since the state court relied on a state procedural (non-constitutional) bar, the Court is unable to review questions of fact or law under the amended AEDPA standards"); *Swann v. Taylor,* 1999 WL 92435, at *5 (4th Cir. Feb. 18, 1999), *cert. denied,* 119 S. Ct. 1591 (1999) (there was no state court adjudication of federal issue on merits within meaning of section 2254(d) because state court relied exclusively on state law and did not "mention or appear to apply the controlling federal precedent..., nor...cite or rely upon state precedents that, in turn, cite or rely upon [controlling federal precedent]"; *Smith v. Smith,* 1998 WL 764761, at *2 (6th Cir. Oct. 19, 1998) (ineffective assistance claims are "reviewed *de novo"* because state courts resolved claims on procedural grounds and never reached merits); *Trice v. Ward,* 196 F.3d 1151, 1166 n.5 (10th Cir. 1999) ("In disposing of Trice's arguments, the Court of Criminal Appeals did not cite any federal law, but looked only to state law.  Accordingly, it is questionable whether the standards of review set forth in §2254(d)(1) apply.  Assuming *arguendo* those standards do not apply, we proceed to review Trice's arguments *de novo.*").

### 3) Almost all of the claims in the subsequent petition were denied on state procedural grounds, not on the merits.

Adjudication "on the merits" is a prerequisite for the application of the new standard of review under the AEDPA.[40]  In both the initial and subsequent state habeas proceedings, the state habeas court and the Texas Court of Criminal Appeals adopted these prosecutor-produced findings verbatim, and they never did consider these claims on their own merits.

---

[40]   The AEDPA prescribes the following standard of review: [2254(d)] "An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was *adjudicated on the merits* in State court proceedings unless..."  (Emphasis added).  *See also Miller v. Johnson,* 200 F.3d 274, 281 (5th Cir. 2000); *Neal v. Puckett,* 286 F.3d 230, 235 (5th Cir. 2002) (*per curiam*) ("In the context of federal habeas proceedings, adjudication 'on the merits' is a term of art that refers to whether a court's disposition of the case was substantive as opposed to procedural.")

Thus, Mr. Barbee's federal constitutional claims have never been "adjudicated on the merits." This is a prerequisite to the application of 2254(d).

The Fifth Circuit has held that "section 2254(d) [amended under the AEDPA] **applies only to issues that have been adjudicated on the merits in state court.**" *Miller v. Johnson,* 200 F.3d 274, 281 (5th Cir. 2000). The Fifth Circuit in *Miller* also pointed out that "[r]eview is *de novo* when there has been no clear adjudication on the merits" *Id.,* at 281, n.4, citing *Nobles v. Johnson,* 127 F.3d 409, 416 (5th Cir. 1997). The court in *Miller* added that "[i]n the context of federal habeas proceedings, a resolution (or adjudication)  on the merits is a term of art that refers to whether a court's disposition of the case was substantive, as opposed to procedural." *Id.* at 281. As it is impossible to tell how these claims were denied, the standard of review under section 2254(d) does not apply.[41]

Since the passage of the AEDPA, numerous federal courts, including the Fifth Circuit have found the state decisional process  deficient, or have found that the state process did not amount to an "adjudication on the merits," and have refused to apply the Act. *See, e.g., Lockhart v. Johnson,* 104 F.3d 54, 57-58 (5th Cir.), *cert. denied,* 117 S. Ct. 2518 (1997) ("AEDPA's provision altering our standard of review, when the petitioner's claim has been adjudicated on the merits by a state court, has no application to this claim" because it was not presented to the state court and the Director has waived the  exhaustion  requirement"); *Fisher v. Texas,* 169 F.3d 295, 299-300 (5th Cir. 1999) (because state court's rejection of claim on procedural grounds was not "adjudication on the

---

[41] *See also Blankenship v. Johnson,* 106 F.3d 1202, 1204 (5th Cir.), *superseded,* 118 F.3d 312 (5th Cir. 1997) ("when faced with a silent or ambiguous state habeas decision, we 'look through' to the last clear state decision," and adopting additional rule that "[w]here, as here, there is no clear state decision, we determine, on a case-by-case basis, whether the adjudication was 'on the merits'").

merits"—notwithstanding that state court opinion contained footnote addressing merits as alternative ground of decision—state determination deserves no deference under section 2254(d)); *Jones v. Wood,* 114 F.3d 1002, 1013 (9th Cir. 1997) (holding that when a state court has made no findings of fact, "the district court's duty to ascertain the sufficiency of the evidence by engaging in a thorough review of the complete state court record is unaffected by the AEDPA"); *Baylor v. Estelle,* 94 F.3d 1321, 1325 (9th Cir. 1996) (stating that the district court's evidentiary hearing was the first chance that the petitioner had to develop the factual basis of his claim and therefore finding that it would be inappropriate to disregard the facts developed in the district court even in the light of AEDPA), *cert. denied,* 520 U.S. 1151, 117 S. Ct. 1329 (1997); *Tucker v. Prelesnik,* ____ F.3d ____, 1999 WL 374105 (6th Cir. June 10, 1999) ("Having reviewed the performance of trial counsel in Mr. Tucker's case, we are persuaded that the unreasonableness of the state courts' application of *Strickland* is not debatable among reasonable jurists"); *Moore v. Park,* 148 F.3d 705 (7th Cir. 1998) ("A prerequisite for applying [section 2254(d)] is that the state court adjudicated the issue before us on the merits. In this case, the state court denied Moore's petition because he failed to satisfy [a procedural rule]. Therefore, the state courts did not address Moore's sufficiency of the evidence argument on the merits, and the new standard of review in AEDPA does not apply"... The court addressed the merits of Moore's claims *de novo,* and granted relief); *Neeley v. Nagle,* 138 F.3d 917 (11th Cir. 1998), *cert. denied,* 119 S. Ct. 811 (1999) (The state court analyzed *Brady* material individually, and did not consider its collective effect; this approach is 'contrary to' clearly established federal law; therefore the court must independently consider the merits of Neeley's claim); *Jeffries v. Wood,* 114 F.3d 1484 (9th Cir. 1997) (The state court erred in requiring Jeffries to shoulder the burden of proof on prejudice on a juror misconduct issue; this was contrary to clearly established federal law as determined by the Supreme Court and it was based on an unreasonable

determination of the facts in light of the evidence presented in the state court proceedings, the AEDPA would not preclude the issuance of the writ of habeas corpus); *Hall v. Washington,* 106 F.3d 742 (7th Cir. 1997), *cert. denied,* 118 S. Ct. 264 (1997) (granting penalty phase relief in capital case on grounds that petitioner received ineffective assistance of counsel at sentencing phase because counsel failed to present readily available mitigating evidence, even though state judge to whom penalty phase was tried concluded during state post-conviction proceedings that had the mitigating evidence been presented to him, he still would have imposed death...the state court's finding that Hall's counsel provided effective assistance at sentencing 'involved an unreasonable application of clearly established Federal law' as determined by the supreme Court in *Strickland v. Washington*); *Childress v. Johnson*, 103 F.3d 1221 (5th Cir. 1997) (granting relief in noncapital case where the state courts entirely failed to apply the law pertaining to constructive denial of the right to counsel, which was 'contrary to'  or an unreasonable application of Supreme Court precedent); *Mata v. Johnson*, 99 F.3d 1261 (5th Cir. 1996), *vacated on other grounds,* 105 F.3d 209 (5th Cir. 1997) (it was unreasonable for the state court to hold that the exclusion of all eight African-American prospective jurors under an agreement between Mata and the State did not violate equal protection); *Dickerson v. Vaughn*, 90 F.3d 87 (3rd Cir. 1996) ("To the extent that the state Supreme Court appears to have adopted a per se rule that a defendant's facially incorrect responses during a plea colloquy bar claims for involuntariness, the holding is contrary to clearly established federal law as articulated in [*Blackledge v.*]  *Allison*, [431 U.S. 63 (1977)] and the other opinions we have cited"); *Weeks v. Angelone,* 176 F.3d 249, 258, 263  (4th Cir. 1999) ("When a petitioner has properly presented a claim to the state court but the state court has not adjudicated the claim on the merits, ...our review of questions of law and mixed questions of law and fact is de novo."); *id,* at n.32 ("In those instances in which the merits of a properly presented claim have not been addressed by the Supreme Court

of Virginia either on direct review or in state habeas proceedings, the claim is reviewed de novo”);

*Lakin v. Stine,* 44 F. Supp.2d 897 (E.D.Mich. 1999) (“The waiver of counsel did not comply with

the requirements of *Faretta v. California,* 422 U.S. 806 (1975). The failure of the state to provide

counsel was exacerbated by compelling Mr. Lakin to represent himself.”  Applying § 2254(d), the

court grants habeas relief.”); *Spicer v. Warden,* 31 F.Supp.2d 509 (D.Md. 1998) (District court

applies § 2254(d), as amended by the AEDPA, and concludes that the “decision of the State post-

conviction courts involved an unreasonable application of clearly established Supreme Court law

and an unreasonable determination of the facts in light of the evidence presented.  Accordingly, the

writ of habeas corpus will issue.”);  *Atley v. Ault,* 21 F.Supp2d 949 (S.D.Iowa 1998) (“This court

is compelled to find the majority opinion of the Iowa Supreme Court an unreasonable application

of clearly established federal law, as established by the Supreme Court of the United States.  The

Iowa Supreme Court failed to require the constitutionally mandated inquiry by the trial court and

also failed to require the substitution of counsel free from the constitutionally prohibited constraints

of a conflict of interest...”).

Therefore, as to many claims, there has been no “adjudication on the merits,”  a prerequisite

to the application of the amended standard of review under the AEDPA.


**4) Except as to Claim 2, there was no evidentiary hearing in state court.**

In the first round of state habeas proceedings, the state habeas court denied Petitioner’s

request for an evidentiary hearing when it adopted verbatim the prosecutor-prepared order “finding”

that there were no previously uncontroverted issues of fact.  (Exhibits 14, 15.) This also shows that

there has been no “adjudication on the merits” sufficient for the application of the revised standard

of review under the AEDPA.   This deficiency also entitles Petitioner to a federal court evidentiary hearing.   *See, e.g.,  Glock v. Singletary,* 84 F.3d 385, 386 (11th Cir.), *cert. denied,* 117 S. Ct. 616 (1996) (petitioner entitled to evidentiary hearing because claim not meritless on its face and has "heretofore been resolved on the record, without an evidentiary hearing" in either state or federal court); *Perillo v. Johnson,* 79 F.3d 441, 444-45 (5th Cir. 1996) (petitioner entitled to federal evidentiary hearing because state court proceedings did not include hearing on factual questions that could be dispositive in resolving claim of conflict of interest by trial counsel); *Bouchillon v. Collins,* 907 F.2d 589 (5th Cir. 1990) (because state trial court did not hold hearing on competence to stand trial, relying instead on statements of trial counsel and trial judge's own observations, federal hearing required).

On November 6, 2008, less than ten days after the prosecutor's answer was filed,  the trial court signed off verbatim on the prosecutor's "Proposed Findings of Fact and Conclusions of Law." (Exhibits 14,  15.) In the subsequent writ application, a hearing was granted only as to Claim 2.

### 5) In both rounds of state habeas proceedings, the state court findings and conclusions were adopted verbatim from the State's proposed findings and conclusions.

The trial court's actions and those of the Texas Court of Criminal Appeals in this case violated the basic principles of an adversary system and deprived Mr. Barbee of the independent, impartial review which is the bedrock of our judicial system.  The Findings and Recommendations entered by the state trial court (and the affirmation of those recommendations in a summary order by the Texas Court of Criminal Appeals) contain no original fact-findings, but simply adopt the State's responsive pleadings ("Respondent's  Proposed Findings of Fact, Conclusions of Law, and

Order ) as the trial court's own.  (*See* Exhibits 14 and 15.) The district attorney prepared the proposed findings and conclusions of the trial court, and the trial court then adopted the "State's Proposed Findings of Fact and Conclusions of Law" as its own, without even changing a comma. The CCA than adopted the "trial judge's [sic] findings and conclusions." *Ex parte Stephen Dale Barbee,* No. WR-71-071-01, at 2.  (Exhibit 9.)

The same procedure was followed in the subsequent habeas application (most of the claims considered herein), with the exception that a hearing was ordered on one claim.   After the evidentiary hearing (Exhibits 49, 50 and 51, transcripts of the hearing and exhibits introduced), relief on Claim 2 was ultimately denied "[b]ased upon the trial court's findings and conclusions and our own review" and the other claims, Claims 1 and 3 through 21 were also dismissed "as an abuse of the writ" because those allegations "do not satisfy the requirements of Article 11.071 Section 5." *Ex parte Stephen Dale Barbee,* No. WR-71,070-02, at 2. (Tex. Crim. App. May 8, 2013)(Exhibit 52.)    This one-sided process denied Mr. Barbee of his federal due process rights and  his right  to an impartial and fair determination of his constitutional challenges to his conviction and death sentence.  Disregard for fair process and impartial judicial review in any degree is of no small moment and should not go uncorrected, particularly in a death penalty case.  But the gravity of the violations in this case have implications extending far beyond Mr. Barbee.   When prosecutors and judges are allowed to treat post-conviction applications for habeas corpus relief in the manner in which Mr. Barbee's  application was treated, the judge's role becomes indistinguishable from the prosecutor's, nullifying the statutory provisions for collateral review of constitutional violations in criminal trials.

The very practice implicated here, a court's routine and wholesale adoption of the

prosecutor's proposed order, has been roundly -- and rightly --- condemned as a brazen denial of due process and an engine for producing unreliable results.  Countless courts have strongly criticized the practice of adopting verbatim the findings of fact and conclusions of law proposed by one litigant. *See, e.g., Anderson v. City of Bessemer*, 470 U.S. 564, 572 (1985) (criticizing courts for "verbatim adoption of findings of fact prepared by prevailing parties," citing, *e.g., United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 656-657 (1964); *United States v. Marine Bancorporation Inc.*, 418 U.S. 602, 615 n.13 (1974)); *FMC Corp. v. Varco Internat'l*, 677 F.2d 500, 501 n.2 (5th Cir. 1982) ("We have consistently expressed our disapproval of the practice of unconditionally adopting findings submitted by one of the parties to a litigation."); *Cuthbertson v. Biggers Bros., Inc.,* 702 F.2d 454, 458-59 (4th Cir. 1984) (and cases cited therein); *Ramey Construction Co. v. Apache Tribe*, 616 F.2d 464, 466-69 (10th Cir. 1980); *Tyler v. Swenson*, 427 F.2d 412 (8th Cir. 1970); *Holbrook v. Institutional Insurance Co.*, 369 F.2d 236 (7th Cir. 1966); *Roberts v. Ross,* 344 F.2d 747, 750-752 (3rd Cir. 1965); *Phillips v. Phillips*, 464 P.2d 876, 878 (Colo. 1970); *Kentucky Milk Marketing & Anti-Monopoly Com. v, Borden Co.,* 456 S.W.2d 831, 834-35 (Ky. 1969); *Krupp v. Krupp*, 236 A.2d 653 (Vt. 1967); *Nashville , C. & S. L. Ry. v. Price*, 148 S.W. 219 (Tenn. 1911); *see generally* Judge Skelly Wright, The Non-Jury Trial -- Preparing Findings of Facts, Conclusions of Law and Opinions, Seminars for Newly Appointed Federal Judges, at 166 (1963); Judge Gunnar Norbye, Improvements in Statements of Findings of Fact and Conclusions of Law, 1 F.R.D. 25, 30 (1940); Henry Monaghan, Constitutional Fact Review, 86 Colum. L. Rev. 229, 272 (1986); Annotation, Propriety and Effect of Trial Court's Adoption of Findings Prepared by Prevailing Party, 54 A.L.R.3rd 868 (& Supp.) (collecting state cases).

An especially cogent discussion of why such verbatim adoptions of party-prepared findings

and conclusions are improper is found in *Roberts v. Ross*, 344 F.2d 747 (3rd Cir. 1965).  The case

merits extensive quotation:

> [W]e have observed in this case and in a number of others which have been brought here
> from the district court for review that the judge of the court has followed the practice of
> announcing his decision for the plaintiff or the defendant substantially in the form of a
> general verdict, either in a written order or by communication to counsel, and of thereupon
> directing counsel for the prevailing party to prepare and submit findings of fact, conclusions
> of law and a form of judgment.  The trial judge's order has not been accompanied by an
> opinion setting out, even summarily, the facts and legal conclusions which have brought him
> to his decision.  Obviously the judge must have dealt with the questions of fact and law
> involved in the case in the course of the reasoning by which he has reached his ultimate
> conclusion, even though his reasoning has not been articulated and put on paper.  But
> counsel who is called upon to articulate and write out the findings and conclusions must do
> so without any knowledge of the fact findings and reasoning processes through which the
> judge has actually gone in reaching his decision.
> *Id.* at 751.

The court went on:

> We strongly disapprove this practice.  For it not only imposes a well-nigh impossible task
> upon counsel but also flies in the face of the spirit and purpose, if not the letter, of Rule
> 52(a).[42]  The purpose of that rule is to require the trial judge to formulate and articulate his
> findings of fact and conclusions of law in the course of his consideration and determination
> of the case and as a part of his decision making process, so that he himself may be satisfied
> that he has dealt fully and properly with all the issues in the case before he decides it and so
> that the parties involved and this court on appeal may be fully informed as to the bases of
> his decision when it is made.  Findings and conclusions prepared ex post facto by counsel,
> even though signed by the judge, do not serve adequately the function contemplated by the
> rule.  At most they provide the judge with an opportunity to reconsider the bases of his
> original decision but without affording the parties any information as to what those bases
> were or which of them are being reconsidered.  At worst they are likely to convict the judge
> of error because, as here, they are inadequate to support his decision or because, as we have
> observed in other cases, they are loaded down with argumentative, over-detailed partisan
> matter much of which is likely to be of doubtful validity or even wholly without support in
> the record.
> *Id.* at 751-52.

---

[42]    While the analogous rule of the Texas Rules of Civil Procedure does not apply to state
habeas cases, the provisions found in Art. 11.071 of the Texas Rules of Criminal Procedure are
at least as clear, if not more so, in their requirement that the trial judge is responsible for
preparing any findings of fact, conclusions of law and recommendations

The court vacated the judgment and remanded for the trial court to make its own findings. *Id.* at 753.

After all, such a practice ultimately makes a mockery of the adversarial system of justice, whose proper functioning is the most essential principle informing our notions of what "process" is "due" under the Constitution. *See Faretta v. California*, 422 U.S. 806, 818 (1975) (the protections in the Bill of Rights are "basic to our adversary system of criminal justice [and thus] part of 'due process of law' [as] guaranteed by the Fourteenth Amendment"); *United States v. Thompson*, 827 F.2d 1254, 1261 (9th Cir.  1987) (adversary system serves the principles of due process).

The adversary system has been recognized as particularly critical to our system of criminal justice.[43]  *See Thompson*, 827 F.2d at 1258 ("The right of a criminal defendant to an adversarial proceeding is fundamental") (citations omitted); *see also Rock v. Arkansas*, 483 U.S. 44, 51 n.8 (1987).  Two key elements in such an adversarial system are the firm neutrality of an "unbiased judge," *cf. Johnson v. Mississippi*, 403 U.S. 212, 216 (1971), and the minimal requirements of procedural due process, namely, "notice and opportunity to be heard." *See, e.g., Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985).  Both fundamental requirements were subverted during Mr. Barbee's  post-conviction proceedings when the trial court adopted verbatim the district attorney's proposed findings and the Texas Court of Criminal Appeals summarily affirmed.    Thus, the state habeas proceeding in Mr. Barbee's case do not qualify as an "adjudication on the merits" for purposes  of §2254(d), and the AEDPA does not apply to this case.

---

[43]    Indeed, most of the fundamental protections afforded in criminal cases by the Bill of Rights indirectly or directly relate to the adversarial process.  *See* U.S. Const., Amendment V (Self-Incrimination Clause); Amendment VI (Impartial Jury Clause; Notice-of-Nature-and-Cause-and-Accusation Clause; Confrontation Clause; Compulsory Process Clause; Assistance of Counsel Clause).

## VI.

## PROCEDURAL DEFAULT, "CAUSE AND PREJUDICE," "FUNDAMENTAL MISCARRIAGE OF JUSTICE," AND THE IMPACT OF *MARTINEZ V. RYAN* AND *TREVINO V. THALER*..

As procedural default is an affirmative defense that must be pled by Respondent, Petitioner does not yet know whether or in what manner Respondent may assert any procedural defenses that may be available in this post-exhaustion amended petition. Therefore, this section is only a short overview of the foreseeable arguments that may be made by Respondent. A full discussion will be appropriate and possible only in Petitioner's Reply Brief, after Respondent has filed his Answer.

### A. Introduction.

Contrary to the holding of the CCA, Mr. Barbee met the standards for subsequent habeas corpus applications under Tex. Code Crim. Proc. Art. 11.071 § 5(a) as to claims other than Claim 2. That section provides as follows:

> If an initial application for a writ of habeas corpus is untimely or if a subsequent application is filed after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent or untimely initial application unless the application contains specific facts establishing that:
> (1) the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application;
> (2) by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt; or
> (3) by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues.
> Tex. Code Crim. Proc. art. 11.071 sec. 5(a)(1) and (2) and (3).

Questions of procedural default and cause and prejudice are not relevant until a federal court first determines that the state procedural rule relied upon for the default is adequate and independent.

*See Coleman v. Thompson*, 501 U.S. 722 (1991).

Petitioner presented facts and arguments to the CCA that provided the requisite "sufficient specific facts establishing" (art. 11.071, sec. 5 (a)) his claims that he is innocent of capital murder as shown by the above evidence. In other words, Petitioner presented to the CCA facts and argument that prove (1) "by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt," as required by art. 11.071 section 5(a)(2), *and* (2) "by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues that were submitted to the jury in the applicant's trial under Article 37.071 or 37.0711" as required by art. 11.071, section 5 (a)(3).

**B. The CCA's dismissal of Petitioner's subsequent petition pursuant to Art. 11.071 Sec. 5(a) does not deprive this Court of jurisdiction over those claims.**

As previously discussed, many of the claims presented herein by Mr. Barbee were first presented to the state courts in his subsequent state petition. The CCA's dismissal of that petition as "an abuse of the writ" does not deprive this Court of jurisdiction over those claims.

**i. "Adequate and independent" state grounds.**

A federal court reviewing the lawfulness of a habeas petitioner's custody should not reach the merits of a federal constitutional claim where a previous state court's decision relied upon an adequate and independent state law ground to deny relief. *Coleman v. Thompson,* 501 U.S. 722 (1991). While the adequate and independent state ground doctrine is jurisdictional in the context of direct review of state court judgments, in the habeas context, the doctrine is judicially created and "grounded in concerns of comity and federalism." *Id* at 730. The doctrine serves to "ensure[] that

the States' interest in correcting their own mistakes is respected in all federal habeas cases." *Id.* at 732.

### ii.  The *Long* Presumption.

To determine whether a state court's resolution of a claim is based on an adequate and independent state ground, a federal habeas court looks to the highest state reviewing court's decision disposing of the claim.   To preclude federal review, a reviewing court need only "clearly and expressly [indicate] that it is...based on bona fide separate, adequate, and independent [state law] grounds." *Michigan v. Long,* 463 U.S. 1032, 1041 (1983).   However, if the state court decision is ambiguous about the ground of decision–federal or state law–then a presumption applies that federal law was the basis of disposal and the federal court must review the claim:

> When...a state court decision fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion, we will accept as the most reasonable explanation that the state court decided the case the way it did because it believed that federal law required it to do so.
> *Long,* 463 U.S. at 1040-1041; *see also Harris v. Reed,* 489 U.S. 255, 257 (1989)(adopting

*Long* presumption in habeas corpus context); *Coleman v. Thompson,* 501 U.S. 722, 733 (1991)(reaffirming the *Long* presumption where state court ground of decision interwoven with federal law or primarily relied on federal law).

### iii.  State procedural rules that depend upon a predicate federal constitutional understanding are not independent.

When resolution of a state procedural question depends upon a predicate federal constitutional understanding, the state-law prong of the court's holding is not independent of federal law, and a federal court may address the merits of the claim.  *Ake v. Oklahoma,* 470 U.S. 68, 75 (1985); *Smith v. Texas,* 550 U.S. 297, 315 (2007)(a state court's predicate "error of federal law" in

resolving a state procedural question does not preclude federal review); *Delaware v. Prouse,* 440 U.S. 648, 652-653 (1979)(state court decision is not based on an independent state ground when the resolution of a state law question involves an interpretation of what federal law requires to state a claim for relief). Under these circumstances, the federal court may review the claim because "[i]f the state court misapprehended federal law, '[i]t should be freed to decide...these suits according to its own local law,'" and not under a mistaken interpretation of federal law. *Prouse,* 440 U.S. at 653 (quoting *Missouri ex rel. Southern R. Co. V. Mayfield,* 340 U.S. 1, 5 (1950)). *See also Long,* 463 U.S. at 1042 (*Long* presumption foreshadowed by *Prouse*).

### iv. The State Court decision in this case is interwoven with federal law and does not clearly and expressly indicate that it is based on an independent state law ground.

The *Long* presumption applies to the CCA's decision in this case because (1) it is interwoven with federal law; and (2) it does not clearly and expressly indicate that it is based on an independent state law ground.

Federal law is deeply interwoven both in the plain text of Section 5(a) and in the manner in which the CCA has recently interpreted and applied it. The text of sections 5(a)(2) and 5(a)(3), for example, both expressly invoke the federal question of whether a federal constitutional violation has been alleged. *See, e.g., Ex parte Blue,* 230 S.W.3d 151, 167-168 (Tex. Crim. App. 2007).

On its face, Section 5(a)(1) does not reference or incorporate substantive federal constitutional law. However, the CCA has made clear that the 5(a) determination is necessarily intertwined with federal law. *See Ex parte Campbell,* 226 S.W.3d 418 (Tex. Crim. App. 2007)("We have interpreted [the language of section 5] to mean that, to satisfy Art. 11.071, §5(a),...the specific facts alleged, if established, would constitute a constitutional violation that would likely require

relief from either the conviction or sentence.")

Thus, an applicant who wishes to raise a second or subsequent challenge to his capital murder conviction or sentence of death under Section 5 of Article 11.071 must allege not only the factual conditions which, as a matter of Texas law, permit a second or subsequent filing, but he must also allege facts which, if true, would establish a violation of the United States Constitution. *Id.; Ex parte Brooks,* 219 S.W.3d 396, 400 (Tex. Crim. App. 2007)("While Article 11.071, section 5(a)(1) does not state that the application must include facts establishing that the applicant has a prima facie *Atkins* claim, it would be absurd to consider applications in which the applicant does not show that the previously unavailable legal basis applies to his claim.')

### v. The CCA did not clearly and expressly indicate that its dismissal of Mr. Barbee's subsequent state application was based on a state law procedural component of Section 5(a).

Mr. Barbee's subsequent state habeas petition raised several claims of ineffective assistance of counsel and a claim of actual innocence based on new facts, as discussed *supra*.  To surmount the Section 5(a) threshold, he asserted that these claims relied on "new facts," that those facts were previously unavailable, and that he was actually innocent of the murders.  Thus, he asserted that he met the standards for subsequent applications under Sections 5(a)(1) through 5(a)(3).

The CCA's order dismissing all the claims in Mr. Barbee's subsequent application (except Claim 2) as an "abuse of the writ" (Exhibit 52) does not rest on an adequate and independent state ground because (1) as explained *supra,* the sections of the state statute upon which the CCA's dismissal relied incorporated and is interwoven with federal constitutional law (the merits of Mr. Barbee's federal constitutional claims, including his claim of actual innocence), raising the *Long* presumption; (2) the language of the dismissal does not unambiguously declare its independence

from federal law, leaving the *Long* presumption intact.

Thus, the CCA's decision dismissing Mr. Barbee's subsequent petition is not independent of, but intertwined with federal law. *Id.* 463 U.S. at 1040-1041, and this Court's jurisdiction is intact.

### C.  Petitioner has also established "cause and prejudice" for any alleged procedural default because his state post-conviction counsel was responsible for the default.

Mr. Barbee was denied meaningful access to courts and due process of law in state post-conviction proceedings by the failure of his state post-conviction attorney to render effective assistance in the initial state habeas proceedings.  As discussed in more detail *supra*, in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), the Supreme Court held that the ineffective assistance of post-conviction counsel can be cause for the procedural default of an ineffective assistance of trial counsel claim.  *Id.* at 1318. Recently,  *Martinez* was held to apply to Texas cases in  *Trevino v. Thaler.*

### i.  Mr. Barbee did not receive "competent" representation in state post-conviction proceedings.

Any "procedural default" suffered by Mr. Barbee  stems from the failure of his state habeas counsel to raise the issues in his initial state post-conviction application.  The result was that Mr. Barbee did not receive the "competent" representation to which he was entitled by Texas law.  Mr. Barbee's retained state habeas attorney, Mr. Don Verany, submitted an egregiously inadequate petition which  was a complete abdication of habeas counsel's duties.  It was only 29 pages long, of which only 12 pages were devoted to the claims and legal argument.  It raised only four claims:

1. Ineffective assistance of counsel at the pretrial stage.
2. Abandonment by counsel at the trial stage
3. Ineffective assistance of counsel at the punishment phase

4.  Police misconduct (withholding of the complete videotape of the interrogation) (Exhibit 11.)

Ineffective assistance of counsel claims, by their very nature, are often not apparent from the face of the trial record, as they often involve favorable evidence that was not presented or conflicts of interest. ("In the majority of instances, the record on direct appeal is simply undeveloped and cannot adequately reflect the failings of trial counsel." *Jackson v. State*, 973 S.W.2d 954, 957 (Tex. Crim. App. 1998)).  Additionally, state habeas counsel performed no meaningful extra-record investigation into the circumstances of Mr. Barbee's conviction and death sentence and refused to investigate and present his actual innocence claims.  Without an effective investigation, Mr. Barbee was unable to present the extra-record evidence concerning this issue and many others presented in his federal petition. (*See, e.g.*, Exhibits 20-34, various declarations not presented at trial or on state habeas.)

**ii.  Mr. Barbee was prejudiced as a result of this failure.**

State habeas counsel's representation fell well below a minimal standard of competence in the following ways: failure to adequately and coherently brief claims; failure to conduct more than a bare-bones investigation of  extra-record evidence, even though that is the primary purpose of post-conviction proceedings; failure to present proper post-conviction claims; and failure to adequately communicate with the client.  Mr. Barbee was prejudiced by this ineffective performance, because, as his federal petition demonstrates, viable challenges to his conviction and death sentence could have been, but were not, raised during state post-conviction proceedings.

Performing an investigation to determine the existence of cognizable constitutional violations is a fundamental component of adequate state post-conviction representation:

>Accordingly, where necessary to assure the full and fair adjudication of the client's federal claims, post-conviction counsel should request that the state post-conviction case be conducted, and should be prepared to conduct it, as a civil trial proceeding, initiated by her on behalf of the client, complete with frequent and productive interaction with the client; comprehensive pre-filing and pretrial documentary, field, and legal investigation to identify and prepare to litigate the appropriate causes of action; careful pleadings; motions practice; evidentiary hearings; briefing; and any other procedures that counsel might use in civil litigation on a plaintiff's behalf.

1 JAMES S. LIEBMAN & RANDY HERTZ, FEDERAL HABEAS CORPUS PRAC. & PROC. § 7.1a, at 274-75

(3rd ed. 1998) (LIEBMAN & HERTZ) (footnotes omitted).  In order to zealously represent the client

and preserve an appropriate record for later federal review, state post-conviction counsel is under

a binding professional and ethical obligation to determine the avenues of investigation which may

prove fruitful and request the resources necessary to pursue them, if such a request is necessary:

>At the outset of state post-conviction proceedings, counsel should identify the procedures and resources necessary to investigate the case fully and fairly; discover meritorious claims; ascertain the expert and other analyses, evidence, and testimony that effective litigation of those claims will require; and present that information in a meaningful manner, whether by way of an evidentiary hearing or some other procedure.  Thereafter, counsel should request, formally and in writing, each of the necessary procedures and resources and explain with specificity why each is essential, what claim it relates to, what evidence is likely to be generated thereby, and, generally, how the "full and fair" litigation of one or more claims in the petition requires the requested procedure or resource.

*Id.* at 279 (footnote omitted).  This is not an unreasonable or extraordinary burden to place on a

lawyer whose client faces execution by lethal injection

State habeas counsel failed to perform any of these tasks.  There were viable claims of

constitutional error affecting Mr. Barbee's trial and direct appeal proceedings.  Had state habeas

counsel properly investigated, he would have determined that there was a strong claim of actual

innocence at the guilt/innocence phase, but was not put before his jury.

**D. Art. 11.071 is arbitrary, violates due process and is not "regularly and consistently" followed, and therefore cannot be an "adequate" state procedural rule to support any alleged default.[44]**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

"State courts may not avoid deciding federal issues by invoking procedural rules that they do not apply evenhandedly to all similar claims"

*Hathorn v. Lovorn*, 457 U.S. 255, 263 (1982)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Even when a petitioner is found to have violated a state procedural rule, the procedural default doctrine does not bar federal habeas relief unless the state procedural rule is both "adequate" to support the state court judgment and "independent" of federal law. *See, e.g., Coleman v. Thompson,* 501 U.S. 722, 729-32, 735 (1991) (under procedural default rule, which is derived from the "independent and adequate state grounds" rule applied on direct review, federal habeas corpus court may not review state court decision that "clearly and expressly rel[ied] on an independent *and* adequate state ground" (emphasis added). The state procedural rule, art. 11.071 sec. 5(a), is inadequate, and hence does not bar federal relief, because the state procedural rule is arbitrary, violated due process, and was not "regularly and consistently" followed at the time of the alleged default.

Article 11.071 became effective on September 1, 1995, well before Mr. Barbee's conviction and sentence of death. Until that date, the controlling statute, Article 11.07, did not impose any deadlines for the filing of state habeas applications. Article 11.071, in contrast, includes time limits for almost every step of the process, including the filing of writ applications, with substantial

---

[44]  Petitioner acknowledges that art. 11.071 has been found to be an "adequate" state procedural rule. However, in light of *Martinez* and *Trevino* case, those holdings may no longer be valid. *See. e.g.,* Primus, Eve B., "Effective Trial Counsel After *Martinez v. Ryan*: Focusing On the Adequacies of State Procedures," 2013 Yale Law Journal (forthcoming).

penalties for applicants who fail to file on time.  Article 11.071 also changed the Texas procedure

for capital habeas by promising, through the Court of Criminal Appeals, "competent counsel" for

death row inmates for the state habeas process, and "reasonable compensation" of appointed

counsel.  Furthermore, Article 11.071 requires the state habeas remedy and the direct appeal to be

pursued simultaneously, rather than allowing the state habeas process to start after the direct appeal

was concluded as was the practice under 11.07.  Perhaps most significant to Mr. Barbee's case,

under former Article 11.07, there were no restrictions on the amendment of applications.  Article

11.071 now imposes time limits on the filing of such amendments.  If amendments or supplements

to writ applications are filed out of time, the facts and issues contained in them may be waived and

lost to the inmate for the balance of the state and federal habeas process.

The statute was amended, effective September 1, 1999.  It permitted  inmates whose

attorneys had not made timely filings of the state habeas application, and who would otherwise be

barred by the earlier version of sec. 11.071, to return to the state courts for another round of state

habeas proceedings.  Another amendment effective on the same date transferred the power of

appointment of counsel for death row inmates  from the Texas Court of Criminal Appeals to the

convicting district courts in which the applications would be filed.

Thus, the state procedural rule here (before the proposed 2003 amendments discussed

above), art. 11.071, gives a new round of state habeas to those applicants who filed *untimely,* but

does not give any explicit remedy to those who, through  no fault of their own, were represented by

counsel who failed to bring their clients' claims before the state court in a minimally competent

manner.  Such an arbitrary distinction, between untimely applicants and those who had incompetent

attorneys, results in a deprivation of due process, and is not a state rule that is "adequate" to support

a finding of procedural default.  The Supreme Court  has counseled that "State courts may not avoid deciding federal issues by invoking  procedural rules that they do not apply evenhandedly to all similar claims." *Hathorn v. Lovorn,* 457 U.S. 255,  263 (1982).  *See also  Dobbs v. Zant,* 506 U.S. 357, 359 91993) (*per curiam*) (petitioner permitted to rely on transcript not previously discovered or asserted as basis for relief because "delay [in discovery of transcript] resulted substantially from the State's own erroneous assertions that closing arguments had not been transcribed" and because petitioner properly relied on state's assertions); *Moore v. Reynolds,* 153 F.3d 1086, 1096-97 (10th Cir. 1998), *cert. denied,* 119 S. Ct. 1266 (1999) (state law requirement that ineffective assistance of counsel claim be raised on direct appeal is inadequate state ground); *Reynolds v. Berry,* 146 F.3d 345, 349-50 (6th Cir. 1998) (state procedural bar to successive postconviction motions, when applied to petitioner on novel theory that initial motion for resentencing was the sole opportunity to raise all postconviction claims, was not "adequate" state ground);  *Gosier v. Welborn,* 175 F.3d 504, 507 (7th Cir. 1999) (state procedural rule was inadequate to bar federal habeas corpus review because state courts applied it inconsistently in "incompatible lines of authority, [and in] cases that do not cite each other, let alone establish a rule-and-exception framework").

The Supreme Court has long "stress[ed] that a state procedural ground is not "adequate" unless the procedural rule is 'strictly or regularly followed.'" *Hathorn v. Lovorn,* 457 U.S. 255, 262-63 (1982), quoting *Barr v. City of Columbia,* 378 U.S. 146, 149 (1964).  *See also Ford v. Georgia,* 498 U.S. 411, 424 (1991) (state supreme court's application of procedural rule "does not even remotely satisfy the requirement ...that an adequate and independent state procedural bar to the entertainment of constitutional claims must have been 'firmly established and regularly followed' by the time as of which it is to be applied"); *Dugger v. Adams,* 489 U.S. 401, 410-11 n.6 (1989)

(state procedural default rule that is not "consistently or regularly applied" by state courts is "not [an] adequate" state ground and may not supply basis for denying federal habeas corpus relief; rule held to apply to circumstances of case); *James v. Kentucky,* 466 U.S. 341, 348 (1984) (only state procedures that are "firmly established and regularly followed...can prevent implementation of federal constitutional rights").

### E.  Petitioner has also established "prejudice" for the "cause and prejudice" exception to the procedural default doctrine.

As discussed in the prior sections, Mr. Barbee has shown  that the Texas statute is not an "adequate" state procedural ground on which to base a procedural default.  He also has shown "cause" for any alleged default.  A petitioner is barred from raising a defaulted claim as a basis for federal habeas corpus relief unless he can "excuse" the default by "demonstrat[ing] ...cause for the default and actual prejudice as a result of the alleged violation of federal law."  *Coleman v. Thompson,* 510 U.S. 722, 750 (1991).  *See also, e.g., Murray v. Carrier,* 477 U.S. 478, 485 (1986); *Wainwright v. Sykes,* 433 U.S. 72, 87 (1977).  This section will show how Mr. Barbee has also met the closely related concept of "prejudice" to excuse any default.

The Supreme Court has not yet provided a precise definition of the "prejudice" half of the "cause and prejudice" exception to the procedural default doctrine. *See, e.g., Amadeo v. Zant,* 486 U.S. 214, 221 (1988) (Court's "decisions...have not attempted to establish conclusively the contours of the [cause and prejudice] standard," leaving "open" 'for resolution in future decisions the precise definition of the ...standard'" (quoting *Wainwright v. Sykes, supra,* 433 U.S. at 87 (1977); *United States v. Frady,* 456 U.S. 152, 168 (1982) (declining to define "import of the term ['prejudice'] in ...situations" other than the one before the Court).   In *Strickler v. Greene,* 119 S. Ct. 1936 (1999),

the Court resolved the issue–whether the petitioner, in a *Brady* claim, suffered prejudice sufficient to excuse his procedural default–without announcing a broad-based definition of "prejudice."   It concluded that the nature of the defaulted *Brady* claim, involving prosecutorial suppression of evidence, rendered the "prejudice" analysis of the procedural default doctrine coterminous with the assessment of "materiality" under the substantive *Brady* rule.  At least for some purposes, therefore, "prejudice" is established by a showing that, but for the default, there is a reasonable probability that the outcome of the relevant proceeding would have been different.  The 'relevant proceeding' includes both stages of the trial, and the Supreme Court in *Strickler* exhaustively analyzed the facts of the case and the possible effects of the prosecutor's conduct on both the guilt/innocence and penalty phases of the capital trial.  *Id.* at 1952-55.  The Court emphasized the inevitable complexity of such an analysis of "prejudice."  *Id.* at 1952.

In *Strickler,* the Court stated that "[t]he differing judgments of the District Court and the Court of Appeals attest to the difficulty of resolving the issue of prejudice."  *Id. at* 1952. "[Petitioner] must convince us that 'there is a reasonable probability' that the result of the trial would have been different if the suppressed documents had been disclosed to the defense."  *Id.* at 1952.  The Court concluded that, "[a]s we made clear in [*Kyles v. Whitley,* 514 U.S. 419 (1995)], the materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions...Rather, the question is whether 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  *Id.* at 1952. (Citations omitted).

The Supreme Court has said, however, that prejudice requires more than a "possibility of

prejudice," *United States v. Frady, supra,* 456 U.S. at 170, and that the error must have "worked to [the petitioner's] *actual* and substantial disadvantage." *Id.* These admonitions offer little guidance, however, because "actual prejudice" is a term of art meaning only that some kind of prejudice is found and not merely a presumption of prejudice. *United States v. Olano,* 507 U.S. 725, 734-35, 736, 739-41 (1993). It is clear, however, that to excuse a default under the "cause and prejudice" doctrine, a habeas petitioner must either show some "structural" error as to which prejudice is always present or presumed, or demonstrate some specific type of prejudice produced by the otherwise defaulted error.

Mr. Barbee shows herein the existence of the deprivation of "structural" constitutional rights that are "so basic to a fair trial that their infraction can never be treated as harmless error," or as so prone to prejudice, when violated, that prejudice should be presumed.

Additionally, a strong showing on cause, such as here, has been held to go a long way toward establishing prejudice. *See, e.g., Wainwright v. Sykes,* 433 U.S. 72, 95-96 (1977) (Stevens, J., concurring); *Clay v. Director,* 749 F.2d 427, 434 (7th Cir. 1984), *cert. denied,* 471 U.S. 1108 (1985) ("if prejudice is high, cause will be more easily found"); *Huffman v. Wainwright,* 651 F.2d 347, 351 (5th Cir. 1981) (reviewing court may "view cause...with an eye to the possible resulting prejudice"); *Bridge v. Lynaugh,* 856 F.2d 712, 714 (5th Cir. 1988)(procedural default overcome in part by "highly prejudicial" quality of petitioner's claim).

If Respondent raises a procedural default issue, a hearing must be held on controlling and controverted factual issues surrounding the default and any excuses for it, as the state courts have not fully and fairly addressed the factual issues. *See* 28 U.S.C.A. §2254(e); *Wainwright v. Sykes,* 433 U.S. 72, 80 (1977); *Townsend v. Sain,* 372 U.S. 293, 312-18 (1963); *Brown v. Allen,* 344 U.S.

443 (1953); *Williams v. Turpin,* 87 F.3d 1204, 1211 (11th Cir. 1996) (district court erred in refusing to hold evidentiary hearing to assess sufficiency of petitioner's allegations of "cause" and "prejudice" for default).

The failure of the state court to address Mr. Barbee's issues in either his first or subsequent application (except for Claim 2) emphasizes the need for a federal hearing to adjudicate these factual issues. *See, e.g., Jenkins v. Anderson,* 447 U.S. 231, 234-35 n.1 (1980) ("application of the 'cause' and 'prejudice' standard may turn on factual findings that should be made by a district court"); *Humphrey v. Cady,* 405 U.S. 504, 517 (1972); *Barnard v. Collins,* 13 F.3d 871, 878 (5th Cir. 1994)(district court's finding of absence of "cause" was "premature in the absence of an evidentiary hearing or other appropriate proceeding to determine exactly when Barnard's counsel could have discovered [the claim] through reasonable diligence and investigation"); *Ratliff v. United States,* 999 F.2d 1023, 1026 (6th Cir. 1993); *Preston v. Maggio,* 705 F.2d 113, 115 (5th Cir. 1983), *cert. denied,* 471 U.S. 1104 (1985); *Walton v. Stewart,* 1999 WL 57427, at *9-*11 (9th Cir. Feb. 5, 1999) (district court erred in denying petitioner's request for evidentiary hearing to prove "cause" and "prejudice"); *Holleman v. Duckworth,* 155 F.3d 906, 909-12 (7th Cir. 1998)(holding, in writ-abuse context, that district court erred in summarily rejecting petitioner's claim of "cause" based on newly acquired facts, and remanding to district court for evidentiary hearing on issue); *Porter v. Singletary,* 49 F.3d 1483, 1489-90 & n.13 (11th Cir. 1995)(*per curiam*) (petitioner was entitled to evidentiary hearing to show "cause" for procedural default on ground that he did not know and could not reasonably have known factual predicate for claim at time of default); *Huffamn v. Wainwright,* 651 F.2d 347, 353 (5th Cir. 1981).

**F.  Fundamental miscarriage of justice.**

Should this Court find that Mr. Barbee has failed to establish cause and prejudice to excuse any procedural default, this Court may nonetheless consider the merits of any defaulted claims if failure to do so would result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  As with cause and prejudice, the Supreme Court has not defined precisely what constitutes a fundamental miscarriage of justice.  At the very least, the incarceration of one who is actually innocent of the crime for which he was committed would constitute a fundamental miscarriage of justice.  *Schlup v. Delo*, 513 U.S. 298, 321-22 (1995).  Thus, a petitioner who shows that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt absent the constitutional violation demonstrates a fundamental miscarriage of justice sufficient to overcome a procedural default.  *Bousley v. United States*, 523 U.S. 614, 623 (1998).

The Ninth Circuit has explained that the "actual innocence" showing necessary to establish a fundamental miscarriage of justice to excuse a procedural default is less demanding than the showing necessary to prevail on a "freestanding" claim of actual innocence.  To establish a freestanding claim of actual innocence in federal court, the petitioner must "go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent." *Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir. 1997) (citing *Herrera v. Collins*, 506 U.S. 390, 442-44 (1993) (Blackmun, J., dissenting)), *cert. denied*, 523 U.S. 1133 (1998).  However, to demonstrate a fundamental miscarriage of justice sufficient to excuse a procedural default, the petitioner must demonstrate only that "in light of all the evidence, including new evidence, `it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'"

*Carriger*, 132 F.3d at 478 (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

In *Carriger*, the Ninth Circuit found a fundamental miscarriage of justice where "[a]lthough Carriger has not affirmatively proved his actual innocence sufficiently to satisfy *Herrera*," he showed "sufficient doubt about the validity of his conviction to satisfy *Schlup*" because it was more likely than not that no reasonable juror hearing all of the available evidence would have voted to convict Carriger beyond a reasonable doubt. 132 F.3d at 478. *See also Paradis v. Arave*, 130 F.3d 385, 396 (9th Cir. 1997) ("[I]t may be more likely than not that no reasonable juror would have found Paradis guilty beyond a reasonable doubt . . . .").

A petitioner likewise demonstrates a fundamental miscarriage of justice when he shows that the constitutional violation probably resulted in the imposition of a death sentence upon one who is "actually innocent" of the death penalty. *Sawyer v. Whitley*, 505 U.S. 333, 340-47 (1992). Innocence of the death penalty means the petitioner was not death-eligible. *Id*. at 345. A petitioner who shows by clear and convincing evidence that, but for the constitutional violation, he would not have been eligible for the death penalty, demonstrates a fundamental miscarriage of justice sufficient to excuse procedural default. *Id*. at 347-48.[45] Aside from actual innocence and innocence of the death penalty, the Supreme Court has not determined what other circumstances constitute a fundamental miscarriage of justice sufficient to overcome a procedural default. But clearly, Mr. Barbee's strong claim of actual innocence meets the standards discussed *supra*.

### G. *Martinez v. Ryan* and *Trevino v. Thaler* Create an Exception to the Procedural Bar Formerly Precluding Review of Claims Three, Four and Five.

---

[45] The standard for establishing innocence of the death penalty is not as stringent as the standard for establishing constitutional insufficiency of the evidence under *Jackson v. Virginia*, 443 US. 307 (1979) – that no rational trier of fact could have found proof of guilt beyond a reasonable doubt. *Schlup v. Delo*, 513 U.S. 298, 323 n.38 (1995).

**1. Introduction.**

The Supreme Court recently created an exception to the  precedent that has repeatedly refused to create an exception to the procedural bar that formerly precluded federal review of Mr. Barbee's procedurally defaulted claims of ineffective assistance of counsel.  These claims would be all the claims and sub-claims of ineffective assistance of trial counsel, Claims Three, Four and Five.

In *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), the Court held that the ineffective assistance of post-conviction counsel can be cause for the procedural default of an ineffective assistance of trial counsel claim.  *Id*. at 1318.  *Martinez* represents a "jurisprudential sea change" in relevant law that determines whether Mr. Barbee's Sixth and Fourteenth Amendment defaulted effective assistance of counsel claims can be reviewed on their merits by a federal court.  *Vicknair v. Formosa Plastics Corp., Louisiana*, 98 F.3d 837, 839 (5th Cir. 1996).

*Martinez* was decided on March 20, 2012.  Instead of addressing whether a defendant has a constitutional right to counsel for the initial opportunity to raise a claim of ineffective assistance of trial counsel, the Supreme Court addressed the narrower question of whether the ineffective representation of state habeas counsel can establish cause for a procedural defaulted claim in federal habeas corpus proceedings:

> *Coleman v. Thompson*, [501 U.S. 722, 755 (1991)] left open, and the Court of Appeals in this case addressed, a question of constitutional law: whether a prisoner has a right to effective counsel in collateral proceedings which provide the first occasion to raise a claim of ineffective assistance at trial.  ....
> This is not the case, however, to resolve . . . [the] constitutional matter [left open in *Coleman*].  The precise question here is whether ineffective assistance in an initial-review collateral proceeding on a claim of ineffective assistance at trial may provide cause for a procedural default in a federal habeas proceeding.

*Martinez v. Ryan*, 132 S.Ct. at 1315.  As described in more detail, *infra*, the Supreme Court

answered the latter question in the affirmative.

*Martinez* addressed the question of whether ineffective assistance of state habeas counsel in state collateral proceedings which provide the first occasion to raise a claim of ineffective assistance of trial counsel ("IATC") may provide cause for a procedural default in federal habeas proceedings. *Martinez,* 132 S. Ct. at 1315. That Court found that under the Arizona procedural framework in which state law required that IATC claims must be raised in initial-review collateral proceedings, ineffective assistance of habeas counsel ("IAHC") "may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Martinez,* 132 S. Ct. at 1315. The Court held that a federal court may find cause excusing such procedural default where (1) the ineffective assistance of trial counsel is a "substantial" claim; (2) the cause consisted of either no counsel or ineffective assistance of habeas counsel; (3) the state collateral review proceeding was the initial review proceeding with regard to the ineffective assistance of trial counsel claim; and (4) state law requires that an ineffective assistance of trial counsel claim be raised in that initial review collateral proceeding. *Martinez,* 132 S. Ct. at 1320

The merits of those claims compels the equitable remedy of allowing Mr. Barbee to present his argument that the deficient performance of his state habeas counsel excuses the procedural bar to federal review of his ineffective assistance of trial counsel claims.


### 2. *Trevino v. Thaler* makes the equitable holding of *Martinez v. Ryan* applicable to Texas cases.

In *Trevino v. Thaler,* 133 S. Ct. 1911 (2013) the Supreme Court found that the Arizona procedural framework differed from that of Texas only with respect to the fourth requirement. *Id.* at 1918. It found that to be "a distinction without a difference." *Id.* at 1921. It concluded that Texas

does not afford a meaningful review of an ineffective assistance of trial counsel claim in proceedings prior to the initial-review collateral proceedings. *Id.* at 1919. Thus, where a petitioner can establish the first three requirements of *Martinez,* a procedural default will not bar a federal court from hearing a Texas ineffective assistance of trial counsel claim. *Id.* at 1921.  The holding in *Trevino* overruled a contrary holding by the Fifth Circuit in *Ibarra v. Thaler,* 687 F.3d 222 (2012); *accord, Ibarra v. Stephens,* ___F.3d.___, 2013 WL 3762683 (5th Cir. July 17, 2013).

        In the wake of *Trevino,* a procedural default will not bar a federal habeas court from hearing the merits of a substantial claims of ineffective assistance of trial counsel in Texas cases "if, in the initial-review collateral proceeding...counsel in that proceeding was ineffective." *Trevino,* 133 S. Ct. at 1921 (quoting *Martinez,* 132 S. Ct. at 1320).  *Trevino* thus requires that a Texas habeas petitioner such as Mr. Barbee now be provided a full and meaningful review of his meritorious claims of ineffective assistance of trial  counsel claims.

        *Trevino,* handed down on May 28, 2013, held that a federal habeas court can excuse a defendant's procedural default even if state law, as in Texas, did not require that an ineffective assistance of trial counsel claim be raised in an initial collateral review proceeding.  The case clarified a question left open in *Martinez.*

        As discussed *supra, Martinez* had held that a procedural default "will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the [State's] initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Martinez,* 132 S. Ct. at 1320.  However, that holding was limited to states where "claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding." *Id.*  Although Texas state law does not "require" a defendant to raise such a claim in

a state collateral review proceeding, in actuality "[t]he structure and design of the Texas system make it 'virtually impossible' for an ineffective assistance claim to be presented on direct review." *Trevino,* 133 S. Ct. at 1915, quoting *Robinson v. State,* 16 S.W.3d 808, 810-811 (Tex. Crim. App. 2000).

The Supreme Court determined that the *Martinez* exception to procedural default did apply in Texas.  In *Trevino,* a capital case, the initial state post-conviction petition did not include a claim that trial counsel's ineffectiveness "consisted in part of a failure adequately to investigate and to present mitigating circumstances during the penalty phase of Trevino's trial." [a claim under *Wiggins v. Smith,* 539 U.S. 510, 523 (2003)] *Trevino,* 133 S. Ct. at 1916.  Subsequent federal habeas counsel presented several aspects of this *Wiggins* claim to the federal district court which included mitigating evidence not previously presented in state court.  When the case was stayed in federal court and Trevino returned to state court, the state court held that the claim was procedurally defaulted because it had not been raised in the initial round of state post-conviction proceedings. *Trevino,* 133 S. Ct. at 1916.  The federal district court, citing *Coleman v. Thompson,* 501 U.S. 722 (1991) also held that the claim could not be considered due to Trevino's failure to timely raise the claim in state court.  The Fifth Circuit agreed, although the case was decided before *Martinez.*  The Fifth Circuit's reasoning in the later case of *Ibarra v. Thaler,* 687 F.3d 222 (2012) "makes clear that the Fifth Circuit would have found that *Martinez* would have made no difference." *Id.*  *Ibarra* had interpreted *Martinez* as holding that the "good cause exception applies where state law says that a criminal defendant *must* initially raise his claim of ineffective assistance of trial counsel in initial state collateral review proceedings." *Id.*  Because Texas law on its face appeared to permit a criminal to raise such a claim on direct appeal, the Fifth Circuit held that *Martinez* does not apply in Texas. *Ibarra,* 687 F.3d at 227.

The Supreme Court in *Trevino* recognized that a procedural default will normally rest upon "an independent and adequate state ground." *Coleman,* 501 U.S. at 729-730.  If so, then a federal habeas court normally cannot consider the defendant's federal constitutional claim. *Trevino* at 1917.  However, there is a "cause and prejudice" exception to that rule. *Martinez,* 132 S. Ct. at 1316.  In *Martinez,* the Supreme Court held that a "narrow exception" should "modify the unqualified statement in *Coleman* that an attorney's ignorance or inadvertence in a postconviction proceeding does not qualify as cause to excuse a procedural default." *Martinez,* 132 S. Ct. at 1315.  There were three reasons for this holding: 1) the bedrock right to effective assistance of counsel, 2) ineffective assistance of counsel on direct appeal could amount to cause, and 3) where the State consequently channels review of the constitutional claim of ineffective assistance of counsel to collateral proceedings, a lawyer's failure to raise it during the initial state postconviction proceedings could deprive the defendant of any review of that claim at all. *Martinez,* 132 S. Ct. at 1316-1317.  The exception in *Martinez* was limited to "substantial" claims of ineffective assistance of trial counsel; the state collateral proceeding was the "initial" review proceeding with respect to the ineffective assistance of trial counsel claim,  and where state law required that the claim be raised on state habeas. *Martinez,* 132 S. Ct. at 1318-1319.

Texas law differed from the Arizona law in *Martinez* which required that these claims be raised on state habeas.  The Supreme Court concluded that the difference in Texas law from the outright prohibition in Arizona did not matter because 1) Texas procedure makes it virtually impossible for appellate counsel to adequately present an ineffective assistance of trial counsel claim on direct appeal, and 2) if the *Martinez* exception did not apply in Texas, then "the Texas procedural system would create significant unfairness." *Trevino,* 133 S. Ct. at 1919.  In Texas, the motion for

a new trial was an inadequate vehicle for these claims due to the severe time constraints and because the trial record is generally not yet transcribed at this point. *Trevino,* 133 S. Ct. at 1918.  In the vast majority of cases. "The undeveloped record on direct appeal will be insufficient for an appellant to satisfy the dual prongs of *Strickland...*" *Id.*  Texas cases have held that raising the claim, or failing to raise such a claim, on direct appeal does not bar it from being raised in state collateral proceedings and have directed that counsel should not raise these claims on direct appeal.  *Id.* at 1920.  As the Supreme Court held,

> [h]ow could federal law deny defendants the benefit of *Martinez* solely because of the existence of a theoretically available procedural alternative, namely direct appellate review, that Texas procedures render so difficult, and in the typical case all but impossible, to use successfully, and which Texas courts so strongly discourage defendants from using?
> *Id.* at 1920.

Practically, state collateral proceedings are the only method for raising trial counsel ineffectiveness claims in Texas. As the Court stated,

> [w]hat the Arizona law prohibited by explicit terms, Texas law precludes as a matter of course.  And, that being so, we can find no significant difference between this case and *Martinez.* The very factors that led this Court to create a narrow exception to *Coleman* in *Martinez* similarly argue for the application of that exception here.
> *Id.* at 1921.

The Supreme Court concluded that,

> for present purposes, a distinction between 1) a State that denies permission to raise the claim on direct appeal and 2) a State that in theory grants permission but, as a matter of procedural design and systemic operation, denies a meaningful opportunity to do so is a distinction without a difference.
> *Id.*

The Supreme Court also concluded that:

> For these reasons, we conclude that where, as here, state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal, our holding in *Martinez* applies:

'[A] procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.' *Trevino* at 1921, quoting *Martinez,* 132 S. Ct. at 1320.

### 3.   The claims of ineffective assistance of counsel are "substantial" as required by *Martinez.*

*Martinez* held that "the underlying ineffective-assistance-of-trial-counsel claim [must be] a substantial one, which is to say that … [it] has some merit." *Martinez*, 132 S. Ct. at 1318–19.  Mr. Barbee presented extensive evidence that, at both phases of the trial, his attorneys failed to present readily-available evidence that fell below the standards of *Strickland v. Washington,* 466 U.S. 668 (1984).  The facts are discussed herein as to the previously-presented individual sub-claims.  Mr. Barbee's's trial attorneys presented very little at the guilt phase.

Time and time again, the Supreme Court has counseled that the failure to investigate can never be termed "strategy."  For example, in both *Rompilla v. Beard,* 545 U.S. 374 (2005)  and *Wiggins v. Smith,* 539 U.S. 510 (2003)  the Court held that  trial counsel were ineffective for failing to adequately investigate.  *Rompilla*, 545 U.S. at 381-387; *see also Wiggins*, 539 U.S. at 519-527.  The Supreme Court then performed a careful analysis of the ways in which the decisions rejecting the petitioners' claims were based on an "unreasonable determination of the facts," and involved an "unreasonable application of" federal law.  *Rompilla*, 545 U.S. at 389-390; *Wiggins*, 539 U.S. at 527-534.  The Court used the same framework in *Porter v. McCollum*, 558 U.S. ___, 130 S. Ct. 447 (2009) – first conducting a careful review of the mitigating evidence Porter claimed his trial counsel ineffectively failed to uncover and present during the penalty phase of his capital trial, before then determining that the state court's decision that Porter suffered no prejudice was an unreasonable application of federal law.

-116-

The perfunctory guilt and punishment phase defense presentations, compared with what could have been presented, shows no effort to ensure that their client had representation that met with even the most minimal of prevailing professional norms.

In summary, Mr. Barbeee's Claims Three, Four and Five, discussed in more detail *infra,* demonstrate deficient performance, the first prong of the test under *Strickland v. Washington,* 466 U.S. 668 (1984).   As *Strickland* makes clear, the evaluation of attorney error, and the resulting prejudice, should be seen cumulatively.  *Strickland,* 104 S. Ct. at 2069; *Williams,* 529 U.S. at 397. Nor do trial counsel's actions comport with *Williams, Wiggins* and *Rompilla*, *supra*, where despite much more aggravating evidence and much less omitted mitigating evidence, ineffective assistance of counsel was found.  *See, e.g, Williams* 120 S. Ct. at 1500; *Rompilla,*  125 S. Ct. at 2460 and 2462 (Rompilla's "own contributions to any mitigation case were minimal" as he was uninterested in helping counsel and at times "even actively obstructive"); and *Wiggins* (trial counsel's punishment-phase strategy not owed the deference usually accorded trial strategy, because it was not the product of a professionally reasonable investigation into other potential mitigation themes).  Decisions made from ignorance or the failure to investigate can *never* be called "strategy."  *Lewis v. Dretke,* 355 F.3d 364 (5th Cir. 2003).

**H.  The Effect of *Martinez v. Ryan* and *Trevino v. Thaler.***

**1.  Mr. Barbee can satisfy the two-part *Martinez* test for establishing cause for the procedural default of his ineffective assistance of trial counsel claim.**

As we have seen, *Martinez* held that

 "[A] procedural default will not bar a federal habeas court from hearing a substantial claim

of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel

or counsel in that proceeding was ineffective" [under the standards of *Strickland v. Washington*, 466

U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)].  *Martinez v. Ryan*, 132 S.Ct. 1911,  1320 (2012);

*Trevino v. Thaler,* 133 S. Ct. 1911, 1921 (2013).  Mr. Barbee will address each part of the *Martinez*

test in turn.

**2. Counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984).**

**a.  Mr. Barbee's initial habeas counsel was grossly deficient in state habeas corpus proceedings.**

Mr. Barbee's state habeas counsel, Mr. Don Vernay,  incontestably failed to perform the

basic tasks necessary to identifying the factual bases for a habeas corpus application, much less the

investigation  necessary  to  plead  and  prove  any  habeas  claims.   Mr. Verany's 29-page  writ

application clearly did not comply with applicable professional standards for Texas capital *habeas*

*corpus* counsel.[46]

**b.  Texas capital habeas corpus counsel has a statutory duty to conduct a thorough extra-record investigation and identify the factual bases for relief.**

Article 11.071 of the Texas Code of Criminal Procedure governs Texas capital habeas corpus

proceedings.  Tex. Code Crim. Proc. art. 11.071 § 1. The habeas statute *requires* that counsel

conduct an extra-record investigation:

---

[46]   Mr. Vernay was retained by Mr. Barbee's family.  The *Martinez/Trevino* equitable analysis applies equally to this situation, as Mr. Barbee did not acquiesce in the omissions and inadequate petition filed by Mr. Vernay any more than if he had been appointed by the state, and neither *Martinez* nor *Trevino* purport to limit their holdings to state-appointed counsel.  Indeed, in *Martinez,* the Court held that "a prisoner may establish cause for a default of an ineffective-assistance claim in two circumstances.  The first is where the state courts did not appoint counsel in the initial-review collateral proceeding...," *Martinez,* 132 S. Ct. at 1318.

Investigation of Grounds for Application
 Sec. 3. (a) On appointment, counsel ***shall*** investigate expeditiously, ***before and after*** the appellate record is filed in the court of criminal appeals, the factual and legal grounds for the filing of an application for a writ of habeas corpus.

*Id*. at § 3 (emphasis added).  Counsel must be thorough and exercise reasonable diligence to uncover the factual basis for every available claim.  *Id*. at § 5(e) (claims are not cognizable in subsequent habeas applications, and thus waived, unless "the factual basis was not ascertainable through the exercise of reasonable diligence" when the prior application was filed).  Investigation is so fundamentally important that Texas courts are obligated to grant all reasonable investigative funding requests.  *Id*. at § 3(c); § 3(d).

> **c.  The prevailing professional standards in Texas capital habeas corpus cases, as reflected in State Bar of Texas materials, prescribed a broad and thorough investigation.**

One year after the 1995 passage of article 11.071 overhauled capital habeas corpus proceedings and established a right to counsel, the State Bar of Texas published the third edition of the Texas Criminal Appellate Manual.[47]  One of the chapters in the State Bar Manual was a primer for defense counsel litigating capital habeas corpus cases.  *Id*.  The State Bar Manual confirms that, by the time of Mr. Barbee's trial in 2006, the prevailing professional standards in capital habeas corpus representation compelled counsel to conduct extensive investigation.

The manual begins with "essential ideas to bear in mind" when considering the habeas corpus litigation, the first two of which stress the need to investigate the case:

> *1.  **State habeas litigation is not the same as a direct appeal.  Habeas litigation concentrates on developing and presenting facts outside the appellate record*** which, in conjunction with facts in the record, raise important constitutional claims. Habeas counsel must know the appellate record, but cannot be bound to it, or they will offer their clients nothing more than another attempt at a direct appeal.

---

[47]     Attached herein as <u>Exhibit 57</u>.

*2. **Writ practice requires investigation**.* You can't learn about, develop, and present facts outside the record if you don't investigate the case. ***Investigation for a writ can be as intensive as investigation in preparation for trial. This must be so particularly where habeas counsel believes that trial counsel may have rendered ineffective assistance of counsel***. It is impossible to accurately evaluate the effectiveness of counsel without knowing what the counsel in question knew or could have known.

(Exhibit 57, State Bar Manual at 4 (emphasis added)).

The State Bar Manual repeatedly emphasizes the paramount importance of extra-record fact development:

Facts outside the record are critical to a successful writ application. Those facts must be sought out through investigation . . . . Because of the nature of habeas claims, habeas counsel must investigate not only the client's background and the facts that gave rise to the offense, but also the investigation by police and defense counsel and the actions of the jury. There is no quick and easy way to do this and counsel will almost certainly need the help of a trained investigator to do an efficient and complete job . . . .

Exhibit 57, State Bar Manual at 31.

Ten pages—almost 25%—of the State Bar Manual are dedicated to describing the scope and depth of the requisite investigation. State Bar Manual at 31–40. Of course, any investigation begins with the client, and the State Bar Manual describes the "[t]opics to cover" during client interviews:

(1) Your client[']s version of the facts of the offense; (2) his or her relationship with the trial and direct appeal lawyers; (3) anything the client found strange, unusual or objectionable about the trial or direct appeal; (4) ***your client's social history, including his or her background, education, family history, medical history, drug abuse history, etc***. You should strive to know more about your client and his or her history than any other lawyer has known, and perhaps more than his own family has known, to ensure that you are aware of and can use all beneficial information that might come from that knowledge.

Exhibit 57, State Bar Manual at 32–33 (emphasis added).[48] Given this broad range of topics,

---

[48]   This standard essentially mirrors the Texas Court of Criminal Appeals' determination that, in a 1997 trial, capital defense counsel had a duty to interview the client about specific aspects of his social history. *Ex parte Gonzales*, 204 S.W.3d 391, 400–01 (Tex. Crim. App. 2006) (Cochran, J., concurring).

the State Bar Manual advises habeas counsel that "the information you need from your client cannot be obtained in just one interview," thus "the more conversations you have, the more likely it is that you will win the inmate's trust and uncover additional helpful and highly relevant information." Exhibit 57, State Bar Manual at 33.

Client interviews, though critical, "must serve as the beginning, not the end, of [counsel's] investigation":

> [The client's family] may shed light on mitigating evidence that was not presented at trial, or guilt/innocence phase evidence that was suggested to trial counsel, but not presented. ***They will certainly have things to tell you about your client's background that you can get nowhere else that could contribute substantially to the development of claims*** concerning mental disorders, mental limitations, or drug abuse. You will also want to ask them about their contacts with trial counsel, as part of your investigation into trial counsel's investigation.

> Exhibit 57, State Bar Manual at 33–34 (emphasis added).

Habeas counsel must also meet with trial counsel or, at a minimum, obtain trial counsel's files:

> [Y]ou should always, at the first meeting with [trial counsel], request their files. The files and all the notes in them belong to the client, not the lawyer, and you should insist on them being turned over to you . . . . [H]aving access to the file is vital, for it will tell you a lot about what information the lawyers had and what they were doing before, during and after the trial. Be sure that the file you receive includes all notes of the lawyers as well, for those notes are also the property of the client.

> Exhibit 57, State Bar Manual at 34.

The above steps are merely preliminary measures: "Your record review, and interviews of your client, his or her family, and trial counsel will give you a pretty good idea of what some of the important issues may be in the case. That will allow you to focus your energy on developing information relevant to those issues." Exhibit 57, State Bar Manual at 34–35. The State Bar Manual

-121-

subsequently describes three basic methods for investigating the case.

First, habeas counsel must collect a wide variety of records, a lengthy process that begins early in the representation: "It is vital to start gathering records as early in your writ preparation process as possible.  Records collection is time consuming and is sometimes contested by agencies who are the custodians of records.  It is preferable to deal with these disputes early in the investigation rather than in the last weeks or days before the writ application is due."  Exhibit 57, State Bar Manual at 35.  The State Bar Manual describes some of the records that should be gathered in every case:

> ● Prison records: "Be sure to request all prison records from every previous incarceration of your client in any institution, as well as his or her time on death row . . . .  Those records may contain very important information concerning your client's mental and medical condition."  Exhibit 39, State Bar Manual at 35.

> ● School Records: "School records are another valuable source of information.  Through them you can find out about learning and mental difficulties your client was having throughout school that your client may be too embarrassed to tell you about or does not think are important.  The records may include I.Q. tests or other testing that is quite helpful in learning how your client was able to function as he or she developed."  Exhibit 39, State Bar Manual at 35.

> ● Medical and mental health records: "Medical and mental health records should be sought from any care provider who treated your client.  When getting these records, particularly from mental health professionals, make sure you specifically request all the records the care provider has, including handwritten or dictated notes made at or shortly after interviews or times of testing."  Exhibit 39, State Bar Manual at 35.

> ● Criminal records of witnesses: "Criminal records of all important witnesses at the trial should be checked in the county of conviction and any counties where they have spent substantial time.  You may find that some non-law enforcement witnesses had good reason to cooperate with the state at the trial, due to pending charges against them.  You may also find that some witnesses had prior convictions that could have been used to impeach their testimony at trial."
> Exhibit 57, State Bar Manual at 35-36.

In addition to these fundamental documents, the State Bar Manual includes a five-page

"Investigative Source List," State Bar Manual at Exhibit 39, which itemizes numerous other sources of relevant documents.

Second, habeas counsel must collect information from all relevant law enforcement agencies:

Always seek access to the district attorney's files and law enforcement agency files regarding the capital offense and any other offenses that you believe will be relevant to any of your claims, including offenses committed by key state's witnesses, such as jailhouse informants . . . . [I]t [is] important to energetically seek access to the files of every law enforcement agency that may have generated information regarding your client.
 (Exhibit 57, State Bar Manual at 36.)

Third, habeas counsel must obviously interview witnesses and, when possible do so in person: "As you begin to focus on the claims you want to pursue, you will identify people who have important information about those claims.  Some may have testified at trial.  Others may never have been called or perhaps were even unknown at the time of trial.  You or your investigator need to interview these people in person, if at all possible." Exhibit 57, State Bar Manual at 37.

The State Bar Manual observed that "it should be clear that the services of an experienced criminal or habeas investigator are invaluable in efficiently and comprehensively gathering the information necessary for a writ application." Exhibit 57, State Bar Manual at 38.  "Other experts will likely be needed, too," including mental health and medical experts.  *Id.*

* * * *

In sum, both the statute  and the prevailing professional standards in capital habeas corpus proceedings mandated that state habeas counsel conduct substantial extra-record investigation.  Mr. Barbee's state habeas petition  reveals little  evidence of any investigation, as the claims are record-based.

Basing Mr. Barbee's state habeas corpus application solely on record-based claims did

nothing to fulfill habeas counsel's duty.   It merely provided a facade of post-conviction representation.   This mode of post-conviction representation was condemned by the State Bar of Texas Task Force on Habeas Counsel Training and Qualification as the among the most serious deficiencies in post-conviction representation, equal in efficacy to representation by a deceased lawyer: "[the lack of regulation of capital state post-conviction counsel] "resulted in a list containing lawyers who were, at best, unqualified to serve as capital habeas counsel and at worst, lawyers who . . . filed habeas writs copied verbatim from writs filed in other cases, lawyers who filed writs with absolutely no cognizable claims, lawyer who were serving suspensions from the practice of law for neglecting their clients and even lawyers who were deceased." *State Bar Task Force Report*, p.8. The type of deficient representation is what led to subsequent reforms in Texas, including the creation of a specialized capital post-conviction defender agency.   Mr. Vernay's performance here was grossly negligent and far below accepted norms of professional performance.

**3. Mr. Barbee's state habeas proceeding was the "initial-review collateral proceeding" within the meaning of *Martinez* in which the claim should have been raised.**

**a. *Martinez* applies to the first proceeding in which a prisoner can obtain relief for a violation of his Sixth Amendment right the effective assistance of counsel.**

Arizona, where *Martinez* arose, does not permit prisoners to raise ineffective assistance of counsel claims on direct appeal, requiring them instead to file such claims in state collateral proceedings.   Martinez sought federal habeas corpus relief claiming ineffective assistance of trial counsel.   The claim was procedurally defaulted because it had not been properly raised in state court. Martinez argued that he was entitled to the effective assistance of counsel in that state collateral proceeding because it constituted his first opportunity to raise his claim of ineffective assistance of trial counsel.   Because he had been denied such assistance, Martinez contended, he had established

"cause" for any default.  The district court found his claim of ineffective assistance of trial counsel procedurally defaulted, citing *Coleman v. Thompson*, 501 U.S. 722, 755 (1991) (holding that "post-conviction counsel's ignorance or inadvertence does not qualify as cause to excuse a procedural default."). The Ninth Circuit affirmed, and Martinez presented to the Supreme Court the question *Coleman* left open*: "*whether a prisoner has a [constitutional] right to effective counsel in collateral proceedings which provide the first occasion to raise a claim of ineffective assistance at trial." *Martinez v. Ryan*, 131 S.Ct. 2960 (2011).

Although the Supreme Court granted *certiorari* to address Martinez's constitutional question, it deferred that issue and instead addressed "whether ineffective assistance in an initial-review collateral proceeding on a claim of ineffective assistance at trial may provide cause for a procedural default in a federal habeas proceeding." *Martinez*, 132 S.Ct. at 1315.  The Court concluded that "a narrow exception" to the unqualified holding in *Coleman* was necessary "[t]o protect prisoners with a potentially legitimate claim of ineffective-assistance of trial counsel." *Id*. at 1315.  Thus, the Court held that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial."  *Id.*

The Court explained that an exception to *Coleman* was appropriate because when "an initial review-collateral proceeding" provides the first opportunity for raising a claim of ineffective assistance of trial counsel, it is the equivalent of a prisoner's direct appeal, in that "the state habeas court looks to the merits of the claim of ineffective assistance, no other court has addressed the claim, and defendants pursuing first-tier review are generally ill equipped to represent themselves because they do not have a brief from counsel or an opinion of the court addressing their claim of error." *Id.* at 1317 (citations and internal quotation marks omitted).  *Martinez* pointed out that if

direct appeal counsel is ineffective, "the prisoner has been denied fair process and the opportunity

to comply with the State's procedures and obtain adjudication on the merits of his [other] claims."

*Id.* Without the effective assistance of counsel in initial-review collateral proceedings, there is a

similar risk that prisoners will forfeit claims of ineffective assistance of trial counsel. *Id.* Such

claims often cannot be presented adequately without factual investigation and an "understanding of

trial strategy." *Id.* When a claim of ineffective assistance of trial counsel cannot be raised on direct

appeal, a prisoner in initial-review collateral proceedings

> cannot rely on a court opinion or the prior work of an attorney addressing that claim
> . . . . The prisoner, unlearned in the law, may not comply with the State's procedural
> rules or may misapprehend the substantive details of federal constitutional law. . .
> . [C]onfined to prison, *the prisoner is in no position to develop the evidentiary
> basis for a claim of ineffective assistance, which often turns on evidence outside
> the trial record*.

> *Id.* (citation omitted) (emphasis added).

The *Martinez* Court recognized that while there are sound practical reasons for adjudicating

ineffective assistance of counsel claims in collateral proceedings, doing so deprives the prisoner of

constitutionally-guaranteed counsel to help safeguard perhaps the most important trial right:

> Ineffective-assistance claims often depend on evidence outside the trial record.
> Direct appeals, without evidentiary hearings, may not be as effective as other
> proceedings for developing the factual basis for the claim. *Ibid.* Abbreviated
> deadlines to expand the record on direct appeal may not allow adequate time for an
> attorney to investigate the ineffective-assistance claim. *See* Primus, *Structural
> Reform in Criminal Defense*, 92 Cornell L.Rev. 679, 689, and n. 57 (2004) (most
> rules give between 5 and 30 days from the time of conviction to file a request to
> expand the record on appeal). Thus, there are sound reasons for deferring
> consideration of ineffective-assistance-of-trial-counsel claims until the collateral-
> review stage, but this decision is not without consequences for the State's ability to
> assert a procedural default in later proceedings. By deliberately choosing to move
> trial-ineffectiveness claims outside of the direct-appeal process, where counsel is
> constitutionally guaranteed, the State significantly diminishes prisoners' ability to
> file such claims. It is within the context of this state procedural framework that
> counsel's ineffectiveness in an initial-review collateral proceeding qualifies as cause
> for a procedural default.

*Id.* at 1318.  The core concern of *Martinez* is that a prisoner receive an adequate opportunity to

vindicate his Sixth Amendment right to the guiding hand of counsel: "A prisoner's inability to

present a claim of trial error is of particular concern when the claim is one of ineffective assistance

of counsel.  The right to the effective assistance of counsel at trial is a bedrock principle in our

justice system."  *Id*. at 1317.


**I.  No deference is due to the initial-round state court holdings as to any of the issues raised in the initial state habeas proceedings as the "paper hearings" were insufficient.**

The following issues were raised on state post-conviction review:

1. Ineffective assistance of counsel at the pretrial stage.
2. Abandonment by counsel at the trial stage
3. Ineffective assistance of counsel at the punishment phase
4. Police misconduct (withholding of the complete videotape of the interrogation) (Exhibit 11.)

The judge who presided at Petitioner's trial was Judge Robert K. Gill. *See, e.g.,* 2 CR 394,

Court's Charge at Guilt/Innocence, signed by Judge Bob Gill, 213th District Court.  However, Judge

Gill did not preside over Petitioner's state habeas proceedings.  On March 14, 2008, Petitioner filed

his application for writ of habeas corpus setting forth four these four claims for relief.  (Exhibit 11.)

On September 29, 2008, Judge Louis Sturns, Judge Gill's successor in the 213th District Court,

signed a "Memorandum and Order" prepared by the State, holding that

> the Court hereby determines, pursuant to article 11.071, section 8(a), of the Code of Criminal Procedure, that there exists no controverted, previously unresolved factual issues material to the legality of the applicant's confinement.
> (Exhibit 15, Memorandum and Order of September 29, 2008, by Judge Louis Sturns.)

Petitioner's state habeas application was then denied by Judge Louis Sturns on November

6, 2008 when he signed an Order, also prepared by the State, which adopted the state's proposed

findings and conclusions verbatim, without so much as changing a comma.  (*See* Exhibit 15, Order adopting the State's proposed memorandum, findings of fact, and conclusions of law and forwarding these findings and the application to the Texas Court of Criminal Appeals.)  No evidentiary hearing was held, as  the CCA's Order of January 14, 2009 points out.  (*See* Exhibit 9, Order in *Ex Parte Stephen Dale Barbee,* No WR-71,070-01, at 2; "The trial court did not hold an evidentiary hearing.") The State conceded the existence of genuine questions of fact  in their reply (Exhibit 12)where they used the affidavits of trial counsel and the prosecutor to controvert Petitioner's claims, and their proposed findings and conclusions were mainly based on those affidavits. (Exhibits 12, 14.)

On January 14, 2009, the Texas Court of Criminal Appeals denied the state post-conviction application for writ of habeas corpus.  *Ex Parte Stephen Dale Barbee ,* No. WR-71,070-01 (Tex. Crim. App. January 14, 2009)(*per curiam*)(not designated for publication)(Exhibit 9).  The CCA held that "[w]e adopt the trial judge's findings and conclusions.  Based upon the trial court's findings and conclusions and our own review, the relief sought is denied."  (Exhibit 9, *Ex parte Stephen Dale Barbee,* No. 71,070-01.)  This is erroneous on its face, as the "trial judge," Judge Gill, made no findings and conclusions in the state habeas proceedings and the CCA's "review" apparently overlooked this basic fact.  In fact, there were no "trial judge findings" for the CCA to adopt.

Even aside from this error, review of the state habeas claims must be *de novo* because the Fifth Circuit  has repeatedly held when the state habeas court judge was not the trial judge and there is a factual dispute that, if resolved in the petitioner's favor would entitle him to relief and the state has not afforded him a full and fair hearing, these state court findings are not entitled to any presumption of correctness.   *Nethery v. Collins*, 993 F.2d 1154, 1157 n. 8 (5th Cir. 1993)*, cert. denied,* 114 S. Ct. 1416 (1994)(no presumption of correctness to a state court finding when the state

habeas  proceeding was not considered by the same judge who presided over the petitioner's trial); *Salazar v. Johnson*, 96 F.3d 789 (5th Cir. 1996)(no presumption of correctness to a state court finding when the state judge who presided over the plea did not conduct the habeas proceeding); *Livingston v. Johnson*, 107 F.3d 297 (5th Cir. 1997); *Perillo v. Johnson,* 79 F.3d 441, 446-47 (5th Cir. 1996);   *Goodwin v. Johnson*, 132 F.3d 162, 182 n. 15 (5th Cir. 1998)("The presence of conflicting evidence, *even if substantially weighted in favor of the state*, generally denotes the existence of a genuine fact question requiring an evidentiary hearing.")

Thus, there is a long line of cases in which the Fifth Circuit has refused to sanction "paper hearings" where the state habeas judge did not preside at the petitioner's trial.  Here, as to all claims raised in state habeas proceedings,  he did not.  At the very least, no presumption of correctness adheres to the state court habeas findings.  Additionally, as we have seen, the CCA held that "we adopt the trial judge's findings and conclusions" even though there were no such findings and conclusions by the trial judge.  Clearly, in such circumstances, no deference need be paid to the CCA's statement that it conducted its "own review" when this "review" did not notice that the trial judge was not the state habeas judge *and* their own "review" was merely a rubber-stamp of the trial court "review" which in turn was a rubber stamp of the prosecution's findings and conclusions.  The state habeas judge here performed no more functions than that of a rubber stamp or an Auto-Pen.  The CCA's denial of relief  was clearly erroneous and was a decision that was contrary to and involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. (*i.e.,* the federal law discussed in these claims *infra.*)

## VII.

## CLAIMS FOR RELIEF

**CLAIM ONE: MR. BARBEE IS ACTUALLY INNOCENT OF CAPITAL MURDER.**

Petitioner's conviction and sentence are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, because he is actually innocent of the murder of Lisa and Jayden Underwood.

Petitioner hereby incorporates by reference the Statement of Facts, *supra.*

From the time of his arrest and initial incarceration, Mr. Barbee has consistently maintained his innocence of the murders of Lisa and Jayden Underwood.  Immediately upon his transfer to the county jail, Mr. Barbee recanted his coerced "confession" and maintained his innocence. Yet his trial attorneys, who were under great pressure from the trial court judge to plead the case, failed to take any steps to establish Mr. Barbee's innocence or to investigate the possibility that his employee Ron Dodd had actually committed the murders.  The trial itself was a perfunctory two-and-a-half day affair.  His attorneys, against Mr. Barbee's express wishes, confessed his guilt without his permission.

Herein, Petitioner presents compelling evidence that he is actually innocent of these murders.

**A. Facts in Support Presented to the State Courts.**

Immediately after his transfer to the county jail, Mr. Barbee recanted his confession and professed his innocence of the murders of Lisa and Jayden Underwood.  (*See, e.g.,* Exhibits 19, 20, 37.) He has continued to maintain his innocence to the present day.  Mr. Barbee consistently communicated this fact to his lawyers, investigators, experts,  and others involved in this case and continues to do so.  (Exhibit 37.) At no time after the statement made to Detective Carroll on

February 21, 2005 did Mr. Barbee ever state to anyone that he had committed the crimes he was charged with.  Instead he told all who would listen that although he did assist in disposing of the bodies, Ron Dodd had committed the murders.  (*See, e.g.*,  Exhibit 16, Affidavit of Amanda Maxwell at 4.)

The State's case, when subjected to close scrutiny, makes little sense.  According to the evidence presented at trial, Mr. Barbee, who lacked any  prior history of criminal activities or convictions,  killed both Lisa and Jayden Underwood because he was worried about the prospect of paying child support for the yet-unborn infant and his wife finding out about Lisa's pregnancy.  Somehow he single-handedly placed the pregnant 166-pound Lisa in her SUV;  and then drove both bodies to a remote location and buried them.  He was supposedly assisted by Ron Dodd, who, having nothing to gain and a lot to lose as an ex-convict with a history of violent assault, decided to implicate himself in a double murder and help dispose of the bodies simply because Mr. Barbee asked him to do so.[89]  Mr. Dodd allegedly left his house late at night, drove many miles to the location near Denton, brought a shovel, and assisted with the concealment of the bodies, then picked up and drove Mr. Barbee back to his house.

The implausibility of the State's case is heightened by the newly-discovered evidence uncovered in the investigation of this matter, which will be discussed categorically:

### i.  Evidence pointing to the guilt of Ron Dodd.

From the time of his false "confession," Mr. Barbee has insisted that he did not commit the

---

[89]   It is instructive to recall Mr. Dodd's situation at the time: an ex-con with a long record who would ordinarily have trouble obtaining employment, at the time of the murders was living in a 5,000 square foot house valued at over $400,000 with a large swimming pool, cabana, movie room, and other luxury amenities, receiving a generous salary and benefits, co-habiting with the co-owner of two very successful businesses.  Clearly, Mr. Dodd had never had it so good.

murders.  Unfortunately, his attorneys ignored him and failed to investigate, let alone present, any evidence pointing to Ron Dodd as the actual perpetrator of the murders of Lisa and Jayden.

1) Jerry Dowling is Theresa Barbee's father and hence, hardly someone with a motive to lie or submit a false affidavit.  He has submitted a sworn affidavit stating that "[m]y son Danny Dowling told me that Ron Dodd had told him right after the murders that he had to punch Lisa in the face 25-26 times before 'the fucking bitch would go down.'" (Exhibit 30, Declaration of Jerry Dowling.)  Ron Dodd impressed Mr. Dowling as "a smart ass, loud mouth, and obnoxious.  When Theresa wanted me to meet him, I told her I did not want to meet him and wanted nothing to do with him.  I knew that Ron Dodd was like a dog that would come up to the back door and Theresa was feeding him.  He was there for the money.  Big money was being thrown around." (*Id.*)  Mr. Dowling also does not believe that Mr. Barbee was responsible for the murders of Lisa and Jayden. (*Id.*)  Yet Mr. Dowling was never contacted by the defense attorneys or asked to testify at Mr. Barbee's trial. (*Id.*)

2) This is confirmed by the declaration of Tina Church in which she states that "both Jerry Dowling and his son Danny Dowling had said that Ron Dodd said he had to punch Lisa Underwood 25-26 [times] in the face before the 'fucking bitch would go down.'  This confession was made directly by Ron Dodd to Danny Dowling and repeated to Danny's father Jerry Dowling." (Exhibit 25, Declaration of Tina Church of Aug. 9, 2010.)

3) Ron Dodd has admitted that he had his clothes washed at 4 a.m. on the night of the murders and also that, the next morning, he had his vehicle power-washed by his son Nathan and Danny Dowling.  (Exhibit 25, Declaration of Tina Church of July 21, 2010 at 3.)

4) Jennifer Cherry, Stephen's niece, has stated that Theresa often told her "how much she hated him and wanted him 'gone.'" (Exhibit 24, at 1.)  Ms. Cherry also states that "[a]fter their

separation and divorce, Theresa would say directly to me that she wished Stephen would die and wished he was out of the office.  She used to think aloud that she wished there was a way to get rid of him." (*Id.* at 2.)  When Ron Dodd came onto the scene and started living with Theresa, she now had the means to put these wishes into action.

     5) In contrast to Mr. Barbee, Mr. Dodd has a long and well-documented history of violence. (Exhibit 35, criminal records of Mr. Dodd.).  From 1990, when Mr. Dodd was 19, he has a history of arrests and convictions for assault, aggravated assault, assault causing bodily injury, telephone harassment, and various violations of parole. (*Id.*)  These records indicate that Mr. Dodd was in prison from March of 1999 to January of 2003, almost four years, for aggravated assault causing serious bodily injury. (*Id.*)  Mr. Dodd appears to have been released on parole on January 23, 2003.  Shortly after his release, Mr. Dodd went to work for Mr. Barbee.  (Exhibits 19, 20, 30.)  At the time of the murders, Mr. Dodd was an ex-con with an extensive criminal record that would have made employment very difficult, was living in a large, expensive 4000 square foot house with a swimming pool and movie room, was being paid a very adequate salary with the use of a company truck and was living with the co-proprietor of two valuable businesses. Mr. Dodd was living with someone who stood to benefit to the tune of a half-million dollars upon the demise of Mr. Barbee, the proceeds of a life insurance policy, as well as the businesses.  Clearly, this is the history of a person who has resorted to violence in order to get his way and had a motive to do so here.

**ii.  Evidence pointing to the motives for Mr. Dodd to commit the murders.**

     The implications of the State's case were that Mr. Dodd's involvement in the murders was altruistic, simply helping a friend conceal two bodies in a multiple murder and thereby implicating himself, an ex-convict with a lot to lose if his actions became known to the police. But Mr. Dodd

has never impressed anyone as a person given to spontaneous acts of generosity in the name of friendship.

However, there are reasons, other than spontaneous altruism being wildly out character for Mr. Dodd, to suspect that he was much more involved in these heinous murders than the State's case made him out to be. Mr. Dodd had a huge financial motive to commit the murders and blame them on Mr. Barbee.

The trial attorneys rejected Stephen's claim of actual innocence partly on the basis that they found no motive for Mr. Dodd to "kill two persons he had no association with." (Exhibit 37 at 5; *see also* Declaration of Jackie Barbee of July 30, 2010 at 6, "Stephen repeatedly told his attorneys that Ron Dodd had committed the murders, but Bill Ray refused to listen and kept saying there was no motive").   This sentiment reveals the lack of investigation conducted by the trial attorneys, as there were plenty of potential motives for Mr. Dodd to commit the crime, principally financial, had the attorneys bothered to look.

Jackie Barbee, Stephen's mother, confirms the financial motive for Ron Dodd to have committed the murders. (Exhibit 19, Declaration of Jackie Barbee of July 30, 2010)  Soon after the murders, Theresa Barbee visited her ex-husband in jail and had him sign over the businesses to her, allegedly to prevent them being the subject of a lawsuit if they remained in Mr. Barbee's name. Shortly before the murders, Mr. Barbee had discovered that Theresa was embezzling money from the companies, and this provided another motive for Ron and Theresa to want to take Stephen out of the picture.   Mr. Dodd was also instrumental in causing the serious head injury suffered by Mr. Barbee only a month or so before the murders.  (*Id.* at 5.)

Jackie Barbee also  states that Theresa had a $500,000 bonding insurance policy switched

to her as the beneficiary, without Stephen's knowledge or consent. (*Id.* at 2.) This would give her a motive for wanting Stephen to be convicted, according to Ms. Barbee. (*Id.*) Theresa and Ron Dodd, with whom she was living, also benefitted from the extensive home improvements paid for by Jackie Barbee. (*Id.* at 2-3.) Theresa has also refused to pay back any of the $53,000 she owes Jackie. (Exhibit 20, Declaration of Mr. Barbee, at 14.)

Tina Church confirms that Theresa and Ron Dodd had a financial motive to have Stephen out of the way. "Within two weeks of Stephen's arrest, Theresa went to the jail with paperwork and told Stephen that if he didn't sign over the businesses to her that they would both lose everything." (Exhibit 25, Declaration of Tina Church of July 21, 2010 at 3.) Theresa also thought that it was odd that Ron Dodd wanted his clothes washed at 4 a.m. in the morning and that he power-washed his car, inside and out, the next day. (*Id.*)

During the trial preparations, mitigation expert Amanda Maxwell uncovered significant evidence of financial misdeeds by Theresa which would have provided a motive for Ron Dodd to have committed the murders:

> During this November 2nd meeting I suggested to the attorneys that an investigation into Stephen's business finances be conducted. I had found out that his former wife owed his mother tens of thousands of dollars. Additionally, I had discovered that his former wife, Theresa Barbee, was caught embezzling funds from company accounts, had long been trying to get majority control of the businesses, had lied about DNA evidence and coerced Stephen into signing over his interest in the businesses and was living with his so-called accomplice. As she was not the owner of two multi-million dollar companies, she agreed to keep money on Stephen's jail accounts. She never followed through on this agreement and had stopped payment on the loan she owed to Stephen's mother.
> (Exhibit 16 at 4.)

**iii. Evidence pointing to Mr. Dodd's propensity for violence and Mr. Barbee's lack of it.**

In order to accept the State's case at face value, one has to believe that a person with

absolutely no prior convictions or history of violence brutally strangled a pregnant woman and her young son.  But virtually every declarant appended to this petition speaks of their shock when Stephen was accused of the murders, his lack of a history of violence, and his essentially non-violent nature.  Likewise, virtually every declarant who personally knew or came into contact with Md. Dodd speaks of his history of violence  and his essentially mean and manipulative nature.  It strains credulity to think that Stephen alone committed these murders.

Mary Hackworth states that "Stephen since a child I have always known him to walk away from any kind of confrontation."  (Exhibit 31, Declaration of Mary Hackworth at 2.)  Bobby Boyd, the former Assistant Superintendent of the Azle, Texas School District, states that "Steve was a well-behaved young man when I knew him..." (Exhibit 21.)

The cruelty and malignant nature of the murder of Jayden was repeated often in both the media (Exhibit 10) and at trial, yet Stephen's fondness for children was never raised by his attorneys.  Christy Mackenson, a friend of Stephen's former roommate, states that "Steve was crazy about Trish's kids and was very good with them. (Exhibit 32, Declaration of Christy Mackenson.) Ms. Mackenson also states that "I never saw Steve angry. He was always fun and the life of the party. Based on my prior knowledge of him, an his love for Trish's kids, it is hard for me to believe that Steve is guilty of these murders."(*Id.*)

Melody Tarwater, Stephen's cousin, states that "I felt that Ron Dodd was trouble, and he was not a person that I wanted anything to do with."  (Exhibit 33, Declaration of Melody (Tarwater) Novak.)  She also states that "I was shocked to learn that Stephen had been arrested for something like this, and I still don't believe that he would be capable of such an act....From the first time that I saw Stephen [in jail] he proclaimed his innocence.  He kept saying, 'it's not what it seems, I can't

explain, but I didn't do it.'  I believed Stephen when he made that statement to me."  (*Id.*)

In contrast to Mr. Barbee's history, we have discussed *supra* the fact that Mr. Dodd had a long and well-documented history of violence.  (Exhibit 35, criminal record of Mr. Dodd.).  From 1990, when Mr. Dodd was 19, he has a history of arrests and convictions for assault, aggravated assault, assault causing bodily injury, telephone harassment, and various violations of parole. (*Id.*) These records indicate that Mr. Dodd was in prison from March of 1999 to January of 2003, almost four years, for aggravated assault causing serious bodily injury. (*Id.*)  Mr. Dodd appears to have been released on parole on January 23, 2003.  Shortly after his release, Mr. Dodd went to work for Mr. Barbee (Exhibits 19, 20, 30) and was living with Therea Barbee at the time of the murders.

**iv.  Evidence pointing to the falsity of Mr. Barbee's "confession."**

The State's case against Mr. Barbee rested to a large degree on his "confession" as there was no forensic evidence connecting him to the scene of the murders in the victim's residence.  There is an abundance of evidence to show that his confession was coerced and false.

1) Mr. Barbee explains in his own affidavit how the confession was coerced:

The next morning, Monday, I was once again contacted by the police.  I agreed to meet them at the Wal-Mart at 6:30 p.m.  My headache had still not gone away.  I took three more hydrocodone in addition to 3-4 generic ibuprophen.  Detective Carroll met me and I was taken in for questioning.  They wanted a written statement which I never got to do.  Ron had told me that if I said anything about him, that he would do something to harm my parents. I told Theresa this when I was in the Mansfield Police Department.  A tape was made of my interrogation and it starts and stops.  At this time, my head was hurting all the time as a result of the pipe accident.  Det. Carroll kept saying "Just tell us it was an accident." Eventually I said it was an accident because Det. Carroll said I was going to get the death penalty unless I said this.  Det. Carroll testified that eventually there was a 45-minute confession by me in the restroom.  But this was not true.  Actually, I told him that I didn't do it.  He said that he had enough evidence to give me the death penalty.  He also said that an accident is an accident that would save me.  Finally, they got a false confession from me. I was crying and holding my head, it was hurting bad.
(Exhibit 20,  at 13-14.)

-137-

Mr. Barbee also states that "Det. Carroll asked me if I knew where FM 407 was.  I said yes.  He asked me to go to the computer map and point to FM 407.  I did.  I did not point to a site, only to FM 407." (*Id.* at 14.)  Mr. Barbee has admitted he panicked when he saw the bodies after Ron Dodd left the victim's house, as he thought that he would be blamed for the murders.  (*Id.* at 11.)  He has also admitted that he transported the bodies and met Ron Dodd at a deserted location to conceal them. (*Id.* at 12.)   Hence, he did know the approximate location of the bodies and this knowledge does not show that he actually committed the murders or that his confession was true.

2) Stephen, at the time of his arrest,  also told his niece Jennifer Cherry that Stephen confessed because he "was protecting his family because Ron threatened Stephen that if he told anyone what really happened, he would hurt his family..."  (Exhibit 24, Declaration of Jennifer Cherry at 4.)

3) As we have seen, Stephen has insisted, virtually from the time of his coerced confession, that it was false.  There are not new allegations, presented here for the first time.  Jackie Barbee states that

> Stephen proclaimed his innocence from the very moment that I received a call from him right after his arrest and arrival in Mansfield.  Bill, Theresa, Trish, Jennifer and myself all went to Mansfield and were allowed a short visit for approximately 10 minutes.  During this time Stephen kept saying, "it's not what it looks like, I didn't kill anyone."  Theresa kept telling Stephen to tell the truth, and he said he was.
> (Exhibit 19, Declaration of Jackie Barbee of July 30, 2010 at 5.)

Stephen also refused a guilty plea that would have taken the death penalty off the table. (*Id.* at 6.)  Although Stephen told his attorneys that he was innocent, "[t]hey wanted Stephen to admit to a crime that he did not commit." (*Id.*)

4) One of the main problems with the State's case is the reliance on the testimony of

Detective Carroll regarding the alleged "bathroom confession." In the restroom,  Barbee then allegedly told Carroll the following: that he and Dodd had created a plan to kill Lisa as she was trying to take money from him and ruin him and his relationship with his wife.  (24 RR 102-103.) However, the "money" motive does not hold up, as the evidence shows that Mr. Barbee's past actions have never been particularly motivated by financial considerations.  He gave up and walked away from his expensive house outright, giving it to Theresa when they divorced. As a consequence, there was no acrimony about financial considerations in the divorce.  (*See, e.g.* Exhibit 19, Jackie Barbee's declarations; Exhibit 20, Stephen Barbee's declaration, etc.)  Compared to these large sums, and a house worth in the neighborhood of $400,000, the paltry amount Mr. Barbee would be required to pay in child support would not have even entered into the picture, let alone been the prime motive for two brutal murders.

Additionally, Det. Carroll admitted that his report was not detailed in regard to the bathroom interview at the Tyler Police Department (24 RR 134) and the only report that was generated was a five page report in December 2005, ten months after the incident, which he consulted to support his testimony.  (24 RR 136.)  It strains credulity to believe that a crucial report of an alleged confession in a high-publicity case would be left unwritten for almost a year after the incident.

Author Pat Springer, who wrote a book entitled "*Lethal Charmer*" about this case, has stated in her sworn declaration that she went to the Tyler Police Station where the alleged confession took place and

> When I was shown the bathroom, I observed the entire layout of the room, and the room had two urinals, one enclosed toilet, and the opposite side of the room there was a double sink with a counter.  This was not a large room.  I asked the officer if anyone had ever confessed while in that bathroom, and he said "not to my knowledge."
> (Exhibit 34, Declaration of Patricia Springer.)

Ms. Springer also states that

> I did several interviews for the book including one with Stephen Barbee.  During this interview, Stephen told me that he did not commit the murders, and that Ron Dodd was responsible.  I asked him why he did[n't](sic) say anything right away to the authorities, and he said that he was fearful for his family.  He stated that Ron Dodd had threatened to hurt his family.

(*Id.*)

5) A nationally-recognized expert on false confessions has opined that the circumstances of

the confession are suspicious.  (*See* <u>Exhibit 36</u>, Letter of Dr. Richard A. Leo to attorney Bill Ray.)

Dr. Leo states:

> As I mentioned over the phone, there are two major issues that lawyers must confront if they are putting forward a false confessions defense: first, why the client would have falsely confessed; and second, how we know the confession is false.  The second issue is related to but logically independent of the first.
> In this case, the police suspiciously turned the tape recorder off after they appeared to begin an accusatorial interrogation of Mr. Barbee.  As I understand it from you, they had no good explanation for why they turned the tape recorder off and failed to memorialize the entire interrogation, especially since the tape was running at the beginning of the interrogation.
> In his written account, Mr. Barbee describes an interrogation that is highly coercive—involving death penalty threats in the absence of confessions and promises of leniency in exchange for confession.  Mr. Barbee describes the kind of interrogation that researchers regard as psychologically coercive and that involve the kind of psychological interrogation techniques that typically lead to false confessions when false confessions occur.  However, these very same interrogation techniques can also coerce true confessions.
>
> Further, Mr. Barbee consistently maintained to counsel that during the interrogation he was coerced into stating that he committed the murders by threats of the death penalty, that portions of his interrogation, including Det. Carroll banging on the table and threatening him, were missing from the recording provided to counsel, and that he spent only a brief time in the bathroom with Det. Carroll.  Notwithstanding these facts, counsel did not give Mr. Barbee the option of testifying during the suppression hearing, thus leaving the State's case unrefuted.
>
> There is little doubt that the most damaging evidence in this case was Mr. Barbee's alleged statement to Det. Carroll.  To say that the circumstances of the alleged "bathroom" confession are unusual are an understatement.  This alleged confession was not memorialized in Det. Carroll's notes and it occurred conveniently out of recording range.  It simply defies coincidence that the tape recorder was turned off just as the detectives began to accuse Mr. Barbee of the murders, and that none of his responses after this point nor any of the police interrogation appear on the recording, until later when Det. Carroll leads him

through his statement after the alleged "confession" in the bathroom.
(Exhibit 36, Letter of Dr. Leo.)

It is important to note that Dr. Leo was not used by the defense due to his opinion that the confession was likely to be true.[90]   Dr. Leo's opinion, however, was based on a number of mis-perceptions and incomplete information that should and could have been cleared up by defense counsel.  Dr. Leo thought that Mr. Dodd did not have a motive to commit the murders, whereas he had a huge financial motive as discussed above.   In fact, there was no motive for Mr. Dodd to merely "assist" Mr. Barbee in the concealment of the bodies, as the State's case had it.  Secondly, Dr. Leo was troubled by his assumption that he told his wife that he had committed the murders, when in fact he merely told her of his involvement in the disposal of the bodies.  Dr. Leo did not know that Mr. Barbee has a long history of consistently denying that he committed the murders, to his wife and everyone else involved in this case, while admitting that he disposed of the bodies.  Third, Dr. Leo was disturbed by the fact that Mr. Barbee led the police to the bodies, apparently not knowing or not being told by the defense attorneys that he had admitted his involvement in burying the bodies, and thus knew where they were buried,  and that the police already knew the approximate location of the bodies from Ron Dodd's confession.[91]

---

[90]    In fact, the trial attorneys  have eagerly seized upon this as support for their failure to call this witness in support of Petitioner's claim of actual innocence and to denigrate the claim of innocence generally.  (Exhibit 37 at 4-5.)  However, the failure of the defense attorneys to fully inform Dr. Leo of the facts surrounding Petitioner's "confession"and the facts of the case led directly to his negative opinion.  Dr. Leo's letter is just one more indication of the trial attorneys' ineffectiveness.

[91]    It should be noted that false confessions, even in murder cases, are far from uncommon.  *See, e.g., "Two Alleged False Murder Confessions for Waukegan Police Officer,"* by Dan Hinkel, Chicago Tribune, Sept. 25, 2010 (Jerry Hobbs confessed to killing his 9-year-old daughter and her friend; 5 years in prison before DNA cleared him); "*Confessing to Crime, but Innocent",*  by John Schwartz, New York Times, Sept. 10, 2010 (several false confessions to rape and murder; Jeffrey Deskovic confessed to murder; prosecutors asked jury to consider his "highly detailed" confession which proved to be false); "*DNA Clears Man Wrongly Convicted of*

**B. What the State Court Held.**

This claim was first presented to this Court in Mr. Barbee's initial federal habeas petition, as Claim One.  This Court stayed those proceedings and held Mr. Barbee's petition in abeyance in order to present his unexhausted claims in state court.  This claim was then first presented to the state courts as Claim One in Mr. Barbee's subsequent petition.  The Texas Court of Criminal Appeals held that only Claim Two, the conflict of interest claim, met the successor writ standards under Section 11.071 Sec. 5(a).  Claim 1 was  dismissed "as an abuse of the writ" because those allegations "do not satisfy the requirements of Article 11.071 Section 5." *Ex parte Stephen Dale Barbee,* No. WR-71,070-02, at 2. (Tex. Crim. App. May 8, 2013)(Exhibit 52.)  Hence, it was not denied on the merits but only on procedural grounds,  and the 2254(d) standard of review does not apply.  Nor does procedural default apply to claims of actual innocence under the "miscarriage of justice" exception to procedural default.

**C. Why the Claim Is Not Barred Under 2254(d).**

**i) The "gateway" claim of actual innocence.**

There are two types of claims advanced in federal habeas corpus proceedings.  "Merits" claims are those claims upon which a federal court may grant relief. "Gateway" claims are those claims which are used to explain why otherwise procedurally barred constitutional claims should be considered on the merits.

Mr. Barbee has shown *supra* a compelling case of freestanding innocence as well as

---

*1988 Murder,"* Associated Press, April 28, 2010 (Frank Sterling convicted of murder after all-night interrogation resulted in confession; DNA testing cleared him); *"DNA Clears Man Convicted of Murder at 15",* Associated Press, Sept. 9, 2009 (Anthony Caravella wrongly convicted of murder and rape 26 years ago; death penalty sought; DNA evidence cleared him.)

innocence of the death penalty.  Additionally, at the very least  he has also shown sufficient prejudice for him to meet the *Strickland* standards for ineffectiveness of counsel for failure to effectively present his case for actual innocence.

The procedural default doctrine is not applicable to gateway claims for two reasons. First, a federal court may not grant relief from a state court judgment based **purely** upon a gateway claim; the favorable resolution of a gateway claim merely permits a federal court to consider an otherwise defaulted merit claim. Thus, a state's interest in finality is not compelling at the gate-keeping stage because the petitioner is merely seeking authorization from the court to apply for the writ. Second, the question  of procedural default is a *purely federal inquiry*. Federal courts decide which merit claims should be reviewed, and while a state's disposition of a case on procedural grounds is a relevant consideration with respect to merit claims, a state may not preemptively determine the scope of a federal court's discretion.

In  *Herrera v. Collins*, 506 U.S. 390 (1993), and *Schlup v. Delo*, 513 U.S. 298 (1995), the Supreme Court defined the difference between merit claims and gateway claims.  *Herrera* and *Schlup*  explain that merit claims and gateway claims serve distinct purposes.

In  *Herrera,* the habeas petitioner alleged that he was actually innocent of the crime for which he was convicted and sentenced to death, but he did not allege a constitutional, trial error. Without an accompanying constitutional claim, a plurality of the Supreme Court held, his claim of actual innocence was irrelevant. "A claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to  have his otherwise barred constitutional claim considered on the merits." *Herrera*, 506 U.S. at 404.[92]

---

[92]  While *Herrera* was a plurality opinion, all nine Justices of the Supreme Court agreed that Herrera's actual innocence claim could serve as a gateway to another constitutional claim.

Herrera's claim of actual innocence was of no import because Herrera did not seek to excuse a procedural error so that he might bring an independent constitutional claim challenging his conviction or sentence. (*Id.*)  The gateway claim of actual innocence would only be relevant if "the prisoner supplements his constitutional claim with a colorable showing of actual innocence." (*Id.* at 404 (emphasis in original) citing *Kuhlman v. Wilson*, 477 U.S. 436, 454 (1986).)  In other words, had Herrera presented a separate merit claim -- one amounting to a denial of a federal constitutional right -- Herrera could have asserted actual innocence as his gateway claim to excuse the default of his merit claim.

The situation was different in *Schlup v. Delo*, 513 U.S. 298 (1995) where Schlup filed a second federal habeas corpus petition asserting that he was actually innocent and that he was denied the effective assistance of trial counsel. Schlup's ineffectiveness claim was procedurally defaulted; nevertheless, the Supreme Court remanded his case for further proceedings to determine if he could demonstrate sufficient evidence of his actual innocence so that the procedural default of his ineffectiveness claim could be excused. *Schlup*, 513 U.S. at 332.

In *Schlup,* the Supreme Court again noted the fundamental distinction between gateway claims and merit claims. Gateway claims, that Court held, are procedural rather than substantive. *Schlup,* 513 U.S. at 314. Because no relief can be granted on claims that are purely procedural, a state has no interest in blocking a federal court's review of that claim; therefore, the federal courts were not restrained by the fact that much of Schlup's evidence of actual innocence was presented for the first time in a successor habeas petition. (*Id.*)  Rather, the Supreme  Court characterized Schlup's case as resting, in the final analysis, on his underlying merit claim, which could only be addressed if Schlup proved his gateway claim. (*Id.* at 316.)

More recently, in *House v. Bell,* 126 S. Ct. 2064 (2006)  the Supreme Court answered the

following  two questions which are important in determining the question of procedural default in

Mr. Barbee's case:

> 1.  Did the majority below err in applying this Court's decision in *Schlup v. Delo* [513 U.S.
> 298 (1995) to hold that Petitioner's compelling new evidence, though presenting at the very
> least a colorable claim of actual innocence, was as a matter of law insufficient to excuse his
> failure to present that evidence before the state courts–merely because he had failed to
> negate each and every item of circumstantial evidence that had been offered against him at
> the original trial?

> 2.  What constitutes a "truly persuasive showing of actual innocence" pursuant to  *Herrera
> v. Collins* [506 U.S. 390 (1993)] sufficient to warrant freestanding habeas relief?

In *House,* the Supreme Court held that "the habeas court must consider 'all the evidence,'

old and new, incriminating and exculpatory, without regard to whether it would necessarily be

admitted..."  *House,* at 2077, *quoting Schlup* at 327-328.  The Court emphasized that

> the *Schlup* standard does not require absolute certainty about the petitioner's guilt or
> innocence.  A petitioner's burden at the gateway stage is to demonstrate that, more likely
> than not, in light of the new evidence, no reasonable juror would find him guilty beyond a
> reasonable doubt—or, to remove the double negative, that more likely than not any
> reasonable juror would have reasonable doubt."
> *House,* at 2077.

The *House* court added that "[b]ecause a *Schlup* claim involves evidence the trial jury did

not have before it, the inquiry requires the federal court to assess how reasonable jurors would react

to the overall, newly supplemented record." (*House, id.*)  Although "deference" is given to the trial

court's assessment of the evidence, "the *Schlup* inquiry, we repeat, requires a holistic judgment

about 'all the evidence.'" (*House, id.*)  House had an evidentiary hearing regarding his new evidence

of innocence, including newly-discovered DNA evidence.

While *Herrera*, *Schlup* and *House* all deal with the fundamental-miscarriage-of- justice exception to procedural default, they teach that all claims advanced in federal habeas proceedings and, indeed, all arguments advanced in support of them, need not be constrained by the doctrines of exhaustion and procedural default. *See  Vasquez v. Hillery*, 474 U.S. 254, 257-58 (1986) ("We have never held that presentation of additional facts to the district court, pursuant to that court's directions, evades the exhaustion requirement when the prisoner has presented the substance of his claim to the state courts"); *House,* at 2068 ("In certain exceptional cases involving a compelling case of actual innocence, however, the state procedural default rule is not a bar to a federal habeas corpus petition," *citing Schlup* at 319-322.

Federal courts unquestionably owe a great degree of respect to state-court judgments, but not at the expense of an Article III Court's discretion to determine, in the first instance, if merit claims should be reviewed. *See Reed v. Ross*, 468 U.S. 1, 15 (1984) ("This Court has never held, however, that finality, standing alone, provides a sufficient reason for federal courts to compromise their protection of constitutional rights under Sec. 2254"). Comity requires more than protecting the states' interests; those interests must be weighed against the federal courts' authority to remedy fundamental wrongs committed by the states. *See House v. Bell*  at 2076 ("the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a fundamentally unjust incarceration" *quoting Murray v. Carrier,* 477 U.S. 478, 495 (1986).

Thus, procedural default is not applicable to this claim.

**D. State court procedures were inadequate to deal with the factual disputes raised in this claim.**

Despite requesting an evidentiary hearing on this claim, the state courts granted the hearing

-146-

only on Claim 2, the conflict of interest.  Although the hearing did touch on issues of both actual innocence and ineffective assistance of trial counsel for failure to present Mr. Barbee's claim to his jury, the state fact-findings procedures did not resolve the many outstanding factual issues described herein.

**CLAIM TWO: MR. BARBEE WAS DEPRIVED OF DUE PROCESS AND A FAIR TRIAL BECAUSE HIS ATTORNEYS HAD A CONFLICT OF INTEREST.**

Mr. Barbee was denied due process and a fair trial because his attorneys, particularly Mr. Ray, had a conflict of interest that precluded them from effectively representing him at trial. This conflict of interest deprived Petitioner of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

**A. Introduction.**

Both of Mr. Barbee's trial attorneys were appointed by Judge Robert Gill, on the basis of an understanding that they were to "move" the case rapidly through the court process. Recent revelations of a secret agreement between lead counsel Mr. Bill Ray and Judge Gill, in terms of the number of a huge number of appointments he received from Judge Gill and how Judge Gill handled those cases, make clear that Mr. Ray was under pressure to handle this case similarly to the hundreds of others to which he was appointed by Judge Gill. The attorneys were expected to plead Mr. Barbee guilty, and, failing that, they were to put up only a minimal defense so that the case would move quickly. Mr. Ray has been held to have rendered ineffective assistance of counsel and Judge Gill's conduct has been termed "outrageous" by a judge of this Court. This claim could not have been brought earlier, as it is based on revelations that only became public less than a year ago, after Petitioner's state writ application had been denied. The conflict of interest also involves Mr. Moore, as second-chair, as the court's imperative to move the case along quickly also implicated his actions and failures to act.

This is *both* a stand-alone claim of a conflict of interest and a claim that also explains the ineffective assistance of counsel claims (3 through 5) that follow this claim. The failure of Mr.

Barbee's counsel to investigate his actual innocence and the inexplicable jettisoning of a multitude of mitigating evidence become very clear when viewed through the explanatory prism of this claim. This conflict also amounted to ineffective assistance of counsel, as there was no valid strategic reason for this failure and Mr. Barbee was prejudiced as a result.

## B.  Facts in Support of Claim.

The Facts in Support of the prior claim (actual innocence) and the claims of ineffective assistance of trial counsel (Claims Three, Four, and Five)  are hereby incorporated by reference.

### i. Facts previously presented to this Court in the initial federal petition and to the state court in the subsequent state petition.

As mentioned in the factual summaries, there was a multitude of mitigating evidence that was either not investigated or else, when it had been investigated, was not presented at trial.

In February of 2010, shocking revelations came to light regarding secret, long-standing practices in the courtroom of Judge Robert K. Gill, Mr. Barbee's trial judge, and Mr. Bill Ray, Mr. Barbee's lead counsel.  As summarized by Associated press reporter Danny Robbins in his February 21, 2010 article entitled "*Secret Testimony: Tarrant judge acted as prosecutor*":

> For years, thousands of probation revocation cases moved through the courtroom of one Texas judge with remarkable efficiency.
> Robert K. Gill disposed of nearly 8,000 such cases in 14 years as a state district judge before his retirement in 2007.  No other judge in Tarrant County handled more.
> But the method he used to clear his docket, detailed in secret testimony obtained by The Associated press, raises fairness and ethics concerns for legal experts and leads some to think that many of the revocations could be overturned.
> An attorney who regularly represented indigent probationers facing revocation in Gill's court has testified that the judge personally negotiated plea deals, a role normally reserved for prosecutors.  Rejecting Gill's offer often meant a tougher sentence if he later heard the case and decided a violation occurred, the attorney, William H. Ray, said under oath.
> "In his court, as opposed to other courts, there was no interaction with the prosecutors," Ray testified.  "They didn't enter into the conversation unless it became a contested matter."

Ray, a well-known Fort Worth criminal defense attorney, testified at a hearing in federal court last May that was part of a case that has since been sealed.  Documents from the case were obtained by the AP.

The testimony suggests conduct that would violate defendant's constitutional right to due process, according to some who study criminal law and judicial matters.

"The judge, after all, is supposed to be a neutral referee," said John Schmolesky, a law professor at St. Mary's University in San Antonio.

Attorneys who specialize in post-conviction issues said Ray's testimony raises the possibility that every revocation in Gill's court could be challenged, although defendants who have already been denied relief on other grounds would face significant legal hurdles...

The Tarrant County District Attorney's Office was aware of what Gill was doing, said Alan Levy, chief of the criminal division.  Although he acknowledged that the judge's procedure was 'contrary to the way every other court has ever handled these cases,' he said the DA's office went along with it because cases moved rapidly, sentences seemed to fit the offenses and defense attorneys didn't complain.

'No, [the process] was not approved by us,' Levy said.  "But he's the judge.  It's his court.  If we were worried about our rights, I suppose we could have intervened at some point.  But it wasn't our rights [being affected].' ...

Gill's procedure became an issue during a hearing on a writ of habeas corpus filed on behalf of a mentally ill woman whose probation was revoked in his court in 2007.

The woman, Sandra W[],[93] contended that Ray, her court-appointed attorney, was ineffective because he failed to mention her mental condidtion even after she tried to hang herself in her jail cell.

The focus shifted to Gill when Ray testified that W[] received a 15-year prison sentence after she rejected a plea deal in which the judge offered 12 years.

U. S. District Judge John McBryde later vacated W[]'s sentence on the grounds of ineffective counsel.  But he also noted Gill's 'unusual procedure' for sentencing and said he had 'serious concern' that it denied W[] due process....

Ray said in an interview that he disclosed McBryde's ruling to Tarrant County's district court judges and they have allowed him to continue representing indigent defendants on the condition that he attend a five-hour seminar on mitigation.

Ray has received more than $1.3 million from court appointments in Tarrant County the last five years, the most of any attorney, according to data compiled for the AP by the county auditor.

In giving Ray most of the appointments for probation revocations in his court, Gill bypassed the rotation system, or 'wheel', usually used for matching attorneys with indigent defendants.

The Texas Fair Defense Act, in effect since 2001, requires counties to have an impartial system for making court appointments, but it doesn't explicitly state that probation revocations must be included.  Consequently, some counties, including Tarrant, allow judges to choose attorneys for those cases.

---

[93]   The last name of this defendant has been redacted for privacy concerns.

Ray earned $710,000 from his work in Gill's court between 2001 and 2007, an amount that represented 43 percent of his total earnings from court appointments, according to the auditor.

When Gill ran for reelection in 2004, Ray was the largest contributor to the campaign, giving the judge, who was unopposed, $1000....[94]

See Exhibit 38, Danny Robbins, Associated Press, February 21, 2010 article entitled "*Secret Testimony: Tarrant judge acted as prosecutor*."

These revelations only came to light only after Petitioner's writ had been denied in the state courts. On May 12, 2009, Judge John McBryde of the Dallas Division of the United States District Court for the Northern District of Texas held a hearing at which Mr. Ray testified. (Exhibit 39, Hearing on a Writ of Habeas Corpus Before the Honorable John McBryde, United States District Court, Northern District of Texas, May 12, 2009, *W____ v. Quarterman,* No. 4:07-cv-___-A). Mr. Ray was appointed to represent a defendant named Sandra W. (*Id.* at 5.)  She was there because she had allegedly violated her deferred adjudication and was now charged with selling drugs.  Mr. Ray told her that the judge "wants you to plea bargain for twelve years."  (*Id.* at 10.)  Ms. W. told Mr. Ray about her mental health and retardation issues.  (*Id.* at 11.)    She did not accept the twelve years offered to her.  (*Id.* at 13.)  Then she tried to hang herself in prison.  (*Id.* at 14.)  When she returned to the court, she was given fifteen years. (*Id.* at 18.)

Mr. Ray testified that he was appointed by Judge Gill  to represent Ms. W.  on this probation revocation charge.  (*Id.* at 25.)  Mr. Ray explained the appointment system of Judge Gill:

Well, what happened, in Tarrant County there is a rotating basis of people that are appointed, and judges can go outside that rotation and appoint people outside the wheel.  Judge Gill

---

[94]    Despite having no opposition, Judge Gill collected over $20,000.00 in contributions but had "campaign" expenditures of less than $3,000.00.  (Exhibit 46).  The records compiled by the Texas Ethics Commission show that Bill Ray donated $1000.00 as the largest contributor (*see* Exhibit 38, quoted *supra*); co-counsel Tim Moore contributed $300.00; and appellate attorney Mary Thornton contributed $500.00. (Exhibit 46.)   All three large contributors benefitted from appointments by Judge Gill in this case.

appointed me and other judges would appoint other lawyers on people that had probation violations because those cases they never had a jury trial, and they were typically all settled without a trial.  And he would appoint me outside the process, which the law allowed him to do.
(*Id.* at 25.)

He was appointed to the W. case on November 13, 2006.  (*Id.* at 26.)  According to Mr. Ray, Judge Gill "would just appoint me because he felt like I took care of my business pretty well."  (*Id.* at 27.)  This arrangement with Judge Gill started in 2001 or 2002 and Mr. Ray would handle from 4 to 15 cases per week.  (*Id.*)  The total number of cases he handled in this way from Judge Gill was 400 to 500.  (*Id.* at 28.)  The arrangement was unusual because there was no interaction with the prosecutor:

In Judge Gill's court, what would happen is the probation officer would bring their files over to the court.  He would look at the files, and he would write whatever his offer was in the file.  In his court, as opposed to other courts, there was no interaction with the prosecutors.  They didn't enter into the conversation unless it became a contested matter.  So to answer your question more specifically, Judge Gill made the offers and the negotiations, if there were any, and quite frankly, there wasn't much [it] was directly between myself and Judge Gill....he [Judge Gill] would write it [the offer] in the file, and it was generally in a specific part of the file."
(*Id.* at 28.)

"[I]f a person had a robbery deferred adjudication and they had a new offense, the offer was almost always twelve years, and it was even predictable."  (*Id.* at 29.)

On November 13, 2006 Ms. W.  did not want to accept the offer.  (*Id.* at 31.)  Mental health issues usually did not figure into Judge Gill's offers: "[i]f the person was sane and competent, my experience was it didn't make a whole lot of difference." ( *Id.* at 33.)  If Mr. Ray had known about the mental health issues in this case, he would have had her referred to a psychologist to see if she was competent.  (*Id.* at 33.)

-152-

Judge Gill was in the habit of handing out "standard sentences" of 15 years for someone who had a deferred adjudication for a robbery and then dealt in drugs. (*Id.* at 37.)  Judge Gill made an offer of 12 years for Ms. W.  (*Id.* at 38.)  On January 5, 2007, Ms. W. did not accept the offer and hence she was given 15 years.  (*Id.* at 43.)  She was wearing a neck brace as a result of her suicide attempt.  (*Id.* at 43.)

Of particular significance to Mr. Barbee's case are Mr. Ray's admissions in the W. case as to his attitude toward mitigating evidence.  In that case, he admitted that the fact that Ms. W.'s house burned and some of her relatives were killed "wasn't going to make a lot of difference to Judge Gill."  (*Id.* at 54.)  As a result of Judge Gill's indifference to mitigating evidence, Mr. Ray did not investigate the fire, did not investigate Ms. W.'s mental health issues, did not investigate her retardation issues or her attempted suicide. (*Id.* at 55.)  Even though the new offense of dealing drugs was found to be not true in Ms. W.'s case, because the state changed the charge from actual to constructive dealing of drugs, that finding did not make any difference for Judge Gill.  (*Id.* at 61-62, 72.)  As Judge McBryde accurately stated regarding Judge Gill's sentencing routine, "It sounds like he has a fixed routine without taking into account the characteristics of the individuals." (*Id.* at 66.)  Mr. Ray agreed that "He's pretty predictable." (*Id.*)  As he stated, "if they were deferred and they had a new felony offense, the offer was almost always twelve years, and if they got revoked, they would get fifteen years." (*Id.* at 67.)  Mr. Ray had no reason not to raise the mental retardation issue had he known of it.  (*Id.* at 73.)  Mr. Ray believed that even if it had been shown that Ms. W. was mentally retarded, it would not have made much difference to Judge Gill.  (*Id.* at 74.)

Judge McBryde held that because Ms. W. had a neck collar on when Mr. Ray visited her, he should have made further inquiry as to what the problem was and that would have led to him

-153-

finding out about her mental problems.(*Id.* at 78.)  Judge McBryde also stated that "I think what Judge Gill did is outrageous....[i]n my view what he did is outrageous, not considering her mental condition or retardation." (*Id.* at 82.)  The judge also added that "it's apparent in this case there has been a miscarriage of justice." (*Id.* at 85.)

On August 19, 2009, Judge McBryde issued a detailed and lengthy Memorandum Opinion and Order holding that Ms. W. was entitled to habeas corpus relief and that Mr. Ray had rendered ineffective assistance of counsel.  (Exhibit 40, Memorandum Opinion and Order, by Honorable John McBryde, United States District Court, Northern District of Texas, August 19, 2009, *W_____ v. Quarterman,* No. 4:07-cv-___-A.)  The opinion summarized the extensive mental health problems of Ms. W. (*Id.* at 10-13.)  The report was particularly scathing in its description of Mr. Ray's handling of the case:

> The court is satisfied that Ray had sufficient information in advance of the January 5, 2007, hearing to show that there was available evidence that applicant had mental shortcomings.  She told him that she had attempted to commit suicide, had mental illnesses, and was mentally retarded.  Ray did not take an interest in any of those things, and did not seek to acquire any knowledge about them.  If he had been providing applicant with the kind of legal assistance to which she constitutionally was entitled, he would have made further inquiry, including and studying the jail records, the records of John Peter Smith Hospital, and applicant's prison records....
>
> Ray's failure to do those things was not the result of any trial strategy or reasoned decision on his part.  His conduct fell below an objective standard of reasonableness, and was outside even the widest range of reasonable professional assistance.  Ray's conduct amounted to ineffective assistance of counsel that permeated the entire revocation hearing....
>
> The court has concluded, and finds, that there is a reasonable probability that, but for the unprofessional conduct of Ray in failing to acquire and bring to Judge Gill's attention the available information about applicant's suicide attempt, mental illness, and mental retardation, Judge Gill would have taken action different from the action he took....
>
> For the reasons given above, Ray deprived applicant of her right to effective assistance of counsel by his failure to render adequate legal assistance to her.  Ray failed to play the role necessary to ensure that applicant's revocation hearing was fair.  He failed to play the role that is critical to the ability of the adversarial system to produce just results.  (*Id.* at 24-28)(Order signed August 19, 2009.)

In that order, Judge McBryde also ruled that "the factual basis for the claim was not available to her until the May 12, 2009 hearing." (*Id.* at 35-36.) The court also held that it "has a serious concern that applicant was denied due process because of Judge Gill's plea bargaining practice..." (*Id.* at 36.) Judge McBryde granted Ms. W.'s writ, found that Mr. Ray had rendered ineffective assistance of counsel, and ordered either a new hearing or that the case be dismissed. (*Id.* at 35-38.)

### ii.  Summary of the facts developed and presented at the evidentiary hearing in state court.

On September 14, 2011, the Texas Court of Criminal Appeals issued an order finding that this claim satisfied the subsequent writ requirements of Tex. Code Crim. Proc. 11.051 Section 5(a) and remanded the application to the trial court for consideration of the claim. *Ex parte Stephen Dale Barbee,* No. WR-71,070-02 (Tex. Crim. App. Sept. 14, 2011) at 2. The CCA phrased the question to be resolved was whether Mr. Barbee "was deprived of due process and a fair trial because his attorneys had a conflict of interest." (*Id.* at 2.)

The trial court then ordered that a live evidentiary hearing be held solely on this claim on February 22 and 23, 2012, in the 213th Judicial District Court of Tarrant County, Texas, Judge Louis Sturns presiding, on February 22 and 23, 2012. Representing the State were Steven W. Conder and Charles M. Mallin of the Office of the District Attorney of Tarrant County. Representing Petitioner were undersigned counsel and attorney Hilary Sheard.

The subject of the hearing was summarized by this Court in its order holding federal proceedings in abeyance:

> In claim two, Barbee contends he was denied due process and a fair trial because his counsel [Mr. Bill Ray and Mr. Tim Moore] had a conflict of interest that precluded them from effectively representing Barbee at trial. Specifically, Barbee contends there was a secret agreement between his lead counsel and the trial judge

under which the trial judge appointed lead counsel [Mr. Ray] to represent hundreds of indigent defendants in unrelated probation-revocation proceedings. Barbee contends that the trial judge [Judge Gill] personally negotiated plea bargains in the revocation proceedings without a prosecutor's involvement, and if the probationer rejected the plea offer and insisted on a hearing, the sentence would be higher if the hearing resulted in revocation. Barbee contends the trial judge was indifferent to mitigating evidence in the revocation proceedings. He contends that the revocation appointments earned his lead counsel $710,000 (or 43 per cent of his total earnings from court appointments) between 2001 and 2007. Barbee, who was tried and convicted in 2006, concludes that lead counsel's favored status as the sole appointee for hundreds of cases depended on counsel moving cases quickly without undue delay and abandoning due process in favor of efficiency and a high number of dispositions.

Barbee alleges that counsel, in keeping with this pattern of efficiency and high disposition count, put his own financial interests ahead of Barbee's interests by (1) attempting to pressure Barbee into pleading guilty, (2) failing to investigate and present mitigating evidence, (3) acquiescing to voir dire being supervised by a different judge, (4) presenting a short, almost non-existent defense and concluding the trial in 'near-record time', (5) failing to inform the false-confession expert about basic facts which caused him to render an unfavorable opinion, and (6) failing to move for a change of venue.

(Order Granting Motion For Stay and Abeyance, *Barbee v. Thaler,* No. 4:09-cv-074-Y (N.D.

Tex., May 18, 2011, at 3-4).

Three motions were pending before the trial court at the commencement of the hearing. The

first was a motion to designate Petitioner's trial counsel Bill Ray and Tim Moore and the trial Judge,

Robert Gill, as hostile witnesses. The trial court stated it while it would not grant the motion at this

time it would give the defense "latitude in questioning these witnesses." (2 EH 9.)[95] The second

motion was the State's motion to limit the scope of the hearing. (2 EH 10.) Petitioner argued that

in order to show prejudice as a result of the conflict, it would be necessary to delve into instances

of ineffective assistance of counsel. (2 EH 10-13.) The State argued that the hearing should be

---

[95] References to the evidentiary hearing will be designated as "EH" with the volume number preceding the page number. The transcript of that hearing is included herein as Exhibit 49 (1st day, "2 EH") and Exhibit 50 (2nd day, "3 EH").

limited to evidence of any possible conflict.  (2 EH 14-15.)  The trial court ruled that, in light of the order of remand from the Court of Criminal Appeals, "it would allow some testimony with regard to the issue of the impact of any alleged conflict of interest upon the attorneys' representation of Mr. Barbee in this matter."  (2 EH 26.)  The trial court allowed "some latitude" as otherwise "this very issue may have to be readdressed in a second hearing of some sort."  (2 EH 26.)  The third motion was to quash the State's subpoena as to the records of trial counsel's mitigation specialist Amanda Maxwell.  (2 EH 18.)  Arguments were made as to whether the materials were privileged or not. (2 EH 18-24.)  The trial court allowed the State to have access to Ms. Maxwell's materials, but not to any correspondence between Ms. Maxwell and Petitioner's attorneys.   (2 EH 26-27.)  The exhibits that were filed in support of Petitioner's writ were received into evidence. (2 EH 27.)

**Amanda Maxwell** testified that she is a licensed clinical social worker, has extensive training in mitigation techniques, has trained as a court mediator, and has a master's degree in social work. (2 EH 30.)  She is currently employed at the Dallas Independent School District in the Psychological and Social Services Department and also as a mitigation specialist in Collin County. (2 EH 30-31.)  She has specialized in mitigation work since 2004 and has qualified as an expert in many cases.  (2 EH 31.)

Ms. Maxwell was hired by Petitioner's trial attorney Bill Ray in this case, which was her first capital mitigation case. (2 EH 32.)  Her duties in the case began on June 28, 2005.  (2 EH 33.)  Right at the beginning of the case, the attorneys went to Petitioner's mother's house and showed her the "confession" tapes. (2 EH 76.)  At that time, Mr. Ray told Ms. Maxwell that she should include in her mitigation report "all of the good stuff and all of the bad information that I received from the witnesses..."  (2 EH 32.)  She later realized that this is not the normal practice in mitigation work.

(2 EH 32.)   Ms. Maxwell also considered it to be a bad practice because it turned Mr. Barbee's mitigation report into an "aggravation report" and it also became subject to discovery.  (2 EH 33.) She did not know why Mr. Ray wanted the "bad" information written down in the report.  (2 EH 33.) Ms. Maxwell learned both good and bad things about Mr. Barbee.  (2 EH 72.)  After the death of his sister, Petitioner engaged in certain acts of vandalism at the school and stole from some stores in reaction to his sister's death. (2 EH 74-75.)  Some of this, although minor, was information the defense would not want the jury to hear. (2 EH 75.)

    As part of her duties, Ms. Maxwell requested and reviewed Petitioner's mental and physical health records, education records, employment records and family and social history records.  (2 EH 34.)  She also compiled a social history on Mr. Barbee.  (2 EH 34.)  The medical records indicated that Mr. Barbee had suffered a series of head injuries, had a suicide attempt and had a diagnosis of bipolar disorder.  (2 EH 34.)  Mr. Barbee's first head injury occurred when he was eight months old and then he had another when he was 16, and 18 and then again at age 36 or 37.  (2 EH 35.)  This last incident, shortly before his arrest, occurred when Ron Dodd, who was living with Petitioner's ex-wife, dropped a 400-pound pipe on Petitioner's head.  (2 EH 35.)  Ms. Maxwell felt this injury could have been of significant mitigating value at the punishment phase of the trial.  (2 EH 36.)

    Mr. Barbee also had a history of drug use, specifically hydrocodone, as a result of severe migraine headaches caused by the last head injury.  (2 EH 36.)   He was also taking Advil and Tylenol.  (2 EH 36.) Ms. Maxwell also became aware of Petitioner's's diagnosis of Lyme Disease. (2 EH 37.)  As a result of these factors, Ms. Maxwell recommended to Petitioner's attorneys an MRI, a cat-scan and a neuropsychological evaluation. (2 EH 37.)  However, they did not respond to this suggestion. (2 EH 38.)

A later meeting with defense counsel occurred on November 2, 2005. (2 EH 38.)  At that meeting, Ms. Maxwell told the attorneys that Petitioner was hallucinating in the jail and was seeing spiders on the walls. (2 EH 39.)  Ms. Maxwell had also found out that Petitioner's ex-wife Theresa Barbee had visited him in the prison and told him (falsely) that his DNA was all over the crime scene, that he should sign over the two businesses to her, and that she coerced the signing over of the businesses.  (2 EH 39-41.)  Ms. Maxwell also found out that Theresa Barbee had been embezzling money from the businesses. (2 EH 39.)  Theresa Barbee was also trying to obtain 51 per cent ownership of the businesses so she could apply for a minority business loan. (2 EH 40.)  At this time, Theresa Barbee was living with Ron Dodd who had dropped the pipe on Petitioner's head. (2 EH 40.)   Although Theresa Barbee had promised to keep money on Petitioner's books in the jail, she failed to do so. (2 EH 41.)   At the time of this November 2, 2005 meeting, Mr. Barbee's attorneys were attempting to have him plead guilty. (2 EH 41.)

Ms. Maxwell met again with Petitioner's attorneys on November 17, 2005.  (2 EH 41.)  Mr. Ray did not allow Ms. Maxwell to order any of Petitioner's records although she had requested them. (2 EH 42.)  Eventually, she had to go to Azle, Texas and obtain the records personally. (2 EH 42.)  Ms. Maxwell again requested a neuropsychiatrist and a psychiatrist and again there was no response from Mr. Ray or Mr. Moore. (2 EH 42.)  A Dr. Shupe, a psychologist, had apparently been hired. (2 EH 42, 69.)  Again, at this meeting, the overriding issue was to have Mr. Barbee plead guilty. (2 EH 43.)

On December 28, 2005, the defense met with Mr. Barbee in the courtroom.  (2 EH 43.) The purpose was to show Petitioner the crime scene photos and autopsy pictures of the victim in order to convince Mr. Barbee to plead. (2 EH 43.)  The attorneys made Petitioner look at all the pictures.

(2 EH 43-44.)  It was apparent that Petitioner's attorneys were pressuring him to plead. (2 EH 44.)

After Ms. Maxwell submitted her mitigation report to Mr. Ray, she never heard from him. (2 EH

45.)  At one point prior to trial, the defense investigator Kathy Minnick disappeared. (2 EH 45.)  He

was replaced by a man named Stanley Keeton. (2 EH 46.)  He contacted Ms. Maxwell and wanted

to know who all the people were that Ms. Maxwell had previously interviewed. (2 EH 46.)

Although these people were listed in the mitigation report, Mr. Keeton did not know who they were.

(2 EH 46.)  Mr. Keeton had not seen the report. (2 EH 46.)  Some of these witnesses called Ms.

Maxwell and indicated they were confused and didn't understand who Stanley Keeton was or why

he was calling them. (2 EH 48.)  Ms. Maxwell believed that the witnesses were not prepared to

testify and she was not allowed to meet with them to prepare them prior to the trial. (2 EH 48.)  They

were only spoken to briefing by Mr. Keeton and told not to display any emotion or cry. (2 EH 49.)

 In Ms. Maxwell's opinion, the mitigation testimony in Mr. Barbee's trial was "not effective.

Dismal. It was not the information that, had I been allowed to prepare the witnesses, would have

come forward." (2 EH 49-50.)  Additionally, she interviewed helpful witnesses who were not called

at trial. (2 EH 50.)  The jury was not given information about Mr. Barbee's hydrocodone use, his

good acts, his lack of prior arrests. (2 EH 50.)  The relationship of Theresa Barbee and Ron Dodd

was not presented. (2 EH 54.)  The numerous documents gathered by Ms. Maxwell were not used

at trial. (2 EH 55.)

A number of stressor factors, such as business pressures, were also not presented at trial. (2

EH 55-56, 70.)  Also not presented was the fact that Mr. Barbee had caught Theresa Barbee stealing

from the company shortly before the murders. (2 EH 56.)  Other mitigating stressor factors, such as

1) Petitioner's wife pressuring him to recover money from his ex-wife; 2) Petitioner finding out his

father was dying from cancer just days before his arrest; 3) fetal alcohol exposure; 4) his suicide

attempts; 5) a car wreck when he was 16; and 6) the blow to his head shortly before his arrest were not presented to the jury. (2 EH 57-59.)[96]  Also, the fact that Petitioner was a reserve police officer with the Blue Mound Police Department was not presented to the jury as a mitigating factor. (2 EH 60.)  Although Ms. Maxwell has worked on 16 additional capital cases, she had never seen another such case handled as this one was. (2 EH 60-61.)  Mr. Ray and Mr. Moore found Petitioner disgusting because he cried. (2 EH 61.)  At the conclusion of this case, Mr. Ray stated that "we will all end up in federal court answering for this case." (2 EH 63.)

Ms. Maxwell did not keep her original notes of the witness interviews. (2 EH 64.)  She prepared a "Psychosocial History Report" at the request of Mr. Ray and Mr. Moore. (2 EH 66.)  Ms. Maxwell told Mr. Ray that she did not need 40 or 50 people testifying at the trial "all saying the same thing." (2 EH 68.)  This referred to the social history and mitigation report and was made at a time when Ms. Maxwell thought that many people would indeed be testifying on behalf of Petitioner. (2 EH 116.)

When Mr. Ray saw Ms. Maxwell's affidavit submitted in the state habeas proceedings, he promptly sent her a "nasty e-mail" and fired her from the case and another one she was working on for Mr. Ray.  (2 EH 62.)  The submission of the affidavit hurt Ms. Maxwell financially. (2 EH 62.)  It terminated her relationship with Mr. Ray. (2 EH 63.)

---

[96]   On cross examination, Ms. Maxwell testified that State's witness Theresa Barbee answered one question identifying herself as Ron Dodd's boyfriend (2 EH 108); testified briefly regarding the head accident with the pipe (2 EH 109-110); and  mentioned Petitioner's attempted suicide (2 EH 111-112.)  These incidents were not presented by defense witnesses but by Ms. Barbee. (2 EH 124-125.)  Jackie Barbee also mentioned her son's service as a reserve police officer. (2 EH 113-114.)  However, beside these brief references, none of these factors were developed by the defense as mitigation themes in terms of the two special issues and they were "never presented, developed and supported by an expert." (2 EH 125.)  They weren't "developed and presented in a way as a mitigating factor" and this is what she meant when she said these factors "were not presented." (2 EH 125.)

Mr. Barbee's mother Jackie Barbee was unhappy with Mr. Ray from the beginning and wanted different counsel. (2 EH 72-73.) Jackie Barbee believed in Petitioner's innocence. (2 EH 76.)  One of the persons interviewed by Ms. Maxwell, a Mr. Boyd, provided some negative information about acts of vandalism, violence to animals. (2 EH 78-79.) The vandalism acts may have been grief reactions to the death of his sister. (2 EH 122.)

Ms. Maxwell also interviewed Mr. Tim Davis, but her notes of that interview were inadvertently destroyed as a result of a computer crash. (2 EH 80.)[97] Her notes regarding that interview referred to an incident where Mr. Davis and Petitioner were driving and got into an altercation with two other men when Petitioner cut them off. (2 EH 87.) The other men "walked back to Steve's truck and reached in hitting Tim and Steve." (2 EH 87.) They ended up fighting and Mr. Davis pulled Petitioner off the younger man as "Steve had no off button." (2 EH 88.) At the end of this report, Ms. Maxwell wrote that Mr. Davis "would be a good witness....I don't think he would go into court and say anything negative about Steve" and "we could explore this with him, he would be a good witness." (2 EH 118.)  Ms. Maxwell testified that Mr. Ray and Mr. Moore's affidavit, where they stated that "applicant attempted to kill the driver of the other vehicle" was not accurate and there was nothing in her report to that effect. (2 EH 119.)  She testified that in effect Petitioner was the victim of this "road rage" incident as the other men first punched Petitioner and Mr. Davis. (2 EH 120.)  In her opinion, this incident would not justify the defense attorneys' attempt to characterize it as a valid reason to preclude any mention of future dangerousness. (2 EH 121.) The police were not called, she was unaware of any other witnesses to the incident, and the defense attorneys' characterization of it as an "attempt to kill" the other driver was a lie (2 EH 121) and a

_____

[97]   On the State's objection, Ms. Maxwell confirmed that the notes she produced included all the information in the handwritten notes. (2 EH 85.)

mischaracterization of what was in the report. (2 EH 130.)

Ms. Maxwell may also have told the defense attorneys that Petitioner wanted  Theresa Barbee to implicate Ron Dodd in the crime. (2 EH 91.)  At the time she worked for Mr. Ray, she was inexperienced. (2 EH 94.)  With her current experience, she would provide the defense attorney with all the information, both good and bad, but the bad would be provided verbally. (2 EH 95.)  The negative information would not normally be in the written reports. (2 EH 96-97.)  At the time she provided the report in this case she "had no idea the prosecution was even allowed to see my report" and Petitioner's attorneys failed to advise her that it could. (2 EH 97.)  Since this case, Ms. Maxwell has learned "to only provide mitigating information in the final report." (2 EH 97-98.)  In seven or eight years of mitigation training, Ms. Maxwell has been taught that it is "standard procedure" not to write down bad or negative information as it may become discoverable. (2 EH 123-124.)  In her report, Ms. Maxwell wrote that Petitioner had poor behavioral and impulse control (2 EH 100, 104), did not do well under stress (2 EH 101-102), and had numerous girlfriends and a secret cell phone (2 EH 103) but would not have done that in light of her training.  She said that she did not realize that the prosecution would obtain a copy of her report as this was her first capital case.  (2 EH 128.) Ms. Maxwell thought that Petitioner's attorneys may have provided a copy of her report to the prosecution but was not certain of that. (2 EH 129.)   Currently, Ms. Maxwell does not include anything other than mitigating facts in her mitigation report (2 EH 133.)

**Tim Davis** testified that he worked with Petitioner at "All Green Lawn Care" and another company for four years. (2 EH 140.)  He was his best friend for ten years, from 1990 to 2000. (2 EH 141.) Mr. Davis' declarations,  submitted in the subsequent writ, were identified by the witness. (2 EH 140.) Mr. Davis reaffirmed his statement in his supplemental declaration that ""I've been told

that Stephen's attorneys stated in the[ir] affidavit that I told them that Stephen attempted to kill the driver of the other vehicle. That is completely and totally untrue and a lie." (2 EH 163.)  He also reaffirmed his declaration statement that "there is no way I believe that Stephen could have killed anyone." (2 EH 164.)

Mr. Davis characterized Petitioner as easy-going and friendly. (2 EH 142.) An automobile incident in 1996 or 1997 was recalled.  On the highway, in icy driving conditions, two people in a truck swerved in front of Petitioner and Mr. Davis' vehicle and forced them off the road. (2 EH 143.) The two men approached their vehicle, so Mr. Davis and Mr. Barbee rolled down the window to see what they wanted. (2 EH 143.) One of the other drivers tried to punch Mr. Davis so Petitioner and Mr. Davis got out and defended themselves. (2 EH 143.)  Then they got back in the truck and drive away. (2 EH 143) The other people were the aggressors, Mr. Davis and Petitioner were trying to defend themselves, and no one was hurt. (2 EH 144.)

At no time did Mr. Davis ever tell Petitioner's mitigation person or his attorneys that Petitioner tried to kill the other persons and it was nothing even close to that. (2 EH 145.)  The incident was a simple fistfight. (2 EH 145.)  Mr. Davis did not think that Petitioner was violent or that he would be likely to commit future acts of violence and he had never seen him being the aggressor. (2 EH 144-145.)  Mr. Davis would have been willing to be a witness at Petitioner's trial and if he had been called as a witness he would have told the jury that he would "absolutely not" be a threat to society or likely to commit future violent acts. (2 EH 146.)  Had he been asked any "have you heard" or "do you know" questions about Mr. Barbee's past incidences of violence, he would have said "I don't know of any" such incidents. (2 EH 146.) Other than the highway incident where they were defending themselves, "I've never seen Stephen be aggressive at all." (2 EH 146.)

However, he was not asked to testify at Petitioner's trial. (2 EH 147.)

On cross-examination, Mr. Davis testified he did not remember telling Amanda Maxwell that Mr. Barbee ever said "watch this," that he had "no off button," and that "he didn't know how to stop." (2 EH 150-153.)  Mr. Davis reaffirmed on cross-examination that both he and Mr. Barbee were defending themselves during the "road rage" incident. (2 EH 157.)  He had not thought about it much from when it occurred. (2 EH 158.)  Mr. Davis believes what he told Ms. Maxwell was positive as "I don't have anything negative to say about Steve." (2 EH 159.)

**Calvin Cearley,** a teacher at Weatherford College, testified that he met Stephen Barbee about 20 years ago when he began to attend the church where Mr. Cearley was the pastor. (2 EH 166.)  Mr. Barbee and his wife led the children's program and Mr. Barbee was the children's church leader.  (2 EH 167.)  He loved children and animals and had a happy temperament and was polite and respectful. (2 EH 168-169.)  When Mr. Cearley heard about the murders, his reaction was "unbelief." (2 EH 169.)  Yet he was not contacted by Mr. Barbee's defense attorneys at the time of his trial. (2 EH 170.)  Had he been asked about the likelihood of Mr. Barbee being a danger to society or committing future violent acts, he would have told the jury that he was not such a danger. (2 EH 170.)

**Dr. Nancy Cearley,** Calvin Cearly's wife, was the former co-pastor of the church  Mr. Barbee used to attend. (2 EH 173-174.)  She knew Mr. Barbee for 20 years. (2 EH 185.)  She also testified that the church needed a children's church leader and Mr. Barbee took that role. (2 EH 174.)  Under his leadership, the program grew from about ten children to about 75 or 80. (2 EH 174.)  Mr. Barbee did this for two or three years. (2 EH 174.)  His temperament was easy-going, very friendly and very likeable, polite and respectful. (2 EH 175.)  Dr. Cearley knew Mr. Barbee for about 20

years. (2 EH 175.)  In that time, Dr. Cearley never knew Petitioner to commit any acts of violence. (2 EH 175.)

Dr. Cearley was a witness at Petitioner's trial, but she was never asked about his character or  whether he would be likely to commit future violent acts. (2 EH 176.)  This witness had never met Tim Davis and did not know of any incident of alleged "road rage." (2 EH 176.)   Had this witness been asked about her opinion as to the likelihood of Mr. Barbee committing future violent acts, she would have said that he did not think he would be likely to commit these acts. (2 EH 177.)

On cross-examination, Dr. Cearley stated that notwithstanding Petitioner's conviction for the murders, she not only did not believe he would be a future danger, she knew he wouldn't. (2 EH 179.)  Dr. Cearley also reaffirmed her statement in her declaration that she felt that Mr. Barbee's attorneys "were just going through the motions." (2 EH 180.)  This opinion was based on what she saw at trial, that "no evidence or any kind of defense" was being put on. (2 EH 183.)   She was at the trial not because the attorneys asked her, but because she just decided to attend. (2 EH 184.)  Mr. Barbee's attorneys actually told her not to come to the trial.  (2 EH 184.)  She would have liked to tell the jury that he was not the kind of person the State was portraying him to be, that he was actually very friendly and "all the children dearly loved him at the church." (2 EH 185.)  Yet she was not given a chance to tell this to the jury.  (2 EH 185.)  She did not believe Mr. Barbee had committed the murders. (2 EH 186.)

**Mike Cherry,** Petitioner's ex-brother-in-law and an ordained minister,  testified that he has known Mr. Barbee since he was 10 or 11 years old. (2 EH 187, 199.)  Mr. Cherry married Kathy, Mr. Barbee's sister,  in 1980. (2 EH 188.)  Kathy died at age 20 and this affected Mr. Barbee greatly. (2 EH 189.)  Mr. Barbee also had a brother, David, who also died at age 20 in a car accident. (2 EH

189-190.) Thus, Mr. Barbee lost both his brother and sister when they were 20. (2 EH 190.) These losses affected him greatly. (2 EH 189.)

Mr. Barbee married Theresa and Mr. Cherry knew them to have arguments but never anything physical. (2 EH 190.) Stephen Barbee came from a stable family. (2 EH 191.) About one year prior to the murders, Mr. Cherry moved to San Antonio and then just two weeks prior to the murders, he moved back. (2 EH 192.) When he heard about the murders, Mr. Cherry was in "complete shock." (2 EH 192.) He never talked to Mr. Barbee's attorneys. (2 EH 192.) If he had been asked to testify at Mr. Barbee's trial, he would have told the jury that he was not likely to commit violent acts in the future. (2 EH 192.) There was only one occasion where he had seen Mr. Barbee get into a fight and that was at a party when a guest was acting inappropriately and "dirty dancing" around children. (2 EH 193.) Mr. Barbee first asked the man to leave but he didn't. (2 EH 193.) Mr. Cherry had never heard of the alleged incident of road rage and had he been asked about it, he would have said that he knew nothing about it. (2 EH 194.) Mr. Cherry was aware of some of the acts of vandalism of Mr. Barbee's youth. (2 EH 198.)

On cross-examination, Mr. Cherry again stated that he had never seen Mr. Barbee act violently towards his wife, that "there was no violence," and that Mr. Barbee would confide in him about "most everything." (2 EH 199-200.)

**Jennifer Cherry,** Mr. Barbee's niece and Mike Cherry's daughter, testified that she has known Mr. Barbee for 30 years. (2 EH 202-203.) Growing up, he was playful and wanted to make her laugh. (2 EH 204.) Mr. Barbee ran the church children's program and would put on puppet shows and the like for the children. (2 EH 204.) At the time of the murders, Theresa was still in debt to Jackie Barbee as Theresa had taken out a loan to build a cabana in their back yard. (2 EH 204.)

Theresa was living in this house with Ron Dodd at the time of the murders. (2 EH 205.)  It was a very large home, about 6000 square feet.  (2 EH 205.)  In 2002 Jennifer began to work at one of Theresa and Stephen's businesses, "Cowboy Cutters." (2 EH 205.)  Jennifer was Theresa's assistant and worked on the books. (2 EH 206.)  Jennifer became aware that Theresa was embezzling from the company by paying her bills with company money.  (2 EH 206, 207.)  One time, Theresa gave Jennifer $14,000 in cash to deposit and, when she learned that it would alert the IRS, she wanted some of it back.  (2 EH 207.)  Theresa tried to keep Mr. Barbee from seeing the cash. (2 EH 207.)

While working at the office, Jennifer noticed that Theresa would bad-mouth Stephen a lot after they divorced. (2 EH 208.)  Jennifer recalled an incident when they got into a yelling match and Theresa accused Stephen of hitting her, which was false. (2 EH 210-211.)   Although Jennifer told Stephen's attorneys about this incident, they did not want to hear it. (2 EH 211.)  Jennifer had never seen Stephen in a physical fight with Theresa. (2 EH 212.)  After their separation and divorce, Theresa said that she wished Stephen would die. (2 EH 214.)  Although at the trial Theresa said she would love Stephen until the day she died, in reality she had told Jennifer that she hated Stephen. (2 EH 216.)  At the time of the murders, Stephen was living with Ron Dodd. (2 EH 216.)  This did not bother Stephen as he wanted Theresa to be happy. (2 EH 218.)  Jennifer thought that Ron Dodd was "crass, rude and uncouth." (2 EH 223.)

When Jennifer talked to Stephen's attorneys, they seemed set on their opinions and thoughts and they were not interested "in what any of us had to say much." (2 EH 219.)  She did not feel that they prepared her to testify and all they said was "follow my lead." (2 EH 219.)  When Jennifer testified, she was not asked any questions about her opinion of the likelihood of Stephen committing future acts of violence, but if she had been she would have said that she did not think he would. (2

EH 220.)  The attorneys never asked for her opinion as to Stephen's future dangerousness. (2 EH 220.)  Her opinion was that he was not a future danger. (2 EH 220.)  Although she knew Tim Davis, she had never heard of an incident where they were the victims of road rage. (2 EH 220.)  Stephen's attorneys never asked her about this incident. (2 EH 220.)  At trial she was just asked if she loved Stephen. (2 EH 221.)

**Sharon Calvin** testified that she met Stephen Barbee in 1984. (2 EH 226.)  She was friends with his mother. (2 EH 226.)  Stephen attended her church for about a year. (2 EH 226.)  She had nothing bad to say about Stephen. (2 EH 227.)  His attorneys never asked her to testify at trial although she would have been willing to do so. (2 EH 228.)  She was never asked by Stephen's attorneys whether she thought he would be a future danger but if she had been so asked she would have said that she "probably wouldn't be." (2 EH 228.)  Ms. Calvin had never heard of an incident in which Stephen and Mr. Davis were the victims of a road rage incident. (2 EH 229.)  Nor had she ever heard of any incidents of violence involving Stephen. (2 EH 229.)

**Robert Gill** testified he was currently an assistant criminal district attorney in the Tarrant County District Attorney's Office. (2 EH 231.)  From 1993 until 2007 he was a judge in the 213th District Court. (2 EH 232.)  Mr. Gill presided over Stephen Barbee's pre-trial and trial in 2005 and 2006. (2 EH 232.)  When he retired, Mr. Gill was considering running for district attorney of Tarrant County. (2 EH 233.)  But he did not run.  (2 EH 233.)

Mr. Gill was familiar with the article in the Fort Worth Star Telegram of February 21, 2010 entitled "Secret Testimony, Judge Acted As Prosecutor" by Danny Robbins.[98]  He did not dispute the number of case resolutions cited in the article, 8,000 probation revocation cases before his

---

[98]   This is Exhibit 38.

retirement. (2 EH 234.)  Mr. Gill denied that he had ever cited his high case resolution rate in his

campaign materials. (2 EH 234.)  Shown a copy of a web page entitled "welcome to the official web

page of Bob Gill, former presiding judge of the 213th District Court" and whose domain name was

"bobgillcampaign.com," where his case resolution rate was cited, Judge Gill denied that this was

related to a campaign. (2 EH 237.)  He stated that "'Bob Gill Campaign' was the domain name that

I chose for it, but it was not designed in connection with the campaign." (2 EH 237.)  Even though

Mr. Gill had a website domain name of "Bob Gill Campaign" the witness claimed he was not

running a campaign. (2 EH 238.)  He stated that he was considering running for district attorney in

2010 but not in 2007.  (2 EH 238.)  Mr. Gill claimed that the purpose of placing the web page on

the internet was simply to provide "information about the court and about myself." (2 EH 239.)  The

information in that page included "a page dedicated to the number of cases we processed in this

court." (2 EH 239.)  But he claimed this had nothing to do with any political ambitions, it was

simply "because the public wants to know about the number of cases that we disposed of and

handled." (2 EH 240.)  He considered that a high case disposition rate would be something he would

want the public to be aware of if he was running for district attorney. (2 EH 261-262.)

Mr. Gill admitted that he had an arrangement with Mr. Ray regarding the handling of

probation revocation cases in his court, Mr. Barbee's trial court. (2 EH 246.)  Mr. Ray handled a lot

of those cases. (2 EH 247.)  Mr. Gill stated that he did not know if it was common practice for other

judges to have similar arrangements with other attorneys as in 14 years on the bench he never asked

another judge how they handled these cases. (2 EH 248.)  Nor did any information come his way

about these cases as he "never investigated, while I was on the bench, how other judges handled

their probation revocation cases." (2 EH 248.)  Mr. Gill did not dispute the statistic in the article that

said that 60 per cent of those who came to Judge Gill's court for these cases had their probation revoked. (2 EH 248.)

Mr. Gill claimed not to know in how many cases he personally made a recommendation or in how many cases Mr. Ray would attempt to make a plea. (2 EH 249.) Mr. Gill saw no conflict of interest in later presiding over the trial of those persons who had rejected his recommendation of a sentence. (2 EH 250.) Mr. Gill was aware that federal Judge McBryde had termed his conduct in these cases "outrageous." (2 EH 252.) He did not use the Tarrant County rotation system in appointing Mr. Ray to these cases, he stated that he used "another provision of the indigent appointment plan" that "allowed the courts to employ a lawyer to handle probation revocations on the Court's own motion." (2 EH 253.) Mr. Gill appointed Mr. Ray because of his manner of handling the cases and his efficiency but said that was an "oversimplification." (2 EH 253.) He stated that he appointed Mr. Ray because he was "available" and "followed up and took care of business." (2 EH 263.) Mr. Gill claimed never to have checked how much Mr. Ray earned from these cases in his court and did not know if the $710,000 the article cited Mr. Ray was paid between 2001 and 2007 was accurate. (2 EH 253-254.) In those years, Mr. Ray had a "high volume" of cases in Judge Gill's court. (2 EH 254.)

In Mr. Barbee's case, Mr. Gill thought that the case was of average length for a capital case. (2 EH 266.) The guilt-phase defense preparation was three pages but that was "three pages longer than most of them I see." (2 EH 266.) Mr. Gill claimed that in most capital cases he saw no guilt-phase defense at all. (2 EH 266.) He did not remember what mitigation evidence was presented by the defense or whether the witnesses presented any evidence as to the second special issue of future dangerousness. (2 EH 267.) Although he thought that Mr. Barbee was "satisfactorily represented"

by Mr. Moore and Mr. Ray (2 EH 265), Mr. Gill did not "recall a lot of specifics..." (2 EH 268.)

Mr. Gill had no idea how many capital cases Mr. Ray handled in his own court although he could think of two. (2 EH 255.)  In Mr. Barbee's case, Mr. Gill said he signed off on the attorneys' bills without an hourly itemization and it would not be unusual for him to sign off on an attorney voucher that simply listed the number of hours without an hourly itemization.  (2 EH 257.)   If the bill did not look "out of line" he would not request an hourly itemization. (2 EH 257.)

Mr. Gill ran unopposed for re-election as a judge in the 213th District Court but had no recollection of his total campaign contributions. (2 EH 259.)  He did "not doubt" that Mr. Ray contributed to the campaign in the amount of $1000. (2 EH 259.)  His total contributions in that campaign were $20,175. (2 EH 259.)  Mr. Moore contributed $300.  (2 EH 260.)  Mr. Gill discussed his testimony with Mr. Conder and Mr. Mallin once before testifying but not with Mr. Ray or Mr. Moore. (2 EH 261.)

**Jackie Barbee,** Petitioner's mother, testified that Mr. Ray and Mr. Moore represented her son Stephen at his capital murder trial. (2 EH 270.)  Stephen was a person with a good heart and a hard worker.  (2 EH 271.)  He was involved in Sunday school since he was three years old. (2 EH 271.)  Mrs. Barbee had three children and two of them died at age 20.  (2 EH 272.)  Both deaths affected Stephen greatly. (2 EH 273.)  He married Theresa in 1996.  (2 EH 274.)  Stephen started a tree and yard service called "All Four Seasons" and it became very successful. (2 EH 274.)  Mrs. Barbee lent them money to build a dream house.  (2 EH 275.)  When Stephen and Theresa divorced, he let her have everything and moved to an apartment. (2 EH 275.)  At one point, Mrs. Barbee became aware that Theresa had switched herself as the beneficiary of a life insurance policy that was meant to be a performance bond for a tree job. (2 EH 276.)

-172-

Only ten days after Mr. Ray and Mr. Moore were appointed, Stephen thought he was going to have to defend himself. (2 EH 278.)  The attorneys only wanted to show a film of the confession and that's the only thing they concentrated on at first. (2 EH 279.)  Because of the attorneys' efforts to have the family view the film, Mrs. Barbee came to the conclusion that they wanted Stephen to plead guilty. (2 EH 280.)  The attorneys "didn't care for me at all, and they didn't talk to Bill [Petitioner's father] because he was sick." (2 EH 290.)  Mrs. Barbee once overheard Theresa saying that she wished that Stephen was dead. (2 EH 281.)

Before the trial, Mrs. Barbee met with Amanda Maxwell two or three times.  (2 EH 283.)  Ms. Maxwell knew everything about Stephen's background.  (2 EH 283.)  But much of this information was not presented at the trial. (2 EH 284.)  It was a surprise when the attorneys failed to present many of her findings. (2 EH 284.)  At the time of the trial, Mrs. Barbee did not know anything about the alleged "road rage" incident herself other than what Amanda Maxwell had told her. (2 EH 285.)[99]  When she testified at Stephen's trial, Mrs. Barbee did not feel as if she had been prepared for a picture that she was handed and there were things that she was not asked about which she would have liked to tell the jury. (2 EH 282.)  The argument in the guilt phase, when Mr. Ray told the jury that Stephen was guilty, came as a shock to Mrs. Barbee.  (2 EH 282.)

**William "Bill" Ray** testified that he was admitted to practice law in Texas in 1985 and was a criminal defense attorney. (3 EH 7.)  Previously he was a prosecutor. (3 EH 135.)  At the time of his appointment to Petitioner's case, about 70 to 80 per cent of his practice was court-appointed. (3 EH 8.)  Mr. Barbee's trial court, where Judge Gill was sitting, accounted for "certainly more than

---

[99]   The attorneys had apparently told Ms. Maxwell that "we can't use Tim Davis because of a road rage incident" and that is what she told Mrs. Barbee. (2 EH 285.)  Ms. Maxwell's report indicates that she herself felt that Mr. Davis would be a helpful witness and should be called as a witness.

25 percent and certainly less than 75" per cent of his practice. (3 EH 9.)  It could have been 50 per cent of his practice. (3 EH 9.)  Mr. Ray asked Judge Gill to appoint Mr. Moore as co-counsel. (3 EH 12, 14.)

As for the division of duties, Mr. Ray stated that he handled "the DNA review and determined what evidence we were going to send to Identigene in Houston to be examined."  (3 EH 13.)  It was a collaborative effort on the part of both attorneys. (3 EH 13.)  Mr. Ray may have been more responsible for the penalty phase. (3 EH 14.)

As far as the pre-trial publicity, Mr. Ray agreed that it was heightened in Tarrant County because the local paper, the Star-Telegram, covered the crime. (3 EH 16.)  Mr. Ray and Mr. Moore discussed a change of venue motion with Mr. Barbee and he may have wanted it filed. (3 EH 17.)  However, they did not file a motion for change of venue because when Mr. Ray has done this in the past "the people in the town get the impression that whoever you're trying is such a notorious criminal that he's actually not treated as fair there as he would be here.  That's my concern in the change of venue." (3 EH 17.) Mr. Ray stated that Judge Gill suppressed some evidence relating to the confessions at the pre-trial suppression hearing. (3 EH 146.)

Mr. Ray testified he was paid $40,400 for his work on this case (3 EH 19) but later stated it was $66,000. (3 EH 41.)

Mr. Barbee told Mr. Ray and Mr. Moore that Ron Dodd may have been the actual murderer. (3 EH 21.)   Their initial investigator was Kathy Minnich and she "fell in love with a judge who retired and they moved to Florida, and we had to get someone else." (3 EH 21.)  Ms. Minnich submitted a report from a person named Donald Painter who was housed in the Tarrant County Jail. (3 EH 22.)  In the report, signed by Mr. Painter, he stated that he was housed with Mr. Dodd. (3 EH

-174-

23.)  Mr. Dodd would ask Mr. Painter to call Theresa Barbee and Mr. Dodd gave him money to make the calls.  Initially, Mr. Dodd said that Mr. Barbee had committed the murders but gradually his story changed.  Dodd later said that Barbee was upset about a woman (identified as the victim Lisa Underwood) who wanted him to leave his wife. (3 EH 23.)  He drove Barbee to the woman's house, told Barbee to wait in the truck and went in to talk to her. (3 EH 23.)  Dodd said the girl got mad and he stopped telling the story to Painter. (3 EH 24.)  Later, Painter said that Theresa told Dodd not to worry because she washed down his truck and the police would not find anything because it was clean.  (3 EH 24.)  Another day, Dodd admitted hitting the child: "I hit that kid. I threw him face down on the bed and sat on him...Another day Dodd told Painter that he helped put the bodies in the girl's car." (3 EH 24.)  Dodd said that Mr. Barbee drove off with the bodies and then ran out of gas and called Dodd. (3 EH 24.)  Painter at first believed that Barbee had committed the murders and told him he needed to die. (3 EH 25.)  Then after talking with him, Dodd believed his story and came to believe that "Dodd was the actual killer."  (3 EH 25.)  Painter was reluctant to come forward because Dodd was a member of the Aryan Brotherhood, a powerful prison gang. (3 EH 25-26.)  The statement of Mr. Painter taken by Ms. Minnich was admitted into evidence. (3 EH 27.)

On cross examination, Mr. Ray claimed that he did not call Mr. Painter as a witness because he had "an extensive criminal history."  (3 EH 171-172.)  Mr. Ray also claimed that Mr. Barbee had given Mr. Painter some money which he characterized as a "bribe." (3 EH 173.)  Mr. Ray was given some documents which were introduced into evidence as Respondent's 11 and 12. (3 EH 178.)  The letter from Mr. Barbee expresses concern that Mr. Painter was asking for money.  (Respondent's 12.)  Mr. Ray believed that it was "more if not all Painter's idea.  I don't think, given the way it all kind of transpired, that it was Steve's idea to bribe Donald Painter." (3 EH 178.)  Although they had

nothing to indicate that Mr. Painter was lying about what he heard from Mr Dodd, or how Painter came to be in possession of a knowledge of the facts of the case, Mr. Ray decided that he would not be a good witness, "worse than anybody else we could have got to the courtroom." (3 EH 179.)

Mr. Ray said that he told Mr. Barbee he should think about pleading guilty because of his statements to the police. (3 EH 28.)  Yet Mr. Ray admitted that "[t]he State never offered him anything." (3 EH 183.)  Mr. Ray admitted that one of his first acts was to have Mr. Barbee's family view the tape of the confession. (3 EH 29.)  Mr. Ray said that this was done because he wanted them to know "what the testimony was going to be." (3 EH 170.)  He also admitted he made no opening statement, called no witnesses at the guilt phase other than one to obtain a foundation for some records, and the total of the defense guilt phase presentation was three transcript pages. (3 EH 29.)  The guilt and punishment phases together were under three days. (3 EH 29.)  Mr. Ray told the jury that one of the murders was not intentional. (3 EH 30.)  Mr. Barbee had told Mr. Ray all along that he was innocent. (3 EH 31.)  "Mr. Barbee told me unequivocally, in no uncertain terms, that he was completely innocent of what he was charged with. The evidence that I found in this case, from various sources, tended to indicate that was not a correct statement."  (3 EH 32.)   Mr. Ray also admitted that in the affidavit he submitted for the state in the state habeas proceedings he also stated that "Mr. Barbee has, from the beginning of...your representation, maintained that he was innocent." (3 EH 34.)  Mr. Ray then qualified that as follows: "The problem with Mr. Barbee, which is what a lot of clients have, is they don't understand the law of parties....He felt in his own mind that he was innocent...Some of the things that Mr. Barbee said, while he felt made him innocent, and I firmly believe that he felt that way, they also subjected him to liability under the law of parties." (3 EH 35-36.) However, none of this qualifying language appeared in the affidavit Mr. Ray and Mr. Moore

submitted for the state.

Mr. Ray denied that he had an "arrangement" or "agreement" with Judge Gill to handle probation revocation cases. (3 EH 37.)  He termed it a "situation": "We had a situation where Judge Gill would appoint me on criminal cases...they weren't all probation revocations...and I would represent those people, and then he would decide the case, if it needed to be decided.  Some of them resulted in plea agreements.  And then he would appoint me on another case, and we would do that same process over.  It could have ended at any time and it ultimately did." (3 EH 37.)  Mr. Ray also said that "I don't think we had an arrangement...Judge Gill appointed me, I took care of cases, he paid me based on the work I did, and he appointed me on other cases." (3 EH 40.)  Yet again, Mr. Ray denied this was an "agreement": "I don't know what the right word is.  If it's a word to say we had an agreement, that's the wrong word.  So I guess we can call it whatever we want." (3 EH 42.)  Except, apparently, an "arrangement" or "agreement."

Whatever it was called, it started in 2001 or 2002. (3 EH 40.)  Judge Gill originally had another lawyer handling these case from the time of his election in 1991.  (3 EH 43.)  Then that lawyer did not want to do the cases anymore and Mr. Ray volunteered to take them over. (3 EH 43.)  He handled 5 to 15 cases per week and about 400 to 500 cases before Judge Gill. (3 EH 41.)  In five years, Mr. Ray made about $1.3 million in five years and in that time, about $710,000 from cases before Judge Gill,  and $66,000 from Mr. Barbee's case. (3 EH 41.)[100]  Mr. Ray did not dispute that this represented about 43 per cent of his earnings. (3 EH 42.)  Mr. Ray agreed that Judge Gill handled "many more probation revocation cases...in...2001 through 2007." (3 EH 44.)

Mr. Ray recalled a newspaper article written by Danny Robbins that appeared on February

---

[100]   This contradicts his earlier statement that he made only about $40,000 from the case. (3 EH 19.)

21, 2010 in the Fort Worth Star-Telegram. (3 EH 37.)  He remembered the article's reference to his

testimony in the W_____ hearing in Judge McBryde's court.  (3 EH 38.)  Mr. Ray said he told the

truth at that hearing. (3 EH 38.)  In the year 2000, a bill was passed which had as its object the goal

of promoting the more equitable distribution of cases by a system of random or rotational selection

of attorneys, known as the "wheel." (3 EH 45.)  Mr. Ray claimed that the probation revocation cases

were not required to be included in this system. (3 EH 45.)  Some judges utilize the "wheel" for

these probation revocation cases. (3 EH 46.)

     Mr. Ray said that mitigating evidence did not make a whole lot of difference to Judge Gill

in these cases. (3 EH 49.)  His offers often did not take into account the personal characteristics of

the defendant. (3 EH 50.)  As a result of the federal case, Mr. Ray was found to have rendered

ineffective assistance of counsel and ordered to take a five-hour course on mitigating evidence. (3

EH 50.)  When Judge Gill ran for reelection unopposed, Mr. Ray donated $1000 to his campaign.

(3 EH 51.)  At the time the contribution was made, it was possible that Judge Gill could have had

an opponent. (3 EH 137.)

     Mr. Ray stated that he drafted two memos of understanding for Mr. Barbee to sign. (3 EH

51- 52.)  It was Mr. Ray's idea because he did not trust Mr. Barbee or his family. (3 EH 53.)  In

drafting these memos, Mr. Ray admitted that  "I thought we might be sitting here one day," in other

words that his work would one day be the subject of an ineffective assistance of counsel claim.  (3

EH 53.)  Mr. Ray also admitted that the memo was "protection" for him if Mr. Barbee changed his

mind (3 EH 54) or said something different later. (3 EH 187-188.)   Mr. Barbee did not want to sign

the second memo. (3 EH 56.)  Mr. Ray did not obtain Mr. Barbee's consent to the divulging of the

memo as "[i]t's my understanding that when he claims I'm an ineffective lawyer, I can provide

whatever I need to do to defend myself, which is what I did." (3 EH 56.)  The memo was drafted to protect himself from a possible state post-conviction writ alleging ineffectiveness. (3 EH 57.)  Nor did Mr. Ray obtain Mr. Barbee's permission to divulge his letters or other confidential attorney work-product. (3 EH 57-58.)  Mr. Ray asserted that he could do anything to defend himself against the ineffectiveness claim, including divulging confidential communications. (3 EH 63-64.)

Regarding the affidavit he and Mr. Moore submitted to the state, Mr. Ray stated that the district attorney had requested it. (3 EH 66.)  Mr. Ray drafted the affidavit after talking to Mr. Moore. (3 EH 67.)   Regarding his statement in the affidavit that he assembled a team of experts, Mr. Ray admitted that he did not present any testimony from the "licenced forensic psychologist," the "licenced forensic psychiatrist," the expert on false confessions, and the mitigation specialist he referred to in his affidavit as showing that he properly prepared for the trial. (3 EH 68-69.)  He also did not present any expert to explain the significance of the cell phone records or himself explain their significance to the jury. (3 EH 69, 191.)  Yet those cell phone records were the entirety of his guilt phase presentation. (3 EH 69.)  On cross examination, Mr. Ray stated at length that he obtained the records through subpoenas under seal, and what they purported to show. (3 EH 140-145.)  He also explained that he though he did not introduce the cell phone records into evidence because there was a "mix-up on [his] understanding" of what the record showed. (3 EH 144.)  But he actually did introduce the records at the guilt phase. (24 RR 177.)

Although Mr. Ray stated in the affidavit that Mr. Barbee "initially explained that the murders were accidental" this explanation was to the police officers, not to his attorneys. (3 EH 69.)  Mr. Ray admitted that from the first time he met Petitioner, Mr. Barbee insisted he did not commit the murders. (3 EH 70.)  Although in his affidavit Mr. Ray had written that "Applicant ultimately took

the position that Ron Dodd killed Lisa," Mr. Ray admitted that this referred to his first statements to the police that it was an accident. (3 EH 70-71.)  Mr. Ray admitted that "Stephen consistently stated that Ron Dodd was the real killer" from the outset of the case. (3 EH 71.)  Mr. Ray also used the word "steadfast" in relation to Mr. Barbee's statements about Ron Dodd's culpability. (3 EH 71.)

Despite these admissions, Mr. Ray wrote in his affidavit that "due to Applicant continuously changing his version of the events and his specific involvement, it was difficult to develop a defense theory that would be beneficial or consistent in both the guilt/innocence and punishment phases of the trial." (3 EH 72.)  Mr. Ray the problem was that he had "two or three different theories of how it happened" and Petitioner allegedly provided different facts at different times. (3 EH 73, 185.)  Mr. Ray admitted that "[i]f I said something [in the affidavit] that reads a little bit different than that, then, you know, maybe that's not completely accurate." (3 EH 73.)  He stated that the "inconsistencies" he was referring to were those that had arisen before he was appointed to the case. (3 EH 75.)  Mr. Ray admitted that in his affidavit he had attributed to Mr. Barbee, as the reason he did not want to testify, something Mr. Barbee had crossed out in the memo of understanding. (3 EH 76-77.)

As to Dr. Richard Leo, an expert on false confessions, Mr. Ray first sent him a letter and materials. (3 EH 80-81.)  The motion for his appointment was filed under seal. (3 EH 147-1148.)  Mr. Ray did not inform Dr. Leo that Mr. Barbee's admission that he had helped move the bodies did not indicate that he was necessarily guilty of the murders. (3 EH 83.)  In his report, Dr. Leo said that one of the reasons he felt the confession was true was that Mr. Barbee had led the police to the bodies. (3 EH 83.)  Yet Mr. Ray could not state that he had told Dr. Leo that Mr. Barbee had admitted to helping conceal the bodies, but not to the murders. (3 EH 83.)  Mr. Ray also admitted

giving Dr. Leo false information about the cell phone records which Mr. Ray claimed indicated that Mr. Barbee was lying. (3 EH 84-85.)  That information, relied upon by Dr. Leo, was false. (3 EH 84.)  Mr. Ray sent a corrective letter to Dr. Leo after he had rendered his opinion that the confession was true. (3 EH 85, 151-153.)  The false information was not shared with Mr. Barbee. (3 EH 88.) Dr. Leo also based his opinion on his belief that Ron Dodd had no motive to commit the murders. (3 EH 90.)  On cross examination, Mr. Ray stated that "in virtually all confession cases, the suspect will immediately recant the confession after the police leave the room and a loved one enters.  And that didn't happen in this case." (3 EH 150.)[101]  Mr. Ray found Dr. Leo's report "unfavorable," yet his own omissions contributed to the unfavorable findings of that report. (3 EH 155.)

A Dr. Shupe was also contacted and he examined Mr. Barbee. (3 EH 163.)  Mr. Ray did not use him as a witness because the doctor said that he believed Mr. Barbee was "fixated" on how his mother would view him and so "I did not think that was going to help us." (3 EH 164.)  Dr. Shupe examined Mr. Barbee but even though he "came up with some explanations to kind of diminish his responsibility for the deaths" he was not called because he "got this bipolar disorder result" and even though that jibed with Dr. Goodness' finding of Lyme's Disease, which "might cause some bipolar symptoms," Mr. Ray felt that his three experts were "getting different answers and that just wasn't going to work." (3 EH 164.)  Mr. Ray also testified that he had a Dr. Norman interview Mr. Barbee but he was not called as a witness because  "he didn't think there was anything wrong with him, specifically over getting hit on the head with this pipe." (3 EH 182.)   Mr. Ray, in dismissing anything or any witness who had the least perceived or possible risk or unfavorable outcome, did not explain why he did not just call those experts who agreed with each other or question them on

---

[101]   Yet Mr. Ray later admitted that Mr. Barbee did recant when he met with his mother Jackie Barbee. (3 EH 192.)

potentially helpful areas.

Mr. Ray said he did not call Theresa Barbee as a witness because he did not know "which way the sail was going to blow" with her and "[c]alling your ex-wife is not a good idea anyway." (3 EH 180.)   As to Jennifer Cherry, she was not called as a witness because of "some criminal matters" in her background. (3 EH 189.)   As to three jailers who agreed to be witnesses as long as no one was singled out individually, Mr. Ray could not "say specifically why we did not call those three jailers." (3 EH 197.)

Mr. Ray also stated in his affidavit that "Ron Dodd had no motive to commit the crimes nor could we discover any reason to kill two persons he had no association with." (3 EH 93.)  Mr. Ray also asserted that the defense would have had no way to show he did unless Mr. Barbee testified. (3 EH 93.)[102]   The witness admitted that "maybe I didn't say that correctly in my affidavit" but "that's what I meant." (3 EH 94.)

Mr. Ray admitted that "there was a financial motive" for Ron Dodd to commit the murders, contrary to the statement in his joint affidavit with Mr. Moore. (3 EH 94.)  Mr. Ray stated that what he meant when he said that  "Ron Dodd had no motive to commit the crimes nor could we discover any reason to kill two persons he had no association with" was actually that "there was no motive that we could prove.  Maybe I should have put that in there to be a little clearer." (3 EH 95.)  Mr. Ray also admitted that he did not know what Jennifer Cherry, who worked at the businesses, knew

---

[102]   As shown elsewhere herein, both statements are false.  Mr. Dodd, an ex-con living lavishly in a huge luxury home,  had a tremendous financial motive to commit the crimes.  This could have easily been shown by the testimony of numerous other witnesses, including Amanda Maxwell (the embezzlement, fact that Ron Dodd was living with Theresa Barbee, etc.), Jackie Barbee (debts owed, Theresa and Ron Dodd's lavish lifestyle, large house, loans, etc.), Jennifer Cherry (embezzlement, their life style, Theresa's statement that she wished that Mr. Barbee was dead) and Theresa Barbee herself (financial dealings, large house, living with Ron Dodd.)

about Theresa Barbee's embezzlements, which also could have shown a motive. (3 EH 96.) Mr. Ray admitted that he knew Ron Dodd was living in a very large and expensive house.  (3 EH 97.)  But, in explanation for his failure to present this to the jury, Mr. Ray stated that "the jury wasn't going to decide what, if anything, Ron Dodd had to do with it.  The jury was deciding one thing which is whether or not Mr. Barbee here was guilty of capital murder...So it really doesn't matter what anybody's theory was on Ron Dodd." (3 EH 99.)   This is of course a non sequitur, as showing Ron Dodd's involvement  would also have showed Mr. Barbee's innocence.   This explanation also ignored the fact that the jury did not consider Mr. Dodd's involvement because it was not presented to them by Petitioner's attorneys.  Mr. Ray also admitted that "I don't know very much about Ron Dodd." (3 EH 99.)  Neither did Mr. Barbee's jury.

        As to the head injury suffered by Petitioner when Ron Dodd dropped a pipe on his head, Mr. Ray stated in his affidavit that they "determined not to present the head injury theory because that theory would necessitate that Petitioner was, in fact, guilty as charged." (3 EH 100.)  Mr. Ray attempted to explain this by stating that

> [i]f he got hit on the head by a 400-pound pipe, or whatever this was, and that somehow caused him to be psychological (sic) infirm or have bad judgment or do the wrong thing or overreact, or whatever you want to call it, any of those things would have lended (sic) credence to the idea that he did commit the murder because of that reason....I felt like presenting psychological or physical or bodily-type evidence...that would have shown that he either wasn't in his right state of mind or that he had some injury that caused a seizure or whatever, that ultimately caused him to be (sic)  the motive or the reason that he killed Lisa and Jayden Underwood, I thought that would undermine the defense of innocence.
> (3 EH 101-102.)

        Mr. Ray then admitted that this reasoning actually applied to the punishment phase: "And when you are at the punishment phase and you try to excuse conduct for somebody who has just been found guilty that you've stood and told the jury that they were completely innocent and the

State's whole case was a lie, that does not help your client." (3 EH 102.)  Yet this was not what Mr.

Ray told Mr. Barbee's jury, he told them that one of the killings was an accident.  Additionally, this

explanation would mean that no mitigation would ever be presented as the jury would not reach the

punishment phase without the client being found guilty.  Mr. Ray stated that "[i]f he's got a head

injury, then the argument is that's why he committed the murder." (3 EH 103.)  He thought it would

be a "bad idea" to present the mitigating evidence because of Mr. Barbee's claim of innocence. (3

EH 104-105.)[103]

Mr. Ray stated that he "tried to run all those people down" who had been talked to by Ms.

Maxwell. (3 EH 105.)  Mr. Ray admitted he did not use Ms. Maxwell's findings of hydrocodone use.

(3 EH 105.)  He did not have a neuropsychological examination performed although Ms. Maxwell

recommended it, he only had "three doctors look at Mr. Barbee."  (3 EH 106.)   He never told the

jury that Theresa Barbee was deeply in debt to Mr. Barbee's mother, another finding of Ms.

Maxwell. (3 EH 107.)  Mr. Ray also never told the jury about Theresa Barbee's embezzlement from

the company because somehow "this would have been inconsistent with the "Ron Dodd did it"

theory..."(3 EH 107.)

On cross-examination, Mr. Ray stated that he thought it was good to know both the positive

and negative information about his client. (3EH 156.)  He denied providing Ms. Maxwell's

"Psychosocial History report" to the prosecution. (3 EH 157.)  As to having experts keep negative

information out of written reports, Mr. Ray did not think that was a good idea because "it makes it

---

[103]   Despite the fact that Mr. Ray presented no guilt phase defense, he attempted to
justify not presenting the head injury as follows: he stated that the experts did not find it to be
significant and if he had presented it "we would have had a big nothing over something that
could have backfired into this whole concept of I got a head injury, it made me snap, and than
that leads into solidifying a guilty issue.  I was concerned about that." (3 EH 182.)

look somewhere like you're trying to hide something." (3 EH 195.)

Mr. Ray stated that Judge Gill did not restrict him on the number of experts he could use. (3 EH 160.) Dr. Kelly Goodness was one of these experts and although she thought Mr. Barbee may have had Lyme's Disease, Mr. Ray did not use her as a witness because "people with Lyme's Disease sometimes act out in a rage and have violent tendencies." (3 EH 162.)

As to the "road rage" incident involving Mr. Davis, Mr. Ray stated that Mr. Davis had told him that Mr. Barbee tried to kill the driver of the other vehicle. (3 EH 109.) Mr. Ray did not present Mr. Davis as a witness because he "didn't know if [prosecutor] Kevin Rousseau knew about it or not, which would have been a big gamble on my part." (3 EH 109.) "I thought that it was extremely likely that he might know about some other things that Mr. Barbee had allegedly done....I just couldn't take that risk." (3 EH 110.) Even though Mr. Ray understood there were no police records regarding this event, "that didn't mean they wouldn't know about it." (3 EH 110.)

Mr. Ray admitted that he "stayed away from presenting evidence on lack of future dangerousness based on what Mr. Davis told" him. (3 EH 112.) Mr. Ray explained that he did not ask other mitigation witnesses about future dangerousness because they could have been asked by the state if they had heard of other incidents. (3 EH 117-118.) Mr. Ray admitted that he did not take any steps to investigate what the prosecution knew about the road rage or any other incident, but he assumed that "they were very well prepared in this case..." (3 EH 119.) He claimed that "there's no way to investigate it without potentially causing someone like the District Attorney to find out about it." (3 EH 119.) Mr. Ray testified that he felt there was some risk of the prosecutor finding out about this unreported incident involving four people, none of whom were going to testify. (3 EH 120.) He claimed that Mr. Barbee's past has "some history" of violence. (3 EH 121.)

On cross examination, Mr. Ray read parts of Ms. Maxwell's report about the Tim Davis incident and claimed that Mr. Davis was lying when he said they never asked him to testify at trial. (3 EH 168.)  However, Mr. Ray contradictorily admitted that he told Mr. Davis "don't come to the courthouse." (3 EH 169.)  Mr. Ray testified that he did not know "who else the defendant or Mr. Davis had ever related this story to. " (3 EH 169.)   But apparently, Mr. Ray made no efforts to find out.  Although he had searched the State's file and found nothing relating to the incident, he did not know if the State knew about it and said it was somehow "likely" that they did.  (3 EH 169.)  "If those two guys had gotten hurt and went to the hospital, you know, or some traffic camera caught it...you have no idea how that could happen." (3 EH 169.)  This logic assumed that the State had searched several years of hospital records of an unknown number of hospitals, for an incident that was not known to them, for records of  two people whose names were not known to them, and who in all likelihood did not know Mr. Davis or Mr. Barbee's names.   Or that the State would randomly search traffic camera recordings for years after an event that they did not know about.  This rationale is logically flawed, as these searches would have been impossible as the state did not know who or what they were searching for, and, without that knowledge, would have had no reason to instigate any record searches in the first place.

Mr. Ray's basic rationale for not presenting future dangerousness mitigation was that "the mitigating fact of future dangerousness, as told by the witnesses, was all subject to knowledge assassination." (3 EH 123.)  Of course, this logic would preclude any presentation of a lack of future dangerousness, as any witness could always be asked about potential incidents or be subject to "knowledge assassination," by which Mr. Ray presumably meant "have you heard" questions.

Mr. Ray did not agree with statistics that showed that the best predictor of future

dangerousness is the age of the person and Mr. Barbee was in his late 30s at the time of the trial. (3 EH 125.)  On cross examination, Mr. Ray somewhat irrelevantly stated that Mr. Barbee was not the oldest person he had ever defended on capital murder charges. (3 EH 140.)

As to the harmful testimony of Susan Evans, Mr. Ray claimed that he was trying "to show to the jury...that the prison system has the ability to react to violence of inmates...that Mr. Barbee...was going to be able to conform to those policies because he hadn't been in any trouble in the Tarrant County Jail..." (3 EH 129.)  This evidence was presented to show that Mr. Barbee could conform to prison. (3 EH 130.)   As for the evidence of "violence, riots and escapes" she presented, which would be a reason for the jury to want to put Mr. Barbee in a more secure placement on death row, Mr. Ray could only say that "you can make that argument." (3 EH 131.)  Mr. Ray was also asked about a well-known state expert named A. P. Merillat,[104] who, as a state's witness, gives essentially the same testimony as to prison violence that Ms. Evans gave. (3 EH 132.)

Mr. Ray said that he had discussed his testimony beforehand with the district attorney "at least twice." (3 EH 134.) He also said that Judge Gill never threatened him with "lack of future appointments." (3 EH 190.)  Mr. Ray had talked about their testimony with Mr. Moore. (3 EH 201.)

**Tim Moore,** who was Mr. Ray's co-counsel, testified that he had tried three capital cases before Mr. Barbee's. (3 EH 203.)  Mr. Moore was a former assistant district attorney. (3 EH 226.) Trial counsel did not file a motion for a change of venue because they were worried it might possibly be transferred "to a smaller community, more conservative community." (3 EH 205, 229.) He stated that he never called Amanda Maxwell as a witness . (3 EH 207.)  Mr. Moore did not know that Mr. Ray was going to tell the jury that Mr. Barbee had committed the murders but that it was

---

[104]   Spelled incorrectly in the transcript as "Marital." (3 EH 132-133.)

accidental. (3 EH 208.)  He was not aware that Mr. Barbee was upset when he heard that argument. (3 EH 208.)  Mr. Moore did not recall if he contributed to Judge Gill's 2004 election campaign but admitted that he contributed to every criminal judge in Tarrant County. (3 EH 209.)  As to  his and Mr. Ray's joint affidavit, Mr. Moore gave some input but Mr. Ray drafted it. (3 EH 210-211.)  As to the "memo of understanding," that was drafted because Mr. Barbee did not want to testify and its purpose was to protect themselves if he changed his mind.  (3 EH 211.)

Mr. Moore said he "probably" did not obtain Mr. Barbee's permission when they divulged the reports and letters to the state in defending themselves in state habeas. (3 EH 214.)  Mr. Moore did not remember if he presented any experts to explain the cell phone records. (3 EH 214.)  He did not remember how he found out about Mr. Barbee's head injury (3 EH 216.)  When asked to explain his statement in the affidavit that they did not present evidence of the head injury because "that theory would necessitate that Applicant was, in fact, guilty as charged," Mr. Moore could not explain what that meant: "I'm not sure." ( 3 EH  217.)  Mr. Moore did not believe the defense presented Mr. Barbee's hyrdocodone use to the jury nor his history of migraine headaches. (3 EH 218.)  He did not remember if he told Ms. Maxwell of the trial date so that she could be present. (3 EH 219.)  Mr. Moore felt that the information they obtained from their experts was not favorable to Mr. Barbee. (3 EH 232.)

Mr. Moore said that Mr. Davis was "lying" if he said he did not tell them that Mr. Barbee "tried to kill" the driver of the other vehicle in the "road rage" incident.  (3 EH 220.)  But Mr. Moore admitted he never attempted to investigate this incident. (3 EH 221.)  Mr. Moore repudiated his statement in his affidavit that the only reason they did not present mitigation of a lack of future dangerousness was Mr. Davis's statement; he said there "were other reasons." (3 EH 221.)  The

reason they did not call the other witnesses on future dangerousness was that they thought the state might somehow know about the "road rage" incident. (3 EH 222, 235.)  He explained that "when you bring somebody's character up for being a peaceful and law-abiding citizen, and the State has knowledge of some kind of a bad act that they can ask you those questions."  (3 EH 235.)  Despite being risk-averse in this respect, Mr. Moore testified that he was not concerned about the risk of damaging information on his client being discovered by the prosecution if his experts wrote it down. (3 EH 237-239.)  But he did not remember if he asked the other witnesses if they knew about it or any other potentially damaging incidents.  (3 EH 222-223.)  Mr. Moore admitted that Ms. Maxwell wrote that she did not think Mr. Davis would say anything negative about Mr. Barbee if he was called as a witness. (3 EH 222.)

Mr. Moore admitted that Mr. Barbee's relatively advanced age of 37 at the time of trial was not presented as a factor that would have meant he was a lower risk for future dangerousness. (3 EH 225.)  Mr. Moore said that he had discussed his testimony with Mr. Ray "a couple of times." (3 EH 226.)  Finally, Mr. Moore admitted making a campaign contribution to Judge Gill. (3 EH 227-228.)

**Dr. Jack Randall Price,** a clinical and forensic psychologist and neuropsychologist,  was called by the State.  (3 EH 214.)  He was retained by the State in 2008 to analyze information from Dr. Stephen Martin. (3 EH 248.)  Dr. Price did not conduct a personal interview with Mr. Barbee. (3 EH 248, 302.)  Nor did the witness perform the "Hare Psychopathy Checklist" on Mr. Barbee. (3 EH 302.) As a result, Dr. Price did not diagnose him as a psychopath. (3 EH 303.)

Dr. Martin, who examined Mr. Barbee, concluded that he suffered some impairment in functioning from his head injury. (3 EH 252.) Dr. Price found that "the test results he obtained do not indicate either generalized brain impairment nor do they suggest frontal lobe impairment." (3

EH 257.)  He found no brain damage because there was no such conclusion in the file and no behavioral indicators and he found Dr. Martin's data to be in the normal range. (3 EH 258-260.) Dr. Price did not agree that an expert should destroy files if they contained negative information. (3 EH 264.) He thought that if Dr. Martin had been called as a witness, the prosecution could have seen the "Psychosocial History" which contained negative elements. (3 EH 266, 269.)  There were descriptions of past behavior and poor impulse control and a failure to take responsibility for his actions. (3 EH 267.)

On cross-examination, the witness admitted that there was always the possibility that an expert's reports would be discoverable by the opposite side. (3 EH 271-272.) Sometimes attorneys will ask what the information is and then decide if they want a written report. (3 EH 272-273.) Mr. Barbee's IQ would fall in the low-average range. (3 EH 274.)  He had some impairment on the verbal fluency portion of the Multilingual Aphasia Examination. (3 EH 275.)  Of 51 areas of impairment, Mr. Barbee scored abnormal in 7 of those. (3 EH 277.) However, almost anyone would score abnormally or in the impaired range in some of these tests. (3 EH 307.)  There was still some impairment in the category of word-finding and fluency. (3 EH 278.)  The current edition of DSM-IV (Diagnostic and Statistical Manual) does not refer to "psychopathy" but to "Antisocial Personality Disorder." (3 EH 281.)  The witness admitted that some courts have ruled that the Hare PCL-R should not be administered in capital cases. (3 EH 282.)

Dr. Price was asked about some of the 11 factors out of 20 that he put in his report regarding the Hare Psychopathy Checklist (PCL-R) that he claimed showed signs of psychopathy. But he admitted that "I'm not saying he's a psychopath." (3 EH 305.)   Dr. Price stated that charm or glibness is subjective (3 EH 284) but there was evidence of "superficial charm." (3 EH 305.)  The

second factor, grandiosity, can be a facet of bipolar disorder. (3 EH 286.) As to the third point, a need for stimulation, the witness admitted that Mr. Barbee worked at jobs that many would find boring. (3 EH 287.)  The fourth characteristic, pathological lying, is not uncommon and not related to violence.  (3 EH 288.)  As to the fifth point, a parasitical lifestyle, Mr. Barbee did work hard and occasionally receiving help from one's family is not unusual. (3 EH 289.)[105]  As to poor behavior controls, spending money lavishly does not mean that one is a psychopath. (3 EH 291.)  As to point number seven, promiscuous sexual behavior, the  only evidence of this was that he was involved with more than one woman at a time. (3 EH 291.)  As to number eight, impulsivity, the witness admitted that Mr. Barbee worked hard to pass his GED. (3 EH 292.)  As to irresponsibility, the witness admitted that Mr. Barbee ran his own business. (9 EH 294.)  Dr. Price admitted that the type of risk assessment done by Dr. Mark Cunningham and Dr. Thomas Ready, whose research was available at the time of Mr. Barbee's trial,  shows that the offense itself is not a good predictor of the likelihood of future violence in prison. (3 EH 295-298.)

This witness admitted that age is a factor and "criminal acts of violence is a young man's game...the older you get, the less likely it is." (3 EH 299-300.)  But there has been criticism of this "actuarial" approach. (3 EH 300-301.)   However, Dr. Cunningham has won awards from the American Psychological Association and the Texas Psychological Association. (3 EH 308-309.) This witness did not perform an evaluation of Mr. Barbee and hence never diagnosed him as a psychopath. (3 EH 302.) Dr. Price gleaned from the psychosexual report that Mr. Barbee had many sexual partners.  (3 EH 304.)    The witness saw signs of financial irresponsibility or "manipulativeness."  (3 EH 305.)  Even though Mr. Barbee scored in the impaired range in some

---

[105] The "help" was in the form of loans from his parents which he was paying back. (3 EH 309.)

tests, it would not be unusual, and that alone would be insufficient to conclude that he has suffered brain damage. (3 EH 307.)

Taking into account the facts and evidence adduced at the evidentiary hearing and summarized *supra*, the Court concludes that the exculpatory affidavit submitted by Mr. Ray and Mr. Moore in the initial state habeas proceedings is both self-serving and not credible. Further, in and of itself without making any credibility determination, the affidavit is evidence of a conflict of interest between trial counsel and their client, as it shows the attorneys' willingness to put their own interests ahead of their client's as they go out of their way to denigrate Mr. Barbee. The affidavit goes well beyond what was factually necessary or legally permissible for Mr. Ray and Mr. Moore to defend themselves in state habeas proceedings.

**C.  Argument in Support.**

**i) Conflict of interest.**

The facts described above do not just illustrate ineffective assistance of counsel by Mr. Ray in one case, the W.____ matter, as Respondent will probably argue. They show an ongoing relationship between Judge Gill and Mr. Ray that extended over many years and over many hundreds of cases which were the main source of income for Mr. Ray during the period before, during and after Mr. Barbee's capital murder trial. The Associated Press article quoted above shows that Ray earned $710,000 from his work in Judge Gill's court between 2001 and 2007, an amount that represented 43 percent of his total earnings from court appointments during those years, according to the auditor. (Exhibit 38). There is no reason to believe that this case, which demonstrates Mr. Ray's attempts to have Mr. Barbee plead guilty, his lack of interest in his claim of actual innocence, and mysterious refusal to present all the mitigation evidence amassed by

Amanda Maxwell, was not following the same script as Ms. W.'s case and the other probation revocation cases handled by Mr. Ray in Judge Gill's court. Mr. Ray's favored status as the sole appointee for these many hundreds of cases and almost three-quarters of a million dollars in fees from Judge Gill, depended on his moving the cases quickly without undue "delay." In accepting this appointment, knowing that it was in his interest to plead the case, just as in Ms. W.'s matter, Mr. Ray put his own financial interests ahead of those of his client, Mr. Barbee.

Texas Disciplinary Rules of Professional Conduct Rule 1.06 ("Conflict of Interest; General Rule") states in relevant part as follows:

Rule 1.06(b)...a lawyer shall not represent a person if the representation of that person...

(2) reasonably appears to be or become adversely limited by the lawyer's or law firm's responsibilities to another client or to a third person or by the lawyer's or law firm's own interest.

Mr. Ray's and Mr. Moore's representation of Mr. Barbee fell afoul of this disciplinary rule because of their responsibilities to a "third person," Judge Gill. Mr. Ray was beholden financially to Judge Gill for a huge number of appointments to probation revocation cases in which he was expected to move the cases along expeditiously. Mr. Ray, in accepting this appointment, knew that he had to move Mr. Barbee's case as quickly as possible through Judge Gill's court and that may indeed have been the reason he was appointed to this high-profile case. Mr. Moore simply acquiesced in the goal of moving this case quickly through the system.

There is no reason to believe that this conflict of interest, which resulted in the ineffective assistance of counsel to which Mr. Ray admitted in the Sandra W. case, was limited solely to his probation revocation cases. It clearly extended to this capital case, as the facts of the case show prejudice to Mr. Barbee as a result of this secret agreement between Judge Gill and Mr. Ray:

1) both defense attorneys attempted to pressure Mr. Barbee into accepting a guilty plea, thus avoiding a lengthy trial and one of their first acts was to try to convince Mr. Barbee's family that he was guilty (Exhibits 19, 20, etc.);

2) neither Mr. Ray nor Mr. Moore bothered to investigate or present Mr. Barbee's case of actual innocence, hoping for a quick guilty plea (Exhibit 16, statement of Amanda Maxwell);

3) the lengthy jury selection process was not overseen by Judge Gill, but was instead handed over to Judge Thornton, leaving Judge Gill free to tend to his "rocket docket";

4) the defense trial presentation was so short as to be almost non-existent and the trial itself was conducted in near-record time;

5) much of Mr. Barbee's mitigation evidence was not presented, for no apparent strategic reason, which would have slowed things down considerably (Exhibit 16);

6) the mitigation expert, Amanda Maxwell was fired by Mr. Barbee's attorneys and her findings were not presented, again for no apparent strategic reason (*Id.*);

7) counsel made no efforts to inform important witnesses such as false confession expert Dr. Richard Leo, of basic facts about the case which caused him to render an unfavorable opinion;

8) counsel made no efforts to have the venue of the case moved out of Fort Worth, despite massive unfavorable publicity about the case in the local newspaper.

These actions or inactions are understandable when viewed through the prism of what we now know about Judge Gill's manner of running his court.  Basic due process was abandoned in the search for efficiency and a high case-resolution count.  Mr. Ray and Mr. Moore went along with this program and thereby put their own interests in future appointments ahead of those of their client. As Rule 1.06(b) of the Texas Rules of Disciplinary Conduct states, "...a lawyer shall not represent

a person if the representation of that person...reasonably appears to be or become adversely limited by the lawyer's or law firm's responsibilities to another client or to a third person or by the lawyer's or law firm's own interest." Here, clearly, that third person was Judge Gill.

Habeas petitioners normally do not have to show prejudice from a conflicted lawyer's performance to establish a Sixth Amendment violation because "[t]he case law is clear that actual prejudice need not be shown. Once a habeas petitioner has proved the existence of an actual conflict, only an adverse impact on the attorney's performance need be shown." *Ruffin v. Kemp,* 767 F.2d 748, 752 (11ᵗʰ Cir. 1985); *see also, Holloway v. Arkansas,* 435 U.S. 475 (1978); *Cuyler v. Sullivan,* 446 U.S. 335 (1980); *Burden v. Zant,* 24 F.3d 1298 (11ᵗʰ Cir. 1994); *Baty v. Balkcom,* 661 F.2d 391, 395 (5ᵗʰ Cir. 1982)*.* But if prejudice has to be shown, it has been shown in abundance in the eight factors listed above.

The Court's focus should be whether defense counsel did, or failed to do, something because of the conflict. *Holloway v. Arkansas, supra,* 435 U.S. at 490 ("the evil – it bears repeating – is in what the advocate finds himself compelled to refrain from doing.") *Zuck v. Alabama,* 588 F.2d 436, 439 (5ᵗʰ Cir. 1979) (actual conflict occurs when defense counsel is placed in a situation "inherently conducive to divided loyalties."*); United States v. Chronic*, 466 U.S. 648 (1984) (Where "the surrounding circumstances made it so unlikely that any lawyer could provide effective assistance," prejudice is presumed.) (*citing, Powell v. Alabama*, 287 U.S. 45 (1932)). Under *Strickland v. Washington,* 466 U.S. 668, 692 (1985), the court has to *presume* prejudice if a conflict existed.

As recounted *supra,* trial counsel made great efforts to have their client plead guilty and then, failing that, to make sure the trial moved through Judge Gill's court quickly. This conflict "adversely affected his lawyer's performance." *Strickland, supra,* 466 U.S. at 692. A petitioner

is presumed to have been prejudiced by acts trial counsel *did not do* as a result of the conflict.  *See,*

*Cuyler v. Sullivan,* 446 U.S. 335 (1980) (the Court must focus on whether the attorney's performance

was adversely affected); *Burden v. Zant*, 24 F.2d 1298 (11th Cir.  1994) (upon remand in *Burden v.*

*Zant,* 510 U.S. 132 (1994); *Stoia v. United States*, 22 F.3d 766 (7th Cir. 1994).

In *Mickens v. Taylor,* 535 U.S. 162, 122 S. Ct. 1237 (2002) the Supreme Court held that in

situations where the trial court failed to inquire into a potential conflict of interest about which it

knew or reasonably should have known, a defendant has to establish that this conflict adversely

affected counsel's performance.   There are a number of reasons why this holding may not be

applicable here.  First, it is explicitly limited to situations where the court fails to inquire into a

potential conflict and, as we have seen, there was a limited inquiry and questioning by the judge as

to the propriety of the representation. (22 RR 166-173.)   Secondly, *Mickens* involved a *prior*

representation, whereas the conflicts here were *concurrent*. As the court in *Mickens* explained

> Both *Sullivan* itself...and *Holloway*...stressed the high probability of prejudice arising from
> multiple concurrent representation, and the difficulty of proving that prejudice...Not all
> attorney conflicts present comparable difficulties.  Thus, the Federal Rules of Criminal
> Procedure treat concurrent representation and prior representation differently, requiring a
> trial court to inquire into the likelihood of conflict whenever jointly charged defendants are
> represented by a single attorney (Rule 44(c)) but not when counsel previously represented
> another defendant in a substantially related matter, even where the trial court is aware of the
> prior representation.
> (*Mickens,* 122 S. Ct. at 1246.)

In *Cuyler v. Sullivan, supra,* the court held that a showing of deficient performance was

required, but not requiring the additional *Strickland* showing of a probable effect on the outcome

of the trial.  *Mickens* was decided on the assumption that *Cuyler v.  Sullivan* was applicable, and its

decision did not hold, even in the successive representation situation, that *Sullivan* did not apply.

In its conclusion, the Supreme Court stated that "[i]n resolving this case on the grounds on which

-196-

it was presented to us, we do not rule upon the need for the *Sullivan* prophylaxis in cases of successive representation. Whether *Sullivan* should be extended to such cases remains, as far as the jurisprudence of this Court is concerned, an open question." (*Id.* at 1246.)

Therefore, we must look to *pre-Mickens* Fifth Circuit precedent, and precedents from other circuits.   In *Perillo v. Johnson*, 79 F.3d 441 (5th Cir. 1996) (*Perillo I*) and, on remand, *Perillo v. Johnson,* 205 F.3d 775 (5th Cir. 2000) (*Perillo II*), the Fifth Circuit reaffirmed that when an actual conflict adversely affects trial counsel's performance, the governing legal standard is *Cuyler v. Sullivan*, 100 S. Ct. 1708 (1980) and its progeny.   *See Strickland v. Washington*, *supra*; *Beets v. Scott*, 65 F.3d 1258 (5th Cir. 1995) (*en banc*).   The *Cuyler* standard applicable when a criminal defendant alleges that counsel's performance was impaired by an actual conflict of interest differs substantially from the *Strickland* standard generally applicable to Sixth Amendment ineffectiveness claims.   *See Strickland*, 104 S. Ct. at 2067; *see also Beets*, 65 F.3d at 1265.

*Cuyler* permits a defendant *who raised no objection at trial* to recover upon a showing that an actual conflict[106] of interest *adversely affected* counsel's performance.   *See Cuyler*, 100 S. Ct. at 1718; *Perillo I*, 79 F.3d at 447; *Beets*, 65 F.3d at 1264; *see also Strickland*, 104 S. Ct. at 2067.   The *Perillo* court stated that an "adverse effect" may be established with evidence that "some plausible alternative defense strategy or tactic" could have been pursued, but was not because of the actual conflict impairing counsel's performance.   *See, also Perillo I*, 79 F.3d at 449.   Assuming the defendant establishes an actual conflict that adversely affected counsel's performance, prejudice is

---

[106]   The Fifth Circuit stated in *Perillo, supra,* that an "actual conflict" exists when defense counsel is compelled to compromise his or her duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests of a former or current client.   *See Strickland* at 2067; *Perillo I*, 79 F.3d at 447; *United States v. Alvarez*, 580 F.2d 1251, 1254 (5th Cir. 1978).

*presumed* without any further inquiry into the effect of the actual conflict on the outcome of the defendant's trial.  *See Strickland*, 104 S. Ct. at 2067; *Cuyler*, 100 S. Ct. at 1719; *Beets,* 65 F.3d at 1265.

The Fifth Circuit recognized in *Perillo, supra*, that beyond those basic legal precepts, *Cuyler*'s "actual conflict" and "adverse effect" elements have been described as "rather vague," *see Beets*, 65 F.3d at 1265, and even a brief review of the precedent reveals that any categorical treatment of when an actual conflict exists is difficult.

The Fifth Circuit in *Perillo* found that the determination of actual conflict and adverse effect is tightly bound to the particular facts of the case at hand.  Petitioner is  claiming that trial counsel were conflicted due to his attorneys' putting their interests ahead of and in conflict with his.  There could have been  no reasonable strategy in failing to present the mitigating evidence, to fail to present the case for actual innocence and to fail to attempt to have the trial moved out of Tarrant County.

*Perillo* recognized that several circuits have drawn a distinction in Sixth Amendment conflict of interest cases, holding that an actual conflict may be more difficult to prove when it arises in the context of successive or serial representation rather than concurrent representation.  *See, e.g.*, *Freund v. Butterworth*, 165 F.3d 839, 859 (11th Cir.), *cert. denied*, 120 S. Ct. 57 (1999); *Maiden v. Bunnell*, 35 F.3d 477, 480 (9th Cir. 1994); *McConico v. Alabama*, 919 F.2d 1543, 1546 (11th Cir. 1990).  *But see Church v. Sullivan*, 942 F.2d 1501, 1511 (10th Cir. 1991) (rejecting the view that successive representation cases are necessarily more difficult to prove).  This difficulty, however, does not preclude the Fifth Circuit from finding that an actual conflict did exist because trial counsel put their personal interests ahead of their duty to Petitioner.   An evidentiary hearing  will be the only

opportunity to develop these facts.

The Fifth Circuit has not limited *Cuyler* to concurrent representation cases. The Fifth Circuit's recent *en banc* treatment of *Cuyler* in *Perillo II* expressly extends *Cuyler* to all cases of multiple representation, whether successive or concurrent. S*ee Beets v. Scott*, 65 F.3d 1258, 1265 (5th Cir. 1995) (en banc) ("*Strickland* offers a superior framework for addressing attorney conflicts outside the multiple or serial client context.") & *id*. at 1265 n.8 ("*Cuyler* has been routinely applied to cases in which an alleged attorney conflict resulted from serial representation of criminal defendants as well as simultaneous multiple representation. . . . For convenience, we denominate both of these situations as 'multiple representation.'"). Moreover, *Cuyler* itself can be viewed as a serial or successive representation case. The Third Circuit granted relief in *Cuyler* on the basis that the multiple representation involved a "possible" conflict of interest. The Supreme Court vacated, but remanded for reconsideration of whether the successive representation of the three defendants created an actual, as opposed to possible, conflict of interest. (*See id*. at 1719.) *Cuyler* has routinely been applied to cases involving successive representation.

The Fifth Circuit, therefore, has not definitively embraced the theory that there is any real and inviolate substantive difference between conflicts of interest arising in the context of successive, as opposed to concurrent, representations. Instead, the Fifth Circuit has in each case focused upon the "guiding principle in this important area of Sixth Amendment jurisprudence," which is whether counsel's allegiance to the accused was compromised by competing obligations owed to others. *Alvarez*, 580 F.2d at 1255, 1258. In *Perillo*, the Fifth Circuit stressed that a conflict exists when counsel is prevented "by his interest in another's welfare from vigorously promoting the welfare of his [current] client." *Vega*, 149 F.3d at 360. Certainly this would apply here, where the competing

-199-

welfare was their own.

The issue is simply whether trial counsel were burdened by an actual conflict. An actual conflict may exist and the Constitution is implicated when an attorney is placed or places himself or herself in a situation "inherently conducive to divided loyalties" such as trial counsel did here. *Johnson v. Hopper*, 639 F.2d 236, 238 (5th Cir. 1981) (internal quotations omitted); *Zuck v. Alabama*, 588 F.2d 436, 439 (5th Cir. 1979) (internal quotations omitted).  But, in keeping with the requirement for an actual, as opposed to a mere hypothetical or possible conflict, the Fifth Circuit has also held that something more must be shown to demonstrate that the inherent potential for conflict actually moved into the realm of an actual conflict.  *See, e.g.*, *Olivares*, 786 F.2d at 663-64. Petitioner has demonstrated "something more" and established the conflict.

The very essence of a conflict of interest is that it requires counsel to make a choice between competing interests.   This Court's focus must remain upon the adequacy of Petitioner's representation.  *See Strickland*, 104 S. Ct. at 2064-67; *Cuyler*, 100 S. Ct. at 1718-19.  An adverse effect on counsel's performance may be shown with evidence that counsel's judgment was actually "fettered by concern" over the effect of certain trial decisions on other clients.  *Perillo I*, 79 F.3d at 448.  As the Fifth Circuit held in *Perillo I*, when a petitioner's claim is premised solely upon what a conflicted lawyer failed to do on his or her behalf, the petitioner must generally establish adverse effect  by demonstrating that there was some plausible alternative defense strategy that could have been pursued, but was not, because of the actual conflict.  (*See id*. at 449)(relying upon *Beets*, 65 F.3d at 1284 (King,J., dissenting), which in turn relied upon the Second Circuit's test for measuring adverse effect premised upon "what an attorney failed to do").  Thus, Petitioner has shown not only that trial counsel's performance was compromised, but that the compromises  were generated by the

actual conflict between trial counsel's interests and Petitioner's interests.

A showing of intentional compromising of interests is not required.  The Fifth Circuit has stated that it is enough that there was an error in judgment that adversely affected trial counsel's performance.  *See Castillo*, 504 F.2d at 1245 ("We do not ascribe to Castillo's appointed attorney nor to the appointing judge improper motives, but they are chargeable with an error of judgment fatal to a fair trial.").   Neither does a showing of adverse effect require a "but for" inquiry.  *Nealy*, 782 F.2d at 1365 (finding adverse effect where the record suggested that defense counsel decided against calling a particular witness because he feared the witness would harm the petitioner's case, rather than because he also represented the potential witness); *see also Malpiedi*, 62 F.3d at 469. To the contrary, the defendant need only establish that there was a plausible alternative defensive strategy that could have been pursued, but was not because of the actual conflict of interest. Petitioner has done this.

Petitioner has proven that trial counsels' performance was adversely affected by the conflict of interest and he has shown prejudice.   Based upon the particular factual context of this case,  trial counsel compromised their duty of loyalty to Petitioner  in order to accommodate their own interests.  Petitioner  has also demonstrated that there were plausible alternative defense strategies (the actual innocence claim, the investigation of Mr. Barbee's innocence, and the mitigation evidence) that could have been pursued, but were not, because of the conflict between counsel's interests and the interests of their client.

A review of the entire record in this case is persuasive that trial counsel's failures appreciably weakened the defense. This failure was caused by the conflicts alleged demonstrated by Petitioner. This court should find that trial counsels' representation  was burdened by a conflict which adversely affected trial counsels'  performance  throughout the trial.

**D. What the State Court Held.**

This claim was brought in Petitioner's subsequent writ application.  The CCA determined that it met the requirements for a subsequent writ under art. 11.071 Sec. 5(a) and the trial court held an evidentiary hearing on this claim.  The trial court ultimately denied relief and adopted verbatim the State's "Proposed Memorandum, Findings of Fact and Conclusions of Law." (Exhibit 54.)  The Texas Court of Criminal Appeals denied relief on Claim 2 "[b]ased upon the trial court's findings and conclusions and our own review." *Ex parte Stephen Dale Barbee,* No. WR-71,070-02, at 2. (Tex. Crim. App. May 8, 2013)(Exhibit 52.)

**E. Why the State Court Holding Was Unreasonable.**

**1. The 2254(d)(2) analysis.**

To see why the state court decision is contrary to 2254(d)(2) as a "decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," we must examine the basis of the trial court and the CCA's holding, the prosecutors "Proposed Memorandum, Findings of Fact and Conclusions of Law." (Exhibit 54.)  Many of these findings are derived uncritically from either Mr. Ray and Moore's self-serving declaration or their testimony at the evidentiary hearing. The problem is that many of these findings are either not supported by the record, are directly contradicted by testimony from witnesses without any incentive to lie on behalf of Mr. Barbee, are illogical, or are inherently incredible or unbelievable.

Subsequent Finding of Fact[107] No. 12 is somewhat inaccurate in that it states that "other

---

[107]  The Findings of Fact in the subsequent state habeas proceedings are in Exhibit 54 and are referred to herein as "Subsequent Findings of Fact" to differentiate them from the state courts' original Findings of Fact in the initial state habeas proceedings (Exhibit 14).  As these subsequent findings purport to deal (at least partially) with the conflict of interest claim, in the broad sense of the claim, the 2254(d)(2) analysis is presented here as to all those subsequent

criminal district courts used similar arrangements with attorneys to handle probation revocations," citing 2 EH 247.  But what Mr. Gill actually testified that "other courts had arrangements with other lawyers to handle probation revocation cases..."  2 EH 247. But when asked if they handled them in the same way as he did, Judge Gill said "I don't know" and he never bothered to find out. 2 EH 247.

Subsequent Finding of Fact No. 13 holds that the reason "Judge Gill appointed Mr. Ray to handle many probation cases [is] because 1) Mr. Ray made himself available on Friday afternoons when Judge Gill preferred to handle probation revocation proceedings and 2) Mr. Ray investigated his cases beforehand and was prepared to handle the probation when scheduled." Yet Mr. Ray's testimony contradicts this and at the hearing he denied that he had an "arrangement" or "agreement" with Judge Gill to handle probation revocation cases. (3 EH 37.)  "We had a situation where Judge Gill would appoint me on criminal cases...they weren't all probation revocations...and I would represent those people, and then he would decide the case, if it needed to be decided.  Some of them resulted in plea agreements.  And then he would appoint me on another case, and we would do that same process over.  It could have ended at any time and it ultimately did." (3 EH 37.)  Mr. Ray also said that "I don't think we had an arrangement...Judge Gill appointed me, I took care of cases, he paid me based on the work I did, and he appointed me on other cases."  (3 EH 40.) Mr. Ray never claimed that the alleged "Friday" arrangement Judge Gill was the main basis for the appointments.

Subsequent Finding of Fact No. 31 states that "Mr. Moore believes that any effect from pre-trial publicity can be worked out in jury selection."  That standard would obviate the need for any

---

findings that are an unreasonable determination of the facts. Some of the subsequent findings of fact discussed here in Claim 2 are also relevant to claims other than the conflict of interest. These subsequent findings of fact are also discussed *infra,* in the relevant claims.

change of venue in any case, and it is obviously not a tenable standard for effective assistance of counsel.  There would be no need to "work it out" had they filed for a change of venue in the first place.

Subsequent Finding of Fact No. 36 states that soon after their appointment, "Mr. Ray and Mr. Moore interviewed the applicant's family and other witnesses—including witnesses who could provide information regarding the applicant's family background."  This ignores the large number of family members who were either not interviewed at all, or interviewed without asking the crucial questions regarding Mr. Barbee's propensity for future acts of violence.   And Mr. Ray himself admitted that one of his first acts was not to interview the family members, but to gather them in one place to view the tape of the "confession," presumably so that they would support his efforts to have Mr. Barbee plead guilty. (3 EH 29.)

Subsequent Finding of Fact No. 46 points to several pre-trial motions filed in the case. However, these were basically boiler-plate standard motions filed in every capital case.

Subsequent Findings of Fact Nos. 54 through 64, dealing with Dr. Leo,  are seriously flawed and contrary to the record.  For instance, Subsequent Finding of Fact No. 57 holds that Dr. Leo "concluded that the applicant's confession was more likely to be true than false."  Subsequent Finding of Fact No. 58 gives three reasons why Dr. Leo reached this conclusion: 1) that Mr. Barbee led the police to the bodies; and two reasons that are basically similar: 2) that Mr. Barbee did not deny committing the crime to his wife; and 3) that he told his wife he committed the murders.

These findings completely ignore the basics of the claim, which is Mr. Ray did not inform Dr. Leo that Mr. Barbee's admission that he had helped move the bodies did not indicate that he was necessarily guilty of the murders. (3 EH 83.)  This omission resulted in the unfavorable report from

Dr. Leo and his opinion that the confession was valid. In his report, Dr. Leo said that one of the reasons he felt the confession was true was that Mr. Barbee had led the police to the bodies. (3 EH 83.) Yet Mr. Ray could not state that he had told Dr. Leo that Mr. Barbee had admitted to helping conceal the bodies, but not to the murders. (3 EH 83.) Mr. Ray also admitted giving Dr. Leo false information about the cell phone records which Mr. Ray claimed indicated that Mr. Barbee was lying. (3 EH 84-85.) That information, relied upon by Dr. Leo, was false. (3 EH 84.) Dr. Leo also based his opinion on his belief that Ron Dodd had no motive to commit the murders. (3 EH 90.) Mr. Ray found Dr. Leo's report "unfavorable," yet his own omissions contributed to the unfavorable findings of that report. (3 EH 155.) As for telling his wife he committed the murders, Mr. Barbee has explained that was the result of the death penalty threats and he had repudiated that confession around the time he left the police station. Thus, all the findings of fact relating to Dr. Leo are an unreasonable determination of the facts under 2254(d)(2) because they ignore these central facts. The conclusory Subsequent Finding of Fact No. 61, that Dr. Leo was not called "because his testimony would be favorable to the State," is flawed because the reason his testimony would have been favorable to the State was directly due to Mr. Ray's errors and omissions in failing to properly inform Dr. Leo of the facts of the case.

Subsequent Finding of Fact No. 65 states that "Mr. Ray and Mr. Moore's efforts to prepare and present a defense were hampered by the applicant's ever-changing version of these murders and his specific involvement therein." Yet, immediately after his transfer to the county jail, and before Mr. Ray and Mr. Moore were even appointed, Mr. Barbee recanted his confession and professed his innocence of the murders of Lisa and Jayden Underwood. (*See, e.g.,* Exhibits 19, 20, 37.) Mr. Ray himself admitted that "Stephen consistently stated that Ron Dodd was the real killer" from the outset

of the case. (3 EH 71.)   Mr. Ray also used the word "steadfast" in relation to Mr. Barbee's statements about Ron Dodd's culpability. (3 EH 71.) His own declaration also shows the opposite. *E.g.,* "Applicant consistently stated that Ron Dodd was the real killer, Exhibit 37, at 5; "Applicant was steadfast in his assertion that he was innocent", *Id.* at 5; "Applicant maintained that he was completely innocent" *Id.* at 6; "Client has maintained his innocence to attorneys since the date of appointment", Memo of Understanding, appendix to Exhibit 37.

Subsequent Findings of Fact Nos. 66 and 67 are similarly flawed.  No. 66 held that "[t]he applicant initially explained that the murders of Lisa and Jayden Underwood were accidental" and No. 67 held that "applicant later took the position that Ron Dodd killed Lisa and Jayden Underwood and that he was not present when it happened."  This is an unreasonable determination of the facts in light of Mr. Ray's own testimony and the other evidence and testimony that clearly shows that Mr. Barbee repudiated his "confession" before Mr. Moore and Mr. Ray were even appointed to his case. These glaring inconsistencies should cause the Court to afford little credibility to trial counsel's testimony.

Similarly, Subsequent Findings of Fact No. 67 through 70,  78, and 80-82 are also flawed and contrary to the record and an unreasonable determination of the facts.  Subsequent Finding of Fact No. 65 held that "Mr. Ray and Mr. Moore's efforts to prepare and present a defense were hampered by the applicant's ever-changing version of these murders and his specific involvement therein."   Subsequent Finding No. 67 holds that "applicant later took the position that Ron Dodd killed Lisa and Jayden Underwood, and that he was not present when it happened."  These holdings ignore and are directly contrary to the attorneys' contradictory statements in their  affidavit that Mr. Barbee *always* insisted on his innocence and that Ron Dodd was the actual murderer. (*E.g.,*

"Applicant consistently stated that Ron Dodd was the real killer, Exhibit 37, at 5; "Applicant was steadfast in his assertion that he was innocent", *Id.* at 5; "Applicant maintained that he was completely innocent" *Id.* at 6; "Client has maintained his innocence to attorneys since the date of appointment", Memo of Understanding, appendix to Exhibit 37.)  Mr. Barbee's statement that the killings were accidental occurred at the police interrogation and he had clearly repudiated that statement as coerced well before the attorneys were appointed, as they themselves admit.

Subsequent Finding No. 69 held that Mr. Ray believed the "Ron Dodd did it" theory "was unworkable because Dodd had no motive to kill to people with whom he had no association and because this theory did not take into account the applicant's confessions." On the contrary,  Mr. Ray admitted at the evidentiary hearing that "there was a financial motive" for Ron Dodd to commit the murders and to frame Mr. Barbee, contrary to the statement in his joint affidavit with Mr. Moore. (3 EH 94.)  Mr. Ray also admitted that Theresa Barbee's embezzlements and her fear of being discovered could have also been a motive for Mr. Dodd, as Mr. Dodd was living with her at the time of the murders. (3 EH 96.)  Mr. Ray also admitted that he knew Ron Dodd was living in a very large and expensive house and he had a motive to continue that life style.  (3 EH 97.)

In testimony that showed his lack of understanding of this issue, Mr. Ray stated that "the jury wasn't going to decide what, if anything, Ron Dodd had to do with it.  The jury was deciding one thing which is whether or not Mr. Barbee here was guilty of capital murder...So it really doesn't matter what anybody's theory was on Ron Dodd." (3 EH 99.)   This is of course a non sequitur, as showing Ron Dodd's involvement would also have showed Mr. Barbee's innocence.   This explanation also ignored the fact that the jury did not consider Mr. Dodd's involvement because it was not presented to them by Petitioner's attorneys.  Mr. Ray actually admitted that "I don't know

very much about Ron Dodd." (3 EH 99.)   And as to the head injury suffered by Petitioner when Ron Dodd dropped a pipe on his head, Mr. Ray stated in his affidavit that they "determined not to present the head injury theory because that theory would necessitate that Petitioner was, in fact, guilty as charged." (3 EH 100.)   This too, is a non sequitur.

Subsequent Findings of Fact Nos. 74 through 77 relating to Donald Painter, an inmate who implicated Ron Dodd in the murder, are similarly contrary to the record and an unreasonable determination of the facts. They are based on Subsequent Findings Nos. 76 and 77, which hold that the alleged reason for not presenting Mr. Painter was that he supposedly wanted money for his testimony. Yet the money motive, which allegedly made him a bad witness, was never adequately investigated.

Subsequent Finding of Fact No. 78 purports to explain why the "Ron Dodd did it" theory was inconsistent with evidence admitted at trial.   But Subsequent Finding of Fact 78(a) and (b) are based on Mr. Barbee's repudiated confession.   That repudiated confession could have been explained to the jury as a result of coercion and threats of the death penalty.

Subsequent Findings of Fact No. 88 and 89 are unreasonable because they are misleading and miss the point.   No. 88 held that "Mr. Ray instructed Ms. Maxwell to learn everything about the applicant's past, including positive and negative information" and No. 89 held that they believe such information is useful, and No. 91 held that "Mr. Ray's decision to prepare a psychosocial history report containing both positive and negative information was not due to any relationship to Judge Gill."   The problem here is not that Ms. Maxwell was asked to learn positive and negative information, but that Mr. Ray told her to write up and put the negative information in a report that was in fact later given to the prosecution and used against Mr. Barbee.

At the hearing, Ms. Maxwell testified that, with her current experience, she would provide the defense attorney with all the information, both good and bad, but the bad would be provided only verbally. (2 EH 95.)  The negative information would not normally be in the written reports. (2 EH 96-97.)  At the time she provided the report in this case she "had no idea the prosecution was even allowed to see my report" and Petitioner's attorneys failed to advise her that it could be seen by them. (2 EH 97.)  Since this case, Ms. Maxwell has learned "to only provide mitigating information in the final report." (2 EH 97-98.)  In seven or eight years of mitigation training, Ms. Maxwell has been taught that it is "standard procedure" not to write down bad or negative information as it may become discoverable. (2 EH 123-124.)[108]  In her report, Ms. Maxwell wrote that Petitioner had poor behavioral and impulse control (2 EH 100, 104), did not do well under stress (2 EH 101-102), and had numerous girlfriends and a secret cell phone (2 EH 103) but would not have done that in light of her training.  She said that she did not realize that the prosecution would obtain a copy of her report as this was her first capital case.  (2 EH 128.) Ms. Maxwell thought that Petitioner's attorneys may have provided a copy of her report to the prosecution but was not certain of that. (2 EH 129.) Currently, Ms. Maxwell does not include anything other than mitigating facts in her mitigation report (2 EH 133.)  Thus, these findings are all unreasonable determinations of fact.

Subsequent Finding of Fact No. 96, relating to the head injury, is flawed.  In the only subsequent finding relating to the non-presentation of the head injury, it held that "Dr. Goodness did not find significant symptoms suggestive of a head injury."  However, it was Amanda Maxwell (Exhibit 16) and Dr. Martin (Exhibit 17) who found these symptoms, not Dr. Goodness, who held

---

[108]    This is standard practice and was so at the time of Mr. Barbee's trial.  For instance, in *Crutsinger v. Stephens,* No. 12-70014 (5th Cir. Sept. 18, 2013) an expert involved in this case, Dr. Kelly Goodness, indicated that in Crutsinger's 2003 capital trial, "she would first make an oral report to trial counsel and prepare a written report only if requested." *Crutsinger,* at *7.

a Ph.D, not a medical degree.

Subsequent Finding of Fact No. 97 held that "Dr. Goodness did not find that the applicant suffered from any developmental delay or from bipolar mood disorder." This was found by Ms. Maxwell and Dr. Martin.

Subsequent Finding of Fact No. 108 is completely illogical. It held that "Mr. Ray and Mr. Moore's decision not to offer head injury evidence was not a decision adverse to the applicant's interests, but rather a reasonable tactical decision given the applicant's lack of significant symptoms and his unwillingness to accept responsibility for the murders..." As discussed *supra,* innocent people can also have head injuries, and the head injury evidence was not in any way dependent or diminished by a claim of actual innocence. And there were significant symptoms, including severe headaches. Subsequent Finding of Fact No. 110 offers the same illogical rationale for not presenting the evidence of hydrocodone use. It too was not dependent or tied to an "acceptance of responsibility" for the murders as the state courts held when they adopted this finding.

Subsequent Findings of Fact Nos. 111 through 128, relating to the "road rage" incident, are similarly flawed and illogical and an unreasonable determination of the facts. These are discussed in detail in Claim 5(c), *infra,* and that discussion is incorporated by reference herein. The evidentiary hearing testimony of Mr. Davis showed that this incident was misrepresented by Mr. Moore and Mr. Ray in their affidavit in an attempt to avoid responsibility for their complete failure to offer any evidence of Mr. Barbee's low propensity for future dangerousness, the crucial special issue. At the hearing, Mr. Davis testified that two people in a truck swerved in front of Petitioner and Mr. Davis' vehicle and forced them off the road. (2 EH 143.) The two men approached their vehicle, so Mr.

Davis and Mr. Barbee rolled down the window to see what they wanted. (2 EH 143.)  One of the other drivers tried to punch Mr. Davis so Petitioner and Mr. Davis got out and defended themselves. (2 EH 143.)  Then they got back in the truck and drove away. (2 EH 143)  The other people were the aggressors, Mr. Davis and Petitioner were trying to defend themselves, and no one was hurt. (2 EH 144.)

At the evidentiary hearing, Mr. Davis testified that at no time did he ever tell Petitioner's mitigation person or his attorneys that Petitioner tried to kill the other persons and it was nothing even close to that. (2 EH 145.)  The incident was a simple fistfight. (2 EH 145.)  Mr. Davis did not think that Petitioner was violent or that he would be likely to commit future acts of violence and he had never seen him being the aggressor.  (2 EH 144-145.)   Mr. Davis would have been willing to be a witness at Petitioner's trial and if he had been called as a witness he would have told the jury that he would "absolutely not" be a threat to society or likely to commit future violent acts. (2 EH 146.)  Had he been asked any "have you heard" or "do you know" questions about Mr. Barbee's past incidences of violence, he would have said "I don't know of any" such incidents.  (2 EH 146.)

Subsequent Findings of Fact Nos. 122 and 124 are totally contrary to the record.  No. 122 held that "Mr. Davis denied meeting with Mr. Ray and Mr. Moore before the applicant's trial" citing 2 EH 147.  Mr. Davis made no such denial.  At 2 EH 147 he testified only that he was never contacted by Mr. Barbee's attorneys to testify in the case.  Subsequent Finding of Fact No. 124 held that "Mr. Davis' writ hearing testimony that he never met with Mr. Ray and Mr. Moore is not credible."  Again, Mr. Davis newer so testified, he said that he was never contacted *by them to testify.*

Subsequent Finding of Fact No. 126 is also flawed.  It held that "Mr. Ray and Mr. Moore were concerned that the State was aware of the applicant's road rage incident."  First, it was not a

road rage incident, at least on the part of Petitioner and Mr. Davis.  Second, there was simple way to avoid any harmful testimony: simply ask each prospective witness if they knew about it.  Any "concerns" about the State finding out about the so-called road rage were certainly bogus and an after-the-fact pretext for the trial attorneys' failure to present mitigating evidence as to future dangerousness, as shown herein.  Subsequent Finding of Fact No. 127 has the same defect.

Subsequent Finding of Fact No. 130 encapsulates this issue: "Mr. Ray and Mr. Moore's decision to limit their examination of the defense punishment witnesses was...rather a reasonable tactical decision given the applicant's past violent behavior." This cannot bear reasonable scrutiny against the arrest-free behavior of a 38-year old successful businessman.  Even if the "road rage" incident was as the defense attorneys depicted it, and even if some of the defense witnesses had known of it, this cannot reasonably be called a history of "violent behavior."

Subsequent Findings of Fact Nos. 134 through 138 relate to the "memorandum of understanding" that Mr. Ray drew up.  There is no other logical explanation for this memorandum than that it was intended to undercut any future claims of ineffective assistance of counsel that Mr. Barbee might bring against the trial attorneys.  Yet the Subsequent Findings of Fact state in conclusory manner that it "was not a conflict of interest" and Mr. Ray's use of the memorandum to "defend himself" was not a conflict of interest. (Subsequent Findings of Fact Nos. 137 and 138.) The fact that the trial attorneys felt they needed to prepare this memorandum is in itself proof of a conflict of interest. These Subsequent Findings of Fact are all unreasonable determinations of the facts under 2254(d)(2).

Subsequent Finding of Fact No. 139 is essentially a selective summary (some of it misleading) of some of the guilt phase trial testimony that purports to "undercut[] any additional

potential evidence or theory which Mr. Ray and Mr. Moore could have presented to the jury." This too is illogical. Mitigating evidence is not "undercut" even if the prosecution's guilt phase case is very strong. This has been discussed *supra.* The finding flies in the face of *Williams, Wiggins* and *Rompilla, supra,* where despite much more aggravating evidence than Mr. Barbee's arrest-free past and less omitted mitigating evidence, ineffective assistance of counsel was found. *See, e.g, Williams* 120 S. Ct. at 1500; *Rompilla,* 125 S. Ct. at 2460 and 2462; and *Wiggins* (trial counsel's punishment-phase strategy not owed the deference usually accorded trial strategy, because it was not the product of a professionally reasonable investigation into other potential mitigation themes). The Supreme Court in these cases has repeatedly rejected the notion that even an extremely aggravating guilt phase presentation absolves the trial attorneys of their obligation to present mitigating evidence at the punishment phase.

The same flaw is seen in Subsequent Finding of Fact No. 140, which holds that "[t]he following guilt/innocence phase evidence undercuts any additional potential evidence or theory which Mr. Ray and Mr. Moore could have presented to the jury."

Subsequent Findings of Fact Nos. 141 through 153 are all conclusory statements, most of which are not supported by the facts as developed at the hearing and in Petitioner's writ, as shown herein.

Subsequent Finding of Fact No. 140 presents an egregiously slanted and unreasonable view of the very sparse aggravating evidence in the case. Subsequent Finding of Fact No. 140(a) is particularly inaccurate. Stephen allegedly assaulted his wife Theresa twice in the course of the marriage. (25 RR 34.) Regarding alleged fights when Mr. Barbee was married to Theresa, the actual testimony was that the first fight occurred when they were living in an apartment in Fort

Worth, and the next one was when they lived in a metal building they had bought for the company (25 RR 34-36) and Theresa did not have any injuries from either one. (*Id.*)   The next "fight" involved Mr. Barbee knocking something off the wall and it accidentally hit Theresa. (25 RR 40.) She had a concussion (25 RR 43) and Stephen later showed up at the hospital. (25 RR 44.)[109]   The next fight was in 2002 when Theresa admitted she egged him on and Stephen hit her in the arm. (25 RR 45.)  She suffered a bruise. (25 RR 45.)  Another incident was recalled from 2003 when Theresa was the aggressor and she hit Stephen at a party, at which point he left her for good. (25 RR 47-48.) He did not move back to the house. (25 RR 48, 68.)[110]   All told, they had 3 or 4 fights. (25 RR 67-68.)   This evidence hardly "under cuts any additional potential evidence or theory which Mr. Ray or Mr. Moore could have presented to the jury." Subsequent Finding of Fact No. 140a.  Subsequent Finding of Fact No. 140c actually highlights the paucity of aggravating evidence, as the State had to rely on an incident when a witness "rejected a personal relationship with the applicant [and] he had an outburst and began cursing her."

The factual analysis *supra* in Section C, "Argument in Support" is also incorporated herein, as also shows why the state court holding was an unreasonable determination of the facts under 2254(d)(2).

## 2.  The 2254(d)(1) analysis.

To examine why the state court holding is contrary to 2254(d)(1), and resulted in a decision

---

[109]   The witness also testified about Stephen once joking about throwing her through the wood chipper and on July 4, 2003, when he said it, she thought he was serious. (25 RR 64-65.) But at the grand jury hearing, Theresa had earlier testified that she did not think Stephen was serious when he said this at the July 4th party. (25 RR 65-67.)

[110]   The house in question was 4000 square feet with a movie room and a pool. (25 RR 63.)  Stephen's mother helped them pay for it. (25 RR 63.)

that was contrary to, or an unreasonable application of clearly established Federal law," we must similarly look to the "Conclusions of Law," adopted verbatim by the trial court and later by the CCA., contained in the prosecutors' "Proposed Memorandum, Findings of Fact and Conclusions of Law." (Exhibit 54.)  As Conclusion of Law No. 2 points out, "[a] defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief," citing *Cuyler,* 446 U.S. at 349-350.  Petitioner has shown at length that there was an actual conflict here and that his interests were prejudiced by various acts and omissions of the trial attorneys.

The evidentiary hearing in this matter brought out clearly the many ways in which the trial attorney's interests were put ahead of their client's interests.  Even if we use the *Strickland* ineffective assistance of counsel yardstick, the performance of Mr. Moore and Mr. Ray falls short.

Petitioner incorporates herein the above discussion in Section C of this claim, "Argument in Support" is also incorporated herein, as also shows why the state court holding was an unreasonable application of clearly established federal law under 2254(d)(1).

**CLAIM THREE: MR. BARBEE RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AT THE PRE-TRIAL STAGE OF HIS TRIAL.**[111]

Petitioner's conviction, judgment, sentence and confinement are illegal and were obtained in violation of his Fifth, Sixth, Eighth and Fourteenth Amendment rights to a fair and impartial jury, the presumption of innocence, a fair trial, freedom from self-incrimination, effective assistance of counsel, due process of law, and reliable guilt and penalty determinations, because  trial counsel failed adequately to prepare for trial.

**A. Standard of review and legal analysis for ineffective assistance of counsel claims in general.**[112]

**\*\*\*\*\*\*\*\*\*\*\*\***

> We hope, of course, that the defendant whose life is at risk will be represented by competent counsel -- someone who is inspired by the awareness that a less-than-vigorous defense truly could have fatal consequences for the defendant.  We hope that the attorney will investigate all aspects of the case, follow all evidentiary and procedural rules, and appear before a judge who is still committed to the protection of defendants' rights.

**\*\*\*\*\*\*\*\*\*\*\*\***

*Callins v. Collins*, 114 S. Ct. 1127 (1994) (J. Blackmun, dissenting).  Unfortunately, for the indigent accused of a capital crime, it is the rare case indeed where competent counsel is appointed.  *See* Stephen Bright, *Counsel for the Poor: The Death Sentence Not for the Worst Crime, But for the Worst Lawyer*, 103 YALE L.J. 1832 (1995).  Mr. Barbee is a perfect example of a man who was denied a fair trial because he had the misfortune to be represented by counsel who put on a "less

---

[111]   This claim is exhausted as it was brought as Mr. Barbee's first claim for relief in his state habeas application.

[112]   This analysis applies to all three ineffective assistance of counsel claims: Claim Three (pre-trial ineffectiveness; Claim Four (guilt/innocence phase ineffectiveness and Claim Five (punishment phase ineffectiveness) and is incorporated herein as to those claims.

than vigorous" defense, did not effectively investigate and present a compelling case for actual innocence of the murders of Lisa and Jayden Underwood, did not diligently investigate readily available mitigating evidence, were not aware of significant facts concerning the background of their client, and did not present an accurate picture of him to the jury.

### 1.    The legal standard under *Strickland v. Washington*

The Sixth Amendment to the United States Constitution guarantees criminal defendants the fundamental right to effective assistance of counsel. *McMann v. Richardson,* 397 U.S. 759, 771, n.14 (1970) ("[i]t has long been recognized that the right to counsel is the right to the effective assistance of counsel.")[113] As the Court in *McMann* explained, the existence of a right to *effective* assistance of counsel follows logically and necessarily from the existence of the Sixth Amendment basic right to the assistance of counsel: "[I]f the right to counsel guaranteed by the Constitution is to serve its purpose, defendants cannot be left to the mercies of incompetent counsel." *McMann,* at 771. Our adversary system of criminal justice, and the concept of counsel contemplated by the Sixth Amendment assumes, at a minimum, that counsel will act as an *advocate* for the accused. *Anders v. California,* 386 U.S. 738, 87 S. Ct. 1396 (1967); *United States v. Cronic,* 466 U.S. 648, 104 S. Ct. 2039 (1984). The Sixth Amendment also demands that counsel be able to provide the "guiding hand" necessary to adequately prepare and present a defense, and not simply the physical presence of one who is licensed to practice law. *Powell v. Alabama,* 287 U.S. 45, 68-69 (1932).

In the 1984 decision of *United States v. Cronic,* 466 U.S. 648 (1984), the Supreme Court reiterated the logical connection between the existence of a constitutional right to effective

---

[113]    *See also Avery v. Alabama,* 308 U.S. 444, 446 (1940); *Glasser v. United States,* 315 U.S. 60, 69-70 (1942); *Reece v. Georgia,* 350 U.S. 85, 90 (1955); *Herring v. Estelle,* 491 F.2d 125, 127 (5th Cir. 1974) (a criminal defendant has the right to be represented by counsel "reasonably likely to render and rendering reasonably effective assistance.")

assistance of counsel and the text of the Sixth Amendment, reasoning that

> [t]he special value of the right to the assistance of counsel explains why "[i]t has long been recognized that the right to counsel is the right to affective assistance of counsel."....The text of the Sixth Amendment itself suggests as much.  The Amendment requires not merely the provision of counsel for the accused, but "Assistance", which is to be "for his defense." Thus, "the core purpose of the counsel guarantee was to assure 'Assistance' at trial, when the accused was confronted with both the intricacies of the law and the advocacy of the public prosecutor."...If no actual "Assistance" "for" the accused's "defense" is provided, then the constitutional guarantee has been violated.[114]

*Cronic,* at 654 (footnote and citations omitted).

The constitutional standard for judging the effectiveness of counsel under the Sixth Amendment is a two-prong test, requiring that the petitioner show that: (i) counsel's performance was so "deficient"  that counsel did not provide "reasonably effective assistance," and (ii) that counsel's errors "prejudiced" the defense by depriving the defendant of a fair trial whose result is reliable.  *Strickland v. Washington*, 466 U.S. 668 (1984).  An attorney is ineffective if his or her performance "fell below an objective standard of reasonableness."  (*Id*. at 688.) "Prejudice" is established if, but  for counsel's errors, there is a "reasonable probability" that the result of the proceeding would have been different.   "A reasonable probability is a probability sufficient to **undermine confidence** in the outcome."  *Strickland*, 466 U.S. at 694 (emphasis added).  The *Strickland* test is the proper standard to gauge the effectiveness of counsel at the guilt/innocence phase of a non-capital trial and at the guilt/innocence and punishment phases of a capital trial. *Livingston v. Johnson,* 107 F.3d 297, 304-05 (5th Cir. 1997).

### 2. Standard for deficient performance.

Counsel owes the accused a duty of competent representation. This is particularly true in a capital case, because "there is a significant difference between the death penalty and lesser

---

[114]   *See also Strickland v. Washington,* 466 U.S. 668, 686 (1984).

punishments." *Beck v. Alabama,* 447 U.S. 625, 637 (1980). Although the effectiveness of counsel must be determined on a case-by-case basis, *Strickland v. Washington, supra* at 688-89 (1984), Courts are entitled to look to objective standards and to the appropriate case law to determine what constitutes "reasonably competent counsel" in a particular death penalty case.

### a. Case law.

When "counsel's performance as a whole," *United States v. Cronic,* 466 U.S. 648, 657 n.20, 104 S. Ct. 2039, 2046 (1984), or through individual errors, *Strickland, supra,* 104 S. Ct. at 2064,[115] falls below an objective standard of reasonableness, deficient performance is established. The writ will issue if the failings amount to counsel being functionally absent[116] **or** if prejudice is shown such that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland, supra. See Williams v. Washington,* 59 F.3d 673 (7th Cir. 1995) (counsel ineffective in investigating and presenting defense); *Antwine v. Delo,* 54 F.3d 1357 (8th Cir. 1995) (counsel ineffective for failing to investigate and present available evidence of bipolar disorder); *Baxter v. Thomas,* 45 F.3d 1501 (11th Cir. 1995) (trial counsel ineffective during penalty phase of capital trial for failing to adequately investigate and present mitigation evidence); *Bryant v. Scott,* 28 F.3d 1411 (5th Cir. 1994) (counsel ineffective for failure to interview alibi witnesses); *Hill v. Lockhart,* 28 F.3d 832 (8th Cir. 1994) (trial counsel ineffective at penalty phase for failing to prepare and present evidence of defendant's mental state at the time of the offenses); *Loyd v. Whitley,* 977 F.2d 149 (5th Cir. 1992) (counsel ineffective in sentencing

---

[115] *See also Curry v. Zant,* 371 S.E.2d 647, 649 (Ga. 1988) (notwithstanding an otherwise reasonable performance by counsel, the single error of failing to obtain "an independent psychiatric evaluation of [the defendant] deprived his client of the protection of counsel.")

[116] *See Holloway v. Arkansas,* 435 U.S. 475, 98 S. Ct. 1173, 1181 (1978) ("The mere physical presence of an attorney does not fulfill the Sixth Amendment guarantee").

phase for failing to obtain an independent mental health evaluation when funds were available); *Griffin v. Warden,* 970 F.2d 1355 (4th Cir. 1992) (trial counsel ineffective for failure to contact alibi witnesses); *Harris v. Reed,* 894 F.2d 871 (7th Cir. 1990) (counsel ineffective for failure to interview eyewitnesses); *Blake v. Kemp,* 758 F.2d 523, 531 (11th Cir. 1985) ("[T]he courts have 'long recognized a particularly critical relationship between expert psychiatric assistance and minimally effective assistance of counsel.'") (citations omitted).

### b. Objective standards.

This Court is entitled to refer to guidelines such as the *ABA Standards for Criminal Justice* to determine what level of performance is required by reasonably competent counsel in a capital sentencing trial. As the Supreme Court stated in *Strickland*:

> In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. Prevailing norms of practice as reflected in American Bar Association standards and the like, e. g., ABA Standards for Criminal Justice 4-1.1 to 4-8.6 (2d ed. 1980) ("The Defense Function"), are guides to determining what is reasonable....

466 U.S. at 687.

The need to investigate is an essential part of the duty of competent representation and is set forth in the ABA's *Standards*:

> It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty.

American Bar Association, *Standards for Criminal Justice: The Defense Function, Standard 4-4.1, Duty to Investigate*, at 4-53 (2d ed. 1980)(emphasis added).

Counsel's duty to investigate in preparation for sentencing is even more critical:

The lawyer has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the Court at sentencing. This cannot effectively be done on the basis of broad emotional appeals or on the strength of statements made to the lawyer by the defendant. Information concerning the defendant's background, education, employment record, mental and emotional stability, family relationships and the like will be relevant, as will mitigating circumstances surrounding the commission of the offense. **Investigation is essential to the fulfillment of these functions.**

American Bar Association, *Standards for Criminal Justice: The Defense Function,* Standard 4-4.1,

Commentary, at 4-55 (2d ed. 1980)(emphasis added).

**Claim Three(a): Ineffective assistance of counsel for failure to properly challenge the veracity of the video recording of Mr. Barbee's interrogation and confession and to investigate whether it was coerced.**

**A. Facts in Support.**

Defense counsel were provided with recordings (in VHS format) of the interrogations of both Mr. Barbee and Mr. Dodd. Both the trial testimony and a comparison of the two recordings makes it clear that the recording of Mr. Barbee's interrogation was altered and edited.

First, the recording of Mr. Dodd's interview is a continuous one, as even when Detective McCaskill has left the room the recording continues and no obvious breaks in it are apparent. On the other hand Mr. Barbee's recording inexplicably stops as soon as Detectives Jamison and Carroll begin to accuse him of the murders of Lisa and Jayden Underwood. It only resumes when he gives his statement confessing to the murders.

Second, at the suppression hearing, Detective Carroll gave detailed testimony about Mr. Barbee's actions during the interrogation, both with Detective Jamison after he left the room and when Mr. Barbee was left alone in the interrogation room prior to the alleged trip to the bathroom, none of which appears on the video provided to counsel.

The testimony of Det. Carroll was that after initial questioning of about 25-27 minutes, there was a break in the recording in order to document some injuries on Mr. Barbee's body. (15 RR 16.) This was about an eight-minute break. (15 RR 17.) Det. Carroll testified that the tape was re-started and Mr. Barbee was confronted with the issue of running from the police. (15 RR 19-20.) Det. Jameson left the interview room and Mr. Barbee was left alone in the room for 30 to 35 minutes. (15 RR 22.) Then Mr. Barbee needed to go to the restroom, and Det. Carroll allegedly accompanied him. (15 RR 25-26.) Supposedly this took about 45 minutes to an hour and no one else entered or left the restroom. (15 RR 32.) Then they returned to the interview room to put it on tape. (15 RR 33.) None of this appears on the video which was provided to counsel.

Notwithstanding the foregoing, and notwithstanding the fact that Dr. Richard Leo, a nationally known expert on false confessions, noted the suspicious nature of the gap in the recording provided to defense counsel, counsel failed to cross-examine any of the officers involved in the interrogation on the missing data from the tape or to later address this issue in the suppression hearing. (*See* Exhibit 36, Letter of Dr. Richard A. Leo to attorney Bill Ray.) Dr. Leo states:

> As I mentioned over the phone, there are two major issues that lawyers must confront if they are putting forward a false confessions defense: first, why the client would have falsely confessed; and second, how we know the confession is false. The second issue is related to but logically independent of the first.
> In this case, the police suspiciously turned the tape recorder off after they appeared to begin an accusatorial interrogation of Mr. Barbee. As I understand it from you, they had no good explanation for why they turned the tape recorder off and failed to memorialize the entire interrogation, especially since the tape was running at the beginning of the interrogation.
> In his written account, Mr. Barbee describes an interrogation that is highly coercive—involving death penalty threats in the absence of confessions and promises of leniency in exchange for confession. Mr. Barbee describes the kind of interrogation that researchers regard as psychologically coercive and that involve the kind of psychological interrogation techniques that typically lead to false confessions when false confessions occur. However, these very same interrogation techniques can also coerce true confessions. (Exhibit 36.)

Further, Mr. Barbee consistently maintained to counsel that during the interrogation he was coerced into stating that he committed the murders by threats of the death penalty, that portions of his interrogation, including Det. Carroll banging on the table and threatening him, were missing from the recording provided to counsel, and that he spent only a brief time in the bathroom with Det. Carroll.  (Exhibit 20.) Notwithstanding these facts, counsel did not give Mr. Barbee the option of testifying during the suppression hearing, thus leaving the State's case unchallenged.

There is little doubt that the most damaging evidence in this case was Mr. Barbee's alleged statement to Det. Carroll.  To say that the circumstances of the alleged "bathroom" confession are unusual are an understatement.  This alleged confession was not memorialized in Det. Carroll's notes and it occurred conveniently out of recording range.  It simply defies coincidence that the tape recorder was turned off just as the detectives began to accuse Mr. Barbee of the murders, and that none of his responses after this point nor any of the police interrogation appear on the recording, until later when Det. Carroll leads him through his statement after the alleged "confession" in the bathroom.

**B. What the state court held.**

This claim is exhausted and Respondent has conceded that it was brought in the initial state habeas proceedings. (*See* Docket No. 40, RA at 17.)  The CCA  held, in Mr. Barbee's first habeas application, that "[w]e adopt the trial judge's findings and conclusions.  Based upon the trial court's findings and conclusions and our own review, the relief sought is denied."  (Exhibit 9, *Ex parte Stephen Dale Barbee,* No. 71,070-01.)

**C. The State court erred in denying this claim as the findings were an unreasonable determination of the facts under 2254(d)(2).**

This claim was brought in the initial round of state habeas.  (Exhibit 11, at 17-20, Claim 1.)  The State court's findings as to this claim, written verbatim by the prosecutor and rubber-stamped by the Texas Court of Criminal Appeals, were multiply flawed and erroneous.   The State claimed that, based on trial counsels' self-serving affidavit (Exhibit 37), that "Mr. Ray and Mr. Moore do not believe that the video-recordings support the applicant's contention that they have been altered or edited....From their review of the video-recording, Mr. Ray and Mr. Moore had no reason to believe that the Petitioner's video-recording was altered—only that it stopped and started—and knew of no fact supporting an 'alteration' claim."  (Exhibit 12, State's Reply at 19; Exhibit 14 at 5, factual finding number 22.)  That is not surprising, as the "alteration claim" is that it was edited by stopping and starting it.  The State court findings and conclusions are based on this false assumption.  In fact, the attorney's affidavit admits what Petitioner is claiming here—that the tape has unexplained gaps and that it stops and starts.

The State court findings are similarly flawed when they attempt to debunk this claim using the letter of Dr. Richard Leo.[117]  (Exhibit 12, at 19-21; Exhibit 14 at 5-6, factual findings numbers 24-26)   The state court points to Mr. Barbee's leading the police to the bodies, not denying the crime to his wife, and Dodd's lack of motive.  (Exhibit 14, finding of fact number 26.) However, as discussed *supra* in Claim One,  Dr. Leo's opinion was based on a number of mis-perceptions and incomplete information that should have been cleared up by defense counsel.  (*See* Exhibit 36.)  Dr. Leo thought that Mr. Dodd did not have a motive to commit the murders, whereas he had a huge financial motive as discussed above.  (*Id.*)  In fact, there was no motive for Mr. Dodd to merely

---

[117]   Dr. Leo's letter is Exhibit 36.

"assist" Mr. Barbee in the concealment of the bodies, as the State's case had it.  Secondly, Dr. Leo was troubled by his assumption that he told his wife that he had committed the murders, when in fact he never said this, but merely told her of his involvement in the disposal of the bodies. *Id.*  Dr. Leo did not know that Mr. Barbee has a long history of consistently denying that he committed the murders, to his wife and everyone else involved in this case, while admitting that he disposed of the bodies.  *Id.*  Third, Dr. Leo was disturbed by the fact that Mr. Barbee led the police to the bodies, apparently not knowing or not being told by the defense attorneys that he had admitted his involvement in burying the bodies, knew where they were buried,  and that the police already knew the approximate location of the bodies from Ron Dodd's confession.  *Id.*  Far from excusing trial counsel's performance, their sloppy  handling and preparation of this potential witness is merely more proof of their ineffective assistance.  Had Dr. Leo been properly informed, he would have known that none of the factors he expressed concerns about had any bearing on the truth of Mr. Barbee's confession.  By their failure to properly inform this potentially crucial witness, the trial attorneys threw away their best opportunity to cast doubt on Mr. Berbee's "confession," the most damaging evidence against him.

The  summary  of  the  state  court's  finding  is  contradicted  by  its  own  language  and  the language of the trial attorneys used to support it: "Mr. Ray and Mr. Moore found no evidence that the applicant's video-taped statement was altered or edited." (Exhibit 12 at 21; Exhibit 14 at 5, finding of fact No. 23)  But the attorneys themselves state that it stops and starts, which means that it was edited.  (Exhibit 37.)  Thus, the state court findings as to this claim are an unreasonable determination of the facts under 2254(d)(2)  as well as being incoherent.[118]

---

[118]  As discussed in the prior claim, the evidence adduced at the evidentiary hearing also showed that Mr. Ray did not supply Dr. Leo with adequate information, which led to his conclusion that the confession was probably valid.  Yet the conclusions in the subsequent writ

Similarly, the state court findings err in discussing the non-recorded oral statements of Petitioner.   Basically, the State court held that counsel were effective because they filed motions to suppress the statements and preserved their motion for appeal.  (Exhibit 12 at 21-23; Exhibit 14 at 6, factual findings numbers 30, 35, 38.)   However, this does not address the failure of the attorneys to effectively challenge these statements at the suppression hearing.

The state habeas court judge (who was not the state trial judge) held that "there exits no controverted previously unresolved factual issues material to the legality of the applicant's confinement."  (Exhibit 15, Memorandum and Order of September 30, 2008, signed by Judge Sturns.)  This was clearly erroneous, as the state's own findings and conclusions admitted the existence of many controverted factual issues in their use of the affidavits of trial counsel (which the state habeas judge ordered) and the prosecutor in order to attempt to controvert the claims.  The same judge later stated that he "carefully reviewed the State's proposed memorandum, findings of fact, and conclusions of law, the Court hereby orders adjudges and decrees that they be adopted as its own."  (Exhibit 15, Order of Nov. 7, 2008).  The CCA later  held that "[w]e adopt the trial judge's findings and conclusions. Based upon the trial court's findings and conclusions and our own review, the relief sought is denied."  (Exhibit 9, *Ex parte Stephen Dale Barbee,* No. 71,070-01.) This  was erroneous on its face, as the "trial judge," Judge Gill, made no findings and conclusions in the initial state habeas proceedings and the CCA's "review"  apparently overlooked this fact.

Some of the Subsequent Findings of Fact are also relevant to this claim because they made holdings regarding Dr. Leo's opinion of the veracity of the videotaped confession.  As discussed

---

mirrored those of Mr. Barbee's first application. That discussion is incorporated herein by reference.

*supra,* Subsequent Finding of Fact No. 57 holds that Dr. Leo "concluded that the applicant's confession was more likely to be true than false." Subsequent Finding of Fact No. 58 gives three reasons why Dr. Leo reached this conclusion: 1) that Mr. Barbee led the police to the bodies; and two reasons that are basically similar: 2) that Mr. Barbee did not deny committing the crime to his wife; and 3) that he told his wife he committed the murders. These findings ignore the bases of the claim, which is that 1) Mr. Ray did not inform Dr. Leo that Mr. Barbee's admission that he had helped move the bodies did not indicate that he was necessarily guilty of the murders(3 EH 83); 2) that Mr. Ray also admitted giving Dr. Leo false information about the cell phone records which Mr. Ray claimed indicated that Mr. Barbee was lying (3 EH 84-85) and this false information was relied upon by Dr. Leo (3 EH 84);  3) that Dr. Leo also based his opinion on his belief that Ron Dodd had no motive to commit the murders (3 EH 90) because he was not given information that would have provided that motive; 4) and as for telling his wife he committed the murders, Mr. Barbee has explained that was the result of the death penalty threats and he had repudiated that confession around the time he left the police station. Thus, these subsequent findings of fact relating to Dr. Leo are also an unreasonable determination of the facts under 2254(d)(2) because they ignore these central facts. The conclusory Subsequent Finding of Fact No. 61, that Dr. Leo was not called "because his testimony would be favorable to the State," is flawed because the reason his testimony would have been favorable to the State was directly due to Mr. Ray's errors and omissions in failing to properly inform Dr. Leo of the facts of the case.

Habeas corpus relief may be granted, under the AEDPA,  28 U.S.C. § 2254 (1994 & Supp. 2000), if the decision of the Texas Court of Criminal Appeals ("CCA") affirming the  conviction and death sentence  "resulted in a decision that was based on an unreasonable determination of the

facts in light of the evidence presented in the State court proceedings." *Coble v. Quarterman,* 496 F.3d 430, 435 (5th Cir. 2007) (quoting 28 U.S.C.A. § 2254(d)(2)).  For the reasons discussed *supra,* the state court decision here was an unreasonable determination of the facts under 2254(d)(2).

Nor are any of the state court findings and conclusions entitled to any  presumption of correctness under 2254(e)(1). *Sumner v. Mata*, 499 U.S. 539 (1981),"presumption of correctness is defeated by a showing that "the fact-finding procedure employed by the state was not adequate to afford a full and fair hearing.'" citing *Cabana v. Bullock,* 474 U.S. 376, 399 (1986); *Nethery v. Collins*, 993 F.2d 1154 (5th Cir. 1993)( no presumption of correctness where state habeas court never conducted an evidentiary hearing and adopted in whole the state's proposed findings of fact two days after the petition was filed); *Armstead v. Scott*, 37 F.3d 202 (5th Cir. 1994)( "a presumption of correctness will not apply to a state court finding of fact if the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing." *Id.*, at 207; *Amos v. Scott*, 61 F.3d 333 (5th Cir. 1995)("[f]actual findings based solely on a paper hearing are not automatically entitled to a Sec. 2254(d) presumption of correctness" at 347.)   Although a hearing was granted in the subsequent application, it was limited to Claim Two, and denied on this claim.

### D. Exhaustion and Procedural Default.

This claim is exhausted and not procedurally defaulted as it was raised in the initial round of state habeas proceedings.

### Claim Three(b): Ineffective assistance of counsel for failure to complete DNA testing prior to trial.

### A. Facts in Support.

As discussed *supra,* Connie Patton**,** a DNA tester for the Tarrant County Medical Examiner's

Office, testified that she took some swabs from the deadbolt knob, the east living room wall, and they matched the DNA profile of Lisa Underwood. (24 RR 42.) A swab from the garage floor and the entertainment center also matched her DNA profile. (24 RR 44.) Various swabs from the Dodge Durango were also offered in evidence. (24 RR 46.) However, no conclusions could be made about them. (24 RR 47-48.) A blood stain was found on the couch cover, but both Mr. Barbee and Mr. Dodd were excluded as being possible contributors. (24 RR 50.) After the testimony of this witness, a stipulation was received that evidence samples were also received from the fingernails of Jayden and Lisa and nothing linking Mr. Barbee or Mr. Dodd to them was found. (24 RR 63-64.) It does not appear that all the DNA samples that were taken were tested.

Petitioner was denied expert funding for any forensic work or testimony and is unable to prove that the incomplete testing would have resulted in exculpatory evidence. He is making this claim in order to preserve it for exhaustion in state court and/or as the basis for a future motion for DNA testing.

### B. What the state court held.

This claim was first brought in Mr. Barbee's subsequent writ application as Claim 3(b). It was denied on the basis that it did not meet the standards for a subsequent writ claim under art. 11.071 sec. 5(a). (Exhibit 52.)

### C. Petitioner has "cause" for the failure to raise the claim in his initial state habeas petition.

Any procedural default of this claim is excused under the *Martinez/Trevino* exception discussed *supra,* which provides "cause" for failure to adequately raise it in that application. The prejudice component is discussed in the factual summary of this claim.

**CLAIM FOUR:** **TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL AT THE GUILT/INNOCENCE PORTION OF THE TRIAL BY COMPLETELY ABANDONING THEIR CLIENT.**

Petitioner's conviction, judgment, sentence and confinement are illegal and were obtained in violation of his Fifth, Sixth, Eighth and Fourteenth Amendment rights to a fair and impartial jury, the presumption of innocence, a fair trial, freedom from self-incrimination, effective assistance of counsel, due process of law, and reliable guilt and penalty determinations, because trial counsel rendered ineffective assistance of counsel at the guilt/innocence phase of the trial.

**Law governing *Cronic* claims.**

Petitioner herein incorporates by reference the legal analysis of ineffective assistance of counsel claims, presented *supra* in Claim Three.

Our adversary system of criminal justice, and the concept of counsel contemplated by the Sixth Amendment assumes, at a minimum, that counsel will act as an *advocate* for the accused. *Anders v. California,* 386 U.S. 738, 87 S. Ct. 1396 (1967); *United States v. Cronic,* 466 U.S. 648, 104 S. Ct. 2039 (1984). The Sixth Amendment also demands that counsel be able to provide the "guiding hand" necessary to adequately prepare and present a defense, and not simply the physical presence of one who is licensed to practice law. *Powell v. Alabama,* 287 U.S. 45, 68-69 (1932).

In the 1984 decision of *United States v. Cronic,* 466 U.S. 648 (1984), the Supreme Court reiterated the logical connection between the existence of a constitutional right to effective assistance of counsel and the text of the Sixth Amendment, reasoning that

> [t]he special value of the right to the assistance of counsel explains why "[i]t has long been recognized that the right to counsel is the right to affective assistance of counsel."....The text of the Sixth Amendment itself suggests as much. The Amendment requires not merely the provision of counsel for the accused, but "Assistance", which is to be "for his defense."

Thus, "the core purpose of the counsel guarantee was to assure 'Assistance' at trial, when the accused was confronted with both the intricacies of the law and the advocacy of the public prosecutor.''...If no actual "Assistance" "for" the accused's "defense" is provided, then the constitutional guarantee has been violated.[119]

*Cronic,* at 654 (footnote and citations omitted).

When "counsel's performance as a whole,", *United States v.Cronic,* 466 U.S. 648, 657 n.20, 104 S. Ct. 2039, 2046 (1984), or through individual errors, *Strickland, supra,*[120] falls below an objective standard of reasonableness, deficient performance is established.  The writ will issue if the failings amount to counsel being functionally absent[121] **or** if prejudice is shown such that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  *Strickland, supra.  See Williams v. Washington,* 59 F.3d 673 (7th Cir. 1995) (counsel ineffective in investigating and presenting defense); *Antwine v. Delo,* 54 F.3d 1357 (8th Cir. 1995) (counsel ineffective for failing to investigate and present available evidence of bipolar disorder); *Baxter v. Thomas,* 45 F.3d 1501 (11th Cir. 1995) (trial counsel ineffective during penalty phase of capital trial for failing to adequately investigate and present mitigation evidence); *Bryant v. Scott,* 28 F.3d 1411 (5th Cir. 1994) (counsel ineffective for failure to interview alibi witnesses); *Hill v. Lockhart,* 28 F.3d 832 (8th Cir. 1994) (trial counsel ineffective at penalty phase for failing to prepare and present evidence of defendant's mental state at the time of the offenses); *Loyd v. Whitley,* 977 F.2d 149 (5th Cir. 1992) (counsel ineffective in sentencing phase for failing

---

[119]   *See also Strickland v. Washington,* 466 U.S. 668, 686 (1984).

[120] *See also Curry v. Zant,* 371 S.E.2d 647, 649 (Ga. 1988) (notwithstanding an otherwise reasonable performance by counsel, the single error of failing to obtain "an independent psychiatric evaluation of [the defendant] deprived his client of the protection of counsel.")

[121] *See Holloway v. Arkansas,* 435 U.S. 475,  98 S. Ct. 1173, 1181 (1978) ("The mere physical presence of an attorney does not fulfill the Sixth Amendment guarantee").

to obtain an independent mental health evaluation when funds were available); *Griffin v. Warden,* 970 F.2d 1355 (4th Cir. 1992) (trial counsel ineffective for failure to contact alibi witnesses); *Harris v. Reed,* 894 F.2d 871 (7th Cir. 1990) (counsel ineffective for failure to interview eyewitnesses); *Blake v. Kemp,* 758 F.2d 523, 531 (11th Cir. 1985) ("[T]he courts have 'long recognized a particularly critical relationship between expert psychiatric assistance and minimally effective assistance of counsel.'") (citations omitted).

**Claim Four(a):** **Trial counsel completely abandoned their client by failing to effectively present petitioner's case for actual innocence through expert testimony.**

**A. Facts in Support.**

As discussed *supra* in Claim One, petitioner has a strong claim of actual innocence. Petitioner incorporates by reference the facts and argument from Claim One herein.

Immediately after his transfer to the county jail after his alleged "confession" to Detective Carroll, Mr. Barbee recanted his confession and continued to maintain his innocence to his attorneys and others involved in the case, further maintaining that it was Ron Dodd, who was living with his ex-wife and who only weeks before had dropped a 500-pound pipe on Mr. Barbee's head, who had actually committed the murders. (*See, e.g.,* 25 RR at 98; <u>Exhibit 16</u>, Affidavit of Amanda Maxwell.)

Despite Mr. Barbee's constant assertion of his innocence, at trial his attorneys made no opening statement, put on no testimony, and during final argument confessed to the jury that the evidence was conclusive that Mr. Barbee intentionally killed Lisa and Jayden Underwood, and Mr. Ray attempted to argue that Ms. Underwood's death was accidental. (25 RR 14-16.)

There were two main failures here:

**i) Ineffective assistance for failure to present expert medical testimony at the guilt/innocence phase.**

Defense counsel were ineffective for failing to present expert medical opinion testimony to rebut the coroner's testimony regarding the cause of death. Petitioner's request for expert assistance from Dr. Glenn Larkin to investigate this claim was denied and Petitioner is unable to present evidence that the testimony was flawed. Had the expert assistance been granted, Petitioner would have attempted to show that the testimony of Dr. Krouse and Dr. White was flawed. Petitioner presents this claim in order to preserve it.

**ii) Ineffective assistance for failure to present guilt/innocence phase neuropsychological evidence.**

At trial, Petitioner's attorneys presented no expert medical testimony regarding the effect of Mr. Barbee's head injury just two months before trial or expert opinion regarding his frontal lobe injuries and impairment. Attached to this petition as Exhibit 17 is the statement of Dr. Stephen K. Martin, Ph.D, a licensed clinical neuropsychiatrist. Dr. Martin conducted extensive neuropsychiatric testing on Mr. Barbee and discovered that his known history of head injuries caused damage to the frontal lobes of Mr. Barbee's brian and that "Mr. Barbee's brain-related impairment appears to be long-standing in nature, and would have been present at the time of the offense. (Exhibit 17 at 7.)

These findings have implications for the guilt/innocence phase. Dr. Martin noted that

> When the behavioral effects of his frontal lobe impairment are considered, a broader and more accurate explanation for why Mr. Barbee could have engaged in a violent crime emerges. As previously described, the brain's "frontal lobes' tend to directly moderate how we react to emotionally charged situations. Individuals that have damage to the frontal lobes are at greater risk to engage in impulsive and potentially violent behavior without fully considering the consequences.
>
> Based upon this information, it is my opinion that Mr. Barbee's violent actions at the time of the offense would have been mediated by emotional factors as opposed to reason due to the aforementioned damage to his frontal lobes. The negative effects of damaged frontal lobes would have likely increased his impulsivity tendencies and reduced his ability to fully

consider the consequences of his actions.

It is my understanding that at the time of the trial, Mr. Barbee's trial attorney was aware of his history of head trauma and was encouraged by his mitigation expert to pursue neuropsychological testing.  Nevertheless, this testing was not performed.  It is my opinion that his trial attorney should have requested a neuropsychological evalaution, particularly given his knowledge that Mr. Barbee had, in fact, suffered head trauma a few weeks prior to the offense.  Further, an expert with the same or comparable experience and training such as I could have given testimony substantially the same as outlined in my affidavit above at the guilt/innocence phase of the trial to challenge the legal elements of his knowing and intentionality.   It is my opinion that had this evidence been adequately investigated, developed and presented by trial counsel in the guilt/innocence phase, the verdict may have been different.

(Exhibit 17 at 7-8.)


**B.  The State court holdings as to this claim were erroneous and were an unreasonable determination of the facts and an unreasonable application of clearly established federal law.**

This claim was brought in the initial state habeas proceedings. (Exhibit 11, at 10-11, 21-23).

It was Claim 2.  Hence it is exhausted. The state habeas court and the CCA's holding, in rubber-

stamping the State's findings, were based on the controverting conclusions of Dr. Price, which they

submitted as an appendix to their proposed findings and conclusions.  (Exhibit 14 at 12.)  Thus, the

state court's holding that there were no controverted factual issues (Exhibit 15; adopted by the CCA,

Exhibit 9)  is erroneous on its face.   The state court also erred when it found that "Mr. Ray and Mr.

Moore's decision not to use a 'head injury' explanation for the appellant's murderous conduct was

a valid strategic choice based on reasonable investigation given the applicant's lack of significant

symptoms and his unwillingness to accept responsibility." (Exhibit 14 at 12.)  An "unwillingness

to accept responsibility", even if true, is no valid strategic reason for failing to present the mitigating

value of the evidence as explained by Dr. Martin.

The state used the same rationale in the subsequent habeas proceedings, as the evidentiary

hearing also touched on this issue. Subsequent Finding of Fact No. 108 held that "Mr. Ray and Mr. Moore's decision not to offer head injury evidence was not a decision adverse to the applicant's interests, but rather a reasonable tactical decision given the applicant's lack of significant symptoms and his unwillingness to accept responsibility for the murders..."

However, the record shows that no neuropsychiatric testing was ever done, despite Ms. Maxwell's recommendation, so this failure cannot be seen as "strategic." The attorneys did not know what mitigating value the impairment had because they did not investigate it. This cannot be seen as "strategic." Therefore, the underlying conclusion of law, that this failure was "strategic" and based on "reasonable investigation" and that the attorneys provided Petition with "reasonable counsel" were also erroneous. (Exhibit 14 at 23, Conclusions of Law Nos. 35-38.)

Habeas corpus relief may be granted, under the AEDPA, 28 U.S.C. § 2254 (1994 & Supp. 2000), if the decision of the Texas Court of Criminal Appeals ("CCA") affirming his conviction and death sentence "was either (1) contrary to, or resulted in an unreasonable application of clearly established Federal Law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." *Coble v. Quarterman,* 496 F.3d 430, 435 (5th Cir. 2007) (quoting 28 U.S.C.A. § 2254(d)(1) and d(2)). Petitioner has shown herein that he is entitled to relief under 2254(d)(2) as the state court holding was an unreasonable determination of the facts. It was also erroneous under 2254(d)(1), as an unreasonable application of clearly established federal law.

**Claim Four(b)**: Abandonment of client and ineffective assistance of counsel for confessing their client's guilt without the client's permission.

### A. Facts in Support.

The trial attorneys, Bill Ray and Tim Moore, have repeatedly admitted that their client, from the first stages of their representation, has always insisted on his innocence. They state this repeatedly in this affidavit submitted for the state habeas proceedings. (*E.g.*, "Applicant consistently stated that Ron Dodd was the real killer, Exhibit 37, at 5; "Applicant was steadfast in his assertion that he was innocent", *Id.* at 5; "Applicant maintained that he was completely innocent" *Id.* at 6; "...a frame up [Petitioner's insistence that Ron Dodd was the actual killer] ...became a controversy that existed from the very beginning of our representation throughout our representation of Applicant", *Id.* at 7-8; "Client has maintained his innocence to attorneys since the date of appointment", Memo of Understanding, appendix to Exhibit 37.) In fact, the attorneys use this "refusal to accept responsibility" (*Id.* at 7, 8) to attempt to justify their failure to present any reasonably sufficient case at the punishment phase. (Exhibit 37, *passim.*)

Petitioner himself brought his concerns to the attention of the trial court. (Exhibit 3.) He stated that "There is a complete breakdown in communication between both attorneys and myself." *Id.*, letter of June 22, 2005. He asked for outside help in obtaining different attorneys. *Id.* Letter of June 19, 2005. He asked his attorneys to call in additional help. *Id.* On September 23, 2005 he asked the court to dismiss them. *Id.*

After virtually no defense at the guilt/innocence phase, which as discussed herein establishes deficient performance, Mr. Barbee's attorneys confessed his guilt to the jury without his permission. Mr. Ray told the jury that "[as hard as it is to say, the evidence from the courtroom shows that

Stephen Barbee killed Jayden Underwood.  There is no evidence to the contrary." (25 RR 14.)   He also told them that "Lisa Underwood.  Was he there? Yes. Did he hold her down? Yes." (25 RR 18.)

At the evidentiary hearing, Mr. Ray admitted he confessed his client's guilt without his permission:

> And I had typed up a memo and I showed it to him [Mr. Barbee] and he didn't want
> to sign it.  And the gist of the memo was that that [telling the jury Mr. Barbee did the
> murders but they are accidental] was the only way we could get through this get
> through this and him be found not guilty.  And it was not a...it was not an agreement
> to get his permission. It was just my theory of the case.  He didn't sign the memo but
> he had it explained to him.  So did I explicitly ask him if I could do that [confess his
> guilt]?  The answer is no.  Did he explicitly tell me he didn't want me to do it?  The
> answer is no."
> (3 EH 31.)

Deficient performance is also shown by the fact that the strategy adopted had no chance of success and did not make sense. This argument failed completely to account for the death of Jayden, a prime reason why the "accident" theory was inadequately presented.

The facts of this claim are undisputed, yet the state court denied relief.


**B. The State courts erred in denying this claim as the findings and conclusions were an unreasonable application of clearly established federal law and an unreasonable determination of the facts under 2254(d)1 and (d)(2).**

This claim was brought in the initial state habeas proceedings as a *Cronic* claim. (Exhibit 11 at 21-23, Claim 2.)  Respondent has previously conceded that this claim is exhausted.  Docket No. 40, RA at 17, 31-41.  The  CCA in denying this claim relied on the state habeas court's ruling (Exhibit 9) and the state habeas court in turn relied on the State's Findings and Conclusions (Exhibit 14) which were adopted verbatim.  So we must look to those pleadings to ascertain the state court's holding.

As pointed out *supra*, the state habeas court judge (who was not the state trial judge) held that "there exits no controverted previously unresolved factual issues material to the legality of the applicant's confinement."  (Exhibit 15, Memorandum and Order of September 30, 2008, signed by Judge Sturns.)  This was clearly erroneous, as the state's own findings and conclusions admitted the existence of many controverted factual issues in their use of the affidavits of trial counsel (which the state habeas judge ordered) and the prosecutor in order to attempt to controvert this claim.

Secondly, as to this claim, there was a very heavy reliance on the affidavits of the trial attorneys (Exhibit 37), and that affidavit is shown herein to be replete with misrepresentations, non sequiturs, and contradictions. The factual findings as to this claim are, in part, actually copied virtually verbatim from the trial attorneys' affidavit.  For instance, the state court adopted as fact the trial attorneys' statement that "Mr. Ray and Mr. Moore's effort to prepare and present a defense were hampered by the applicant's ever-changing version of these murders and his specific involvement therein...The applicant initially explained that the murders of Lisa and Jayden Underwood were accidental...The applicant later took the position that Ron Dodd killed Lisa and Jayden Underwood, and that he was not present when it happened." (Exhibit 14 at 4-5.)   This ignores and is directly contrary to the attorneys' contradictory statements *in the same affidavit* that Mr. Barbee *always* insisted on his innocence and that Ron Dodd was the actual murderer. (*E.g.*, "Applicant consistently stated that Ron Dodd was the real killer, Exhibit 37, at 5; "Applicant was steadfast in his assertion that he was innocent", *Id.* at 5; "Applicant maintained that he was completely innocent" *Id.* at 6; "Client has maintained his innocence to attorneys since the date of appointment", Memo of Understanding, appendix to Exhibit 37.)   The dangers of total and uncritical reliance on the pleadings of one side could hardly be clearer than here, where those

pleadings are based on self-serving and contradictory affidavits.[122] Mr. Barbee's statement that the killings were accidental occurred at the police interrogation and he had clearly repudiated that statement as coerced well before the attorneys were even appointed, as they themselves admit.

The state court findings admit that trial counsel admitted Mr. Barbee's guilt without his permission:

> During closing argument, Mr. Ray argued the defense theory of accidence rather than a pure innocence defense...
> Mr. Ray decided to use the accident theory because, in his professional opinion, the applicant's favored 'Ron Dodd did it' theory would not work...
> The applicant's 'Ron Dodd did it' theory asserted that Dodd killed Lisa and Jayden Underwood to get the applicant out of a potential disruption in his marriage to Trish Barbee...
> Mr. Ray believed that this theory was unworkable because Dodd had no motivation to kill two people with whom he had no association and because it did not take into account the applicant's confessions...
> The "Ron Dodd did it" theory was not a viable jury argument...
> (Exhibit 14 at 7-9.)

The state court errors are compounded in their "Conclusions of Law" as to this claim.

(Exhibit 14 at 19-24.)   The claim is erroneously analyzed under the *Strickland* standard, which requires a showing of prejudice, rather than the *Cronic* standard under which the claim was brought.

(Exhibit 11, at 14, 21-23.)   The cases cited all relate to ineffective assistance of counsel, and do not incorporate the *Cronic* standard discussed in the following section.   The main case cited, *Yarborough v. Gentry,* 540 U.S. 1 (2003)(Exhibit 14 at 20-21) for the proposition that "[t]he right to effective assistance extends to closing arguments,"  relates to ineffective assistance of counsel. *Cronic* is not mentioned or discussed.

---

[122]   In *Anderson v. City of Bessemer City*, 470 U.S. 564 (1985) the Supreme Court stated: "We, too, have criticized courts for their verbatim adoption of findings of fact prepared by prevailing parties, particularly when those findings have taken the form of conclusory statements unsupported by citation to the record." *Id.*, at 572.  Here, the record does not support the basis for the state court findings.

Habeas corpus relief may be granted, under the AEDPA,  28 U.S.C. § 2254 (1994 & Supp. 2000), if the decision of the Texas Court of Criminal Appeals ("CCA") affirming his conviction and death sentence  "was either (1) contrary to  or resulted in an unreasonable application of clearly established Federal Law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." *Coble v. Quarterman,* 496 F.3d 430, 435 (5th Cir. 2007) (quoting 28 U.S.C.A. § 2254(d)(1) and d(2)).

A state court decision is contrary to clearly established Supreme Court precedent if (1) the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's ] cases," or (2) "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams v. Taylor,* 529 U.S. 362, 406 (2000). The CCA's holding was erroneous and Petitioner has shown that he is entitled to relief under the standards of both 2254(d)(1) and d(2).

### C. The State courts failed to apply the *Cronic* standard for confession of client's guilt.

Mr. Ray's closing argument was not merely a negligent misstep in an attempt to champion his client's cause.  The concession that there was no reasonable doubt that his client committed the murders was an abandonment of the defense of his client at a critical stage of the criminal proceedings.

The *Cronic* standard of structural error has been held to apply to situations in which counsel confesses his client's guilt to a jury without his client's acquiescence or permission. In *U.S. v. Swanson,* 943 F.2d 1070 (9th Cir. 1991), the Ninth Circuit addressed this issue:

"A lawyer who informs the jury that it is his view of the evidence that there is no reasonable doubt regarding the only factual issues that are in dispute has utterly failed to 'subject the prosecution's case to meaningful adversarial testing. *Cronic,* 466 U.S. at 659, 104 S. Ct. at 2047." *Swanson,* 943 F.2d at 1974. *See also Jackson v. State,* 41 P.3d 395, 400-401 (Okla.Crim.App. 2001); *State v. Maready*, ___ S.E.2d ___, 2010 WL 2650482 (N.C. Ct. App. July 6, 2010)(Counsel *per se* ineffective in murder case for conceding guilt of involuntary manslaughter in closing arguments. Because North Carolina courts require the defendant's explicit consent prior to any concession of guilt, even after *Florida v. Nixon*, 543 U.S. 175 (2004), reversal was required. The record did not reflect that "Defendant was asked if he consented to these admissions, or that Defendant had given informed and voluntary consent to these admissions of his guilt.").

The Fifth Circuit has held, in *Haynes v. Cain,* 298 F.3d 376 (5th Cir. 2002) that an opening statement confession of guilt was a strategic attempt to avoid the death penalty and thus did not raise the presumption of prejudice under *Cronic.* The situation in *Haynes*, however, was less egregious than here. In *Haynes* the attorneys made at least some meaningful attempt to challenge the prosecution's case, whereas here there was no attempt to present Mr. Barbee's claim of actual innocence and his contention that Ron Dodd was the actual killer. There was massive forensic evidence implicating Haynes in the crime, such as video surveillance tapes of him at the crime scene, blood in his car and on his pants, the victim's wallet found in his home, and his semen found in the victim's body and the evidence of his guilt was termed "overwhelming" (*Haynes* at 377, 380-383). Here, there was no forensic evidence linking Mr. Barbee to the murder scene at the victim's residence.[123] The strategy in *Haynes* actually proved effective as their client received a life sentence,

---

[123] The state courts repeatedly emphasized evidence linking Mr. Barbee to the scene of the burial of the bodies, his presence near that scene when stopped by the officer and his leading the police to the burial site of the bodies. However, he has admitted his involvement in the

unlike Mr. Barbee. (*Id.* at 382.)    Additionally, the confession of guilt there occurred at the opening statement and the judge allowed Haynes to take the stand if he wished. (*Id.* at 378.)  No such option was available for Mr. Barbee, as the statement at his trial occurred at final guilt phase argument.

The facts in Mr. Barbee's case fit squarely within the parameters of *Cronic* and its progeny. Mr. Barbee never consented or acquiesced to allowing his attorney to confess his guilt in final argument, particularly in a case where the entire defense case consisted of three transcript pages. Defense counsel's actions constitute a complete abandonment of Mr. Barbee at a critical stage of his trial, and because this error is structural, prejudice need not be shown.

Nor are any of the state court findings and conclusions entitled to any  presumption of correctness under 2254(e)(1) due to the failure of the court to hold an evidentiary hearing on controverted issues of material fact where the state habeas court judge was not the trial judge. *Sumner v. Mata*, 499 U.S. 539 (1981); *Armstead v. Scott*, 37 F.3d 202 (5th Cir. 1994); *Amos v. Scott*, 61 F.3d 333 (5th Cir. 1995)("[f]actual findings based solely on a paper hearing are not automatically entitled to a Sec. 2254(d) presumption of correctness" at 347.)

### D. Exhaustion and procedural default.

Respondent has previously conceded that this claim was presented to the state courts.  *See* Docket No. 40, RA at 17.  Hence, it is not defaulted.

---

disposal of the bodies, but has maintained his innocence of the murders.  The main evidence against Mr. Barbee was his "confession" which he repudiated as coerced soon after it was given.

**Claim Four(c): Ineffective assistance for failing to explain the phone records.**

**Facts in Support.**

Stanley Keaton was called as a defense witness. (24 RR 174.) He was the defense investigator and served subpoenas for cell phone records from the City of Fort Worth on February 21 through February 22, 2005. (24 RR 175.) These records were admitted into evidence. (24 RR 177.) However, the significance of these records was never explained or argued to the jury. The jury would have no way of ascertaining the evidentiary value, if any, of these records.

Any procedural default of this claim, for failure to raise it in his initial state habeas petition, is excused under the *Martinez/Trevino* exception discussed *supra,* which provides "cause" for failure to adequately raise it in that application.

**Claim Four(d): Ineffective assistance for failure to object to prejudicial speculation by the coroners.**

The coroners were allowed to engage in a highly speculative reconstruction of the victim's death. It was based mainly on their own conjectures and was very prejudicial to the defendant.

**A. Dr. Krouse.**

Dr. Marc Krouse performed the autopsy on Lisa Underwood. (23 RR 137.) He claimed that he performed the autopsy under his authority as the Deputy Chief Medical Examiner in Fort Worth covering Tarrant, Denton and Parker Counties. (23 RR 141.

Dr. Krouse was allowed to give several extremely speculative and conjectural theories regarding the cause of death of the victim Lisa Underwood, all of which were extremely prejudicial to Petitioner:

1) He opined that there was evidence of blunt force trauma caused by having a great force

applied to her.  (23 RR 155-157.)   However, the witness could not say what type of force caused these injuries.  (23 RR 158.)  As for the compression force required, it had to be sufficient to asphyxiate someone (five to seven minutes of 100 to 300 or 400 pounds of force)  which would have caused the type of soft tissue injury, and not bony trauma, seen by the witness.  (23 RR 158-159.)

2) He opined that the facial injuries could have been from a moderate blow (23 RR 159) and were consistent with blunt force injury.  (23 RR 160.)

3) He opined that the patterned injuries were probably due to pressure or pressure with a blow component to it (23 RR 160) and that force was applied over a very broad area of the victim's back.  (23 RR 160-161.)  The broken bone in her forearm indicates that force was applied from above, a shearing force.  (23 RR 169-172.)

4) He opined that it would have required several minutes to cause her death, from two to three minutes to seven or eight.  (23 RR 163.)

5) He opined that because the body had been secreted and concealed, this increased the chances it was a homicide.  (23 RR 165.)  The doctor was quite confident that it was a homicide. (23 RR 166.)

6) He was allowed to speculate that the bruises on the victim's back could have been caused by someone sitting on her.  (23 RR 174-175.)  The doctor was allowed to answer the speculative and leading question, "is there anything that is inconsistent with Lisa Underwood being beaten followed by or contemporaneous with her face being forced to the floor while her assailant sat or kneeled on her back?"  (23 RR 180.)

7)  The doctor was also allowed to speculate that "[t]he allegation here is that Lisa's death was caused by smothering her with the weight of a body or with an object that is unknown or by a

combination of the two." (23 RR 183.)   It could take up to seven minutes for death to occur. (23

RR 184.) But someone could lose consciousness within seven or eight seconds. (23 RR 184.)

8) He opined that she was certainly in a fight of some sort as she had a black eye and other

bruises. (23 RR 191.) "The other injuries tell me that this happened in the context of an altercation,

of a fight, basically." (23 RR 195.) There were bruises on the victim's hands. (23 RR 197.)

9) He also speculated that the victim may have stopped breathing and started again. (23 RR

199.)

### B. Dr. White

Dr. Lloyd White, a deputy Tarrant County Medical Examiner, testified that he performed

the autopsy on Jayden Underwood on February 23, 2005. (24 RR 155.)  He too was allowed to

testify as to many speculative conjectures regarding the method of Jayden's death.

1)    Dr. White testified that "petechiae" are "little pinpoint hemorrhages" sometimes seen

"around the face and sometimes on the internal organs in association with asphyxial death, such as

strangulation where the neck is constricted." (24 RR 156-157.)

2) The following speculation was not objected to by the defense:

Dr. White: There was a small amount of blood-tinged fluid in the mouth and also over the
pleural surface...surface of the left lung, I saw petechiae.   These are small pinpoint
hemorrhages that are associated with increased pressure in the chest and are sometimes seen
with asphyxial death, or death due to lack of oxygen, associated with increased pressure in
the chest.
Q.  Let's start with the petechiae in the lungs.  What...you say it is associated with increased
pressure.  What does that mean exactly?  Let's say you are being asphyxiated, you cannot
breathe.  What causes petechiae and what exactly is it?
A.  Petechiae are little pinpoint hemorrhages literally the size of a pin point that are seen in
the skin or on mucous membranes or on the surfaces of the organs that are believed to be due
to actual ruptures of capillaries in those areas.
And we have seen them around the face and sometimes on the internal organs in association
with asphyxial death, such as strangulation where the neck is constricted.  We see them in
the legs when a person has been hanged and the legs have been suspended.  They also can
be seen in heart failure and other natural causes as well.

Q. So is it caused from the pressure put on the...in this case in lung tissue, it's caused by the pressure put on the pulmonary system.
A. Correct.
Q. Okay. Let's...let's review those...those injuries just a little bit more. You said there was some bloody fluid in the mouth. Were there injuries in the mouth that could have caused the blood...that could have been the source of that blood?
A. Yes. There were the bruises of the mucous membranes and the lips which could have caused that. I examined the membranes and didn't find an actual laceration or tear, but there could have been a small tear in some area that simply was not visible.
(24 RR 156-157.)

3) The witness speculated that the injuries to the lips and gums are caused by compression, "some object put over the area of the mouth pressing on the mouth and compressing the lips against the underlying teeth." (24 RR 158.)

4) He speculated that the scrapes and scratches appeared to be antemortem, caused before death. (24 RR 159.)

5) In Dr. White's opinion, the cause of death was "asphyxia by smothering...obstruction or occulation of the airway externally by something being put over the face and the mouth so that adequate oxygen and air is not supplied to the organs and tissues of the body." (24 RR 160.) He also speculated that something hit the victim in the head, causing a hemorrhage, before he died. (24 RR 163.)

**C. What the state courts held and why the claim is not procedurally barred.**

This claim was brought in Mr. Barbee's subsequent state habeas application and was dismissed "as an abuse of the writ" because those allegations "do not satisfy the requirements of Article 11.071 Section 5." *Ex parte Stephen Dale Barbee,* No. WR-71,070-02, at 2. (Tex. Crim. App. May 8, 2013)(Exhibit 52.) Hence, it was not denied on the merits but only on procedural

grounds,  and the 2254(d) standard of review does not apply.

Any procedural default of this claim, for failure to raise it in his initial state habeas petition, is excused under the *Martinez/Trevino* exception discussed *supra,* which provides "cause" for failure to adequately raise it in that application. The prejudice to Mr. Barbee has been discussed *supra.* This damaging testimony could and should have been excluded.

## CLAIM FIVE: TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL AT THE PENALTY PHASE OF THE TRIAL.

Petitioner's conviction, judgment, sentence and confinement are illegal and were obtained in violation of his Fifth, Sixth, Eighth and Fourteenth Amendment rights to a fair and impartial jury, the presumption of innocence, a fair trial, freedom from self-incrimination, effective assistance of counsel, due process of law, and reliable guilt and penalty determinations, because trial counsel rendered ineffective assistance of counsel at the penalty phase of the trial.

Petitioner herein incorporates by reference the legal analysis of ineffective assistance of counsel claims, presented *supra* in Claims Three and Four.

### General Argument Regarding Punishment Phase Ineffective Assistance of Counsel.[124]

### i. Sentencing Phase Ineffectiveness and the *Wiggins* case.

This standard, regarding the duty to investigate, applies acutely to a capital sentencing trial because the Constitution requires that the sentencer be provided with and must consider "any aspects of the defendant's background and record" that may be "proffer[ed] as a basis for a sentence less than death." *Lockett v. Ohio,* 438 U.S. 586, 604 (1977). The standard of performance in a capital case is, and must be, higher than in a non-capital case since "death is different." *See, e.g., Gardner v. Florida*, 430 U.S. 349, 357-358 (1977)(plurality opinion). Courts, therefore, have given particular attention to capital cases where little or no mitigating evidence is presented in support of a life sentence. *See, e.g., Harris v. Dugger,* 874 F.2d 756 (11th Cir. 1989); *Kubat v. Thieret*, 867 F.2d 351 (7th Cir. 1989); *Cook v. Lynaugh*, 821 F.2d 1072 (5th Cir. 1987)[125].

---

[124] **This argument is applicable to all sub-claims of Claim Five, (a) through (f).**

[125] The Seventh Circuit reasoned that trial counsel's failure had produced "`a breakdown in the adversarial process that our system counts on to produce just results.'" *Id.* at 369 (quoting *Strickland v. Washington*, 466 U.S. 688 (1984)). The Court of Appeals further found that by not presenting mitigating evidence "no effort was made to present Kubat to the jury as a human

Courts have long considered evidence  of mental illness,  emotional disturbance, the defendant's and victim's background, character, and childhood abuse to be types of mitigating evidence that juries should be allowed to hear.  *Lockett v. Ohio*, 438 U.S. 586, 604 (1978), *Eddings v. Oklahoma*, 455 U.S. 104, 113-114, 102 S. Ct. 869, 68 L.Ed.2d 378 (1982); *Franklin v. Lynaugh*, 487 U.S. 164, 108 S. Ct. 2320, 101 L.Ed.2d 2320 (1988); *Skipper v. South Carolina*, 476 U.S. 1 (1986).

Independent investigation of the facts and circumstances of a case in preparation for trial is one of the cornerstones of the Sixth Amendment right to effective assistance of counsel.  Over seventy-five years ago, in the landmark case of *Powell v. Alabama,* 287 U.S. 45 (1932), the Supreme Court recognized that thorough factual investigation is at the heart of effective representation:

> It is not enough that defense counsel thus precipitated into the case thought there was no defense, and exercised their best judgment in proceeding to trial without preparation. Neither they nor the court could say what a prompt and thorough-going investigation might disclose as to the facts.
> *Powell,* 287 U.S. at 58.  *See also Strickland,* 466 U.S. at 668, 691 (reiterating the primacy of counsel's duty to investigate client's available defenses at both phases of trial).[126]

 The Supreme Court's directives on this subject have been clear.  "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances[.]"  *Strickland v. Washington*, 466 U.S. at 691

---

being." *Id*. at 368.

[126]   The Fifth Circuit has repeatedly recognized the vital importance of meaningful investigation.  *See, e.g., Bell v. Watkins,* 692 F.2d 999, 1009 (5th Cir. 1982), *cert. denied sub nom Bell v. Thigpen,* 464 U.S. 843 (1983); *Baldwin v. Maggio,* 704 F.2d 1325, 1332-33 (5th Cir. 1983), *cert. denied,* 467 U.S. 1220 (1984) (unless counsel undertakes "a reasonably substantial, independent investigation into the circumstances and the law from which potential defenses may be derived," he cannot provide effective assistance).

(1984).  *See also Goodwin v. Balkcom*, 684 F.2d 794, 805 (11th Cir. 1982) ("[a]t the heart of effective representation is the independent duty to investigate and prepare.").

In *Baxter v. Thomas*, 45 F.3d 1501, (11th Cir., 1995), trial counsel was found ineffective where he conducted some limited investigation into the client's background, but failed to discover evidence of mental deficiency.  *See also Antwine v. Delo*, 54 F.3d 1357 (8th Cir. 1995), *cert. denied,* 116 S. Ct. 753 (1996).

In *Blanco v. Singletary*, 943 F.2d 1477, 1502 (11th Cir. 1991), *cert. denied,* 504 U.S. 943 (1992), the court held that because counsel "failed to discover and present any of the available mitigating evidence....the errors committed by Blanco's counsel fell below an objective standard of reasonable representation " *Id.*  This case involved a situation where the defense attorneys' only attempt to procure witnesses to testify at the penalty phase was to leave messages for them and wait for them to call back. The court rejected the explanations offered by counsel for their failure to call the witnesses, including the fact that the defendant himself instructed them not to present evidence. In this case, the court concluded that no adequate investigation had been conducted:

> The ultimate decision that was reached not to call witnesses was not a result of investigation and evaluation, but was instead primarily a result of counsel's eagerness to latch onto Blanco's statements that he did not want any witnesses called...From these facts, we do not see that counsel conducted a reasonable investigation into the availability of mitigation evidence, or that there was a strategic reason for not presenting such evidence.
> (*Id.* at 1503.)

When an attorney fails to collect medical records, interview family members or conduct other investigation into the defendant's background, his decision cannot be considered a "tactical" one.  "An attorney's trial decisions must be based on a proper exercise of judgment based on adequate knowledge" of the facts and relevant law.  *United States v. Cronic*, 839 F.2d 1401, 1404

(10th Cir. 1988); *see also McDougall v. Dixon*, 921 F.2d 518, 537 (4th Cir. 1991) (a "strategic" choice by counsel is one "made with **full knowledge** of the facts and the law, and the options available to him"); *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986) ("`[C]ounsel has a duty to make reasonable investigations or make a reasonable decision that makes particular investigations unnecessary.'"); *Baxter v. Thomas*, 45 F.3d 1501, (11th Cir. 1995) ("An attorney's decision to limit his [mitigation] investigation must `flow from an informed judgment.'")

Any deference that courts must afford trial counsel under *Strickland* in judging whether such failures were constitutionally deficient, as opposed to "tactical" or "strategic" trial decisions, presupposes that an attorney's trial decisions are fully informed and reasonable exercises of professional judgment. "Judges wisely defer to true tactical choices -- that is to say, to choices between alternatives that each have the potential for both benefit and loss." *Profitt v. Waldren,* 831 F.2d 1245, 1249 (5th Cir. 1987). Moreover, "`[t]his measure of deference ... must not be watered down into a disguised form of acquiescence.'" *Bouchillon v. Collins*, 907 F.2d 589, 595 (5th Cir. 1990) (quoting *Profitt v. Waldren*, *Supra* at 1248).

Any choice that flows "from lack of diligence in preparation and investigation is not protected by the presumption in favor of counsel." *Kenley v. Armontrout,* 937 F.2d 1298, 1304 (8th Cir. 1991), *cert. denied sub nom Deleo v. Kentucky,* 112 S. Ct. 431 (1991). As the *Kenley* court stated:

> We will not fault a reasonable strategy not to investigate further if it is based on sound assumptions. Here it was not a reasonable strategy that led counsel not to investigate, but lack of thoroughness and preparation. "Counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made."

*Id.* at 1308 (quoting *Chambers v. Armontrout,* 907 F.2d 825, 835 (8th Cir. 1990) (en banc)*, cert.*

*denied,* 111 S. Ct. 369 (1990).[127]

Courts have not characterized omissions by trial counsel as "strategic" based merely on counsel's assertion that they were.  For instance, *in Holsomback v. White*, 133 F.3d 1382 (11th Cir. 1998), the petitioner challenged the adequacy of his trial counsel's investigation of the medical evidence, specifically his failure to interview and call as witnesses two doctors and  introduce a report prepared by one of them.  The trial attorney justified his failure to contact the physicians and introduce the records based on his view that there was nothing to be gained by doing so, as there was no medical evidence to substantiate the alleged crime of molestation. *Id.,* at 1387.  The trial attorney also stated that he feared that  some harmful evidence may have surfaced had he called the doctors to the stand. *Id.*

The Eleventh Circuit Court of Appeals found this unpersuasive.  *Id.*, at 1388.  If the doctors had been interviewed, a decision not to call them as witnesses at trial may well have fallen  within the "wide range of reasonable professional assistance."  *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065. But

> [h]aving conducted no investigation into the significance of the lack of medical evidence...counsel could not have made an informed tactical decision that the risk...outweighed 'what potential benefit might come from [their testimony].'  Because counsel never actually spoke with the physicians, he remained entirely unaware...of whether and to what extent their testimony might have helped Holsomback's case.  In these circumstances, we cannot say that counsel's decision not even to contact the physicians as part of his pre-trial investigation was professionally reasonable...[W]e are also persuaded that counsel's failure to conduct an adequate pre-trial investigation satisfies the prejudice prong of *Strickland.*

> *Holsomback*, at 1388.

---

[127]   *See also Wilson v. Butler,* 813 F.2d 664, 672 (5th Cir. 1987), *cert. denied,* 484 U.S. 1079 (1988).

Thus, adequate performance of counsel in a capital case requires that counsel undertake an independent investigation to unearth any potential mitigating circumstances or evidence that may be offered during the sentencing phase. This objective standard may be established by either national performance guidelines such as the *ABA Standards for Criminal Justice* or by reference to relevant case law. Based upon either standard, trial counsels' performance in this case fell below that of a "reasonably competent attorney" defending a capital case during the penalty phase trial. In Mr. Berbee's case, his counsels' decision to forego expert medical and forensic testimony, to fail to secure experts who could have challenged the State's case, to fail to present significant mitigating evidence, and to fail to even interview many friends and family members whose declarations are included herein fell below widely accepted professional norms. This decision was, therefore, not a strategic or tactical decision nor was it a reasonable one, and the CCA's decision is objectively unreasonable.

In *Wiggins v. Smith,* 123 S. Ct. 2527 (2003), the Supreme Court, in an important decision, addressed the standards for ineffective assistance of counsel at the punishment phase of a capital trial under *Strickland* and *Williams.* Specifically, that Court held that Wiggins' counsel rendered ineffective assistance of counsel at the punishment phase of his capital trial by their failure to perform an adequate investigation of his background, which included evidence of his dysfunctional family background and physical and sexual abuse. The Supreme Court held that trial counsel's punishment-phase strategy of disputing Wiggins' direct responsibility for the murder was not owed the deference usually accorded trial strategy, because it was not the product of a professionally reasonable investigation into other potential mitigation themes. Wiggins' trial counsel's performance was held deficient under the standards of the Anti-Terrorism and Effective Death

Penalty Act of 1996 ("AEDPA").

*Strickland, Williams* and *Wiggins* are the definitive triad of holdings on ineffectiveness of counsel, and the Supreme Court has made clear they are to be read together: *Strickland* "established the legal principles that govern claims of ineffective assistance of counsel" (*Wiggins* at 2535), and *Williams* "is illustrative of the proper application of these standards" (*Id.*).[128]  *Wiggins* specifically addresses the scope of background investigation  *Strickland* requires in a capital case in order to make a reasonably informed strategic judgment concerning the  mitigation presentation.

**ii.  Extent of background investigation**.

Crucially, the investigation deemed inadequate in *Wiggins* was fairly substantial, much more substantial than here.  Wiggins' counsel:

- arranged for a psychologist to conduct a number of tests on their client, in which he was found to have "an IQ of 79, had difficulty coping with demanding situations and exhibited features of a personality disorder." *Wiggins* at 2536;

- hired a criminologist who interviewed Wiggins and testified he would adjust adequately to life in prison (*Id.* at 2538, 2547);

- secured access to Wiggins' PSI report, which included an account of his disadvantaged and, in his own words "disgusting" youth; and

- "'tracked down' records kept by the Baltimore City Department of Social Services (DSS) documenting petitioner's various placement in the State's foster care system." (*Id.* at 2536).

Trial counsel in *Wiggins* were held ineffective for abandoning a mitigation investigation that

---

[128]   The Supreme Court "made no new law in resolving Williams' ineffectiveness claims" (*Wiggins* at 2535) and likewise no new law was made in *Wiggins.*

should have been completed; here, we have the same factor, as Ms. Maxwell's investigation was simply abandoned and not presented at trial. (Exhibit 16 at 4-5.)

### iii. Presentation of a "half-hearted mitigation case" crippled by lack of adequate preparation and investigation.

The Supreme Court noted that Wiggins' attorneys "put on a halfhearted mitigation case" (*Wiggins* at 2538). We also have that factor here, although it would be charitable to call what was presented "half-hearted." The crucial issue of future dangerousness was never even addressed by the witnesses that were called and the trial attorneys' explanation for this failure was false as well as nonsensical. (Exhibit 37, affidavit of trial counsel). The same nonsense was adopted verbatim by the state habeas court (Exhibits 14, 15) and ultimately by the CCA. (Exhibit 9.) These facts are discussed in detail in Claim Five, *infra.*

### iv. Reliance on dubious and unconvincing strategic justification for failure to perform adequate investigation.

The Supreme Court in *Wiggins* emphasized that "our principal concern...is not whether counsel should have presented a mitigation case. Rather we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background *was itself reasonable.*" *Wiggins,* at 2536 (emphasis in original). In *Wiggins,* the trial attorneys had much more credible reasons for their failure than here: "trial counsel made 'a deliberate, tactical decision to concentrate their effort at convincing the jury' that appellant was not directly responsible for the murder." *Wiggins* at 2533, quoting *Wiggins v. State,* 724 A.2d 1, 15 (1999).[129]

---

[129] Additionally, Wiggins' "counsel likely knew further investigation 'would have resulted in more sordid details surfacing'" (*Wiggins v. Corcoran,* 288 F.3d 629, 641-42 (4th Cir. 2002) and "conflicting medical testimony with respect to the time of death, the absence of direct evidence against Wiggins, and unexplained forensic evidence at the crime scene supported counsel's strategy." (*Id.* at 641, quoted in *Wiggins* at 2534.) Compare this with the flimsy and false state court holdings here: "Mr. Ray and Mr. Moore limited questioning character witnesses as to their opinion whether the applicant would be a future danger because they could not take

*Wiggins* elaborates on the *Strickland* standard:

"[i]n assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. Even assuming [the attorneys] limited the scope of their investigation for strategic reasons, *Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy."
*Wiggins* at 2538.

Even with Wiggins' attorneys' explanations of their strategic reasons, the Supreme Court

found their performance deficient. Counsel for Wiggins

sought, until the day before sentencing, to have the proceedings bifurcated into a retrial of guilt and a mitigation stage... On the eve of sentencing, counsel represented to the court that they were prepared to come forward with mitigating evidence...and that they intended to present such evidence in the event the court granted their motion to bifurcate.

*Wiggins* at 2537. The motion was, of course, not granted. Mr. Barbee's trial record trial shows

much worse inattentiveness than that seen in *Wiggins.*

In the state habeas proceedings, the trial attorneys submitted a staggeringly dishonest and

self-serving affidavit, replete with nonsensical and demonstrably false explanations for their actions

and inactions and so-called "strategic decisions." To call it "dubious and unconvincing" would be

charitable. This very affidavit, in fact, is strong evidence that Mr. Barbee's attorneys failed to meet

the standards of care discussed herein. The state courts signed on to it virtually verbatim. It is

analyzed in detail *infra.*

### v. **Performance shown deficient under prevailing professional standards**.

The Supreme Court held in *Wiggins* that counsels' investigation "fell short of the

---

the chance of the State learning of other instances of violence—such as the incident reported by Mr. Davis—through opinion and reputation cross-examination." (<u>Exhibit</u> 14 at 14-14, factual finding 111.)

professional standards prevailing in Maryland in 1989." *Wiggins* at 2536.   Texas lawyers routinely performed more thorough mitigation investigations than performed by Petitioner's counsel, *and* made conscious strategic decisions to put evidence of their clients' troubled backgrounds and mental problems before Texas sentencing juries.[130]   It should further be noted that this formidable collection of cases does not, of course, include capital cases in which Texas death penalty lawyers *avoided a death sentence* by the presentation of compelling mitigation evidence.[131]

The *Wiggins* case provides additional powerful confirmation that Mr. Barbee  has met the

---

[130]   *See, e.g., Jurek v. Estelle,* 593 F.2d 672, 675 (5th Cir. 1979) (verbal IQ of 66, possible brain damage, and inability to recite alphabet, give change or say how many weeks in a year); *Riles v. McCotter,* 799 F.2d 947, 952 (5th Cir. 1986)(history of mental illness as possible mitigating factor); *Wicker v. McCotter,* 783 F.2d 487, 496 (5th Cir. 1986)(physicians called to establish psychiatric disease and drug and alcohol abuse); *Brock v. McCotter,* 781 F.2d 1152, 1160 (5th Cir. 1986)(troubled childhood and heavy drug abuse); *Williams v. Lynaugh,* 809 F.2d 1063, 1065 (5th Cir. 1987)(defendant hit by automobile at age six, slow learner, headaches, borderline mentally retarded); *Elliason v. State,* 815 S.W.2d 656, 663 (Tex. Crim. App. 1991)(drug addiction, intense paranoia); *Ex parte Patrick Rogers,* 819 S.W.2d 533, 534-37 (Tex. Crim. App. 1991)(habitual drug use, youth, remorse); *Ex parte Jewel Richard McGee, Jr.,* 817 S.W.2d 77, 79-80 (Tex. Crim. App. 1991)(mental retardation, abandonment, severe child abuse); *Ex parte David Ray Harris,* 825 S.W.2d 120, 121 (Tex. Crim. App. 1991)(alcoholism); *Joiner v. State,* 825 S.W.2d 701, 706 (1992)(emotional problems, suicide attempts, no prior criminal record); *Ex parte Carl Kelly,* 832 S.W.2d 44, 45 (Tex. Crim. App. 1992)(difficulty in school, drug use, youth, good work ethic); *Nobles v. State,* 843 S.W.2d 503, 505-06 (Tex. Crim. App. 1992)(drug use, severe child abuse and neglect); *Ex parte Toby Lynn Williams,* 833 S.W.2d 150, 151-52 (Tex. Crim. App. 1992)(mental retardation and child abuse); *Kemp v. State,* 846 S.W.2d 289, 309 (1992)(positive character traits, religious devotion, poor parenting, youth); *Nelson v. State,* 848 S.W.2d 126, 136-37 (19920(drug use, molestation, child abuse, youth); *Gunter v. State,* 858 S.W.2d 430, 446 (Tex. Crim. App. 1993)(childhood physical and sexual abuse, abandonment, emotional problems, etc.); *Richardson v. State,* 879 S.W.2d 874, 883 (Tex. Crim. App. 1993)(parental neglect, starvation, learning disabilities); *Emery v. State,* 881 S.W.2d 702, 711 (Tex. Crim. App. 1994)(unstable and abusive upbringing, parental neglect); *Ex parte Henry Lee Lucas,* 877 S.W.2d 315, 317 (Tex. Crim. App. 1994)(physical and emotional abuse, poor parenting, low IQ).

[131] See, e.g. Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. REV. 299, 300-01 (1983) (describing extremely aggravated capital murder case tried in Harris County, Texas during the 1970s in which the jury spared the defendant's life after hearing an extensive mitigation presentation).

*Strickland* standards on this issue.

**vi.** ***Rompilla v. Beard****.*

In *Rompilla v. Beard,* 125 S. Ct. 2456 (2005), the Supreme Court reaffirmed the *Williams-Wiggins* high standards for effective assistance of counsel at the punishment phase of a capital trial. In this case, the Court held that Rompilla was entitled to sentencing phase relief on the ground that his trial counsel had been ineffective in failing to obtain and review a readily available court file which, had it been reviewed, would have led to a range of mitigating evidence.  As the Court held, "[E]ven when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial."  (125 S. Ct. at 2460.)  Even though trial counsel took efforts to interview various family members and presented testimony from five of them at trial, and consulted with three mental health experts, this was held insufficient.  The Court noted that petitioner's own contributions to any mitigation case were minimal" as he was uninterested in helping counsel and at times "even actively obstructive."  (125 S. Ct. at 2462.)

The Court described the ABA Standards for Criminal Justice and the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases as "well recognized."  The state court decision to the contrary that "defense counsel's efforts were enough to free them from any obligation to enquire further" was held to be objectively unreasonable. (125 S. Ct. at 2467.) These lapses were found prejudicial under the second prong of *Strickland,* as "[t]his evidence adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury...the undiscovered 'mitigating evidence, taken as a whole, 'might well have influenced the

jury's appraisal of [Rompilla's] culpability,' and the likelihood of a different result if the evidence

had gone in is 'sufficient to undermine confidence in the outcome..'" (125 S. Ct. at 2469.)

### vii.  Fifth Circuit holdings on sentencing phase ineffectiveness.

The Supreme Court's holdings in *Williams, Wiggins* and *Rompilla* show unmistakably that

Courts cannot pay lip-service to trial counsel's invocation of "strategic" reasons for their failures,

and these decisions have echoed in recent holdings of the Fifth Circuit.  In  *Smith v. Dretke*, 417

F.3d 438 (5th Cir. 2005) that Court held counsel ineffective in a murder case for failing to adequately

prepare and present evidence of self-defense, close to the situation here, where the defense of

accidental death was not effectively presented.  Although petitioner identified four witnesses for

counsel, counsel did not interview them or call them to testify to corroborate the petitioner's

testimony concerning the victim's history of violence.  Counsel did not do so because of his

erroneous belief that the testimony of these witnesses was inadmissible and that only evidence

known to the defendant was permitted. Prejudice was found because petitioner's only plausible

defense was that he acted in self-defense and he testified to that affect but his testimony was easily

discounted and disparaged by the prosecutor in argument without corroboration.  "[A]n objectively

reasonable court could not conclude otherwise." *Id.* at 444.

In *Tenny v. Dretke*, 416 F.3d 404 (5th Cir. 2005), a similar case, the Fifth Circuit  held

counsel  ineffective in murder case for failing to adequately prepare and present evidence of self-

defense.  Prejudice was found because the evidence counsel failed to prepare and present included

evidence that the victim, the defendant's live-in girlfriend, had threatened to kill him in the days

prior to her death and even on that day, she had stabbed him within the week before, she had

threatened to burn the house down, she had violent tendencies and would have "insane rages," and

she was strong enough to throw almost any grown man to the ground.  Under the AEDPA standards,

the state court's and the district court's upholding of it were  unreasonable.

Based upon the above standards, Petitioner's trial counsel rendered ineffective assistance of

counsel at all phases of this case.

### viii.  Standard for meeting the  "prejudice" prong.

In order to demonstrate prejudice under *Strickland*, the defendant must show that it is

**reasonably likely** that the jury would have reached a different decision absent counsel's

unprofessional errors.  *Strickland,* 466 U.S. at 696.  This showing must be sufficient to undermine

confidence in the outcome of the proceeding.  466 U.S. at 693.  Importantly, *Strickland* does not

require Mr. Barbee to prove the errors of counsel were outcome-determinative.  Indeed, the Court

in *Strickland* expressly considered and rejected such a test:

> [W]e believe that a defendant need not show that counsel's conduct more likely than not
> altered the outcome in the case...The result of a proceeding can be rendered unreliable, and
> hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a
> preponderance of the evidence to have determined the outcome.
> (466 U.S. at 693-94.)[132]

In assessing whether confidence is undermined in the punishment trial verdict (and thus

whether *Strickland* "prejudice" has been established), this Court must look at trial counsel's

deficiencies both individually **and cumulatively** during the course of the penalty trial.[133]  *See Mak*

---

[132]   The Fifth Circuit, in *Bouchillon v. Collins,* 907 F.2d 589 (5th Cir. 1990), observed
that the prejudice prong imposes "a lower burden of proof than the preponderance standard."
Even when "the evidence arguably supports a different result under a preponderance standard",
the court can still be "confident that it meets the 'reasonable probability' standard." *Id.* at 595.
As demonstrated herein, the evidence available to counsel in this case establishes a "reasonable
probability" that the result of the proceeding would have been different but for counsel's
unprofessional performance.

[133]   As a constitutional matter, the punishment phase trial in Texas is a full-blown trial in
and of itself and thus entitled to the same due process rights, including the right to the effective
assistance of counsel, as the guilt-innocence phase trial. *See, e.g., Barclay v. Florida*, 463 U.S.

*v. Blodgett,* 970 F.2d 614, 622 (9th Cir. 1992); *Kubat v. Thieret*, 867 F.2d 351, 370 (7th Cir. 1989).

*See also Hendricks v. Calderon,* 70 F.3d 1032 (9th Cir. 1995), *cert. denied,* 116 S. Ct. 1335 (1996) (trial counsel held ineffective for failing to prepare and present mitigation evidence even though a defense expert was called; although the jury was given some lay evidence in mitigation, it was given no guidance of how to connect the facts and expert testimony about background to the mitigating factors; and the "quantum of prejudice the case law seems to require for deficient penalty phase performance is relatively low").

Because a single hold-out juror during the punishment phase would have resulted in a life sentence, *see* Tex. Code Crim. Pro. Art. 37.071(e) (Vernon 1983), this Court's "prejudice" analysis regarding errors in the **sentencing** phase must ask only whether there is a reasonable probability that a single juror's mind could have been changed had counsel performed effectively.  *See Mak v. Blodgett*, 970 F.2d 614, 619-21 (9th Cir. 1992) (considering the Washington death penalty statute's "single holdout juror" provision in analyzing a *Strickland* claim); *Cf. Kirkpatrick v. Whitley,* 992 F.2d 491, 497 (5th Cir. 1993) ("[G]iven the unanimity required at the Louisiana punishment phase, the proper frame of reference, at least with regard to the punishment assessed, is whether the mind of one juror could have been changed with respect to the imposition of the sentence of death.").

In *Moore v. Johnson,* 185 F.3d 244 (5th Cir. 1999) the Fifth Circuit held that trial counsel's

---

939, 952-954 (1983); *Bullington v. Missouri*, 451 U.S. 430 (1981). "A capital sentencing proceeding ...is sufficiently like a trial in its adversarial format and in the existence of standards for decision...that counsel's role in the proceeding is comparable to counsel's role at trial -- to ensure that the adversarial testing process works to produce a just result under the standards governing decision.  For purposes of describing counsel's duties, therefore...[a]... capital sentencing proceeding need not be distinguished from an ordinary trial." *Strickland*, 466 U.S. at 684. Thus, the proper application of the cumulative assessment of the constitutional ineffectiveness of Petitioner's trial counsel on the issue before this Court is whether counsel was ineffective considering all of their performance during the penalty trial.

performance was constitutionally insufficient and prejudicial to the outcome of the penalty phase. Counsel in Moore failed to investigate potentially mitigating evidence, including an abusive and deprived childhood, impaired mental functioning and an early release from prison on a prior conviction.   At an evidentiary hearing in state court, counsel for Moore admitted that he was cognizant of some elements of Moore's turbulent childhood but failed to engage in investigation of potentially mitigating evidence because it was "per se inconsistent with an alibi defense." *Id.,* at 271. The Fifth Circuit  rejected counsel's explanation stating:

> Moore maintains that counsel's failure to present mitigating evidence is not entitled to a presumption of reasonableness because it was neither informed by a reasonable investigation nor supported by any logical position that such failure would benefit Moore's defense.  We agree.

*Moore* at 273.  The Fifth Circuit  characterized counsel's view as "over broad and insufficient alone, without any reference to why that justification would apply in this case, to justify counsel's complete failure to investigate for the purpose of making an informed decision and failure to offer any mitigating evidence."  *Moore* at 275.  The Court went on to clarify that:

> To be clear, we are dealing here with counsel's complete, rather than partial, failure to investigate whether there was potentially mitigating evidence that could be presented during the punishment phase of Moore's trial.  The fact that distinguishes this case from those cases in which we have rejected similar claims because the record established counsel conducted an adequate investigation, but made an informed trial decision not to use the potentially mitigating evidence because it could have a potential backlash effect on the defense.

*Moore* at 274.  Finally, the Fifth Circuit  substantially based its conclusion that counsel's failures were harmful "upon the fact that counsel also failed to use what limited mitigating evidence was readily available."  *Moore* at 278.

Counsel's ineffective performance was more egregious, and the resulting prejudice more harmful to Mr. Barbee than the circumstances in *Moore, supra*.  As in *Moore*, trial counsel failed

to investigate or present much of the potentially favorable character or background evidence. As in *Moore,* there was in Mr. Barbee's case "no logical or factual support and no conceivable strategic purpose" in failing to present this potentially mitigating evidence.

In *Lewis v. Dretke*, 355 F.3d 364 (5th Cir. 2003) the Fifth Circuit granted penalty phase relief, reversing the district court, for failure to conduct an adequate penalty phase investigation. After an evidentiary hearing, the magistrate judge found that counsel attempted to speak with family members about Lewis' abusive background, but that they were "not forthcoming." This "mere modicum of evidence" was held insufficient to support the district court's conclusion that counsel's very limited presentation of Lewis' childhood abuse was reasonable. To assess counsel's performance in preparing for the sentencing phase of trial, the proper focus is not whether counsel should have presented a mitigation case, but "whether the investigation supporting counsel's decision not to introduce mitigation evidence … *was itself reasonable*." (citing *Wiggins v. Smith*, 539 U.S. 510 (2003) (emphasis in original)). "It is axiomatic – particularly since *Wiggins* – that [a decision not to present mitigating evidence] cannot be credited as calculated tactics or strategy unless it is grounded in sufficient facts, resulting in turn from an investigation that is at least adequate for that purpose."

Three of Lewis' sisters could have provided detailed testimony about the severe abuse suffered by Lewis at the hands of his father. These sisters attended Lewis' trial but counsel never asked them to testify. Though counsel did present testimony from Lewis' grandmother, "her conclusional testimony contained none of the details provided by Lewis' siblings at the habeas hearing, which could have been truly beneficial. [The grandmother's] skeletal testimony concerning the abuse of her grandson was wholly inadequate to present to the jury a true picture of the tortured

childhood experienced by Lewis." Furthermore, the sisters' testimony could have been corroborated by abundant records documenting numerous hospital visits and domestic disturbance calls.

The district court's reasons for finding that Lewis was not prejudiced by the failure to present detailed evidence of his childhood abuse were held to be flawed. The district court held that the amount of time elapsed between the alleged child abuse and the commission of the crime, and Lewis' intervening criminal convictions, diminished the weight that could be given to the omitted mitigation. The circuit court, however, noted that in both *Williams v. Taylor*, 529 U.S. 362 (2000) and *Wiggins*, the time that elapsed between the abuse and commission crime were greater than in Lewis' case, and that the defendant in *Williams* had many intervening criminal convictions. "It is obvious to us that the level of abuse to which Lewis was exposed mandates the conclusion that, had this evidence been produced, it is quite likely that it would have affected the sentencing decision of at least one juror."

All of these cases are consistent with the Supreme Court's directives on this subject. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances[.]" *Strickland v. Washington*, 466 U.S. at 691 (1984). *See also Goodwin v. Balkcom*, 684 F.2d 794, 805 (11th Cir. 1982) ("[a]t the heart of effective representation is the independent duty to investigate and prepare.").

Similarly, it has been held that "...a lawyer is not entitled to rely on his own belief about a defendant's mental condition, but must instead make a reasonable investigation." *Becton v. Barnett*, 920 F.2d 1190, 1192 (4th Cir. 1990). After all, "the fact that a person is intelligent does not represent proof that he is free from mental illness." *United States v. Tate*, 419 F.2d 131, 132 (6th

-264-

Cir. 1969).

Trial counsel were at least bound to conduct more than a bare-bones investigation into Petitioner's background and life history. *See, e.g., Strickland,* 466 U.S. 688, 706 (1984) (Brennan, J., concurring in part and dissenting in part); *Gray v. Lucas*, 677 F.2d 1086, 1093-94 (5th Cir. 1982), *cert. denied*, 461 U.S. 910 (1983); *Martin v. Maggio*, 711 F.2d 1273, 1280 (5th Cir. 1983), *cert. denied*, 469 U.S. 1028 (1984); *Thompson v. Wainwright*, 787 F.2d 1447, 1451, 1452 (11th Cir. 1986); *Goodwin v. Balkcom*, 684 F.2d 794, 805 (11th Cir. 1982). The most minimal investigation of this sort would have revealed the information that is set forth in detail below.

The *Wiggins* case also reiterates the *Strickland* standard for showing prejudice:

> ...to establish prejudice, a 'defendant must show that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence. *Wiggins* at 2542.

The *Wiggins* court, echoing *Williams,* twice stressed that in assessing prejudice, the mitigating evidence must be evaluated as a *totality* (*Wiggins* at 2542 and 2543) and without reference to its constitutional or trial-based dimensions.

Finally, *Wiggins* confirms that a court should find prejudice and grant punishment-phase relief upon a finding that " there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins* at 2543. That standard was met in *Wiggins, Williams*, and *Rompilla* and is met here as well.

The discussion above regarding the *Strickland* standards in Claim Three is incorporated herein by reference. Of additional interest to a claim of penalty phase ineffective assistance of counsel are several recent cases. The Supreme Court, in *Sears v. Upton,* 130 S. Ct. 3259 (2010)(*per*

*curiam*) granted certiorari, vacated the judgment, denying state post-conviction relief, and remanded the case for further consideration of whether Sears was prejudiced by trial counsel's deficient failure to investigate mitigating evidence.  The state court in *Sears* committed the same errors as the state courts in Mr. Barbee's case.  In *Sears,* after reviewing the mitigating evidence that was available through reasonable investigation, the Court first noted that "the fact that some of such evidence may have been 'hearsay' does not necessarily undermine its value—or its admissibility–for penalty phase purposes." (130 S. Ct. at 3263.)  The Court found two errors in the state court's analysis: 'First, the court curtailed a more probing prejudice inquiry because it placed undue reliance on the assumed reasonableness of counsel's mitigation theory." (130 S. Ct. at 3265.)  That a theory might be reasonable, in the abstract, does not obviate the need to analyze whether counsel's failure to conduct an adequate mitigation investigation before arriving at this particular theory prejudiced Sears." (*Id.*) "Second, and more fundamentally, the [state] court failed to apply the proper prejudice inquiry." (130 S. Ct. at 3265-3266.)  Whereas the state court perceived a barrier to applying *Strickland*'s "reasonable probability" inquiry in a case where some mitigating evidence was presented at trial, the Court emphasized that no such barrier exists:

" "[T]he fact that some of this evidence may have been 'hearsay' does not necessarily undermine its value–or it admissibility–for penalty phase purposes" because:

> We have . . . recognized that reliable hearsay evidence that is relevant to a capital defendant's mitigation defense should not be excluded by rote application of a state hearsay rule. *See Green v. Georgia*, 442 U.S. 95, 97, 99 S. Ct. 2150, 60 L.Ed.2d 738 (1979) (*per curiam*) ("Regardless of whether the proffered testimony comes within Georgia's hearsay rule, under the facts of this case its exclusion constituted a violation of the Due Process Clause. . . .  The excluded testimony was highly relevant to a critical issue in the punishment phase of the trial); *see also Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S. Ct. 1038, 35 L.Ed.2d 297 (1973) ("In these circumstances, where constitutional directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice").

(*Id.*)

In considering the state court's prejudice analysis, the Court noted that the state court "appears to have stated the proper prejudice standard," but then "did not correctly conceptualize how that standard applies to the circumstances of this case." Because *some* mitigation evidence had been presented, the state court concluded that it could not "be fairly compared with those where little or no mitigation evidence is presented and where a reasonable prediction of outcome can be made." Likewise, the state court found it "impossible to know what effect [a different mitigation theory] would have had on [the jury]." (130 S. Ct. at 3266-3267.) In short, in the state court's view, "counsel put forth a reasonable theory with some supporting evidence," which precluded finding "a reasonable likelihood that the outcome at trial would have been different if a different mitigation theory had been advanced." The state court committed two errors in its analysis. First, it "placed undue reliance on the assumed reasonableness of counsel's mitigation theory," when the reasonableness of counsel's theory was, "at the very least, called into question" by the state court's "determination that counsel had conducted a constitutionally deficient mitigation investigation."

> [T]hat a theory might be reasonable in the abstract, does not obviate the need to analyze whether counsel's failure to conduct an adequate mitigation investigation before arriving at this particular theory prejudiced [petitioner]. The "reasonableness" of counsel's theory was, at this stage in the inquiry, beside the point: [petitioner] might be prejudiced by his counsel's failures, whether his haphazard choice was reasonable or not.

*Id.*

The Court made this "plain" in *Williams v. Taylor,* 529 U.S. 362 (2000), where the Court "rejected any suggestion that a decision to focus on one potentially reasonable trial strategy–in that

case, petitioner's voluntary confession–was 'justified by a tactical decision' when 'counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background.'" (quoting, *Williams*, 529 U.S. at 396). "A 'tactical decision' is a precursor to concluding that counsel has developed a 'reasonable' mitigation theory in a particular case." Second, "and more fundamentally, the court failed to apply the proper prejudice inquiry." The Court has "never limited the prejudice inquiry under *Strickland* to cases in which there was only 'little or no mitigation evidence' presented." To the contrary, "the *Strickland* inquiry requires . . . probing and fact-specific analysis," rather than "the type of truncated prejudice inquiry undertaken by the state court in this case." A proper prejudice analysis must consider "the newly uncovered evidence" and the mitigation evidence introduced during sentencing.

Thus, Petitioner has shown that he is entitled to relief on this claim under both 2254(d)(1) and d(2). Nor are any of the state court findings and conclusions entitled to any presumption of correctness under 2254(e)(1) due to the failure of the court to hold an evidentiary hearing on controverted issues of material fact where the state habeas court judge was not the trial judge. *See, e.g. Sumner v. Mata*, 499 U.S. 539 (1981); *Armstead v. Scott*, 37 F.3d 202 (5th Cir. 1994); *Amos v. Scott*, 61 F.3d 333 (5th Cir. 1995)("[f]actual findings based solely on a paper hearing are not automatically entitled to a Sec. 2254(d) presumption of correctness" at 347.)

**Claim Five(a)**: **Ineffective assistance of counsel for presenting harmful testimony from Susan Evans.**

We begin our factual analysis of this claim with an examination of what was actually presented at trial on behalf of Mr. Barbee at the punishment phase. As discussed *supra* in the

statement of facts, the penalty phase was an extremely perfunctory affair. Although the defense called ten witnesses, many of them were simply called to the stand to say that they loved and supported Stephen.

Most of the defense punishment phase case, in terms of time and transcript pages, was occupied by a single witness, Susan Evans, a former warden who testified, disastrously for the defense, about prison conditions. (25 RR 2-92.) Much of her testimony was not only unhelpful but actually very damaging to Mr. Barbee's case for a life sentence. It highlighted the violence in prisons even in high security areas, escapes, and the privileges of inmates. Inexplicably, Ms. Evans testified:

--about guard training which was necessary to respond to riots and security issues in prison (26 RR 5-16), including that persons convicted of a DWI could be a prison guard (26 RR 7);

--that guards "[h]ave to be able to use force and deadly force, including the use of chemical agents and firearms to control offenders" (26 RR 9);

--that guards have training to deal with "riots and disturbances," (26 RR 13);

--that there is "gang involvement in the prison system" (26 RR 14, 36);

– that"riots and hostage situations" are prevalent in prison along with contraband (26 RR 13-14);

--that there are sometimes "inappropriate relations between staff and inmates (26 RR 15);

-- that "inmates and guards having sexual relations is a problem sometimes" and that the training to prevent this is only two hours (26 RR 15-16);

– that "sexual assault. That's a fact of life in the prison system. The situation is that an employee can be sexually assaulted as can another offender (26 RR 16);

--that inmates try to extort things from employees and other inmates, that some inmates choose to harm others (26 RR 17);

–that sometimes, chemical agents and tear gas are necessary to control prison riots (26 RR 18-20);

–that officers are taken hostage and need to know "things you need to do to come out of the situation alive" (26 RR 20);

–that riot batons have to be used to control inmates (26 RR 21);

—that despite all of the above-described dangerous situations, guards do not carry guns inside the prison (26 RR 22);

—the defense attorney mentioned the escape of "the Texas 7", "when they were in the maintenance barn and they had access to some automotive tools or tools you can hurt someone with" (26 RR 24);

---that "all the bad things that have happened within the prison system, there were policies and procedures in place to prevent that from happening.  Unfortunately, people don't always follows (sic) policies and procedures" (26 RR 32);[134]

–that wardens have no control over who the parole board decides to let out of prison (26 RR 33);

–that 'most inmates that come into the system at some point or another they're going to get out (26 RR 37);

–that some inmates are "a current escape risk, threat to the public, safety of the offender or staff or public or threat to the order and security of the institution..." (26 RR 38);

---

[134]   This testimony alone would have largely negated any positive factors of the prior testimony regarding prison policies and procedures.

—that inmates who are classified as G1 are trusted to go outside prison, "the person who takes care of the lawns outside, works on a community service squad, works in agriculture, the guy out on a horse checking on cows... "[h]e's let out there by himself. You have to check on them about every two hours" (26 RR 42);

--that a  person who is convicted of murder could be classified as a  G2 the second lowest security classification  (26 RR 45);

-- that offenders committed to TDCJ for G3 offenses of 50 years or more may serve only five years before they can go to the lower G2 level (26 RR 46);

 --that a  prisoner with a sentence of 50 years or more who are higher than a G3 can go down to G3 level (26 RR 48);

--once more testified that prisoners engage in assaults and  violence (26 RR 49);

–again reminded jurors that prisoners escape and assault officers (26 RR 51);

–told jurors that everyone in the prison system is either in general population, administrative segregation or death row (26 RR 52);

–presented a 17-minute videotape tour of the Connelly Unit as it was a "footprint" of the Polunsky Unit and "basically the same" as the Polunsky Unit in order to show the security precautions similar to both units (26 RR 53-55);[135]

 --defense counsel, in questioning stated "That's Martin Gerule. He was on death row, and he escaped from death row."  (26 RR 57); Ms. Evans answered "He escaped from death row.  He and six other inmates attempted to escape.  He was the only one who actually got out." (26 RR 57-58);

---

[135]   As discussed *infra,* this was disastrous as the Connelly Unit was the unit from which the Texas 7 escaped.

—that people on death row have recreation, visitation, meals served in their cells, commissary where "an inmate can purchase ice cream, cookies, a bowl, soup, tennis shoes, watch, radio...", they can be sent money, they have showers, are allowed mail  (26 RR 60);

–that the inmates 'are not under direct supervision all the time" (26 RR 62);

–that security measures and restrictions are greater on death row than for other prisoners (26 RR 65-67);

--that the inmates in general population have television in the day room (26 RR 70);

--gave qualified testimony that "[g]enerally they are under a very controlled environment." (26 RR 72);

--that prison is a hazardous work environment with assaults on prison officers (26 RR 74);

--that the current rules for changes in prisoner status are always subject to revision and may not apply in the future.  (26 RR 76);

--that they are housing the "worst of the worst", "from minimally bad people" to "people who have done the most heinous thing you can imagine," "[s]uch as brutally slaughtering innocent people in their homes" (26 RR 74-77);

–that some inmates intimidate weaker cellmates, commit violent acts against them, shake others down for their commissary or sex and might get away with it (26 RR 80-81);

–that the Texas 7 escaped from the Connelly Unit and that four of them were already murderers and two are there for rape and one for injury to a child, all violent offenses (26 RR 84-85)

--testified that there were 19,000 disciplinary convictions for assaults in the Texas prison system in 2005 (26 RR 88);

–that two death row inmates seized a guard and shackled her (26 RR 90);

--was asked about reports of prior assaults and a rape of a corrections officer (26 RR 90);

--and stated that murderers are sometimes the best trustees. (26 RR 94-95);

– that "I had an inmate who was an outside trustee who killed his girlfriend, chopped her up, hid her body in a dump. He was an outside trustee, worked in our radio shop. Never had a problem one with him. I'm sure he's out on the streets by now." (26 RR 95);

–that she does believe in the death penalty (26 RR 95).

Topping all of this, probably the most damaging testimony of this "defense" witness was when she admitted that there were seven people who escaped from the Connally Unit in 2000, the very same unit that was the subject of the videotape she showed at trial in an attempt to show high security in prison (26 RR 84) and that they all eluded capture and they were walking around the streets and they then murdered a police officer. (26 RR 84-86). Defense counsel stated that "the Connelly Unit, the Polunsky Unit...are basically all the same" and the witness agreed, and the Polunsky Unit and the Connelly Unit were "built on the same footprint." (26 RR 53-54.) This escape was very well-known and resulted in national publicity, and the presentation of these damaging facts to the jury can be explained only by a lack of investigation and preparation. It defies rational comprehension to imagine how any of Ms. Evans' testimony could have possibly been construed as helpful to the defense.

### B. What the state courts held and why this claim is not procedurally barred.

This claim was brought in Mr. Barbee's subsequent state habeas application and was dismissed "as an abuse of the writ" because those allegations "do not satisfy the requirements of Article 11.071 Section 5." *Ex parte Stephen Dale Barbee,* No. WR-71,070-02, at 2. (Tex. Crim. App. May 8, 2013)(Exhibit 52.) Hence, it was not denied on the merits but only on procedural

grounds,  and the 2254(d) standard of review does not apply.

Any procedural default of this claim, for failure to raise it in his initial state habeas petition, is excused under the *Martinez/Trevino* exception discussed *supra,* which provides "cause" for failure to adequately raise it in that application.  The prejudice to Mr. Barbee has been laid out in detail in the factual summary of Ms. Evans' testimony.

## Claim Five(b): Ineffective assistance of counsel for failure to present mitigating evidence.

### A.  Facts in Support.

The rest of the defense penalty case, while perhaps not undeniably harmful like Ms. Evans' testimony, did little to present the defense case for a life sentence.  The defense called Nancy Kearly to show Stephen's involvement in church activities (25 RR 122-131); Petitioner's mother Jackie Barbee to provide brief family background (25 RR 134-150);  Mary Hackworth and Jennifer Cherry, Stephen's sister and niece, who both testified  that they loved and supported him(25 RR 153-157); Ashley Vandiver, who testified that they met at church and she has visited him in jail (25 RR 161-164); Denise Morrison, who testified that she became romantically involved with Stephen after his divorce  and did not believe Stephen committed the murders (25 RR 168-175); Christy McKemson, who testified that she was there to support Stephen (26 RR 98-99); Jerry Jones**,** who testified that Stephen's family's health has been affected by what has happened (26 RR 101-102); and  David Derusha**,** a bailiff in the trial court, who testified that Stephen had never been a problem during the trial.  (26 RR 105.)

Inexplicably, none of these witnesses were asked to specifically address the crucial special issue of future dangerousness and their assessment of the likelihood of Stephen committing future

violent acts.[136]  This failure was particularly apparent with the defense witnesses who were called simply to say they were there to support Stephen, such as Ms. Hackworth, Ms. Cherry, Ms. Vandiver, and Ms. McKemson.  The jury could well have made an adverse inference from this glaring omission.

Petitioner has appended to this petition a large number of declarations attesting to what could have been presented at the penalty phase of Mr. Barbee's trial in terms of mitigation evidence.

Jackie Barbee, Stephen's mother, would have had much to tell the jury had she been asked.  At trial, she testified briefly about family background (25 RR 134-150).  However, had she been properly prepared, her testimony would have told the jury a different story.  She relates detailed information regarding Stephen's reading comprehension problems in school (Exhibit 19, 7/30/10 declaration, at 1); his academic struggles in school (Id.); his reactions to the death of his sister and brother (Id. at 1-2); his service as a reserve police officer in the Blue Mound Police department (Id. at 3); his hard work at his businesses (Id. at 3-4); Stephen's serious head injury just a few months prior to his arrest, caused by Ron Dodd (Id. at 5); his suicidal ideation in jail (Id. at 5); his history of severe migraine headaches, which were a factor in his "confession" (Id. at 5); the motivation of Ron Dodd and Theresa to blame the murders on Stephen (Id. at 3-7); and her testimony regarding Stephen's lack of a history of violence.

Other witnesses could also have presented other important mitigating evidence.  Sally Boyd could have testified regarding Stephen being "polite and well-behaved" as a boy. (Exhibit 22.)

Mandy Carpenter could have testified that Stephen was "very upbeat, happy, fun loving,

---

[136]   See Claim Five(c). The trial attorneys have tried to justify this failure based on a spurious theory that Tim Davis told them about a road-rage incident and that if they had asked the "future dangerousness" question, this incident would have been revealed.  As shown herein, this is simply untrue, and Mr. Ray and Mr. Moore's explanation is bogus.

having a good sense of humor, and very generous with people." (Exhibit 23.)  He "never showed any signs of an anger problem or difficulty getting along with people."  (Id.)  Yet she was never contacted by the defense despite knowing Stephen for 21 years. (Id.)

Jennifer Cherry was Stephen's niece and she did testify briefly at the trial. (Exhibit 24 at 1.) However she had much more to add had she been properly interviewed, as on the stand she "was asked for virtually none of the information in this declaration."  (Id. at 3.)  She was very close to Stephen and was very close to him:

> I was born when Stephen was 14 and I felt he was more like a brother than an uncle. Throughout my childhood he was very playful, funny and very loving and it continued as such though my adult years.  He loved to make me laugh and always made sure I was taken care of and happy as I was his only niece.
> Through out my life I noticed Stephen's love for animals and children.  He often brought home stray dogs that became a part of the Barbee family.  He also taught children's church along with Theresa and the kids loved him.  I was involved with the puppet shows and vacation bible school under the guidance of Stephen and Theresa....
> (Id. at 1.)

Ms. Cherry could have countered any suggestions that Stephen had a violent nature and could have discredited the penalty phase testimony of Theresa:

> Theresa was mouthy and I noticed signs of this even before they were married.  She would provoke Stephen into arguments and was very aggressive not only with speech but bodily as well.  She would agitate Stephen until he would turn and leave, as that's what Stephen does when he's angry.  He leaves the situation to cool off and then returns when his temper has leveled off.  I never saw Stephen touch her or in any way engage in physical violence in one of their fights.
> On one occasion I was working at Cowboy Cutters in my office, which was approx. 20 feet from Theresa's office. I heard Stephen and Theresa arguing in the hallway so I stepped out of my office and watched the argument ensue.  Theresa was up in Stephen's face yelling and he was trying to leave.  I had full view of both of them and Theresa did not notice I was watching as she was so engrossed in arguing with Stephen.  They were standing in the hallway between Theresa's office door and the door that went out to the shop area of the building.  Once Stephen had had enough of Theresa's yelling, he turned to leave through the shop door.  I still had a clear view of Theresa and she followed him yelling as he was walking out.  Stephen went through the door and Theresa was still in the hallway.  I could see her clearly when all of a sudden she yelled loudly, "You hit me!"  Stephen hitting her was impossible as he was already through the door, going towards the shop and Theresa was

-276-

standing there in the middle of the hallway, in my full view the whole time. Stephen never raised a hand to her or moved towards her in any threatening manner. She also said he tried to slam the door on her, which is a lie because when he was going out the door, she tried to grab him and stop him.

Once he was in the shop, she called the police and lied about him hitting her once again. When the police arrived, she told them she had handled it and they left, no report was filed. They had a very tumultuous relationship at times but had many good times as well.

After their separation and divorce, Theresa would say directly to me that she wished Stephen would die and wished he was out of the office. She used to think aloud that she wished there was a way to get rid of him. I was always shocked she would say these things to me as I was Stephen's niece.

(*Id.* at 1-2.)

This testimony to rebut Theresa would have been extremely important, as the prosecution presented little in terms of aggravating evidence aside from her allegations. Ms. Cherry could also have discredited Theresa in terms of her animosity towards Stephen and motive to lie:

During my employment with Cowboy Cutters, I observed Theresa operate the business in a shady manner. She never paid the bills on time and would avoid calls from creditors. She also paid her personal bills with company checks, and I know this for a fact because she had me write out the company checks and she would later sign them. I observed her embezzling thousands of dollars from Cowboy Cutters throughout the years of my employment. On one occasion, I was instructed by Theresa to forge a letter from a vendor as a letter of reference so that she could obtain a line of credit from the bank. I typed the letter and Theresa forged the vendor's signature. When I told Stephen what was going on, he had no idea and confronted Theresa about the monies. Shortly after alerting Stephen of Theresa's fraudulent money transactions, Theresa would no longer give me enough hours of employment to pay my bills so I left the company.

While I was working at Cowboy Cutters, Theresa and Ron Dodd became romantically involved. I was surprised because through the years of Ron's employment, he and Theresa had nothing nice to say to each other or about each other. From all my observations, I would have thought they hated each other. However, they did get together and was very open about it in the office and even brought their sexual relationship into the office. They were very open about their exploits and Theresa often talked about what a good lover Ron was. On one occasion, Theresa, Ron and I were sitting in Theresa's office having a conversation which included them talking about sex and then the subject turned to Stephen and Cowboy Cutters. Theresa said, "I know he's your uncle but I wish he would just die! There has got to be a way to get him out of the office." Then Ron looked over at me and said, "One of these days I'm going to run this mother fucker". He was referencing Cowboy Cutters. I was shocked they would say this to me.

-277-

Theresa often pitted the office employees against Stephen, telling them things he said about them in private conversations between him and Theresa, resulting in the office personnel disliking him.

Lauren Edmondson, who also worked in the office, has written a book about her experience there. After Theresa took over, Lauren pronounced her the worst person ever to work for. Lauren no longer works for Theresa. Theresa filed a law suit to block the release of *White Trash Inc.*, the book Lauren wrote.

(*Id.* at 2-3.)

Ms. Cherry also tells how she was rendered an ineffective witness as a result of Stephen's

trial attorneys' failure to investigate or develop what she had to say:

At the time of Stephen's trial, I talked with a defense mitigation expert who was developing mitigating evidence for Stephen's attorney to use at the trial.
I did testify during Stephen's punishment phase, however, when I was on the stand, I was asked for virtually none of the information in this declaration. I do not know why as much of the information I have experienced first hand could have been useful in discrediting Theresa as a witness. Stephen's attorneys only spoke to me once when they asked why Stephen would admit to something he didn't do. I told them what Stephen told me when I asked him the same question, which was he was protecting his family because Ron threatened Stephen that if he told anyone what really happened, he would hurt his family; however the attorneys did not want to hear this I was never spoken to again.

(*Id.* at 3-4.)

Ms. Tina Church, a well-known investigator, offered her services to Mr. Ray on a pro bono

basis. He refused. (Exhibit 25, Declaration of Tina Church of July 21, 2010 at 2.) Mr. Ray and Mr.

Moore were more interested in having their client plead guilty than in developing evidence of his

innocence or mitigating evidence. (*Id.* at 2.) Ms. Church also discovered evidence of Theresa

changing the bonding policy to an insurance policy for which she was the beneficiary. (*Id.*)

Calvin Cearley did not testify at the trial. (Exhibit 26, Declaration of Calvin Cearley.) If he

had, he would have told the jurors about Stephen being "very congenial, honest, caring of other,

respectful of others and very friendly and outgoing....He was always a kind and loving person.

Stephen always liked to make people laugh." (*Id.*) His wife Nancy Cearley did testify but she could

have gone into much more detail about Stephen's activities with the church youth group. (*Id.*) "Stephen was a very hard worker, dedicated to his job and took his job seriously being the Children's church leader. The children loved him. It was obvious to anyone whenever he walked into the church, as they would all go running to him." (*Id.*) Mrs. Cearley felt that "Stephen's attorneys were just going through the motions, as they did not question me in depth about my knowledge of Stephen's character, his family, his efforts for the church and his non-violent nature. I was on and off the stand in a matter of minutes. Had I been properly prepared and questioned by the defense attorneys, I would have been able to give a much more thorough and complete picture of Stephen to the jury. (*Id.*)

Mike Cherry is Stephen's brother-in-law, having been married to his sister Kathy before her untimely death. (Exhibit 27, Declaration of Mike Cherry.) He could have told the jury that Stephen was

> very outgoing, bubbly...I found Stephen to be kind and courteous...Stephen was very devastated at the loss of my then-wife Stephen's sister and shortly thereafter the death of his brother David...I would say that Stephen came from a very good stable environment, and the family attended church regularly...Stephen loved animals and children and they loved Stephen....
> In all of the years that I have known Stephen and Theresa I have never seen Stephen raise his hand to Theresa. Stephen would walk away from Theresa, because she would just go on and on trying to take control. Theresa would rather bite her nails off than be wrong about anything.
> (*Id.*)

Yet despite this helpful information, both as to mitigation and to discredit the prosecution's picture of Stephen as violent, Mr. Cherry was never contacted by the defense attorneys. (*Id.*)

Sharon Colvin, who was the co-pastor at the Azle Baptist Church, was never contacted by the defense attorneys or asked to testify at trial. (Exhibit 28.) Had she been, she could have told the

jury that

> We met the Barbee's shortly after the death of their son David. At the time my husband was the pastor of the Azle Baptist Church. Stephen was dating Michele Cook whose mother Carol was a part time member of the church. I remember Steve as a jovial and friendly young man, funny and outgoing. I have nothing bad to say about him.
> (*Id.*).

Ms. Colvin had additional testimony to rebut Stephen's future dangerousness which will be

discussed in the next sub-claim.

Tim Davis, a former business partner of Stephen's was never asked by the attorneys to

testify. (Exhibit 29.) If he had been, he could have told them important information that would have

discredited Theresa's testimony regarding violence:

> ...Everything about our friendship changed when Steve met Theresa. After they started dating Steve changed. She ruined him, changed him for the worst. Neither I nor my wife could stand Theresa. She was loud, crude and rude. My wife was the total opposite of Theresa in every way. After Steve decided to marry Theresa, I walked away from the business. I couldn't stand her and what she had done to Steve. Once we were no longer business partners, our contact became less and less. Both of us were working a lot and had little time to socialize. Belisa and I did not want to socialize with Theresa.
> (*Id.*)

Mr. Davis would also have had important information regarding Stephen's future

dangerousness, which will be discussed in the next sub-claim.

Jerry Dowling, in addition to being able to substantiate Stephen's claim of actual innocence

(*see* Claim One), would have been a valuable witness at the punishment phase:

> Stephen was a very hard worker and a generous person. Stephen came from a very good stable family. The family had endured personal tragedy with the loss of his sister and brother and when Stephen and I would discuss this it would sadden Stephen. Stephen looked up to me like a father figure and would ask me questions or seek direction on personal matters as well as business matters.
> (Exhibit 30, Declaration of Jerry Dowling.)

Mary Hackworth, Stephen's aunt, did testify, but she had much more to say than what little

she was asked at the trial. (Exhibit 31, Declaration of Mary Hackworth.)  In the next sub-claim, we

will discuss what she could have said regarding the future dangerousness special issue, but she also

had a lot of general mitigating evidence that was never told to the jury:

> I have always known Stephen to be a loving, caring, wonderful child who went through extreme adversities due to the sudden death of his older sister Kathy, and then less than two years later, the death of his older brother David....
>
> Stephen has always been a very hard worker, and has always wanted to help others. Stephen was very fond of animals...
>
> On one occasion Stephen at his own expense flew from Fort Worth to South Carolina to put in a back yard for Gerald and me.  Since he was very good at landscaping, he knew what needed to be done and he came on his own without us asking.  Stephen did a wonderful job...
>
> Stephen was always a gentleman around women, and children loved him.  During this visit with Jackie, I met with both trial attorneys Bill Ray and Tim Moore.  All they wanted me to do was view the confession tape....
>
> On several occasions I tried to speak with both attorneys regarding what is stated in this declaration, however they would not listen.  They did not prepare me for my testimony other than to tell me to just answer their questions that were limited to knowing and loving my nephew.  I was more than willing to testify to what is in this declaration had I been asked to...
>
> (Exhibit 31, Declaration of Mary Hackworth.)

Similarly, Christy Mackemson, the girlfriend of Stephen's former roommate, did testify

briefly at the trial but there was much that she did not have the opportunity to tell Stephen's jury:

> Steve was crazy about Trish's kids and was very good with them....
> I never saw Steve angry.  He was always fun and the life of the party....
> Basically, I told Steve's jury that I was there to support him.  Had the defense attorneys asked me more questions, I would have testified to what is in this declaration.
> (Exhibit 32, Declaration of Christy Mackemson.)

Melody (Tarwater) Novak did not testify at trial. (Exhibit 33, Declaration of Melody

(Tarwater) Novak.)  Had she been interviewed and talked to by the trial attorneys, she could have

told the jury that:

> I am Stephen's cousin and I have known Stephen all of his life.  Stephen was a fun loving kid, mischievous, and he loved collecting animals.  He loved animals and was always good to them..

> When I was a child I would visit with the Barbee family maybe once a year, and as I grew older I saw them more frequently. I knew the family was devastated at the loss of Kathy and, less than two years later, the loss of David. Stephen was very devastated. He was like a 'lost puppy' because the sublings were very close.
> (Exhibit 33, Declaration of Melody (Tarwater) Novak.)

The evidentiary hearing held on Claim Two, the conflict of interest claim, necessarily touched on this issue, as the prejudice component of the conflict claim. The testimony at that hearing both amplified and supported the declarations summarized *supra*. The testimony has been summarized *supra* in the factual summary of Claim Two, and that summary is incorporated herein by reference. Hence, only a short synopsis of that testimony will be repeated here.

At the evidentiary hearing, Amanda Maxwell testified that the medical records indicated that Mr. Barbee had suffered a series of head injuries, had a suicide attempt and had a diagnosis of bipolar disorder. (2 EH 34.) Mr. Barbee's first head injury occurred when he was eight months old and then he had another when he was 16, and 18 and then again at age 36 or 37. (2 EH 35.) This last incident, shortly before his arrest, occurred when Ron Dodd, who was living with Petitioner's ex-wife, dropped a 400-pound pipe on Petitioner's head. (2 EH 35.) Ms. Maxwell felt this injury could have been of significant mitigating value at the punishment phase of the trial. (2 EH 36.)

Mr. Barbee also had a history of drug use, specifically hydrocodone, as a result of severe migraine headaches caused by the last head injury. (2 EH 36.) He was also taking Advil and Tylenol. (2 EH 36.) Ms. Maxwell also became aware of Petitioner's's diagnosis of Lyme Disease. (2 EH 37.) As a result of these factors, Ms. Maxwell recommended to Petitioner's attorneys an MRI, a cat-scan and a neuropsychological evaluation. (2 EH 37.) However, they did not respond to this suggestion. (2 EH 38.) Ms. Maxwell also found out that Theresa Barbee had been embezzling money from the businesses. (2 EH 39.)

Ms. Maxwell again requested a neuropsychiatrist and a psychiatrist and again there was no response from Mr. Ray or Mr. Moore. (2 EH 42.)  After Ms. Maxwell submitted her mitigation report to Mr. Ray, she never heard from him. (2 EH 45.)  Ms. Maxwell believed that the witnesses were not prepared to testify and she was not allowed to meet with them to prepare them prior to the trial. (2 EH 48.)  They were only spoken to briefing by Mr. Keeton and told not to display any emotion or cry. (2 EH 49.)   In Ms. Maxwell's opinion, the mitigation testimony in Mr. Barbee's trial was "not effective. Dismal. It was not the information that, had I been allowed to prepare the witnesses, would have come forward." (2 EH 49-50.)   Additionally, she interviewed helpful witnesses who were not called at trial. (2 EH 50.)  The jury was not given information about Mr. Barbee's hydrocodone use, his good acts, his lack of prior arrests. (2 EH 50.)  The relationship of Theresa Barbee and Ron Dodd was not presented. (2 EH 54.)  The numerous documents gathered by Ms. Maxwell were not used at trial. (2 EH 55.)  A number of stressor factors, such as business pressures, were also not presented at trial. (2 EH 55-56, 70.)  Also not presented was the fact that Mr. Barbee had caught Theresa Barbee stealing from the company shortly before the murders. (2 EH 56.)  Other mitigating stressor factors, such as 1) Petitioner's wife pressuring him to recover money from his ex-wife; 2) Petitioner finding out his  father was dying from cancer just days before his arrest; 3) fetal alcohol exposure; 4) his suicide attempts; 5) a car wreck when he was 16; and 6) the blow to his head shortly before his arrest were not presented to the jury. (2 EH 57-59.)[137]

---

[137]   On cross examination, Ms. Maxwell testified that State's witness Theresa Barbee answered one question identifying herself as Ron Dodd's boyfriend (2 EH 108); testified briefly regarding the head accident with the pipe (2 EH 109-110); and  mentioned Petitioner's attempted suicide (2 EH 111-112.)  These incidents were not presented by defense witnesses but by Ms. Barbee. (2 EH 124-125.)  Jackie Barbee also mentioned her son's service as a reserve police officer. (2 EH 113-114.)  However, beside these brief references, none of these factors were developed by the defense as mitigation themes in terms of the two special issues and they were "never presented, developed and supported by an expert." (2 EH 125.)  They weren't "developed and presented in a way as a mitigating factor" and this is what she meant when she said these

At the hearing, Tim Davis testified, among other things,  about an automobile incident in 1996 or 1997.  On the highway, in icy driving conditions,  two people in a truck swerved in front of Petitioner and Mr. Davis' vehicle  and forced them off the road. (2 EH 143.)  The two men approached their vehicle, so Mr. Davis and Mr. Barbee rolled down the window to see what they wanted. (2 EH 143.)  One of the other drivers tried to punch Mr. Davis so Petitioner and Mr. Davis got out and defended themselves. (2 EH 143.)  Then they got back in the truck and drive away. (2 EH 143)  The other people were the aggressors, Mr. Davis and Petitioner were trying to defend themselves, and no one was hurt. (2 EH 144.)   At no time did Mr. Davis ever tell Petitioner's mitigation person or his attorneys that Petitioner tried to kill the other persons and it was nothing even close to that. (2 EH 145.)  The incident was a simple fistfight. (2 EH 145.)  Mr. Davis did not think that Petitioner was violent or that he would be likely to commit future acts of violence and he had never seen him being the aggressor.  (2 EH 144-145.)   Mr. Davis would have been willing to be a witness at Petitioner's trial and if he had been called as a witness he would have told the jury that he would "absolutely not" be a threat to society or likely to commit future violent acts. (2 EH 146.)  Had he been asked any "have you heard" or "do you know" questions about Mr. Barbee's past incidences of violence, he would have said "I don't know of any" such incidents.  (2 EH 146.)  Other than the highway incident where they were defending themselves, "I've never seen Stephen be aggressive at all."  (2 EH 146.)   However, he was not asked to testify at Petitioner's trial. (2 EH 147.)

Calvin Cearley testified that  Mr. Barbee and his wife led the children's church program and

factors "were not presented." (2 EH 125.)

Mr. Barbee was the children's church leader. (2 EH 167.) He loved children and animals and had a happy temperament and was polite and respectful. (2 EH 168-169.) When Mr. Cearley heard about the murders, his reaction was "unbelief." (2 EH 169.) Yet he was not contacted by Mr. Barbee's defense attorneys at the time of his trial. (2 EH 170.) Had he been asked about the likelihood of Mr. Barbee being a danger to society or committing future violent acts, he would have told the jury that he was not such a danger. (2 EH 170.)

Dr. Nancy Cearley, Calvin Cearly's wife, was the former co-pastor of the church Mr. Barbee used to attend. (2 EH 173-174.) She knew Mr. Barbee for 20 years. (2 EH 185.) She also testified that the church needed a children's church leader and Mr. Barbee took that role. (2 EH 174.) Under his leadership, the program grew from about ten children to about 75 or 80. (2 EH 174.) Mr. Barbee did this for two or three years. (2 EH 174.) His temperament was easy-going, very friendly and very likeable, polite and respectful. (2 EH 175.) Dr. Cearley knew Mr. Barbee for about 20 years. (2 EH 175.) In that time, Dr. Cearley never knew Petitioner to commit any acts of violence. (2 EH 175.) Dr. Cearley was a witness at Petitioner's trial, but she was never asked about his character or whether he would be likely to commit future violent acts. (2 EH 176.) Had this witness been asked about her opinion as to the likelihood of Mr. Barbee committing future violent acts, she would have said that he did not think he would be likely to commit these acts. (2 EH 177.)

Mike Cherry, Petitioner's ex-brother-in-law and an ordained minister, testified that Mr. Cherry knew Mr. Barbee and Theresa had arguments but he never heard about anything physical. (2 EH 190.) If he had been asked to testify at Mr. Barbee's trial, he would have told the jury that he was not likely to commit violent acts in the future. (2 EH 192.) There was only one occasion where he had seen Mr. Barbee get into a fight and that was at a party when a guest was acting

inappropriately and "dirty dancing" around children. (2 EH 193.) Mr. Barbee first asked the man to leave but he didn't. (2 EH 193.) Mr. Cherry had never heard of the alleged incident of road rage and had he been asked about it, he would have said that he knew nothing about it. (2 EH 194.)

Jennifer Cherry, Mr. Barbee's niece and Mike Cherry's daughter, testified that Mr. Barbee ran the church children's program and would put on puppet shows and the like for the children. (2 EH 204.) Theresa was living in this house with Ron Dodd at the time of the murders. (2 EH 205.) It was a very large home, about 6000 square feet. (2 EH 205.) Jennifer became aware that Theresa was embezzling from the company by paying her bills with company money. (2 EH 206, 207.) One time, Theresa gave Jennifer $14,000 in cash to deposit and, when she learned that it would alert the IRS, she wanted some of it back. (2 EH 207.) Theresa tried to keep Mr. Barbee from seeing the cash. (2 EH 207.) Jennifer recalled an incident when they got into a yelling match and Theresa accused Stephen of hitting her, which was false. (2 EH 210-211.) Although Jennifer told Stephen's attorneys about this incident, they did not want to hear it. (2 EH 211.) Jennifer had never seen Stephen in a physical fight with Theresa. (2 EH 212.) After their separation and divorce, Theresa said that she wished Stephen would die. (2 EH 214.) Although at the trial Theresa said she would love Stephen until the day she died, in reality she had told Jennifer that she hated Stephen. (2 EH 216.) When Jennifer talked to Stephen's attorneys, they seemed set on their opinions and thoughts and they were not interested "in what any of us had to say much." (2 EH 219.) She did not feel that they prepared her to testify and all they said was "follow my lead." (2 EH 219.) When Jennifer testified, she was not asked any questions about her opinion of the likelihood of Stephen committing future acts of violence, but if she had been she would have said that she did not think he would. (2 EH 220.) The attorneys never asked for her opinion as to Stephen's future dangerousness. (2 EH

220.)  Her opinion was that he was not a future danger. (2 EH 220.) At trial she was just asked if she loved Stephen. (2 EH 221.)

Sharon Calvin testified that Stephen attended her church for about a year. (2 EH 226.)  She had nothing bad to say about Stephen. (2 EH 227.)  His attorneys never asked her to testify at trial although she would have been willing to do so. (2 EH 228.)  She was never asked by Stephen's attorneys whether she thought he would be a future danger but if she had been so asked she would have said that she "probably wouldn't be." (2 EH 228.)

### B.  The State court holdings are erroneous as they are an unreasonable determination of the facts and contrary to and an unreasonable application of clearly established federal law.

There is a full discussion of how the State courts erred in denying this claim of failure to present mitigating evidence in the immediately following sub-claim. (Claim 5(c).)  That discussion is incorporated herein by reference. The CCA's denial is largely based on the false and self-serving affidavit of trial counsel, and other extra-record evidence, that clearly shows the existence of controverted material issues of fact.   The factual determinations of the CCA were clearly not supported by the record, as shown herein. The CCA's holding was also an unreasonable application of clearly-established federal law (the *Williams, Wiggins, Rompilla* standard discussed in the legal analysis section of this claim).

The findings regarding this claim made in the subsequent state habeas application are also flawed.  For instance, some of the Subsequent Findings of Fact Nos. 105 through 139 basically offer the flawed rationale that mitigating evidence was not presented because Mr. Barbee insisted he was innocent, which is nonsensical.  Some of the subsequent findings also attempt to justify the failure

-287-

to offer any evidence as to the critical issue of future dangerousness on the basis of their misrepresentation of the "road rage" incident and their fear that Me. Barbee's "violent past" would be exposed. Both these rationales have been shown to be bogus after-the-fact rationalizations by the trial attorneys. The discussion of the Subsequent Findings of Fact in the following claim is hereby incorporated by reference.

### C. Exhaustion and cause and prejudice.

Respondent has previously conceded that this claim was brought in the initial round of state court proceedings (Docket No. 40, RA at 41-46), but argued that it has no merit. (RA at 14-51.) All evidence in support of this claim was brought before the state court either in the initial and/or the subsequent habeas proceedings, extensive testimony was heard at the evidentiary hearing regarding this claim, and the state court issued and adopted extensive findings and conclusions as well as subsequent findings and conclusions as to this claim. Hence, as it was completely presented in both rounds of state habeas proceedings, it is exhausted and not procedurally defaulted.

Even if it were not, any procedural default of this claim, for failure to raise it in his initial state habeas petition, would be excused under the *Martinez/Trevino* exception discussed *supra,* which provides "cause" for failure to raise it adequately in his first state habeas application. The prejudice component is discussed in the statement of facts pertaining to this claim.

### Claim 5(c): Ineffective assistance of counsel in failing to present mitigating evidence regarding the future dangerousness special issue.

### A. Facts in Support.

Here again, virtually of the declarations attached to the petition show that these potential

witnesses would have presented a dramatically different picture of the "future dangerousness" special issue to Mr. Barbee's jury, as well as the general mitigation themes discussed in the prior sub-claim. Even those witnesses who were called were not even asked about their opinion as to Mr. Barbee's likelihood of committing future violent acts. As a result, Mr. Barbee's non-violent nature and low risk of future dangerousness was ever presented to his jury.

Bobby Boyd, former Assistant Superintendent of the Azle Independent School District, was not called as a defense witness. If he had, he would have testified that when he knew Stephen, he "was a well-behaved young man when I knew him and his behavior was not out of the ordinary for a young man his age...based on my knowledge of him when he was young, I do not think Steve has a high probability of committing future violent acts." (Exhibit 21, Declaration of Bobby Boyd.).

Sallie Boyd states the same thing: "Steve was always polite and well-behaved...I do not think Steve has a high probability of committing violent acts, nor would he be a threat to society." (Exhibit 22.)

Mandy Carpenter, who has known Stephen Barbee for 21 years states:

> When I heard of the murders I was shocked, because this was not in Stephen's character. I would describe Stephen as very upbeat, happy, fun loving, having a good sense of humor, and very generous with people. He was always fun to be around. Stephen never showed any signs of having an anger problem, or difficulty getting along with people. I never knew of Stephen to be a confrontational type of person....
> Despite my having known Stephen as long as I have, I was never contacted by his trial attorneys or anyone on his defense team. Had I been asked to testify during his trial, I would have said what is contained in this declaration. If asked if I thought that Stephen would be capable of committing future acts of violence, or be a threat to society, my answer would have been no.
> (Exhibit 23.)

Jennifer Cherry, who did testify at Stephen's trial, was never asked by the defense her opinion on the crucial "future dangerousness" special issue. If she had been, she could have told

the jury:

Stephen and I are very close and I consider him one of my favorite uncles. I was born when Stephen was 14 and I felt he was more like a brother than an uncle. Throughout my childhood he was very playful, funny and very loving and it continued as such though my adult years. He loved to make me laugh and always made sure I was taken care of and happy as I was his only niece.

Through out my life I noticed Stephen's love for animals and children. He often brought home stray dogs that became a part of the Barbee family. He also taught children's church along with Theresa and the kids loved him. I was involved with the puppet shows and vacation bible school under the guidance of Stephen and Theresa....

Theresa was mouthy and I noticed signs of this even before they were married. She would provoke Stephen into arguments and was very aggressive not only with speech but bodily as well. She would agitate Stephen until he would turn and leave, as that's what Stephen does when he's angry. He leaves the situation to cool off and then returns when his temper has leveled off. I never saw Stephen touch her or in any way engage in physical violence in one of their fights.

On one occasion I was working at Cowboy Cutters in my office, which was approx. 20 feet from Theresa's office. I heard Stephen and Theresa arguing in the hallway so I stepped out of my office and watched the argument ensue. Theresa was up in Stephen's face yelling and he was trying to leave. I had full view of both of them and Theresa did not notice I was watching as she was so engrossed in arguing with Stephen. They were standing in the hallway between Theresa's office door and the door that went out to the shop area of the building. Once Stephen had had enough of Theresa's yelling, he turned to leave through the shop door. I still had a clear view of Theresa and she followed him yelling as he was walking out. Stephen went through the door and Theresa was still in the hallway. I could see her clearly when all of a sudden she yelled loudly, "You hit me!" Stephen hitting her was impossible as he was already through the door, going towards the shop and Theresa was standing there in the middle of the hallway, in my full view the whole time. Stephen never raised a hand to her or moved towards her in any threatening manner. She also said he tried to slam the door on her, which is a lie because when he was going out the door, she tried to grab him and stop him.

Once he was in the shop, she called the police and lied about him hitting her once again. When the police arrived, she told them she had handled it and they left, no report was filed. They had a very tumultuous relationship at times but had many good times as well. ..

I did testify during Stephen's punishment phase however, when I was on the stand, I was asked for virtually none of the information in this declaration. I do not know why as much of the information I have experienced first hand could have been useful in discrediting Theresa as a witness. Stephen's attorneys only spoke to me once when they asked why Stephen would admit to something he didn't do. I told them what Stephen told me when I asked him the same question, which was he was protecting his family because Ron threatened Stephen that if he told anyone what really happened, he would hurt his family; however the attorneys did not want to hear this I was never spoken to again.

If I would have been asked by trial counsel during the trial if Stephen would be a future threat to society, my answer would have been no and it is still no today. (Exhibit 24.)

Calvin Cearly was never called to testify at Stephen's trial.  If he had been, he would have

told the jurors that Stephen was

very congenial, honest, caring of others, respectful of others, and very friendly and outgoing. I know that Stephen loved animals and children....When I heard about the murders and Stephen being arrested for them I was shocked.  The Stephen that I knew would never have done anything like this, because he was always such a kind and loving person...At no time did any of Stephen's defense team attempt to contact me prior to his trial, or at any time until this declaration....If I would have been asked if I would consider Stephen capable of committing future acts of violence my answer would have been no.  I personally do not know of Stephen even having arguments with other people. (Exhibit 26.)

Nancy Cearly, Calvin's wife, did testify at Stephen's trial but, as with all the witnesses called

by the defense, was never asked about the crucial question of future dangerousness.  Had she been

properly prepared, she could have told the jury that:

I have known the Barbee family since the late 1980's.  My husband Calvin and I had been given a pastor-ship at the Gospel Outreach Pentecostal Holiness Church in Azle Texas.
Jackie and Bill Barbee were regular attendees at the church and as he reached his twenties, Steve began to attend regularly as well.My husband and I officiated at the wedding of Stephen and Theresa Barbee.  The wedding was held at a local hotel and was a very nice affair.  The Barbees and us had grown close by this time.  We often socialized together outside of church.  The two couples would frequently go out to dinner or to a function together.  After the marriage of Steve and Theresa, they too would come out to dinner with us.
The children's church was not doing well and children were not attending.  My husband and I asked Steve and Theresa if they would take over the program.  They agreed. At the time, there were 10-12 children who came on a regular basis.  After Steve and Theresa took over regular attendance soared to 50-75 children every Sunday.  Steve loved the children and the children loved him.  All the parents were very happy with how Steve and Theresa interacted with the children.  They ran this program successfully for three years...
Steve could never have committed such a crime and could not under any circumstances, kill a child. Steve loved children...
I testified at Stephen's trial, at the punishment phase.  However, I felt that Stephen's attorneys were just going through the motions as they did not question me in depth about my

knowledge of Stave's character, his family, his efforts for the church and his non-violent nature. I was on and off the witness stand in a matter of minutes. Had I been properly prepared and questioned by the defense attorneys I would have been able to give a much more thorough and complete picture of Stephen to the jury. I feel that he is innocent of the crime for which he has been convicted and that a great injustice has taken place. (Exhibit 26.)

Mike Cherry, who has known Stephen since he was 12, was never contacted by the defense

attorneys. If he had been, he could have told the jury that

Stephen loved and still loves [his child] Jennifer very much....I would say that Stephen came from a very good stable environment, and the family attended church regularly...Stephen loved animals and children...In all of the years that I have known Stephen and Theresa I have never seen Stephen raise his hand to Theresa. Stephen would walk away from Theresa, because she would just go on and on trying to take control....When I first learned about the murders, I was in complete and total disbelief...I just said that is crazy, because Stephen would never hurt a child....

I was never contacted by Stephen Barbee's defense, and had I been I would have been willing to testify at Stephen's trial in his defense on what is contained in this declaration. If I were to have been asked if Stephen Barbee would be a future threat to society I would say not at all. (Exhibit 27.)

Sharon Colvin knew Stephen from the Azle Baptist Church were she was the co-pastor with

her husband. However, Ms. Colvin was never contacted by the defense attorneys. Had she been

asked to testify, she could have told the jurors that

My husband B.M. Colvin and I were the pastors for the Azle Baptist Church. We met Stephen shortly after the death of his brother David when he began to attend church with Michele Cook, a semi regular parishioner. Michele dated Stephen when he was about 16 for a short period of time.

We met the Barbee's shortly after the death of their son David. At the time my husband was the pastor of the Azle Baptist Church. Stephen was dating Michele Cook whose mother Carol was a part time member of the church. I remember Steve as a jovial and friendly young man, funny and outgoing. I have nothing bad to say about him.

Based on my knowledge of him, I do not think Steve has a high probability of committing future violent acts. I would have been willing to be a witness at Stephen Barbee's trial. Had I been asked about Steve's likelihood of committing future violent acts, I would have testified that I believe the risk would be very low.

Around the time of Steve's trial, I talked with Amanda Maxwell, an investigator and

mitigation expert working for Steve's attorney, Mr. Bill Ray.    I told Ms. Maxwell everything that is in this declaration.  However, I was never contacted by Steve's attorneys and they never asked me to testify at Steve's trial.  Had they asked me to do this, I would have been willing to do so and I would have testified to what is in this declaration. (Exhibit 28.)

Tim Davis was Stephen Barbee's best friend for ten years, yet he was never asked to testify

at his trial.  If he had, he could have told the jurors that

I was Stephen Barbee's best friend for ten years.  Steve lived with me and my wife in Burleson, Texas, for about one year.  With Steve, we started the company which would eventually become All Four Seasons.   Steve referred to me as "brother of mine."

I first met Stephen at All Green Lawn Care in 1989-1990.  We worked applying lawn chemicals.  Steve had an apartment in Euless but stayed at least half of the time at his parent's house in Azle.  I was married in 1990 to a woman named Belisa.  In about 1991 Steve and I transferred to Ameritech where we continued to apply chemicals to lawns as well as sell lawn treatments.  We remained at this company till about 1995 or 1996. We started doing a little tree work on the side. Jackie and Bill, Steve's parents,  bought the first tree truck and equipment.   We worked on weekends and evenings when we got done with lawns.  Steve was talking about getting state contracts to trim the power lines.  We were making excellent money and both  of us had a lot of money.  We dressed well and drove nice cars. Steve could have any girl he wanted.  He looked good and could really talk the talk.  He had the gift of gab.   He was dating Michele Howell at the time.  I thought she was a really nice girl, quiet and sweet.  Belisa and I were quiet people.

...He was very respectful to Belisa and did his best to keep his stuff picked up.  He was on his best behavior.  Steve did not do a lot of running around.  The three of  us grilled or cooked at home most of the time.  Steve moved back home with his parents after Belisa became pregnant.   Steve was never a big drinker but he might occasionally have a drink or two socially.   I never saw him intoxicated.

...Everything about our friendship changed when Steve met Theresa.  After they started dating Steve changed.  She ruined him, changed him for the worst.  Neither I nor my wife could stand Theresa.  She was loud, crude and rude.  My wife was the total opposite of Theresa in every way.  After Steve decided to marry Theresa, I walked away from the business. I couldn't stand her and what she had done to Steve.  Once we were no longer business partners, our contact became less and less.  Both of us were working a lot and had little time to socialize. Belisa and I  did not want to socialize with Theresa.

Around the time of Steve's trial, I talked with Amanda Maxwell, an investigator and mitigation expert working for Steve's attorney, Mr. Bill Ray.  We had a long talk when I was visiting Steve in jail.  I told Ms. Maxwell everything that is in this declaration.  However, I was never contacted by Steve's attorneys and they never asked me to testify at Steve's trial.  Had they asked me to do this, I would have been willing to do so and I would have testified to what is in this declaration.

(Exhibit 29.)

Jerry Dowling was Stephen's father-in-law and the father of his ex-wife Theresa.  If he had been called as a witness, he could have told the jury that

> Stephen was a very hard worker, and a generous person. Stephen came from a very good stable family...When I heard about the murders of Lisa Underwood and her child, and that Stephen had been arrested I was shocked, and could not believe this at all....I met Ron Dodd and my first impression was that he was a smart ass, loud mouth, and obnoxious. When Theresa wanted me to meet him, I told her I did not want to meet him and wanted nothing to do with him.  I knew that Ron Dodd was like a dog that would come up to the back door and Theresa was feeding him.  He was there for the money.  Big money was being thrown around.
>
> If I had been called to testify at Stephen's trial, I would have clearly stated that Stephen would not be a future threat to anyone in prison or in the free world.
> (Exhibit 30, Declaration of Jerry Dowling.)

Mary Hackworth was Stephen's aunt and although she did testify at the trial, it was extremely brief and it did not cover the crucial issue of future dangerousness.  Had she been properly interviewed and prepared, Ms. Hackworth would have told the jury that

> I have always known Stephen to be a loving, caring, wonderful child who went through extreme adversities due to the sudden death of his older sister Kathy, and then less than two years later, the death of his older brother David....
>
> Stephen has always been a very hard worker, and has always wanted to help others. Stephen was very fond of animals...
>
> On one occasion Stephen at his own expense flew from Fort Worth to South Carolina to put in a back yard for Gerald and me.  Since he was very good at landscaping, he knew what needed to be done and he came on his own without us asking.  Stephen did a wonderful job...
>
> Since he was a child, I have always known Stephen to walk away from any kind of confrontation.  Once, Stephen was grilling steaks on the grill and had put barbeque sauce on Theresa's steak.  She became so outraged that it scared both Gerald and myself.  She went into a total rage and threw her engagement ring on the floor, and Stephen was so embarrassed that he just walked out the door.  She went right after him, screaming and making a huge spectacle of herself, but Stephen finally calmed her down....
>
> No one could even comprehend this [Stephen's arrest] especially as the victims were a pregnant woman and a small child.
>
> Stephen was always a gentleman around women, and children loved him.  During this visit with Jackie, I met with both trial attorneys Bill Ray and Tim Moore.  All they wanted me to do was view the confession tape....

On several occasions I tried to speak with both attorneys regarding what is stated in this declaration, however they would not listen.  They did not prepare me for my testimony other than to tell me to just answer their questions that were limited to knowing and loving my nephew.  I was more than willing to testigy to what is in this declaration had I been asked to.  If the attorneys had asked me about Stephen's risk of committing future violent acts, I would have told the jury that I believed his chances were small.
(Exhibit 31, Declaration of Mary Hackworth).

Similarly, Christy Mackemson did testify very briefly at Petitioner's trial but was not asked

about her views about his potential for future dangerousness:

I never saw Steve angry.  He was always fun and the life of the party.  Based on my prior knowledge of him, and his love for Trish's kids, it is hard for me to believe that Steve is guilty of these murders.   Based on this knowledge, I do not think that Steve would be a high risk of committing future acts of violence.
Around the time of Steve's trial, I talked with an investigator and mitigation expert working for Steve's attorney.  I told the investigator everything that is in this declaration. I did testify briefly at Steve's trial. Basically, I told Steve's jury that I was there to support him.  Had the defense attorneys asked me more questions, I would have testified as to what is in this declaration.  I would have also told the jurors that, based on my knowledge of Steve from when I knew him, I believe that he is a very low risk of committing future acts of violence.
(Exhibit 32, Declaration of Christy Mackemson).

Melody (Tarwater) Novak, Stephen's cousin, has known Stephen all his life yet she was

never contacted by the trial attorneys.  Had she been called to testify at the trial, she could have told

the jury that

Stephen was a fun loving kid, mischievous, and he loved collecting animals...He also loved children and children loved him.  My granddaughter adored Stephen...
I was shocked to learn that Stephen had been arrested for something like this, and I still don't believe that he would be capable of such an act....
Stephen's attorneys never contacted me.  However, if I had been, I would have been willing to testify to what is in this declaration.  If I would have been asked it (sic) Stephen would be a future danger to society my answer would have been no.
(Exhibit 33, Declaration of Melody Novak.)

The trial attorneys had Mr. Barbee evaluated by Dr. Kelly Goodness, Ph.D. (Exhibit 18,

Letter of Dr. Kelly Goodness.)  She conducted a dangerousness risk assessment on Mr. Barbee.  She noted that Mr. Barbee had never been a problem while he was housed in the local jail awaiting trial. (*Id.* at 1.)  She revealed that he had been diagnosed positive for Lyme's Disease and which may explain his symptoms and behavior. (*Id.* at 2.)  As it was treatable with antibiotics, it could be seen as more mitigating than aggravating. (*Id.*)  She did not think that Mr. Barbee would be a future danger.  Yet she did not testify.

The evidentiary hearing held pursuant to the subsequent state habeas application touched on this issue, although the hearing itself was on the conflict of interest issue.  Evidence was presented that reenforced Mr. Barbee's showing of deficient performance and prejudice under the *Strickland* standard.  The factual summary of the hearing testimony in Claim 2 is incorporated herein by reference.

Briefly, some highlights of the evidentiary hearing testimony were as follows:

1) Amanda Maxwell testified that Mr. Ray told her that she should include in her mitigation report "all of the good stuff and all of the bad information that I received from the witnesses..."  (2 EH 32.)  She later realized that this is not the normal practice in mitigation work.  (2 EH 32.)  Ms. Maxwell also considered it to be a bad practice because it turned Mr. Barbee's mitigation report into an "aggravation report" and it also became subject to discovery.  (2 EH 33.)  She did not know why Mr. Ray wanted the "bad" information written down in the report.  (2 EH 33.)  In seven or eight years of mitigation training, Ms. Maxwell has been taught that it is "standard procedure" not to write down bad or negative information as it may become discoverable. (2 EH 123-124.)

2) Ms. Maxwell requested and reviewed Petitioner's mental and physical health records and recommended to Petitioner's attorneys an MRI, a cat-scan and a neuropsychological evaluation. (2 EH 37.)  However, they did not respond to this suggestion. (2 EH 38.)

3)  Ms. Maxwell found out that Theresa Barbee had been embezzling money from the businesses. (2 EH 39.)  Theresa Barbee was also trying to obtain 51 per cent ownership of the businesses so she could apply for a minority business loan. (2 EH 40.)  At this time, Theresa Barbee was living with Ron Dodd who had dropped the pipe on Petitioner's head. (2 EH 40.)

4)  Mr. Ray did not allow Ms. Maxwell to order any of Petitioner's records although she had requested them.  (2 EH 42.)  Eventually, she had to go to Azle, Texas and obtain the records personally. (2 EH 42.)  Ms. Maxwell again requested a neuropsychiatrist and a psychiatrist and again there was no response from Mr. Ray or Mr. Moore. (2 EH 42.)  The overriding issue was to have Mr. Barbee plead guilty. (2 EH 43.)

5)  After Ms. Maxwell submitted her mitigation report to Mr. Ray, she never heard from him. (2 EH 45.)  At one point prior to trial, the defense investigator Kathy Minnick disappeared. (2 EH 45.  Ms. Maxwell believed that the witnesses were not prepared to testify and she was not allowed to meet with them to prepare them prior to the trial. (2 EH 48.)  They were only spoken to briefing by Mr. Keeton and told not to display any emotion or cry. (2 EH 49.)   In Ms. Maxwell's opinion, the mitigation testimony in Mr. Barbee's trial was "not effective. Dismal. It was not the information that, had I been allowed to prepare the witnesses, would have come forward." (2 EH 49-50.)

6)  Additionally, she interviewed helpful witnesses who were not called at trial. (2 EH 50.) The jury was not given information about Mr. Barbee's hydrocodone use, his good acts, his lack of

prior arrests. (2 EH 50.)  The relationship of Theresa Barbee and Ron Dodd was not presented. (2 EH 54.)  The numerous documents gathered by Ms. Maxwell were not used at trial. (2 EH 55.)

7)  A number of stressor factors, such as business pressures, were also not presented at trial. (2 EH 55-56, 70.)  Also not presented was the fact that Mr. Barbee had caught Theresa Barbee stealing from the company shortly before the murders. (2 EH 56.)  Other mitigating stressor factors, such as 1) Petitioner's wife pressuring him to recover money from his ex-wife; 2) Petitioner finding out his  father was dying from cancer just days before his arrest; 3) fetal alcohol exposure; 4) his suicide attempts; 5) a car wreck when he was 16; and 6) the blow to his head shortly before his arrest were not presented to the jury. (2 EH 57-59.)

8) Although Ms. Maxwell has worked on 16 additional capital cases, she had never seen another such case handled as this one was. (2 EH 60-61.)  Mr. Ray and Mr. Moore found Petitioner disgusting because he cried. (2 EH 61.)  At the conclusion of this case, Mr. Ray stated that "we will all end up in federal court answering for this case." (2 EH 63.)

9) Ms. Maxwell wrote that Mr. Davis "would be a good witness....I don't think he would go into court and say anything negative about Steve" and "we could explore this with him, he would be a good witness." (2 EH 118.)  Ms. Maxwell testified that Mr. Ray and Mr. Moore's affidavit, where they stated that "applicant attempted to kill the driver of the other vehicle" was not accurate and there was nothing in her report to that effect. (2 EH 119.)  She testified that in effect Petitioner was the victim of this "road rage" incident as the other men first punched Petitioner and Mr. Davis. (2 EH 120.)

10) In her opinion, this incident would not justify the defense attorneys' attempt to characterize it as a valid reason to preclude any mention of future dangerousness.  (2 EH 121.)  The

police were not called, she was unaware of any other witnesses to the incident, and the defense attorneys' characterization of it as an "attempt to kill" the other driver was a lie (2 EH 121) and a mis-characterization of what was in the report. (2 EH 130.)

11)   Tim Davis testified that ""I've been told that Stephen's attorneys stated in the[ir] affidavit that I told them that Stephen attempted to kill the driver of the other vehicle. That is completely and totally untrue and a lie." (2 EH 163.)  He also reaffirmed his declaration statement that "there is no way I believe that Stephen could have killed anyone." (2 EH 164.)

12) As to the "road rage" incident, in icy driving conditions,  two people in a truck swerved in front of Petitioner and Mr. Davis' vehicle  and forced them off the road. (2 EH 143.)  The two men approached their vehicle, so Mr. Davis and Mr. Barbee rolled down the window to see what they wanted. (2 EH 143.)  One of the other drivers tried to punch Mr. Davis so Petitioner and Mr. Davis got out and defended themselves. (2 EH 143.)  Then they got back in the truck and drive away. (2 EH 143) The other people were the aggressors, Mr. Davis and Petitioner were trying to defend themselves, and no one was hurt. (2 EH 144.)

13)   At no time did Mr. Davis ever tell Petitioner's mitigation person or his attorneys that Petitioner tried to kill the other persons and it was nothing even close to that. (2 EH 145.)  The incident was a simple fistfight. (2 EH 145.)  Mr. Davis did not think that Petitioner was violent or that he would be likely to commit future acts of violence and he had never seen him being the aggressor.  (2 EH 144-145.)

14) Mr. Davis would have been willing to be a witness at Petitioner's trial and if he had been called as a witness he would have told the jury that he would "absolutely not" be a threat to society or likely to commit future violent acts. (2 EH 146.)  Other than the highway incident where they

-299-

were defending themselves, "I've never seen Stephen be aggressive at all." (2 EH 146.)  However, he was not asked to testify at Petitioner's trial. (2 EH 147.)

15) Calvin Cearley, testified that  Mr. Barbee and his wife led the children's program and Mr. Barbee was the children's church leader (2 EH 167);   he loved children and animals and had a happy temperament and was polite and respectful (2 EH 168-169);  he was not contacted by Mr. Barbee's defense attorneys at the time of his trial (2 EH 170); and had he been asked about the likelihood of Mr. Barbee being a danger to society or committing future violent acts, he would have told the jury that he was not such a danger. (2 EH 170.)

16) Dr. Nancy Cearley testified that the church needed a children's church leader and Mr. Barbee took that role (2 EH 174); under his leadership, the program grew from about ten children to about 75 or 80 (2 EH 174); Mr. Barbee did this for two or three years (2 EH 174); his temperament was easy-going, very friendly and very likeable, polite and respectful (2 EH 175); Dr. Cearley knew Mr. Barbee for about 20 years (2 EH 175) and in that time, Dr. Cearley never knew Petitioner to commit any acts of violence. (2 EH 175.)

17) Dr. Cearley was a witness at Petitioner's trial, but she was never asked about his character or  whether he would be likely to commit future violent acts. (2 EH 176.) Had this witness been asked about her opinion as to the likelihood of Mr. Barbee committing future violent acts, she would have said that he did not think he would be likely to commit these acts. (2 EH 177.)

18) Mike Cherry,  Petitioner's ex-brother-in-law and an ordained minister,  testified that he has known Mr. Barbee since he was 10 or 11 years old  (2 EH 187, 199);   Mr. Cherry married Kathy, Mr. Barbee's sister,  in 1980 (2 EH 188);   Kathy died at age 20 and this affected Mr. Barbee greatly (2 EH 189);   Mr. Barbee also had a brother, David, who also died at age 20 in a car accident.

(2 EH 189-190.)

19) Mr. Cherry never talked to Mr. Barbee's attorneys. (2 EH 192.) If he had been asked to testify at Mr. Barbee's trial, he would have told the jury that he was not likely to commit violent acts in the future. (2 EH 192.) There was only one occasion where he had seen Mr. Barbee get into a fight and that was at a party when a guest was acting inappropriately and "dirty dancing" around children. (2 EH 193.)

20) Jennifer Cherry, Mr. Barbee's niece and Mike Cherry's daughter, testified that Mr. Barbee ran the church children's program and would put on puppet shows and the like for the children (2 EH 204); at the time of the murders, Theresa was still in debt to Jackie Barbee as Theresa had taken out a loan to build a cabana in their back yard (2 EH 204); and Theresa was living in this house with Ron Dodd at the time of the murders (2 EH 205). It was a very large home, about 6000 square feet.

21) Jennifer became aware that Theresa was embezzling from the company by paying her bills with company money. (2 EH 206, 207.) One time, Theresa gave Jennifer $14,000 in cash to deposit and, when she learned that it would alert the IRS, she wanted some of it back. (2 EH 207.) Theresa tried to keep Mr. Barbee from seeing the cash. (2 EH 207.)

22) When Jennifer talked to Stephen's attorneys, they seemed set on their opinions and thoughts and they were not interested "in what any of us had to say much." (2 EH 219.) She did not feel that they prepared her to testify and all they said was "follow my lead." (2 EH 219.) When Jennifer testified, she was not asked any questions about her opinion of the likelihood of Stephen committing future acts of violence, but if she had been she would have said that she did not think he would. (2 EH 220.) The attorneys never asked for her opinion as to Stephen's future dangerousness. (2 EH 220.) Her opinion was that he was not a future danger. (2 EH 220.) Although

she knew Tim Davis, she had never heard of an incident where they were the victims of road rage. (2 EH 220.) Stephen's attorneys never asked her about this incident. (2 EH 220.)  At trial she was just asked if she loved Stephen. (2 EH 221.)

23) Sharon Calvin testified that she met Stephen Barbee in 1984. (2 EH 226.)  She was friends with his mother. (2 EH 226.) Stephen attended her church for about a year. (2 EH 226.)  She had nothing bad to say about Stephen. (2 EH 227.)  His attorneys never asked her to testify at trial although she would have been willing to do so. (2 EH 228.)  She was never asked by Stephen's attorneys whether she thought he would be a future danger but if she had been so asked she would have said that she "probably wouldn't be." (2 EH 228.)

**B. No "strategic decisions" excuse this failure as the State courts erroneously held, and the State court's denial of this claim was an unreasonable determination of the facts and an  unreasonable application of clearly established federal law.[138]**

**i. The state court holding was an unreasonable determination of the facts under 2254(d)(2).**

When the State asked for affidavits from the trial attorneys, and the state habeas court obligingly complied with this request, Mr. Ray and Mr. Moore attempted to provide some justification for their inaction at the penalty phase.  (Exhibit 37.) But in reality, their joint affidavit actually shows that they have inadvertently admitted their own ineffectiveness.  In addition it contains serious misrepresentations and it is both internally contradictory and contradicted  by the very appendices they attached to it.  Far from showing that they acted effectively, it actually shows the exact opposite.

---

[138]   The following analysis relates to all claims and sub-claims of punishment phase ineffective assistance of counsel and is incorporated herein as to all such claims and sub-claims.

Initially, the attorneys state

Applicant initially explained that the murders were accidental. This was shown by the letter Applicant wrote to counsel, which was provided to habeas counsel, and is attached hereto, wherein Applicant basically says that he accidentally killed Lisa and Jayden Underwood. Applicant ultimately took the position that Ron Dodd killed Lisa and Jayden Underwood and Applicant was not present when that happened.
(Id. at 2.)[139]

Petitioner's attorneys' actions, in choosing to reveal their client's privileged confidential

communications in order to defend themselves, have actually shown quite clearly where their

loyalties lie. However, the very letter that they point to actually shows something else:

Det. Jamison kept asking me questions about the ware-abouts (sic) of Lisa. That I knew what happened to them. I said no. They kept saying that I knew something. I kept saying no. I wasn't there.

They (Det.) Would leave and come back. They kept saying that I knew what happened. I kept telling them, I didn't do it. I wasn't there. Det. Jamison left and det. Carroll stayed. He was asking me if I knew what had happened, I said I didn't know.

Det. Carroll left, stayed a long time. I almost fell asleep. Det. Carroll finally came back. He said something about DNA on a fence. I said what? He said 'nothing.' Then he said do [I] know anything about 407 and a gas can because Ron Dodd had told him (Det. Carroll) that he saw me in 407 and a gas can. I sit down and said why would he say that for. Det. Carroll said that Ron was taking them there where Ron saw me on 407 with the bodies. Det. Carroll ask me where were they. I didn't say any thing, still asking myself why would Ron say that for, it sounded like he was blaming me for everything, because Ron Dodd was driving right behind me. And he knew what he did. Det. Carroll said I know you did it! I said no, no.

Det. Carroll said, I know you did it, while he hit his fist on the desk, where I was sitting. And if I don't say something, that they will look at me as a cold blooded killer and that was the death penalty. I said, I wasn't there.

Det. Carroll said they have enough evidence to convict me with capital murder and that was the death penalty. I was till thinking about the death penalty. I said no. Det. Carroll asked if it was an accident because those things happen. With me thinking about it all, and Det. Carroll said he was leaving and the talking was over when he left. If I didn't say anything I was going to die, and look like a cold-blooded killer. Det. Carroll opened the door, I said wait a minute. That's when I said it was an accident thinking that a accident was a accident (sic). I told him that Lisa and I got into argument and she kicked me, and I hit her in the nose and I held her down too long, and her son was screaming and I put my hand over

---

[139]   As we will see, both the "initial" explanation and Mr. Barbee's "ultimate" position occurred well before Mr. Ray and Mr. Moore were appointed to the case, and their attempt to cite this as a rationale for being hamstrung in their defense efforts is bogus.

his mouth until he stopped screaming.  Then I went to jail.
(Exhibit 37, Stephen Barbee's Letter To Counsel About His Version Of The Events
Concerning The Death Of Lisa And Jayden Underwood.)

It is clear in this letter that Stephen is explaining how he came to falsely confess to the

killings, and not that this was what he actually did.  He repeatedly states in this same letter that he

was not there and explains how he believed that if he told Det. Carroll it was an accident that he

would not get the death penalty.  Yet his attorneys have attempted to construe this as an admission

of guilt to them.   Their statements that "Applicant initially explained that the murders were

accidental" and then  "Applicant ultimately took the position that Ron Dodd killed Lisa and Jayden

Underwood and Applicant was not present when that happened" are also false, as their own affidavit

repeatedly states that Stephen has maintained his innocence from the beginning of their

representation.  (*E.g.*, "Applicant consistently stated that Ron Dodd was the real killer, Exhibit 37,

Counsel's Joint Declaration,  at 5; "Applicant was steadfast in his assertion that he was innocent",

*Id.* at 5; "Applicant maintained that he was completely innocent" *Id.* at 6; "Client has maintained

his innocence to attorneys since the date of appointment", Memo of Understanding, appendix to

Exhibit 37.)  In fact, Stephen takes this position in the very letter they cite. Apparently, Mr. Ray and

Mr. Moore, in attempting to claim that their client was "continuously changing his version of the

events" (*Id.* at 2) have forgotten their oft-repeated main theme, that they were hamstrung from the

outset because their client has always insisted that he was innocent. (*Id.* at 5-7).

The "Memo of Understanding Between William Ray, Tim Moore, and Stephen Barbee" that

the attorneys submitted in support of their affidavit is also extremely troubling.  First, it was

obviously prepared to use against their client at some future date.  The fact of its existence is, in

-304-

itself, disturbing and evidence of a conflict of interest.[140]  It also shows that both Mr. Ray and Mr. Moore felt that their representation was so deficient that some such protection would be needed in the future against a claim of ineffective assistance of counsel.  Additionally, it contradicts the attorneys' own affidavit.  Point 4 of this Memo states that "Client then said to the detectives that the murders were accidental in that client felt that he would not then be in trouble."  Memo of Understanding, appendix to Exhibit 37.  This mirrors what the attorneys state in their affidavit. (*Id.* at 2.)  Yet this statement in the Memo is crossed out and replaced by "The detective advised client that a accident was a accident it would be better on me rather than death." *Id.*   The attorneys have attempted to twist their client's statements into an admission of guilt in order to absolve themselves of their own ineffectiveness.

The attorneys state that "[w]e also consulted with and interviewed witnesses concerning Applicant's family background." (*Id.* at 3.)   The total inadequacy of this "consultation and investigation becomes apparent in the declarations attached to this petition (Exhibits 16, 19 to 34) (discussed at length *supra*) where the vast majority of the declarants state that they had no interaction whatsoever with the attorneys.  Testimony at the evidentiary hearing, summarized *supra,* also bears this out.

Next, the attorneys attempt to absolve themselves of the claim involving not letting their client testify.  In so doing, they engage in a remarkable piece of sophistry:

> Concerning the subject of Applicant not being allowed to testify at the suppression hearing, we submit that is not correct.  Attached hereto is an agreement, which was provided to Applicant's counsel, that indicates Applicant's desire to not testify, as well as the portion

---

[140]   The State's Subsequent Findings of Fact in the subsequent writ application (Exhibit 54) again show the obvious conflict here.  Subsequent Findings of Fact Nos. 137 and 138 simply state that the preparation and use of the "memorandum of understanding" "was not a conflict of his [Mr. Ray's] interests with the applicant's interests."  This conclusion flies in the face of the facts.

of the record where Applicant stated that he did not want to testify.  While it does not appear in the record on the hearing on the Motion to Suppress, the only version of the facts concerning the voluntariness of his confession would be the testimony of the police. Applicant continued to refuse to testify.  *Item 2 of the Memo of Understanding, which Applicant marked out, is the real reason that Applicant did not want to testify*, that being that Applicant's mother was convinced by persons unknown to us that Applicant would waive all rights if he testified.  Applicant and his counsel are lying on this matter.[141]  Applicant refused to testify and it was his decision to do so.
*Id.* at 4.(emphasis added)

Thus, according to the trial attorneys, the "real reason" Mr. Barbee did not testify is in a passage that he crossed out.  This Memo, drafted by the attorneys for the sole purpose of possible later use against their client, indicates in Point 1 that "Attorney's (sic) have been told on numerous occasions by client, that client does not want to testify in this case, either at guilt/innocence or..." and then "punishment phases" is crossed out and initialed. *Id.,* Memo of Understanding,  appendix to <u>Exhibit 37</u>.) Then Mr. Barbee crosses out entirely the attorneys' cited justification regarding his mother being told that testifying was a waiver. (*Id.*)  At most, this shows an unwillingness to testify at the guilt/innocence phase, which the court transcript attached to the affidavit shows.  (24 RR 171-173.)

Mr. Ray and Mr. Moore point to a letter from Dr. Shupe "that indicates that if Applicant would have taken some responsibility for his actions, he might have been able to receive a life sentence."  (<u>Exhibit 37</u> at 5.)[142]  This is illogical, as the failure to present mitigating evidence and evidence of a lack of potentiality for future dangerousness had nothing to do with Petitioner's acceptance of guilt.  Additionally, if this reasoning is accepted, counsel would be excused from their

---

[141]    The trial attorneys calling state habeas counsel a "liar" needs no further comment.

[142]    Dr. Shupe did not testify at trial, and Petitioner has been afforded no opportunity to cross-examine him in an evidentiary hearing.

-306-

own ineffectiveness in all cases in which an innocent client has been wrongfully convicted unless that client wants to accept "responsibility" for something they did not do.  This reasoning also mirrors the attorneys' own belief that Petitioner was guilty and that fact absolved them of any deficiencies in the penalty phase.

From here, the logic deteriorates even further.  The attorneys then state that

Applicant claims in his Third Claim for relief that Amanda Maxwell, our mitigation specialist, had provided useful information that was not used in Applicant's trial.  Maxwell stated in her affidavit that she provided several witnesses and a history of head in juries (sic) that could have helped in Applicant's case.  We discussed what we were provided from Ms. Maxwell, and determined not to present the head injury theory because that theory would necessitate that Applicant was in fact guilty as charged.
(Exhibit 37 at 6.)

The French have a well-known saying: "*qui s'excuse, s'accuse*."  (He who excuses himself, accuses himself).  That saying is particularly appropriate here, where Mr. Ray and Mr. Moore's affidavit actually shows the exact opposite of its intent, as it highlights the lack of any reasonable strategic decisions on their part, as well as some very strange conceptions about mitigating evidence. Additionally, they trip all over themselves in trying to arrange the facts in their favor. Here, they believe that the presentation of the  head injury "would necessitate that Applicant was in fact guilty as charged." (*Id.*)  The logic of this statement is inscrutable. In other words, only the guilty suffer from head injuries?  Or, perhaps, the innocent just don't get head injuries?  The metaphysical implications of this statement exceed the bounds of rational analysis and are thus well within the bounds of "an unreasonable determination of the facts" under 2254(d)(2).[143]

---

[143]   The state habeas court, and hence the CCA, similarly adopted this nonsensical reasoning: "Mr. Ray and Mr. Moore made the tactical decision not to offer head injury evidence because it only served to diminish mitigation absent any acceptance of responsibility for the murders of Lisa and Jayden Underwood as *a 'head injury' explanation is factually inconsistent with a 'no involvement' defense....Mr. Ray and Mr. Moore concluded that a 'head injury' explanation would necessitate the applicant accepting responsibility and admitting guilt...*" (Exhibit 14, State's Proposed Findings and Conclusions , Findings No. 78, 82 at 11-

The attorneys continue in a similar vein:

> Applicant maintained that he was completely innocent, in spite of overwhelming evidence to the contrary.  Applicant was injured, and as Dr. Goodness pointed out, there were several items that could be considered in mitigation.  However, the overwhelming thought in mitigation is some acceptance of responsibility.
> (*Id.*)

Counsel have backtracked just a little and instead of it being "necessary" that their client be guilty in order to present mitigation, now "acceptance of responsibility" of guilt is the "overwhelming thought" in mitigation.  This too is not only false but completely illogical, as the "acceptance of responsibility" has nothing to do with a thorough and complete presentation of mitigating evidence that includes head injuries, good character, a history of non-violence toward women and lack of potential for future violent acts. If "acceptance of responsibility" is the "overwhelming thought," then all of Mr. Ray and Mr. Moore's innocent clients would be plumb out of luck.  It is not for nothing  that Mr. Ray has recently been ordered by a judge of this Court to take a course in "mitigation" in another case in which he was held to be ineffective for failing to present readily-available mitigating evidence. (*See* Exhibits 38, 39, 40.)

The affidavit continues in a like vein: "Applicant refused to accept any responsibility."  It has apparently failed to register on Mr. Ray and Mr. Moore that since their client "consistently stated that Ron Dodd was the real killer" (*Id.* at 5) that he had no responsibility for the murders to accept.[144]

Applicant would have had a much better presentation if Applicant had taken some

---

12.)(emphasis added).
Of course, the head injury evidence could not "diminish mitigation" because it itself was mitigation evidence.

[144] The trial attorneys even get this wrong, as Petitioner, however, has always accepted full responsibility for those actions he has admitted committing, the removal and the concealment of the bodies of the victims. (Exhibit 20.)

responsibility for his actions.  The entire theory of head injury and mental illness, combined with hydrocodone abuse, in our opinion, only serves to diminish any mitigation if there is no acceptance of responsibility.
(*Id.* at 6.)

Now the attorneys have shifted their position once again.  Acceptance of guilt has gone from "necessary" to an "overwhelming thought" to making a "better presentation."  But all three premises are both false and illogical.  How "head injury and mental illness" and drug abuse would "diminish any mitigation" is entirely unclear.  Again, the attorneys assume that only the innocent can suffer head injuries or have valid mitigation evidence.  Additionally, and more importantly, the "head injury and mental illness" and drug abuse *are in themselves mitigation evidence*, so how could they "diminish" it?

Next, the attorneys attempt to justify their failure to present a mitigation case based on something that Mr. Tim Davis allegedly told their mitigation specialist, Amanda Maxwell.  The attorneys claim

...we found that one of the witnesses provided by Ms. Maxwell, had information regarding an extraneous offense.  Tim Davis, a friend of Applicant was interviewed in William Ray's office prior to trial.  Davis indicated that he was once with Applicant when they were cut off by another vehicle.  The two vehicles stopped, and Applicant attempted to kill the driver of the other vehicle.  Attached is Ms. Maxwell's notes on her interview of Mr. Davis.

In light of that episode, neither Ms. Clearly, or any other witness was asked if they thought that Applicant would be a future danger, because that type of questioning would be subject to cross examination by the State with 'have you heard' or 'did you know' questions concerning the incident that Tim Davis informed us about.  We chose not to take the chance on the State knowing about Applicant's violent past.
(*Id.* at 6.)

This is simply untrue and the attorneys' account is patently false.  Ms. Maxwell's notes, which the attorneys themselves cite, and which they appended to their affidavit, tell a very different story:

Tim recollected that one day some men on the highway got angry because Steve had cut them off.  The men gave them the finger and cut in front of their truck motioning them to pull over.  Steve said, watch this."  Steve pulled over on the median as did the two men.  It turned out to be an older man and his son.  They walked back to Steve's truck and reached in hitting Tim and Steve.  They all ended up on the shoulder fighting.  Tim said he had to pull Steve off of the old man to keep him from hurting him really bad.  Then Steve started in on the son.  Tim pulled Steve off of him as well  and the two men left in Steve's truck.  (Exhibit 37, appendix, Mitigation Interview of Amanda Maxwell at 2.)

Additional verification of this was provided when Ms. Maxwell testified at the evidentiary hearing.  Her interview with Mr. Tim Davis referred to an incident where Mr. Davis and Petitioner were driving and got into an altercation with two other men when Petitioner cut them off. (2 EH 87.) The other men "walked back to Steve's truck and reached in hitting Tim and Steve." (2 EH 87.)  At the end of this report, Ms. Maxwell wrote that Mr. Davis "would be a good witness....I don't think he would go into court and say anything negative about Steve" and "we could explore this with him, he would be a good witness." (2 EH 118.)  Ms. Maxwell testified that Mr. Ray and Mr. Moore's affidavit, where they stated that "applicant attempted to kill the driver of the other vehicle" was not accurate and there was nothing in her report to that effect. (2 EH 119.)  She testified that in effect Petitioner was the victim of this "road rage" incident as the other men first punched Petitioner and Mr. Davis. (2 EH 120.)  In her opinion, this incident would not justify the defense attorneys' attempt to characterize it as a valid reason to preclude any mention of future dangerousness.  (2 EH 121.) The police were not called, she was unaware of any other witnesses to the incident, and the defense attorneys' characterization of it as an "attempt to kill" the other driver was a lie (2 EH 121) and a mis-characterization of what was in the report. (2 EH 130.)   The fact that Ms. Maxwell, who formerly made her living as a mitigation expert, has gone out of her way to bring this to counsel's and the Court's attention, in itself lends credibility to her account in comparison with trial counsel's

self-serving version.  Ms. Maxwell, unlike the trial attorneys, has no motive to present an untruthful declaration.

More directly, Mr. Davis himself has submitted a supplemental declaration that completely demolishes the attorneys' claims:

> The incident that happened on the highway goes as follows: Stephen was working for the Blue Mound Police Department as a reserve officer.  Stephen and I were in Stephen's truck when another pick-up truck curved and tried to run us off the road.  Both trucks ended on the side of the freeway and two people exited their truck and approached our vehicle.  It was a man approximately 50 years old and another man that was approximately 25 years old.  Stephen said as they started getting out of their truck to let them come to us, because if they start something it would be self-defense, because we both could tell that they (sic) two men were very angry.  When they approached the vehicle the younger guy came around to the passenger side where I was, and the windows were both down and the younger guy slugged me, so I got out of the truck.  By this time the older man had approached Stephen.  The younger guy and me were fighting on the ground, but I was much larger and was able to get the guy off of me.  I walked over to Stephen while Stephen was defending himself.  I did pull Stephen off of him so that we could get out of there.  At no time were we ever the aggressors.  We were only defending ourselves.  It was simply a fist fight and all four guys walked away from it with no serious injuries.
>
> I have been told that Stephen's attorneys have stated in an affidavit that I told them that Stephen "attempted to kill the driver of the other vehicle."  This is completely and totally untrue and a lie.  My prior statement said nothing even close to this and the attorneys have twisted it around.  There is no way that I believe that Stephen could have killed anyone, and had I been asked if I believe that Stephen would be a future danger to society my answer would have been no.
>
> (Exhibit 29, Supplemental Declaration of Tim Davis.)

Mr. Davis also testified at the evidentiary hearing.  He reaffirmed his statement in his supplemental declaration that ""I've been told that Stephen's attorneys stated in the[ir] affidavit that I told them that Stephen attempted to kill the driver of the other vehicle. That is completely and totally untrue and a lie."  (2 EH 163.)  He also reaffirmed his declaration statement that "there is no way I believe that Stephen could have killed anyone."  (2 EH 164.)

Mr. Davis characterized Petitioner as easy-going and friendly. (2 EH 142.) An automobile incident in 1996 or 1997 was recalled. On the highway, in icy driving conditions, two people in a truck swerved in front of Petitioner and Mr. Davis' vehicle and forced them off the road. (2 EH 143.) The two men approached their vehicle, so Mr. Davis and Mr. Barbee rolled down the window to see what they wanted. (2 EH 143.) One of the other drivers tried to punch Mr. Davis so Petitioner and Mr. Davis got out and defended themselves. (2 EH 143.) Then they got back in the truck and drive away. (2 EH 143) The other people were the aggressors, Mr. Davis and Petitioner were trying to defend themselves, and no one was hurt. (2 EH 144.)

At no time did Mr. Davis ever tell Petitioner's mitigation person or his attorneys that Petitioner tried to kill the other persons and it was nothing even close to that. (2 EH 145.) The incident was a simple fistfight. (2 EH 145.) Mr. Davis did not think that Petitioner was violent or that he would be likely to commit future acts of violence and he had never seen him being the aggressor. (2 EH 144-145.)

Thus, there is nothing about an "attempt to kill" the driver. Instead, it is clear that the physical confrontation was initiated not by Stephen but by the driver and the other man when they reached inside Stephen's truck and punched both him and Mr. Davis. (*Id.*) They were the aggressors, not Stephen and Tim Davis. (*Id.*) Even if the State had somehow found out about this incident of "road rage," with the other side instigating the physical confrontation, it does not come close to attempted murder. Nor was this incident so threatening that it would cast a cloud over all the mitigating evidence in the entire case and excuse the non-presentation of evidence regarding future dangerousness of a thirty-eight year old successful businessman with no criminal record.

It is ludicrous to suggest that such a trivial incident would outweigh the positives of a 38-year-old successful businessman's arrest-free past and cause the jury to see him as a danger of committing violent acts.  Nor is there any logic to the attorneys' self-serving assertion that the questioning of witnesses other than Mr. Davis regarding future dangerousness would have made it more likely that this incident would have come out.

Actually, Mr. Davis himself would have been an excellent witness. Indeed, Ms. Maxwell states that "*I don't think he would go into court and say anything negative about Steve. We could explore this with him. He would be a good witness*." (Exhibit 37,  appendix, Mitigation Interview of Amanda Maxwell at 2.) (Emphasis added.)  Mr. Davis himself says "had I been asked if I believe that Stephen would be a future danger to society my answer would have been no." (Exhibit 29, Supplemental Declaration of Tim Davis.)  Thus, in an effort to exculpate themselves, Mr. Barbee's trial attorneys have fabricated a bogus rationale and a bogus affidavit upon which the state habeas court and the CCA uncritically relied.

But there is yet another reason why the trial attorneys' affidavit is false.  Even if this incident was harmful, which it was clearly not, there was no reason to believe that the State would ever learn of it, as indeed Mr. Davis did not testify for either side.  Nor was there any reason to believe that questioning other witnesses about "future dangerousness" would increase "the chance of the State knowing about Applicant's violent past." (Exhibit 37 at 6.)  How would the other witnesses even know about this incident, as only Stephen, Mr. Davis and the two aggressors were present?  Of course, terming their own client's arrest-free history as "violent" says much more about Mr. Barbee's attorneys than it does about Mr. Barbee.

Mr. Ray and Mr. Moore's affidavit then makes the following strange statement:

-313-

Finally, there is an allegation in the first part of Applicant's Application that is not assigned to any particular point.  That is the allegation that Jackie Barbee, Applicant's mother, could not identify Applicant's high school diploma and an elementary school photograph.  Ms. Barbee stated in her affidavit that she was not prepared by William Ray for this testimony.  Ms. Barbee provided these items to us.  We felt she would be able to identify her own child. (*Id.* at 7.)

The actual statement in the habeas petition was as follows:

Similarly, when defense counsel was questioning Jackie Barbee, the applicant's mother, he showed her two exhibits which she could not even identify; a photograph allegedly containing her son, who she could hardly pick out, and his high school diploma, which she had not seen.  *Id.* at 141-145.  Attached hereto as Exhibit D and by this reference made a part hereof is an affidavit of Jackie Barbee, in which she states that she was not prepared either for her testimony or the exhibits that were shown to her, and further states that her sole contact throughout the period that the case was pending was Amanda Maxwell. (Exhibit 11 at 17.)

Thus, in a further effort to excuse themselves, the trial attorneys have trivialized the allegations of Mrs. Barbee's affidavit into a complaint that she was not able to identify the exhibits instead of its real import as an overall failure to prepare this crucial witness.

Next, the attorneys  make the astonishing statement that "[w]e did everything we could to help Applicant." (Exhibit 37 at 7.)  However, their affidavit goes to extreme lengths in an attempt to attempt to justify the exact opposite, why they did not do various actions.  Then the attorneys inadvertently  admit their own ineffectiveness:

We felt that there were several items that could help in showing a lack of future danger, or a mitigating fact that would prevent Applicant from receiving the death penalty.  While we did offer evidence at punishment concerning Applicant's background, we could not afford to take the chance on expert or lay testimony concerning an opinion on future dangerousness for the reasons set out in paragraph 3 above. (*Id.*)

Here is the same theme we have seen above: they couldn't even address the future dangerousness special issue because if they had, somehow there would have been an increased risk

of the State finding out about an incident in which Stephen and Mr. Davis were attacked by two out-of-control drivers. There was a simple way to eliminate this so-called "chance," which was to ask prospective witnesses if they knew of anything that would indicate violence in Stephen's past, and the affidavits presented herein show that this was not done. Additionally, the State could have called so-called "future dangerousness experts" regardless of what the defense did or did not do. The defense attorneys present as a "strategic decision" the fact that they sat on their hands instead of addressing the issue because of this imaginary fear. In no way can this be seen as "strategic" because the State was not in any way constrained in their future dangerousness presentation simply because the defense shied away from the issue entirely.

The State's meager case for future dangerousness did not rely on cross-examining the defense witnesses. If there is any logic at all to the attorneys' statement, it seems to assume some sort of quid-pro-quo, where if they don't present mitigating evidence of non-future dangerousness, then the State will also not try to present aggravating evidence. This is a false assumption. Were this standard to be adopted, it would justify complete inaction at all penalty phase trials, because of the "fear" that whatever was presented could be countered by the prosecution. This clearly violates the *Williams, Wiggins* and *Rompilla* standards discussed herein in the argument section of this claim and shows that the state court holding was an unreasonable determination of the facts and the law under both 2254(d)(1) and (2).

Finally, the attorneys return to their oft-repeated theme, that they couldn't present mitigation evidence because Stephen refused to admit that he was guilty:

> The problem is that Applicant refused to accept any responsibility for any action. What we had, according to Applicant, was a frame up by his exwife, and Ron Dodd. This frame up we discovered was not based on any fact other than Applicant's claims, and Applicant refused to offer any evidence on this matter.

Applicant's parents catered to this theory, and this became a controversy that existed from the very beginning of our representation throughout our representation of Applicant. We felt then, and still do, that Applicant refused to accept responsibility for his actions, which prevented any meaningful effort on our part to show mitigation and a lack of a future danger....

(*Id.* at 7-8.)

As discussed above, this "strategy" is a complete *non sequitur*. The fact that a client "refuses to accept responsibility", i.e., admit that he is guilty, has no bearing whatsoever on the decision to present or not to present mitigating evidence, especially of the sort foregone here: head injuries, abundant good character evidence and lack of future dangerousness. According to Stephen's trial counsel, only the guilty who admit their guilt are "entitled" to present mitigating evidence. The innocent who maintain their innocence and the guilty who do likewise are apparently not so "entitled."

This failure of the *Strickland* performance prong is underlined by the fact that, as mentioned above, there was so much readily available positive information. The Barbee family was cooperative, work records were available, and good character information was at hand. This was not a case in which nothing was said at the penalty phase regarding future dangerousness because there was nothing good to say, but, by remaining silent, this is exactly the impression that the jurors were given. In fact, this was the *only possible impression* they could have had given the lack of defense evidence as to future dangerousness.

There is a basic inconsistency in the rationale used by the trial attorneys to justify their inaction, a contradiction that reveals the lack of "strategy" behind their decisions. They repeatedly states that their prime objective was not to introduce damaging double-edged future dangerousness evidence at the penalty phase. However, because they never investigated the existence of such

-316-

evidence, by asking the Barbee family about it, they could not know its substance and they could not have possibly formulated any clear and objectively-reasonable "strategy."   Reasonable strategies cannot be based on ignorance or designed in a vacuum.

The CCA's holding as to this claim was based on the uncritical acceptance of the trial attorneys' flawed affidavit.   The holding was erroneous and unreasonable because that Court and the trial court were misled by both the prosecution and the trial attorneys who jointly wrote the basis of the state courts' holdings. The state habeas court, and hence the CCA, similarly adopted findings and conclusions that make no sense at all (findings of fact by number):

> 98. Mr. Tim Davis, a friend of the applicant and one of the witnesses provided by Ms. Maxwell, related information about a prior violent road rage incident where the applicant ended up in a physical confrontation. *See* Mr. Ray and Mr. Moore's Affidavit, page 6; Mitigation Interview–Tim Davis, page 2.
>
> 99. Mr. Davis eventually had to pull the applicant off each of the other two men before he hurt them badly. *See* Mitigation Interview-Tim Davis, page 2.
>
> 100. Mr. Davis described the applicant as having no 'off-button' and did not know how to stop. *See* Mitigation Interview–Tim Davis page 2.
>
> 101. Mr. Davis recalled fights involving the applicant on other occasions. *See* Mitigation Interview–Tim Davis, page 2...
>
> 104. The applicant's violent history limited the ability of Mr. Ray and Mr. Moore to question defense punishment witnesses because they could not take the chance of the State learning of other instances of violence—such as the incident reported by Mr. Davis—through opinion and reputation cross-examination. *See* Mr. Ray and Mr. Moore's Affidavit, page 6.
>
> 105. Mr. Ray and Mr. Moore attempted to present evidence regarding the applicant's background which was mitigating or would show a lack of future danger; however, such evidence had to be tempered to limit the discovery and admission of the applicant's heretofore unknown past violent conduct. *See* Mr. Ray and Mr. Moore's Affidavit, page 7...
>
> 107. Mr. Ray and Mr. Moore's decisions regarding the presentation of punishment evidence were valid strategic choices based upon a reasonable investigation and an understanding of the applicant's violent past...
>
> 109. Mr. Ray and Mr. Moore's defense was undercut by the applicant's unwillingness to accept any responsibility for his own conduct.
>
> 110. Nancy Cearley and Jackie Barbee complain that they were not asked whether, in her opinion, the applicant would be a future threat to society. *See* Nancy Cearley's letter; Affidavit of Jackie Barbee, page 2.
>
> 111. Mr. Ray and Mr. Moore limited questioning character witnesses as to their opinion

whether the applicant would be a future danger because they could not take the chance of the State  learning of other instances of violence—such as the incident reported by Mr. Davis—through opinion and reputation cross-examination.  *See* Mr. Ray and Mr. Moore's Affidavit, page 6.

112.  The decision by Mr. Ray and Mr. Moore not to ask this type of questions was valid trial strategy....

119.  The following guilt/innocence phase evidence would have undercut any additional potential evidence or theory which Mr. Ray and Mr. Moore could have presented to the jury: [there follows a three-page summary of the guilt/innocence phase]...

120.  The following punishment phase evidence combined with the guilt-innocence phase evidence would have undercut any additional other potential evidence or theory which Mr. Ray and Mr. Moore could have presented to the jury: [there follows a slanted and inaccurate summary of the punishment phase evidence]...

(Exhibit 14 at 13-18.)

Some of the Subsequent Findings of Fact also touch on this claim and the previous one and they too are unreasonable determinations of the facts under 2254(d)(2).  Subsequent Finding of Fact No. 65 states that "Mr. Ray and Mr. Moore's efforts to prepare and present a defense were hampered by the applicant's ever-changing version of these murders and his specific involvement therein."  Yet, immediately after his transfer to the county jail, and before Mr. Ray and Mr. Moore were even appointed, Mr. Barbee recanted his confession and professed his innocence of the murders of Lisa and Jayden Underwood.  (*See, e.g.,* Exhibits 19, 20, 37.)

Subsequent Findings of Fact No. 88 and 89 are unreasonable because they are misleading and miss the point.  No. 88 held that "Mr. Ray instructed Ms. Maxwell to learn everything about the applicant's past, including positive and negative information" and No. 89 held that they believe such information is useful, and No. 91 held that "Mr. Ray's decision to prepare a psychosocial history report containing both positive and negative information was not due to any relationship to Judge Gill."   The problem here is not that Ms. Maxwell was asked to learn positive and negative information, but that Mr. Ray told her to write up and put the negative information in a report that

was in fact later given to the prosecution and used against Mr. Barbee.

At the hearing, Ms. Maxwell testified that, with her current experience, she would provide the defense attorney with all the information, both good and bad, but the bad would be provided only verbally. (2 EH 95.) The negative information would not normally be in the written reports. (2 EH 96-97.) At the time she provided the report in this case she "had no idea the prosecution was even allowed to see my report" and Petitioner's attorneys failed to advise her that it could be seen by them. (2 EH 97.) Since this case, Ms. Maxwell has learned "to only provide mitigating information in the final report." (2 EH 97-98.) In seven or eight years of mitigation training, Ms. Maxwell has been taught that it is "standard procedure" not to write down bad or negative information as it may become discoverable. (2 EH 123-124.) In her report, Ms. Maxwell wrote that Petitioner had poor behavioral and impulse control (2 EH 100, 104), did not do well under stress (2 EH 101-102), and had numerous girlfriends and a secret cell phone (2 EH 103) but would not have done that in light of her training. She said that she did not realize that the prosecution would obtain a copy of her report as this was her first capital case. (2 EH 128.) Ms. Maxwell thought that Petitioner's attorneys may have provided a copy of her report to the prosecution but was not certain of that. (2 EH 129.) Currently, Ms. Maxwell does not include anything other than mitigating facts in her mitigation report (2 EH 133.) Thus, these findings are all unreasonable determinations of fact.

Subsequent Finding of Fact No. 96, relating to the head injury, is flawed. In the only subsequent finding relating to the non-presentation of the head injury, it held that "Dr. Goodness did not find significant symptoms suggestive of a head injury." However, it was Amanda Maxwell (Exhibit 16) and Dr. Martin (Exhibit 17) who found these symptoms, not Dr. Goodness, who held a Ph.D, not a medical degree.

-319-

Subsequent Finding of Fact No. 97 held that "Dr. Goodness did not find that the applicant suffered from any developmental delay or from bipolar mood disorder." This was found by Ms. Maxwell and Dr. Martin.

Subsequent Findings of Fact Nos. 111 through 128, relating to the "road rage" incident, are similarly flawed and illogical and an unreasonable determination of the facts. The evidentiary hearing testimony of Mr. Davis showed that this incident was misrepresented by Mr. Moore and Mr. Ray in their affidavit in an attempt to avoid responsibility for their complete failure to offer any evidence of Mr. Barbee's low propensity for future dangerousness, the crucial special issue. At the hearing, Mr. Davis testified that two people in a truck swerved in front of Petitioner and Mr. Davis' vehicle and forced them off the road. (2 EH 143.) The two men approached their vehicle, so Mr. Davis and Mr. Barbee rolled down the window to see what they wanted. (2 EH 143.) One of the other drivers tried to punch Mr. Davis so Petitioner and Mr. Davis got out and defended themselves. (2 EH 143.) Then they got back in the truck and drove away. (2 EH 143) The other people were the aggressors, Mr. Davis and Petitioner were trying to defend themselves, and no one was hurt. (2 EH 144.)

At the evidentiary hearing, Mr. Davis testified that at no time did he ever tell Petitioner's mitigation person or his attorneys that Petitioner tried to kill the other persons and it was nothing even close to that. (2 EH 145.) The incident was a simple fistfight. (2 EH 145.) Mr. Davis did not think that Petitioner was violent or that he would be likely to commit future acts of violence and he had never seen him being the aggressor. (2 EH 144-145.) Mr. Davis would have been willing to be a witness at Petitioner's trial and if he had been called as a witness he would have told the jury that he would "absolutely not" be a threat to society or likely to commit future violent acts. (2 EH

146.)  Had he been asked any "have you heard" or "do you know" questions about Mr. Barbee's past incidences of violence, he would have said "I don't know of any" such incidents.  (2 EH 146.)

Subsequent Findings of Fact Nos. 122 and 124 are totally contrary to the record.  No. 122 held that "Mr. Davis denied meeting with Mr. Ray and Mr. Moore before the applicant's trial" citing 2 EH 147.  Mr. Davis made no such denial.  At 2 EH 147 he testified only that he was never contacted by Mr. Barbee's attorneys to testify in the case.  Subsequent Finding of Fact No. 124 held that "Mr. Davis' writ hearing testimony that he never met with Mr. Ray and Mr. Moore is not credible."  Again, Mr. Davis newer so testified, he said that he was never contacted *by them to testify*.

Subsequent Finding of Fact No. 126 is also flawed.  It held that "Mr. Ray and Mr. Moore were concerned that the State was aware of the applicant's road rage incident."  First, it was not a road rage incident, at least on the part of Petitioner and Mr. Davis.  Second, there was simple way to avoid any harmful testimony: simply ask each prospective witness if they knew about it.  Any "concerns" about the State finding out about the so-called road rage were certainly bogus and an after-the-fact pretext for the trial attorneys' failure to present mitigating evidence as to future dangerousness, as shown herein.  Subsequent Finding of Fact No. 127 has the same defect.

 Subsequent Finding of Fact No. 130 encapsulates this issue: "Mr. Ray and Mr. Moore's decision to limit their examination of the defense punishment witnesses was...rather a reasonable tactical decision given the applicant's past violent behavior."  This cannot bear reasonable scrutiny against the arrest-free behavior of a 38-year old successful businessman.  Even if the "road rage" incident was as the defense attorneys depicted it, and even if some of the defense witnesses had known of it, this cannot reasonably be called a history of "violent behavior."

Subsequent Findings of Fact Nos. 134 through 138 relate to the "memorandum of understanding" that Mr. Ray drew up.  There is no other logical explanation for this memorandum than that it was intended to undercut any future claims of ineffective assistance of counsel that Mr. Barbee might bring against the trial attorneys.  Yet the Subsequent Findings of Fact state in conclusory manner that it "was not a conflict of interest" and Mr. Ray's use of the memorandum to "defend himself" was not a conflict of interest. (Subsequent Findings of Fact Nos. 137 and 138.) The fact that the trial attorneys felt they needed to prepare this memorandum is in itself proof of a conflict of interest. These Subsequent Findings of Fact are all unreasonable determinations of the facts under 2254(d)(2).

Subsequent Finding of Fact No. 139 is essentially a selective summary (some of it misleading) of some of the guilt phase trial testimony that purports to "undercut[] any additional potential evidence or theory which Mr. Ray and Mr. Moore could have presented to the jury." This too is illogical.  Mitigating evidence is not "undercut" even if the prosecution's guilt phase case is very strong.  This has been discussed *supra.* The finding flies in the face of *Williams, Wiggins* and *Rompilla*, *supra*, where despite much more aggravating evidence than Mr. Barbee's arrest-free past and less omitted mitigating evidence, ineffective assistance of counsel was found.   *See, e.g, Williams* 120 S. Ct. at 1500; *Rompilla,*  125 S. Ct. at 2460 and 2462; and *Wiggins* (trial counsel's punishment-phase strategy not owed the deference usually accorded trial strategy, because it was not the product of a professionally reasonable investigation into other potential mitigation themes). The Supreme Court in these cases has repeatedly rejected the notion that even an extremely aggravating guilt phase presentation absolves the trial attorneys of their obligation to present mitigating evidence at the punishment phase.

The same flaw is seen in Subsequent Finding of Fact No. 140, which holds that "[t]he following guilt/innocence phase evidence undercuts any additional potential evidence or theory which Mr. Ray and Mr. Moore could have presented to the jury."

Subsequent Findings of Fact Nos. 141 through 153 are all conclusory statements, most of which are not supported by the facts as developed at the hearing and in Petitioner's writ, as shown herein.

Subsequent Finding of Fact No. 140 presents an egregiously slanted and unreasonable view of the very sparse aggravating evidence in the case. Subsequent Finding of Fact No. 140(a) is particularly inaccurate. Stephen allegedly assaulted his wife Theresa twice in the course of the marriage. (25 RR 34.) Regarding alleged fights when Mr. Barbee was married to Theresa, the actual testimony was that the first fight occurred when they were living in an apartment in Forth Worth, and the next one was when they lived in a metal building they had bought for the company (25 RR 34-36) and Theresa did not have any injuries from either one. (*Id.*) The next "fight" involved Mr. Barbee knocking something off the wall and it accidentally hit Theresa. (25 RR 40.) She had a concussion (25 RR 43) and Stephen later showed up at the hospital. (25 RR 44.)[145] The next fight was in 2002 when Theresa admitted she egged him on and Stephen hit her in the arm. (25 RR 45.) She suffered a bruise. (25 RR 45.) Another incident was recalled from 2003 when Theresa was the aggressor and she hit Stephen at a party, at which point he left her for good. (25 RR 47-48.)

---

[145]   The witness also testified about Stephen once joking about throwing her through the wood chipper and on July 4, 2003, when he said it, she thought he was serious. (25 RR 64-65.) But at the grand jury hearing, Theresa had earlier testified that she did not think Stephen was serious when he said this at the July 4th party. (25 RR 65-67.)

He did not move back to the house.  (25 RR 48, 68.)[146]   All told, they had 3 or 4 fights.  (25 RR 67-68.)  This evidence hardly "under cuts any additional potential evidence or theory which Mr. Ray or Mr. Moore could have presented to the jury."  Subsequent Finding of Fact No. 140a.  Subsequent Finding of Fact No. 140c actually highlights the paucity of aggravating evidence, as the State had to rely on an incident when a witness "rejected a personal relationship with the applicant [and] he had an outburst and began cursing her."

These initial and subsequent factual determinations and findings are both unreasonable and not supported in fact in that the failure to present mitigating evidence depends heavily on the false statement attributed to Tim Davis, as shown *supra*.  They also make no sense as there was no reason to believe that there were other undiscovered violent instances in Mr. Barbee's past or that the questioning of the many mitigating witnesses listed herein would have somehow led to that result. Equally importantly, almost all of these potential witnesses, and even those witnesses who did testify (Exhibits 21-33) state that either the attorneys never talked to them or else talked to them only superficially. This cannot be "strategy."  *See, e.g.,  Lewis v. Dretke*, 355 F.3d 364 (5th Cir. 2003)( penalty phase relief granted for failure to conduct an adequate penalty phase investigation. A "mere modicum of evidence" was held insufficient to support the district court's conclusion that counsel's very limited presentation of Lewis' childhood abuse was reasonable.  To assess counsel's performance in preparing for the sentencing phase of trial, the proper focus is not whether counsel should have presented a mitigation case, but "whether the investigation supporting counsel's decision not to introduce mitigation evidence … *was itself reasonable*."  (citing *Wiggins v. Smith*, 539 U.S. 510 (2003) (emphasis in original)).  "It is axiomatic – particularly since *Wiggins* – that [a

---

[146]   The house in question was 4000 square feet with a movie room and a pool.  (25 RR 63.)  Stephen's mother helped them pay for it.  (25 RR 63.)

decision not to present mitigating evidence] cannot be credited as calculated tactics or strategy unless it is grounded in sufficient facts, resulting in turn from an investigation that is at least adequate for that purpose.")

The state court conclusions of law were also unreasonable as they were based on these faulty findings of fact.   The state habeas court and the CCA found these actions to be "strategic." (Conclusions of Law Nos. 30, 31, 32, Exhibit 14 at 22.)   This was erroneous and unreasonable because the decisions were based on a less than thorough investigation.   Other conclusions were similarly unreasonable, for instance conclusion 28 ("It is not deficient strategy for an attorney to decline to call witnesses who would testify to some mitigating fact, but be subject to cross-examination over a vast array of aggravating facts." (*Id.* at 22.)   No such evidence of a "vast array of aggravating facts" exists here.

### ii.  The state court holding was also an unreasonable application of clearly established federal law under 2254(d)(1).

The state court holdings were also an unreasonable application of clearly established federal law under 2254(d)(1).   The *Strickland* standard was unreasonably interpreted and applied.   The supreme Court has held that even a general standard such as *Strickland* can be applied in an unreasonable manner.  *Panetti v. Quarterman,* 551 U.S. 930, 953 (2007).   Additionally, 'AEDPA does not 'require state and federal courts to wait for some nearly identical pattern before a legal rule must be applied.'" *Panetti* at 953, *quoting Carey v. Musladin,* 549 U.S. 70, 81 (2006)(Kennedy, J., concurring in judgment).   Nor does AEDPA prohibit a federal court from finding an application of a principle unreasonable when it involves a set of facts 'different from those of the case in which the principle was announced." *Locker v, Andrade,* 538 U.S. 63, 76 (2003).

**C. Exhaustion and cause and prejudice.**

Respondent has previously conceded that this claim was brought in the initial round of state court proceedings but argued that it has no merit.  (Docket No. 40, RA at 41-51.)   All evidence in support of this claim was brought before the state court either in the initial and/or the subsequent habeas proceedings, extensive testimony was heard at the evidentiary hearing regarding this claim, and the state court issued and adopted extensive findings and conclusions as well as extensive subsequent findings and conclusions as to this claim.  Hence, as it was completely presented in both rounds of state habeas proceedings, it is exhausted and not subject to procedural default.

Even if it were not exhausted, any procedural default of this claim, for failure to raise it in his initial state habeas petition, or raise it fully or adequately, is excused under the *Martinez/Trevino* exception discussed *supra,* which provides "cause" for failure to raise it adequately in his first state habeas application.  The prejudice component is discussed in the statement of facts pertaining to this claim.

**Claim Five (d)**: Ineffective assistance of counsel for failure to present mitigating evidence of Petitioner's head injury and hydrocodone use.**

**A. Facts in support.**

**i) Hydrocodone use.**

The basic facts of Mr. Barbee's hydrocodone use are not in dispute.  As Mr. Barbee explains in his own affidavit:

> The next morning, Monday, I was once again contacted by the police.  I agreed to meet them at the Wal-Mart at 6:30 p.m.  My headache had still not gone away.  I took three more hydrocodone in addition to 3-4 generic ibuprophen.

(Exhibit 20 at 13-14.)

Ms. Amanda Maxwell brought this to the attention of the trial attorneys:

As a result of this most recent injury [the head injury] Mr. Barbee was ingesting a number of medications, one of which was hydrocodone prescribed for his wife Trish...
On November 2, 2005 the defense team met to discuss strategy...Prior to this date I had requested that a neuropsychological examination be conducted on Stephen due to his multiple head injuries, because I felt that any brain damage would constitute significant mitigating evidence in the event Mr. Barbee's case went to a punishment hearing.  At the time I made this request I also requested an evaluation be done to address the potential effects of Stephen's hydrocodone abuse after his most recent head injury.  I had found through research that hydrocodone is contraindicated in head injuries.  I was also concerned about Stephen's report that the hydrocodone made him itch and kept him awake at night.  I did not receive any response from either of the attorneys to any of my requests.
(Exhibit 16, Statement of Amanda Maxwell at 3.)

This claim was brought on state habeas as part of Claim 3.  (Exhibit 10, at 23-25)

**ii) Head injury.**

Here too, the basic facts are not in dispute that Mr. Barbee suffered a severe head injury a

few weeks before the murders and had other severe head injuries earlier in life.  During the state

habeas proceedings, Mr. Barbee was evaluated by Dr. Stephen Martin, who found that

2....Mr. Barbee's medical history included several prior head injuries including: a. A fall from a window sill as an infant resulted in an impact to the back of his head and a 'huge goose egg." B. Shortly after obtaining his driver's license, Mr. Barbee was not wearing his seatbelt when he was involved in a motor vehicle accident (MVA) in which his head cracked the windshield.  He received medical attention at a local hospital and was diagnosed with cervical strain. C. Another MVA occurred at age 18 involving a head-on collision with another car traveling approximately 50-60 miles per hour.  Mr. Barbee was unrestrained, and impacted the steering wheel while shattering his nose.  He was unconscious for an unclear duration, and was transported via ambulance to Azle hospital where he suffered a seizure.  It was also reported that he was bleeding profusely from the nose, chin, and between his eyes. Mr. Barbee was then transported via helicopter to Harris Methodist where he remained for four days, and subsequently underwent several plastic surgeries to repair his nose and chin.   d.  In approximately January 2005, a 400 pound lead pipe was dropped on Mr. Barbee's head while on a work site.  The impact split his hard hat and resulted in loss of consciousness for an undetermined amount of time.  He was treated at Parkland Hospital and released.  The frequency and intensity of his migraine headaches increased after this injury...
22.       It is my understanding that at the time of trial, Mr. Barbee's trial attorney was aware

-327-

of his history of head trauma and was encouraged by his mitigation expert to pursue neuropsychological testing. Nevertheless, this testing was not performed. It is my opinion that his trial attorney should have requested a neuropsychological evaluation, particularly given his knowledge that Mr. Barbee had, in fact, suffered head trauma a few weeks prior to the offense. Further, an expert with the same or comparable experience and training such as I could have given testimony substantially the same as outlined in my affidavit above at the guilt/innocence phase of the trial to challenge the legal elements of his knowing and intentionality. It is my opinion that had this evidence been adequately investigated, developed and presented by trial counsel in the guilt/innocence phase, the verdict may have been different.

23.      Finally, it is my opinion that this clinical information had mitigating significance and Mr. Barbee's trial attorney was ineffective in failing to present it. As a result, the jury could not have appreciated and given effect to the mitigating significance of this evidence in making a life/death decision.

(Exhibit 17, Statement of Dr. Stephen Martin.)


Amanda Maxwell had been hired by the trial attorneys to discover and develop mitigating

evidence. (Exhibit 16, Statement of Amanda Maxwell at 2.) Ms. Maxwell found the following

information about Mr. Barbee's head injuries:

> As a part of my mitigation investigation I obtained all of Mr. Barbee's medical and school records. Mr. Barbee's medical records showed a history of head injuries of various types which began at a young age and culminated with Mr. Barbee being hospitalized a month before the alleged offense after having a 400 pound pipe dropped on his had by Ronald Dodd, one of Mr. Barbee's employees and the boyfriend of his ex-wife...
>
> Prior to this date I had requested that a neuropsychological examination be conducted on Stephen due to his multiple head injuries, because I felt that any brain damage would constitute significant mitigating evidence in the event Mr. Barbee's case went to a punishment hearing...
>
> I did not receive any response from either of the attorneys to any of my requests.
>
> (Exhibit 16 at 3.)


**B.  The State courts erred in denying this claim and their holding is based on an unreasonable determination of the facts and an unreasonable application of clearly established federal law.**

The trial attorneys attempted to justify their non-presentation of this evidence as follows:

> Applicant would have had a much better presentation if Applicant had taken some responsibility for his actions. The entire theory of head injury and mental illness, combined

with hydrocodone abuse, in our opinion, only serves to diminish any mitigation if there is no acceptance of responsibility.
(Exhibit 37, Joint Affidavit of Trial Attorneys at 6.)

As discussed *supra,* this is nonsensical.

The State court holding regarding this claim basically rubber-stamped this statement in the

following factual findings (by number):

78.  Mr. Ray and Mr. Moore made the tactical decision not to offer head injury evidence because it only served to diminish mitigation absent any acceptance of responsibility for the murders of Lisa and Jayden Underwood as a 'head injury' explanation is factually inconsistent with a 'no involvement' defense. *See* Mr. Ray and Mr. Moore's Affidavit, page 6. (Exhibit 37.)

79.  In preparing her mitigation report, Ms. Maxwell learned that the applicant had a history of head injuries, including a four-hundred pound pipe being dropped on his head by Ron Dodd about one month before the Underwood murders.  (*See* Ms. Maxwell's Report, page3. (Exhibit 16.)

80.  Ms. Maxwell brought this information to the attention of Mr. Ray and Mr. Moore. *See* Mr. Ray and Mr. Moore's Affidavit, page 6. (Exhibit 37.)

81.  Mr. Ray and Mr. Moore discussed the head injury information. *See* Mr. Ray and Mr. Moore's Affidavit, page 6. (Exhibit 37.)

82.  Mr. Ray and Mr. Moore concluded that a 'head injury' explanation would necessitate the applicant accepting responsibility and admitting guilt, which the applicant was unwilling to do.  *See* Mr. Ray and Mr. Moore's Affidavit, page 6. (Exhibit 37.) ...

87.  Mr. Ray and Mr. Moore's decision not to use a 'head injury' explanation for the applicant's murderous conduct was a valid strategic choice based on reasonable investigation given the applicant's lack of significant symptoms and his unwillingness to accept responsibility.

88.  Mr. Ray and Mr. Moore made the tactical decision not to offer hydrocodone use evidence because it only served to diminish mitigation absent any acceptance of responsibility for the murders of Lisa and Jayden Underwood as a 'hydrocodone use' explanation is factually inconsistent with a 'no involvement' defense. *See* Mr. Ray and Mr. Moore's Affidavit , page 6.

89.  In her mitigation investigation, Ms. Maxwell learned that the applicant had been ingesting numerous medications, including hydrocodone, which had been prescribed to his wife, Trish Barbee.  *See* Ms. Maxwell's Report, page 3.

90.  Ms. Maxwell brought this information to the attention of Mr. Ray and Mr. Moore.  *See* Mr. Ray and Mr. Moore's Affidavit, page 6.

91.  Mr. Ray and Mr. Moore discussed the hyrdocodone information.  *See* Mr. Ray and Mr. Moore's Affidavit, page 6.

92.  Mr. Ray and Mr. Moore concluded that a hydrocodone abuse explanation would also necessitate the applicant accepting responsibility and admitting guilt, which the applicant was unwilling to do.  *See* Mr. Ray and Mr. Moore's Affidavit, page 6. (Exhibit 14 at 11-13.)

Under 2254(d)(2), these findings, with the possible exceptions of 80-81 and 89-91,  are unreasonable determinations of the facts.  In uncritically copying verbatim the trial attorney's affidavit, the prosecutor and the State habeas court led the CCA astray.

The state court findings are also unreasonable applications of clearly established federal law under 2254(d)(1).  The conclusions of law as to this claim were similarly flawed as they repeated verbatim the findings of fact:

37. Mr. Ray and Mr. Moore's decision not to use a 'head injury' explanation for the applicant's murderous conduct was a valid strategic choice based on reasonable investigation given his lack of significant symptoms and his unwillingness to accept responsibility.
38. Mr. Ray and Mr. Moore provided the applicant with adequate counsel regarding the decision not to present a 'head injury' explanation for his murderous conduct.
39. Mr. Ray and Mr. Moore's decision not to use a 'hydrocodone abuse' explanation for the applicant's murderous conduct was a valis strategic choice based on a reasonable investigation given his lack of significant symptoms and his unwillingness to accept responsibility.
40. Mr. Ray and Mr. Moore provided the applicant with adequate counsel regarding the decision not to present a 'hydrocodone abuse' explanation for his murderous conduct.
(Exhibit 14 at 23.)

Additional findings were made in the subsequent habeas proceedings. Subsequent Finding of Fact No. 108 is illogical.  It held that "Mr. Ray and Mr. Moore's decision not to offer head injury evidence was not a decision adverse to the applicant's interests, but rather a reasonable tactical decision given the applicant's lack of significant symptoms and his unwillingness to accept responsibility for the murders..."  As discussed *supra,* innocent people can also have head injuries,

and the head injury evidence was not in any way dependent or diminished by a claim of actual innocence. And there were significant symptoms, including severe headaches. Subsequent Finding of Fact No. 110 offers the same illogical rationale for not presenting the evidence of hydrocodone use. It too was not dependent or tied to an "acceptance of responsibility" for the murders as the state courts held when they adopted this finding.

As these conclusions were also based on the errors discussed above, they were an unreasonable application of clearly established federal law (the *Williams, Wiggins, Rompilla* standard discussed *infra*).

### C. Exhaustion and procedural default.

Respondent has previously conceded that this claim is exhausted and was brought in the initial round of state habeas proceedings. Docket No. 40, RA at 17. It was brought before the state courts in the initial habeas petition and hence it is not subject to procedural default.

### Claim Five(e): Ineffective assistance for failure to present evidence of Petitioner's low intelligence.

### A. Facts in Support.

Mental retardation and sub-average intellectual functioning have been widely recognized as mitigating evidence. In *Atkins v. Virginia*, 536 U.S. 304 (2002), the United States Supreme Court declared that the Eighth Amendment's ban on excessive and cruel and unusual punishments prohibited the execution of individuals with mental retardation.[147] The decision in *Atkins* relies upon

---

[147]   *Atkins* specifically overruled the Supreme Court's contrary decision in *Penry v. Lynaugh*, 492 U.S. 302 (1989) (*Penry I*)

three related rationales: The empirically established consensus against executing the mentally retarded; the Court's independent determination that retaining the death penalty for the mentally retarded would not further any interest in retribution or deterrence; and the fact that the nature of the impairment of mental retardation leads to an unacceptable risk of wrongful executions.   All three of these rationales apply equally to persons such as Mr. Barbee.  Even if Mr. Barbee does not meet the traditional criteria for mental retardation, his sub-average functioning would have been seen as having mitigating value, as it was a disability that he suffers through no fault of his own.

Had Jackie Barbee been properly prepared and presented to the jury, she would have been able to tell the jury about Stephen's difficulty in school with reading comprehension; that he was consistently in the bottom 20% of his classes; that he had been assigned to a classroom where students needed extra help; that he struggled throughout his academic career, mainly with reading comprehension and conduct problems; that he had to attempt his GED three times before passing it.  (Exhibit 19,  Declaration of Jackie Barbee).  Had Mr. Barbee been tested and had the attorneys presented this at trial, his jury would have learned that he has a verbal IQ of 87 (low average), a performance IQ of 99 (average) and a full scale IQ of 91 (average).  (Exhibit 17, Statement of Dr. Stephen Martin, at 3.)   However, on other tests he scored lower, such as the Wide Range Achievement Test-3, he scored in the 13th percentile on the reading segment, the 16th percentile on the spelling component, and the 27th percentile on the arithmetic segment.  (*Id.* at 4.)  Even though Petitioner had not met the *Atkins* standard, this would have been significant mitigating evidence.

### B.  Argument.

The legal argument as to this sub-claim overlaps with the prior sub-claim (Five (d)) and the next sub-claim (Five(f)) and those arguments are incorporated herein by reference.

### C. Exhaustion and procedural default.

This claim was presented in the initial state habeas petition as part of Claim 3 and hence it is exhausted and not defaulted.   Even if it were not, any procedural default of this claim, for failure to adequately raise it in his initial state habeas petition,  or raise it adequately, is excused under the *Martinez/Trevino* exception discussed *supra,* which provides "cause" for failure to raise it adequately in his first state habeas application.   The prejudice component is discussed in the statement of facts pertaining to this claim.

### Claim Five(f): Ineffective assistance of counsel for failure to present medical evidence of frontal lobe impairment, brain impairment and neuropsychiatric evidence.

### A. Facts in Support.

At trial, Petitioner's attorneys presented no expert medical testimony regarding the effect of Mr. Barbee's head injury just a month before trial, his prior head injuries, or expert opinion regarding his frontal lobe injuries and impairment.   Attached to this petition as <u>Exhibit 17</u> is the statement of Dr. Stephen K. Martin, Ph.D, a licensed clinical neuropsychiatrist.   Dr. Martin conducted extensive neuropsychiatric testing on Mr. Barbee and discovered that his known history of head injuries caused damage to the frontal lobes of Mr. Barbee's brain and that "Mr. Barbee's brain-related impairment appears to be long-standing in nature, and would have been present at the time of the offense.  (<u>Exhibit 17</u> at 7.)

Dr. Martin found that:

3.      Neuropsychological testing has been demonstrated to reliably document the presence of brain-related impairment and other forms of brain injury.  A neuropsychological examination consists of various standardized tests which have the ability to measure a variety of cognitive abilities which include: intelligence, academic skills, attention, verbal and visual processing, decision-making, memory, language, visual-spatial skills, sensory

functions, and motor functions. Such tests are customarily used in the evaluation of an individual's neuropsychological functioning and are accepted by the scientific community as reliable tools in the evaluation and treatment of brain impairment. I am licensed to administer such neuropsychological tests and have done so hundreds of times.

4. I evaluated Mr. Barbee at the Allen B. Polunsky Unit in Livingston, TX on June 14, 2007. During my examination of Mr. Barbee, I administered various standard and customary neuropsychological tests. The tests that were administered are as follows: Wechsler Adult Intelligence Scale (WAIS-3); Wechsler Memory Scale (WMS); Halstead Reitan Neuropsychological Test Battery; Wide Range Achievement Test (WRAT-3); Lateral Dominance Exam; Grip Strength; Aphasia Screening Exam; Wisconsin Card Sorting Test (WCST); Paced Auditory Serial Addition Test (PASAT); Stroop Neuropsychological Screening Test; Controlled Oral Word Association (COWA); Sensory Perceptual Exam; Trail Making Test A&B; California Verbal Learning Test (CVLT-2); Rey-O Complex Figure; Clock Drawing; Grooved Pegboard; Test of Memory Malingering (TOMM); Rey-15 Item Test.

5. Mr. Barbee was quite cooperative throughout the testing session. He demonstrated excellent effort at all times during the evaluation. In order to further evaluate his effort, he was given the Rey 15-Item Test and TOMM which are malingering inventories. Mr. Barbee's scores, 15/15 on the Rey-15 Item Test and 49/50 and 50/50, on the TOMM reflected excellent effort and was not indicative of malingering. As a result, this evaluation is considered to be a valid reflection of his cognitive abilities. Sections 6 - 16 of this affidavit include the results of this evaluation:

6. On the WAIS-3, he demonstrated a verbal IQ of 87 (low average), a performance IQ of 99 (average), for a full scale IQ of 91 (average). The age corrected subtest scores are presented below:

| **Verbal** | | **Performance** | |
|---|---|---|---|
| Vocabulary | 6 | Picture Completion | 11 |
| Similarity | 8 | Digit Symbol | 9 |
| Arithmetic | 7 | Block Design | 10 |
| Digit Span | 9 | Matrix Reasoning | 10 |
| Information | 9 | Picture Arrangement | 10 |
| Comprehension | 8 | | |

In terms of his verbal skills he demonstrated mildly impaired performance on a measure assessing knowledge of vocabulary words. He demonstrated low average skills on measures assessing verbal concept formation, general fund of knowledge and social comprehension. Average skills were noted on measures assessing simple and complex auditory attention. In terms of his performance skills he demonstrated average performance on measures assessing attention to detail, visual motor learning and motor persistence, visual perceptual reasoning and problem solving, abstraction and problem solving and visual sequencing.

7. On the Wide Range Achievement Test-3, he demonstrated the following grade

equivalents: Reading-High School, Spelling-8[th] grade and Arithmetic-8[th] grade. These are equivalent to the standard scores of 83 (13th percentile), 85 (16th percentile) and 91 (27th percentile), respectively. Mr. Barbee's reading skills (high school) and, to a lesser degree, spelling and math skills (7th grade) remain consistent with his educational level.

8.      On tests more sensitive to the biological integrity of the brain, the patient demonstrated a Halstead Impairment Index of 0.3 (30% of components test within the brain damage range). On the General Neuropsychological Deficit Scale, his score of 28 falls in the mildly impaired range.

9.      In terms of his auditory attention, he demonstrated mildly impaired performance while attending to slowly paced auditory information and low average skills while attending to more rapidly paced auditory information. On a complex auditory attention task requiring Mr. Barbee to rapidly add a sequence of numbers, he demonstrated variable scores that overall suggested a mild degree of impairment. He demonstrated average simple visual attention and tracking skills. On a complex visual attention and tracking task requiring flexibility of thought and motor sequencing ability, he demonstrated low average performance. He demonstrated mildly impaired skills on another visual attention task requiring rapid visual sequencing and processing and the ability to rapidly shift cognitive sets.

10.     On other complex cognitive measures, he demonstrated average performance on a semi structured task requiring flexibility of thought, ability to shift cognitive sets and problem solving ability. However, he also demonstrated a single "failure to maintain set error" suggesting some disruption with sustained problem solving skills. On another measure assessing abstraction ability and logical analysis, he demonstrated average skills. On this test, he was required to "figure out" the underlying principle to use in a problem solving situation. Finally, on a complex psychomotor problem solving task (placing blocks in a form board while blindfolded), he demonstrated average skills.

11.     On a brief aphasia screening exam, he demonstrated evidence of dysnomia. He also demonstrated severely impaired verbal fluency skills on a measure requiring him to generate as many words as possible beginning with a specific letter.       12.     The patient did not demonstrate clear evidence of constructional dyspraxia upon examination. He performed adequately on a clock drawing task. Average performance was noted on a WAIS-3 measure requiring visual spatial and visual motor integration skills. He demonstrated average skills on a psychomotor problem solving task that has a strong spatial component.

13.     In terms of his ability to incidentally learn information that he did not specifically set out to learn, he demonstrated above average skills with simple information and average skills with complex information.

14.     In terms of his verbal memory, he demonstrated high average immediate (SS=12) and mildly impaired 30 minute delayed recall (SS=5) for simple, paragraph length material. On a less structured list learning task, he demonstrated average memory storage as he was able to learn fourteen of sixteen words after five trials. He did not benefit a great deal from verbal cuing and his recognition memory was in the average range.

15.     In terms of his visual memory, he demonstrated high average immediate (SS=13) and very superior 30 minute delayed recall (SS=16) for simple visual information. On a more

complex visual memory measure, he demonstrated mildly impaired performance while reconstructing a complex geometrical design. However, his immediate and 30 minute delayed recall fell within the average to above average ranges. His recognition of specific details of the design and the overall gestalt of the design was within normal limits.

16. A mild degree of impairment was noted involving simple motor abilities. In particular, his right hand was noted to be somewhat slower and weaker than expected in comparison to his left hand on each of these measures. On the specific measures, his bilateral finger tapping speed appeared average, his grip strength scores were moderately impaired, and his fine motor dexterity scores fell in the average – low average ranges. He did not demonstrate any simple sensory errors in the tactile, auditory or visual modalities, nor did he demonstrate any finger agnosia errors. He demonstrated two right sided finger tip number writing errors. His tactile form recognition performance was within normal limits. He did not demonstrate any visual field cuts upon gross visual field examination.

17. Results of this neuropsychological evaluation reflect a subtle to mild degree of diffuse neuropsychological impairment along with subtle bilateral hemisphere dysfunction. General impairment was noted on measures assessing recognition of simple auditory information, mental flexibility and cognitive shifting, as well as complex auditory attention. Left hemisphere dysfunction was noted to involve word finding and verbal fluency, mildly impaired delayed verbal recall of contextual information, and mild sensory-motor impairment. Cognitive abilities associate with the right hemisphere were largely intact with the exception of left sided psychomotor problem solving issues. Mr. Barbee's intellectual skills are falling in the average to low average ranges including his verbal IQ (VIQ = 87) and performance IQ (PIQ = 99). From an academic standpoint, his basic abilities appear relatively intact although his spelling and math skills represent areas of relative academic weakness. Other areas of cognition that fell generally within normal limits included basic visual tracking skills, simple problem solving, abstraction skills, psychomotor problem solving, incidental memory, visual-spatial skills, simple and complex sensory abilities, verbal recall for non-contextual information, as well as visual recall for simple and complex information.

(Exhibit 17, Statement of Dr. Stephen Martin.)

Dr. Martin concluded that:

The areas of impairment on this profile appear to reflect primarily frontal lobe-mediated abilities including simple motor and psychomotor skills, word finding and verbal fluency, mental flexibility, cognitive processing speed, as well as aspects of auditory attention particularly for rapidly-paced information. There were also some indications of mild verbal memory dysfunction. From an etiological standpoint, this pattern of impairment would be consistent with long-term residual effects from a concussion(s). There are no indications that psychiatric factors contributed towards this profile, and Mr. Barbee is not taking any medications that could have negatively affected his performance.

Mr. Berbee's brain-related impairment appears to be long-standing in nature, and would have been present at the time of the alleged offense. As previously noted, the most significant impairment currently being reported involves frontal lobe-mediated abilities....

When the behavioral effects of his frontal lobe impairment are considered, a broader

and more accurate explanation for why Mr. Barbee could have engaged in a violent crime emerges. As previously described, the brain's "frontal lobes' tend to directly moderate how we react to emotionally charged situations. Individuals that have damage to the frontal lobes are at greater risk to engage in impulsive and potentially violent behavior without fully considering the consequences.

Based upon this information, it is my opinion that Mr. Barbee's violent actions at the time of the offense would have been mediated by emotional factors as opposed to reason due to the aforementioned damage to his frontal lobes. The negative effects of damaged frontal lobes would have likely increased his impulsivity tendencies and reduced his ability to fully consider the consequences of his actions.

It is my understanding that at the time of the trial, Mr. Barbee's trial attorney was aware of his history of head trauma and was encouraged by his mitigation expert to pursue neuropsychological testing. Nevertheless, this testing was not performed. It is my opinion that his trial attorney should have requested a neuropsychological evalaution, particularly given his knowledge that Mr. Barbee had, in fact, suffered head trauma a few weeks prior to the offense. Further, an expert with the same or comparable experience and training such as I could have given testimony substantially the same as outlined in my affidavit above at the guilt/innocence phase of the trial to challenge the legal elements of his knowing and intentionality. It is my opinion that had this evidence been adequately investigated, developed and presented by trial counsel in the guilt/innocence phase, the verdict may have been different.

Finally, it is my opinion that this clinical information had mitigating significance and Mr. Barbee's trial attorney was ineffective in failing to present it. As a result, the jury could not have appreciated and given effect to the mitigating significance of this evidence in making a life/death decision.
(Exhibit 17 at 7-8.)

Mitigation expert Amanda Maxwell was hired by the trial attorneys to obtain mitigation evidence. She obtained extensive mental, physical health, educational, employment and family and social history records of Mr. Barbee. (Exhibit 16, Statement of Amanda Maxwell, at 3.) Ms. Maxwell also found that there was significant mitigating evidence regarding these factors and brought them to the attention of trial counsel. (Exhibit 16 at 2-5.)

**B.  The state court erred in denying this claim and its holding was an unreasonable determination of the facts and an unreasonable application of clearly established federal law.**

This claim was brought in the initial state habeas proceedings. (Exhibit 11 at 10-11, 23-24, Claim 3.) The state habeas court and the CCA, in rubber-stamping the State's findings, were based on the controverting conclusions of Dr. Price, which they submitted as an appendix to their proposed findings and conclusions.  (Exhibit 14 at 12.)  Thus, the state court's holding that there were no controverted factual issues (Exhibit 15) is erroneous on its face.   The state court also erred when it found that "Mr. Ray and Mr. Moore's decision not to use a 'head injury' explanation for the appellant's murderous conduct was a valid strategic choice based on reasonable investigation given the applicant's lack of significant symptoms and his unwillingness to accept responsibility." (Exhibit 14 at 12.)  However, the record shows that no neuropsychiatric testing was ever done, despite Ms. Maxwell's recommendation, so this failure cannot be seen as "strategic."  The attorneys did not know what mitigating value the impairment had or did not have because they did not investigate it. This cannot be seen as "strategic."  Therefore, the underlying conclusion of law, that  this failure was "strategic" and based on "reasonable investigation" and that the attorneys provided Petition with "reasonable counsel" was also erroneous. (Exhibit 14 at 23, Conclusions of Law Nos. 35-38.)

 Subsequent Finding of Fact No. 108 is completely illogical.  It held that "Mr. Ray and Mr. Moore's decision not to offer head injury evidence was not a decision adverse to the applicant's interests, but rather a reasonable tactical decision given the applicant's lack of significant symptoms and his unwillingness to accept responsibility for the murders..."  As discussed *supra,* innocent people can also have head injuries, and the head injury evidence was not in any way dependent or diminished by a claim of actual innocence. And there were significant symptoms, including severe

headaches.  Subsequent Finding of Fact No. 110 offers the same illogical rationale for not presenting the evidence of hydrocodone use.   It too was not dependent or tied to an "acceptance of responsibility" for the murders as the state courts held when they adopted this finding.

The state court conclusions of law were also an unreasonable application of clearly established federal law, as discussed in the argument section at the end of this claim.

### C. Exhaustion.

This claim is exhausted as it was brought in the initial round of habeas proceedings and, as discussed *supra,* the state courts issued and adopted extensive findings of fact and conclusions of law regarding this claim.   Respondent has previously conceded that the claim is exhausted and devoted a large part of the Answer to this claim.   Docket No. 40, RA at 57-75.   It was also brought in the subsequent round of state habeas proceedings, and subsequent findings and conclusions were issued.

Even if it were not exhausted, any procedural default of this claim, for failure to adequately raise it in his initial state habeas petition,   or raise it adequately, is excused under the *Martinez/Trevino* exception discussed *supra,* which provides "cause" for failure to raise it adequately in his first state habeas application.   The prejudice component is discussed in the statement of facts pertaining to this claim.

**CLAIM SIX: DUE TO PERVASIVE AND EXTREMELY PREJUDICIAL PRE-TRIAL AND TRIAL PUBLICITY, MR. BARBEE'S TRIAL WAS CONDUCTED IN AN ATMOSPHERE THAT RENDERED IT INHERENTLY UNFAIR.**

Mr. Barbee's conviction and sentence are invalid because he was deprived of his constitutional right to effective assistance of counsel, due process of law, equal protection of the laws, cross-examination and confrontation, and a reliable sentence due to the fact that his trial was conducted in an inherently unfair venue.   U.S. Const. Art. VI, Amends. V, VI, VIII, XIV; International Covenant on Civil and Political Rights, Art. XIV and comparable provisions of the Texas Constitution.

Due to extensive media coverage of the events surrounding the murders, Mr. Barbee's trial was conducted in an atmosphere calculated to deprive him of any chance of fairness, due to the extensive exposure of the jurors to that publicity. The pre-trial and trial coverage of the murders was both inflammatory and prejudicial, and could only have had the effect of depriving Petitioner of due process of law.

**A. Facts in Support of Claim.**

**i) Juror knowledge of the case and exposure to pre-trial publicity.**

Many jurors had heard of this case because of the extensive pre-trial publicity, such as juror Denise Anderson who actually sat on Petitioner's jury.  (*See* Claim Nine, *infra*.)

**ii) The newspaper coverage.**

The news coverage of the events leading up to Mr. Barbee's 2006 trial was pervasive and prejudicial.  A fair trial was impossible in Tarrant County. Due to the large number of prominent stories on the case, the coverage of the Forth Worth Star-Telegram  was undoubtedly the main source of the jurors' knowledge of the case.  This paper, according to the Audit Bureau of

Circulation (compiled by BurrellesLuce), in 2005 had a circulation of 237,554 on weekdays and a Sunday circulation of 333,933.[148]  In 2006, the circulation was 219,715 on weekdays and 321,322 on Sundays, also according to the Audit Bureau of Circulation figures quoted by the owners.  In 2000, Tarrant County had a total of 533,864 households, and in 2009 it had 691,604 "housing units" which indicated that the paper was received by about 43 per cent of the households in the county.[149]

  Due to the notoriety of the charges and the case, the paper has given the  Underwood murder case extensive and prominent coverage.  In 2005, the year of the trial, there were  many articles featuring this case.

From the very initial stages of this case, there was massive publicity in Tarrant County that was extremely prejudicial to Mr. Barbee's chance of a fair trial and of an unbiased jury.  Because the publicity was much more localized and of interest to residents of Tarrant County, much or all of this prejudice could have been avoided had his attorneys filed a motion for change of venue.

On February 22, 2005, the Forth Worth Star-Telegram featured a story entitled "*Missing mom's vehicle found*."  (Exhibit 10.)[150]  The article gave details about the victims.

Also on February 22, 2005, the Forth Worth Star-Telegram featured a story entitled *"Bodies of missing woman, child found* ."  (Exhibit 10.)   That story mentioned that "Stephen Barbee, 37, who had romantically been involved with Underwood, was taken into custody in Tyler in East Texas..." (Exhibit 10.)

---

[148]    *See* Exhibit 42, circulation figures for Fort Worth Star-Telegram; Tarrant County population.

[149]    *See* Exhibit 42, U.S. Census Bureau Statistics for Tarrant County, at 2.

[150]    The articles in Exhibit 10 are arranged in chronological order, as they are discussed here.

The same day, an article appeared in the Fort Worth paper entitled "*Man charged with double homicide in Texas*." It stated that "Stephen Dale Barbee, 37, admitted arguing with Underwood over leaving his wife, according to court papers. Barbee allegedly said he suffocated Underwood, then did the same to the boy after he interrupted the attack. Court papers said Barbee was the father of Underwood's fetus... Barbee told investigators he put the bodies in the back of Underwood's sport utility vehicle and dug a shallow grave...Court papers also revealed that a sheriff's deputy briefly had Barbee in custody early Saturday when he stopped a suspicious man covered in mud. The man ran into the woods and escaped...Underwood and Barbee met about two years ago but split up last fall because Barbee had another girlfriend.... " (Exhibit 10.)

Also on Feb. 22, 2005, a long article appeared in the same paper entitled "*Police arrest suspect on murder warrant*. (Exhibit 10.) The article mentioned that Mr. Barbee had been arrested.

On February 23, 2006, a very long and detailed update to the previous's day's article appeared in the Fort Worth Star-Telegram by Melody McDonald and Deanna Boyd entitled "*Bodies of missing mom, child found near Justin; Woman's ex-boyfriend leads authorities to grave.*" (Exhibit 10.) The article started out with the statement that

> The bodies of a missing pregnant woman and her 7-year-old son were found Tuesday after the father of the unborn baby led authorities to their shallow grave off a rural road near Justin.
> Stephen D. Barbee, had told homicide detectives that he suffocated ex-girlfriend Lisa Underwood and Jayden, her son from another relationship, after arguing with her over his refusal to leave his wife. Barbee, who worked in the concrete and tree-clearing business, was arrested in Tyler on a capital murder warrant early Tuesday after making the admission. He was being held in the Mansfield Jail, with bail set at $2 million....
> After determining that Barbee was the father of Underwood's unborn child, police questioned him about the missing woman and her son. He told investigators that he was at his business partner's home at the time of their disappearance.
> On Monday night, Barbee's story changed.
> Fort Worth police officers had traveled to Tyler, near where Barbee had told police

 he would be clearing trees if they needed to talk to him again.
This time, Barbee admitted that he had killed the mother and son.

According to an arrest warrant, he told Detective Mike carroll that Ron Dodd, a friend and business associate, had dropped him off at Underwood's house late Friday.

Barbee told police that he and Underwood, who was seven months pregnant with his daughter, began to argue and that Underwood kicked him in the leg, Carroll wrote in the affidavit.

Barbee said he punched Underwood, 34, several times in the face, causing her nose to bleed, then held her down and suffocated her, the affidavit states.

At some point, Jayden ran into the room screaming, and Barbee used his hand to cover   the boy's mouth and nose until he was dead, according to the affidavit.

Barbee loaded the bodies into the back of Underwood's sport utility vehicle, drove to a deserted location in Denton County and buried them together, the affidavit states.

On Tuesday morning, Barbee was taken from Tyler to Fort Worth.  Later, sheckled and handcuffed, he led investigators to the grave.

Throughout the day, friends of the victims stopped by Boopa's Bagel Deli, which Underwood co-owned, to place memorials.  On Tuesday night, classmates and friends of Jayden gathered outside the deli for a candlelight vigil.

Brittany Bumgarner, a first-grader at North Riverside Elementary School, where Jayden was also a student, placed a card she made among the flowers, balloons and candles that were piled in front of the deli.
(Exhibit 10.)

The same long article gave Ron Dodd's version of the events; stated that Barbee had admitted he was the man who ran away from the law enforcement officer who stopped him near the site where the bodies were discovered; that Lisa and Stephen Barbee had been romantically involved; that a friend of Lisa's was struggling about how to tell her son that Jayden was dead; that Mr. Barbee had admitted killing Lisa and Jayden; and a long  time-line of "how it happened" taken from "an arrest warrant."  (Exhibit 10.)

On Feb. 23, 2005, another article appeared in the Fort Worth paper entitled *"Associate of suspect arrested on parole violation*."  It again stated that Mr. Barbee had admitted suffocating Lisa and Jayden. (Exhibit 10.)

The same day, another article appeared entitled "*Acquaintances views on suspect differ*."

The article stated that some was in disbelief on hearing of Mr. Barbee's arrest, but quoted a Tim Housman as saying that Mr. Barbee would set fires from his tree clippings and leave them unattended, and that "Barbee was not the most likeable of people."  Another acquaintance was quoted as saying that Mr. Barbee was "prone to drinking and in trouble with his wife because of his extramarital affairs...'he wanted to run around buy new cars.'" (Exhibit 10.)

Also on Feb. 23, 2005, the Fort Worth paper ran another long article entitled "*Authorities: Suspect tells police he suffocated woman, son*."  (Exhibit 10.)  That article detailed Mr. Barbee's alleged confession; falsely reported that he was the father of Lisa's unborn child; and gave extensive details on Mr. Barbee's alleged actions in both the murders and the concealment of the bodies. (Exhibit 10.)

Also that date, the paper ran an article entitled "*Memorials and flowers flow at bagel shop*," which contained details regarding the mourners at the victim's bagel shop, such as "Ian Korpi, 5, dropped off flowers for Underwood, stickers for Jayden and a pink stuffed bunny for the baby.  He didn't quite understand that they had been killed, his mother, Lara Korpi said." (Exhibit 10.)

On Feb. 24, 2005, the Fort Worth paper ran an article entitled "*Suspect's wife says he's not a murderer*."  (Exhibit 10.)   Although the article contained supportive statements from Trish Barbee, it also contained statement from the police disputing Trish's statements, including allegations that Lisa was blackmailing Mr. Barbee.

Also on Feb. 24, the same paper ran an article entitled "*Barbee transferred to county jail*" which stated that "[c]ourt documents state Barbee confessed to investigators that he suffocated Lisa Underwood and Jayden, her son from another relationship, after he and Underwood began arguing over his refusal to leave his wife." (Exhibit 10.)

On that date, another article appeared in the Fort Worth paper entitled *"Man jailed on parole violation*," relating Ron Dodd's version of the events.  (Exhibit 10.)

On Feb. 25, 2005, the Fort Worth paper carried an article entitled *"Capital murder charges filed*."  (Exhibit 10.)  The article indicated that "[a]ccording to investigators, Barbee, 37, confessed that he suffocated Underwood and Jayden after arguing with Underwood about his refusal to leave his wife.  He then buried the bodies in Denton County, police reported."

Also on that date, the same paper ran an article entitled "Company distances itself from Barbee."  (Exhibit 10.)  It detailed a company spokesman's "shock, sadness and dismay at the disgusting and despicable events that took place and resulted in the murder of three innocent individuals: Lisa Underwood, her unborn child, and Jayden Underwood."  It also included Ron Dadd's statement that "he was not involved."

On Feb. 26, 2005, the Fort Worth paper ran an article entitled "Friends remember slain mom, son" which mentioned the memorial services for the victims.

On Feb. 27, 2005, the same paper ran an article entitled "Paying respects" which stated "Stephen Barbee, who police say admitted suffocating the two, has been charged with capital murder." (Exhibit 10. )

The articles continued well after the first week, well into the beginning of the trial.

As a result of this pre-trial publicity, the notoriety of the case and the strong feelings that the re-trial engendered in the local community, the trial was conducted in an inherently prejudicial atmosphere.

**B. Legal Standard**

Pre-trial publicity, *see Sheppard v. Maxwell,* 384 U.S. 333 (1966), may make the trial

process inherently unfair and violate due process of law. "Where a petitioner adduces evidence of inflammatory, prejudicial pretrial publicity that so pervades or saturates the community as to render virtually impossible a fair trial by an impartial jury drawn from that community, prejudice is presumed and there is no further duty to establish bias." *Mayola v. Alabama,* 623 F.2d 992, 997 (5th Cir. 1980).

The due process clause of the Fourteenth Amendment guarantees the right of state criminal defendants to be tried by an impartial jury. The Fourteenth Amendment incorporates the essence of the Sixth amendment right to be tried "by a panel of impartial 'indifferent' jurors [whose] verdict must be based upon the evidence developed at the trial." *Irwin v. Dowd,* 366 U.S. 717 (1961). As Chief Justice Earl Warren noted in his concurrence in *Estes v. Texas,* 381 U.S. 532, 552 (1965) (Warren, C.J., concurring) due process requires the courts to safeguard against "the intrusion of factors into the trial process that tend to subvert its purpose." *Id.* at 560. Specifically, the courts must guard against 'the atmosphere in and around the courtroom [becoming] so hostile as to interfere with the trial process, even though...all the forms of trial conformed to the requirements of law..." *Id.* at 561; *Woods v. Dugger,* 923 F.2d 1454, 1456-57 (11th Cir. 1991).

As the leading case of *Sheppard v. Maxwell, supra,* observed, "legal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper." *Sheppard,* at 350, quoting *Bridges v. State of California,* 314 U.S. 252, 271 (1941). A defendant is entitled to a fair trial "in a public tribunal free of prejudice, passion, excitement, and tyrannical power." *Id.* There is the requirement that "the jury's verdict be based on evidence received in open court, not from outside sources", *Sheppard,* at 351, and the "prejudice from such material 'may indeed be greater' than when it is part of the prosecution's evidence 'for then it is not tempered by protective

procedures'" *Id.,* quoting *Marshall v. United States,* 360 U.S. 310, 313 (1959).  Juror statements "that [they] would not be influenced by the news articles, that [they] could decide the case only on the evidence of record, and that [they] felt no prejudice against petitioner as a result of the articles" are not considered dispositive.  *Sheppard,* at 351.

In *Estes v. State of Texas,* 381 U.S. 532 (1965), the Supreme Court set aside a conviction despite the absence of any showing of prejudice.  As the Court said in *Estes:*

> [i]t is true that in most cases involving claims of due process deprivations we require a showing of identifiable prejudice to the accused.  Nevertheless, at times a procedure employed by the State involves such a probability that prejudice will result that it is deemed inherently lacking in due process.
> *Id.,* at 542-43.

The procedure in question in *Estes* was the denial of a change of venue "to a locale away from where the publicity originated; nor was his jury sequestered." *Sheppard,* at 352-53.

Similarly, *Rideau v. Louisiana*, 373 U.S. 723 (1963) dealt with the trial court's refusal to grant a change of venue motion.  In *Rideau,* there was a single broadcast of a videotaped confession.  The Supreme Court held that

> for anyone who has ever watched television the conclusion cannot be avoided that this spectacle, to the tens of thousands of people who saw and heard it, in a very real sense was Rideau's trial...Any subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality."
> *Rideau,* at 726.

Due process of law, the Court held, "required a trial before a jury drawn from a community of people who had not seen and  heard" [the interview].  *Id.* at 727, and this same due process, "preserved for all by our Constitution, commands that no such practice as that disclosed by this record shall send any accused to his death." *Rideau, id.,* quoting *Chambers v. Florida,* 309 U.S. 227 (1940).

### i) Bias and prejudice

Normally, a showing of either actual or inherent prejudice is required in order to prevail on a claim of denial of a fair trial. *Holbrook v. Flynn,* 475 U.S. 560 (1986); *Irvin v. Dowd,* 366 U.S. 717 (1961); *Woods v. Dugger,* 923 F.2d 1454, 1457 (11th Cir. 1991). The test for inherent prejudice is "not whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether 'an unacceptable risk is presented of impermissible factors coming into play.'" *Holbrook v. Flynn,* 475 U.S. at 570, quoting *Estelle v. Williams,* 425 U.S. 501 (1976).

But, as *Rideau* held, prejudice is presumed when the record demonstrates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime. *Rideau,* 726-27; *see also Sheppard v. Maxwell,* 384 U.S. 333, 352-55 (1966). Under such circumstances, it is not necessary to demonstrate actual bias. *Estes,* 381 U.S. at 542-43; *Mayola v. Alabama,* 623 F.2d 992, 997 (5th Cir. 1980), *cert. denied,* 451 U.S. 913 (1981). As shown above, the record in Mr. Barbee's case shows that the relevant community, Tarrant County, was saturated in highly prejudicial and inflammatory publicity that assumed the guilt of Mr. Barbee and served to create a hostile atmosphere in which a fair trial was impossible. Thus, "prejudice is presumed, and there is no further duty to establish bias. *Mayola v. Alabama,* 623 F.2d 992, 997 (5th Cir. 1980). Thus, if this Court should hold that a showing of bias is required in Mr. Barbee's case, he has easily meet that burden.

### C. What the state courts held.

This claim was brought in Mr. Barbee's subsequent state habeas application as Claim 6, and was dismissed "as an abuse of the writ" because those allegations "do not satisfy the requirements of Article 11.071 Section 5." *Ex parte Stephen Dale Barbee,* No. WR-71,070-02, at 2. (Tex. Crim.

App. May 8, 2013)(Exhibit 52.)  Hence, it was not denied on the merits but only on procedural grounds, and the 2254(d) standard of review does not apply. *Cone v. Bell,* 129 S. Ct. 1769, 1784 (2009)("Because the Tennessee courts did not reach the merits of Cone's *Brady* claim [and instead rejected claim on procedural default grounds], federal habeas review is not subject to the deferential standard that applies under AEDPA...Instead the claim is reviewed *de novo*"); *Graves v. Dretke,* 442 F.3d 334, 339 (5th Cir.), *cert. denied,* 549 U.S. 943 (2006)(section 2254(d) is inapplicable because petitioner's "claims were dismissed by the Texas courts as abuses of the writ, i.e., on procedural grounds," and thus "were not adjudicated on the merits in Stare court").

### D. Cause and prejudice.

To the extent that the trial occurred in this prejudicial setting because of the failure of trial counsel to file a motion for change of venue (the subject of the next claim) then any procedural default of this claim, for failure to raise it in his initial state habeas petition, or failure to raise it adequately, is excused under the *Martinez/Trevino* exception discussed *supra,* which provides "cause" for failure to raise it adequately in his first state habeas application. The prejudice component is discussed in the statement of facts pertaining to this claim.

**<u>CLAIM SEVEN</u>: DEFENSE COUNSEL WERE INEFFECTIVE FOR FAILING TO FILE A MOTION FOR CHANGE OF VENUE.**

Mr. Barbee's conviction and sentence are invalid because he was deprived of his constitutional right to effective assistance of counsel, due process of law, equal protection of the laws, cross-examination and confrontation, and a reliable sentence due to the failure of trial counsel to file a motion for change of venue. U.S. Const. Art. VI, Amends. V, VI, VIII, XIV; International Covenant on Civil and Political Rights, Art. XIV and comparable provisions of the Texas Constitution. As recounted *supra* in Claim Six, *supra,* due to extensive media coverage of the events surrounding the murders, Mr. Barbee's trial was conducted in an atmosphere calculated to deprive him of any chance of fairness, due to the extensive exposure of the jurors to that publicity. The pre-trial and trial coverage of the murders was both inflammatory and prejudicial, and could only have had the effect of depriving Petitioner of due process of law. Yet, inexplicitly, counsel failed to file a motion for change of venue.

**A. Facts in Support of Claim**.

Petitioner incorporates herein by reference the facts and argument in support of Claim Six, *supra.*

No motion for change of venue was filed by the defense attorneys, despite the massive level of local prejudice. There would have been no downside to such a motion. Had the case been moved to another city in Texas, it is highly likely that the jury pool would not have been prejudiced by the pre-trial publicity detailed *supra.* The Fort Worth paper's massive publicity caused a tainting of the juror pool. As the case had significance to Tarrant County, and the publicity was particularly intense in that county, simply moving the case out of county would have largely eliminated the threat to a fair trial that existed in Tarrant County.

### B.  Legal Standard.

Mr. Barbee's attorneys' failure to attempt to move for a change of venue caused his conviction and death sentence to violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.  But for counsel's unprofessional omission to file the motion, the result of the proceeding would have been different.  *Wiggins v. Smith,* 539 U.S. 510, 521, 534 (2003); *Strickland v. Washington*, 466 U.S. 668, 694 (1984); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). The standards discussed *supra* are incorporated herein by reference.

Given the community's animosity toward Mr. Barbee, as shown *infra,* it was unreasonable under these standards for defense counsel to fail to file a motion for change of venue.  As we have seen, the massive publicity was mainly generated by the local newspaper (Exhibit 10), along with other media such as television.  The level of interest in the crime would have been much less even in nearby counties or in any nearby city such as Austin, Houston, or Dallas.  But the crime, involving the murder of a pregnant woman and her young son, was of great local interest.   There was no reasonable strategic reason for defense counsel not to at least try to have the trial moved out of Fort Worth and Tarrant County.

Mr. Barbee has established the prejudice component of the *Strickland* test by showing that there was massive negative publicity that would have meant that a motion for change of venue likely would have been successful.  The massive publicity shown in Exhibit 10 documents clearly that a fair and unbiased jury would have been impossible.  The only chance Mr. Barbee  had of a fair trial depended on this matter being removed from Tarrant County, the source of the jury pool, which had been contaminated by the numerous local newspaper and television stories.

**C. What the state courts held.**

This claim was brought in Mr. Barbee's subsequent state habeas application as Claim 7, and was  dismissed "as an abuse of the writ" because those allegations "do not satisfy the requirements of Article 11.071 Section 5." *Ex parte Stephen Dale Barbee,* No. WR-71,070-02, at 2. (Tex. Crim. App. May 8, 2013)(Exhibit 52.)  Hence, it was not denied on the merits but only on procedural grounds, and the 2254(d) standard of review does not apply. *Cone v. Bell,* 129 S. Ct. 1769, 1784 (2009)("Because the Tennessee courts did not reach the merits of Cone's *Brady* claim [and instead rejected claim on procedural default grounds], federal habeas review is not subject to the deferential standard that applies under AEDPA...Instead the claim is reviewed *de novo*"); *Graves v. Dretke,* 442 F.3d 334, 339 (5th Cir.), *cert. denied,* 549 U.S. 943 (2006)(section 2254(d) is inapplicable because petitioner's "claims were dismissed by the Texas courts as abuses of the writ, i.e., on procedural grounds," and thus "were not adjudicated on the merits in Stare court").

**D. Cause and prejudice.**

As this claim involves ineffective assistance of trial counsel, any procedural default of this claim, for failure to raise it in his initial state habeas petition, or failure to raise it adequately, is excused under the *Martinez/Trevino* exception discussed *supra,* which provides "cause" for failure to raise it adequately in his first state habeas application. The prejudice component is discussed in the statement of facts pertaining to this claim.

**CLAIM EIGHT: PETITIONER WAS DEPRIVED OF HIS RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY THE FAILURE OF THE STATE COURTS TO HOLD AN EVIDENTIARY HEARING ON SUBSTANTIAL, CONTROVERTED AND UNRESOLVED ISSUES OF FACT.**

Petitioner was deprived of due process and his right to a fair trial when, in Petitioner's initial state habeas proceedings, the state court erroneously refused his request to hold an evidentiary hearing on substantial controverted factual issues and the Texas Court of Criminal Appeals failed to order such a hearing.[151]   The error was repeated in the subsequent round of state habeas proceedings, where a hearing was denied on all claims except Claim 2, the conflict of interest claim. The judge who presided over the state habeas proceedings, Judge Louis Sturns, was not the same judge who presided over Petitioner's trial (Judge Robert Gill).  This deprived Petitioner of his rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

**A. Facts in Support.**

The initial state habeas proceedings involved no more input from the state habeas judge than that which could have been provided by the use of a  rubber stamp or an Auto-Pen.

The judge who presided at Petitioner's trial was Judge Robert K. Gill. *See, e.g.,* 2 CR 394, Court's Charge at Guilt/Innocence, signed by Judge Bob Gill, 213th District Court.  However, Judge Gill did not preside over Petitioner's state habeas proceedings.   His successor Judge Louis Sturns did.  (*See, e.g.* Exhibit 15.)

On March 14, 2008, Petitioner filed his application for writ of habeas corpus setting forth four claims for relief, including abandonment of counsel, ineffective assistance of counsel at both pretrial and trial, and police misconduct.  (Exhibit 11.)   Then the State filed a "Motion To Compel

_____

[151]    The trial court, in the subsequent application, did order a hearing on one issue, Claim 2, relating to a conflict of interest.  This Claim concerns the issues upon which a hearing was requested and refused, principally the ineffective assistance of counsel claims.

Disclosure Of Medical Information And Records" from Dr. Martin, as Petitioner's state habeas counsel had included Dr. Martin's affidavit in the state habeas application. (Exhibit 45, Orders of the state habeas court.)   The State helpfully included a proposed Order to compel this disclosure, which was signed verbatim by Judge Sturns. *Id.* The State applied for an extension of time to file their reply (unopposed) and this was granted by Judge Sturns. (Exhibit 45, Orders of the state habeas court).   Then the State requested affidavits from trial counsel Mr. Ray and Mr. Moore and again Judge Sturns granted the motion signed the State's pre-prepared order verbatim. *Id.* (This joint affidavit was submitted to the state habeas court, Exhibit 37.)[152] On September 29, 2008, Judge Louis Sturns signed a "Memorandum and Order" holding that

> the Court hereby determines, pursuant to article 11.071, section 8(a), of the Code of Criminal Procedure, that there exists no controverted, previously unresolved factual issues material to the legality of the applicant's confinement.
> (Exhibit 15, Memorandum and Order of September 29, 2008, by Judge Louis Sturns.)

Petitioner specifically requested an evidentiary hearing on the contested factual issues. (Exhibit 41, Petitioner's Reply to State's Response and Request for Hearing) but this was never even ruled upon.   Petitioner's state habeas application was then denied by Judge Louis Sturns on November 6, 2008, by adopting verbatim the State's proposed findings and conclusions without changing so much as a comma.   (*See* Exhibit 15, Order adopting the State's proposed memorandum, findings of fact, and conclusions of law and forwarding these findings and the application to the Texas Court of Criminal Appeals.)   No evidentiary hearing was held, as  the CCA's Order of January 14, 2009 points out.   (*See* Exhibit 9, Order in *Ex Parte Stephen Dale Barbee,* No WR-

---

[152]   As discussed *supra,* the joint affidavit of Mr. Ray and Mr. Moore was based on many misrepresentations and distortions and was so haphazardly written, in an effort to ensure that their client's death sentence be upheld, that it is contradictory on its own terms.  As such, it created many controverted factual issues that were never resolved in the state habeas proceedings, such as they were.

71,070-01, at 2; "The trial court did not hold an evidentiary hearing.")

Contrary to the state habeas court's finding (Exhibit 15), and the CCA's holding (Exhibit 9), it is very clear that there were numerous unresolved factual issues. Judge Sturns was in no position to dispose of these issues through "paper hearings" as they involved claims of ineffective assistance of trial counsel which involved controverted issues of fact, and Judge Sturns had not presided over the trial. Without a live hearing, he was in no position to judge the veracity of the conflicting factual claims, particularly those regarding ineffective assistance of counsel. In fact, the State's own reply to Petitioner's writ application, and the State's proposed findings of fact and conclusions of law, adopted verbatim by the state habeas court, establish the existence of many disputed factual issues. The State's reply to Petitioner's application claimed that there was no ineffective assistance of counsel as counsel's decisions were "tactical" and thus immune from challenge as ineffective assistance of counsel and that there was no police misconduct because the recordings were accurate and complete. (*See* Exhibit 12, State's Reply at 13-51 (discussing the claims of ineffective assistance of counsel and frequently referencing the trial attorneys' affidavit); at 51-59, discussing police misconduct.) Yet the state habeas judge had no personal recollection of these events as he had not presided over the trial.

To dispute Petitioner's factual allegations, the State relied on various affidavits and in fact the entire reply was almost completely based upon these affidavits. Repeatedly cited in the Reply are:

1) the affidavit of Dr. Jack Randall Price, Ph.D, submitted by the State in support of the Reply, to allege that the findings of Petitioner's expert Dr. Stephen Martin were erroneous and that Mr. Barbee's neuropsychological tests were within normal range and he did not suffer from frontal

lobe damage, and that the mitigation report of Amanda Maxwell was "more of an 'aggravation' report"; (Exhibit 12, Affidavit of Dr. Price, at 2-5, 6);

2) the affidavit of trial attorneys Bill Ray and Tim Moore, which were ordered by the state habeas judge, designed to show that their actions were tactical and because "Applicant refused to accept responsibility for his actions, which prevented any meaningful effort on our part to show mitigation and a lack of future danger, because Applicant did not want to tell his parents, specifically his mother, about his involvement in the murders of Lisa and Jayden Underwood." *See* Exhibit 37, Affidavit of Bill Ray and Tim Moore at 8.

3) the affidavit of trial prosecutor Richard Kevin Rousseau, in which he attempted to justify the recordings as complete and to show that they were provided to defense counsel. (Exhibit 12, Affidavit of Kevin Rousseau.)

Petitioner's habeas attorney pointed this out in his "Applicant's Reply to State's Response and Request for Evidentiary Hearing." (*See* Exhibit 41, Reply to State's Response and Request for Hearing, *Ex parte Stephen Dale Barbee,* Cause No. 1004856R1, 213th District Court.) In that pleading, Petitioner discusses the outstanding factual issues presented by the State's reply and requested an evidentiary hearing because "substantial factual issues remain unresolved and can only be resolved at a hearing and the Applicant respectfully requests that the Court set this matter for an evidentiary hearing prior to ordering the parties to submit proposed findings of fact and conclusions of law." ( *Id* at 3.) Yet the state habeas court refused to hold a hearing and incorrectly held that "there exists no controverted, previously unresolved factual issues material to the legality of the applicant's confinement." (Exhibit 15, Memorandum and Order of September 29, 2008, by Judge Louis Sturns; ultimately adopted by the CCA, Exhibit 9.)

**B. Argument.**

Nowhere in these state habeas proceedings did Judge Sturns' do anything more than sign his name to the State's prepared pleadings and orders. The entire state habeas proceedings consisted of Judge Sturns adoption of the State's pleadings and orders without changing a comma. There was one-sided discovery of medical information and the ordered disclosures of trial counsel to the State, when they asked for it, but when the petitioner requested an evidentiary hearing, this was ignored.

Where a trial court (here the state habeas court) accepts all of a prosecutor's explanations at face value, and has no way to independently scrutinize their validity, the habeas court abdicates its judicial responsibilities and violates a defendant's rights to due process. The state habeas court's actions in this case, its refusal to hold an evidentiary hearing on the controverted unresolved factual issues, constituted an abdication of its constitutional responsibilities and obligations.

Based upon its absence from the trial proceedings, the state habeas court here was unable to scrutinize the State's "tactical" explanations for the attorneys' performance and its reliance on the affidavits of Dr. Price, Kevin Rousseau, and the trial attorneys. The record reflects that Petitioner timely requested an evidentiary hearing which was never ruled on. (Exhibit 41.)

In these circumstances, Judge Sturns was acting as a rubber stamp for the State. The state habeas court and the CCA's actions deprived Petitioner of his right to a fair trial and due process of law, under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

**i) Petitioner is entitled to an evidentiary hearing and the state court findings are not entitled to any presumption of correctness as there was no evidentiary hearing and the state habeas judge that ruled on the habeas claims was not the trial judge.**

As shown above, the judge that presided over petitioner's trial, Judge Gill, was not the trial judge at the state habeas proceedings, which were presided over by Judge Sturns. A long line of

Fifth Circuit cases have consistently refused to accord any deference or presumption of correctness to state court findings made without an evidentiary hearing when the state habeas judge was not the trial judge. Additionally, that Court has repeatedly recognized that the existence of *any* exception to the presumption of correctness will entitle a petitioner to both discovery and an evidentiary hearing.

### a. No presumption of correctness.

The Fifth Circuit has held that the fact that the state habeas judge was not the trial judge is not a prerequisite to according the presumption of correctness to state court findings. *Carter v. Johnson,* 131 F.3d 452, 460 n. 13 (5th Cir. 1997). But this is only *one* of the factors at play here. The other vital factor is the lack of an evidentiary hearing on disputed factual issues on which the state habeas court made factfindings, so-called "paper hearings."[153]   In the circumstances of Mr. Barbee's case, there should be no presumption of correctness to any of the state court factfindings.

A review of the Fifth Circuit's holdings on the appropriateness of "paper hearings" will show that they were inadequate and inappropriate, and are not entitled to any presumption of correctness in this Court. The question is broader than merely a focus on credibility determinations by a 'judicial entity' other than the state habeas judge. It involves the circumstances under which a paper hearing is entitled to a presumption of correctness.

In *Sumner v. Mata*, 499 U.S. 539 (1981), it was held that the presumption of correctness of state court fact-finding only applies to those proceedings that are found to be adequate, and the "presumption of correctness is defeated by a showing that "the fact-finding procedure employed by the state was not adequate to afford a full and fair hearing.'" citing *Cabana v. Bullock,* 474 U.S. 376,

---

[153]   The term "paper hearings" refer to the state habeas court and the CCA's denial of all Petitioner's state habeas claims without an evidentiary hearing.

399 (1986).[154]

In *Nethery v. Collins*, 993 F.2d 1154 (5th Cir. 1993) the Fifth Circuit  again took up the question of whether findings made after a "paper hearing" should be accorded a presumption of correctness. In *Nethery*, the Fifth Circuit held that the state habeas court's finding was not entitled to a presumption of correctness where that court never conducted an evidentiary hearing and adopted in whole the state's proposed findings of fact two days after the petition was filed.

In *Armstead v. Scott*, 37 F.3d 202 (5th Cir. 1994) the Fifth Circuit again held that "a presumption of correctness will not apply to a state court finding of fact if the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing." *Id.*, at 207.  Again, in *Amos v. Scott*, 61 F.3d 333 (5th Cir. 1995) the Fifth Circuit again held that "[f]actual findings based solely on a paper hearing are not automatically entitled to a Sec. 2254(d) presumption of correctness." *Id*, at 347.

Thus, time and time again, the Fifth Circuit has held that the major, and not infrequently the only factor in upholding state habeas "paper hearings" is this unity of state trial and habeas judge. The fact that the state habeas claims were not denied by the trial judge is a major reason to not afford a presumption of correctness to the state court's findings as to this issue.

In *Perillo v. Johnson*, 79 F.3d 441 (5th Cir. 1996)*,* the Fifth Circuit,  quoting *Ward v. Whitley*, 21 F.3d 1355, 1367 (5th Cir. 1994), held that where there is a "factual dispute, [that,] if resolved in the Petitioner's favor, would entitle [her] to relief and the state has not afforded the

---

[154]   One factor highlighting the unfairness of the state court procedures was the  state court's verbatim adoption of the state's pleadings. In *Anderson v. City of Bessemer City*, 470 U.S. 564 (1985) the Supreme Court stated: "We, too, have criticized courts for their verbatim adoption of findings of fact prepared by prevailing parties, particularly when those findings have taken the form of conclusory statements unsupported by citation to the record." *Id.*, at 572.

petitioner a full and fair evidentiary hearing", there is no presumption of correctness. *Id*. at 444.  The holding did not require that the petitioner prove the allegations at the pleading stage, but held that they were sufficient to merit an evidentiary hearing.

Equally important for Mr. Barbee's case is the reaffirmation in *Perillo* that "[s]tate court fact-findings are presumed correct only when there has been a full and fair hearing." *Id.*, at 446, citing *Armstead v. Scott*, 37 F.3d 202 (5th Cir. 1994). In *Perillo*, the decisive factor was the fact that the state habeas  judge was different from the trial judge.

In *Salazar v. Johnson,* 96 F.3d 789 (5th Cir. 1996), the Fifth Circuit again refused to grant any presumption of correctness to a state court finding when the state judge who presided over Salazar's plea did not conduct the habeas proceeding, and  remanded the matter for an evidentiary hearing.

 Thus, no presumption of correctness applies to the state court holdings as to all the state habeas claims and Petitioner is also entitled to a state court evidentiary hearing, as discussed next.

**b.  Mr. Barbee is also entitled to an evidentiary hearing.**

Mr. Barbee is entitled, at least, to an evidentiary hearing on his claims that present controverted factual issues (except as to Claim 2, where a hearing was held in the subsequent habeas proceedings).  In the initial round, the CCA's order (Exhibit 9) relied entirely on the state district court "findings of fact and conclusions of law" (Exhibit 13) written by the state prosecutors in this case and rubber-stamped -- without changing so much as a comma -- by the state habeas court, which adopted them verbatim only 17 days after they were filed on September 12, 2008. No evidentiary hearing was ever held in the state court in the initial round of habeas proceedings.  The  state habeas judge who perfunctorily denied Mr. Barbee's claims was not the state trial judge. The prior holdings of the Fifth Circuit show that this is a case in which "paper hearings" are

inappropriate and the district court's decision is not within the contours of Fifth Circuit precedent. Disputed factual issues are and were raised by Petitioner in his state habeas application. Thus, the CCA's and the district court's denial of the application without the hearing violated the mandatory hearing requirements of *Townsend v. Sain*, 372 U.S. 293, 318 (1963) and Fifth Circuit precedents.

### i)  The state court's failure to hold an evidentiary hearing.

The state habeas court failed to engage in an independent review of Mr. Barbee's allegations of federal constitutional violations.

This threshold question of whether a federal habeas court must hold an evidentiary hearing has long been controlled not by statute, but rather by the Supreme Court's decision in *Townsend.* In that case, the Court held that as a general matter an evidentiary hearing must be held if the applicant alleged disputed facts that, if true, would entitle the applicant to relief. Clearly Mr. Barbee has done that here.  Of the six *Townsend* circumstances, each of which make a hearing mandatory, all six apply to Mr. Barbee's case, even though only one would have triggered the hearing requirement.[155]

The perfunctory denial of Mr. Barbee's claims by the state habeas court through verbatim adoption of the state's pleadings meant that the merits of the factual dispute were not resolved. The

---

[155]   Under certain circumstances findings of fact by the state court may be presumed correct. But questions of federal law are always for the federal court to determine independently. *Townsend v. Sain*, 372 U.S. 293, 318 (1963) (district judge has independent duty to apply federal law to state court fact-findings).

Under *Townsend,* a federal court must grant an evidentiary hearing to a habeas applicant if any of the following six circumstances apply: 1) the merits of the factual dispute were not resolved in the state hearing; 2) the state factual determination is not fairly supported by the record as a whole; 3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; 4) there is a substantial allegation of newly-discovered evidence; 5) the material facts were not adequately developed at the state court hearing; or 6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing. *Townsend*, at 312-313.

fact-finding procedure was not full or fair, and the material facts were not adequately developed. Additionally, there were substantial allegations of ineffectiveness of trial counsel and the factual determinations were not fairly supported by the record.

As discussed *supra,* the presumption of correctness does not apply to the findings of fact made by the state court regarding Mr. Barbee's constitutional claims. The state habeas court should have made its own factual determination whether the prosecutor-written findings were fairly supported by the record. *Sumner v. Mata*, 449 U.S. 539, 550 (1981). If none of the six exceptions apply, then, and only then, does the burden shift to the petitioner to establish, by convincing evidence, that the factual findings of the state court are erroneous. *Id.* An evidentiary hearing may itself be another appropriate way of determine whether one or more of the exceptions are present and thus that the purported "fact-findings" may not be presumed correct. *See, e.g., Ross v. Kemp*, 785 F.2d 1467 (11th Cir. 1986); *United States ex rel. Gorham v. Franzen*, 675 F.2d 932, 936 n.1 (7th Cir. 1982) *cert. denied*, 474 U.S. 922 (1985). The reasons that the presumption of correctness does not apply are explained in detail with respect to each claim *infra.*

The state court fact-finding procedures in Mr. Barbee's case were not only inadequate, they were nonexistent. Thus the state court review can be seen, on its face, as inadequate because not only were the affidavits and documentary evidence not considered, but the state court also abdicated its responsibility to impartially review the arguments and evidence submitted by the parties when it adopted verbatim the state's findins and conclusions a few days after they were filed. As pointed out, this practice has been widely condemned as inadequate to afford even minimal standards of due process. This procedure denied him an opportunity to present his legal claims to the court.

**ii) Inadequacy of "paper" hearings and the presumption of correctness**.

A review of the Fifth Circuit's holdings on the appropriateness of "paper hearings" will show that, in the circumstances of this case, they were both inadequate and inappropriate, and, at the least, the matter must be remanded for an evidentiary hearing. The question is broader than merely this focus on credibility determinations by a 'judicial entity' other than the state habeas judge. It involves the circumstances under which a paper hearing is entitled to a presumption of correctness and whether a live evidentiary hearing is mandatory when it will be the only effective mechanism for review of a Petitioner's claims.

A survey of the most important cases will show the glaring need for a live hearing in the instant case. In *May v. Collins*, 955 F.2d 299 (5th Cir. 1992), the Fifth Circuit held that review by a state habeas court that failed to conduct an evidentiary hearing may be sufficient when the same district judge hears both the trial and the state habeas application and, "where credibility determinations are made on a paper record by a state judge who had an opportunity to view the witnesses at the trial, the petitioner has received a hearing sufficient to invoke the presumption of correctness." *May*, at 307. In *Sawyers v. Collins*, 986 F.2d 1493 (5th Cir. 1993), where, again, the state habeas judge had presided at the trial, the Fifth Circuit held that "it is necessary to examine in each case whether a paper hearing is appropriate to the resolution of the factual disputes underlying the petitioner's claim," and in *Sawyers* the only reason the paper hearings were held adequate was because the judge was in an "excellent position" to judge witness credibility. *Id.*, at 1504-05. *Sawyers* did hold that "*May* does not stand for the proposition that findings of fact made on the basis of a paper hearing are entitled to a presumption of correctness only when the judge has observed the demeanor of all the affiants." *Id.*, at 1505.

In *Sumner v. Mata*, 499 U.S. 539 (1981), the presumption of correctness to state court fact-finding only applies to those proceedings that are found to be adequate, and the "presumption of correctness is defeated by a showing that 'the fact-finding procedure employed by the state was not adequate to afford a full and fair hearing.'" *Cabana v. Bullock*, 474 U.S. 376, 399.

As *May, supra*, pointed out, *Sumner* is not dispositive of the issue, because it stands for the proposition that the presumption of correctness is not inapplicable for the <u>sole</u> reason that no live evidentiary hearing has been held. In other words, in some cases paper hearings are adequate and in others they are not. Because the paper hearing in Mr. Barbee's case was not accompanied by the necessary factors of reliability, the procedure was inadequate.

In Mr. Barbee's case, we are presented with a situation in which the credibility determinations that were necessary to deny his writ were not made by the trial judge and, even worse, were made on the basis of affidavits sought by the state and oredered by the state habeas court. An important issue is the matter of the effectiveness of trial counsel. This and the other claims also involve credibility determinations or issues that could not adequately be resolved on paper.

In *Buxton v. Lynaugh*, 879 F.2d 140 (5th Cir. 1989) the Fifth Circuit again addressed the issue of the adequacy of a "paper hearing." The court in *Buxton* drew a distinction between a situation where the fact-finding was made by a state appellate court on the basis of a paper hearing and the situation in *Buxton,* "a decision made by the trial court that conducted Buxton's trial and sentenced him." *Buxton*, at 146. Again, the decision in *Buxton* to allow this hearing by affidavit was based on the numerous reasons for the reliability of trial judge conducted hearings:

"The trial judge before whom Buxton was tried was in a different and better

position to make determinations regarding the facts and circumstances surrounding that trial than other courts on direct or collateral review. The trial judge had the opportunity to watch the trial as it progressed, he saw both [trial attorneys] in action, and he was familiar with the jury... As a federal court in collateral review, we are far removed from the trial proceedings and therefore defer to the trial courts' determination of the facts surrounding that trial." *Buxton,* at 146-47.

Unlike Mr. Buxton, Mr. Barbee was not afforded a review of his conviction by the trial judge, so the state habeas court's (and the CCA's, whose decision was based on the state habeas court's findings and conclusions) determination in the instant case is not due any deference or presumption of correctness here because it does not have any of the criteria of reliability that normally inhere in trial-court-conducted review. The decision in *Buxton* falls within Fifth Circuit precedent in allowing paper hearings when they were conducted by the trial judge, but disallowing them when they were not.

But in *Sawyers,* the judge ruling on the habeas claim had observed some of the affiants, whereas here the judge did not have the opportunity to observe any of them. Even if not dispositive, it can be seen that it is certainly a major factor that the habeas proceedings were presided over by a judge totally unfamiliar with any of the trial attorneys, witnesses, lawyers and state habeas affiants, and, coupled with the other factors mentioned above, it can be seen that the state habeas hearing was not a real hearing to which this court should afford a presumption of correctness. The fact that this is Petitioner's first chance to present these claims, that his own affidavits are of high quality, and that they present compelling claims, added to the fact that the state habeas proceeding was not conducted by the trial judge, all lead to the conclusion that the state habeas proceeding was unfair, and hence no presumption of correctness should adhere to it *and* he is entitled to a live evidentiary hearing.

In *Anderson v. City of Bessemer City*, 470 U.S. 564 (1985) the Supreme Court stated:

-365-

> We, too, have criticized courts for their verbatim adoption of findings of fact prepared by prevailing parties, particularly when those findings have taken the form of conclusory statements unsupported by citation to the record."
> *Id.,* at 572.

In *Nethery v. Collins*, 993 F.2d 1154 (5th Cir. 1993) the Fifth Circuit again took up the question of whether findings made after a "paper hearing" should be accorded a presumption of correctness. In *Nethery,* the Fifth Circuit held that the state habeas court's finding was not entitled to a presumption of correctness where that court never conducted an evidentiary hearing and adopted in whole the state's proposed findings of fact two days after the petition was filed. Thus, the factual circumstances in *Nethery* are similar to those in Mr. Barbee's case.

Also significant is the importance the Fifth Circuit placed on the fact that the state habeas petition was not heard by the trial judge:

> Notably, and for obvious reasons, unlike the petitioners in *Ellis* and *May,* Nethery's petition was not considered by the same trial judge who had presided over this trial; thus, there was never a meaningful opportunity for the court to assess the credibility of the conflicting affiants." *Id.*

This decision places *Nethery* in the mainstream of Fifth Circuit cases, discussed *infra,* that view with extreme caution the state habeas proceedings conducted solely on the basis of paper hearings, when that review was not conducted by the trial judge. This type of review has been held, time and again, not to be a "full and fair" hearing to which a presumption of correctness should attach. The precipitous haste of the state habeas court raises the unescapable conclusion that these findings could not represent the judge's own considered conclusions. *See Anderson, supra,* at 572-573. Thus, under the standards outlined in *Nethery*, Petitioner is at least entitled to an evidentiary hearing on his federal constitutional claims.

In *Armstead v. Scott*, 37 F.3d 202 (5th Cir. 1994) the Fifth Circuit again held that "a

presumption of correctness will not apply to a state court finding of fact if the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing." *Id.*, at 207.

In *Armstead*, the court held that the crucial factor in holding the state fact finding procedures adequate was the fact that the trial judge had presided over the state habeas application. *Id.,* at 208. Similarly, this court held in *Ellis v. Collins*, 956 F.2d 76 (5th Cir. 1992) that a crucial factor in holding state habeas "paper hearings" adequate is whether the state habeas judge was the trial judge. In *Ellis*, he was. As the Court held in *Ellis*,

> "[w]e have previously held that when (1) a state court enters written fact-findings in which credibility questions are resolved and (2) the same state district judge hears both the trial on the merits and the state application for writ of habeas corpus, the state fact-finding procedures are entitled to a presumption of correctness even without a state evidentiary hearing." *Id,* at 79, citing *May v. Collins, supra*, at 307.

In *Amos v. Scott*, 61 F.3d 333 (5th Cir. 1995) the Fifth Circuit again held that "[f]actual findings based solely on a paper hearing are not automatically entitled to a Sec. 2254(d) presumption of correctness." *Id,* at 347. The Court went on:

> "[n]evertheless, a fact-finding procedure that involves credibility determinations and is based on a "paper hearing" affords the habeas petitioner a full and fair hearing when the state court judge who presided over the petitioner's trial conducts the habeas proceeding (citing *Armstead, supra*). Whenever such a judicial identity exists, the presumption of correctness applies, and a federal habeas court must accord the presumption to the factual facts." *Amos*, at 347.

Thus, time and time again, this court has held that the major, and not infrequently the only factor in upholding state habeas "paper hearings" is this unity of state trial and habeas judge. The fact that Mr. Barbee's state application was not ruled on by his trial judge is a major reason why this court should not afford a presumption of correctness to the state court's findings. This unwarranted presumption is the lynchpin in the state courts' dismissal of Mr. Barbee's writ.

-367-

This court has held that "[t]he opportunity for an evidentiary hearing in a federal habeas corpus proceeding is mandatory only where there is a factual dispute which, if resolved in the Petitioner's favor, would entitle the Petitioner to relief and Petitioner has not received a full and fair evidentiary hearing in state court." *East v. Scott*, 55 F.3d 996, 1000 (5th Cir. 1995) citing *Townsend v. Sain*, 372 U.S. 293,(1963). *See also Montoya v. Scott*, 65 F.3d 405, 417 (5th Cir. 1995).

c)      ***Perillo v. Johnson*** **and the standard for an evidentiary hearing**.

In 1996, the Fifth Circuit Court clarified the standards for granting an evidentiary hearing and discovery when the state habeas petition was ruled on by someone other than the trial judge. In *Perillo v. Johnson*, 79 F.3d 441 (5th Cir. 1996), the federal district court had refused to allow any discovery or an evidentiary hearing and granted summary judgement denying the writ. The Fifth Circuit held that the district court erred and reversed.

In *Perillo*, the Court, quoting *Ward v. Whitley*, 21 F.3d 1355, 1367 (5th Cir. 1994), held that where there is a "factual dispute, [that,} if resolved in the Petitioner's favor, would entitle [her] to relief and the state has not afforded the petitioner a full and fair evidentiary hearing", a federal habeas corpus petitioner is entitled to discovery and an evidentiary hearing. *Id.* at 444.

A conflict of interest was alleged in *Perillo*. In finding that there was a factual dispute regarding this conflict, the *Perillo* court looked at whether the allegations, if resolved in her favor, would entitle her to relief, "and there are no state fact-findings on the issue that are entitled to the presumption of correctness." *Id*. This court did not require that the petitioner prove the allegations at the pleading stage, but held that they were sufficient to merit an evidentiary hearing.

Even more important for Mr. Barbee's case is the reaffirmation in *Perillo* that "[s]tate court fact-findings are presumed correct only when there has been a full and fair hearing." *Id.*, at 446, citing *Armstead v. Scott*, 37 F.3d 202 (5th Cir. 1994). In *Perillo*, the decisive factor was the fact that

-368-

the state habeas  judge was different from the trial judge:

> In the instant case, the judges were different... Because the judge in the state habeas corpus proceedings was not the trial judge, he could not compare the information presented in the various affidavits against his own firsthand knowledge of the trial"... We do not suggest that a full and fair hearing cannot be had any time the state habeas judge is different from the trial judge. In our case-by-case review, the identity of the judges is but one factor to consider, as we explained in *Nethery,* 993 F.2d at 1157 n.8. In this case [the state habeas judge] could not supplement the affidavits with his own recollection of the trial and [the attorney's] performance in it. Thus, there is a danger of 'trial by affidavit' (quoting <u>Amos</u>, 61 F.3d at 347). Therefore, the findings of fact in the state habeas corpus proceedings are not entitled to the 2254(d) presumption of correctness.
> *Id.*, at 447.

This was not a new holding, but was squarely in line with existing Fifth Circuit precedent:

> In *Nethery v. Collins*, 993 F.2d 1154, 1157 (5th Cir. 1993)., *cert. denied* 128 L.Ed.2d 87, 114 S.Ct. 1416 (1994), we held that, because the state habeas judge was not the judge at the state trial, the paper hearing was not an adequate and fair hearing. In *Armstead*, we found that a paper hearing was adequate because, 'unlike the scenario in *Nethery*, the trial judge in Armstead's case who made the factual finding with regard to the conflicting affidavits via the 'paper hearing' was the same judge who presided over Armstead's guilty plea. The judge had the opportunity to fully assess Armstead during  his plea process and determine his credibility then.'" *Armstead*, 37 F.3d at 208. *See Vuong v. Scott*, 62 F.3d 673, 683-84 (5th Cir.) (same judge -- paper hearing accorded presumption of correctness), <u>*cert. denied*</u> 133 L.Ed. 2d 458, 116 S.Ct. 557 (1995); *Amos v. Scott*, 61 F.3d 333, 347 (5th Cir.) (same judge -- paper hearing accorded presumption of correctness), *cert. denied*, 133 L.Ed.2d 458, 116 S.Ct. 557 (1995); *Sawyers v. Collins*, 986 F.2d 1493, 1505 (5th Cir.) (same judge -- paper hearing accorded presumption of correctness), *cert. denied*, 508 U.S. 933, 113 S.Ct. 2405, 124 L.Ed.2d 300 (1993).
> *Perillo*, at 7.

Mr. Barbee has shown, in his pleadings, that <u>at a minimum</u>, this court should remand for a hearing on his claims raised in his state habeas petition: ineffective assistance of counsel and police misconduct in addition to the claims that could not have been raised previously.

**C. What the state courts held.**

This claim was brought in Mr. Barbee's subsequent state habeas application as Claim 8, and was dismissed "as an abuse of the writ" because those allegations "do not satisfy the requirements of Article 11.071 Section 5." *Ex parte Stephen Dale Barbee,* No. WR-71,070-02, at 2. (Tex. Crim. App. May 8, 2013)(Exhibit 52.)   Hence, it was not denied on the merits but only on procedural grounds, and the 2254(d) standard of review does not apply. *Cone v. Bell,* 129 S. Ct. 1769, 1784 (2009)("Because the Tennessee courts did not reach the merits of Cone's *Brady* claim [and instead rejected claim on procedural default grounds], federal habeas review is not subject to the deferential standard that applies under AEDPA...Instead the claim is reviewed *de novo*"); *Graves v. Dretke,* 442 F.3d 334, 339 (5th Cir.), *cert. denied,* 549 U.S. 943 (2006)(section 2254(d) is inapplicable because petitioner's "claims were dismissed by the Texas courts as abuses of the writ, i.e., on procedural grounds," and thus "were not adjudicated on the merits in Stare court").

**D. Exhaustion and procedural default.**

As this claim involves the failure of the state habeas court to order an evidentiary hearing after one was requested by initial state habeas counsel, it could not have been raised as an issue in the initial state habeas petition. Hence, it is not procedurally defaulted.

**CLAIM NINE: TRIAL COURT ERROR IN REFUSING TO GRANT PETITIONER'S CHALLENGE FOR CAUSE TO JUROR #126, DENISE ANDERSON.**

Petitioner's conviction, judgment, sentence and confinement are illegal and were obtained in violation of his Fifth, Sixth, Eighth and Fourteenth Amendment rights to a fair and impartial jury, the presumption of innocence, a fair trial, freedom from self-incrimination, effective assistance of counsel, due process of law, and reliable guilt and penalty determinations, because, *inter alia*, a biased pro-death juror was allowed to serve due to the Court's denial of a defense challenge for cause.

**A. Facts in Support.**

Venire member number one-hundred twenty-six, Denise Anderson, made the following statements during the State's individual *voir dire* regarding her significant knowledge of the facts of this case:

> Q.      You have heard police -- you have heard -- tell me what you have heard.
>
> A.      I just remember about a girl that was pregnant had gone missing.  And then it seemed like they found her three days later and her boyfriend and his friend were involved and -- or the friend was involved in discovering where she was thrown. That's all I remember.
>
> Q.      Do you remember anything about the victim?
>
> A.      I remember that she was excited about going to her baby shower.  Because during the time that she was missing they kind of questioned if she was depressed and if she would have left, seemed like the report did.  And her friend or coworker or something said no, in fact, she was excited about having this baby and going to a baby shower.
>
> *      *      *

Q.      Do you remember anything -- you said the friend or the boyfriend.   Do you remember anything specifically about the friend or the boyfriend?

A.      No.  I remember that it seemed like the friend didn't have any idea what was going on or something.  But that he had been asked to borrow his truck or something the actual night or day she was missing or time.  And the only other thing that stands out it seems like I remember hearing something about a T-shirt.

Q.      Do you remember what you heard about a T-shirt?

A.      I can't remember -- I can't remember if they found a T-shirt -- or I don't remember.  I just remember a T-shirt.
(21 RR 42-43.)

Pursuant to defense counsel's questions, Ms. Anderson elaborated on her knowledge of the

facts surrounding this case as well as her obvious, preconceived belief in Petitioner's guilt:

Q.      And did you hear any specifics about her pregnancy that you can remember?

A.      That she was not married.

Q.      Okay.

A.      And just that she was excited about going to a baby shower or that's what her friend --

Q.      Okay.   She's not married.   She's pregnant and she was going to a baby shower.   Was that the baby that was getting ready to be born?

A.      Yes.  Or that she was going to it.  I just know that one of the questions to this co-worker or friend was was there any reason why she would be depressed about being pregnant.

Q.      Okay.  And what did you hear about

-372-

that?

A.     And that's when she just said: No, she was excited about this baby.  She was looking forward to her baby shower.  When that baby shower was, I am not sure or --

Q.     So you heard somewhere in the newscast she might have been depressed.  But then her friend said, no, she wasn't depressed, that she was excited about this baby?

A.     I didn't hear she was depressed.  I heard that they were wondering -- this was during the phase of when she was missing.

*     *     *

Q.     Okay.  And do you remember anything about how long she was missing or whatever became of that, if anything?

A.     I don't -- I couldn't tell you for sure, but for some reason three days --

Q.     Okay.

A.     -- stands out to me.

Q.     Okay.  Why is that?

A.     I think maybe because I watched the news three days in a row to see if they found her or something, you know.  When I found out she was missing I was just kind of curious.

*     *     *

Q.     .  .  .And did you ever listen to the news to find out whether or not anybody had been arrested?

A.     I think the last time I listened to the

-373-

news was when they said something about a friend and the boyfriend.

Q.      Okay.  Tell me a little about it, what you heard there.

A.      Just that a friend came forward and said that he had been asked to borrow his truck.

Q.      Okay.

A.      And this coincided with the time with about the time she was first missing.

                    *      *      *

Q.      So you watched this on the news for three days more than once, and specifically wanted to watch it so you could see what happened to this girl or whether she was going to be found or not.  You see that somebody's friend is asked to borrow his truck has no idea himself of what's going on, and then you just quit watching it?

A.      Oh, no.  It seemed like when the -- during the course of the time that the friend had borrowed his truck, that's when her body was found.

Q.      Okay.  Tell me what you heard about that.

A.      And then just that her body was found in a field.

                    *      *      *

Q.      Anything particular details you heard about that?

A.      Just that, you know, this friend's truck -- or I apparently -- I don't know if the guy went with the truck or just loaned the truck or -- but somehow he knew where she was dumped.

-374-

Q.      Okay.  Is this the same friend you are talking about, the friend that had no idea?

A.      Yeah.

Q.      So he knew where she was dumped?

A.      It seemed like -- I'm telling you, my memory is sketchy on that part.  It was like once she was found dead, I didn't really watch any more because it was more just why she was missing in the first place.

Q.      Okay.

A.      Was what was my interest.

Q.      Up until that point, did you have any feelings about Mr. Barbee's here guilt based on these news reports?

A.      Well, I felt like he was definitely involved.

Q.      Okay.  Tell me what you mean by that.

A.      I felt like that he was the boyfriend.

*     *     *

Q.      Okay.  Tell me what you heard about that.

A.      Because of the friend of her boyfriend, that's what was said, the friend of the boyfriend it was his truck --

Q.      Okay.

A.      -- that was borrowed.

*     *     *

Q.      <u>Okay. But you felt -- you felt Mr. Barbee here was involved?</u>

A.      <u>Yes.</u>

Q.      Okay. When you say involved, tell me what you mean by that?

A.      I think most crimes are done by people that know you.

Q.      Okay.

A.      <u>And when she was found dead then -- and he was implicated -- or I don't know if that's the right word.</u>

\*      \*      \*

Q.      Was it because of borrowing the truck or was it something else?

A.      I think it was from borrowing the truck.

Q.      Okay.

A.      Because I remember that the reason they just thought she was missing was that they didn't, you know, didn't look like anything happened where she lived.

\*      \*      \*

Q.      Okay. So let's go back to him being implicated. Do you feel like he was guilty of that?

A.      At the time I am sure I did.

Q.      Okay. Well, what is it that's changed between then and now that based on these news reports that you don't think he is guilty, if I [sic] that's what you are saying. I am not trying to put words in your mouth.

A.     Well, I don't trust my memory for one thing.  And, again, as soon as she was found the news story wasn't that interesting to me.

\*     \*     \*

Q.     <u>And you have stated that based on what you heard at the time that you thought he was guilty; is that --</u>

A.     <u>Yes.  Well, I thought he was involved.</u>

Q.     Okay.  Well --

A.     And I just kind of like, well, you know, since most crimes it seems like are people that know you, you know, or <u>it seems like that, that once I knew he was involved it was just sad to me.</u>

\*     \*     \*

Q.     <u>Well, but you were interested enough to watch it enough to form an opinion that Mr. Barbee is involved?</u>

A.     <u>Yes.</u>

\*     \*     \*

Q.     And so the question then becomes, are you really going to be able to do that even it it's -- if it's kind of a subconscious thing that -- what guarantee do I have that you are really not going to be considering that?  It's one thing for you to say, well, I am going to do it.  I don't question your will.  What I question is your subconscience [sic]

A.     Right.

Q.     -- that's going say, well, I saw that on TV and I saw the -- I am just throwing one of these facts out there -- the friend had no idea.

-377-

A.     Okay.

Q.     And the friend knew something about the truck.  And then you think, well, that's what implicated Mr. Barbee.

A.     Yeah.

Q.     Okay.  And so now I have got a juror that at least subconsciously hadn't been able to move that out of her mind.  And what happens in the courtroom might or might not take precedence over that.  Do you see?

A.     I see.  And that's -- I mean, I don't really know how to tell you that I think I could do it other than I am a person who follows rules and tries really hard to -- I mean, I feel like just from coming to these different little times here with y'all of learning and seeing and even feeling like I know such more about the difference like capital murder versus murder or whatever.  <u>But I can't tell you that I'm going to be able to put it through my mind other than the fact that I don't feel like at the time I knew all the facts.   I just remember feeling very strongly concerned  for  this  girl  because  she  was  pregnant. And I don't know if that's because, you know, I am a mom or whatever.</u>  And then once she was found, you know, then the story -- I was just glad that there was an end to it.

(21 RR 48-59)(emphasis added).



**B.  Argument.**

The record reflects that Petitioner properly preserved his error pursuant to art. 35.16 (a) (10)

Tex. Crim. Proc. Code Ann. (Vernon 1995). (RR. XXI-68-71). *See, Halprin v State,* 170 S.W. 3d

111, 117-18 (Tex. Crim. App. 2005)*; Escamilla v State,* 143 S.W. 3d  814, 821 (Tex. Crim. App.

-378-

2004) cert. denied, 161 L.Ed. 2d 528 (2005); *Allen v State,* 108 S.W. 3d 281, 282 (Tex. Crim. App. 2003) cert. denied, 158 L.Ed. 2d 90 (2004).   Art. 35.16 (a) (10) reads as follows:

> That from hearsay, or otherwise, there is established in the mind of the juror such a conclusion as to the guilt or innocence of the defendant as would influence the juror in finding a verdict.  To ascertain whether this cause of challenge exists, the juror shall first be asked whether, in the juror's opinion, the conclusion so established will influence the juror's verdict.  If the juror answers in the affirmative, the juror shall be discharged without further interrogation by either party or the court.  If the juror answers in the negative, the juror shall be further examined as to how the juror's conclusion was formed, and the extent to which it will affect the juror's action; and, if it appears to have been formed from reading newspaper accounts, communications, statements or reports or more rumor or hearsay, and if the juror states that the juror feels able, notwithstanding such opinion, to render an impartial verdict upon the law and the evidence, the court, if satisfied that the juror is impartial and will render such verdict, may, in its discretion, admit the juror as competent to serve in such a case.  If the court, in its discretion, is not satisfied that the juror is impartial, the juror shall be discharged...

The state courts utilize an abuse of discretion standard when evaluating a trial court's ruling on a challenge for cause. *Blue v State,* 125 S.W. 3d 491, 497 (Tex. Crim. App. 2003) *cert. denied,* 160 L.Ed. 2d 87 (2004); *Herron v State,* 86 S.W. 3d 621, 629 (Tex. Crim. App. 2002); *Feldman v State,* 71 S.W. 3d 738, 749 (Tex. Crim. App. 2002); *Hart v State,* 173 S.W. 3d 131, 142 (Tex. App. -- Texarkana 2005, *no pet.*).  The trial court's ruling is reviewed with considerable deference being given because the trial court is in the best position to evaluate the venire member's demeanor and

responses. *Newbury v State,* 135 S.W. 3d 22, 32 (Tex. Crim. App. 2004) *cert. denied,* 160 L.Ed. 2d 376 (2004)*; Granados v State,* 85 S.W. 3d 217, 231 (Tex. Crim. App. 2002) *cert. denied,* 155 L.Ed. 2d 321 (2003); *See also, Routier v State,* 112 S.W. 3d 554, 588 (Tex. Crim. App. 2003) *cert. denied,* 158 L.Ed. 2d 728 (2004).

Ms. Anderson's interest in this case was apparent from her answers during her individual voir dire. Of particular concern was her misinformation. The dissemination of inaccurate information relative to this case through the various media outlets was illuminated through her responses; her rapt attention to those sources, manifest. To believe that this woman was capable of forgetting such information was preposterous, if not ludicrous. Moreover, her glaring belief in Petitioner's guilt had the most pernicious effect. The trial court expressed its concern, obviously wavering in its ruling on Appellant's objection:

> The Court, when she began to go into all this, I took -- I observed her completely and totally the whole time. I have listened to what she had to say. I vacillated as she vacillated. And I feel like frankly that based upon what I have observed that I am going to overrule the challenge and she will be juror number 42.
> (21 RR 71.)

Though the trial court evidently believed that Ms. Anderson could base her decision strictly on the evidence presented at trial, the record chronicling her preconceived notions about Petitioner speaks for itself. As a result, the trial court abused its discretion in refusing to grant the defense challenge for cause.

The Sixth Amendment guarantees the accused the right to trial by an impartial jury. When a trial is biased against a defendant, the Fourteenth Amendment Due Process Clause requirement

-380-

of an impartial and disinterested tribunal is violated and reversal is automatic. *See Porter v. Singletary,* 49 F.3d 1483, 1489 (11th Cir. 1995) (evidence that "the judge had a fixed predisposition to sentence this particular defendant to death if he were convicted" warrants relief); *see also Arizona v. Fulminante,* 499 U.S. 279, 111 S. Ct. 1246, 1265 (1991); *Marshall v. Jerrico, Inc.,* 446 U.S. 238 (1980).

This bias analysis also applies to biased jurors.  In *Leonard v. United States,* 378 U.S. 544, 84 S. Ct. 1696 (1964) (*per curiam*), the Court reversed a conviction because of the "implied bias" of certain jury members at Leonard's second trial who had been in the courtroom during the announcement of the guilty verdict at his first trial.  There are other circumstances under which implied bias would be appropriate. *See Smith v. Phillips,* 455 U.S. 209, 102 S. Ct. 940, 949 (1982) (O'Conner, J., concurring).  Juror bias, whether presumed or proven, requires automatic reversal. *Id.*

Harm from the erroneous denial of a defense challenge during voir dire occurs when: (1) a defendant exercises a peremptory challenge on a venire member whom the trial court should have excused for cause at the defendant's request, (2) the defendant uses all of his statutorily allotted peremptory challenges, and (3) the defendant unsuccessfully requests an additional peremptory challenge which he claims he would use on another venire member whom the defendant identifies as objectionable and who actually sits on the jury. *Newbury, supra* at 30-31.  Since Ms. Anderson was one of the twelve jurors in Petitioner's case who found him guilty of this offense, harm has been established.

### C. What was presented to the state courts.

The claim was presented in the direct appeal as Point of Error Number Three (Exhibit 4, direct appeal brief, at pages 31 to 43.)  The claim is exhausted and not defaulted.

Petitioner respectfully requests that this Court reverse the trial court's Judgment and Sentence of Death, and remand his case for a new trial.

**CLAIM TEN: TRIAL COURT ERROR FOR ABUSE OF ITS DISCRETION IN DENYING PETITIONER'S MOTION TO SUPPRESS HIS ALLEGED STATEMENTS MADE TO DETECTIVE CARROLL**

Mr. Barbee's conviction and death sentence are invalid under state and federal constitutional guarantees of due process, a fair trial, a reliable sentence, and to be free from cruel and unusual punishment. Mr Barbee is entitled to a new trial because the trial court improperly denied the defense motion to suppress Mr. Barbee's alleged statements to Detective Carroll in the Tyler Police Department bathroom and in the office of the Tyler Police Department and the statements allegedly made the next day in the car to find the victim's bodies U.S. Const. amend. VI, VIII, XIII, & XIV.

**A. Facts in Support.**

**i. The Bathroom Statement**

During the hearing on Petitioner's original Motion to Suppress any oral or written statements, the State elicited testimony from Detective Carroll of the Fort Worth Police Department regarding three separate inculpatory statements allegedly made by Petitioner, the first of which took place in the bathroom of the Tyler Police Department. Det. Carroll testified to the following:

> Q.      What is it that he [Petitioner] said?
>
> A.      First he said he was going to go to jail [sic] the rest of his life. And I asked him, "What do you mean by that?" He went on to say that he didn't mean to, but he killed Lisa. From there he went on to talk about in detail what happened.
>
> Q.      What detail do you recall him giving you at that point?

A.      He talked about why he went over, that she was trying to break up his marriage with Trish, he loved his wife very much, he didn't want to lose that relationship; and so he talked about in detail about their relationship.

He also talked about the fact that he went to the house in an attempt -- there was a plan to kill Lisa that he and Ron had discussed.  They had gone to the house and wanted him to carry out this plan, and he couldn't do it.  So he called Ronald Dodd and said, "I can't do it," so Ron picked him up.

Q.      Did he tell you how he had gotten to her house in the first place?

A.      Ronald Dodd had dropped him off.

Q.      And that when the intent -- when that took place, the intent had been to kill -- that he was going to kill Lisa?

A.      That's correct.

Q.      But he had called Dodd to come pick him up, that he could not do it?

A.      Well, the plan was -- he said they were going to meet at Ronald Dodd's house and Ron was going to take him over to kill Lisa.  When he got there, he couldn't go -- he was going to leave his car at Ronald Dodd's house.  When he got there, he couldn't go through with it, so he left the house and called Ronald Dodd.  Ronald Dodd picked him up and took him back to Dodd's house where they discussed it again.  At that point Dodd made the comment, "Should we hire a hit man," and he said, "No, I can do it."  So then Dodd took him back to Lisa's house.

Q.      Was there any discussion about him being -- him being Stephen Barbee -- provoking an argument, provoking a fight in some way?

A.      Yes.   Apparently the first time he couldn't get her upset -- he couldn't get mad enough to kill her.

-384-

Q.      Why was that important to him?

A.      I don't think he could go through with it unless he could get upset or mad at her.

Q.      So the second time around?

A.      The second time around he went back and they got into a fight.  He picked an argument with her.

Q.      Did he say what happened when he got into that fight?

A.      He did say that she let him in.  They got into an argument.  She kicked him in the leg and he punched her in the nose.  Then they began to fight. He then held her down on the carpet for quite some time.  He told me he thought he held her too long, and she stopped breathing.  At that point during the struggle, the fight, the seven-year old, Jayden, walks in, and he's crying.  So he approaches Jayden, puts his hand over Jayden's mouth and nose and suffocates him.

Q.      Did he say what happened -- did he tell you any more detail about what happened while -- about the crime itself while y'all were there in the bathroom?

A.      He did talk about trying to clean up the crime scene, straighten up the place; that he left the house through the garage because he didn't have a key so it appeared locked.  He put both of the bodies in the back of her vehicle and left.

Q.      Now, did you ask -- did he -- were there other comments that he made during this time period about his -- who he was personally, about things that -- things he did or things he felt during that time period?

A.      Yes.  He also told me then that he had lost a loved one and that he felt he understood that -- what Lisa's family would be going through, and so he

said that he buried both victims together and said a prayer for both victims.  And he also wanted closure for Lisa's family, and he asked if he could speak with them.
(15 RR 28-31.)

## ii.      The Office Statement

After the purported conversation in the restroom, Det. Carroll escorted Petitioner to an office in the Tyler Police Department in order to utilize the internet MapQuest site  to ascertain the location of the bodies.  During the hearing on Petitioner's Motion to Suppress Det. Carroll detailed the conversation that ensued between them:

> Q.      What did you do?
>
> A.      We then went to Detective Cashell's office because Barbee agreed to show us on a map exactly where the bodies had been buried.  So we went back into the office and got on MapQuest on the computer, and he looked and kind of pointed out to us where the bodies were.  He gave a description.
>
> Q.      And the description that he gave you -- he's describing to you the location?
>
> A.      Yes.
>
> *      *      *
>
> Q.      Were you able to locate with any degree of specificity where these bodies were?
>
> A.      Yes.
>
> Q.      Enough to where you could have driven there yourself the next day?

A.     Yes.
(15 RR 33-34.)

### iii.  The Police Car Statement

Finally, during the ride back to Fort Worth the following morning, Det. Carroll contended

that Petitioner initiated a conversation with him that consisted of various incriminating comments.

Det. Carroll testified as follows during the suppression hearing:

Q.     Did the Defendant -- did he appear to
have concerns that he wanted to talk to you about?

A.     Yes.

Q.     What were those concerns?

A.     As we were driving -- like I said, we
were just making small talk.  And as we were heading
that way, we had probably been driving for maybe 30,
40 minutes when he said that he wanted to take us to
the bodies but he didn't want to see the bodies.

*     *     *

Q.     So you were headed toward the
location that he gave you the night before.

A.     That's correct.

Q.     And he's asking you some questions.
What were the questions?

A.     He asked about wanting to take us to
the bodies but not wanting to see the bodies.  His
other concern was not wanting to be seen by the
media.  Those were his two concerns.

Q.     What did you tell him?

A.      I said he wouldn't have to see the bodies, and I would make sure the media is not present when he arrived on the scene.

Q.      As you got closer -- I mean, as I understand it, you have to drive all the way -- whether you are going to the bodies or to downtown Fort Worth, you have to drive all the way to 287 on I-20 anyway; is that correct?

A.      That's correct.

*      *      *

Q.      As you got past downtown, you were going toward the direction of where the bodies were, at some point did the Defendant tell you how to get there?

A.      Yes.  We -- we had a basic idea from his description from looking at the map and how he described to us where the bodies were, where we were going.  I also knew from that description that my sergeant and a lot of officers were in that same area.

*      *      *

Q.      Text-messaged?

A.      Text-messaged through my cell phone to my sergeant saying we were getting close.  So the plan was that he would get the media away from there so Barbee wouldn't have to see them.

So our plan was to take 35 to another exit. However, as we got to the exit we were going take, [sic] Barbee cut in and said, "No, take this street," and directed us to another road.  And so at that point he kind of guided us in through a back way.  Instead of going the direction we were going off 35, he guided us in through a back way to the same location.

*      *      *

Q.      How did you go about locating the bodies?

-388-

A.      When he described -- as we came off the road, he said, "We are going into a gate, and along the road there will be a body of water to the right." So I saw that as we turned in.  He said it would be pretty close as we entered.

*    *    *

Q.      So you pull up --

A.      So as we pulled in -- the night before he described that as we pull into this gate, just about a few yards into the gate to the left there will be two barbed-wire fences.  Over that second set of barbed-wire fences will be some shrubbery and a fresh dug grave he described and loose shrubbery on top of it.

As we entered the gate and drove a little bit to the left, I saw such a mound of debris, but farther down I saw a second such description.

So Stephen said -- he looked at that one and made the comment to me that he thought that was it. Then he said, "Wait, wait.  Go further down."

So we drove to the second mound.  We looked at that one for a minute, and then said, "No, back up." So we started to back up.

At that point I got out of the truck and went over the fence.  As I went over the fence, Stephen Barbee is yelling instructions to me; also Officer Thornhill is standing near the truck, so he's relaying information to me also of what he's telling me, to walk further to my left, walk further to my left as I was going back toward that first mound of debris, and that's where I found the bodies.

(15 RR 43-47.)

All of Det. Carroll's testimony was admitted before the jury over Petitioner's objections. (15 RR 75-84; 22 RR 76-83; 23 RR 2-4; 24 RR 99-115, 123-131.)

**B. Analysis and Argument.**

Art. 38.22 sec. 3 (a) of the Tex. Crim. Proc. Code Ann. (Vernon 2001) reads as follows:

> No oral or sign language statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless:
>
> (1)   an electronic recording, which may include motion picture, video tape, or other visual recording, is made of the statement;
>
> (2)   prior to the statement but during the recording the accused is given the warning in Subsection (a) of Section 2 above and the accused knowingly, intelligently, and voluntarily waives any rights set out in the warning;
>
> (3)   the recording device was capable of making an accurate recording, the operator was competent, and the recording is accurate and has not been altered;
>
> (4)  all voices on the recording are identified; and
>
> (5)  not later than the 20th day before the date of the proceeding, the attorney representing the defendant is provided with a true, complete, and accurate copy of all recordings of the defendant made under this article.

Strict compliance with all portions of *sec. 3 (a)* is required. *Nonn v State,* 117 S.W. 3d 874, 879 (Tex. Crim. App. 2003); *Davidson v State,* 25 S.W. 3d 183, 185 (Tex. Crim. App. 2000) *aff'd,* 42 S.W. 3d 165 (Tex. App. -- Fort Worth 2001)*; Vega v State,* 32 S.W. 3d 897, 901-02 (Tex. App. -- Corpus Christi 2000) *rev'd on other grounds,* 84 S.W. 3d 613 (Tex. Crim. App. 2002).

Sec. 3 (c) of art. 38.22 is an exception to the requirement that oral statements be recorded before they can be admitted into evidence:

> Subsection (a) of this section shall not apply to any statement which contains assertions of facts or circumstances that are found to be true and which conduce to establish the guilt of the accused, such as the finding of secreted or stolen property or the

> instrument with which he states the offense was
> committed.

*See Woods v State,* 152 S.W. 3d 105, 117 (Tex. Crim. App. 2004) *cert. denied,* 161 L.Ed. 2d 1092

(2005); *Moore v State,* 999 S.W. 2d 385, 400-01 (Tex. Crim. App. 1999) *cert. denied,* 147 L.Ed. 2d

252 (2000).  The appellate standard of review regarding the admission of evidence pursuant to a

motion to suppress is abuse of discretion. *Martin v State,* 173 S.W. 3d 463, 467 (Tex. Crim. App.

2005)*; Frank v State,* 183 S.W. 3d 63, 75 (Tex. App. -- Fort Worth 2005, *pet. ref'd); Alameda v

State,* 181 S.W. 3d 772, 780 (Tex. App. -- Fort Worth 2005, *pet. granted).*  The trial judge is the sole

trier of fact at a suppression hearing and evaluates the credibility of the witnesses accordingly.

*Torres v State,* 182 S.W. 3d 899, 902 (Tex. Crim. App. 2005)*; Lambeth v State,* No. 2-04-140-CR,

slip op. 5 (Tex. App. --Fort Worth Apr. 5, 2007) available at

*http://www.2ndcoa.courts.state.tx.us/opinions/htm/opinion.asp?OpinionId=18479; State v Garrett,*

177 S.W. 3d 652, 655-56 (Tex. App. -- Houston [1st Dist.] 2005, *pet. ref'd [3]).*  A trial court clearly

abuses its discretion when its decision is so clearly wrong as to lie outside that zone within which

reasonable persons might disagree, *Apolinar v State,* 155 S.W. 3d 184, 186 (Tex. Crim. App. 2005);

*State v Franco,* 180 S.W. 3d 219, 225 (Tex. App. -- San Antonio 2005, *pet. ref'd* [2]); *Carty v State,*

178 S.W. 3d 297, 304-05 (Tex. App. -- Houston [1st Dist.] 2005, *pet. ref'd*) or if its ruling was

reached arbitrarily and unreasonably without reference to any guiding rule or principle. *Bradford

v State*, 178 S.W. 3d 875, 878 (Tex. App. -- Fort Worth 2005, *pet. ref'd*); *Stewart v State*, 162 S.W.

3d 269, 273 (Tex. App. -- San Antonio 2005, *pet. ref'd*); *Jiminez v State*, 67 S.W. 3d 493, 504 (Tex.

App. -- Corpus Christi 2002, *no pet.*).

Here the trial court ruled Petitioner's's oral statements admissible because he provided details pertinent to the burial location of the bodies of Lisa and Jayden Underwood. (2 CR 474-475.) However, prior to Petitioner's information in this regard, Ron Dodd had already volunteered this information to the police. (2 CR 475.)   During the second hearing on Petitioner's Motion to Suppress, Det. J.D. Thornton testified that the police would have been able to locate the bodies based upon the information provided by Ron Dodd and without Petitioner's assistance:

> Q.      And when did you hear about where the bodies were buried?  When did you find that out?
>
> A.      Well, we had a general idea.
>
> Q.      Okay.  And what was that based on?
>
> A.      That was originally based on information from Detective McCaskell.
>
> Q.      And what was his -- was that based on his conversation with a particular person?
>
> A.      Yes, sir.
>
> Q.      Who was that?
>
> A.      That was Mr. Dodd.
>
> Q.      That would have been information that Defendant [sic] McCaskell got while he was interviewing Ron Dodd in Tyler?
>
> A.      That's correct.
>
> Q.      About what time did you have that information?
>
> A.      It would have been shortly before the conversation with Carroll.  Again, I didn't document the time --

Q.      Would it be evening hours of the 21st?

A.      Yes, sir.

\*     \*     \*

Q.      Okay.  Well, I want to ask you to go back through that, if you don't mind.  When you say we got and -- who gave you this information that you are talking about?  Did you get it from Detective Carroll?

A.      I got it from originally Detective McCaskell.  Once I was contacted by Detective Carroll and given information about the confession, my conversations usually were with him from then on.

Q.      Okay.  Now, when you got this information from Detective McCaskell, was he already on the way from Tyler with Ron Dodd?

A.      No, when the original information came, he was still in Tyler.

\*     \*     \*

Q.      I guess here is what I am getting at, Detective Thornton.  Did you have enough information before Stephen Barbee actually got there to say that's where the bodies are?

A.      We would have found the bodies.

Q.      Okay.  And you would have found the bodies, but based on the information you got when?

A.      Throughout the night.

Q.      Well, so -- if Mr. Barbee, then, had decided at five o'clock in the morning on the 22nd, "I am not going to talk to the police anymore, I am not going to say another word," it is your position that you would have found the bodies based on what you already knew?

-393-

A.      <u>Yes, it is.</u>

*     *     *

Q.      And based on all those conversations, at 7:00 o'clock in the morning, even though you were the distance between you and me apart, you didn't find the bodies.

A.      That's correct.

Q.      <u>It was only after that, that you found the bodies; is that right?</u>

A.      Our position, yes, was to let Mr. Barbee come and show us exactly where they were.

Q.      Okay.

A.      <u>If that didn't work out, we were prepared to make a search of that area; and, yes, in my opinion we would have discovered the bodies. We would have found them.</u>

Q.      <u>You would have found them anyway even if he hadn't shown up.</u>

A.      <u>Yes.</u>

Q.      <u>Even though you didn't find them and you were looking for them.</u>

A.      <u>Well, there were two of us looking for them.  There were two of us walking an area which probably initially ten acres.  So with [sic] number of people we had coming out, the number of dogs we had coming out, we hadn't flown the helicopter over yet, we hadn't done anything of that yet.  There were just two of us making a walk-through of that area.</u>
(22 RR 46-54)(emphasis added.)

-394-

Detective McCaskell, who had interviewed Ron Dodd at the Tyler Police Department, also confirmed that the information regarding the location of the bodies came from Mr. Dodd.  He related:

> Q.	Did you ultimately have an interview with a Ron Dodd in the Tyler police department?
>
> A.	Yes, sir, I did.
>
> Q.	Would that have been 7:00 8:00 o'clock that night?
>
> A.	Yes.
>
> *	*	*
>
> Q.	All right.
>
> A.	There was some information that had come forth in my part of the investigation that brought us back this way.
>
> Q.	Tell us what that was.
>
> A.	I had received some information from Mr. Dodd, if that's permissible?
>
> Q.	Yeah.
>
> A.	That he had an idea of where Mr. Barbee had last been seen with the remains of Lisa and Jayden Underwood.
>
> Q.	And you wanted to go see where they were?
>
> A.	Yes.
>
> *	*	*

Q.      Was that generally because you had Ron Dodd with you, and he was going to show you where he thought these bodies might be?

A.      Yes, sir.

Q.      I mean, that's the gist of why you came back?

A.      Yes, sir.

Q.      And Ron Dodd, did he appear like he was cooperating with you?

A.      He did.

Q.      So you had good intentions to go try and find these bodies?

A.      Yes.
(22 RR 57-60.)

Based upon the testimony of the State's witnesses, the detectives would have located the bodies based upon the information previously gleaned from Ron Dodd; they did not need Petitioner. When Petitioner finally agreed to talk, the police were already aware of the general location, and by their own admission, would have honed in on the site without his assistance.  As a result, the evidence eventually provided by Petitioner was not unknown to the authorities.

The erroneous admission of Petitioner's incriminating statements amounts to constitutional error, as it rendered the trial unfair, and reversal is required if a substantial right has been affected. A substantial right is affected when the error has a substantial and injurious effect or influence in determining the jury's verdict. *Woods* at 118-19. *See also, Wappler v State,* 104 S.W. 3d 661, 668-69 (Tex. App. -- Houston [1st Dist.] 2003) *rev'd on other grounds and remanded,* 138 S.W. 3d 331

(Tex. Crim. App. 2004) *rev'd on other grounds,* 183 S.W. 3d 765 (Tex. App. -- Houston [1st Dist.] 2005, *no pet.).*  Obviously the admission of these highly incriminating statements before the jury influenced the jury's verdict of guilt.   A principal facet of the State's case hinged on Petitioner's knowledge of the precise location of the burial site.  Without this evidence, Petitioner likely would have been acquitted of this offense.   The admission of this prejudicial testimony had a profound impact on his fate.

Because the trial court abused its discretion by admitting Petitioner's oral statements into evidence before the jury, Mr. Barbee respectfully prays that this Court   remand his case for a new trial.

**C. The claim is exhausted and not subject to procedural default.**

This claim was multiply presented, as Points of Error Numbers 4, 5, 6, and 7 in his direct appeal. (Exhibit 4, pages 44-66.)  Thus, the claim is exhausted and not procedurally defaulted.

<u>CLAIM ELEVEN</u>:  ARTICLE 37.071(e) & (g)'S PROHIBITION AGAINST INFORMING JURORS THAT A SINGLE HOLDOUT JUROR WILL CAUSE THE IMPOSITION OF A LIFE SENTENCE VIOLATED MR. BARBEE'S RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

A.    **Texas' "12-10 rule" violated Mr. Barbee's rights under the Eighth and Fourteenth Amendments to the United States Constitution and Article I, section 13 of the Texas Constitution**

The version of TEX. CODE CRIM. PRO. Art. 37.071 in operation at the time of Petitioner's trial provided that in order for the trial court to impose a death sentence, all twelve jurors had to answer both of the "special issues" affirmatively; to impose a life sentence, at least ten jurors had to answer any of the special issues negatively.  A failure of a capital sentencing jury to garner the requisite number of votes either way resulted in the imposition of a life sentence.  However, Petitioner's **jurors were not informed that if they failed to reach a collective decision either way -- if one juror answered "no" to any special issue -- the court would impose a life sentence.**  Instead, they were instructed by the trial court that the jury must either unanimously agree to answer both of the "special issues" affirmatively (in which case a death sentence would be imposed), or ten or more jurors were to agree to answer one or more of the "special issues" negatively (in which case a life sentence would be imposed).[156]  As we shall see, this had dramatic consequences for Mr.

---

[156]    The court instructed Mr. Barbee's jury:
In deliberating on Special Issue No. 1, the jury shall consider all evidence admitted at the guilt or innocence stage and the punishment stage, including evidence of the defendant's background or character, or circumstances of the offense that militates for or mitigates against the imposition of the death penalty...
The jury may not answer Special Issue No. 1 "Yes" unless the jury agrees unanimously on the answer.
You are instructed that in answering Special Issue No. 1, the jury may not answer "No" unless ten or more jurors agree...
You may not answer [Special Issue No. 2] "No" unless the jury  unanimously agrees, and you may not answer the issue "Yes" unless ten or more jurors agree.
2 CR 400-401 (<u>Exhibit 6.</u>)

Barbee's jury.

The collective operation of these provisions of Article 37.071, upon which Texas capital sentencing jury charges are modeled, has come to be known as the "12-10 rule."[157]  This feature of 37.071 creates the potential for considerable confusion among reasonable jurors.  The United States Supreme Court has held that, in judging the constitutionality of a capital sentencing statute, a court must ask how a reasonable juror could view his or her role under the statutory scheme.  *See California v. Brown*, 479 U.S. 538, 541 (1985); *Francis v. Franklin*, 471 U.S. 307, 315-16 (1985). The Texas statute implicitly informs a juror that, absent similar votes from nine other jurors, his or her "no" vote to a special issue -- e.g. a vote against the imposition of the death penalty -- is meaningless because it alone cannot be sufficient to result in a life sentence.

Texas' 12-10 rule generates the danger that confused jurors otherwise disposed to vote for a life sentence will conform to a "majority rules" mentality.  Potential holdout jurors may reasonably believe that their votes in favor of a life sentence are worthless unless nine others join them; if a majority of other jurors are firmly voting "yes," a single juror may feel obliged to vote "yes" since there would appear to be no possibility of a life sentence and the jury has been instructed to return a verdict.  *See Mills v. Maryland*, 486 U.S. 367, 383 (1988) ("[C]ommon sense . . . suggest[s] that juries do not leave blanks and do not report themselves as deadlocked over mitigating circumstances after reasonable deliberation . . . unless they are expressly instructed to do so.").  Such a belief on the part of a juror is contrary to Texas law, which dictates that if a capital juror is unable to agree on answer to any of the special issues, the court must sentence the defendant to life.

---

[157] *See* Robert J. Clary, "Voting for Death: Lingering Doubts About the Constitutionality of Texas' Capital Sentencing Procedure," 19 *St. Mary's L. J.* 353, 358-59 (1987).

In *Davis v. State*, 782 S.W.2d 211 (Tex. Crim. App. 1989), the Court acknowledged the possibility that "'a juror who conscientiously believes that the evidence called for a life sentence might nevertheless vote for the death penalty in order to avoid mistakenly assumed consequences of jury deadlock.'"  *Id.* at 221, quoting *Barfield v. Harris*, 540 F.Supp. 451, 472 n. 17 (E.D.N.C. 1982), *affirmed*, 719 F.2d 58 (4th Cir. 1983), *cert. denied*, 467 U.S. 1210 (1984).  However, the *Barfield* opinion quoted in *Davis* also speculated that it was just as likely that a life-prone juror would refuse to consider the evidence and the views of her fellow jurors in favor of a death sentence if she knew her steadfastness would result in a life sentence.  *Id.*  The *Barfield* opinion, cited with approval by the Texas Court of Criminal appeals concluded that:

> Neither scenario results in a "reliable" or desirable process of deliberation, but the court cannot say that the first scenario is significantly more likely to occur as a result of not giving the instruction than is the second as of giving it.  *Id.*

Support for the proposition that a juror in the minority may be subject to coercion, and that such coercion results in a constitutionally unreliable sentence, is found in the United States Supreme Court's cases criticizing the practice by trial courts of inquiring into the numerical division of deadlocked juries prior to requiring further jury deliberations.  *See, e.g., Lowenfield v. Phelps*, 484 U.S. 231, 239-40 (1988); *Brasfield v. United States*, 272 U.S. 448, 450 (1926).  In such cases, the Court has held that "inquiry into the jury's numerical division necessitated reversal because it was generally coercive and almost always brought to bear `in some degree, serious although not measurable, an improper influence upon the jury.'"  *Lowenfield*, 484 U.S. at 239 (citing *Brasfield*, 272 U.S. at 450).  Put another way, Texas' "12-10 rule" is a built-in impermissible "dynamite charge," which the Supreme Court has recognized as a possible Eighth Amendment violation in the capital sentencing context.  *See Lowenfield*, 484 U.S. at 240-41.

-400-

In *Kubat v. Thieret*, 867 F.2d 351, 371 (7th Cir. 1989), the United States Court of Appeals for the Seventh Circuit noted that the instructions to Kubat's jury stated both correctly and incorrectly the law as to whether a unanimous verdict was required to find a mitigating circumstance.[158]  However, they reasoned that the fact that the jury had heard a correct explanation of the law did not rescue the law's constitutionality:

> At worst, the jury may have retired for deliberations believing it had to reach a unanimous verdict on sentencing just as it had to do on the merits.  At best, it may have entered the jury room confused.  Indeed, even if only one juror had been confused, the reliability of the verdict is undermined.  For if that one juror thought that the death penalty should not be imposed, he or she might have submitted to the views of the other eleven because of the mistaken belief that unanimity was required.

*Kubat v. Thieret*, 867 F.2d 351, 371 (7th Cir. 1989).  As the reasoning of the Seventh Circuit reveals, there is little constitutional difference between a jury being instructed that they must find a mitigating circumstance unanimously, and a jury being instructed that they must answer a special issue unanimously or by a majority of 10 jurors.

The United States Supreme Court has held that the possibility that a jury may be confused about facts important to their capital-sentencing role has constitutional implications.  In *Simmons v. South Carolina*, 114 S. Ct. 2187 (1994) the Court held that a criminal defendant must be given the opportunity to inform the jury that he would never be eligible for parole if given a life sentence. *Id.* at 2196 (plurality opinion per Blackmun).  The plurality reasoned that "[t]he jury was left to speculate about petitioner's parole eligibility when evaluating petitioner's future dangerousness, and was denied a straight answer about petitioner's parole eligibility even when it was requested." *Id.*

---

[158]  As shown above, Mr. Barbee's jury received similarly ambiguous instructions. 2 CR 400-401 (Exhibit 6.)  They were also  told that the burden of proof in Special Issue No. 1 rests upon the State, and it must prove  that issue beyond a reasonable doubt. (*Id.* at 401.)

at 2195.  The information about petitioner's parole eligibility was of "obvious relevance . . . to the

jury's formidable sentencing task."  *Id*. at 2197.  The parallel is obvious: the significance of an

**individual** vote of "no" to either of the special issues was of "obvious relevance" to any jury, but

they were denied information on this point.  Justice Souter's concurring opinion in *Simmons* makes

the reliability concerns raised by potential jury confusion even clearer: "Whenever there is a

reasonable likelihood that a juror will misunderstand a sentencing term, a defendant may demand

instruction on its meaning. . . ."  *Id*. at 2198 (Souter, J., concurring).   The jurors in Petitioner's case

were told they could vote "no" to a special issue, but were never told what the result of that single

vote would be, as a result, they may have misunderstood the meaning of their vote.  Thus, the Texas

capital-sentencing scheme "diminish[ed] the reliability of the sentencing determination."  *Beck v.*

*Alabama*, 447 U.S. 625, 638 (1980).

        In this way, Article 37.071's "12-10 Rule" injected arbitrariness into the proceedings and

created an **unreliable** sentencing determination -- a constitutional violation of the highest order in

the capital sentencing context.[159]   *See State v. Williams*, 392 So.2d 619, 631 (La. 1980) (on

rehearing). In *Williams*, the court stated:

> In the present case the jurors were not fully informed of the consequences of their
> votes and the penalties which could result in each eventuality.  They were not told
> that, by their failure to decide unanimously, they would in fact decide that the court
> must impose a sentence of life imprisonment. . . .  **Instead, the members of the**
> **sentencing body were left free to speculate as to what outcome would be in the**
> **event there was no unanimity**.  Under these circumstances, individual jurors could

---

[159]  *See Lowenfield v. Phelps*, 484 U.S. 231, 238-39 (1988) (noting that capital sentencing
proceedings made unreliable by coercion of jurors violate Eighth Amendment); *Woodson v.*
*North Carolina*, 428 U.S. 280, 305 (1976) (opinion of Stewart, Stevens, & Powell, JJ.) (holding
that mandatory death sentences deprive defendants of reliable, individualized sentences in
violation of Eighth Amendment); *Cf. Gardner v. Florida*, 430 U.S. 349 (1977) (plurality
opinion) (holding that capital-sentencing procedures which restrict defendant's ability to offer
mitigating evidence lead to unreliable capital sentencing proceedings that violate due process
clause of Fourteenth Amendment).

rationally surmise that in the event of a disagreement a new sentencing hearing, and
perhaps a new trial, before another jury would be required.

*Williams*, 392 So.2d at 631 (emphasis added).  Such a risk of speculation and confusion was held

to be a constitutional violation by the Louisiana Supreme Court.  *Id.  See also State v. Ramseur*, 524

A.2d 188, 284 (N.J. 1987).   Like the statute under which Mr. Barbee was sentenced, the sentencing

statute at issue in *Williams* required the trial court automatically to impose a life sentence if the jury

deliberations ended in a deadlock.  *See* TEX. CODE CRIM. PRO. Art. 37.071(e) (Vernon's 1994).

*Williams* deemed constitutionally impermissible the **potential** for speculation and confusion on the

part of the jury.  Mr. Barbee is similarly entitled to relief.

> **2.      Texas' 12-10 rule violated Mr. Barbee's rights under the Eighth
>         Amendment to the United States Constitution, as construed by the
>         United States Supreme Court's decision in *Mills v. Maryland*[160]**

The 12-10 rule also violates the Eighth Amendment principle in *Mills v. Maryland*, 486 U.S.

367 (1988),[161] that it is unconstitutional to instruct capital sentencing jurors in a manner leading

reasonable jurors to believe that their individual vote in favor of returning a life sentence based on

particular mitigating factors is worthless unless some threshold number of jurors are in agreement

a that particular mitigating factor or factors exist.   That is, a constitutional violation occurs if a

reasonable juror could interpret the jury charge to instruct that there must be a meeting of the minds

among some threshold number of jurors[162] as to whether the mitigating evidence offered by the

---

[160]  486 U.S. 367, 383 (1988).

[161]  *See also McKoy v. North Carolina*, 494 U.S. 433 (1990) (holding that it is a violation
of the Eighth Amendment to require a unanimous verdict as to mitigating circumstances in
capital sentencing trials).

[162]  In *Mills*, the threshold number was twelve; under the Texas statute, the threshold
number is ten.

capital defendant warrants a negative answer to at least one special issue, thus resulting in the imposition of a life sentence. *See Mills*, 486 U.S. at 373-75. Unless jurors are informed of the result of a deadlock in such a situation, the risk that one or more jurors will cave into a "majority rules" mentality is too great under the Eighth Amendment. *See Mills*, 486 U.S. at 383 ("[C]ommon sense . . . suggest[s] that juries do not leave blanks and do not report themselves as deadlocked over mitigating circumstances after reasonable deliberation unless they are expressly instructed to do so.").

Under *Mills*, a constitutional violation would occur under the Texas scheme if reasonable jurors who were instructed pursuant to Article 37.071 were led to believe that their votes in favor of a life sentence based on particular mitigating factors would be worthless unless at least nine other jurors joined them.[163] *See Kubat v. Thieret*, 867 F.2d 351, 369-73 (7th Cir.), *cert. denied*, 493 U.S. 874 (1989). In *Kubat*, in finding a *Mills* violation, the Seventh Circuit was faced with a capital

---

[163] Under the Texas statute at issue here, jurors were not asked to find specific mitigating factors which were to be weighed against specific aggravating factors, as was true in *Mills*. Rather, as this Court is aware, Texas' unique capital sentencing scheme instead only asks jurors to answer three "special issues" -- whether a capital defendant committed the crime "deliberately" (however, this issue was not given to the jury in Mr. Barbee's case) and whether the capital defendant would pose a "future threat" to society if given a life sentence. *See* Tex. Code. Crim. Pro. Art. 37.071(b) (Vernon's 1989).

However, as the United States Supreme Court has repeatedly held, Article 37.071(b)'s "special issue" format permits juries to consider and give proper mitigating effect to almost all types of mitigating evidence. *See Johnson v. Texas*, 119 S. Ct. 2658, 2670 (1993) ("A Texas capital jury deliberating over the Special Issues . . . is likely to weigh mitigating evidence as it formulates . . . answers in a manner similar to that employed by capital juries in `pure balancing' states."); *Adams v. Texas*, 448 U.S. 38, 46 (1980) (in deliberating special issues, jurors answer "on the basis of all relevant evidence not only why the death sentence should be imposed but also why it should not be imposed"). Thus, for purposes of Petitioner's arguments herein, this Court must treat the Texas capital sentencing scheme as one in which jurors weigh mitigating factors against aggravating factors, just as jurors do under a "pure" balancing statute.

sentencing scheme virtually identical[164] to the one at issue in the present case:

> Kubat's jurors were never expressly informed in plain and simple language that even if one juror believed that the death penalty should not be imposed, Robert Kubat would not be sentenced to death. . . . [T]here is a substantial possibility that one or more of Kubat's jurors might have been precluded from granting mercy to Kubat because of a mistaken belief that the sufficiency of mitigating factors had to be found unanimously.

867 F.2d at 373; *cf. Andres v. United States*, 333 U.S. 740, 752 (1948) (reasoning that, in a federal death penalty case, a juror uninformed as to the consequences of a less-than-unanimous verdict "might reasonably conclude that, if they cannot all agree to grant mercy, then the verdict of death must stand unqualified").

The Ninth Circuit has similarly construed the Court's decision in *Mills. Mak v. Blodgett*, 970 F.2d 614, 624-625 (9th Cir. 1992), *cert. denied*, 113 S. Ct. 1363 (1993).  The *Mak* court stated:

> The Supreme Court has held that, where the underlying statute does not require unanimity [in assessing a life sentence], due process will not tolerate instructions that could reasonably be interpreted by a jury to preclude consideration of any mitigating factor unless a such a factor was unanimously found to exist. . . .  As in *Mills*, "[u]nless we can rule out the substantial possibility that the jury may have rested its verdict on the `improper' ground, we must remand for resentencing."

*Id.* at 625 (citations omitted) (quoting *Mills v. Maryland*, 486 U.S. 367, 377 (1988)).

In *Draughon v. State*, 831 S.W.2d 331 (Tex. Crim. App. 1992) the appellant argued the 12-10 rule could mislead the jury to believe that a sentence less than death was not possible unless ten or more jurors answered one of the special issues in the negative.  *Id.* at 337.  The *Draughon* opinion recognized that "it is conceivable that. . .[the jury] will surmise later instructions requiring ten votes for a negative answer [to] mean that a life sentence will not be imposed otherwise." *Id.*  The Court

---

[164] In *Kubat*, as in *Mills,* the jury was instructed that the threshold number of jurors required for a life sentence was twelve; in Texas, capital sentencing juries are instructed that the threshold number is ten.  The difference is irrelevant since the possibility for one or more jurors "caving in" and not voting for a life sentence based on particular mitigating evidence is identical.

further acknowledged that is was "troubled" by the implication of Draughon's argument "that. . .[the

Texas sentencing scheme], by requiring [a] consensus [of ten votes for a "no" answer to a special

issue], inhibit[s] the free exercise by each juror of his individual judgment about the propriety of a

death sentence." *Id*. at 338.  However, the Court stated:

> [I]t is the danger that jurors, unaware of the operation of the law, might mistakenly
> think a sentence other than death to be **impossible** unless ten of them agree that
> renders the procedure constitutionally suspect.  But, because the jury instructions of
> which Appellant here complains are not reasonably susceptible of such an
> interpretation, we are satisfied that no juror would be misled by them into thinking
> that an affirmative answer should be given unless ten or more jurors agree to give a
> negative one.

*Id*. at 338.  However, the Court of Criminal Appeals failed to consider the possibility that Texas' 12-

10 rule would mislead the jury to believe a mistrial would result from the jury's failure to garner 12

"yes" votes or 10 ten "no" votes, resulting in one or more jurors basing his or her determination on

an incorrect understanding of the law.

Even before the United States Supreme Court's decision in *Mills*, at least one other state

court has recognized the constitutional infirmity in a sentencing determination made after a jury had

"thrown away" their dissenting vote because they could not sway a majority of their fellow jurors.

In *People v. Durre*, 690 P.2d 165 (Colo. 1984), the jury was instructed according to Colorado law,

which called for them to explicitly note any mitigating or "additional mitigating" factors they found

and weigh them against the aggravating factors they found.  *Id.* at 175-76.  The jury was not told

how to find the mitigating factors or whether they had to agree on which factor called for leniency.

*Id*.  The foreman returned a jury form reflecting that they had found aggravating circumstances and

had found no mitigating circumstances, and thus that Durre should be sentenced to death.  *Id*. at 170.

However, the foreman attached a note to the form saying that though they could neither "claim the

mitigating circumstances" nor "deny the aggravating circumstances," nevertheless several jurors had concluded that Durre should not die. *Id*. The trial judge personally interviewed the five dissenting jurors, who told him that even though they felt that Durre should be spared, they agreed with the "verdict." *Id*. at 170 & n.10. The trial judge, however, dismissed their votes against death as the product of mere "conscientious difficulties" and sentenced the defendant to death in accordance with the general verdict. *Id*. at 170.

The Colorado Supreme Court reversed the death sentence, dismissing as "faulty" the state's contention that "jury findings on mitigation and aggravation involve no consideration whatever of the issue of punishment." *Id*. at 171. That court intoned:

> Without such an instruction [on the effect of their verdict], the jury will not only be required to labor in the dark about what it is actually deciding by its verdicts but also, of equal importance, will be ill-equipped to fulfill its function of serving as the vital link between contemporary community values and the propriety of the life-and-death decision which its verdicts necessarily resolve.

*Id*. at 173. Therefore, the Colorado Supreme Court ruled that jurors must be explicitly informed of the results of their findings of mitigating and aggravating circumstances. *Id*. at 174 & n.15. Here, Mr. Barbee's jurors were never informed of the results of any individual juror's decision to stick to his verdict for life. This is no different from not being told what the consequences of the entire jury's verdict would be. Any one of Mr. Barbee's jurors may have believed that by holding out for a life sentence, a mistrial would be declared.[165]   This aspect of Texas' 12-10 rule is a *Mills*

---

[165] The Louisiana Supreme Court explained the consequences of leaving the jury in the dark thus:

> Under these circumstances, individual jurors could rationally surmise that in the event of disagreement a new sentencing hearing, and perhaps a new trial before another jury would be required. Such a false impression reasonably may have swayed a juror to join the majority, rather than hold to his honest convictions, in order to avoid forcing the parties, witnesses and court officials to undergo additional proceedings.

violation *a fortiori*.  That is, a reasonable juror may have believed, contrary to Texas law, that they

had no ability to give mitigating effect to **any and all types of mitigating circumstances** unless at

least nine other jurors also voted for life.

This failure to instruct each individual juror of the consequences of his or her firmly held

beliefs was condemned by the Supreme Court over 100 years ago in *Calton v. Utah*, 130 U.S. 83

(1889).  In *Calton*,  the Supreme Court reversed a conviction under the Utah territorial statutes

where the jury had not been informed of the right to recommend a sentence other than death.   The

Court wrote that if the jury had their attention called to the alternative sentence then "it may be that

they might have made such a recommendation and thereby  enable the sentence to be a life

sentence."  In his opinion for the Court, the first Mr. Justice Harlan adopted the lower court's dissent:

> The prisoner was deprived of a substantial right. The determination of the question
> as to whether he should suffer death or imprisonment was one of vital consequence
> to him. The jury, to whom the statute commits the determination of that question, at
> least in part, were not informed of their duty and responsibility in the matter, so as
> to require them to exercise their judgment and discretion in relation to it, and by the
> verdict they rendered the court had none.

*Id*. quoting *Territory v. Catton*, 16 P. 902, 910 (Utah 1888) *rev sub nom Calton v. Utah*, 130

U.S. 83 (1889).

Petitioner recognizes that "[a] critical assumption underlying [the] system [of trial by jury]

is that juries will follow the instructions given them by the trial judge."  *Parker v. Randolph*, 442

U.S. 62, 73 (1979) (plurality opinion).  Here, though, the instructions themselves were deficient:

they "did not tell the whole truth, because [they] did not tell the jurors what to do in the event of a

disagreement."  *Gacy v. Welborn*, 994 F.2d 305, 307 (7th Cir. 1993), *cert. denied* 114 S. Ct. 269

---

*State v. Williams*, 392 So.2d 619, 634-35 (La. 1980).

(1993).  Where one instruction contradicts another instruction, it has constitutional consequences. Contradictory instructions make it impossible to know which instructions jurors used in reaching their verdict.  *Cabana v. Bullock*, 106 S. Ct. 689, 695 n.2 (1986).  Here, the jurors were instructed that each must be convinced beyond a reasonable doubt, but also instructed that it would take 10 votes to impose a life sentence.  Such contrary instructions were constitutionally deficient.  In *Boyde v. California*, 494 U.S. 370, 380 (1990), the Court held that the proper inquiry is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevent[ed] the consideration of constitutionally relevant [mitigating] evidence."

**CLAIM TWELVE:  LETHAL INJECTION – AS IT IS CURRENTLY ADMINISTERED IN TEXAS –  PRODUCES UNNECESSARY PAIN, TORTURE, AND LINGERING DEATH, AND VIOLATES THE EIGHTH AMENDMENT.**

The Eighth Amendment's proscription against cruel and unusual punishment forbids the infliction of unnecessary pain in the execution of a sentence of death.  *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 463 (1947) (opinion of Reed, J.); *Fierro v. Gomez*, 865 F. Supp. 1387, 1413 (N.D. Cal. 1994) (execution by lethal gas in California held unconstitutional where evidence indicated "death by this method is not instantaneous.  Death is not extremely rapid or within a matter of seconds.  Rather . . . inmates are likely to be conscious for anywhere from fifteen seconds to one minute from the time that the gas strikes their face" and "during this period of consciousness, the condemned inmate is likely to suffer intense physical pain" from "air hunger"; "symptoms of air hunger include intense chest pains . . . acute anxiety, and struggling to breath"), *aff'd,* 77 F.3d 301, 308 (9th Cir. 1996), *vacated on other grounds*, 519 U.S. 918 (1996).  Further, "[p]unishments are cruel when they involve . . . a lingering death."  *In re Kemmler*, 136 U.S. 436, 447 (1890).  A punishment is particularly constitutionally offensive if it involves the *foreseeable* infliction of suffering.  *Furman v. Georgia*, 408 U.S. 238, 273 (1973), citing *Resweber*, *supra* (had failed execution been intentional and not unforeseen, punishment would have been, like torture, "so degrading and indecent as to amount to a refusal to accord the criminal human status").

It is not only foreseeable, it is predictable that death by lethal injection as it is currently practiced in Texas – using a paralytic agent in combination with a sedative – will produce unnecessary pain, torture, and lingering death.  Evidence has existed for at least fifty years that the "drugs used in lethal injections pose a substantial threat of torturous pain to persons being executed." *Chaney v. Heckler*, 718 F.2d 1174 (D.C. Cir. 1983), *overturned on other grounds*, *Heckler v.*

*Chaney*, 470 U.S. 821 (1985) (citing ROYAL COMMISSION ON CAPITAL PUNISHMENT,

1949-1953 REPORT (1953)).  The Court of Appeals found that

> Appellants have presented substantial and uncontroverted evidence to support their claim
> that execution by lethal injection poses a serious risk of cruel, protracted death.   See
> ROYAL COMMISSION ON CAPITAL PUNISHMENT, 1949-1953 REPORT (1953),
> Exhibit 1 to Letter to the Secretary, supra, JA 34-40.   Even a slight error in dosage or
> administration can leave a prisoner conscious but paralyzed while dying, a sentient witness
> of his or her own slow, lingering asphyxiation.
> *Id*. at 1191.

Further, an employee of the Texas Department of Criminal Justice has admitted that the

Texas lethal injection protocol has not changed since it was first used in 1982.  *Judge Denies Stays*

*of Three Executions*, HOUSTON CHRONICLE, Dec. 9, 2003, at A29 (quoting a TDCJ official who

acknowledges that no changes have been made to the procedure in place since 1982).

What has changed over the last two decades, however, is that numerous states, most recently

the State of Texas, have enacted statutes regulating the euthanasia of animals which preclude using

the same combination of drugs currently administered to human beings during executions.[166]  If

evolving standards of decency, as reflected by legislative action and professional association of

veterinarians, preclude the use of these particular drugs when killing a dog or a cat, then certainly

those same standards of decency would require a more humane, readily available version of the

lethal injection for human beings as well.  "'The basic concept underlying the Eighth Amendment

is nothing less than the dignity of man . . . .   The Amendment must draw its meaning from the

evolving standards of decency that mark the progress of a maturing society.'" *Atkins v. Virginia*,

311-312 (2002) (quoting *Trop v. Dulles*, 356 U.S. 86, 100-101(1958)).

---

[166]   *See* <u>Exhibit 43</u>, Vernon's Tx. Health & S. §821.052 and 821.055 and related statutes
forbidding for animal euthanasia the combination of drugs used to execute humans in Texas.

**A.      The combination of chemicals used to execute inmates in Texas creates a strong probability of unnecessary suffering and torture**.

The State of Texas proposes to execute Mr. Barbee by poisoning him with a lethal combination of three chemical substances: Sodium Thiopental, or Sodium Pentothal (an ultrashort-acting barbiturate); Pancuronium Bromide, or Pavulon (a curare-derived agent which paralyzes all skeletal or voluntary muscles, but which has no effect whatsoever on awareness, cognition or sensation); and potassium chloride (an extraordinarily painful chemical which activates the nerve fibers lining the person's veins and which can interfere with the rhythmic contractions of the heart and cause cardiac arrest).[167]  While each of these chemicals individually creates concern about their use in the execution process, in combination they cannot pass constitutional muster.  Far from producing a rapid and sustained loss of consciousness and humane death, this particular combination of chemicals often causes the inmate to consciously suffer an excruciatingly painful and protracted death.

**1.      Sodium Thiopental**

Sodium thiopental, or sodium pentothal, is a short-acting barbiturate which is ordinarily used to render a surgical patient unconscious for mere minutes, only in the induction phase of anesthesia, specifically so that the patient may re-awaken and breathe on their own power if any complications arise in inserting a breathing tube pre-surgery.  Because of its brief duration, sodium thiopental may not provide a sedative effect throughout the entire execution process.  Dr. Dennis Geiser, the chairman of the Department of Large Animal Clinical Sciences at the College of Veterinary Medicine at the University of Tennessee, recently explained:

---

[167]  *See* Exhibit 43, drugs used to execute in Texas, from TDCJ website "Death Row Facts" at p. 2.

> Sodium thiopental is not a proper anesthetic for use in lethal injection. Indeed, the American Veterinary Medical Association standards for euthanasia indicate that the ideal barbituric acid derivative for animal euthanasia should be potent, long acting, stable in solution, and inexpensive. Sodium pentobarbital (not sodium thiopental) best fits these criteria. Sodium thiopental is a potent barbituric acid derivative but very short acting with one therapeutic dose.

(Affidavit of Dr. Dennis Geiser, in the case of *Texas v. Jesus Flores*, No. 877,994A).[168]

Due to the chemical combination used in the Texas execution process, there is also a probability that the sedative effect of the sodium thiopental is neutralized by the second chemical, pancuronium bromide. As Dr. Mark Heath, Assistant Professor of Clinical Anesthesia at Columbia University states:

> Sodium thiopental is an ultra short-acting barbiturate. It would not be used to maintain a patient in a surgical plane of anesthesia for purposes of performing surgical procedures. It is unnecessary, and risky, to use a short-acting anesthesia in the execution procedure. If the solution of sodium thiopental comes into contact with another chemical, such as pancuronium bromide, the mixture of the two will cause the sodium thiopental immediately to precipitate or crystallize. These factors are significant in the risk of the inmate not being properly anesthetized, especially since no-one checks that the inmate is unconscious before the second drug is administered.

(Affidavit of Dr. Heath, in the case of *Texas v. Jesus Flores*, No. 877,994A).[169]

Concerns about using sodium thiopental are heightened by the lack of medical personnel, the lack of proper monitoring of the inmate during the process and the lack of inmate-specific dosing of the barbiturate. According to Dr. Geiser:

> [T]he dosage of thiopental sodium must be measured with some degree of precision, and the administration of the proper amount of the dosage will depend on the concentration of the drug and the size and condition of the subject. Additionally, the drug must be administered properly so that the full amount of the dosage will directly enter the subject's blood stream at the proper rate. If the dosage is not correct, or if the drug is not properly administered, then *it will not adequately anaesthetize the subject, and the subject may experience the untoward effects of the neuromuscular blocking agent. . .*

---

[168]   *See* Exhibit 43.

[169]   *See* Exhibit 43.

Affidavit of Dr. Dennis Geiser, in the case of *Abu-Ali Abdur' Rahman v. Bell*, 226 F.3d 696 (6th Cir. 2000), *cert. granted on other grounds*, 122 S .Ct. 1463 (U.S. April 8, 2002) (No. 01-9094).(emphasis supplied).[170]

Moreover, drug manufacturers warn that without careful medical supervision of dosage and administration, sedatives  can cause "paradoxical excitement" and can heighten sensitivity to pain. *See* Physicians Desk Reference, 50th Ed. (1996) at 438-440.   Manufacturers warn against administration by intravenous injection unless a patient is unconscious or out of control.  *Id.*

### 2.        Pancuronium Bromide

The second chemical involved in the lethal injection process, pancuronium bromide, or Pavulon, is a derivative of curare that acts as a neuromuscular blocking agent.  If, as is probable in the Texas execution process, the sedative effect of the sodium thiopental is ineffective or neutralized, the pancuronium bromide would serve only to mask the excruciating pain of the condemned inmate.

> Pancuronium bromide makes the patient look serene because of its paralytic effect on the muscles.  The face muscles cannot move or contract to show pain and suffering.  It therefore provides a 'chemical veil' over the proceedings.  By completely paralyzing the inmate, pancuronium bromide masks the normal physical parameters that an anesthesiologist or surgeon would rely upon to determine if a patient is completely unconscious and within a proper surgical plane of anesthesia.  Because pancuronium bromide is an invisible chemical veil and not a physical veil like a blanket or hood that is easily identifiable, the use of pancuronium bromide in lethal injection creates a double veil.  It disguises the fact that there

---

[170]   The problems inherent in Texas' use of sodium thiopental and pancuronium bromide cannot be directly discounted because of TDCJ's sudden administrative decision in 1989 to cease conducting autopsies of executed individuals.  Texas' failure to collect any post-mortem data precludes the State from presenting any direct evidence to argue that the dosage of sodium pentothal injected into the veins of Texas condemned inmates still provides therapeutic levels of sodium pentothal: the terrible specter of inadequate anesthesia can never be ruled out for any Texas condemned inmate.

is a disguise over the process.

 (Affidavit of Dr. Heath, in the case of *Texas v. Jesus Flores*, No. 877,994A).[171]

In *Abdur' Rahman v. Bell*, Dr. Geiser asserted that while Pavulon paralyzes skeletal muscles, including the diaphragm, it has *no effect on consciousness or the perception of pain or suffering*. Administration of Pavulon is "*like being tied to a tree, having darts thrown at you, and feeling the pain without any ability to respond."* Affidavit of Dr. Dennis Geiser, in the case of *Abu-Ali Abdur' Rahman v. Bell*, 226 F.3d 696 (6th Cir. 2000), *cert. granted* on other grounds, 122 S.Ct. 1463 (U.S. April 8, 2002) (No. 01-9094) (emphasis added).  This assertion is corroborated by the experience of eye surgery patient, Carol Weihrer.  During Ms. Weihrer's surgery the sedative she received was ineffectual and Ms. Weihrer was conscious of the entire surgery.  Due to the administration of a neuromuscular blocking agent like pancuronium bromide, however, she was unable to indicate her consciousness to doctors:

> I experienced what has come to be known as Anesthesia Awareness, in which I was able to think lucidly, hear, perceive and feel everything that was going on during the surgery, but I was unable to move.  It burnt like the fires of hell.  It was the most terrifying, torturous experience you can imagine.  The experience was worse than death.

(Affidavit of Carol Weihrer, in the case of *Texas v. Jesus Flores*, No. 877,994A)[172].

In short, the second chemical, pancuronium bromide, or Pavulon, in the lethal injection protocol serves no purpose other than to guarantee that the condemned inmate will be forced into a total chemical straightjacket and gag while he consciously experiences the potassium chloride ravaging his internal organs.  Persons viewing the lethal injection procedure and the public will never realize that a cruel fraud is being perpetrated upon them: instead of witnessing an inmate quiet

---

[171]   Exhibit 43.

[172]   *Id.*

and motionless while being "put to sleep," they are in fact witnessing the cover-up of a deliberate act of excruciating torture for which only the inmate is fully conscious.[173]

### 3.        Potassium Chloride

Finally, the use of potassium chloride itself raises important Eighth Amendment concerns. James J. Ramsey, a certified perfusionist and currently the Program Director in the Program in Cardiovascular Perfusion at Vanderbilt Medical Center, Nashville, Tennessee, gave a lengthy statement in Abdur Rahman's case regarding the use of potassium chloride in lethal injections. Perfusion involves the study of medicine related to the artificial circulation technologies, including but not limited to the operation of the heart-lung machine, a medical device commonly used during open-heart surgeries of all kinds.   The arena involving the chemical arrest of the heart lies uniquely within the practice of the clinical perfusionist.

Regarding the administration and efficacy of potassium chloride in the lethal injection context, Ramsey stated that:

> It is my understanding that during the performance of lethal injection as carried out during the death penalty, potassium (and other agents) are administered intravenously to the defendant.  Such administration is, in my professional opinion based upon my knowledge, training, and experience, and within a reasonable degree of medical certainty, *entirely inadequate in order to achieve reasonable cardiac standstill*.   Since the agents are introduced intravenously, there will occur an immediate dilution of the solution, weakening any potential effect it may have.  By illustration an 80 kilogram person would have a blood volume of approximately 5.5 to 6 liters.  An administration of 100 milli-equivalents of potassium intravenously to the 80 kilogram person would result in a blood concentration of only 16.6 meq/L.  Such a dose is according to scientific literature… and as evidenced in my practice, inadequate to achieve cardiac standstill.
>
> Furthermore, it must be remembered that [in contrast to the administration of potassium chloride in the surgical context] such administration is: (1) NOT DIRECTED INTO THE CORONARY ARTERIES; (2) DIRECTED ONLY IN AN ANTEGRADE FASHION; AND (3) IS AT MORMOTHERMIA (37 degrees Celsius, NOT at five degrees Celsius).  Without

---

[173]   *See also* <u>Exhibit 43</u>, "Critics Say Execution Drug May Hide Suffering" by Adam Liptak, New York Times, Oct. 7, 2003.

reasonable data regarding any one person's anatomic and pathologic state as to their myocardial function prior to administration of the potassium, there can be no reasonable certainty that the potassium solution intended to arrest the heart would be distributed in a fashion that would arrest the heart.  Thus, the very orchestrated and methodical methods used in surgery should not be thought of as optimizing the arrest of the heart, but should be considered to be necessary as the only reasonable means of ensuring that the heart is arrested.  If the heart could be arrested by intravenous objections, cardiac surgery today would be a very different animal-science and research tell us that mere intravenous injection of potassium is not sufficient.

...

Additionally, in my professional opinion and within a reasonable degree of medical certainty, barring an effective cardiac arrest, it is entirely possible that a lethal injection as I understand it will serve ONLY to arrest the function of the pulmonary system, thereby causing a state of ischemia to the entire body (no oxygen delivery), which, in turn, will ultimately arrest the heart as well (with no oxygen delivery to it.) ***As a result, the defendant is simply suffocated due to lack of oxygen***.

Affidavit of James J. Ramsey, in the case of *Abu-Ali Abdur' Rahman v. Bell*, 226 F.3d 696

(6th Cir. 2000), cert. granted. on other grounds, 122 S.Ct. 1463 (U.S. April 8, 2002) (No. 01-9094)

(emphasis supplied).

### B.      The danger of lethal injection creating unnecessary suffering and torture is greatly increased by the lack of physician involvement in the execution process.

The risk of inflicting severe and unnecessary pain and suffering upon Mr. Barbee in the

lethal injection process is particularly grave in Texas because the meager procedures and protocols

designed by TDCJ fail to include safeguards regarding the manner in which the execution is to be

carried out, fail to establish the minimum qualifications and expertise required of the personnel

performing the critical tasks in the lethal injection procedure, and fail to establish appropriate criteria

and standards that these personnel must rely upon in exercising their discretion during the lethal

injection procedures.  For instance, TDCJ execution protocols do not explain what to do in case an

IV port cannot be established.  The experience of other states teaches that, in such a case, a

medically trained person must perform a "cut down" to expose a deeply buried vein, or perform an infraclavicular catheterization, or other invasive medical procedure to facilitate the subsequent lethal injection such as an attempt to establish a port through the carotid enclosure in the neck.  In Texas, the physician's services are limited to his or her pronouncing death.

There are no directions and no standards for the necessary training, education, or expertise of the personnel who will be exercising this critical discretion and performing these tasks and duties. TDCJ guidelines totally fail to articulate the criteria or standards that such personnel must rely upon in exercising this discretion.[174]  The consequences of this failure will likely result in the unnecessary and wanton infliction of severe pain and suffering.

Perhaps most importantly, there are no apparent  answers to  critical questions governing a number of crucial tasks and procedures in the lethal injection procedure such as

(a)     the minimum qualifications and expertise required for the different personnel performing the tasks involved in the lethal injection procedure after the catheter is inserted;

(b)     the methods for obtaining, storing, mixing, and appropriately labeling the drugs, the minimum qualifications and expertise required for the person who will determining the concentration and dosage of each drug to give, and the criteria that shall be used in exercising this discretion;

(c)     the manner in which the IV tubing, three-way valve, saline solution and other apparatus shall be modified or fixed in the event it is malfunctioning during the execution process, the minimum qualifications and expertise required of the person who shall have the discretion to decide to attempt such action, and the criteria that shall be used in exercising this discretion;

(d)     the manner in which the heart monitoring system shall be modified or fixed in the event it is malfunctioning during the execution process, the minimum qualifications and expertise required of the person who shall have the discretion to decide to

---

[174]     The protocols also fail to provide any direction regarding how TDCJ is to obtain these controlled substances in a manner that insures the drugs are effective, how to store the drugs in a manner to keep them effective, how to "mix" the drugs, or how to store and label the drugs once they have been prepared and transported to the execution chamber.

attempt such action, and the criteria that shall be used in exercising this discretion;

(e)     the manner in which the IV catheters shall be inserted into the condemned prisoner, the minimum qualifications and expertise required of the person who is given the responsibility and discretion to decide when efforts at inserting the IV catheters should be abandoned and the cut down procedure begun, and the criteria that shall be used in exercising this discretion;[175]

(f)     the manner in which the condition of the condemned prisoner will be monitored to confirm that proceeding to the next procedure would not inflict severe and unnecessary pain and suffering on the condemned prisoner;

(g)     the minimum qualifications and expertise required of the person who is given the responsibility and discretion to order the staff to divert from the established protocols if necessary to avoid inflicting severe and unnecessary pain and suffering on the condemned prisoner, and the criteria that shall be used in exercising this discretion; and

(h)     the minimum qualifications and expertise required of the person who is given the responsibility and discretion to insure that appropriate procedures are followed in response to unanticipated problems or events arising during the lethal injection procedure, and the criteria that shall be used in exercising this discretion.

This disturbing lack of outlined medical procedure and personnel in Texas contributes in part

to the numerous execution errors in Texas.  *See e.g.* Deborah Denno, *When Legislatures Delegate*

*Death: The Troubling Paradox Behind State Uses of Electrocution and Lethal Injection and What*

---

[175]  *See* Deborah Denno, *When Legislatures Delegate Death: The Troubling Paradox Behind State Uses of Electrocution and Lethal Injection and What It Says About Us*, 63 Ohio St. L.J. 106, n. 303 (February 2002) (citing Thomas O. Finks, Lethal Injection: An Uneasy Alliance of Law and Medicine, 4 J. Legal Med. 383, 397 (1983) (explaining that "(l)ethal injections may not work effectively on diabetics, drug users, and people with heavily pigmented skins"); Harold L. Hirsh, Physicians as Executioners, Legal Aspects of Med. Prac., Mar. 1984, at 1 (noting that "if a person is nervous or fearful, his veins become constricted"); *On Lethal Injections and the Death Penalty*, 12 Hastings Center Rep. 2, 2 (Oct. 1982) (explaining that lethal injections are particularly difficult to administer "to people with heavily pigmented skins . . . and to diabetics and drug users"); Jacob Weisberg, *This is Your Death: Capital Punishment: What Really Happens, New Republic,* July 1, 1991, at 23 (describing the 45 minutes required for technicians to find a serviceable vein in a former heroin addict); Another U.S. Execution Amid Criticism Abroad, N.Y. Times Apr. 24, 1992, at B7 (reporting that the difficulty in executing Billy Wayne White was due to his history as a heroin user).)

*It Says About Us*, 63 Ohio St. L.J. 111 (February 2002) (quoting Fred Leuchter, "the highly controversial and later-discredited creator of much, if not most, of the execution equipment in this country," as admitting that "'about eighty percent' of the lethal injections in Texas "have had one problem or another.").

Some of the previous errors in Texas executions include:[176]

- **Stephen Peter Morin** -- March 13, 1985 – "Technicians" punctured him repeatedly in both arms and legs for 45 minutes before they found a suitable vein.

- **Randy Woolls** – August 20, 1986 – A drug addict, Woolls had to help the executioner technicians find a good vein for the execution.

- **Elliot Johnson** – June 24, 1987 – Executioners struggled for 35 minutes to insert the catheter into his veins.

- **Raymond Landry** -- December 13, 1988 – Pronounced dead 40 minutes after being strapped to the execution gurney and 24 minutes after the drugs first started flowing into his arms.  Two minutes into the killing, the syringe came out of Landry's vein, spraying the deadly chemicals across the room toward the witnesses.  The execution team had to reinsert the catheter into the vein.  The curtain was drawn for 14 minutes so witnesses could not see the intermission.

- **Stephen McCoy** -- May 24, 1989 – Had such a violent physical reaction to the drugs (heaving chest, gasping, choking, etc.) that one of the witnesses (male) fainted, crashing into and knocking over another witness.  Houston attorney Karen Zellars, who represented McCoy and witnessed the execution, thought that the fainting would catalyze a chain reaction.  The Texas Attorney General admitted the inmate "seemed to have a somewhat stronger reaction," adding "The drugs might have been administered in a heavier dose or more rapidly."

- **Billy Wayne White**  – April 23, 1992 – It took 47 minutes for authorities to find a suitable vein, and White eventually had to help.

- **Justin Lee May** – May 7, 1992 – May had an unusually violent reaction to the lethal drugs.  According to Robert Wernsman, a reporter for the Item (Huntsville), Mr. May "gasped, coughed and reared against his heavy leather restraints, coughing once again before his body froze . . ."  Associated Press reporter Michael Graczyk wrote,

---

[176]  Sources for this information include: Michael Radelet, "On Botched Executions" Peter Hodgkinson and William Schabas (eds.), *Capital Punishment: Strategies for Abolition* (Cambridge University Press, 2001) and Stephen Trombley, *The Execution Protocol*, (1992).

"He went into coughing spasms, groaned and gasped, lifted his head from the death chamber gurney and would have arched his back if he had not been belted down. After he stopped breathing his eyes and mouth remained open."

- **Joseph Cannon** – April 22, 1998 – After his final statement, the execution commenced. A vein in Cannon's arm collapsed and the needle popped out. Seeing this, Cannon lay back, closed his eyes, and exclaimed to the witnesses, "It's come undone." Officials then pulled a curtain to block the view of witnesses, reopening it fifteen minutes later when a weeping Cannon made a second final statement and execution process resumed.

### C. Euthanasia Practices that Include the Use of a Sedative in Conjunction with a Neuromuscular Blocking Agent Violate Evolving Standards of Decency.

Recent legislative changes regarding pet euthanasia cast serious doubt as to whether the Texas execution protocol passes constitutional muster. Since 1981, at least nineteen states, including Texas, have passed laws that preclude the use of a sedative in conjunction with a neuromuscular blocking agent.[177] Moreover, in the year 2000, the leading professional association of veterinarians promulgated guidelines for euthanasia that preclude the practice. Those guidelines specifically state that "[a] combination of pentobarbital with a neuromuscular blocking agent is not an acceptable euthanasia agent." Appendix 5 (*2000 Report of the American Veterinary Medical Association Panel on Euthanasia*, 218 Journal of the American Veterinary Medical Association, 669, 681 (2001)) at 680. A euthanasia practice widely considered unfit for a dog is certainly unfit for humans as well, especially in light of the fact that the State may easily accomplish the same result with a more humane combination of chemicals. Given the consistency in the statutory regulation of euthanasia, the method currently practiced by the State of Texas is outside the bounds of evolving standards of decency.

Texas recently passed legislation mandating inhumane methods of euthanizing animals

---

[177] *See* Exhibit 43.

which precludes the use of neuromuscular blocking agents such as pancuronium bromide.  TEX. HEALTH & SAFETY CODE ANN. § 821.052(a), (b) (Vernon 2003) (specifically prescribing the methods of euthanasia for cats and dogs in the custody of animal shelters and requiring that shelters euthanize all other animals "only in accordance with the applicable methods, recommendations, and procedures set forth in the 2000 Report of the American Veterinary Medical Association Panel on Euthanasia . . . .").[178]  With this legislation, Texas has joined numerous states with laws recognizing that use of these chemicals would be inhumane in the euthanasia of dogs and cats.  *See* Florida, Fla. Stat. §§ 828.058 and 828.065 (enacted in 1984); Georgia, Ga. Code Ann. § 4-11-5.1 (enacted in 1990); Maine, Me.Rev.Stat. Ann., Tit. 17, § 1044 (enacted in 1987); Maryland, Md.Code Ann., Criminal Law, § 10-611 (enacted in 2002); Massachusetts, Mass.Gen.Laws § 140:151A (enacted in 1985); New Jersey, N.J.S.A. 4:22-19.3 (enacted in 1987); New York, N.Y.Agric. & Mkts § 374 (enacted in 1987); Oklahoma, Okla. Stat., Tit. 4, § 501 (enacted in 1981); Tennessee, Tenn.Code Ann. § 44-17-303 (enacted in 2001).  Other States have implicitly banned such practices.  *See* Illinois, 510 Ill. Comp. Stat., ch. 70, § 2.09; Kansas, Kan. Stat. Ann. § 47-1718(a); Louisiana, La. Rev. Stat. Ann. § 3:2465; Missouri, 2 CSR 30-9.020(F)(5); Rhode Island, R.I. Gen. Laws § 4-1-34, Connecticut, Conn. Gen.Stat. § 22-344a; Delaware, Del.Code Ann., Tit. 3, § 8001; Kentucky, Ky.Rev.Stat. Ann. § 321.181(17) and 201 KAR 16:090, § 5(1); South Carolina, S.C.Code Ann. § 47-3-420.

In addition to explicitly forbidding the use of sedative with a neuromuscular blocking agent, the American Veterinary Medical Association stressed that only personnel trained and knowledgeable in anesthetic techniques should administer potassium chloride (the third drug in

---

[178]  *Id.*

Texas' lethal injection) in conjunction with any anesthesia:

> [i]t is of utmost importance that personnel performing this technique are trained and knowledgeable in anesthetic techniques, and are competent in assessing anesthetic depth appropriate for administration of potassium chloride intravenously.  Administration of potassium chloride intravenously requires animals to be in a surgical plane of anesthesia characterized by loss of consciousness, loss of reflex muscle response, and loss of response to noxious stimuli.
>
> (*2000 Report of the American Veterinary Medical Association Panel on Euthanasia*, 218

Journal of the American Veterinary Medical Association, 669, 681 (2001)).[179]  The statutes in at

least five other states, in addition to Texas, expressly reference the AVMA guidelines when

delimiting humane methods of animal euthanasia.  Illinois, 510 Ill. Comp. Stat., ch. 70, § 2.09;

Kansas, Kan. Stat. Ann. § 47-1718(a); Louisiana, La. Rev. Stat. Ann. § 3:2465; Missouri, 2 CSR 30-

9.020(F)(5); Rhode Island, R.I. Gen. Laws § 4-1-34.

"A claim that punishment is excessive is judged not by the standards that prevailed in 1685

when Lord Jeffreys presided over the 'Bloody Assizes' or when the Bill of Rights was adopted, but

rather by those that currently prevail."  *Atkins*, 536 U.S. at 311.  The scope of the substantive

protections afforded by the Eighth Amendment, as the *Atkins* Court reiterated, is defined by

"evolving standards of decency that mark the progress of a maturing society."  *Id.* at 312 (quoting

*Trop v. Dulles*, 356 U.S. 86, 101 (1958)).  The *Atkins* Court re-emphasized that evolving standards

of decency are best reflected in the various relevant laws enacted throughout the country:

> Proportionality review under those evolving standards should be informed by "'objective factors to the maximum possible extent,'" *see Harmelin,* 501 U.S., at 1000, 111 S.Ct. 2680 (quoting *Rummel v. Estelle,* 445 U.S. 263, 274-275, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980)).  We have pinpointed that the "clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures."  *Penry,* 492 U.S., at 331, 109 S.Ct. 2934.

*Id.*  Moreover, "[i]t is not so much the number of these States that is significant, but the consistency

---

[179]   *See* <u>Exhibit 43</u>, Report of the AVMA Panel on Euthansia (2000).

of the direction of change." *Id*. at 315.

The unmistakable trend over the past two decades of condemning the use of neuromuscular blocking agents, such as pancuronium bromide, in euthanasia is clear evidence that the practice violates the Eighth Amendment ban on cruel and unusual punishment.  These recent alterations of euthanasia protocols for pets underscore the inhumanity of the chemicals currently used in Texas. It can hardly be disputed that if certain euthanasia techniques are banned as overly cruel to animals, those same practices must violate our current standards of decency regarding the execution of humans.

**D. Exhaustion.**

This claim was first brought in Mr. Barbee's subsequent state writ application as Claim 12. It was denied on the basis that it did not meet the standards for a subsequent writ claim under art. 11.071 sec. 5(a). (Exhibit 52.)

**CLAIM THIRTEEN**:   THE SECOND SPECIAL ISSUE   IS UNCONSTITUTIONAL BECAUSE IT OMITS A BURDEN OF PROOF AND MAKES IMPOSSIBLE ANY MEANINGFUL APPELLATE REVIEW OF THE JURY'S DETERMINATION.

### A.  Facts in Support.

Petitioner's counsel submitted written pretrial motions alleging that the Texas death penalty statute is unconstitutional and, on its face, the mitigation special issue in Art. 37.071, Sec. 2(e), V.A.C.C.P., is infirm as a matter of federal Eighth Amendment law because it omits any burden of proof placing no burden upon the State to prove aggravating factors, remaining silent as to any standard of proof on either party and provided no opportunity for a meaningful appellate review of the mitigation verdict. (1 CR 145-150, 223-229, 230-238.) The trial court denied the motions.

After the trial court overruled these objections to the constitutionality of the mitigation special issue, the jury received the statutory instruction found in Art. 37.071, Sec. 2(e), V.A.C.C.P., telling them they were to proceed to answer the following question:

Special Issue No 2
Whether taking into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?
(2 CR 402,  Exhibit 6.)

The court gave the following abstract instructions concerning mitigation:

In deliberating on Special Issue No. 1, the jury shall consider all evidence admitted at the guilt or innocence stage and the punishment stage, including evidence of the defendant's background or character, or circumstances of the offense that militates for or mitigates against the imposition of the death penalty...
The jury may not answer Special Issue No. 1 "Yes" unless the jury agrees unanimously on the answer.
You are instructed that in answering Special Issue No. 1, the jury may not answer "No" unless ten or more jurors agree...
You may not answer [Special Issue No. 2] "No" unless the jury  unanimously agrees, and you may not answer the issue "Yes" unless ten or more jurors agree.
(2 CR 400-401, Exhibit 6.)

-425-

**B. Argument.**

Petitioner's argument is that the state courts have a federal constitutional duty to review for "sufficiency" the jury's negative answer to the mitigation special issue. What has become apparent is that the Texas death penalty scheme is <u>functioning</u> like the schemes in "weighing" states, even though on its face it is framed in "non-weighing" terms.   It has become a fiction to say that the mitigation special issue is intended to be or is functioning as a conduit for mitigating evidence to counter the already-answered aggravating special issue or issues. Instead, the so-called mitigation issue has become the State's favored tool for introducing non-statutory aggravating factors it need not have proved in relation to the other issues, free from any statutorily defined constraints, free from any troublesome jury instructions like those found in "weighing states," telling the jurors what may be considered aggravating or mitigating, free from any burden of proof and free from <u>any</u> possibility of review for sufficiency.

There are certainly other states which provide the meaningful appellate review the Supreme Court required in *Clemons v. Mississippi*, 494 U.S. 738 (1990)  by considering whether the mitigating evidence was outweighed by aggravating evidence. In Texas, however, the result of the code's failure to assign a burden or proof and a standard of proof regarding mitigation is that the death penalty will be applied arbitrarily, inconsistently and without clear preventive measures properly to select the persons who receive the penalty of death. The State escapes the burden it should have: that of proving the non-statutory aggravating circumstances comprised by "all of the evidence, including the circumstances of the offense" as the mitigation special issue requires, aggravating factors it had not necessarily proved up to that point.

Why should the reviewing court simply defer to the jury's conclusion "that the evidence was not sufficient to warrant a life sentence" without at the same time asking whether it is fair for such a state of affairs to exist?

In *Colella v. State*, 915 S.W.2d 834 (Tex. Crim. App. 1995) the dissenting opinion noted that the Court could not "say that the evidence was mitigating as a matter of law" any more than it could say in a non-capital case that the particular punishment assessed was not supported by the evidence, while another particular punishment should have been assessed. Of course the answer should be, again, to assign a burden of proof to both the State and the defense and to begin the process of analyzing what the Court believes was shown to be, or not to be, sufficiently mitigating in a particular case, to overcome the aggravating factors.

The capital jury's mitigation verdict is normative only to the extent that it is informed by subjective analysis of the evidence. Every time a state court affirms or reverses a jury's verdict on future dangerousness, it reviews the jury's normative judgment and does not select some other punishment it finds appropriate, it substitutes the proper <u>answer</u> to the punishment question and the law assigns the proper punishment to that answer. The same process should apply to the mitigation special issue.

After all, the Court has not pronounced any factor as establishing "dangerousness as a matter of law," but it has been able to isolate and list factors to be used in assessing sufficiency to prove the continuing threat issue. It could do the same for mitigating and aggravating circumstances. Arizona has done it by statute, as have other "weighing" states.

As for the statutory requirement of review of sufficiency to support a negative mitigation

verdict, under Art. 44.251(s), V.A.C.C.P., Petitioner argues that the Legislature having been once burned (by *Penry*) was twice shy, and realistically anticipated that some reviewing court might one day decide that the U. S. Constitution required some kind of sufficiency review of the mitigation special issue. That day has come, and the purpose of 44.251 may now be fulfilled. The scheme as it is now interpreted and implemented allows the State to offer and use extra-statutory aggravating factors without the traditional controls of a burden of proof or production and without any means of evaluation by review. The result is that rather than an opportunity for the defendant to gain a reprieve from death through an issue that "does not <u>involve</u> consideration of aggravating factors," the mitigation special issue is wide open for the unfettered introduction and argument of extra-statutory aggravating factors.

**i. Omission of Burden of Proof**.

As to this mitigating issue, the code is silent as to which party has the burden of production or persuasion. The CCA has held that the defendant, as the only supposed "beneficiary" of the mitigation special issue, bears the burden of production on that issue, and has specifically declined to review the jury's subjective "normative" weighing of mitigation evidence. *McFarland v. State*, *supra,* 928 S.W.2d at 499.

Acknowledging the Court's *McFarland* opinion, Petitioner respectfully disagrees with its result on this issue, presenting the following arguments which he believes were not advanced in *McFarland* and not addressed by the Court in that case or in any later case. *E.g.*, *Baker v. State*, *supra* ; *Eldridge v. State*, 940 S.W.2d 646, 652 (Tex. Crim. App. 1996).

The Texas Court of Criminal Appeals has wavered as to whether or not it has a constitutional duty to review for sufficiency the jury's negative answer to the mitigation special issue submitted

under Sec. 2(e). Judge Baird has issued a dissenting opinion in which he states, "I joined the majority in *Lawton*, supra and *Broussard v. State*, 910 S.W.2d 952 (Tex. Crim. App. 1995). However, for the reasons stated infra, I now believe my doing so was erroneous." Judge Overstreet, who had joined Judge Clinton in finding review of the mitigation verdict impossible in *Colella v. State*, 915 S.W.2d 834 (Tex. Crim. App. 1995), joined Judge Baird in his opinion, some two years later, that such review was possible and was constitutionally mandated. *Moms v. State*, ___ S.W.2d ___, (Tex. Crim. App. No.71,799, delivered September 11, 1996) (Baird, J., joined by Overstreet, J., dissenting).

That the dissenting opinion has failed to gain any additional converts is apparent from subsequent opinions.[180] However, what is also apparent is that mitigation counts for nothing in the sufficiency review that is provided under the Texas scheme. In *Soria v. State*, 933 S.W.2d 46 (Tex. Crim.App. 1996), the majority granted the State's motion for rehearing and reversed its original opinion, in which it had reformed the death sentence to life based upon the insufficiency of evidence to prove future dangerousness. In its changed view, the majority adjusted its original assessment of the evidence and found the same evidence sufficient, once all mitigation evidence was disregarded.[181]

Thus, it is clear that in Texas the reviewing court will not balance or weigh mitigating

---

[180]   *Shannon v. State*, 942 S.W.2d 591 (Tex. Crim. App. 1996); *Matchett v. State*, 941 S.W.2d 922 (Tex. Crim. App. 1996), cert. denied 117 S. Ct. 2487; *Bell v. State*, 938 S.W.2d 35 (Tex. Crim. App. 1996); *Eldridge v. State*, 940 S.W.2d 646 (Tex. Crim. App. 1996); *Anderson v. State*, 932 S.W.2d 502 (Tex. Crim. App. 1996), cert. denied, 117 S. Ct. 2517

[181]   The defense psychiatrist, who had personally examined the defendant, testified that he did not present a continuing threat. "However," the majority noted, "because we view the evidence in a light most favorable to the verdict, we do not factor that opinion into our analysis or weigh his testimony against the testimony of (the State psychiatrist)." *Id.* at 47, n.2.

evidence against aggravating evidence within the special issues it does review for sufficiency, nor within the mitigation special issue itself nor will it weigh all the defense evidence proffered as mitigating against the statutory aggravating factors proven in the other special issues.

It has become a fiction to say that the mitigation special issue is intended to be or is functioning as a conduit for mitigating evidence to counter the already-answered aggravating special issue or issues. Instead, the so-called mitigation issue has become the State's favored tool for introducing non-statutory aggravating factors it need not have proved in relation to the other issues, free from any statutorily defined constraints, free from any troublesome jury instructions like those found in "weighing states," telling the jurors what may be considered aggravating or mitigating, free from any burden of proof and free from any possibility of review for sufficiency.

Judge Baird lists, in his *Morris* opinion, other states which provide the meaningful appellate review he maintains the Supreme Court required in *Clemons v. Mississippi,* 494 U.S. 738,749, 1105 S. Ct. 1441 (1990) by considering whether the mitigating evidence was outweighed by aggravating evidence: *State v. Breton*, 663 A.2d 1026, 1039 (Conn. 1995); *State v. Richardson*, 462 S.E.2d 492 (N.C. 1995); *Sheridan v. State*, 852 S.W.2d 772 (Ark. 1993); *State v. Hernandez*, 562 N.E.2d 219 (111. App. 2 Dist. 1990); *Lowery v. State*, 547 N.E.2d 1046 (Ind. 1989) and *Fisher v. State*, 736 P.2d 1003 (Okl.Cr. 1987). *Morris*, supra, (slip opinion at 11 of opinion of Baird, J., joined by Overstreet, J., dissenting).

The result of the code's failure to assign a burden of proof and a standard of proof regarding mitigation, even after the CCA has assigned a burden of production, with no possibility of review for the defense, is that the death penalty will be applied arbitrarily, inconsistently and without clear preventive measures properly to select the persons who receive the penalty of death. The State escapes the burden it should have: that of proving the non-statutory aggravating circumstances

comprised of "all of the evidence, including the circumstances of the offense" as the mitigation special issue requires, aggravating factors it had not necessarily proved up to that point.

The Supreme Court has held that the Eighth Amendment requires the State to prove the existence of aggravating factors during the capital punishment phase. See, e.g., *Walton v. Arizona*, 497 U.S. 639, 650 (1990) (State's method of allocating the burdens of proof during capital sentencing phase cannot "lessen the State's burden ... to prove the existence of aggravating factors"). In order to understand why *Walton* applies to the statutory *Penry* special issue, rather than solely to the aggravating factors under the <u>other</u> special issues, this Court should recognize that <u>this special issue is a conduit for aggravating factors (victim impact evidence for example) as well as mitigating factors</u>. By asking jurors to determine whether there are "sufficient ... mitigating circumstances," Art. 37.071, Sec. 2(e), V.A.C.C.P., the statutory special issue in effect tells jurors to consider any possible aggravating factors present in all the evidence, including the circumstances of the case, that may outweigh the mitigating factors. Although the statute does not explicitly use the term "aggravating circumstance," clearly that is how a reasonable juror would interpret the statute, and that is how the state argues the issue. Cf. *Johnson v. Texas*, 113 S. Ct. 2658 (1993) (describing jurors' determination of answer to "future dangerousness" special issue to require balancing of aggravating and mitigating circumstances).

In *Walton v. Arizona*, *supra,* four members of the Supreme Court found constitutionally permissible the Arizona scheme that placed upon capital defendants the burden of establishing, by a preponderance of the evidence, the <u>existence</u> of mitigating circumstances <u>sufficiently</u> <u>substantial</u> to call for leniency in spite of the fact that the State had established (by what standard, the opinion

did not say) the <u>existence</u> of one or more of ten statutorily defined aggravating factors:[182] "So long as a State's method of allocating the burdens of proof does not lessen the State's burden to prove .... the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency." *Walton*, supra, 497 U.S. 639,650 (1990).

The Texas statutory scheme <u>does</u> lessen the State's burden to prove the existence of aggravating factors that fall outside the scope of the special issues that preceded the mitigation special issue. (Again, victim impact evidence, which can only pertain to the mitigation special issue, is the most significant aggravating factor.) If the defendant had to establish mitigating evidence sufficient to overcome or outweigh <u>only</u> the statutorily-defined aggravating circumstances, then the process would be similar to Arizona's -<u>and</u> the defendant could obtain review of the question just as the Arizona defendant did. The syllabus of the *Walton* opinion states that the Arizona Supreme Court "in an independent review" concluded not only that the evidence was sufficient to prove the existence of both aggravating factors found by the trial court but also "<u>agreed</u> that there were no mitigating factors sufficient to call for leniency..." *Walton*, *supra,* Syllabus at 111 L. Ed.2d 511, 519

---

[182]   It is clear from a reading of *Walton* and also from the CCA's opinions cited below in the brief that the State if it bears any burden at all under the mitigation special issue bears only the burden of proving the <u>existence</u> of facts which it may argue are aggravating (or which are defined by statute as aggravating, under the Arizona scheme) while the defendant hears the burden of producing the <u>existence</u> of facts <u>sufficient to warrant a sentence of life rather than death</u> or to call for leniency in the face of aggravating facts.

In fact the CCA held in *McFarland* that the State hears no burden to prove aggravating factors because there <u>is</u> no burden of proof to assign regarding aggravating factors outside the other special issues in the Court's view, ". . . the special issue under Sec. 2(e) <u>does not involve consideration</u> of aggravating factors." *McFarland*, *supra*, slip opinion at 84. (Yet a plurality of the Court in *Ford*, infra, found victim impact evidence, which is clearly an aggravating factor, to he relevant to the issue of moral blameworthiness under Sec. 2(e). These two positions cannot he resolved without correcting one situation or the other.)

(1990); 159 Ariz. 571, 589, 769 P.2d 1017, 1035 (1989).

The Texas defendant, however, as the statute is now interpreted, may obtain review of the sufficiency of the evidence to prove only the aggravating factors upon which the State is assigned the burden of proof. He may not, however, obtain the CCA's review of his proffered mitigation evidence to see if the Court agrees that it was not sufficient to call for a life sentence. See, *McFarland*, *supra.*

The reality is that in Texas, the State submits in argument many aggravating factors that are not set out in the statute (factors upon which it has no independent burden of proof at guilt or at punishment) for the jury to weigh against the defense's mitigating evidence.

The mitigation special issue in Texas, by omitting a burden of proof entirely, opens up the range of aggravating factors to include whatever the prosecution wishes to argue from the evidence, yet places no burden of proof on the State with respect to those factors; it prevents a reviewing court from evaluating the sufficiency of evidence to prove those extra-statutory aggravating factors[183] and it prevents a rational, meaningful review of the sufficiency of mitigating evidence (even if the sufficiency issue is more precisely a determination whether the jury's answer was against the great weight and preponderance of evidence).

**ii. Impossibility of Reviewing Mitigation under Texas Statute**.

Petitioner notes that members of the CCA recently expressed the opinion in dictum (and have now specifically held, in *McFarland*, supra) that the mitigation special issues does impose, at least

---

[183]   For instance in deciding that the Arizona "heinous and depraved" aggravating factor was not unconstitutionally vague and overbroad, the Supreme Court noted that the State court had not considered as aggravating the fact that the victim had not died for some time from his head wound, that he had floundered, blind in the desert for days before dying of dehydration, starvation and pneumonia. *Walton v. Arizona*, supra, 497 U.S. at 654 111 L.Ed.2d at 529 (1990).

by implication, a burden of proof and a standard of proof on the capital defendant: he must establish

sufficient mitigating facts to overcome the jury's prior answers to the special issue or issues by a

preponderance of evidence. He may argue on appeal only that the jury's verdict was against the great

weight and preponderance of evidence, yet he may not obtain review as to whether he met his

burden. Petitioner cites the following excerpts from the dissenting opinion of Judge Clinton, joined

by Judge Overstreet, in *Colella v. State*, 915 S.W.2d 834 (Tex. Crim. App. 1995):

> Appellant nakedly contends that the mitigating evidence was so compelling that we should reform his sentence to life imprisonment. Whether this is a "sufficiency" review appellant thus requests, as the majority characterizes it (slip op. at 16), or a claim that the verdict is against the great weight and preponderance of the evidence, depends upon who carries the burden of proof under Article 37.071, '2(e), supra. We have yet to resolve this question.
>
> We came closest in *Barnes v. State*, 876 S.W.2d 316 (Tex.Cr.App. 1994), where we commented on the question in passing. *Barnes* had argued that the trial court erred not to instruct the jury at the punishment phase of his capital murder trial that the State had a burden to negate evidence proffered in mitigation of the death penalty. This Court held that the trial court had not erred because neither the Eighth Amendment, nor any state provision implementing it, had assigned such a burden to the State. In a footnote we remarked:
>
> "Currently, Article 37.071 mandates that a jury that finds beyond a reasonable doubt, as required by Subsection (c), that the special issues under Subsection (b) should be answered affirmatively must go on pursuant to Subsection (e) to decide whether mitigating circumstances nevertheless warrant a life sentence. However, neither Subsection (c) nor Subsection (e) itself expressly assigns a particular burden of proof on the issue of mitigation. It might be argued, although we certainly have no occasion here to hold, that Subsection (c) implicitly assigns the burden to the beneficiary of a finding of 'sufficient mitigating circumstances to warrant that a sentence of life . . . be imposed. Cf. *Arnold v. State*, 786 S.W.2d 295, at 298 (Tex.Cr.App. 1990) (State has burden of proof to establish harmless error under Tex.R.App.P. 81(b)(2), as beneficiary of the error). That, of course, would be the defendant."
>
> Id., at n.17.
>
> I agree with the *Barnes* footnote that Article 37.071, '2(e) assigns at least a burden of <u>production</u> to the defendant. Before a capital jury can even reach the '2(e) issue, it must have affirmatively found the existence of aggravating facts under Article 37.071, '2(b), for which the State expressly shoulders the burden of proof under '2(c). Once these facts have been established to the jury's satisfaction to a level of confidence beyond a reasonable doubt, the jury proceeds to the '2(e) special issue, <u>viz</u>: "whether. . . there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment <u>rather than a death sentence</u> be imposed." (Emphasis added.) If there are <u>not</u> sufficient mitigating circumstances, the default position is that a sentence of death will be imposed. This means that it is the capital defendant who stands to benefit from the presentation of mitigating

-434-

evidence.

      Because appellant is, thus, the beneficiary of mitigating evidence, the burden of production falls to him. *Arnold v. State*, supra. Therefore, if the jury verdict is against him, Petitioner can only argue on appeal that the verdict was against the greater weight and preponderance of the evidence. *Cf., Meraz v. State*, 785 S.W.2d 146, 155 (Tex.Cr.App. 1990) (defendant has burden to prove affirmative defense of insanity, and appellate review of a verdict against him inquires whether verdict as against the great weight and preponderance of the evidence); *Bigby v. State,* 892 S.W.2d 864, at 875 (Tex.Cr.App. 1994) (same). Strictly speaking, the majority errs to characterize Petitioner's contention as a claim that the evidence is not "sufficient."

      In any event the majority is correct that we cannot review the claim on appeal, however we characterize it. Subsection 2(f)(4) of Article 37.071 defines as mitigating anything "that a <u>juror</u> might regard as reducing the defendant's moral blameworthiness." (Emphasis added.) Thus the statute assigns exclusively to the jury the task of evaluating what evidence proffered in mitigation of the death penalty is sufficient and what is not. We cannot say that evidence was mitigating as a matter of law any more than we can say, in a non-capital case, that the evidence is insufficient to support a twenty year sentence, or that the greater weight and preponderance of the evidence establishes that the proper sentence would have been ten years, probated. There is simply no way for an appellate court to review the jury's normative judgment "that the evidence was not sufficient to warrant a sentence of life imprisonment." Slip op. at 16. Though it should not have reached this sub-contention in appellant's fifth point of error, the majority correctly disposes of it on the merits.
*Colella v. State*, supra, (Clinton, J., dissenting, joined by Overstreet, J.) (Emphasis in Opinion).

      The majority opinion in *Colella* began its answer to the Petitioner's sufficiency argument on mitigation by stating that no burden of proof exists for either the State or the defendant "to disprove or prove the mitigation evidence." *Colella v. State*, *supra*, slip opinion at 16. Noting that there is no evidence that is <u>per se</u> mitigating, i.e., that a juror must view as reducing a defendant's moral blameworthiness under the Texas definition of mitigation, the majority declined to review the evidence on that issue to see if it supported the jurors' subjective determination that it did not warrant a life sentence. *Id.*

      Petitioner submits that if a listing of aggravating and mitigating factors, together with an

assignment of a burden of proof and a requirement of special findings as to those factors, permits appellate review like the review in *Walton*, supra, and the Texas scheme with its lack of specific factors and its omission of burdens of proof forecloses appellate review, then the Texas procedure is unconstitutional on its face.

It is rare, certainly, for the defense to ask for a burden of proof. Nevertheless, if the defense could at the same time require the State to shoulder a burden it should bear (in proving extra-statutory aggravating circumstances it offers in opposition to the mitigating circumstances) and thereby obtain review of the mitigation verdict similar to the kind of review available in Arizona, then he should welcome the burden. He could then obtain review of the State's evidence offered as aggravating on the mitigation special issue as well, just as in *Walton* the reviewing courts assessed and approved the narrow application of the "heinousness" aggravating factor to the facts of the case.

The Texas appellate courts now sit routinely as a "thirteenth juror" on review of factual sufficiency when the Petitioner claims he met his burden of proving some defensive issue; the appellate courts determine whether the verdict was so against the great weight and preponderance of evidence as to be manifestly unjust. *E.g.*, *Meraz v. State*, supra, cited in the *Colella* dissent.

The *Colella* dissenting opinion noted that the Court could not "say that the evidence was mitigating as a matter of law" any more than it could say in a non-capital case that the particular punishment assessed was not supported by the evidence, while another particular punishment should have been assessed. Of course the answer should be, again, to assign a burden of proof to both the State and the defense and to begin the process of analyzing what the Court believes was shown to be, or not to be, sufficiently mitigating in a particular case, to overcome the aggravating factors.

The CCA does, after all, review the jury's "subjective" and "normative" judgment that the

evidence was sufficient to prove the defendant's future dangerousness. After all, the answer is based upon evidence that any juror might regard as increasing the likelihood, to the required degree, that the defendant will be a continuing threat. In the face of longstanding defense arguments that such a prediction is too subjective and too abstract to be proven or reviewed, the Court has taken on and performed the task of reviewing the sufficiency of evidence on that issue. The Court has not pronounced any factor as establishing "dangerousness as a matter of law," but it has been able to isolate and list factors to be used in assessing sufficiency. It could do the same for mitigating and aggravating circumstances. Arizona has done it by statute, as have other "weighing" states. This Court could do it by its opinions, as it has on the future dangerousness issue, or it could hold that the present statute as framed does not permit a fair review and is therefore unconstitutional, leaving the Texas Legislature to formulate a structure that will permit review.

The CCA's review of "sufficiency" under a preponderance standard would not be similar to the setting aside of a term of years and assigning a different term of years as the dissent stated in *Colella*. Neither the State nor the defense bears any burden of proving the proper term of punishment in a non-capital case. The capital jury's mitigation verdict is "normative" only to the extent that it is informed by subjective analysis of the evidence. Every time a State court affirms or reverses a jury's verdict on future dangerousness, it reviews the jury's normative judgment and does not choose some other punishment it finds appropriate, it substitutes the proper <u>answer</u> to the punishment question and the law assigns the proper punishment to that answer. The same process should apply to the mitigation special issue.

### iii.  Statute Requires Sufficiency Review of Mitigation Verdict.

Article 44.251(a) of the Code of Criminal Procedure requires that a State court shall reform

-437-

a sentence of death to a sentence of life imprisonment if the Court finds there is insufficient evidence to support "a negative answer to an issue submitted to a jury under Section 2(e), Article 37.071 of the Code. Appellants have argued in the past that the statute mandates a sufficiency review of a negative ' 2(e) answer. The CCA has answered by finding, essentially, that the Legislature in adding the mitigation-review was attempting to avoid a loophole by which an appellant who successfully challenged sufficiency under 2(e) could gain an entirely new trial, when in fact the intent of the statute when first passed was to avoid retrial. By providing this "remedy" for a possible unwarranted mitigation verdict, the CCA has held the Legislature did not mean to create any additional scope for review or relief for a capital defendant. See, e.g., *McFarland*, supra, (concurring opinion of Keller, J.).

Petitioner can hardly argue that the Legislature ever intended to enlarge upon the opportunities for a capital Petitioner to gain review of any issue that would result in a life sentence where a death sentence had been pronounced. He does argue that the Legislature having been once burned (by *Penry)* was twice shy, and realistically anticipated that some reviewing court (the CCA or the Supreme Court) might one day decide that the Constitution required some kind of sufficiency review of the mitigation special issue.

That day has come, and the purpose of 44.251 may now be fulfilled. The scheme as it is now interpreted and implemented allows the State to offer and use extra-statutory aggravating factors without the traditional controls of a burden of proof or production and without any means of evaluation by review. The result is that rather than an opportunity for the defendant to gain a reprieve from death through an issue that "does not <u>involve</u> consideration of aggravating factors." *McFarland*, *supra,* 928 S.W.2d at 520. The mitigation special issue is wide open for the unfettered introduction and argument of extra-statutory aggravating factors.

Petitioner submits that as a consequence the Court should either grant habeas relief and reform his sentence to life imprisonment or remand his case to the state courts for retrial of the punishment issue pursuant to a scheme that permits the proper assignment of the burden of production (if not proof) the proper introduction of evidence pursuant to that scheme followed by the meaningful review of the mitigation answer if it is negative.

### C. Exhaustion.

The Respondent has previously conceded that this claim was reviewed on the merits in state court and hence is exhausted. (Docket No. 40, RA at 17.)  It is not defaulted.  This claim was also brought in Mr. Barbee's subsequent writ application as Claim 13.  It was denied on the basis that it did not meet the standards for a subsequent writ claim under art. 11.071 sec. 5(a). (Exhibit 52.)

**CLAIM FOURTEEN**: **THE TRIAL COURT ERRED IN DENYING PETITIONER'S MOTION RELATING TO INFORMING THE JURY THAT THE FAILURE TO ANSWER A SPECIAL ISSUE WOULD RESULT IN A LIFE SENTENCE, IN VIOLATION OF PETITIONER'S RIGHTS AS PROTECTED BY THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION.**

Petitioner raised this point by written pretrial motion, but it was denied. (1 CR 223-238.) Petitioner offered mitigating testimony from several witnesses concerning his general good conduct. *See* factual summary, *supra.*

### A. Argument and Authorities.

The jury in Petitioner's case was charged in accordance with Art. 37.071, Sec. 2(d)(2), V.A.C.C.P. that they could not answer the future dangerousness special issue "yes" unless they agreed unanimously and could not answer it "no" unless 10 or more of them agreed.  (Exhibit 6.) They were also instructed in accordance with the statute, section (f)(2) that they could not answer the mitigation issue "no" except by unanimous agreement and could not answer "yes" unless 10 or more agreed. (Exhibit 6.)

In accordance with the statute's prohibition in 37.071 Sec. 2(a), the jurors were never informed that the effect of their failure to agree on a "yes" or "no" answer under the above guidelines would be the automatic assessment of a life sentence under the mandate of Section 2(g) of the same statute.

The State might suggest that this request is improper under this Court's decision in *Robertson v. State*, 871 S.W.2d 701 (Tex. Crim. App. 1993). However, in *Robertson* the defendant requested a charge which would allow the jury to answer "yes," "no" or "we can't decide." That is not the request here. Petitioner's requested charge sought to inform the jury of the effect of their failure to answer -- that Petitioner would receive a life sentence. The Court in *Robertson* did cite *Nobles v.*

*State,* 843 S.W.2d 503, 510 (Tex. Crim. App. 1992), for the proposition that informing the jurors of the effect of their answers would somehow cause them to "skirt this responsibility by failing to return a vote."

The cases cited above somehow suggest that a vote of 6 "yes"and 6 "no" is not an answer, or is a "skirting of responsibility" by the jury. Any such suggestion ignores the fact that each juror answers the issue, and a sentence is entered based upon those answers, whatever the combination. If the answers are any combination other than 12-0 or 10-2, the verdict is one of life. To contend that a juror should not be informed of the effect of anything less than a "12-0" or "10-2" vote is to continue to hide information from jurors against the great trend of our criminal system.

The CCA's  consideration of the issue in *Nobles v. State*, 843 S.W.2d 503 (Tex. Crim. App. 1992),  Petitioner respectfully submits, misses the point. The Court equates a split vote with a juror who refuses to vote. The jury is told what happens at a 12-0 and 10-2 vote, and they are told that death cannot be imposed on <u>this</u> verdict unless the death vote is unanimous. They are simply left to wonder what happens to the case after a vote that did not produce a 12-0 or a 10-2 result.

Returning to the suspect logic in *Nobles,* at 509, n. 12, the Court notes that the instruction is not necessary anyway because "based upon what is usually told to the panel-members at voir dire, jurors are capable of surmising Article 37.071's mandated outcome", citing *Draughon v. State,* 831 S.W.2d 331, 337-38 (Tex. Crim. App. 1992). Apparently then it is acceptable for a juror to  surmise something but not to be instructed on the point. With no citation to the record, it is not possible to know how the Court surmises what a juror surmised. Indeed, as argued in the foregoing point of error, it is quite consistent with common sense that a juror might fear there would be a mistrial if anything did not go according to the rules, and that a retrial might be impossible. What does the

surmise do then to the fear of a juror skirting his responsibility to vote "yes" or "no"?   The Court does not condemn the knowledge, just the instruction. These cases are not defensible on this point. Should those cases stand, they do not defeat Petitioner's simple request that the jury be informed what business it is about. The importance of providing information to the jury as to what each individual's vote means cannot be overemphasized.

The statutory scheme encourages jurors to change their decisions, rationally reached on the basis of the evidence, and return a verdict contrary to their considered judgment, solely in order to satisfy a numerical balance they are led to believe they <u>must</u> satisfy in order to avoid an imagined retrial or even the release of the defendant. The scheme is inherently flawed, and encourages the arbitrary and wanton imposition of the death penalty, in violation of both federal and state guarantees against cruel and/or unusual punishment, United States Constitution, Eighth Amendment.

Petitioner asks for reversal based upon the unconstitutionality of this statutory scheme, and its unconstitutional application in his case.

**B. Exhaustion and procedural default.**

This claim was brought on direct appeal.   The Director has previously not asserted non-exhaustion or procedural default as to this claim. (Docket No. 40., RA at 75-76.)  This claim was also brought in Mr. Barbee's subsequent writ application as Claim 14.   It was denied on the basis that it did not meet the standards for a subsequent writ claim under art. 11.071 sec. 5(a). (<u>Exhibit 52</u>.)

**CLAIM FIFTEEN: PETITIONER WAS DENIED HIS FEDERAL CONSTITUTIONAL RIGHT TO A FAIR TRIAL AND DUE PROCESS OF LAW, AS THE EVIDENCE SUPPORTING SPECIAL ISSUE NUMBER ONE WAS INSUFFICIENT.**

The evidence in this matter was legally insufficient to support the jury's answer to Special Issue No. One as the State failed to prove beyond a reasonable doubt that there is a probability that Mr. Barbee would commit criminal acts of violence and would constitute a continuing threat to society. Thus, Petitioner's sentence of death violates his constitutional right to due process of law. U.S. Const., amends IV, V and XIV.

**A. Facts in Support.**

The trial court at the punishment phase of Petitioner's trial submitted a jury charge which contained the "continuing threat" Special Issue No. One and the mitigation special issue was number two. (Exhibit 6.) The jury answered these issues. (Exhibits 6, 7.) Thereafter, the court pronounced Petitioner's sentence of death by lethal injection based upon these two answers. (Exhibit 7.) This sentence violated Petitioner's federal constitutional right to due process of law.

On direct appeal, Petitioner asserted that Special Issue No. One, relating to future acts of criminal violence, should be submitted to a sufficiency review. (Exhibit 8, opinion on direct appeal.)

**B. Argument.**

The standard of review for the legal sufficiency for the issue of future dangerousness is whether a rational trier of fact could have concluded beyond a reasonable doubt that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. *Jackson v. Virginia,* 443 U.S. 307, 99 S. Ct. 2781 (1979).

The State bears the burden of proof requiring each and every element of the offense. *In re Winship,* 397 U.S. 358, 90 S. Ct. 1068 (1970); *Apprendi v. New Jersey,* 120 S. Ct. 2348 (2000). *See*

*also* Tex. Penal Code. Ann. Sec. 2.01 (Vernon 1994). Proof beyond a reasonable doubt requires that the State produce evidence showing something more than a strong suspicion, and this standard of "proof beyond a reasonable doubt" is a federal constitutional one, guaranteed by a citizen's federal constitutional right to due process of law. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979).

Art. 37.071 sec. 2 (a) (2) (b) (1) of the Tex. Crim. Proc. Code Ann. (Vernon 2001) reads as follows:

> (b) On conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:
> (1) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society[.]

This special issue was included in the court's charge on punishment. (Exhibit 6, 2 CR 401). When evaluating whether the evidence is legally sufficient to support the jury's affirmative answer to the "future dangerousness" special issue this Court reviews the evidence in the light most favorable to the jury's verdict to determine whether any rational trier of fact could have concluded beyond a reasonable doubt that "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." *Jackson v Virginia* at *573; Swain v State,* 181 S.W. 3d 359, 368 (Tex. Crim. App. 2005) *cert. denied,* 166 L.Ed. 2d 106 (2006)*; Bible v State,* 162 S.W. 3d 234, 245 (Tex. Crim. App. 2005)*; Mathis v State,* 67 S.W. 3d 918, 922 (Tex. Crim. App. 2002)*.* The non-exclusive list of factors that may be considered on review of a finding of future dangerous in a capital murder prosecution include (1) the circumstances of the capital offense, including the defendant's state of mind and whether he was acting alone or with other

parties; (2) the calculated nature of defendant's acts; (3) forethought and deliberateness exhibited by the crime's execution; (4) existence of a prior criminal record and severity of the prior crimes; (5) defendant's age and personal circumstances at the time of the offense; (6) whether defendant was acting under duress or domination of another at the time of the offense; (7) psychiatric evidence; and (8) character evidence. *Manns v State,* 122 S.W. 3d 171, 193 (Tex. Crim. App. 2003); *Wardrip v State,* 56 S.W. 3d 588, 594 (Tex. Crim. App. 2001). Though the circumstances surrounding the actual offense can be sufficient taken alone to sustain an affirmative finding, this is not always the case. *Valle v State,* 109 S.W. 3d 500, 502-03 (Tex. Crim. App. 2003); *Guevara v State,* 97 S.W. 3d 579, 581 (Tex. Crim. App. 2003); *Hall v State,* 67 S.W. 3d 870, 874 (Tex. Crim. App. 2002) *cert. granted, vacated and remanded,* 154 L.Ed. 2d 4 (2002) *aff'd,* 160 S.W. 3d 24 (Tex. Crim. App. 2004).

Petitioner called ten witnesses to testify in his behalf at the punishment phase. All of those witnesses testified to his prior involvement in the community, including having been a youth advisor and leader in his church. (25 RR 125-27.) Of particular note is that prior to this offense, Petitioner had no criminal record; indeed, he was the owner of two fairly successful businesses in the Fort Worth area.. (23 RR14-15.) The facts surrounding this offense, though severe, do not rise to the level of supporting the jury's affirmative answer to the first special issue. For this reason the evidence is legally insufficient to support the jury's answer.

Because the evidence is legally insufficient to support the jury's affirmative answer to the future dangerousness special issue, Petitioner respectfully prays that this Court reform the Judgment to a life sentence.

This violated Petitioner's rights to due process and a fair trial under the Fourth, Fifth and

Fourteenth Amendments to the United States Constitution.  Additionally, the state court's finding denying this point of error on direct appeal  "resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" under Section 2254(d)(1) of AEDPA.

**C. Exhaustion.**

The Respondent has previously conceded that this claim is exhausted, as it was brought on direct appeal.  (Docket No. 40, RA at 76-78.)  This claim was also brought in Mr. Barbee's subsequent writ application as Claim 15.  It was denied on the basis that it did not meet the standards for a subsequent writ claim under art. 11.071 sec. 5(a). (Exhibit 52.)

**CLAIM SIXTEEN: PETITIONER'S JURY WAS UNCONSTITUTIONALLY SELECTED BY DEATH QUALIFYING THE JURY MEMBERS.**

A 'death qualified' jury is said to be "one from which prospective jurors have been excluded for cause in light of their inability to set aside their views about the death penalty that would prevent or substantially impair the performance of their duties as jurors in accordance with their instructions and oath." *Buchanan v. Kentucky,* 483 U.S. 40 at fn. 6 (1987).   Death qualification is the process by which these prospective jurors are sought out and excluded during voir dire.

The jury in this case was death qualified.   For the numerous reasons discussed below, death qualification in Texas, in general and as applied in this case, violates the Fifth, Sixth, Eighth and Fourteenth Amendments, as well as International Law, Treaties, Norms, and Customs.

**A.  Facts in Support.**

Several prospective jurors in this case were removed for cause during death qualification based on alleged opposition to the death penalty. For instance, prospective juror Jason Tennerson was challenged by the State and excused due to his unwillingness to impose the death penalty. (6 RR 105.)   Margaret Wossum was also excused for cause due to her willingness to find mitigating evidence.  (13 RR 102.)  Others were removed for similar reasons.

**B.  Argument.**

**Claim 16(a): Death qualification in Texas is unconstitutional based on the Supreme Court's "evolving standards" jurisprudence.**

The standard for death qualification in Texas is "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."  *Wainwright v. Witt*, 469 U.S. 41, 424 (1985) and *Adams v. Texas,* 448 U.S. 38, 45 (1980).  When viewed properly in the context of the Texas death penalty scheme, as interpreted by

-447-

the Texas Court of Criminal Appeals and the Supreme Court's Eighth Amendment jurisdiction, this standard is unconstitutional.

In Texas, the "crucial" determination during death qualification is whether a potential juror's views about capital punishment in the abstract would substantially impair their ability to perform their duties. The only question that a trial court needs to resolve during death qualification is whether any prospective juror has such conscientious or religious scruples about capital punishment, in the abstract, that his views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *See Wainwright v. Witt*, 469 U.S. at 420 and *Adams v. Texas*, 448 U.S. 38, 45.

The standard for death qualification in Texas is focused on the abstract, conscientious, or religious scruples of prospective jurors. A scruple is defined as "an ethical consideration or principle that inhibits action." Merriam-Webster's Collegiate Dictionary (1995) 10th Edition. In other words, the "views" that matter here are, ultimately, moral ones.

Whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath," is the courts controlling question. *Wainwright v. Witt,* 469 U.S. 41, 424 *quoting Adams v. Texas,* 448 U.S. 38, 45. A juror's oath is a vow to follow the law. The "impairment" issue revolves around what duties a juror has under the Texas death penalty law.

A juror's duty at the penalty phase is to determine whether the penalty shall be death or confinement in state prison for a term of life by answering the special issues. General guidance to consider and weigh the evidence is all that the statute provides.

The jury's duty in a death penalty case is further explained in the jury instructions. The

jury's duty at the penalty phase of a death penalty case in Texas is quite different from a jury's typical duty. Jurors at the penalty phase do not merely find facts and apply the law to those facts. Instead, these jurors are explicitly called upon to make their own moral and sympathetic judgment on various factors in deciding an appropriate penalty.

The jurors' duty includes numerous types of "moral and sympathetic" judgments. They must determine if evidence exists to support a special issue. For instance, Special Issue No. One asked: "Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?" (Exhibit 6, 2 CR 401.) Likewise, Special Issue No. Two asked: "Whether taking into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?" (Exhibit 6, 2 CR 402)

The jury had to determine whether Mr. Barbee's evidence, character and background were aggravating or mitigating based on its moral context, and they must determine the weight of each factor. Finally, they must weigh all of the factors against each other and determine, which penalty is justified and appropriate. The jury was called upon to make moral determinations.

A jury's duty at the penalty phase in Texas is the extraordinary duty of making moral and sympathetic determinations about a human being whose life hangs in the balance. There is a serious, underlying problem in the death qualification standard as it applies to the Texas death penalty scheme. Under the standard, a potential juror is removed for cause if their moral views will substantially impair their duty. As shown above, some jurors were so removed. Yet, their duty is

to make "moral and sympathetic" determinations. Thus, a juror can be removed if their moral views on the death penalty substantially impairs them from making a moral and normative decision. This standard is illogical and irrational on its face.

An irrational law cannot withstand even the most minimal scrutiny under the Fourteenth Amendment. *See e.g. San Antonio Ind. School Dist. v. Rodriguez,* 411 U.S. 1, 40 (1973)[The traditional standard of review under the Equal Protection Clause requires only that the State's system be shown to bear some rational relationship to legitimate state purposes.]; *Williamson v. Lee Optical Co.,* 348 U.S. 483, 487-488 (1955) [State laws must be rational under the Due Process Clause of the Fourteenth Amendment.]; *Hudson v. United States,* 522 U.S. 93, 103 (1997) ["The Due Process and Equal Protection Clauses . . . protect individuals from sanctions which are downright irrational."].

In addition, because death is a qualitatively different punishment, heightened reliability is required in capital cases, and procedural rules that tend to diminish the reliability of the sentencing and guilt determination are invalidated. *See e.g. Beck v. Alabama*, 447 U.S. at 638; *Woodson v. North Carolina,* 428 U.S. at 305. An irrational procedure for selecting and removing prospective jurors who will determine a defendant's guilt and punishment cannot meet this heightened review. For these reasons alone, Texas's death penalty scheme is unconstitutional and Mr. Barbee's sentence should be reversed.

Even more important is the fact that this Eighth Amendment aspect of *Witherspoon,* which was ignored in *Witt*, was the embryo of a long line of Supreme Court cases that now completely undermine the constitutionality of death qualification in Texas. Under the Eighth Amendment, the Supreme Court has the constitutional duty to determine whether a punishment is cruel and unusual – that is whether the evolving standards of decency have reached the point where society deems the punishment to be cruel and unusual.

-450-

One of the best sources of objective information on the evolving standards is to look to the jurors who have the responsibility of deciding whether to impose the punishment. *See e.g. Furman v. Georgia,* 408 U.S. at 278-279, and 299 (concurring opinion of J. Brennan); *Id.* at 439-442 (J. Powell, C.J. Burger, J. Blackmun, and J. Rehnquist dissenting); *Gregg v. Georgia*, 428 U.S. at 181-182 (plurality opinion of J. Stewart, J. Powell, and J. Stevens); *Woodson v. North Carolina,* 428 U.S. at 288, fn 13, 293-296, and 301 (plurality opinion of J. Stewart, J. Powell, J. Stevens) [holding that, based upon the "crucial indicator" of jury determinations, a mandatory death penalty violates the evolving standards of decency]; *Coker v. Georgia,* 433 U.S. 584, 592 and 596-597 (1977) (plurality opinion of J. White, J. Stewart, J. Blackmun, and J. Stevens) [holding that, based upon the "response of juries reflected in their sentencing decisions," the death penalty for rape of an adult woman violates the evolving standards of decency]; *Id.* at 603-604 (concurring and dissenting opinion of J. Powell); *Enmund v. Florida,* 458 U.S. 782, 788-789 and 794-796 (1982) (majority opinion by White, J., in which Brennan, Marshall, Blackmun, and Stevens, JJ., joined.) [holding that, based upon the sentencing decisions of juries, the death penalty for those defendants who did not kill or even intend to kill the victims violated the evolving standards of decency]; *Id*. at 814, 815, 816, 818-819, and 825-826 (dissenting opinion of J. O'Connor, C.J. Burger, J. Powell, and J. Rehnquist) [disagreeing with conclusion but agreeing with analysis]); *Thompson v. Oklahoma*, 487 U.S. 815, 822-823, fn 7 and 831-833 (1988) (plurality opinion of J. Stevens, J. Brennan, J. Marshall, and J. Blackmun) [holding that, based upon jury determinations as an "indicator of contemporary standards of decency," the death penalty for offenses committed by defendants who were under 16 violates the evolving standards of decency]; *Id*. at 852-853 (O'Connor concurring); *McCleskey v. Kemp,* 481

U.S. 279, 300 (1987)(majority opinion by Powell, J., in which Rehnquist, C. J., and White, O'Connor, and Scalia, JJ., joined); *Penry v. Lynaugh*, 492 U.S. at 331 and 334 (majority opinion by O'Connor, in which Rehnquist, C. J., and White, Scalia, and Kennedy, JJ., joined) [holding that the death penalty for mentally retarded persons is not unconstitutional and noting that defendant here offered no evidence on jury behaviour on this topic].

Recently, three Supreme Court Justices wrote a separate opinion to emphasize their belief that the actions of sentencing juries, along with legislative judgments, are the *sole reliable factors* in the "evolving standards" analysis. *See Atkins v. Virginia,* 536 U.S. at 322-325 and 328 (C.J. Rehnquist, J. Scalia, and J. Thomas dissenting).) In summarizing this long line of decisions, Chief Justice Rehnquist wrote for the dissenters:

> Our opinions have also recognized that data concerning the actions of sentencing juries, though entitled to less weight than legislative judgments, "'is a significant and reliable index of contemporary values,'" *Coker v. Georgia*, 433 U.S. 584, 596 (1977) (plurality opinion) (quoting *Gregg, supra*, at 181), because of the jury's intimate involvement in the case and its function of "'maintaining a link between contemporary community values and the penal system,'" *Gregg, supra*, at 181 (quoting *Witherspoon v. Illinois*, 391 U.S. 510, 519, n. 15 (1968). In *Coker*, 433 U.S. at 596-597, for example, we credited data showing that "at least 9 out of 10" juries in Georgia did not impose the death sentence for rape convictions. And in *Enmund v. Florida*, 458 U.S. 782, 793-794 (1982), where evidence of the current legislative judgment was not as "compelling" as that in *Coker* (but more so than that here), we were persuaded by "overwhelming [evidence] that American juries . . . repudiated imposition of the death penalty" for a defendant who neither took life nor attempted or intended to take life.
>
> In my view, these two sources – the work product of legislatures and sentencing jury determinations – ought to be the sole indicators by which courts ascertain the contemporary American conceptions of decency for purposes of the Eighth Amendment. They are the only objective indicia of contemporary values firmly supported by our precedents. More importantly, however, they can be reconciled with the undeniable precepts that the democratic branches of government and individual sentencing juries are, by design, better suited than courts to evaluating and giving effect to the complex societal and moral considerations that inform the selection of publicly acceptable criminal punishments.

*Id.* at 323-324; emphasis added.

The Supreme Court has repeatedly held that death penalty juries have a constitutional duty to represent the evolving standards of decency of society.  Since juries represent community values, their verdicts inform the Supreme Court's determination of how far society has evolved.

However, inexplicably, potential jurors in Mr. Barbee's case were removed *precisely because* they represented community values as to their views on the death penalty.  This improper "death qualification" resulted in a skewed jury that could not properly perform its constitutional functions. "A penalty jury can speak for the community only insofar as the pool of jurors from which it is drawn represents the full range of relevant community attitudes." *Hovey v. Superior Court*, 28 Cal. 3d 1, 73 (1981).  Thus, death qualification in Texas stifles society from evolving by insuring that reliable evidence of certain community values as to the death penalty are never brought to the attention of the Supreme Court. Death qualification in Texas also results in unconstitutional stifling of evolving standards and skewing of community values in capital juries.

In *Gregg v. Georgia*, 428 U.S. 153 (plurality opinion of J. Stewart, J. Powell, and J. Stevens), the Supreme Court held that society had yet to evolve to the point that the death penalty per se was deemed to be cruel and unusual.  One of the key factors the Court examined was the actual verdicts of jurors.  In doing so, the Court stated:

> The jury also is a significant and reliable objective index of contemporary values because it is so directly involved. See *Furman v. Georgia*, 408 U.S., at 439-440 (POWELL, J., dissenting). See generally Powell, Jury Trial of Crimes, 23 Wash. & Lee L. Rev. 1 (1966). The Court has said that "one of the most important functions any jury can perform in making... a selection [between life imprisonment and death for a defendant convicted in a capital case] is to maintain a link between contemporary community values and the penal system."

*Witherspoon v. Illinois*, 391 U.S. 510, 519 n. 15 (1968). *Id.* at 181; emphasis added.

The Court then reviewed the evidence on jury behavior and held that it did not show that society had evolved to the point where the death penalty was per se cruel and unusual. By definition, these "evolving standards of decency" are constantly changing. Thus, it is an open question whether at some point in the future they will have evolved to the point where the death penalty is unconstitutional per se. *Compare Penry v. Lynaugh*, 492 U.S. 302[holding that society had yet to evolve to the point where the death penalty for the mentally retarded is unconstitutional] *with Atkins v. Virginia*, 536 U.S. 304 [holding that society has evolved to the point where the death penalty for the mentally retarded is unconstitutional]. In other words, the *Gregg* issue will have to be addressed again by a future court as society evolves.

Yet, when a future court addresses this issue, they will not have the proper constitutional evidence and guidance because all people who believe that the death penalty is cruel and unusual per se will have been disqualified from serving on a death penalty jury via death qualification. This shows how death qualification in Texas stifles the evolving standards of decency and thus violates the Eighth Amendment.

The underlying premise of the *Gregg* issue – as well as the principle of the jury as indicator of evolving standards in general – is that the jury maintains a link to community values. By allowing some values to be excluded, the premise disappears and the future court grappling with the *Gregg* question is left with a guidepost that represents only some community values – namely those that support the status quo – which cannot possibly indicate evolving standards of society as a whole. Indeed, the only way that a jury can be an accurate guidepost on the *Gregg* question of whether the death penalty is unconstitutional per se is if jurors whose values reflect this view are actually deciding cases. Aversion to imposing the death penalty is also part of the conscience of the

community. For the *Gregg* question to be properly answered there must be jurors who decide –  or at least contemplate deciding – death penalty cases based on their moral views of whether the death penalty is per se appropriate.  If not, the future court will be looking at jury data, which will not address the question that they are asking: Do members of society believe that the death penalty per se is wrong?  The effect is to stifle the evolving standards of decency.

When a future court addresses the *Gregg* issue as to the constitutionality of the death penalty per se again, they will look to jury statistics that will have been drastically skewed against capital defendants, including Mr. Barbee. *See e.g. Stanford v. Kentucky*, 492 U.S. at 387, fn 3 (dissenting opinion of Brennan, J.).  And even if the future Court in some manner acknowledges that the proper statistics were not available, it is likely that the future Court may view the lack of statistics as an obstacle to relief.  *See e.g. Atkins v. Virginia*, 536 U.S. at 324, fn. 13 (dissenting opinion of Rehnquist, Scalia, and Thomas) *quoting Stanford v. Kentucky,* 492 U.S. 361, 373   (1989) ["Petitioner's inability to muster studies in his favor ought to cut against him, for it is his 'heavy burden,' to establish a national consensus against a punishment deemed acceptable by the Virginia Legislature and jury who sentenced him."] Thus, Texas's death qualification not only makes certain that a jury skewed to death and guilt was improperly chosen at Mr. Barbee's trial, but also makes certain that he will be unjustly prevented of any future relief no matter how much society evolves. A process of death qualification that guarantees these results is not constitutional.

Moreover, it is entirely proper under Texas law for a juror to decide not to inflict death based upon their moral beliefs about the death penalty. As the community's representative, the jury has ultimate responsibility for determining if death is the appropriate penalty for the particular offense and offender. In exercising this essentially normative task, it may apply its own moral standards to

the aggravating and mitigating evidence presented. It may reject death if persuaded to do so on the basis of any constitutionally relevant evidence or observation. A juror's moral beliefs are constitutionally relevant.   Indeed, the Supreme Court has repeatedly held that they are constitutionally required so as to inform the Court's analysis of "evolving standards of decency." Further, a juror who morally believes that the death penalty is not appropriate for any individual can properly consider the evidence and then allow these moral standards to influence their views of aggravating and mitigating evidence.   In other words, these jurors can properly perform their duty under Texas law to make moral and sympathetic determinations at the penalty phase through their vote on the mitigation special issue.

The Supreme Court has made it explicitly clear that the very reason that juries are allowed to have broad discretion in capital cases is so that they may represent the conscience of the community by allowing their values to influence their disposition of individual cases.  The Supreme Court was adamant that this required functioning of the capital jury is necessary for assessing the constitutionality of the death penalty.

Mr. Barbee has demonstrated that death qualification in Texas results in an unconstitutional death penalty scheme.  It is clear that the current "death qualification" test is inappropriate, as well as simply irrational, and thus in violation of the Eighth and Fourteenth Amendments.  Further, death qualification in Texas is contrary to the Supreme Court's long-standing Eighth Amendment jurisprudence requiring that death penalty juries represent the values of the community and inform the Supreme Court's ability to discern evolving standards of decency.  Death qualification in Texas stifles evolving standards of decency and prevents defendants from having mitigating evidence considered and given effect by sentencers in violation of the Eighth Amendment.

All of these constitutional violations are only made more egregious by the fact that death qualification also results in juries that are skewed towards convictions and death sentences.  Since Mr. Barbee's jury was chosen via Texas' unconstitutional death qualification process here, his death sentence cannot stand.

Given these serious Federal Constitutional violations, as well as violations of International Law, Treaties, Norms, and Customs, this Court should grant the petition for writ of habeas corpus the relief requested.

**Claim 16(b)**: Death qualification violated Petitioner's fundamental right to a fair penalty jury under the Equal Protection and Due Process Clauses of the Fourteenth Amendment.

Death qualification violates the Fourteenth Amendment for another reason.  A capital defendant in Texas has a federal constitutional right under the Sixth Amendment to a jury trial at the penalty phase.  As detailed above, a right is deemed fundamental for Fourteenth Amendment analysis if explicitly or implicitly protected by the Constitution. *See San Antonio Independent Sch. Dist. v. Rodriguez,* 411 U.S. at 17.  Texas has vested its people with this right to a penalty phase jury and that  right is fundamental. Like the legal situation in *Bush v Gore*, the Supreme Court has held: "When the state legislature vests the right to vote for President in its people, the right to vote as the legislature has prescribed is fundamental." *Bush v. Gore,* 531 U.S. at 104 [Where the Supreme Court held that since Florida gave its citizens the right to vote for President, it was a fundamental right for equal protection analysis].

The right to a jury in a criminal trial is a bedrock principle in the American justice system.  Further, a penalty phase jury provides a vital role in maintaining a link to the values of the community both in deciding specific cases and in the overall constitutional death penalty scheme.

*See e.g. Gregg v. Georgia*, 428 U.S. at 190 ["Jury sentencing has been considered desirable in capital cases in order to maintain a link between contemporary community values and the penal system - a link without which the determination of punishment could hardly reflect the evolving standards of decency that mark the progress of a maturing society."]   In fact, in *McCleskey v. Kemp,* 481 U.S. at 309-311, the Supreme Court extensively defended the importance of the jury at the penalty phase, going so far as to refer to the jury at the penalty phase both as a "fundamental protection" *id*. at 310 and as having a "fundamental value" in the American criminal system.   *Id.* at 313.   Thus, just like in *Bush*, the statutory right to a jury trial at the penalty phase is a fundamental right.

The Texas legislature has not enacted any clear, uniform standards for death qualification. It has been entirely left up to the courts to set standards for death qualification.   Confusion as to how the trial courts should conduct death qualification reigns. The Texas courts have failed to establish any uniform standards.   Instead, the court simply defers to the trial court's discretion and never addresses its own jurisprudence. .

This discretion inevitably results in non-uniform standards and unequal treatment, just like the discretion condemned in *Bush*.   Death qualification in Texas is thus "inconsistent with the minimum procedures necessary to protect the fundamental right" to a penalty phase jury. *Bush v. Gore,* 531 U.S. at 109.   Therefore, it is unconstitutional under the Equal Protection Clause.

In addition to the unequal manner in which juries are death qualified in Texas, death qualification also vastly impinges upon a capital defendant's fundamental right to a penalty phase jury by resulting in a jury that is skewed towards voting for death.   Thus, Texas both impinges upon a capital defendant's individual right to an impartial jury at the penalty phase and distributes that right in an unequal manner. Since Mr. Barbee's jury was chosen in an unconstitutional manner, his

penalty must be reversed.

Death qualification violated Mr. Barbee's rights under the Fourteenth Amendment for yet another reason.  The penalty jury is more death prone.  Each similarly situated capital defendant also receives vastly different juries who decide both phases.  These results are impermissible when a fundamental right is involved.  And here, the most fundamental right of all is involved – the right to life.

The Supreme Court has referred to the "fundamental right to life." *Ford v. Wainwright,* 477 U.S. at 409; *see also e.g. generally Yick Wo v. Hopkins,* 118 U.S. 356, 370 (1886) ["The fundamental rights to life, liberty, and the pursuit of happiness, considered as individual possessions, are secured by those maxims of constitutional law which are the monuments showing the victorious progress of the race in securing to men the blessings of civilization under the reign of just and equal laws."]; *Johnson v. Zerbst*, 304 U.S. 458, 462 (1938)["fundamental human rights of life and liberty"]**.**

Life is a fundamental right. Since it is the jury that ultimately deprives capital defendants of this fundamental right, the type of jury selected vastly affects this right. The state bears the heavy burden of justifying death qualification under strict scrutiny, justifying these differences as to further a compelling government interest.  *See e.g. Plyler v. Doe,* 457 U.S. 202, 216-217 (1982).  Texas cannot meet this burden of justifying the death qualification  as necessary. Further, the lack of uniform standards for selecting jurors via death qualification cannot withstand the required *Bush* equal protection analysis.

Due to death qualification in Texas –capital defendants face significantly different juries at the guilt phase than non-capital defendants.  Capital defendants such as Mr. Barbee face juries more

prone to inflict a death sentence.  Similarly situated capital defendants face penalty juries that are vastly different in any given capital case.  Texas has failed to establish uniform guidelines for death qualification.  Death qualification in Mr. Barbee's case was unconstitutional.  His convictions, and penalty must therefore be reversed.

Given these serious Federal Constitutional violations, as well as violations of International Law, Treaties, Norms, and Customs, this Court should grant the petition for writ of habeas corpus the relief requested.

**Claim 16(c)**: **Death qualification in Texas violates the Eighth Amendment**

There is yet another reason that death qualification in Texas violates the Constitution by skewing the jury to be more conviction prone and more prone to inflict death upon capital defendants.  Non-capital defendants do not face these skewed juries.  This result is unacceptable under the Eighth Amendment, as well as International Law, Treaties, Norms, and Customs.

The Supreme Court has consistently made it clear that since "death is different," the Eighth Amendment requires "heightened reliability" at all phases of a capital case. *See e.g. Beck,* 447 U.S. at 638.  Death qualification vastly affects the jury that has the power to impose this ultimate penalty in a manner so as to make death more likely.  It cannot survive the requirement of "heightened reliability."

This "heightened reliability" applies to the guilt phase of capital cases as well. Capital defendants receive juries at the guilt phase that are more skewed towards conviction than guilt juries in non-capital cases.

Death qualification only targets capital defendants.  It results in capital defendants receiving juries at both phases that are far less "impartial" than any other defendant.  A capital defendant is

-460-

forced to face a jury unfairly skewed towards reaching a guilt verdict with a death sentence.  Death qualification violates the "heightened reliability" requirement of due process and the Eighth Amendment.

It is "cruel and unusual" to put a human being on trial for his life, yet systemically force him to face a jury that is more prone to convict than the typical criminal jury and also more prone to condemn him to die by excluding the jurors who would at least be open to the defense evidence.[184] Since Mr. Barbee faced such treatment via the death qualified jury at his trial, his death penalty must be reversed.

Given these serious Federal Constitutional violations, as well as violations of International Law, Treaties, Norms, and Customs, this Court should grant the petition for writ of habeas corpus the relief requested.

**Claim 16(d)**: Death qualification is unconstitutional because it results in a jury prone to vote for death.

The Supreme Court's decision in *Lockhart* did not end the discussion or solve the problems relating to these important constitutional issues involving death qualification in Texas because it was based on a faulty analysis of the scientific evidence, severe misunderstandings of the claims, and baffling logic.[185]  *Lockhart* also failed to address numerous claims, while later cases and data

---

[184] Moreover, Texas has especially established a capital system whereby all the jurors who would consider and give effect to mitigating evidence are systemically removed by particularized death qualification in contravention of the Eighth Amendment.

[185] As one commentator stated: "The majority opinion in *Lockhart v. McCree* demonstrates the inability of the highest court in the land to accurately interpret and apply social science data. The tragedy here – and there is a far reaching one –  is that the Supreme Court has licensed the imposition of death sentences by juries who are more likely to convict than juries empaneled in any other type of criminal case." Seltzer et al., *The Effect of Death Qualification on the Propensity of Jurors to Convict: The Maryland Example* 29 How. L.J. 571, 573 (1986).

continue to undermine its "constitutional facts."

One day the Supreme Court will acknowledge this untenable situation and reverse course – as it has done recently in other areas of its capital jurisprudence. *See e.g. Atkins v. Virginia,* 536 U.S. 304 [reversing its earlier decision in *Penry v. Lynaugh*, 492 U.S. 302 and holding that it is unconstitutional to execute mentally retarded people]; *Ring v. Arizona*, 536 U.S. 584 [reversing its earlier decision in *Walton v. Arizona,* 497 U.S. 639 and holding that it is unconstitutional for a judge, not a jury, to find aggravating circumstances]. Indeed, given the "evolving standards of decency" aspect of its capital jurisprudence, the Supreme Court in the future will have to admit that society has evolved to the point where death qualification is unconstitutional.

The most telling aspect of the scientific data on death qualification is the consistency in which it points in the same direction – which is that death qualification results in a jury that is prone to convict and prone to vote for the death penalty.

Death qualification also disproportionately excludes women, blacks, other "minorities," and religious persons. The very process of death qualification by its indoctrination of jurors skews the jury towards assuming guilt and returning death sentences. One researcher has aptly summarized the varied effects of death qualification detailed in the studies as follows:

> [J]uries in capital cases are considerably different from non-capital juries, both in membership and in operation. The people whose attitudes and prejudices qualify them for service on capital juries also tend to favor the prosecution and its witnesses and are generally distrustful of persons accused of crime and their attorneys. The typical juror in a death case is also probably more likely to believe minority defendants are guilty, because capital jurors are more likely than non-capital jurors to be white males, with a lower threshold of reasonable doubt.

> Their attitudes and biases make "death-qualified" jurors more likely to vote for conviction at the guilt phase of the trial. If a penalty phase is required, these jurors are also less likely to accept mitigation evidence and argument, and consequently are more likely to vote for the death penalty than a jury comprising a typical cross-section of the community.

Smith, *Due Process Education for the Jury: Overcoming the Bias of Death Qualified Juries*, 18 Sw. U.L.Rev. 493, 498 (1989); footnotes omitted.

For these reasons, death qualification in Texas must be deemed to be unconstitutional under the Sixth, Eighth, and Fourteenth Amendments, as well as International Law, Treaties, Norms, and Customs. Given these serious Federal Constitutional violations, as well as violations of International Law, Treaties, Norms, and Customs, this Court should grant the petition for writ of habeas corpus the relief requested.

### C. Exhaustion and procedural default.

These claims were first brought in Mr. Barbee's subsequent state habeas application as Claim 16, and were dismissed "as an abuse of the writ" because those allegations "do not satisfy the requirements of Article 11.071 Section 5." *Ex parte Stephen Dale Barbee,* No. WR-71,070-02, at 2. (Tex. Crim. App. May 8, 2013)(Exhibit 52.) Hence, it was not denied on the merits but only on procedural grounds, and the 2254(d) standard of review does not apply. *Cone v. Bell,* 129 S. Ct. 1769, 1784 (2009)("Because the Tennessee courts did not reach the merits of Cone's *Brady* claim [and instead rejected claim on procedural default grounds], federal habeas review is not subject to the deferential standard that applies under AEDPA...Instead the claim is reviewed *de novo*"); *Graves v. Dretke,* 442 F.3d 334, 339 (5th Cir.), *cert. denied,* 549 U.S. 943 (2006)(section 2254(d) is inapplicable because petitioner's "claims were dismissed by the Texas courts as abuses of the writ, i.e., on procedural grounds," and thus "were not adjudicated on the merits in Stare court").

Respondent has argued that these claims are defaulted. (Docket No. 40, RA at 117.) For the reasons discussed *supra,* procedural default is not appropriate for any of Petitioner's claims.

<u>CLAIM SEVENTEEN</u>: PETITIONER'S DEATH SENTENCE VIOLATES INTERNATIONAL LAW, WHICH IS BINDING ON THIS COURT, AS WELL AS THE EIGHTH AMENDMENT

A few years ago, the Supreme Court of Canada placed the use of the death penalty in the United States for ordinary crimes into an international context:

> Amnesty International reports that in 1948, the year in which the Universal Declaration of Human Rights was adopted, only eight countries were abolitionist. In January 1998, the Secretary-General of the United Nations, in a report submitted to the Commission on Human Rights (U.N. Doc. E/CN.4/1998/82), noted that 90 countries retained the death penalty, while 61 were totally abolitionist, 14 (including Canada at the time) were classified as abolitionist for ordinary crimes and 27 were considered to be abolitionist *de facto* (no executions for the past 10 years) for a total of 102 abolitionist countries. At the present time, it appears that the death penalty is now abolished (apart from exceptional offences such as treason) in 108 countries. These general statistics mask the important point that abolitionist states include all of the major democracies except some of the United States, India and Japan … According to statistics filed by Amnesty International on this appeal, 85 percent of the world's executions in 1999 were accounted for by only five countries: the United States, China, the Congo, Saudi Arabia and Iran.

(*Minister of Justice v. Burns* (2001) 1 S.C.R. 283 [2001 SCC 7], ¶ 91.) The Texas death penalty scheme violates the provisions of international treaties and the fundamental precepts of international human rights. Because international treaties ratified by the United States are binding on state courts, the imposition of the death penalty is unlawful. To the extent that international legal norms are incorporated into the Eighth Amendment determination of evolving standards of decency, Petitioner raises this argument under the Eighth Amendment as well. (*See Atkins v. Virginia* (2002) 536 U.S. 304, 316, fn. 21; *Stanford v. Kentucky* (1989) 492 U.S. 361, 389-390 (Brennan, J., dissenting.).)

A.      **International Law**

Article VII of the International Covenant of Civil and Political Rights ("ICCPR") prohibits "cruel, inhuman or degrading treatment or punishment." Article VI, section 1 of the ICCPR prohibits the arbitrary deprivation of life, providing that "[e]very human being has the inherent right

to life.  This right shall be protected by law.  No one shall be arbitrarily deprived of life."

The ICCPR was ratified by the United States in 1992, and applies to the states under the Supremacy Clause of the federal Constitution.  (U.S. CONST., art. VI, § 1, cl. 2.)  Consequently, this Court is bound by the ICCPR.[186]  The United States Court of Appeals for the Eleventh Circuit has held that when the United States Senate ratified the ICCPR "the treaty became, coexistent with the United States Constitution and federal statutes, the supreme law of the land" and must be applied as written.  (*United States v. Duarte-Acero* (11th Cir. 2000) 208 F.3d 1282, 1284; *but see Beazley v. Johnson* (5th Cir. 2001) 242 F.3d 248, 267-268.)

Mr. Barbee's death sentence violates the ICCPR.  Because of the improprieties of the capital sentencing process challenged in this appeal, the imposition of the death penalty on him constitutes "cruel, inhuman or degrading treatment or punishment" in violation of Article VII of the ICCPR.  There is a growing recognition that international human rights norms in general, and the ICCPR in particular, should be applied to the United States.  (*See United States v. Duarte-Acero*, *supra*, 208 F.3d at 1284; *McKenzie v. Daye* (9th Cir. 1995) 57 F.3d 1461, 1487 (Norris, J., dissenting).)  Thus, Petitioner requests that the Court reconsider and, in the context of this case, find his death sentence violates international law.  (*See Smith v. Murray* (1986) 477 U.S. 527 [holding that even issues

---

[186]   The Senate attempted to place reservations on the language of the ICCPR, including a declaration that the covenant was not self-executing.  (*See* 138 Cong. Rec. S4784, § III(1).)  These qualifications do not preclude Applicant's reliance on the treaty because, inter alia, (1) the treaty is self-executing under the factors set forth in *Frolova v. U.S.S.R.* (7th Cir. 1985) 761 F.2d 370, 373; (2) the declaration impermissibly conflicts with the object and purpose of the treaty, which is to protect the individual's rights  enumerated therein (*see* RIESENFELD & ABBOT, *The Scope of the U.S. Senate Control Over the Conclusion and Operation of Treaties*  (1991) 68 Chi.-Kent L. Rev. 571, 608); and (3) the legislative history indicates that the Senate only intended to prohibit private and independent causes of action (*see* 138 Cong. Rec. S4784) and did not intend to prevent defensive use of the treaty (*see* Quigley, *Human Rights Defenses in U.S. Courts* (1998) 20 Hum. Rts. Q. 555, 581-582).

settled under state law must be reasserted to preserve the issue for federal habeas corpus review].)

## B.     The Eighth Amendment

As noted above, the abolition of the death penalty, or its limitation to exceptional crimes such as treason – as opposed to its use as a regular punishment for ordinary crimes – is particularly uniform in the nations of Western Europe.  (*See, e.g.*, *Stanford v. Kentucky* (1989) 492 U.S. 361, 389 (Brennan, J., dissenting.); *Thompson v. Oklahoma*, *supra*, 487 U.S. at  830 (Stevens, J., plurality opinion)).  Indeed, *all* nations of Western Europe – plus Canada, Australia, and New Zealand – have abolished the death penalty.  (Amnesty International, "The Death Penalty:  List of Abolitionist and Retentionist  Countries"  (as  of  August  2002)  at  <http://www.amnesty.org>  or <http://www.deathpenaltyinfo.org>.)[187]

This consistent view is especially important in considering the constitutionality of the death penalty under the Eighth Amendment because our Founding Fathers looked to the nations of Western Europe for the "law of nations" as models on which the laws of civilized nations were founded and for the meaning of terms in the Constitution.  "When the United States became an independent nation, they became, to use the language of Chancellor Kent, 'subject to that system of rules which reason, morality, and custom had established among the civilized nations of Europe as their public law.'" (*Miller v. United States* (1870) 78 U.S. 268, 315 (Field, J., dissenting), quoting l Kent's Commentaries 1; *Hilton v. Guyot* (1895) 159 U.S. 113, 163, 227; *Sabariego v. Maverick* (1888) 124 U.S. 261, 291-292.)  Thus, for example, Congress's power to prosecute war is, as a matter of constitutional law, limited by the law of nations; what civilized Europe forbade, such as

---

[187]   Many other countries including almost all Eastern European, Central American, and South American nations also have abolished the death penalty either completely or for ordinary crimes.  (*See* Amnesty International's  "List of Abolitionist and Retentionist Countries," *supra,* at <http://www.amnesty.org> or <http://www.deathpenaltyinfo.org>.)

using poison weapons or selling prisoners of war into slavery, was constitutionally forbidden here. (*Miller v. United States*, *supra*, 78 U.S. at 315-316, fn. 57 (Field, J., dissenting).)

"Cruel and unusual punishment" as defined in the Constitution is not limited to whatever violated the standards of decency that existed within the civilized nations of Europe in the 18th century.  The Eighth Amendment "draw[s] its meaning from the evolving standards of decency that mark the progress of a maturing society."  (*Trop v. Dulles* (1958) 356 U.S. 86, 100.)  And if the standards of decency as perceived by the civilized nations of Europe to which our Framers looked as models have evolved, the Eighth Amendment requires that we evolve with them.  The Eighth Amendment thus prohibits the use of forms of punishment not recognized by several of our states and the civilized nations of Europe, or used by only a handful of countries throughout the world – including totalitarian regimes whose own "standards of decency" are supposed to be antithetical to our own.  (*See Atkins v. Virginia*, *supra*, 536 U.S. at  316, fn. 21 [basing determination that executing mentally retarded persons violated Eighth Amendment in part on disapproval in "the world community"]; *Thompson v. Oklahoma*, *supra*, 487 U.S. at 830, fn. 31 ["We have previously recognized the relevance of the views of the international community in determining whether a punishment is cruel and unusual"].)

Assuming *arguendo* that capital punishment itself is not contrary to international norms of human decency, its use as regular punishment for substantial numbers of crimes – as opposed to extraordinary punishment for extraordinary crimes – is contrary to those norms.  Nations in the Western world no longer accept the death penalty, and the Eighth Amendment does not permit jurisdictions in this nation to lag so far behind.  (*See Hilton v. Guyot*, *supra*, 159 U.S. 113; *see also Jecker, Torre & Co. v. Montgomery* (1855) 59 U.S. 110, 112 [municipal jurisdictions of every

country are subject to law of nations principle that citizens of warring nations are enemies].)  Thus, Texas's use of death as a regular punishment, as in this case, violates the Eighth and Fourteenth Amendments, and Petitioner's death sentence should be set aside.

### C. Exhaustion and procedural default.

This claim was first brought in Mr. Barbee's subsequent state habeas application as Claim 17, and it was dismissed "as an abuse of the writ" because those allegations "do not satisfy the requirements of Article 11.071 Section 5." *Ex parte Stephen Dale Barbee,* No. WR-71,070-02, at 2. (Tex. Crim. App. May 8, 2013)(Exhibit 52.)  Hence, it was not denied on the merits but only on procedural grounds, and the 2254(d) standard of review does not apply. *Cone v. Bell,* 129 S. Ct. 1769, 1784 (2009)("Because the Tennessee courts did not reach the merits of Cone's *Brady* claim [and instead rejected claim on procedural default grounds], federal habeas review is not subject to the deferential standard that applies under AEDPA...Instead the claim is reviewed *de novo* "); *Graves v. Dretke,* 442 F.3d 334, 339 (5th Cir.), *cert. denied,* 549 U.S. 943 (2006)(section 2254(d) is inapplicable because petitioner's "claims were dismissed by the Texas courts as abuses of the writ, i.e., on procedural grounds," and thus "were not adjudicated on the merits in Stare court").

## CLAIM EIGHTEEN: APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL.

Petitioner's right to due process of law, equal protection of the laws, and a reliable sentence, trial by jury, and by an impartial sentencer, was violated by his failure to receive effective assistance of appellate counsel, through state court action. U.S. Const. Amends. V, VI, VIII, XIV and applicable provisions of the Texas Constitution.

### A. Argument.

Every criminal defendant has a right to effective assistance of counsel on his first direct appeal as a matter of right. *Evitts v. Lucey*, 469 U.S. 387 (1985); *Strickland v. Washington*, 466 U.S. 668 (1984). Counsel's role on direct appeal is "that of an expert professional whose assistance is necessary in a legal system governed by complex rules and procedures for the defendant to obtain a decision at all -- much less a favorable decision -- on the merits of the case." *Evitts*, 469 U.S. at 394. Appellate counsel must make "a conscientious examination" of the record to identify all of the potential issues for an appeal, thoroughly research every colorable claim, and make a reasonable professional judgment about which points to raise. *Anders v. California*, 386 U.S. 738, 744 (1967). Therefore, appellate counsel "must have a firm command of the facts of the case as well as governing law before [they] can render reasonably effective assistance of counsel."

In reaching its conclusion in *Evitts,* the Supreme Court rejected the state's argument that the Due Process Clause did not apply to state appeals because the state did not have to grant appeals as of right at all. The Court stated, "[i]n short, when a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution—and, in particular, in accord with the Due Process Clause." *Evitts,* at 401. *See also*

*Goeke v. Branch,* 514 U.S. 115, 119-20 (1995).

> The Supreme Court in *Evitts* concluded that "[a] first appeal as of right therefore is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney... In short, the promise...that a criminal defendant has a right to counsel on appeal—like the promise...that a criminal defendant has a right to counsel at trial—would be a futile gesture unless it comprehended the right to the effective assistance of counsel.
> *Evitts,* at 396-97.  *See also Goeke v. Branch,* 514 U.S. 115, 120 (1995).

Any purely-record-based claims or sub-claims discussed herein could and should have been raised on the direct appeal if the basis for them was entirely present in the record itself.  As to any such claims or sub-claims, direct appeal counsel's performance was unreasonable under the prevailing professional norms and there is a reasonable probability that, but for appellate counsels' errors, Petitioner's conviction or sentence would have been reversed on direct appeal.  The two-pronged *Strickland* standard of deficient performance and prejudice governing claims of ineffectiveness of trial counsel likewise applies to the ineffectiveness of direct appeal counsel.  *Evitts,* 469 U.S. 387.  Appellate counsel's inexcusable failure to raise a point of error that had a reasonable probability of success would be sufficient to make the showing of deficient performance.

Should this or any subsequent court hold that any purely-record-based claims or sub-claims were not properly brought on the direct appeal Petitioner submits that although he had counsel on appeal, that counsel did not provide the representation mandated by the Constitution.  *Evitts v. Lucy,* 469 U.S. 387, 396 (1985) ("To be sure, counsel did have nominal representation when he brought this appeal.  But nominal representation on an appeal as of right – like nominal representation at trial – does not suffice to render the proceeding constitutionally adequate; a party whose counsel is unable to provide effective representation is in no better position that one who has no counsel at all.")

**B. What the state courts held.**

This claim was first brought in Mr. Barbee's subsequent state habeas application as Claim 18, and was  dismissed "as an abuse of the writ" because those allegations "do not satisfy the requirements of Article 11.071 Section 5." *Ex parte Stephen Dale Barbee,* No. WR-71,070-02, at 2. (Tex. Crim. App. May 8, 2013)(Exhibit 52.)  Hence, it was not denied on the merits but only on procedural grounds, and the 2254(d) standard of review does not apply. *Cone v. Bell,* 129 S. Ct. 1769, 1784 (2009)("Because the Tennessee courts did not reach the merits of Cone's *Brady* claim [and instead rejected claim on procedural default grounds], federal habeas review is not subject to the deferential standard that applies under AEDPA...Instead the claim is reviewed *de novo"*); *Graves v. Dretke,* 442 F.3d 334, 339 (5th Cir.), *cert. denied,* 549 U.S. 943 (2006)(section 2254(d) is inapplicable because petitioner's "claims were dismissed by the Texas courts as abuses of the writ, i.e., on procedural grounds," and thus "were not adjudicated on the merits in Stare court").

**CLAIM NINETEEN**: PETITIONER WAS DEPRIVED OF DUE PROCESS AND A FAIR TRIAL BY PROVIDING AN EDITED VERSION OF THE VIDEOTAPE OF HIS CONFESSION AND WITHHOLDING THE COMPLETE VIDEO.

Mr. Barbee was deprived of his right to a fair trial, right of confrontation, and due process under the Eighth and Fourteenth Amendments because of the action of the police in withholding the complete videotape of his alleged confession and providing only an edited version of that confession. *Brady v. Maryland,* 373 U.S. 83, 83 S. Ct. 1194 (1963); *Strickler v. Greene,* 527 U.S. 263, 119 S. Ct. 1936 (1999).

**A. Facts in Support.**

On February 21, 2005 Mr. Barbee and Ron Dodd accompanied the Fort Worth police to the police station in Tyler for questioning about the disappearance of Lisa Underwood and her son. (24 RR 82-84.)

Mr. Barbee and Mr. Dodd were placed in separate interview rooms which were wired for video and sound recording. (25 RR 10-11.) Detectives Carroll and Jamison conducted the interview of Mr. Barbee and Detective McCaskill questioned Mr. Dodd. The questioning of Mr. Barbee began at 1945 hours (7:45 p.m.) and continued until the interrogators took a break to photograph Mr. Barbee's injuries. (25 RR 16.)  The interrogation resumed after Mr. Barbee's injuries were photographed, at which time he was confronted with the issue of his running from the police. (25 RR 17-20.)

At 2026 hours (8:26 p.m.), as soon as the police actually began accusing Mr. Barbee of the murder of Ms. Underwood, Detective Carroll told Mr. Barbee he was leaving the room.  He then left the room, allegedly to corroborate some facts with Mr. Dodd.  (*Id.*)  Detective Jamison remained in the interrogation room and continued to interrogate Mr. Barbee.  (25 RR 21.)

Detective Carroll testified at the suppression hearing and at the trial that he returned to the room to replace Detective Jamison, and when Mr. Barbee was alone in the room with Detective Caroll, Mr. Barbee requested to go to the bathroom.  However, this does not appear on the tape or DVD that was supplied to defense counsel.  Instead, the recording supplied to defense counsel abruptly stops in the middle of Jamison's interrogation of Mr. Barbee and only resumes when Mr. Barbee offers his alleged confession to the murder of Ms. Underwood. This alleged confession was suppressed by the trial court because Mr. Barbee invoked his right to counsel prior to making the statement. (22 RR 78-79.)

Thus, the only evidence of Mr. Barbee actually confessing to the murders comes from Detective Carroll and his testimony regarding an alleged 45-minute conversation in the bathroom, out of range of the video camera, during which Mr. Barbee allegedly confessed to the murders.  As was noted above, immediately upon reaching the county jail Mr. Barbee recanted his confession and claimed it was obtained through coercion and threats of the death penalty.

It simply defies coincidence that **none** of Mr. Barbee's interrogation by the police leading up to the alleged confession appears on the copies of the videos provided to counsel.  Petitioner is informed, believes and therefore alleges that these tapes were edited to remove those portions of Mr. Barbee's interrogation during which he was coerced into confessing to the murders of Lisa and Jayden Underwood.  Petitioner was denied any investigative funding in order to advance this claim in these federal habeas proceedings.

### B. Argument in Support.

A capital murder trial is not a game.  The state's obligation is to do justice, not to seek the short-term victories of gamesmanship. *Berger v. United States,* 295 U.S. 78, 80 (1935).

-473-

Consequently, when the state knows that testimony is false, it cannot rely upon that testimony to secure a conviction at either stages of trial; few rules are more clearly established in constitutional criminal jurisprudence than this. *Mooney v. Holohan*, 294 U.S. 103 (1935); *Napue v. Illinois*, 360 U.S. 264 (1959). In addition, the State must turn over to the accused all evidence in its custody that is "both favorable to the accused and material to guilt or punishment." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Such evidence includes any evidence concerning the credibility of a state's witness. *Giglio v. United States*, 405 U.S. 150 (1972).

Because the state violated these well-settled principles by failing to turn over these materials his sentence must be reversed. In the alternative, Mr. Barbee must be granted an evidentiary hearing to present witnesses and documentary evidence regarding the above serious allegations. This was a controverted material issue of fact in the state habeas proceedings and yet no hearing was ever held on this or any other issue. The judge that signed off on the prosecution-prepared pleadings was not the trial judge.

It is a fundamental tenet of constitutional criminal procedure that "the government must turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment." *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987) (*citing United States v. Agurs*, 427 U.S. 97 (1976) and *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). The materiality requirement of *Brady* is judged by whether there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985). The defendant meets this burden if he shows that the suppressed evidence could have created a reasonable doubt -- either as to the defendant's guilt or as to whether the death

penalty would have been imposed -- that did not otherwise exist.  *Agurs*, 427 U.S. at 112; *McDowell v. Dixon*, 850 F.2d 740 (4th Cir. 1988).  The State failed to provide this information to the defense which  constitutes the suppression of material evidence which "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  *Kyles v. Whitley*, 115 S.Ct. 1555, 1566 (1995).

### C. The Materiality Standard.

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that the prosecution's suppression of evidence favorable to a defendant violates due process where the evidence is material either to guilt or to punishment.  *Id.* at 87.  Under *Brady* and its progeny, a proceeding is rendered fundamentally unfair if: (1) the prosecution suppressed favorable evidence; and (2) the evidence was material to either guilt or punishment.  *Kyles v. Whitley*,  115 S.Ct. 1555, 1565 (1995); *Bagley*, 473 at 683; *Brady*, 373 U.S. at 87; *Blackmon v. Scott*, 22 F.3d 560, 564 (5th Cir. 1994). The Court has rejected any distinction between impeachment and exculpatory evidence for purposes of *Brady* analysis.  *United States v. Bagley*, 473 U.S. 667, 677 (1985); *Giglio v. United States*, 405 U.S. 150, 154 (1972).

Evidence is material "if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different."  *Kyles*, 115 S.Ct. at 1565; *Bagley*, 473 U.S. at 682.  In *Kyles*, the Supreme Court clarified four significant aspects of the materiality analysis.  First, to demonstrate materiality, the petitioner is not required to prove by a preponderance of the evidence that the suppressed evidence, if known to the defense, would have ultimately resulted in an acquittal or a life sentence.  *Kyles*, 115 S.Ct. at 1566-67.  The inquiry is more properly whether, in the absence of the suppressed evidence, the defendant received a fair trial.

*Id.* at 1566.   The Court has stated that a fair trial is "a trial resulting in a verdict worthy of confidence." *Id.*   Accordingly, a "reasonable probability" of a different result occurs when the State's suppression of evidence undermines confidence in the jury's verdict. *Id.*

Second, the *Kyles* Court emphasized that materiality analysis "*is not a sufficiency* of the evidence *test*." *Id.* (emphasis added).   The Court explained that "[a] defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Id.*   Instead, a petitioner can prove a *Brady* violation by "showing that the favorable evidence *could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.*" *Id.* (footnote omitted) (emphasis added); *see Lindsey v. King*, 769 F.2d 1034, 1042 (5th Cir. 1985) (noting that suppressed evidence may have consequences far beyond discrediting a witness's testimony).

The third aspect of materiality noted by the *Kyles* Court is that harmless error analysis is not applicable to *Brady* violations. *Kyles*, 115 S.Ct. at 1566.   The Court stated that "once a reviewing court applying *Bagley* has found constitutional error there is no need for further harmless error review." *Id.*

Finally, the Court explained that materiality involves the assessment of the "suppressed evidence *considered collectively*, not item by item." *Id.* at 1567 (emphasis added).   Because materiality is assessed cumulatively, the prosecution has the responsibility of gauging the net effect of all exculpatory evidence and making disclosure to the defense when the point of "reasonable probability" is reached. *Id.* The *Kyles* Court criticized the materiality assessment that the lower court made in its review of that case.   The Court recognized that "[t]he result reached by the Fifth Circuit majority is compatible with a series of independent materiality evaluations, rather than the

cumulative evaluation required by *Bagley*." *Id.* at 1569.   Consequently, "the individual prosecutor has a *duty to learn of any favorable evidence* known to the others acting on the government's behalf in the case." *Id.* (emphasis added).   In other words, the prosecutor cannot ignore information gathered by a police agency to duck his duty to disclose favorable information to the defense, and he also has an affirmative duty to look for and disclose favorable evidence such as the criminal history of his witnesses or the decedent if it is relevant to the defense.  *United States v. Auten*, 632 F.2d 478 (5th Cir. 1980).

Clearly the evidence here reaches this standard.  Mr. Barbee's alleged "bathroom" confession was central to the State's case, as has been discussed herein.  The altering of the videotape would have enabled the defense to challenge the prosecution's chief witness, Detective Carroll.  Coupled with the fact that Detective Carroll admitted he made no contemporaneous notes regarding this conversation, and that none of Mr. Barbee's interrogation appears on the tapes, it is reasonable to assume that the portions of the tape that would show coercion were removed.

**D.   The State courts erred in denying this claim and their holding was both an unreasonable determination of the facts and an unreasonable application of clearly-established federal law.**

This claim was brought in the initial state habeas proceedings as Claim 4. (Exhibit 11 at 25-29.)  The State habeas findings as to this claim are multiply flawed.

First, they rely extensively on the affidavit of trial prosecutor Kevin Rousseau which was appended to the State's reply. (Exhibit  12.) In fact, Findings of Fact numbers 2 through 10 regarding this claim rely completely on this affidavit. (Exhibit 14 at 25-26.)  Basically, all of these fact findings amount to simply "trust us, we turned over everything."  For example, Finding of Fact 10 states:

Mr. Rousseau has no reason to believe, nor has he ever had any reason to believe, that the

representations of the Fort Worth Police Department regarding the accuracy of the recordings were anything less than completely truthful. *See* Mr. Rousseau's Affidavit, page 2.
(Exhibit 14 at 26.)

One could hardly expect Mr. Rousseau to say anything other than this. Petitioner has had no opportunity to cross-examine Mr. Rousseau or the Fort Worth Police Department personnel on the veracity of his allegations. His affidavit represents simply another self-serving allegation which Petitioner has had no opportunity to probe for veracity.

From here on, the state fact-findings become even more unreliable. Findings numbers 12 through 14 are based on the trial attorneys's affidavit. (Exhibit 14 at 26.) Here again, the attorneys go out of their way to dismiss their client's claim but do so in an illogical manner. Finding 14 states that "[f]rom their review of the video-recording, Mr. Ray and Mr. Moore had no reason to believe that the applicant's video-recording was altered–only that it stopped and started—and they know of no fact supporting an 'alteration' claim." (*Id.*) But the claim is that it was edited through omission, not "altered," and hence this finding is meaningless because it does not address the issue. (*see* Claim One, *supra.*) And as discussed *supra,* the unreliability of the attorneys' affidavit precludes it being given any weight at all in these proceedings.

Third, the state habeas fact findings then latch onto Dr. Leo's letter in which he expresses his opinion that the confession is more likely to be true than false. (Exhibit 14 at 27, Findings of Fact numbers 18-20.) As extensively discussed *supra,* Dr. Leo's conclusion was based on very incomplete and inaccurate information about the case. In fact, Dr. Leo's negative opinion was a direct result of the negligence of the trial attorneys in failing to provide him with full information about the case. If they had, it is likely his opinion would have been different.

Finally, Finding of Fact number 22 is based on a misunderstanding of clearly-established

-478-

federal law.  It states that "[t]he following evidence presented during the guilt/innocence phase undercuts any claim that any police misconduct regarding his interviews altered the outcome of the applicant's trial." (Exhibit 14 at 27, finding number 22.  There follows a long and slanted list of the guilt phase evidence. (*Id.* at 27-30.)  As discussed *supra* in the materiality section, this is simply wrong.  In *Kyles, supra,* the Supreme Court held that the petitioner is *not* required to prove by a preponderance of the evidence that the suppressed evidence, if known to the defense, would have ultimately resulted in an acquittal or a life sentence.  *Kyles*, 115 S.Ct. at 1566-67.  The inquiry is more properly whether, in the absence of the suppressed evidence, the defendant received a fair trial. *Id.* at 1566.  The Court has stated that a fair trial is "a trial resulting in a verdict worthy of confidence."  *Id.*  Accordingly, a "reasonable probability" of a different result occurs when the State's suppression of evidence undermines confidence in the jury's verdict.  *Id.*

Second, the *Kyles* Court emphasized that a petitioner can prove a *Brady* violation by "showing that the favorable evidence *could reasonably be taken to put the whole case in such a different light* as to undermine confidence in the verdict."  *Id.* (footnote omitted) (emphasis added); *see Lindsey v. King*, 769 F.2d 1034, 1042 (5th Cir. 1985) (noting that suppressed evidence may have consequences far beyond discrediting a witness's testimony).  Additionally, the Court stated that "once a reviewing court applying *Bagley* has found constitutional error there is no need for further harmless error review."  *Id.*

Other findings denigrate the claim as mere speculation, but the summary of facts provided *supra* goes well beyond that.

Petitioner has shown here, under 2254(d), that the state court holdings as to this claim were both an unreasonable determination of the facts and an unreasonable application of clearly established federal law.

-479-

**E. Exhaustion.**

The Respondent has conceded that this claim is exhausted, as it was first brought on direct appeal.  (Docket No. 40, RA at 17.)  Hence, it is not defaulted.  This claim was also brought in Mr. Barbee's subsequent writ application as Claim 19.   It was denied on the basis that it did not meet the standards for a subsequent writ claim under art. 11.071 sec. 5(a). (Exhibit 52.)

**CLAIM TWENTY: THE TESTIMONY OF THE CORONERS, AND THEIR LACK OF AUTHORITY TO PERFORM THE AUTOPSY DEPRIVED PETITIONER OF A FAIR TRIAL.**

Testimony by Dr. Marc Krouse and Dr. White, who lacked the proper authority to perform the autopsy on the victims, deprived Petitioner of due process and a fair trial.

**A. Facts in Support.**

**i. Dr. Krouse.**

Dr. Marc Krouse performed the autopsy on Lisa Underwood. (23 RR 137.) He claimed that he performed the autopsy under his authority as the Deputy Chief Medical Examiner in Fort Worth covering Tarrant, Denton and Parker Counties. (23 RR 141.

Dr. Krouse was allowed to give several extremely speculative and conjectural theories regarding the cause of death of the victim Lisa Underwood, all of which were extremely prejudicial to Petitioner:

1) He opined that there was evidence of blunt force trauma caused by having a great force applied to her. (23 RR 155-157.) However, the witness could not say what type of force caused these injuries. (23 RR 158.) As for the compression force required, it had to be sufficient to asphyxiate someone (five to seven minutes of 100 to 300 or 400 pounds of force) which would have caused the type of soft tissue injury, and not bony trauma, seen by the witness. (23 RR 158-159.)

2) He opined that the facial injuries could have been from a moderate blow (23 RR 159) and were consistent with blunt force injury. (23 RR 160.)

3) He opined that the patterned injuries were probably due to pressure or pressure with a blow component to it (23 RR 160) and that force was applied over a very broad area of the victim's back. (23 RR 160-161.) The broken bone in her forearm indicates that force was applied from

above, a shearing force.  (23 RR 169-172.)

4) He opined that it would have required several minutes to cause her death, from two to three minutes to seven or eight.  (23 RR 163.)

5) He opined that because the body had been secreted and concealed, this increased the chances it was a homicide.  (23 RR 165.)  The doctor was quite confident that it was a homicide. (23 RR 166.)

6) He was allowed to speculate that the bruises on the victim's back could have been caused by someone sitting on her.  (23 RR 174-175.)  The doctor was allowed to answer the speculative and leading question, "is there anything that is inconsistent with Lisa Underwood being beaten followed by or contemporaneous with her face being forced to the floor while her assailant sat or kneeled on her back?"  (23 RR 180.)

7)  The doctor was also allowed to speculate that "[t]he allegation here is that Lisa's death was caused by smothering her with the weight of a body or with an object that is unknown or by a combination of the two."  (23 RR 183.)   It could take up to seven minutes for death to occur.  (23 RR 184.)  But someone could lose consciousness within seven or eight seconds.  (23 RR 184.)

8) He opined that she was certainly in a fight of some sort as she had a black eye and other bruises.  (23 RR 191.)  "The other injuries tell me that this happened in the context of an altercation, of a fight, basically."  (23 RR 195.)  There were bruises on the victim's hands.  (23 RR 197.)

9) He also speculated that the victim may have stopped breathing and started again.  (23 RR 199.)

However, Dr. Krouse has recently admitted on August 24, 2010 that he is not a state employee as he stated at Mr. Barbee's trial.  In the case of *State v. Gower,* No. F-2009-2949-D

(Denton County)(Exhibit 47), Dr. Krause admitted that he is actually employed by the Chief Medical Examiner, Dr. Peerwani, through his corporation. *Id.* at 5.  He also admitted that he is not an employee of Tarrant County. *Id.*  He denied that Dr. Peerwani's charter had been revoked. *Id.* at 6.

### ii. Dr. White

Dr. Lloyd White, a deputy Tarrant County Medical Examiner, testified that he performed the autopsy on Jayden Underwood on February 23, 2005.  (24 RR 155.)  He too was allowed to testify as to many speculative conjectures regarding the method of Jayden's death.

1)    Dr. White testified that "petechiae" are "little pinpoint hemorrhages" sometimes seen "around the face and sometimes on the internal organs in association with asphyxial death, such as strangulation where the neck is constricted."  (24 RR 156-157.)

2) The witness speculated that the bruises of the membranes "could" have been the source of blood fluid in the mouth.  (24 RR 157.)   The injuries to the lips and gums are caused by compression, "some object put over the area of the mouth pressing on the mouth and compressing the lips against the underlying teeth."  (24 RR 158.)

3) He speculated that the scrapes and scratches appeared to be antemortem, caused before death.  (24 RR 159.)

4)  In Dr. White's opinion, the cause of death was "asphyxia by smothering...obstruction or occulation of the airway externally by something being put over the face and the mouth so that adequate oxygen and air is not supplied to the organs and tissues of the body." (24 RR 160.)  He also speculated that something hit the victim in the head, causing a hemorrhage, before he died.  (24 RR 163.)

**B. Argument.**

As defence counsel stated in the recent *Gower* case, "[h]e [Dr. Krause] is not certified by the state. He's not a county official and, therefore, his contract is void and null with the counties and this district and, therefore, he should not be allowed to testify in this case as to the autopsy..." *Id.* at 7.

Texas Code of Criminal Procedure art. 49.25, sec. 2 states: "Commissioners court shall appoint the medical examiner, who shall serve at the pleasure of the commissioners court."

Section 4, Salaries, states "The commissioners court shall establish and pay the salaries and compensations of the medical examiner and his staff." *Id.* at 8. The medical examiner's office is a public office. *Garcia v. State,* 868 S.W.2d 337 (Tex. Crim. App. 1993). Therefore, Dr. Krause was not operating properly as a medical examiner and he should not have been allowed to testify in this case. The credentials of Dr. White may also currently be under investigation, to the best of undersigned counsel's knowledge.

Petitioner has not been able to fully develop the prejudice component of this claim, or to show that the testimony of Dr. Krause and Dr. White was flawed, as all funding for the requested medical examiner, Dr. Glenn Larkin, was denied by this Court. Petitioner respectfully presents this claim in order to present it in its current unfinished state to preserve it for future developments, as there is currently ongoing litigation regarding this matter in various cases throughout Texas.

**C. What the state courts held.**

This claim was brought in Mr. Barbee's subsequent state habeas application as Claim 20, and was dismissed "as an abuse of the writ" because those allegations "do not satisfy the requirements of Article 11.071 Section 5." *Ex parte Stephen Dale Barbee,* No. WR-71,070-02, at 2. (Tex. Crim. App. May 8, 2013)(Exhibit 52.) Hence, it was not denied on the merits but only on procedural

grounds, and the 2254(d) standard of review does not apply. *Cone v. Bell,* 129 S. Ct. 1769, 1784 (2009)("Because the Tennessee courts did not reach the merits of Cone's *Brady* claim [and instead rejected claim on procedural default grounds], federal habeas review is not subject to the deferential standard that applies under AEDPA...Instead the claim is reviewed *de novo*"); *Graves v. Dretke,* 442 F.3d 334, 339 (5th Cir.), *cert. denied,* 549 U.S. 943 (2006)(section 2254(d) is inapplicable because petitioner's "claims were dismissed by the Texas courts as abuses of the writ, i.e., on procedural grounds," and thus "were not adjudicated on the merits in Stare court").

**CLAIM TWENTY-ONE:   THE CUMULATIVE EFFECT OF THE ERRORS AT MR. BARBEE'S TRIAL DENIED HIM OF DUE PROCESS UNDER THE FOURTEENTH AMENDMENT.[188]**

**A. Argument.**

In his presentation of the above claims, Petitioner has shown how each individually merits relief as a denial of his constitutional rights or a violation of federal law. However, there are situations in which a petitioner alleges several constitutional errors or violations of federal law, each of which is found harmless by the court, or none of which is found to be a constitutional violation, but which, in the aggregate, deny the petitioner a fair trial. Hence, this claim is presented in the alternative to the analysis of Mr. Barbee's other claims contained in this writ, not as a comment on their individual merits.

In *Taylor v. Kentucky,* 436 U.S. 478 (1978), the Supreme Court accepted the notion that several errors, none of which individually rise to constitutional dimensions, may have the cumulative effect of denying a defendant a fair trial. In *Taylor,* the Court did not assess each error to determine whether it was individually harmless. Nor did the Court concern itself only with errors which individually were of constitutional dimension. Instead, the Court evaluated the circumstances surrounding the defendant's trial to determine that the state had denied the defendant fundamental fairness as guaranteed by the Due Process Clause of the Fourteenth Amendment. As the Fifth Circuit has held, a trial is fundamentally unfair if "there is a reasonable probability that the verdict might have been different had the trial been properly conducted." *Kirkpatrick v. Blackburn,* 777 F.2d 272, 278-79 (5th Cir. 1985), *cert. denied,* 476 U.S. 1178 (1986).

---

[188] This claim is argued in the alternative to the above claims, each of which merits relief individually.

The Fifth Circuit, in *Derden v. McNeel,* 978 F.2d 1453 (5th Cir. 1992)(en banc), *cert. denied,* 113 S. Ct. 2928 (1993)*,* recognized that, "[w]ith one exception, however, our sister circuits have held in dicta that federal habeas relief may issue if a defendant was denied fourteenth amendment due process by the cumulative effect of errors committed in a state trial, which together deny fundamental fairness." *Id.,* at 1456.  Adopting a "particularly cautious approach to granting habeas relief for cumulative errors", the *Derden* court articulated a four-prong test delineating the types of errors the court will consider:

> First, any cumulative error theory must refer only to errors committed in the state trial court. A habeas petitioner may not just complain of unfavorable rulings or events in the effort to cumulate errors...
> Second, the error complained of must not have been procedurally barred from habeas corpus review...Beyond the notion of procedural bar, it is important that a defendant objected to errors to demonstrate that they were believed at the time of trial to have had an adverse effect on the defense...
> Third, errors of state law, including evidentiary errors, are not cognizable in [federal] habeas corpus as such... Errors of state law rise to constitutional dimension only if they "so infused the trial with unfairness as to deny due process of law...
> Fourth, the federal court must review the record as a whole to determine whether the errors more likely than not caused a suspect verdict.
> *Derden,* at 1457-58.

The Fifth Circuit's approach in *Derden* imposed three limitations that are not part of cumulative error analysis in federal criminal cases or in direct appeal cases.  Once federal courts recognize the concept of cumulative error analysis, as they have overwhelmingly done, the next question is whether courts should apply a different analysis depending on whether the claim is raised in a direct appeal or in a habeas corpus petition.

In *Derden,* the Fifth Circuit justified the more limited standard for cumulative error on habeas review for several reasons.  First, "[t]he standard for reversal on direct appeal of a criminal conviction...should logically be more flexible than that available on collateral review." *Id.* at 1457.

But the opinion, by Judge Jones, failed to explain why this should "logically" be so.  Rather, the Court pointed to Supreme Court opinions that limited the application of the Due Process Clause, and that "the category of infractions that violate 'fundamental fairness' [has been defined] very narrowly." *Id.,* quoting *Dowling v. United States,* 493 U.S. 342, 352 (1990).  Therefore, courts must exercise caution, the *Derden* court held, in holding that an error which does not amount to a constitutional error "by itself might suddenly, when aggregated with other non-constitutional errors, become worthy of habeas relief." *Id.*

However, the Supreme Court has not imposed a different standard for fundamental fairness in habeas corpus cases.  The Court has never developed or implemented different standards for other constitutional rights when a habeas petitioner has alleged a violation. An allegation that a defendant has been deprived of a fair trial is a constitutional claim.  Cumulative error analysis usually centers on the fairness of the trial, and thus constitutes a claim that the petitioner has been denied due process under the Fourteenth Amendment. The Fifth Circuit's four-pronged test is therefore too restrictive because it eliminates errors which, although individually are "non-constitutional", excludes the possibility that several individually non-constitutional errors might operate in the aggregate to deprive a defendant of a fair trial.  In *Taylor v. Kentucky,* 436 U.S. 478 (1978) the Supreme Court held that several non-constitutional errors cumulatively deprived the defendant of a fair trial. *Id.* at 487-88.  A similar approach should be taken to an analysis of Mr. Barbee's claim of cumulative error.

**B. What the state courts held.**

This claim was first brought in Mr. Barbee's subsequent state habeas application as Claim 21, and was  dismissed "as an abuse of the writ" because those allegations "do not satisfy the

requirements of Article 11.071 Section 5." *Ex parte Stephen Dale Barbee,* No. WR-71,070-02, at 2. (Tex. Crim. App. May 8, 2013)(Exhibit 52.)  Hence, it was not denied on the merits but only on procedural grounds, and the 2254(d) standard of review does not apply. *Cone v. Bell,* 129 S. Ct. 1769, 1784 (2009)("Because the Tennessee courts did not reach the merits of Cone's *Brady* claim [and instead rejected claim on procedural default grounds], federal habeas review is not subject to the deferential standard that applies under AEDPA...Instead the claim is reviewed *de novo*"); *Graves v. Dretke,* 442 F.3d 334, 339 (5th Cir.), *cert. denied,* 549 U.S. 943 (2006)(section 2254(d) is inapplicable because petitioner's "claims were dismissed by the Texas courts as abuses of the writ, i.e., on procedural grounds," and thus "were not adjudicated on the merits in Stare court").

## VIII.

## <u>CONCLUSION AND PRAYER FOR RELIEF</u>

WHEREFORE, Mr. Barbee  prays that this Honorable Court:

A.  Issue a writ of habeas corpus to have him brought before it, to the end that he may be discharged from his unconstitutional confinement and restraint and/or be relieved of his unconstitutional sentence of death;

B.  Conduct a hearing at which evidence and argument may be offered concerning the allegations of his petition;

C.  Grant him the authority to obtain subpoenas *in forma pauperis* for witnesses and discovery of documents, and grant him the authority to take depositions and obtain other information necessary to prove the facts as alleged in his petition;

D.  Grant him an evidentiary hearing at which he may be allowed to present evidence on these claims, and allow him a reasonable period of time subsequent to any hearing this Court determines to conduct, in which to brief the issues of law raised by this petition or such hearing;

E.  Enter Findings of Fact and Conclusions of Law recommending that his conviction and sentence of death be vacated and that his case be remanded for a new trial and sentencing hearing, and

F.  Grant such other relief as may be necessary and appropriate

Respectfully submitted,

*/s/ A. Richard Ellis*

_____

**A. Richard Ellis**
Attorney at Law
Texas Bar No. 06560400
75 Magee Avenue
Mill Valley, CA 94941

-490-

Attorney for Petitioner

Dated: October 2, 2013.

## VERIFICATION

I, A. Richard Ellis, am  the attorney for Stephen Barbee, the  petitioner in the foregoing

Petition for Writ of Habeas Corpus.  I have read the petition and am familiar with its contents.  On

behalf of Stephen Barbee  and upon information and belief, I hereby verify, under penalty of perjury,

that the factual matters stated in the petition are true and correct.

DATED: October 2, 2013.

*/s/ A. Richard Ellis*

_____

A. RICHARD ELLIS
Attorney for Petitioner

## CERTIFICATE OF SERVICE

I, A. Richard Ellis, counsel of record for Petitioner,  hereby certify that  a true and correct copy of this *First Amended Petition For Writ of Habeas Corpus* and the accompanying *Exhibits in Support* was served on counsel of record for Respondent via the Court's automatic electronic service this 2nd of October, 2013, to:

      Mr. Thomas Jones
      Assistant Attorney General
     Capital Litigation Division
      Office of the Texas Attorney General
      P.O. Box 12548, Capitol Station
      Austin, Texas  78711-2548

As specified in the district court rules, the Court's hard copy of the Petition and Exhibits was also sent via 1st Class mail to the following on October 2, 2013:

      Hon. Terry Means
     U. S. District Court, Northern District of Texas
     1100 Commerce Street
     Dallas, TX 75242

              /s/ A. Richard Ellis

             _____
             A. RICHARD ELLIS
             Counsel for Petitioner