IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| STEPHEN DALE BARBEE, | § | |
| *Petitioner,* | § | |
| | § | |
| V. | § | |
| | § | Civil Action No. 4:09-CV-074-Y |
| WILLIAM STEPHENS, Director, | § | |
| Texas Department of Criminal | § | (death-penalty case) |
| Justice, Correctional | § | |
| Institutions Division, | § | |
| *Respondent.* | § | |

**MEMORANDUM OPINION AND ORDER
ON PETITION FOR WRIT OF HABEAS CORPUS**

Stephen Dale Barbee petitions for a writ of habeas corpus, contending that he is innocent and that his state conviction and death sentence are unconstitutional. The case is before the Court after a stay and abeyance during which Barbee returned to state court for exhaustion proceedings that included a live hearing. Having reviewed the parties' arguments and the record from both the initial and subsequent state habeas proceedings, the Court denies the petition for relief and dismisses this action with prejudice.

**I.  BACKGROUND**

**A.  Factual Summary**

The following is a brief summary of the events leading up to Barbee's conviction. The actual evidence is discussed in detail in addressing with the claims that follow.

Lisa Underwood owned a bagel shop in Fort Worth. She began dating Stephen Dale Barbee, a customer of the shop. Lisa became

pregnant in July of 2004 and told Barbee that she believed he was the father of the unborn child. Lisa's family and friends had planned a baby shower for Lisa at 4 p.m. on Saturday, February 19, 2005, but she never arrived. The Fort Worth police were notified and began an investigation into her disappearance.

Unbeknownst to the Fort Worth detectives at that time, Barbee had been stopped by a deputy sheriff earlier that same morning while walking along a service road near a wooded area in another county. He was wet and covered in mud.  He gave the deputy a false name and fled on foot.

Lisa's home, which she shared with her seven year-old son Jayden, showed no signs of forced entry. Jayden's shoes were on top of the fireplace hearth, and his glasses were next to his bed.  Lisa's blood was in the living room, on the rug, and on the furniture.  Having learned that Barbee had been in a relationship with Lisa, the police inquired at the home of Barbee's ex-wife, Theresa.  Although divorced, Theresa and Barbee still operated a tree-trimming business and a concrete-cutting business together.  Theresa lived in their former marital home with an employee of the concrete business named Ron Dodd. Theresa told Barbee that the police were looking for him and asked what he had done.  She urged him to turn himself in.

On Monday, Lisa's Dodge Durango was found in a creek approximately 300 yards from where Barbee had been stopped by the deputy sheriff two days earlier.  The windows were down, the hatchback was

up, and there was a bottle of cleaning solution in the cargo area. On the same day, Fort Worth detectives traveled to Tyler to speak with Barbee, his wife, Trish, and Dodd. Barbee and Dodd were in Tyler working on a job trimming trees. They agreed to go to the Tyler Police Department for questioning.

Barbee initially gave a recorded interview stating that he had not seen or heard from Lisa in months. He then asked to use the bathroom. While in the bathroom with a detective, Barbee confessed that he killed Lisa by starting a fight with her and then holding her face down into the carpet until she stopped breathing. He also admitted that he held his hand over Jayden's mouth and nose until he stopped breathing. Barbee said he did it because Lisa was going to ruin his family and his relationship with his wife. He said that Dodd had helped him plan the murder, had dropped him off at Lisa's house beforehand, and had picked him up afterwards, near the area where he was stopped by the deputy. This "bathroom confession" was not recorded. Afterwards, Barbee gave another, recorded statement to police, which was ultimately suppressed. He then spoke with his wife, Trish, which was also recorded in the police interview room. The next day, Barbee took the police to the place where he had buried the bodies. Barbee recanted his confession a few days later.

The prosecution's case at the guilt phase relied primarily on Barbee's flight from the deputy sheriff, the bathroom confession,

his recorded statement to Trish, and his knowledge of details about the burial site.

At the sentencing phase of trial, the State presented evidence from Theresa that, during the course of their marriage, Barbee had assaulted her on four occasions and had assaulted a driver in a road-rage incident.  The State also presented evidence that Barbee had verbally abused a former coworker who had rejected his attempts to have a relationship. The defense presented testimony from a pastor at Barbee's church, Barbee's mother, his aunt, a niece, a church acquaintance, an ex-girlfriend, and the girlfriend of Barbee's ex-roommate.  The defense also presented testimony from a prison security expert, a confinement officer who had known Barbee his whole life, and the courtroom bailiff, who described Barbee's behavior in jail.

## B.  Procedural summary

The jury convicted Barbee and sentenced him to death for the murders of Lisa and Jayden.  *State v. Barbee*, No. 1004856R (213th Jud. Dist. Ct., Tarrant Co., Tex. Feb. 27, 2006).  Attorney Mary Thornton was appointed to represent Barbee on appeal.  (Doc. 66-5, p. 116).[1]  The Texas Court of Criminal Appeals ("CCA") affirmed the judgment in a unanimous opinion. *Barbee v. State*, No. AP-75359, 2008

---

[1] All electronically filed documents are cited by ECF docketing number followed by the .pdf page number.  This includes all pleadings and the electronically filed state court records from the exhaustion proceedings.

The one-volume paper record from the initial state habeas litigation is cited "SHR" followed by the page number.

WL 5160202 (Tex. Crim. App. Dec. 10, 2008), *cert. denied*, 558 U.S. 856 (2009).

While the appeal was pending, Barbee retained Don Vernay, who raised four claims in an initial application for state habeas relief. (SHR 2, 102.)  The convicting court adopted the State's proposed findings of fact and conclusions of law and recommended relief be denied.  (SHR 250.)  The CCA adopted the findings and conclusions and denied relief.  *Ex parte Barbee*, No. WR-71,070-01, 2009 WL 82360(Tex. Crim. App. Jan. 14, 2009)(per curiam).

One year later, through appointed counsel A. Richard Ellis, Barbee filed his first federal habeas-corpus petition and moved for a stay and abeyance.  (Doc. 24, 30.) The Court granted the stay and allowed Barbee to return to state court to exhaust a claim that his trial counsel, Bill Ray and Tim Moore, had labored under a conflict of interest. (Doc. 47.) Mr. Ellis filed a subsequent habeas application in the convicting court, raising twenty-one claims for relief.  (Docs. 66-1, 66-2, 66-3, 66-4.) A live hearing was held on the conflict-of-interest claim, after which the CCA denied relief. The other twenty claims were dismissed as an abuse of the writ. *Ex parte Barbee*, No. WR-71070-02, 2013 WL 1920686 (Tex. Crim. App. May 8, 2013).  Barbee then filed an amended federal petition (Doc. 61), the State filed its amended answer (Doc. 68), and Barbee filed a reply (Doc. 77).  All twenty-one claims are now exhausted.

## II. CLAIMS FOR RELIEF

Barbee asserts the following claims:

1.   Actual innocence;

2.   Trial counsel (Bill Ray and Tim Moore) had a conflict of interest;

3.   Trial counsel were ineffective at the pre-trial stage;

4.   Trial counsel were ineffective at the guilt phase;

5.   Trial counsel were ineffective at the sentencing phase;

6.   Pervasive and prejudicial pretrial publicity rendered the trial inherently unfair;

7.   Trial counsel were ineffective for failing to move for a change of venue;

8.   The state court proceedings violated due process;

9.   The trial court erroneously denied Barbee's challenge for cause to Juror 126;

10.  The trial court erroneously denied Barbee's motion to suppress all statements made to Detective Carroll;

11.  The Texas "12-10" rule is unconstitutional because it fails to inform jurors that a "hold-out" juror would result in a life sentence;

12.  The three-drug lethal-injection protocol violates the Eighth Amendment;

13.  The Texas death-penalty statute is unconstitutional because the mitigation special issue has no burden of proof;

14.  The trial court erroneously denied Barbee's request to inform the jury that the failure to answer a special issue would result in a life sentence;

15. The evidence is legally insufficient to support the jury's answer to the future-dangerousness special issue;

16. The "death-qualification" of Barbee's jury violates the Constitution and international law;

17. The Texas death-penalty statute violates international treaties and the Eighth Amendment;

18. Appellate counsel (Mary Thornton) rendered ineffective assistance;

19. The prosecution violated *Brady v. Maryland* by providing only an edited version of Barbee's recorded confession;

20. The assistant medical examiners who testified lacked the authority to hold public office; and

21. The cumulative effect of the trial errors violates due process.

## III.   STANDARD OF REVIEW

### A.   Claims adjudicated on the merits in state court

Barbee's petition is subject to the amendments of the Antiterrorism and Effective Death Penalty Act of 1996 in 28 U.S.C. § 2254(d) ("AEDPA").[2] Under AEDPA, a claim adjudicated on the merits in state court is barred in federal court unless it (1) is "contrary to" federal law then clearly established in the holdings of the Supreme Court or "involved an unreasonable application of" such law, or (2) "is based on an unreasonable determination of the facts" in light of the record before the state court. *See* § 2254(d)(1), (d)(2); *Harrington v. Richter*, 562 U.S. 86, 100 (2011). This review ultimately

---

[2]All subsequent citations to § 2254 are to 28 U.S.C. § 2254.

7

examines only the state court's "'decision' and not the written opinion explaining that decision." *See Maldonado v. Thaler*, 625 F.3d 229, 239 (5th Cir. 2010) (quoting *Neal v. Puckett*, 286 F.3d 230 (5th Cir. 2002) (en banc)). And it is limited to the record that was before the state court that adjudicated the claim on the merits. § 2254(d); *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). Congress meant these conditions to be difficult to meet, but they stop short of imposing a complete bar on the relitigation of claims already rejected in state proceedings. *Richter*, 562 U.S. at 102.

A state court's decision is "contrary to" Supreme Court precedent if the state court applies a rule that contradicts governing law or confronts facts that are materially indistinguishable from Supreme Court precedent, yet arrives at a different result. *Coleman v. Thaler*, 716 F.3d 895, 901 (5th Cir. 2013) (quoting *Williams v. Taylor*, 529 U.S. 362 (2000)). A state court's application of Supreme Court precedent is "unreasonable" when the state court identifies the correct governing legal principle but applies it unreasonably to the facts of a particular case. *Id.* at 901-02. The petitioner must show that the state court ruling was "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103; *see also White v. Woodall*, 134 S. Ct. 1697, 1702 (2014). Thus, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Richter*, 562 U.S. at 102;

*Woodall*, 134. S. Ct. at 1702 (stating a "merely wrong" holding or "clear error" will not suffice).

When challenging the factual basis of the state court's decision, petitioner bears the burden of rebutting the state court's factual findings by clear and convincing evidence. § 2254(e)(1); *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013). A "decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). A "state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). A presumption of correctness attaches to explicit findings of fact as well as "unarticulated findings [that] are necessary to the state court's conclusions of mixed law and fact." *Pippin v. Dretke*, 434 F.3d 782, 788 (5th Cir. 2005)(citing *Pondexter v. Dretke*, 346 F.3d 142, 148 (5th Cir. 2003)).

## B.  Claims dismissed in state court as procedurally barred

As noted, twenty of the claims presented in the amended petition were presented in state court in the subsequent habeas application and dismissed as abusive under Texas law. When the state court decision rests on a state law ground that is independent of a federal question and adequate to support the judgment, federal courts will

not review the merits of the case. *Coleman v. Thompson*, 501 U.S. 722, 729 (1991); *Finley v. Johnson*, 243 F.3d 215, 218 (5th Cir. 2001). The United States Court of Appeals for the Fifth Circuit has consistently held that the Texas abuse-of-the-writ statute is a valid state-law procedural ground that forecloses federal habeas review where, as here, there is no indication that the CCA's order relied on federal law in dismissing the petition. *See McGowen v. Thaler*, 675 F.3d 482, 499 (5th Cir. 2012).

Barbee may overcome this bar by showing either (1) cause for the procedural bar and actual prejudice as a result of the violation of federal law or (2) that failure to consider the claim will result in a fundamental miscarriage of justice. *Smith v. Johnson*, 216 F.3d 521, 524 (5th Cir. 2000). The fundamental-miscarriage-of-justice exception is limited to cases of (1) actual innocence and (2) ineligibility for the death penalty. *Schlup v. Delo*, 513 U.S. 298 (1995); *Sawyer v. Whitley*, 505 U.S. 333, 346-47 (1992). Barbee's first claim for relief is an actual-innocence claim lodged under this exception.

For "substantial" claims of ineffective assistance against trial counsel, the ineffective assistance of initial state habeas counsel (in this case, retained counsel Don Vernay) may be cause to excuse the procedural bar. *See Trevino v. Thaler*, 133 S. Ct. 1911 (2013); *Martinez v. Ryan*, 132 S. Ct. 1309 (2012). As discussed below, Barbee

10

relies on *Martinez* and *Trevino* to overcome many of the procedural bars asserted by Respondent.

Finally, if a petitioner can make the showing of ineffective habeas counsel under *Trevino* or can demonstrate actual innocence, the procedural bar is excused, the deference under § 2254 is inapplicable, and a plenary or de novo review is appropriate. *See Henderson v. Cockrell*, 333 F.3d 592, 598 (5th Cir. 2003); *Johnson v. Cain*, 215 F.3d 489, 494 (5th Cir. 2000).

### IV.  ACTUAL INNOCENCE (CLAIM 1)

Barbee asserts that Ron Dodd murdered Lisa and Jayden Underwood. Dodd was an employee of the business that Barbee and Theresa continued to operate after their divorce. Dodd dated and lived with Theresa. In support of this claim, Barbee points out that he recanted his confession to the police, that the State's case makes little sense because he had no criminal history, and that the task of disposing of the victim's 166-pound pregnant body was too difficult for one person.  Dodd, by comparison, had a history of violent assault and had nothing to gain by implicating himself in the mere disposal of the bodies.  Barbee argues that, between the two of them, Dodd is the person more likely to commit murder.

### A. Relevant facts (claim 1)

In his 2010 declaration, Barbee provides the following version of the offense:  Lisa was upset because she wanted Barbee to tell

11

his current wife, Trish, about the pregnancy.  Barbee refused to do so unless Lisa agreed to DNA testing to confirm paternity. On the night of the murders, Barbee asked Dodd if he would come with him to visit Lisa, to see how she was doing.  Dodd agreed and drove Barbee to Lisa's house, but then left to go have dinner with Theresa.  Barbee eventually called Dodd to pick him up, and the two men returned to Theresa's house.  While the men talked in Theresa's driveway, Dodd offered to talk to Lisa about getting a DNA test and Barbee agreed. They again drove to Lisa's house, but Barbee stayed in the truck this time because he did not want Lisa to see he had been crying.  Dodd was in the house for fifteen to twenty minutes.  When Dodd came out, he said, "Your problems are solved, go get her truck."  Barbee went up to Lisa's door, and Dodd "suddenly left" in his truck.  Barbee entered the house, saw the bodies and, believing he would be blamed, loaded the bodies into Lisa's Dodge Durango and drove from the scene. He called Dodd and told him he had the bodies with him. Dodd was "totally shocked," but he agreed to meet Barbee in a deserted place where he helped remove the bodies from the truck.  At this time, Barbee noticed that Dodd had changed his clothes.  Dodd did not want to help bury the bodies, so he threw a shovel to Barbee and left. When Barbee finished burying the bodies, he ditched Lisa's truck and again called Dodd, who agreed to pick him up on the highway. While walking to meet Dodd, however, Barbee was stopped by the deputy sheriff, after which he falsely identified himself and fled.

Eventually, Dodd located Barbee, and they returned to Theresa's house where Theresa washed Dodd's clothes. (Doc. 66-3, p. 81.)

In his petition, Barbee lists the following as evidence of his innocence and Dodd's guilt:

1. A 2010 declaration from Theresa's father stating that his son, Danny Dowling, told him "that Rod [sic] Dodd had told him right after the murders that he had to punch Lisa in the face 25-26 times before 'the fucking bitch would go down.'" (Doc. 66-3, p. 133-34.)

2. The same quote from Dowling, as contained in the 2010 declaration of Tina Church, founder of "The Other Victims Advocacy," who conducted her own investigation before trial. (Doc. 66-3, p. 109, 112.)

3. Theresa's statement to Church that Dodd wanted his clothes washed at 4 a.m. on the night of the murders, and Dodd's admission to Church that he washed his vehicle the next morning. (Doc. 66-3, p. 111.)

4. A 2010 declaration from Barbee's niece stating that Theresa had said how much she hated Barbee and wanted him "gone," and had stated in Dodd's presence that she wished Barbee would just die and that there had to be way to get him out of the office. (Doc. 66-3, p. 104-05.)

5. Dodd's status as a parolee for aggravated assault and his cohabitation with Theresa, who "stood to benefit to the tune of a half-million dollars upon the demise of Mr. Barbee." (Doc. 61, p. 133). Dodd's arrests or convictions for the following misdemeanors: telephone harassment, driving while license suspended, failure to appear, criminal mischief, unauthorized use of a motor vehicle, and assault. (Doc. 66-3, p. 148-54.)

6. A 2010 declaration by Barbee's mother that states that soon after the murders, Theresa had Barbee sign over the businesses to her, Dodd was instrumental in causing a serious head injury to Barbee about a month before the murders, and prior to the murders, Theresa changed a $500,000 company bonding policy to a life

13

insurance policy naming herself as the sole benefi-
ciary. (Doc. 66-3, p. 66, 73-75.)

7.  Church's 2010 "confirmation" of Theresa and Dodd's
    financial motive to have Barbee "out of the way."
    (Doc. 66-3, p. 109-11.)

)   8.  Evidence of financial misdeeds by Theresa which were
        relayed to trial counsel, as detailed in the affida-
        vit of mitigation specialist Amanda Maxwell. (Doc.
        66-3, p. 46, 49.)

9.  The following character evidence:

    ▸ a 2010 declaration from the father of Barbee's best
      friend in middle school stating that Barbee was
      well-behaved, although he had had no contact with
      Barbee since high school (Doc. 66-3, p. 97);

    ▸ a 2010 declaration of Barbee's aunt, who said she
      has always known Barbee to walk away from any kind
      of confrontation (Doc. 66-3, p. 136-37);

    ▸ a 2010 declaration from a girlfriend of Barbee's
      former roommate who said she never saw Barbee
      angry, he was crazy about Trish's kids, and it was
      hard to believe he was guilty (Doc. 66-3, p. 140);

    ▸ a 2010 declaration from his cousin that she did
      not believe Barbee was capable of such an act, and
      she believed him when he proclaimed his innocence
      to her (Doc. 66-3, p. 142-43).

10. The following information about the falsity of
    Barbee's confession:

    ▸ Barbee's 2010 declaration that his confession was
      false because the police threatened him with the
      death penalty (Doc. 66-3, p. 93);

    ▸ a 2010 declaration from his niece stating that
      Barbee told her he confessed because Dodd threat-
      ened to hurt his family (Doc. 66-3, p. 107);

    ▸ a 2010 declaration from the author of a book about
      the murders, *Lethal Charmer*, stating that Barbee
      told her he confessed because Dodd threatened to
      hurt his family (Doc. 66-3, p. 146);

14

▸ a 2005 letter to trial counsel from confession expert Richard Leo stating that Barbee maintained that the confession was coerced, the circumstances surrounding the bathroom confession were unusual, and the police selectively turned the recording device off and on. (Doc. 66-3, p. 156; Doc. 61, p. 140.)

(Doc. 61, p. 131-141; Doc. 77, p. 16.)

Respondent contends that Barbee has not made a case for actual innocence based on new evidence but merely argues the innocence theory that he believes trial counsel should have presented.  Respondent also contends the innocence theory lacks credibility for various reasons. (Doc. 68, p. 40-41.)

## B.  Discussion (claim 1)

Freestanding claims of actual innocence are not cognizable on federal habeas corpus review. *Graves v. Cockrell*, 351 F.3d 143, 151 (5th Cir. 2003). So to the extent Barbee seeks relief on grounds of innocence, the claim is denied.[3] In federal court, Barbee's innocence claim may serve only as a gateway through which a procedurally barred constitutional claim may be considered on the merits.

In *Schlup v. Delo*, the Supreme Court held that a habeas petitioner can overcome a procedural bar to reach the consideration of the merits of his constitutional claims if he establishes that a constitutional violation has probably resulted in the conviction

---

[3] Texas law, on the other hand, recognizes freestanding habeas claims of actual innocence based on newly discovered evidence. *Ex parte Elizondo*, 947 S.W.2d 202 (Tex. Crim. App. 1996).  Barbee availed himself of such a claim. (Doc. 66-1, p. 15, 56.)

of one who is actually innocent. *Schlup*, 513 U.S. at 327. To prove an actual-innocence claim, a petitioner must present new, reliable evidence not presented at trial that establishes that, more likely than not, no reasonable juror would have found the petitioner guilty beyond a reasonable doubt. *Id.* at 327. Examples of new evidence that may establish factual innocence are exculpatory scientific evidence, trustworthy eyewitness accounts, credible declarations of guilt by another, and critical physical evidence not presented at trial. *Schlup*, 513 U.S. at 324. This determination is based on a consideration of "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted" at trial. *House v. Bell*, 547 U.S. 518, 538 (2006) (internal quotation marks omitted). The analysis begins, therefore, by reviewing the incriminating evidence in the record.

Barbee was stopped by a deputy sheriff on the night of the murders about 300 yards from where the victim's Durango was later found in a creek. (23 RR 95-98, 114.) Barbee was wet and muddy below the waist, gave a false name, and fled on foot. (23 RR 84-89.) Two days later, Barbee took the police to the victims' burial site. (24 RR 122-27.) Lisa's business partner confirmed that Lisa had been in a relationship with Barbee and believed he was the father of her unborn child. (23 RR 46-50.) Barbee confessed to the police that he murdered Lisa because she was going to ruin him. He explained that Dodd dropped him off at Lisa's house to pick a fight with her,

but she would not take the bait.  Dodd picked him up and asked if they needed to hire a hitman.  Barbee said, "No, I can do this," and Dodd took him back to Lisa's where he successfully started a fight with her, punched her in the nose, and held her face down in the carpet until she stopped breathing.  When Jayden came into the room crying, Barbee placed his hand over Jayden's nose and mouth until he stopped breathing.  He put both bodies in the Durango and drove to the burial site where he buried them together and said a prayer. (24 RR 102-106).  Barbee admitted that he tried to clean the house and covered a blood stain with a piece of furniture.  (24 RR 106.) The physical evidence at the murder scene corroborates this detail. (23 RR 28-29, 208-09, 216-17, 221.)

Relying on a letter from confession expert Richard Leo, Barbee claims the incriminating statements he made to the police were false. (Doc. 61, p. 383.) The letter is not new evidence, however; it was sent to trial counsel in 2005. Nevertheless, Barbee emphasizes the following portion of the letter, purportedly from Dr. Leo:

> Further, Mr. Barbee consistently maintained to counsel that during the interrogation he was coerced into stating that he committed the murders by threats of the death penalty, that portions of his interrogation, including Det. Carroll banging on the table and threatening him, were missing from the recording provided to counsel, and that he spent only a brief time in the bathroom with Det. Carroll. Notwith-standing these facts, counsel did not give Mr. Barbee the option of testifying during the suppression hearing, thus leaving the State's case unrefuted.
>
> There is little doubt that the most damaging evidence in this case was Mr. Barbee's alleged statement to Det. Carroll. To say that the circumstances of the alleged

"bathroom" confession are unusual are an understatement. This alleged confession was not memorialized in Det. Carroll's notes and it occurred conveniently out of recording range.  It simply defies coincidence that the tape recorder was turned off just as the detectives began to accuse Mr. Barbee of the murders, and that none of his responses after this point nor any of the police interrogation appear on the recording, until later when Det. Carroll leads him through his statement after the alleged "confession" in the bathroom.

(Doc. 61, p. 140-41.)

In truth, the paragraphs set out above are not part of Dr. Leo's letter to counsel. (Doc. 66-3, p. 156.) This misrepresentation about the contents of Dr. Leo's letter was discussed in the state court hearing.  Federal habeas counsel explained that the falsity was the unintended result of a typographical error.  (Doc. 66-8, p. 37, 46.) Incredibly, the amended petition filed post-abeyance retains this substantive error.

Dr. Leo actually concluded that Barbee's confession looked "far more likely to be true than to be false" based on the following: (1) Barbee led police to the bodies, and his account that he was covering up for Dodd does not make sense since Dodd had no motive to murder Lisa, (2) if Barbee were going to recant, the time to do so would have been when his wife, Trish, came into the interrogation room, and (3) Barbee told his ex-wife, Theresa, out of the presence of the police, that he committed the murders.  Dr. Leo did not think his testimony would help the defense because the prosecution could easily turn him into a state's witness. (Doc. 66-3, p. 157.)  Dr.

18

Leo's opinion is therefore not merely unhelpful to the innocence argument but helps defeat it.

As Dr. Leo suggested, there is additional, potent evidence of Barbee's guilt in the form of his conversation with Trish, which was recorded in the police station immediately following his police confession. (24 RR 116-19.) The Court has reviewed the contents of this recording. (SX PT-1 (on compact disc.).)[4] It begins with Trish, visibly shocked, stating, "You killed her?  You killed her?  Friday night?" and asking how Barbee did it.  Barbee replies, "I held her down too long."  He says that Lisa called and threatened him for months, and states at various times that he "made a bad decision," "it was an accident," and he "can't take it back."  Trish silently calculates that Lisa was eight months' pregnant, that she and Barbee were dating eight months ago, and asks, "Why did you cheat on me?" and "How could you sleep with me and sleep with her?"  She asks Barbee what she should tell his mom and dad.  Barbee states that his life is over and he will "lose everything now."  Near the end, he states that he is "so glad" he told her because it would have eaten him alive.  She sits in Barbee's lap throughout most of the recording, holding his head, with Barbee's arms wrapped around her.  A reasonable juror could easily conclude that their unconstrained crying, moaning,

---

[4]The compact discs that are in the record have apparently been mislabeled. The disc labeled PT-1 is actually PT-2 and vice-versa.

hyperventilating, and Barbee's repeated expressions of regret and anxiety are genuine.

In addition to the foregoing, Barbee's ex-wife, Theresa, testified at sentencing about Dodd and Barbee's whereabouts on the night of the murders. She stated that Dodd twice left their home with Barbee and came back without him, and left again when Barbee called about 3 a.m., which coincides with the time Barbees reveals in his confession and the time he was stopped by the deputy. (25 RR 87-90.) Theresa said that, on the Sunday following the murders, she spoke to Barbee about Lisa, who was by then the subject of a well-publicized missing-persons case. Theresa asked Barbee, "What have you done?" He never told her what he did, but he cried and said his life was over. He asked her for help and said he was "guilty until proven innocent." (25 RR 91-94.) Barbee told Theresa he loved her and had hurt her enough, and told her to get the businesses out of his name "because of everything that was going to happen afterwards." She urged him to turn himself in, saying, "Please don't make me call the police." On Monday, Barbee told her he was going to talk to the police. He called her crying on Monday night after he had confessed. He told Theresa that he had gone to Lisa's to do the right thing if the baby were his, but they fought, and Lisa hit him, and before he knew it, he held her down. Theresa asked about the boy, and Barbee said he did not mean to kill him; he was just trying to keep him

quiet.  She asked whether Dodd had helped him, and Barbee replied that Dodd's mistake was picking him up. (25 RR 94-95.)

The following day, however, Barbee told Theresa in the presence of his family (his mother, father, niece, brother-in-law, and Trish) that they "had it all wrong," and he did not do it.  (25 RR 96-98.) Theresa visited Barbee in jail every week for seven months.  (25 RR 86-87, 98.)  She asked him why he changed his story, and he simply got angry because she did not believe him.  (25 RR 99-100.)  During her last visit, Barbee held up a piece of paper on which he had written a message asking her to tell everyone else that Dodd committed the murders and set him up.  (25 RR 100-02.)  He said they could get back together and try to have a baby if he got out of jail. (25 RR 101.)  She walked out, and he subsequently took her off his visitors list.  (25 RR 103.)

The Court now turns to the evidence and argument that Barbee presents for innocence.  First, Barbee contends that the State's theory makes little sense because he could not have "single-handedly placed the pregnant 166-pound Lisa in her SUV." (Doc. 61, p. 131.) Obviously, this is not new information.  Moreover, it is flatly refuted by Barbee's own 2010 declaration in which he states:  "I dragged Lisa, who weighed about 170 pounds, into the garage and placed her in the Durango." (Doc. 66-3, p. 91-92.)  The innocence theory, on the other hand, makes little sense because it fails to account for the fact that Dodd could not have known that Barbee would confess.

Second, Barbee presents no authority that reliable evidence of innocence can take the form of an acquaintance's post-conviction opinion that the petitioner is "not the sort of person" who could commit murder. The Court finds that the character evidence (in the various declarations of his family members and acquaintances) is not sufficient to show that no reasonable juror would have found him guilty beyond a reasonable doubt.

Third, Barbee presents no authority that the double-hearsay statements made by Dowling to Church and to Theresa's father are trustworthy evidence contemplated by *Schlup*. They contradict Dowling's other, unacknowledged statements to Church. Specifically, Dowling attributed the statement--"I had to hit [her] 25-26 times"--to *Barbee* as well as Dodd and ultimately could not remember who said it. Also, when Dowling first saw the missing victims' "Amber Alert" on the side of the road, he said to himself, "That's probably something that [Barbee] would do." (Doc. 66-3, p. 112.)

Fourth, the fact that Dodd washed his clothes on the night of the murders and washed his vehicle the next morning does not negate Barbee's involvement in the murder or necessarily prove that Dodd did anything more than help Barbee dispose of the bodies.

Fifth, Barbee's terrible headaches and the head injury caused by Dodd dropping a pipe on his head were discussed by Theresa during her testimony and was not new information. (25 RR 76-77; Doc. 66-3, p. 48, 164-65.) And, as discussed in later claims, a head injury or

debilitating headaches would not prove Barbee did **not** commit murder; this sort of evidence provides an excuse for wrongdoing and is therefore inconsistent with the actual-innocence assertion.  (Doc. 66-8, p. 23-24.)

Sixth, the evidence of alleged financial misdeeds by Theresa, the purported motive for Dodd to commit double murder, is not new. Trial mitigation specialist Amanda Maxwell reported it to trial counsel.  (Doc. 66-3, p. 49; Doc. 66-7, p. 26; Doc. 66-8, p. 22.)

Seventh, the post-conviction declarations by a book author and Barbee's acquaintances that Barbee confessed only because he was threatened merely repeat information originating from Barbee himself and are not new or objectively reliable.

"When identity is in question, motive is the key." *House*, 547 U.S. at 540.  Even assuming Dodd and Theresa had financial reasons to want Barbee out of the way, it was Barbee, not Dodd, who had the motive for wanting Lisa out of the way.  Barbee's own declaration provides the motive for murdering Lisa when he states: (1) Lisa showed up at his apartment when Trish and her kids were visiting, (2) he described Lisa to Trish as "a psycho I used to date," (3) Lisa would not take "no" for an answer, continued to call, leave notes at his apartment, and show up at his work, (4) Lisa demanded he tell Trish about her pregnancy even though Lisa would not take a paternity test, and (5) Trish had already given him ultimatums about his relationship with ex-wife Theresa. (Doc. 66-3, p. 85-90.) The record as a whole,

reinforces, not undermines, the State's theory about Barbee's motive for wanting Lisa dead. *Cf. House*, 547 U.S. at 541 (finding *Schlup* standard met where new DNA evidence undermined State's theory of sexual assault and removed the motive proffered by the State to link House to the crime).

This claim simply presents the innocence theory that Barbee believes trial counsel should have presented. It presents no newly discovered evidence required by *Schlup.* The theory is unsound and conflicts with Barbee's own declaration. Barbee fails to demonstrate that, more likely than not, in light of new evidence, no reasonable juror would find him guilty beyond a reasonable doubt. Claim 1 is denied.

## V.   CONFLICT OF INTEREST (CLAIM 2)

Barbee asserts that he received ineffective assistance of trial counsel because Bill Ray had a secret understanding with the trial judge that he would "move" the case rapidly and put up a minimal defense. Barbee contends that this conflict of interest caused Ray to fail to investigate his innocence and to jettison "a multitude" of mitigating evidence. (Doc. 61, p. 148-49.) Respondent argues that the state court's rejection of this claim was reasonable.

The initial state habeas proceedings touched upon issues relevant to counsel's representation at punishment, and the conflict-of-interest claim was fully litigated in the subsequent writ proceedings

during the abeyance. Thus, the relevant facts that follow are from both state proceedings.

### A.  The initial state habeas proceedings (claim 2)

Barbee's initial state application alleged that trial counsel were ineffective for failing to present significant mitigating evidence at sentencing. (SHR 24). In support, Barbee presented the affidavit of their mitigation investigator, Amanda Maxwell; a letter discussing mitigation themes from trial expert Dr. Goodness; and written statements from neuropsychologist Stephen Martin, Pastor Nancy Cearley, and Barbee's mother. Dr. Martin opined that Barbee had subtle to mild brain damage, primarily frontal-lobe impairment. (SHR 44-45.) Pastor Cearley and Barbee's mother both stated, among other things, that if they had been asked, they would have testified that Barbee was not a future danger to society. (SHR 47, 49.)

Maxwell stated in her affidavit that Bill Ray asked her to investigate the educational, psychological, medical, institutional, cultural, and social history of Barbee and his family. She detailed her experiences with the defense team as they worked on the case and prepared for trial. She interviewed twenty-one potential witnesses and obtained records relating to Barbee's mental and physical health, education, and employment. She investigated the family's history of abuse, their criminal history, and religious and cultural influences, which she verified through collateral sources. She stated that she was not allowed to meet with the witnesses prior to testi-

fying, however, because Ray had used another investigator to do that. As a result, she believed the mitigation testimony presented at trial was ineffective.  (SHR 33-37.)

Mr. Ray and Mr. Moore provided a joint affidavit in response. (SHR 60, 66.) They said that Barbee continuously changed his version of the murders such that it was difficult to develop a defensive theory that would be beneficial or consistent at both stages of trial. (SHR 67.)  Counsel did not present evidence of head injury, mental illness, or hydrocodone abuse, because presenting this evidence would, in effect, be an admission that Barbee was in fact guilty as charged, even though Barbee had maintained his innocence in spite of over-whelming evidence to the contrary. Counsel said that the "overwhelming thought in mitigation is some acceptance of responsibility," which Barbee refused to give. (SHR 71.) Counsel attached to their affidavit a letter Barbee had written to counsel describing what happened during his police confession, a Memorandum of Understanding between trial counsel and Barbee, Barbee's letter to confession expert Dr. Richard Leo, Dr. Leo's letter to trial counsel, Dr. James Shupe's letter to trial counsel, and Maxwell's notes to counsel about her interview with Tim Davis, a friend of Barbee's.  (SHR 75-100.)

Counsel stated that they did not call Tim Davis to testify because Davis indicated he was with Barbee during a road-rage incident where Barbee "attempted to kill" the driver of the other vehicle. (SHR 71.)  Maxwell's memorandum to trial counsel summarizing her

26

interview with Davis shows that after Barbee cut off another truck in traffic, the other truck motioned for Barbee to pull over. Barbee told Davis to "watch this," as he brought his truck to a stop. An older man and his son approached and started hitting Davis and Barbee, and they all ended up fighting on the shoulder. Davis had to pull Barbee off the son and the old man to keep him from hurting them "really bad." Barbee and Davis left, and Barbee threw the other man's car keys out the window about two miles down the road. Davis also told Maxwell, "Steven had no off button," "he could take care of himself," and was stronger than two men put together. (SHR 99.)

**B.  The subsequent state habeas proceedings (claim 2)**

At the subsequent writ hearing, Barbee presented testimony in an effort to show that Mr. Ray was financially beholden to Judge Robert Gill for appointments in probation revocations cases and that Ray knew he had to move Barbee's case as quickly as possible. Barbee attempted to circumstantially show a conflict of interest through evidence of (1) counsel's alleged attempts to have Barbee plead guilty, (2) counsel's alleged lack of interest in Barbee's innocence, and (3) counsel's "mysterious refusal" to present all mitigation evidence amassed by the defense team, Davis's testimony in particular.

### 1. Amanda Maxwell

Maxwell's testimony reiterated much of the information contained in her affidavit. She also testified that this was her first capital murder case, and that Mr. Ray had told her to put negative as well

27

as positive information about Barbee in her written report.  (Doc.
66-7, p. 24.)  She had developed information about Barbee's head
injuries, a suicide attempt, and Barbee's hydrocodone abuse.  She
requested counsel to obtain a neuropsychological evaluation, but
counsel did not respond. (Doc. 66-7, p. 25.) She reported that
Barbee's ex-wife Theresa told Barbee that he had better sign both
businesses over to her or the State would take them because his DNA
was all over the crime scene.  She testified that Theresa had been
embezzling funds from the company and owed money to Barbee's mother.
(Doc. 66-7, p. 26.) Maxwell said trial counsel were constantly trying
to encourage Barbee to plead guilty, they would not let her order
records herself, and she never talked to the defense psychologists.
(Doc. 66-7, p. 26-27.) She did not hear from Mr. Ray after submitting
her complete mitigation report.  (Doc. 66-7, p. 27-28.) Ray had hired
another investigator to re-interview all the witnesses she had
previously interviewed.  (Doc. 66-7, p. 27-28.)  She believed there
were witnesses who should have been called and information, such as
the head injuries and hydrocodone use, that should have been
presented. (Doc. 66-7, p. 28.)  She also had a list of "crime-week
stressors" that Barbee faced during the week leading up to the murders
that she said was not presented at trial.  (Doc. 66-7, p. 30.)  She
said that Mr. Ray and Mr. Moore had conveyed to her that they found
Barbee "disgusting because he cried." (Doc. 66-7, p. 31.) She also
said that when Mr. Ray saw her affidavit in this case, he fired her

from another capital case in which she was working. (Doc. 66-7, p. 31.)

Maxwell admitted that her laundry list of crime-week stressors could have been aggravating for the defense, and that Barbee's mother had a life-long pattern of running interference for Barbee and wanted a different attorney from the very beginning. (Doc. 66-7, p. 33-34.) Barbee's parents had paid for his acts of vandalism and theft in his past, and his mother was emotionally and socially invested in his being innocent. (Doc. 66-7, p. 33-34.) Maxwell also uncovered negative information about Barbee, such as vandalism and setting fire to baby hamsters in his pre-teen years. (Doc. 66-7, p. 36, 46.) When the prosecutor attempted to cross-examine Maxwell about her interview with Davis, Maxwell said she did not have her notes from the interview but only had an email she had sent to Mr. Ray. She said her written notes were destroyed, and she did not include the Davis interview in her social history report because she felt it was very prejudicial. (Doc. 66-7, p. 32, 36.) She said she has destroyed her handwritten notes in all sixteen of the capital cases she has worked since Barbee's. (Doc. 66-7, p. 37.)

## 2. <u>Tim Davis</u>

Tim Davis testified that he had been best friends with Barbee for eight to ten years and was the best man at Barbee's wedding to Theresa. (Doc. 66-7, p. 51.) He said that Maxwell's report of his 2005 interview is not truthful and twisted his words. (Doc. 66-7,

p. 54, 57.)  He also said that Barbee did not attempt to kill the driver of the other vehicle, as stated in counsel's affidavit.  He said it was a simple fist fight after he and Barbee were attacked by men in a truck who had run them off the road.  (Doc. 66-7, p. 51-52.)  Had he been called to testify, he would have given his opinion that Barbee was not a future danger to society. (Doc. 66-7, p. 57.) Davis testified that he was not aware of any physical confrontations between Barbee and Theresa, and did not know that, as a juvenile, Barbee had broken 47 school windows and robbed a concession stand in Parker County.   He knew that, at the time of the road-rage incident, Barbee was working as a volunteer police officer. (Doc. 66-7, p. 54-55; Doc. 66-3, p. 128 (declaration and supplement).)

### 3. Calvin Cearley

Calvin Cearley testified that he is married to Pastor Nancy Cearley, who testified at trial, but he was not contacted by the defense team. If he had been called to testify, he would have said that Barbee was not likely to commit future acts of violence. He said that Barbee and Theresa were leaders in the children's church. Barbee loved animals and children and was respectful and polite. Cearley was not aware of Barbee's misconduct at a young age, but only knew him in the church setting.  (Doc. 66-7, p. 57-59; Doc. 66-3, p. 119 (declaration).)

### 4. <u>Nancy Cearley</u>

Nancy Cearley said she has known Barbee twenty years and his parents came to her church.  She described Barbee and Theresa's leadership in the children's church and said Barbee was easy going, friendly, likeable, polite, and respectful.  She never knew Barbee to commit acts of violence.  Although she testified at trial, she was not asked her opinion about Barbee's propensity for future dangerousness.  Had she been asked, she would have said he is not likely to commit future violent acts.  She knows Barbee did not commit murder, and there is no evidence that would change her mind.  She believed his attorneys were just "going through the motions."  She admitted that she did not know Barbee when he (1) broke into a bait-and-tackle shop and robbed it, (2) broke the windows at Azle High School, and (3) broke into a concession stand at Parker County. (Doc. 66-7, p. 59-62; Doc. 66-3, 120 (declaration).)

### 5. <u>Barbee's brother-in-law</u>

Barbee's brother-in-law testified that he was married to Barbee's older sister, who died at the age of 20 when she was pregnant with their second child. Barbee's older brother David also died at age 20 in a car accident.  These deaths devastated Barbee.  If he had been called to testify, he would have said that Barbee is absolutely not likely to commit future violent acts.  He saw Barbee fight only once, with a house guest who was behaving inappropriately and refused to leave. He did not attend trial and never saw Barbee's confession

recording but did not believe Barbee confessed to killing the victims. He knew about some trouble Barbee had growing up, including breaking into the Parker County concession stand. He did not remember the road-rage incident, Barbee's breaking 47 windows at Azle High School, or stealing jewelry and other possessions from the school locker room. (Doc. 66-7, p. 63-66; Doc. 66-3, p. 123 (declaration).)

### 6. Barbee's niece

Barbee's niece testified that her mother was Barbee's sister and that she and Barbee are very close. Barbee was playful and always wanted to make her laugh, spoil her, and take care of her. She testified that Theresa and Barbee were in debt to Barbee's parents when the murders occurred. She described Barbee's home with Theresa as expensive, gorgeous, "a great home" of about 6,000 square feet. She worked for their concrete cutting business between 2002 and 2004 as Theresa's assistant. Theresa started paying bills with company money, deposited a large amount of cash, once said she wished Barbee would die, and once falsely claimed that Barbee had hit her. Dodd was rude and uncouth. If she had been asked during her trial testimony, she would have testified that, in her opinion Barbee would not commit future acts of violence. She attended trial and watched Barbee's confession tape but did not believe it. (Doc. 66-7, p. 66-72; Doc. 66-3, p. 104 (declaration).)

### 7. Sharon Colvin

Sharon Colvin testified that she is a pastor and friend of Barbee's mother and knew Barbee for about a year when he was young. She testified that she spoke to Barbee's trial attorneys but they did not ask her to testify. She would have testified, if asked, that Barbee was not likely to commit future dangerous acts.   She had nothing bad to say about Barbee. (Doc. 66-7, p. 72-73; Doc. 66-3, p. 126 (declaration).)

### 8. Barbee's mother

Barbee's mother testified that Mr. Ray and Mr. Moore came to her house once and talked to her on the phone a couple times before the trial. Maxwell came to her house two or three times to discuss Barbee's background and she believed Maxwell "knew everything," but very little of Maxwell's work was presented to the jury.   She testified that Barbee is a giver with a loving heart and a hard worker.   She testified that Barbee did not have anyone to talk to about the deaths of his older siblings because she and her husband were "just making it" themselves. Barbee cried on his twentieth birthday and said it was the worst day of his life.   She promised to buy him a boat or give him money if he lived to be twenty-one. She said Barbee's problem in high school was that he loved to be funny, and he had some trouble completing his GED in reading. She helped him financially with buying and building the home he shared with Theresa, and he let Theresa have everything when they divorced.

33

Barbee's mother said counsel told Barbee that if he pled guilty they might be able to save his life.  Counsel wanted her to watch the recording of his confession but she never did.  There were things she would have liked to have testified about at trial but counsel did not ask, specifically, that she had taught Barbee right from wrong. She was shocked when Mr. Ray told the jury that Barbee was guilty.  She did not know about a road-rage incident with Davis, and if asked, she would have testified that Barbee was not a future threat to anyone.  She said she had never seen anyone so broken in her life as Barbee was after his lawyers visited him in jail.  She said that she and "his daddy had to go, and literally scoop him off the floor." On cross-examination, she admitted Barbee was involved in breaking windows at the Azle school, but she did not know about incidents involving a bait and tackle shop or the Parker County concession stand.  (Doc. 66-7, p. 83-88; Doc. 66-3, p. 66-76 (declarations).)

### 9. Trial Judge Robert Gill

Judge Gill testified that he appointed Mr. Ray on a lot of the probation revocations in his court.  (Doc. 66-7, p. 77-79; Doc. 66-8, p. 9.)  He liked to appoint Ray because Ray "worked" the cases and made himself available on Friday afternoons, when Gill scheduled revocation hearings. (Doc. 66-7, p. 82.)  Gill acknowledged that a newspaper article had reported that a federal judge harbored serious due-process concerns about the way Gill handled plea bargaining in the revocation cases and found Mr. Ray ineffective in one revocation

case. (Doc. 66-7, p. 78-79.) Judge Gill agreed that, about two years before their appointment in Barbee's case, Ray and Moore made campaign contributions to Judge Gill in the amounts of $1000 and $300, respectively. (Doc. 66-7, p. 81.) Gill also testified that, when he was a candidate in the election for district attorney, he would have considered a high disposition rate something he would want to publicize; however, he thought he had an average disposition rate as a judge. (Doc. 66-7, p. 81.) He said there was no type of agreement between him and Mr. Ray about how Ray was going to handle Barbee's case. (Doc. 66-7, p. 82.)

### 10.  Lead counsel Bill Ray

Mr. Ray testified that he was licensed in 1985 and is board certified in criminal and criminal appellate law. (Doc. 66-8, p. 32.) At the time he was appointed, about 70-80 percent of his criminal practice among four counties was court-appointed. (Doc. 66-7, p. 182.) Somewhere between 25 and 75 percent of his court-appointed practice came from Judge Gill's court. (Doc. 66-7, p. 182.) Prior to Barbee's trial, he had tried two other death-penalty cases to conclusion. (Doc. 66-7, p. 182.) He testified that he did not have any sort of agreement or deal with Judge Gill. Judge Gill appointed him on a large number of cases starting in 2001 or 2002, but it could have ended at any time, and it ultimately did. (Doc. 66-8, p. 7-9.) He made $710,000 from Judge Gill's appointments between 2001 and 2007. (Doc. 66-8, p. 8.) He said that campaign

35

contributions are a common practice and that he has contributed to the campaigns of more than ten judges in Tarrant County. (Doc. 66-8, 32-33.)

Hearing exhibits showed that Mr. Ray and Mr. Moore billed the court for 350 and 260 hours of out-of-court time, respectively. (Doc. 66-6, p. 16, 21, 24; Doc. 66-7, p. 80.) Mr. Ray hired Kathy Minnich as a investigator and replaced her with Stanley Keaton when she moved out of state. (Doc. 66-8, p. 4; 24 RR 174.) Maxwell was the mitigation specialist. (Doc. 66-8, p. 5.) He also hired two forensic psychologists, a forensic psychiatrist, an expert on false confessions, a computer investigator, and a DNA expert. (Doc. 66-8, p. 15, 38; 1 CR 35, 46; 2 CR 298.) Ray said Judge Gill placed no limitations on his handling of the defense, made no threats or implications that he would not receive appointments, and denied no request for experts. (Doc. 66-8, p. 33.)

Mr. Ray's theory at the guilt stage was that Barbee should be acquitted of capital murder because Lisa's asphyxiation death was an unintentional consequence due to her advanced pregnancy. (Doc. 66-8, p. 6; 25 RR 9-18.) Mr. Ray's strategy at punishment was to show that the prisons were able to handle violent offenders, and that Barbee could conform to life in prison. (Doc. 66-8, p. 30-31.) Ray presented character and social-history testimony from Barbee's mother, Barbee's aunt, Pastor Nancy Cearley, a young woman Barbee met at church, Barbee's ex-girlfriend, and the girlfriend of Barbee's former

roommate.   Ray presented testimony from prison classification and security expert Susan Perryman, as well as a Tarrant County confinement officer who had known Barbee his whole life, and the court bailiff, who testified about Barbee's good behavior during the trial. (25 RR 121-175, 26 RR 2-105.)

Mr. Ray disagreed with the assertion that he tried to convince Barbee to plead guilty and did not investigate his innocence.  Rather, he told Barbee to consider a plea because his confessions to the police made it difficult to prove innocence.  (Doc. 66-8, p. 3, 5.) He attempted to have Barbee's family view Barbee's recorded confession because they did not believe that he had confessed, especially his mother.  Ray did not do this to convince them that Barbee was guilty, but to show them that it was a problem in the case.  (Doc. 66-8, p. 5.)  Ultimately, the district attorney told Ray there would be no plea agreement anyway.  (Doc. 66-8, p. 44.)

Mr. Ray investigated Dodd, obtained his criminal history, spoke with his assault victim, and knew Dodd had meet a man named Donald Painter while incarcerated.  Ray also knew Dodd had dropped a pipe on Barbee's head.  (Doc. 66-8, p. 3, 23, 41.)  Ray filed subpoenas under seal (so that they would be unknown to the State) in an attempt to locate an ex-girlfriend with whom Barbee had worked at the Blue Mound Police Department.[5]  Ray learned that Barbee had a secret cell

---

[5] According to Barbee's mother, Barbee had had a child with this fellow Blue Mound officer but gave up his parental rights. (Doc. 66-3, p. 72.)

phone with which he called a girlfriend while he was married to Theresa. Through sealed subpoenas, he learned from cell tower records that Barbee had placed a call to Dodd at 1:47 a.m. on the night of the murder, which was initiated from a tower near the victim's home. Barbee also placed calls to Dodd from a tower near the location where the bodies were found, where he was trying to get Dodd to pick him up before he was stopped by the police. The State did not know about these incriminating cell tower records. (Doc. 66-7, p. 42, 55; Doc. 66-8, p. 33-34.) Maxwell also advised Mr. Ray that Barbee was trying to get his ex-wife, Theresa, to implicate Dodd. (Doc. 66-7, p. 38-39; *see* 25 RR 100-101 (Theresa's testimony).)

Regarding Barbee's innocence claim, Mr. Ray explained that Barbee first wrote Ray a letter about his confession to police, stating that both of the murders were accidental. The first time they met in person, Barbee told Ray he did not commit the murders. Ultimately, Barbee stated he was not there at all, that Dodd did it. (Doc. 66-8, p. 16; SHR 75.) Ray identified three problems with the "Dodd did it" theory. First, Barbee would have to testify, and Barbee did not want to testify. (Doc. 66-8, p. 16-18.) Second, Dodd had no motive to kill the victims that Mr. Ray could prove. Mr. Ray would have wanted someone better than Barbee's niece to testify that Theresa was embezzling money from the company that Barbee had already signed over

38

to her.[6] Mr. Ray pointed out that the financial-motive evidence was weak because Dodd was already living with Theresa in Barbee's spacious former home, and Barbee and Theresa were already divorced.   Third, Dodd could not have known that Barbee would later confess to the police.  Mr. Ray said he told Barbee a thousand times that they could not sell that. (Doc. 66-8, p. 22.) Mr. Ray also retained the services of a confession expert, Dr. Leo, to assess the veracity of Barbee's confession, but Dr. Leo's  report was not favorable to the defense. (Doc. 66-8, p. 37.)

Mr. Ray consulted with psychologists Kelly Goodness and Barry Norman and with psychiatrist James Schupe.  Dr. Goodness found no significant symptoms of head injury, no indication that Barbee had bipolar disorder, and no long-term or significant hydrocodone abuse. Dr. Goodness believed Barbee had Lyme's Disease, which can cause mood swings that mimic bipolar disorder, as well as rage and violent tendencies.  Mr. Ray believed this played into the State's hand and was not helpful to the defense.  Dr. Shupe found bipolar disorder, polysubstance abuse, social stressors, a history of closed-head injuries, and antisocial personality disorder, some of which could have been helpful if Barbee had accepted responsibility for the murders. But Shupe believed that Barbee diminished his responsibility for the murders because he did not like the situation he was in and

---

[6] Mr. Ray's testimony suggested that a niece would have implicit bias, but he also testified that the niece had a concerning criminal history.  (Doc. 66-8, p. 45.)

39

was fixated on how his mother would view him if she thought he was guilty. Ray did not think Shupe would help the defense, and he was also worried that the bipolar diagnosis was inconsistent with the Lyme's Disease diagnosis. (SHR 52 (Goodness report), 98 (Shupe's report); Doc. 66-8, p. 38-39.) Dr. Norman believed Barbee suffered from mild depression, but otherwise did not think anything was wrong with Barbee, specifically relating to the head injury. (Doc. 66-8, p. 43-44.) Mr. Ray also explained that, if he had called one of the mental health experts to testify, the State would have been entitled to an expert that would probably reach the same harmful conclusions. (Doc. 66-8, p. 43-44; 2 CR 302, *Lagrone* motion.) (SHR 207, finding that state would have had Barbee interviewed by Dr. Price.)

Regarding his decision not to present evidence of the head injuries, hydrocodone use, and migraine headaches, Ray said this evidence would suggest a reason why Barbee committed the murders and undermine Barbee's innocence claim. Even at the punishment phase, Ray generally did not believe that "excuse" evidence helped the client when the jury has just rejected the innocence defense and found the client guilty. Ray also knew that the witnesses who were going to testify at punishment believed that the jury wrongly convicted Barbee, and it would be inconsistent with their assertions to offer evidence that excused the murder. For the same reason, Ray could not offer evidence of remorse, even though he believed remorse could be a successful strategy in some cases. (Doc. 66-8, p. 24, 29.)

40

Mr. Ray did not call Davis as a character witnesses because Davis had been with Barbee in the road-rage incident.  Although Davis testified at the habeas hearing that he and Barbee were the victims in the incident and he had never seen Barbee get violent with anybody (doc. 66-7, p. 52), Maxwell and both trial counsel testified that Davis told them otherwise at the time of trial.  (Doc. 66-7, p. 38; Doc. 66-8, p. 40, 53.)

Mr. Ray did not call inmate Donald Painter to testify at guilt even though he would say that Dodd confessed to committing the murders to him.  Painter's life-long criminal history aside, Ray had learned that Barbee and Painter had an agreement whereby Barbee would pay Painter for his testimony.  Although Ray believed the exchange of money was Painter's idea, Ray believed for this reason that Painter would have been "worse than anybody else we could have got to the courtroom."  (Doc. 66-8, p. 41-45; Doc. 66-6, p. 62, 64.)

When challenged about his decision not to present lay opinion testimony regarding Barbee's lack of future dangerousness, Ray explained at length that he would not ask his mitigation witnesses whether they believed Barbee to be a future danger because that would have opened them up to questions about Barbee's prior bad acts, which would have been damaging no matter how they answered. In this regard, Ray had information that Barbee built fires as a little kid, set fire to hamsters, killed an animal when he was on a date, offered to bribe Painter to testify, and severely beat an older man in the road-rage

41

incident at the same time he was employed as a volunteer police officer. (Doc. 66-7, p. 35-36, 38, 55; Doc. 66-8, p. 27-28.)

### 11. Co-counsel Tim Moore

Mr. Moore testified that he was licensed in 1978 and 100% of his practice is criminal law.  He had been appointed by Judge Gill in two or three other cases at the time of Barbee's trial and had tried six death-penalty cases in his career. (Doc. 66-8, p. 49, 55.) He made campaign contributions to every criminal judge in the county. (Doc. 66-8, p. 50.)  He said that Judge Gill did not limit or direct how they conducted Barbee's defense and made no threats about future appointments.  (Doc. 66-8, p. 55.)

Moore said that Barbee's family was convinced that he was not guilty.  Moore and Ray wanted the family to view the recorded confession so that the family would know what counsel were dealing with.  (Doc. 66-8, p. 50.) Although Barbee asserted that his confession was false and that Dodd had committed the murders, Moore believed that the only way to get this information before the jury was to have Barbee testify, which he refused to do.  (Doc. 66-8, p. 51.)  Moore knew about Barbee's head injury but Dr. Goodness could not find any effect from it.  He knew about Barbee's hydrocodone use and headaches and the road-rage incident.  Moore testified, as did Ray, that Davis lied about what he originally told them about the road-rage incident. (Doc. 66-8, p. 25, 52-53, 57.)

Moore testified that he believed jurors are less likely to give a defendant the death penalty if he accepts responsibility and shows remorse.  (Doc. 66-8, p. 54.)  Mr. Moore believed that the biggest problems they faced in terms of future dangerousness were the facts of the offense.  (Doc. 66-8, p. 57.)

### 12. Dr. Stephen Martin

Dr. Martin did not testify, but his written statement given in connection with Barbee's original habeas application was admitted into the record.  (Doc. 66-3, p. 53; Doc. 66-7, p. 23.) The written statement asserts that he conducted a neuropsychological evaluation of Barbee in 2007 and that the results "reflect a subtle to mild degree of diffuse neuropsychological impairment along with subtle bilateral hemisphere dysfunction" and that the areas of impairment "appear to reflect primarily frontal lobe-mediated abilities." Martin opined that the "damaged frontal lobes would have likely increased [Barbee's] impulsivity tendencies and reduced his ability to fully consider the consequences of his actions" during the offense.  Martin further opined that trial counsel were ineffective for failing to present the testimony of an expert such as himself. (Doc. 66-3, p. 53-60.)

### 13.  Dr. J. Randall Price

The State called Dr. Price to refute the opinion of Dr. Martin.[7] Dr. Price is a clinical and forensic psychologist and neuropsychologist who has taught university classes in psychology, criminal psychology, and forensic psychology for forty years. He has consulted in over 300 capital murder trials, both for the defense and the prosecution. (Doc. 66-8, p. 59.) Dr. Price reviewed Dr. Martin's affidavit and raw test data; the evaluations of Drs. Goodness, Shupe, and Norman; Maxwell's report; and Barbee's medical history file. (Doc. 66-8, p. 60.)  Dr. Price testified at the writ hearing that he found two scoring errors by Dr. Martin and that Dr. Martin did not analyze the test results against age and education norms, which is the standard practice in the field.  When Dr. Price adjusted for these two things, the test results obtained did not indicate either generalized brain impairment or frontal lobe impairment. He agreed that a direct blow to the head from a 400-500 pound pipe would certainly be likely to cause some brain injury, but he found no evidence of that in the files.  Dr. Price also found no evidence of brain damage following two car accidents.  He said Drs. Shupe, Goodness, and Norman all had face-to-face evaluations of Barbee and also saw no evidence of brain injury. (Doc. 66-8, p. 62-63.)

---

[7] Dr. Price also provided a written affidavit in 2008 in connection with the original habeas application with substantially the same content as his live testimony.  (SHR 182.)

## B.   Applicable law (Claim 2)

The clearly established federal case law governing claims of ineffective assistance of trial counsel can be found in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Williams v. Taylor*, 529 U.S. 362, 398-99 (2000).   Under *Strickland*, a petitioner must first demonstrate that counsel's representation fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688.   This determination asks "whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Richter*, 562 U.S. at 105.   A petitioner must also demonstrate prejudice, meaning a reasonable probability, sufficient to undermine confidence in the outcome, that but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694.

A lawyer who acts under a conflict of interest may deny his client the effective assistance of counsel. *E.g., Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980).   In *Sullivan,* the Supreme Court held that, in cases involving the representation of multiple co-defendants where no objection was raised in trial, a reviewing court does not presume that the mere possibility of a conflict resulted in ineffective assistance. *Id.*   To establish ineffective assistance of counsel in this situation, the defendant must demonstrate that "an actual conflict of interest adversely affected his lawyer's performance."

45

*Id.* at 348-49.  An "actual conflict" exists when counsel "is compelled to compromise his or her duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests." *Perillo v. Johnson*, 205 F.3d 775, 781 (5th Cir. 2000). "Adverse effect" requires evidence that "'some plausible alternative defense strategy or tactic' could have been pursued but was not because of the actual conflict impairing counsel's performance." *Id.* Once the defendant shows that a conflict of interest actually affected the adequacy of the representation--as opposed to a "mere theoretical division of loyalties"--he need not demonstrate *Strickland* prejudice in order to obtain relief.  *Sullivan*, 446 U.S. at 349-50; *Mickens v. Taylor*, 535 U.S. 162, 171 (2002) (discussing holding in *Wood v. Georgia*, 450 U.S. 261 (1981)).

Neither the Supreme Court nor the Fifth Circuit has expanded *Sullivan* to cover the type of conflict alleged in this case, a conflict with the lawyer's personal interests. *Mickens*, 545 U.S. at 176 (holding that the extension of *Sullivan* remains an open question as far as Supreme Court jurisprudence is concerned); *Beets v. Scott*, 65 F.3d 1258, 1271(5th Cir. 1995)(applying *Strickland*, not *Sullivan,* where alleged conflict is with lawyer's personal interests, reasoning that there is little distinction between lawyer who inadvertently fails to act and one who for selfish reasons decides not to act). On the other hand, Texas courts apply the *Sullivan* presumption to all conflict-of-interest claims.  *Acosta v. State*, 233 S.W.3d 349,

46

356 (Tex. Crim. App. 2007).  So the state court here applied *Sullivan* as required by Texas jurisprudence, and then applied *Strickland* as required by federal jurisprudence, and found no error under either standard.  (Doc. 66-5, p. 150-53.)  Barbee contends that the state-court ruling was based on an unreasonable determination of the facts and an unreasonable application of law.  He urges the Court to apply the *Sullivan* standard, which would relieve him of the burden to show prejudice.  (Doc. 77, p. 24-25.)

## C.  Analysis of state court ruling (claim 2)

### 1.  State court factual findings (claim 2)

Barbee takes issue with many of the state-court findings.  Some of the challenges, however, simply ignore the evidence that supports the finding.  (Challenge to Findings 31, 36, 54-64, 65-70, 78, 80-82, 88-89, 91, 96-97, 108, 110, 111-128, 130.)  Some only reassert the argument or the facts that were rejected by the state court, or otherwise take issue with the finding without identifying why it is unreasonable. (Challenge to Findings 12, 31, 36, 46, 54-64, 139-53.)  Other challenges attack findings that do not undermine the ultimate ruling of the state court.  (Challenge to Findings 12, 36, 46, 134-38.)  Still others are based on an incorrect interpretation of the law. (Challenge to Finding 31, 36, 111-128, 130, 134-38.)  Several are based, unpersuasively, on semantics. (Finding 13, 65-70, 78, 80-82, 111-128, 130.) The Court rejects these challenges because they merely reargue the issues in different ways and do not attempt to

overcome the state-court findings by clear and convincing evidence. *See Wood*, 558 U.S. at 301 (holding that state-court factual determination is not unreasonable merely because federal habeas court would reach different conclusion in the first instance). Four arguments merit a more detailed discussion, however, because they are themes throughout this petition.

a. *Nos. 54-64 (Dr. Leo)*. These findings conclude that defense counsel's decision not to call Dr. Leo to testify was a result of reasonable professional judgment, not a conflict of interest. Barbee asserts that these findings are contrary to the record because they do not take into account that Ray could not testify that he had informed Dr. Leo that "Mr. Barbee's admission that he had helped move the bodies did not indicate that he was necessarily guilty of the murders." The necessary inference here is that counsel should have told his expert that his client was not guilty in order to generate an opinion that the confession was, therefore, false. Barbee adjusts this argument somewhat in his reply, asserting simply that counsel did not tell Dr. Leo that Barbee had admitted to helping conceal the bodies. (Doc. 77, p. 18-19.) This allegation is flatly contradicted by the record. Ray's letter to Dr. Leo lays out all of Barbee's versions of what happened, including the version that Dodd committed the murders and Barbee only "took the bodies and buried them." (Doc. 66-6, p. 32-33.) Barbee himself wrote a letter to Dr. Leo stating that Dodd committed the murders and that Detective Carroll scared

48

him about the death penalty, so he confessed to the police, to Trish, and to Theresa. (SHR 84.) Clearly, Dr. Leo was aware of Barbee's claims of innocence and of having only moved the bodies.

Barbee next asserts that Ray gave false information to Dr. Leo about Barbee's whereabouts. Ray testified, however, that he had corrected this erroneous information and then asked Dr. Leo whether the new information would alter his opinion. Dr. Leo said it would not. (Doc. 66-8, p. 21-22.)

Barbee's remaining arguments are grounded in the assertion that Dr. Leo did not receive information that underpins Barbee's theory that Dodd is the real murderer, suggesting that Mr. Ray intentionally engineered an unfavorable outcome from Dr. Leo. In Mr. Ray's letter to Dr. Leo, counsel describes the romantic and working relationships between Barbee, Trish, Lisa, Theresa, and Dodd. It also sets out Dodd's confession to police. (Doc. 66-6, p. 32-33.) Barbee provides no evidence that Dr. Leo was deprived, intentionally or otherwise, of information that would have changed his opinion. Barbee's circular argument simply asks the Court to (1) presume that Barbee is innocent, (2) deduce that his confession is, therefore, false (3) conclude that Dr. Leo's unfavorable opinion must, therefore, be due to counsel's withholding what he considers to be the critical evidence of his innocence, and (4) conclude that the withholding of this evidence is due to a conflict of interest.

*b. No. 88-89, 91 (Negative information in mitigation report).* These findings assert that Mr. Ray instructed Maxwell to include negative as well as positive information in her report because counsel found this useful to the defense, not because of any conflict of interest. The findings are supported by Ray and Moore's testimony that, without knowing all the negative information about a client, they could improvidently put somebody on the witness stand who knew something that would be devastating. (Doc. 66-8, p. 37, 56.) Barbee nevertheless complains that these findings are misleading and "miss the point" because Maxwell put negative information in a report that was later given to the prosecution and used against Barbee.

Barbee explored this subject at the state hearing in an attempt to demonstrate Ray's disloyalty. Maxwell testified that she has had extensive training through the Texas Defender Service and that they have advised her to destroy her handwritten notes and, contrary to counsel's request in this case, put only positive information in her final reports. (Doc. 66-7, p. 32, 39-40.) Maxwell apparently believed that her report in this case had been disclosed to the State, but counsel's testimony shows that the prosecutors were *not* provided a copy before trial. (Doc. 66-7, p. 40; Doc. 66-8, p. 37, 56.)  It appears that the State received Maxwell's report during the exchange of evidence in the initial habeas proceeding. (Doc. 66-7, p. 48; SHR 64.) Dr. Price's affidavit states that Maxwell's mitigation report

was attached to Dr. Martin's statement.[8] (SHR 187.) Barbee therefore fails to rebut the state court's finding regarding counsel's motive for wanting negative information included in the mitigation report.

    *c.  Nos. 111-128, 130 (Road-rage incident, opinion testimony).* Barbee challenges the state court's findings about the road-rage incident with Davis.  The potential exposure of this incident on cross-examination was cited as one reason why counsel did not call Davis as a character witness.  (Doc. 66-8, p. 25-26.)

    Barbee takes issue with the state court's findings because Davis's testimony at the writ hearing and in a 2010 supplemental declaration described the incident as self-defense, which undermines counsel's stated reason for not calling Davis.  (Doc. 66-3, p. 130; Doc. 66-7, p. 52.)  But the testimony of Ray, Moore, and Maxwell support the finding that, at the time of trial, Davis portrayed Barbee as the aggressor with no "off button."  The state court was entitled to credit the testimony of counsel and Maxwell rather than Davis, and this Court may not reweigh the conflicting evidence on habeas review.  *See Kately v. Cain*, 704 F.3d 356, 361 (5th Cir.), *cert. denied*, 133 S. Ct. 2746 (2013) (concluding district court erred in reweighing conflicting evidence).  Because the state court's credibility determination was reasonable, it is also reasonable that counsel chose not to take the risk of calling Davis to testify.  To

---

    [8] Maxwell's 25-page mitigation report is not part of the state-court records filed with this Court.

the extent that Barbee complains that trial counsel remembered Davis's saying Barbee attempted "to kill" the other driver while Maxwell reported only that Barbee had "no off button" and had to be pulled off the other men, the Court sees this as a distinction without much difference: either version would give the jury the impression that Barbee is confrontational and willing to use violence.

Barbee argues that Ray's concerns are a bogus, after-the-fact pretext to justify his failure to present mitigating evidence through Davis.  He asserts that all Ray had to do to avoid any harmful testimony was ask "each prospective witness if they knew about it." He asserts, as a general proposition, that Barbee's violent past behavior was no reason to limit the examination of any of the mitigation witnesses and that all witnesses should have been asked whether, in their opinion, Barbee would be a future danger.  (Doc. 61, p. 212.) This argument overlooks the applicable law.

Ray was not concerned that his potential witnesses knew about the road-rage incident.  He was concerned that the *State* knew about it, and that a question seeking a witness's opinion about Barbee's propensity for future violence would open the subject to cross-examination.  *See, e.g., Wilson v. State*, 71 S.W.3d 346, 350 (Tex. Crim. App. 2002) (holding that witness who testifies to capital defendant's good character may be cross-examined to test the witness's awareness of relevant specific instances of conduct). Ray explained at length that such a witness could be impeached with good-faith

questions about his knowledge of Barbee's bad acts, and it does not matter what the witness's answer is; the jury would hear the damaging questions.  (Doc. 66-8, p. 28, 57.)  Ray thought it was extremely likely that the prosecution knew about the road-rage incident (and other things Barbee had done, like animal cruelty and vandalism). He believed it would have been a big gamble to put Davis on the stand--even "ineffectiveness, per se"--despite his having "a lot of nice things to say about Mr. Barbee." (Doc. 66-8, p. 25-26.)  Barbee provides no authority that the state court's findings on this issue are incorrect, much less unreasonable.

     d.  *Nos. 134-138 (Memorandum of Understanding)*.  These findings deal with a Memorandum of Understanding that set out counsel and Barbee's positions on the main issues in the case. (Doc. 66-3, p. 169.) Because Mr. Ray used the memorandum to defend Barbee's claim of ineffectiveness at the state habeas hearing, Barbee concludes this is proof of counsel's conflict of interest.  Barbee presents no facts to dispute that Barbee willingly signed the memorandum after reading and editing it, nor does he demonstrate that it contains inaccurate facts.  He fails to show that the memorandum is anything more than a practical tool to preserve facts in anticipation of the inevitable post-conviction litigation that occurs in every death-penalty case. Barbee fails to rebut the state-court finding that counsel's preparation of the memorandum was not a conflict of his interests with Barbee's interests.

In sum, Barbee does not argue that the state-court ruling is unreasonable in light of the evidence. Rather, he picks and chooses from the facts in the record to support his claim and simply disagrees with the state-court ruling. This Court has reviewed the facts that Barbee cites correctly with the facts that he omits, and cannot conclude that the state-court ruling was based on an unreasonable determination of facts. *E.g., Hyde v. Branker*, 286 F. App'x 822, 832 (5th Cir. 2008) (rejecting argument that "picks and chooses from the[] facts to support [Petitioner's] ineffective assistance claim"). The Court will not further parse the individual findings here because they did not result in an unreasonable state-court decision. *See Morrow v. Dretke*, 367 F.3d 309, 314 (5th Cir. 2010) (citing *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001)) (holding that it is the state court's ultimate decision that is tested, not every jot of its reasoning).

### 2.   State-court legal conclusions (claim 2)

Barbee's petition contains a section entitled "The 2254(d)(1) analysis." (Doc. 61, p. 215.) The section states, "Petitioner has shown at length that there was an actual conflict here and that his interests were prejudiced by various acts and omissions of the trial attorneys. The evidentiary hearing in this matter brought out clearly the many ways in which the trial attorney's interests were put ahead of their client's interests." Barbee concludes that both the *Sullivan*

and *Strickland* tests have been met and then refers to an earlier "Section C" of his argument in support.

Section C contains the argument that a conflict of interest is demonstrated by the alleged failings of counsel, failings rejected by the state court and addressed by this Court above. Section C does not address how the state-court ruling is an unreasonable application of federal law.   It is an exact copy of the substantive argument Barbee presented in his original petition, *prior* to the state-court ruling on this very issue. (Doc. 24, p. 74-83.) Accordingly, Barbee fails to show that the state-court ruling was based on an unreasonable application of clearly established federal law.

### 3.   Conclusion (claim 2)

The state courts did their job during abeyance.  Barbee tried to demonstrate that trial counsel made decisions harmful to his client that could only be explained by a conflict of interest. But the trial attorneys testified and provided reasons for their decisions.  Counsel and Judge Gill denied the existence of any agreement, implied or otherwise.  Barbee was able to cross-examine his trial counsel and the trial judge and present testimony from Maxwell and others in an attempt to establish something more than a hypothetical conflict of interest.  The claim does not present an actual conflict that forced counsel to choose between his self-interest and his duty to his client. Furthermore, Barbee did not present evidence that some "plausible alternative defense strategy or tactic could have been

pursued" but for the alleged conflict. *See Perillo*, 205 F.3d at 781 (internal quotation marks and citation omitted). Thus, Barbee failed to establish that an actual conflict of interest adversely affected counsel's performance. *See, e.g., Russeau v. Stephens*, 559 F. App'x 342, 358 (5th Cir.), *cert. denied*, 135 S. Ct. 338, 190 L. Ed. 2d 110 (2014).

The state court concluded that Barbee did not show that an actual conflict of interest affected counsel's performance under *Cuyler v. Sullivan*. (Doc. 66-5, p. 152.a)  The state court also concluded that Barbee did not show deficient performance or the prejudice required under the usual *Strickland* standard.  (Doc. 66-5, p. 153.)  This Court has addressed Barbee's arguments and concludes that Barbee has failed to demonstrate that the state-court ruling involved an unreasonable determination of the facts or an unreasonable application of *Strickland* or *Sullivan*.  *See* § 2254(d). The Court denies claim 2.

## VI.  PRETRIAL ASSISTANCE OF COUNSEL & *BRADY* (CLAIMS 3, 19)

### A.  Counsel's challenge to recorded confession (claim 3a)

Claim 3a asserts that trial counsel provided ineffective assistance for failing to properly challenge the "veracity of the video recording of Mr. Barbee's interrogation," and contends that it was "altered and edited" and "inexplicably stops" as soon as the detectives accuse Barbee of the murders. (Doc. 61, p. 221.)  In his Reply, however, he clarifies that he makes no "alteration" claim,

only a claim that the recording has unexplained gaps and "stops and starts." (Doc. 77, p. 26.) Barbee raised this claim in his original state habeas application, and the state court denied it on the merits. (SHR 18, 203, 217.)

Barbee contends the state-court ruling is based on an unreasonable determination of facts because the state court (1) relied on Dr. Leo's opinion, which was ill-informed for the reasons addressed in claims 1 and 2, and (2) falsely assumed this complaint is one of "alteration" when it is in fact a complaint of "unexplained gaps" and "stops and starts."

The Court has already rejected the contention that counsel undermined the reliability of Dr. Leo's opinion by failing to provide certain information. Counsel did not misinform Dr. Leo.  Barbee himself wrote to Dr. Leo, moreover, and said his confession was false because Detective Carroll had scared him into confessing. (SHR 85-88.) The Court now turns to the reasonableness of the state court's ruling that counsel provided adequate representation in challenging Barbee's confessions.

Barbee does not reveal how the state court's characterization of this complaint as an "alteration" claim matters to its resolution. But accepting as correct Barbee's interpretation of his complaint as one of "unexplained gaps" and "stops and starts," the Court nevertheless concludes that the state court's ruling was not unreasonable.

1. <u>Facts from trial</u>

At a two-day hearing on the motion to suppress, Mr. Ray presented the testimony of Barbee's wife Trish, Tyler Police Detective Cashell, and four Fort Worth police officers, including Detective Carroll. Ray moved to suppress all of Barbee's statements under the Fifth Amendment, *Miranda v. Arizona,* and the applicable Texas statute. Ray believed the confession was a critical piece of evidence. (SHR 67.) Seven months prior to the hearing, Ray met with Detective Cashell and made a recording that he would later use to examine Cashell at the suppression hearing. (22 RR 32-35, 38.) Thus, it appears that Ray was aware of the importance of this issue and began his investigation early.

At the suppression hearing, the parties freely addressed the "discrepancy" of stops and starts. (15 RR 15-16.) The first 8-minute break was taken to photograph Barbee's lower body because the person who had fled from the deputy sheriff two days earlier had run through briars. The recording was stopped because Barbee had to take off his pants for the photographs. (15 RR 16-19, 61-62.) On the recording, Detective Carroll announces that he is stopping the tape and states why. (SX PT-2, title 1 at 00:28:12.) Detective Carroll testified that he spoke to Barbee during this break about whether he was the man on the deputy's squad car videotape. (15 RR 16-18, 20.)

The next part of the recording continues with a discussion about what happened when Barbee was stopped by the deputy sheriff at 3:30

58

in the morning on Saturday. (15 RR 18-19.) On the recording, Barbee
tells the officers that Dodd came to pick him up after he fled from
the deputy. Detective Carroll then announces that he is stopping the
recording to go ask Dodd about that. (SX PT-2, title 2 at 00:04:50.)
Detective Carroll testified that, during this break, Detective Jamison
was making Barbee mad, so he asked Jamison to leave the interview
room. (15 RR 20-22.) After listening to Dodd's interview, Detective
Carroll popped his head into Barbee's interview room and asked, "Does
FM 407 ring a bell or sound familiar to you?"  He then walked out
to let Barbee think about that for a while.  He did not go back in.
(15 RR 22, 64-65.) Carroll testified that "FM 407" was the area where
the bodies were later found buried.  (22 RR 18, 62.)

     Carroll testified that Barbee subsequently opened the door and
asked to use the restroom.  (15 RR 65.) Over the course of 45-60
minutes, Barbee made the unrecorded confession to Carroll in the
bathroom, admitting that he killed Lisa and Jayden after making a
plan with Dodd to do so.  (15 RR 24-32.)  Carroll testified that he
and Barbee then left the bathroom and went to an office to map the
location of the burial site on a computer.  (15 RR 33-34.)

     The recording then restarts in the interview room. (15 RR 35.)
Barbee is crying. Detective Carroll gives the *Miranda* warnings again,
and Barbee states, "I'd like to get one," meaning a lawyer, and asks
if that would be bad.  After some discussion, however, Barbee
continues with the interview.  Carroll recites that they have been

talking and have agreed not to get into what Dodd did. Barbee then points to the handheld recorder and signals that he would like to stop the recording. Carroll turns off the recording. (SX PT-1, title 1); (15 RR 36-37.)   Carroll testified that Barbee wanted to ask Carroll off-camera if he could tell Lisa's family, face-to-face, what had happened.   Carroll told Barbee he could not promise anything. (15 RR 35-36.) (SX PT-1, title 2, 00:01:01.) The recording begins again and Barbee gives a tearful statement admitting he killed Lisa and Jayden and buried the bodies. When the interview concludes, Trish comes into the room and converses with Barbee for more than thirty minutes.   (15 RR 35-37.) (SX PT-1, title 2.) The content of their conversation is summarized in claim 1.

The following morning, Barbee directed two detectives to the location of the bodies.   The bodies were found as Barbee described, buried together in a shallow grave not large enough to conceal them. (15 RR 39-41, 45, 70-71.)

Judge Gill suppressed the portion of the recording that followed Barbee's request for a lawyer.   Judge Gill admitted the unrecorded statements Barbee made in the bathroom because they contained facts regarding the location of the bodies that were later found to be

true.[9] He also admitted the statements made the next morning because Barbee had reinitiated contact with the police.  (22 RR 78-79.)

### 2. Facts from state habeas proceedings

Counsel's affidavit provided in the original habeas proceeding states that they viewed the recordings of both Barbee and Dodd and had no reason to believe Barbee's video had been altered other than the starts and stops.  (SHR 68.)  Ray said that, if the police or the district attorney had deleted a portion of the recording, they had no way of knowing that fact. (SHR 68-69.) To the extent Barbee could have provided contradicting information about what occurred during the gaps on the recording, he refused to testify. (SHR 68-69, 79.)

### 3. Analysis

Barbee challenges the state-court ruling by asserting that, contrary to counsel's affidavit, counsel did not give him the option of testifying.  Under section 2254(d), however, this Court asks only whether the state court's ruling was reasonable given the facts before it.  Counsel's affidavit and the Memorandum of Understanding together demonstrate that counsel adequately informed Barbee of his right to testify and that Barbee's decision not to testify was knowingly made. (SHR 79, ¶ 9.)  Barbee provided no evidence to the contrary. The state

---

[9] Under Texas law, unrecorded oral statements are inadmissible unless the statement contains assertions of facts or circumstances that are found to be true and "conduce to establish the guilt of the accused" such as the finding of stolen property or the instrument of the crime. *See* Tex. Code Crim. Proc. Ann. art. 38.22, § 3(c).

court was entitled to believe the testimony of counsel, and its factual determination was not unreasonable. *See Kately*, 704 F.3d at 361.

Counsel persuaded the trial court to suppress the last portion of Barbee's recorded confession. Even without the benefit of Barbee's testimony at trial, moreover, Ray introduced cellphone records and department manuals so that he could argue that Detective Carroll's testimony about the unrecorded bathroom confession was not credible. (25 RR 11-16; DX 2, 4.) Barbee fails to identify what additional investigation or strategy counsel should have pursued to challenge his confession. He fails to argue how it would have made a difference given the other evidence of guilt. This complaint against counsel is grounded on the unsupported assertion that Barbee was coerced into confessing. But his willingness to assert in a petition what he refused to testify about at trial does not make the state habeas court's conclusion unreasonable or counsel ineffective. Claim 3a is denied.

## B.  *Brady* claim (claim 19)

In related claim 19, Barbee contends that the state court unreasonably denied his claim that the police violated his rights under *Brady v. Maryland*, 373 U.S. 83 (1963), by providing "only an edited version" of the confession recording. (Doc. 61, p. 472.) He asserts that he "is informed, believes and therefore alleges that these tapes were edited to remove those portions of Mr. Barbee's

interrogation during which he was coerced into confessing." (Doc. 61, p. 473.) Respondent contends the state court reasonably overruled this claim in Barbee's initial state application. (SHR 222.)

The prosecution violates a defendant's due process rights when it withholds evidence that is favorable to the defendant and material either to guilt or punishment, regardless of the good or bad faith of the prosecutor. *See Brady*, 373 U.S. at 88. To prove a *Brady* viola-tion, the defendant "must show that '(1) the prosecution did not disclose the evidence; (2) the evidence was favorable to the defense; and (3) the evidence was material.'" *United States v. Davis*, 609 F.3d 663, 696 (5th Cir. 2010) (quoting *United States v. Fernandez*, 559 F.3d 303, 319 (5th Cir. 2009)). "Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 696 (quoting *United States v. Severns*, 559 F.3d 274, 278 (5th Cir. 2009)). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.*

The state court's rejection of this claim in the initial habeas proceeding is supported by the affidavits of the prosecutor and trial counsel. The prosecutor averred that the Fort Worth detectives made him a copy of the original recording while he waited, that they represented to him that the recordings were complete copies of the originals, and that he has no reason to believe their assertion was untruthful. (SHR 191-92.) Trial counsel stated they had no reason

to believe the recording was altered beyond being stopped and started and that Barbee's allegations were not supported by any fact known to counsel.  (SHR 68.)

In his Reply, Barbee contends that the state-court findings are flawed because he did not have the opportunity to cross-examine the prosecutor and police detectives.  Barbee does not allege or show that he sought an opportunity to cross-examine the prosecutor and police detectives in the initial state habeas proceedings.  His failure to develop this issue in the state court does not render the state court's factual determination unreasonable.  *See* § 2254(e).  And, furthermore, he provides no objective, factual basis to conclude that the detectives or the prosecutor may have provided false testimony.

Barbee also complains that the state court wrongly interpreted this claim as one of "alteration" rather than "omission."  (Doc. 77, p. 56-57.)[10]  Barbee's own pleadings refer to the allegedly missing portions of the recording as an "alteration."  To the extent the state court did likewise, there is no unreasonable error.  In this Circuit, federal habeas courts focus on the propriety of the ultimate decision reached by the state court and do not evaluate the quality, or lack thereof, of its supporting written opinion.  *See Maldonado*, 625 F.3d at 239; *Morrow*, 367 F.3d at 314.

---

[10] He also complains that the state court findings "latch onto Dr. Leo's letter," which he claims provided an uninformed opinion that the confession was more likely to be true than false.  (Doc. 61, p. 478.)  The Court has already addressed the "Dr. Leo" arguments in full.

Barbee fails to demonstrate that the state court's denial of his *Brady* claim was unreasonable for the simple reason that he provides no factual basis--let alone the "clear and convincing evidence" required under the AEDPA--for the Court to conclude that *Brady* material might exist. *See Schlang v. Heard*, 691 F.2d 796, 799 (5th Cir. 1982) (holding that mere conclusory statements do not raise a constitutional issue in a habeas case).

Barbee complains, however, that he was denied funding to advance this claim in federal habeas proceedings. (Doc. 61, p. 473.) The Court remains convinced that it correctly denied his request to fund a fishing expedition under *Brady*. Despite being given the opportunity to supplement his request for funds prior to abeyance, Barbee failed to provide any meaningful specificity as to the precise information he expected to develop through such assistance. (Doc. 22, p. 8-10.) Barbee presented no new evidence in support of the claim during abeyance, where it was dismissed. He filed no further funding requests in this Court post-abeyance and has yet to provide objective, factual support for his claim that *Brady* material may exist. Claim 19 is denied.

### C. DNA testing (claim 3b)

In claim 3b, Barbee contends "it does not appear that all the DNA samples that were taken [from the crime scenes] were tested," and that counsel was therefore ineffective for failing to complete the DNA testing prior to trial. Barbee complains that this claim

cannot be proven because he was denied funding for DNA testing, presumably, in state court. He makes the claim in order to preserve it for future litigation. (Doc. 61, p. 228-29.)

Respondent asserts the claim is defaulted because it was raised in the subsequent state application and dismissed as an abuse of the writ. *See McGowen*, 675 F.3d at 499. Barbee responds that the procedural default should be excused because state habeas counsel, Don Vernay, rendered ineffective assistance in failing to present the claim in the initial state application. While it is true that the ineffective assistance of initial state habeas counsel may excuse a procedural bar on "substantial" claims of ineffective assistance of trial counsel, Barbee has not shown that this claim against trial counsel is substantial.

A claim is substantial if it has "some merit." *See Trevino*, 133 S. Ct. at 1921; *Martinez*, 132 S. Ct. at 1318. Barbee does not identify any sample for testing. Moreover, the DNA analyst's trial testimony did not inculpate Barbee. Both victims' sexual assault kits tested negative for semen and all samples tested by the analyst were either inconclusive or excluded both Barbee and Dodd as contributors. (24 RR 29-33, 51-53, 60.) Yet the jury found Barbee guilty. Barbee fails to explain how yet another DNA test that excludes him as a contributor could exonerate him when all the others did not. Claim 3b is procedurally barred or, alternatively, lacks merit.

66

## VII.   COUNSEL'S ASSISTANCE AT THE GUILT PHASE (CLAIMS 4a-d)

### A.   Lack of medical testimony (claims 4a(i) and 4a(ii))

Barbee complains that trial counsel did not effectively present a case for actual innocence through two kinds of expert testimony. He contends the claim was exhausted in the original state writ application and that the state court's ruling was unreasonable.  (Doc. 61, p. 234-35.)  Respondent contends this claim is defaulted because it was raised in the subsequent state application and dismissed as abusive.  (Doc. 68, p. 95.)

The claim in Barbee's initial state application asserts that trial counsel abandoned Barbee by "confessing Mr. Barbee's guilt to the jury during closing argument without his client's knowledge [or] consent."  (SHR 22.)  While the present claim is also a claim of ineffective assistance during the guilt phase, it is not the substantial equivalent because it rests on a distinct factual basis:  the failure to rely on experts. *See Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir. 1998)(in exhaustion context, claim is not the "substantial equivalent" if it presents new legal theories or new factual claims).

This claim was raised in Barbee's subsequent state application during abeyance.  (Doc. 66-1, p. 92.)  It was dismissed as abusive under article 11.071, section 5, of the Texas Code of Criminal

Procedure. (*Barbee*, 2013 WL 1920686, at *1.) It is therefore subject to procedural default in federal court. *See McGowen*, 675 F.3d at 499.

Barbee responds that any failure to bring the claim "fully" in the initial state proceedings is excused under *Trevino*. *See Trevino*, 133 S. Ct. 1911. The exception to procedural bar in *Trevino* does not help Barbee because, as discussed below, he fails to show that the sub-claims against trial counsel have some merit and are therefore "substantial." *See Martinez*, 132 S. Ct. at 1318.

### 1. Cause of death (sub-claim 4(a)(i))

In this sub-claim, Barbee contends counsel were ineffective for failing to use experts to rebut the assistant medical examiners' testimony about the cause of death. (23 RR 136, Dr. Mark Krouse; 24 RR 154, Dr. Lloyd White.) Barbee presents no evidence supporting this claim. The record shows, moreover, that both trial counsel personally interviewed the medical examiners months before trial in preparing for this case. (23 RR 198; 24 RR 167.)

Barbee claims that he is unable to present evidence of counsel's alleged ineffectiveness because the Court denied his request for expert assistance from a pathologist/coroner. The Court denied Barbee's request for an expert to evaluate the testimony of the medical examiners because Barbee failed to show a reasonable necessity for the assistance requested. (Doc. 21, 23.) Barbee failed to provide any meaningful specificity as to the information he expected to develop through such an expert, even when given the opportunity

68

to supplement his request for funds.  (Doc. 22, p. 13-14.)  Barbee made no request for funds post-abeyance. Because Barbee sought expert assistance for a fishing expedition on what was then an unexhausted claim, the Court remains convinced that the request was properly denied.  Sub-claim 4(a)(i) has no merit.

2.  Neuropsychological evidence (sub-claim 4(a)(ii))

In this sub-claim, Barbee complains that trial counsel did not present neuropsychological testimony at the guilt phase regarding the effect of his head injury or frontal-lobe injuries and impairment. (Doc. 61, p. 233.)  A similar complaint was made in claim 3 of the original state application regarding trial counsel's failure to present such evidence *at the punishment phase*.  (SHR 24, 200.)  It was supported by the affidavit of Dr. Martin (SHR 39.) and refuted by the State with Dr. Price's affidavit (SHR 182.)

Although the claim before this Court relates to the guilt phase of trial, in support of it Barbee argues that the state-court ruling on the *punishment-phase* claim was an unreasonable determination of the facts. (Doc. 61, p. 234.) He argues specifically that:  (1) the state court rubber-stamped the State's proposed findings, (2) Barbee's unwillingness to accept responsibility, if true, does not justify trial counsel's strategic decision to forego head-injury evidence, and (3) trial counsel's strategy cannot be reasonable because neuro-psychiatric testing was not done, despite Maxwell's recommendation. The Court does not find these assertions persuasive.

69

First, the Fifth Circuit has rejected the contention that habeas findings adopted verbatim from those submitted by the State are not entitled to deference. *See Green v. Thaler*, 699 F.3d 404, 416 n.8 (5th Cir. 2012). Second, as trial counsel stated in his affidavit and his testimony, the presentation of head injury or other "excuse" evidence at the guilt phase presupposes that Barbee did something to excuse, and it would have been inconsistent with Barbee's assertion that he did not commit the offense.  To the extent Barbee contends otherwise, he appears to argue that counsel could have presented head or brain injuries in support of a "diminished capacity" theory at guilt due to a lack of impulse control.  But Texas does not recognize any affirmative defenses other than insanity based on mental disease, defect, or abnormality.  *See Ruffin v. State*, 270 S.W.3d 586, 593 (Tex. Crim. App. 2008) (holding that diminished mental-state defenses, that exonerate or mitigate an offense because of a person's supposed psychiatric compulsion or inability to engage in normal reflection or moral judgment, do not exist in Texas).

Third, the record shows that trial counsel's investigation of Barbee's head injuries was professionally reasonable even though counsel did not hire a neuropsychologist.  Barbee's assertion that trial counsel ignored Maxwell's advice does not alter this conclusion. As trial counsel pointed out, Maxwell is not a doctor. (Doc. 66-8, p. 25.)  Trial counsel retained three mental-health professionals, anyone of whom could have recommended an additional neuropsychological

assessment.  They did not.  *See Couch v. Booker*, 632 F.3d 241, 246 (6th Cir. 2011)("Trial counsel may rely on an expert's opinion on a matter within his expertise when counsel is formulating a trial strategy."). In fact, none of the experts found anything wrong with Barbee due to head injuries.  The conclusion of these experts was confirmed by Dr. Price in post-conviction proceedings.  (SHR 182.) (Doc. 66-8, p. 62-63.)  Dr. Martin's lone declaration to the contrary does not mean that the trial experts were all wrong or that trial counsel were ineffective.  *See Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014) (per curiam) ("The selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made 'after thorough investigation of [the] law and facts,' is 'virtually unchallengeable.'").  This sub-claim has no merit.

### 3. Conclusion as to claim 4a

The sub-claims in 4a are not "substantial" and are therefore procedurally barred.  Alternatively, they have no merit.  Claim 4a is denied.

### B. Counsel's closing argument (claim 4b)

Barbee contends that counsel provided ineffective assistance when they conceded Barbee's guilt during jury argument without his permission.  He characterizes this as abandonment by counsel, subject to the Sixth Amendment standard in *United States v. Cronic*, 466 U.S. 648, 659 (1984) (eliminating *Strickland's* prejudice requirement when counsel entirely fails to subject the prosecution's case to meaningful

adversarial testing).  Respondent does not dispute that the claim
is exhausted and subject to review under § 2254(d). Respondent
contends, however, that *Cronic* does not apply and that the state
court's rejection of the claim under *Strickland* was not
unreasonable.[11]

1. The state court's legal conclusions (claim 4b)

Initially, Barbee fails to show that the state court, in applying
*Strickland* rather that *Cronic* to this issue, unreasonably applied
clearly established federal law.  (SHR 216.)  For *Cronic* to apply,
the attorney's failure to subject the state's case to meaningful
adversarial testing must be complete. *Wright v. Van Patten*, 552 U.S.
120, 124 n.1 (2008).  *Cronic* does not apply where counsel failed to
participate in only parts of trial, such as where counsel did not
present closing argument. *E.g., Bell v. Cone*, 535 U.S. 685, 696-97
(2002)(holding that *Cronic* does not apply in death-penalty case where
counsel did not present mitigating evidence and waived closing state-
ment); *Haynes v. Cain*, 298 F.3d 375, 380-382 (5th Cir. 2002)(holding
that *Strickland,* not *Cronic* applies to claim where counsel conceded
in opening statement that defendant kidnaped, raped, and robbed the

_____

[11] Barbee also asserts that the state-court findings are not entitled to
a presumption of correctness under § 2254(e)(1) because the state habeas judge
was different from the trial-court judge. His supporting authority predates the
AEDPA, however, and he fails to demonstrate or even argue that this rule is still
good law. *See Valdez v. Cockrell*, 274 F.3d 941, 949 (5th Cir. 2001)(stating that
the AEDPA "jettisoned all references to a 'full and fair hearing' from the
presumption of correctness accorded state court findings of fact").

victim, but did not kill her). So the state court correctly analyzed the claim under *Strickland* rather than *Cronic*.

   2. The state court's determination of facts (claim 4b)

   The appropriate inquiry under *Strickland* focuses on the adversarial process, not on the accused's relationship with his lawyer as such. *Cronic*, 466 U.S. at 657 n.21. If counsel is a reasonably effective advocate, he meets constitutional standards irrespective of his client's evaluation of his performance, and courts therefore attach no weight to either the client's expression of satisfaction with counsel's performance at the time of his trial or to his later expression of dissatisfaction. *See id.* (citing *Jones v. Barnes*, 463 U.S. 745 (1983); *Morris v. Slappy*, 461 U.S. 1 (1983)).

   Where, as here, counsel has conceded guilt of a lesser-included offense, Barbee simply bears the burden to prove that this decision was objectively unreasonable under *Strickland*. *McNeill v. Polk*, 476 F.3d 206, 217 (4th Cir. 2007). Judicial review of defense counsel's summation is highly deferential and doubly-deferential when conducted "through the lens of federal habeas." *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003). And, consistent with the *Strickland* standard of giving great weight to trial counsel's judgment on strategy and approach, "[t]actical decisions, made on an informed and reasoned basis, do not fall below *Strickland* standards simply because they do not succeed as planned." *Jones v. Butler*, 837 F.2d 691, 693-94 (5th Cir. 1988).

In this case, Barbee mischaracterizes the complained-of closing argument.  Counsel did not concede Barbee's guilt when he did not dispute that Barbee killed Jayden.  Counsel reiterated that capital murder requires two knowing or intentional murders, he reminded the jury of those definitions, and then he argued that Lisa's death did not fit the definition because Barbee's conduct was not intentional or knowing--he simply held her down too long. (25 RR 10, 18.)  This argument capitalized on testimony elicited from the medical examiner during cross-examination that the more pregnant the victim, the less time it would take to die, and that he could not rule out that Barbee held Lisa down for only thirty seconds.  (23 RR 189, 200.) This was a reasonable argument, under Texas law, that Barbee was not guilty of capital murder.  *See* Tex. Penal Code Ann. § 19.02(b) (defining murder as causing the death of a person intentionally or knowingly), § 19.03(a)(7) (defining capital murder as two murders committed during the same criminal transaction). (25 RR 8-18.) The record also reflects, incidentally, that Ray explained his argument to Barbee before he presented it to the jury.  He did not ask Barbee's permission to make it (nor did he have to), and Barbee did not tell him not to make it.  (Doc. 66-8, p. 6.)

Barbee contends the state-court ruling was factually unreasonable because the record shows that Barbee was steadfast in his assertions to counsel that he was innocent.  The record flatly refutes the implication that Barbee has always maintained his innocence.  In the

recording of his police interview, Barbee first told the detective that he had not seen Lisa in several months. (SX PT-2, title 1 at 00:17:00, et seq.) In his bathroom confession to Detective Carroll, Barbee stated that he killed Lisa and Jayden after making a plan with Dodd to do so. (24 RR 103-04.) In his recorded conversation with Trish, Barbee stated that he accidentally held Lisa down too long. (24 RR 119; SX PT-1, title 2 at 00:27:25, et seq.)  He later told Theresa the same story.  After that, Barbee recanted his confession. (66-8, p. 46.)

In light of the above, the assertion that Barbee was consistent *to counsel* about his limited role in the offense is irrelevant: counsel necessarily had to deal with all the statements and information known to the prosecution in formulating a reasonable trial strategy.  And he had to do this without Barbee's testimony. Counsel's strategy in closing argument was within the realm of reasonable professional assistance.  It coincided with the powerful evidence of Barbee's recorded confession to Trish that he held Lisa down too long.  It was corroborated by the medical examiner's concession that Lisa may have been held down for only thirty seconds before she died. (23 RR 201; 25 RR 14-15.)  Counsel refuted the unrecorded bathroom confession (in which Barbee confessed to planning the murder) by pointing out Detective Carroll's demeanor while testifying, his lack of a timely written report, his willingness to lie to get the confession, and his inability to find the bodies based on what Barbee

told him in bathroom--all elicited by counsel on cross-examination. (24 RR 135-45, 152; 25 RR 15-16.) If the jurors believed the recorded confession to Trish over the unrecorded confession to the detective, counsel provided a theory under which they could convict Barbee of a lesser offense and avoid a death sentence. (2 CR 391, lesser-included offense instruction.) The state court's ruling upholding these strategic choices was objectively reasonable.

Barbee's assertion that he was prejudiced is also unpersuasive. To show prejudice in state court, Barbee had to show a reasonable probability, sufficient to undermine confidence in the outcome, that the innocence theory would have generated a different trial result. *See Neal v. Cain*, 141 F.3d 207, 214-15 (5th Cir. 1998) (holding that petitioner's complaints regarding counsel's failure to raise specific defenses did not satisfy prejudice prong of *Strickland* where proposed defenses were without merit). In this proceeding, Barbee has to show that the state court's ruling on this issue was objectively unreasonable. As discussed in claim 1, however, his innocence theory--that Dodd framed Barbee for the murders so that he could financially benefit from Barbee's incarceration or execution--makes little sense. Dodd was already living in Theresa's house; Theresa and Barbee were already divorced. Even assuming Dodd had a financial motive to get Barbee out of way, it would have made more sense to kill Barbee rather than frame him for a double murder. It certainly made no sense that, after framing Barbee, Dodd would come back and assist him in getting

76

rid of the bodies and fleeing law enforcement.  It fails to account for the fact that Barbee, not Dodd, had the motive to kill Lisa and fails to account for the fact that Dodd could not have known Barbee would confess to the police, to his wife, and to his ex-wife.

### 3. Conclusion (claim 4b)

Barbee does not show that the state-court rulings under *Strickland* regarding (1) the lack of deficient performance during closing argument and (2) lack of prejudice, were unreasonable. Claim 4b is denied.

### C.  Counsel's use of phone records (claim 4c)

Barbee complains counsel was ineffective when he called his investigator to testify about records obtained from the City of Fort Worth regarding cellphone calls made by Detectives Carroll, McCaskill, and Jamison during their investigation of the murder. (24 RR 174-75.) Barbee asserts that counsel failed to explain the significance of these records or argue them to the jury, so the jury had no way of ascertaining their evidentiary value.  Respondent contends the claim is barred under *Coleman* because it was raised for the first time in Barbee's subsequent state application and dismissed as abusive. Barbee asserts that any default is excused under *Trevino* because state habeas counsel was ineffective for failing to raise this claim in the initial state habeas application.

The claim is defaulted because Barbee fails to show it is "substantial" as required to excuse procedural default under *Trevino*.

Counsel used the cellphone records to discredit Detective Carroll's testimony about what Barbee said during the bathroom confession. Carroll testified that, during this trip to the bathroom, Barbee admitted that he and Dodd planned the murder because Lisa was going to ruin him. (24 RR 103-06.) Carroll further testified that Barbee gave accurate information about the location of the bodies during this confession. (24 RR 106-08.) Yet he admitted on cross-examination that the police could not find the bodies that evening. (24 RR 151-52.) Ray emphasized his testimony in jury argument, using the cellphone records to postulate that the detectives were trying to find the bodies but could not because Detective Carroll's entire testimony about the bathroom confession was untrue:

> The problem with that is [Carroll] said he knew where those bodies were[,] based on the statement that Stephen had given him in the bathroom in the Tyler Police Department, and yet as many times as [Carroll] called Detective Thornton, his boss, he didn't tell him that. Because if he had, they would have found those people.

(25 RR 12.) Barbee makes assertions, but no argument, that counsel's use of the cellphone records was below reasonable professional standards. In fact, it appears that, after successfully moving to suppress Barbee's recorded confession, counsel made a reasonable, multi-faceted effort to discredit Carroll's testimony of the unrecorded confession. In addition to using the cellphone records, counsel also attempted to discredit Carroll's testimony by highlighting his demeanor while testifying, his lack of a timely

written report, and his willingness to lie to get the confession. (24 RR 135-45, 152; 25 RR 15-16.)

Barbee fails to assert prejudice from this alleged error, and the Court can find none. Counsel simply gave the jury a reason not to believe Detective Carroll's incriminating testimony. Because this claim has "no merit," Barbee fails to show that it is "substantial." Claim 4c is denied because it is procedurally barred and, in the alternative, has no merit.

### D.  The medical examiners' testimony (claim 4d)

Barbee asserts that counsel was ineffective for failing to object to the medical examiners' testimony, which he contends was speculative, based on conjecture, and very prejudicial. Barbee concedes that this complaint was brought for the first time in Barbee's subsequent state application and dismissed as abusive. (Doc. 61, p. 246.)  He contends that any default should be excused under *Trevino*.  The Court concludes, for the reasons stated below, that the claim is not substantial as required by *Trevino*.

The speculative testimony of which Barbee appears to complain concerns the possible causes of the victims' injuries.  This issue was not discussed in counsel's original affidavit nor did Barbee question counsel about it at the subsequent writ hearing.  It goes without saying that, in the absence of any evidence showing why trial counsel decided not to object (or otherwise showing the decision was presumptively unreasonable), Barbee fails to overcome the presumption

of reasonableness that is usually afforded counsel's strategic decisions. *See Titlow*, 134 S. Ct. at 17.

Furthermore, a reviewing court is required to affirmatively entertain the range of possible reasons trial counsel may have had for not objecting. *Pinholster*, 131 S. Ct. at 1407. The Court need not look far. Testimony as to the various possible causes of injuries does not appear to be erroneous where the indictment alleges multiple manner and means for each victim. *See Sanchez v. State*, 376 S.W.3d 767, 774 (Tex. Crim. App. 2012) (holding that, because indictment permitted a conviction under four alternative manner and means, the State could obtain a conviction if any of the alternatives were proven). The indictment here alleges two alternative manner and means for each victim's death--by smothering Lisa with the weight of the defendant's body, smothering Jayden with his hand, and smothering both victims with an object or means "unknown to the grand jury." (1 CR 2.) Thus, trial counsel could reasonably conclude that testimony opining on the possible causes of the victims' injuries, one of which was "unknown," was not objectionable, and counsel is not ineffective for failing to lodge a meritless objection. *See Johnson v. Cockrell*, 306 F.3d 249, 255 (5th Cir. 2002) (holding that counsel is not deficient for failing to object to testimony that is admissible). Barbee also fails to explain how the failure to lodge such an objection prejudiced him. (Doc. 61, p. 243.) This complaint

is not substantial and has no merit. Claim 4d is procedurally barred or, alternatively, denied on the merits.

### VIII.   COUNSEL'S REPRESENTATION AT PUNISHMENT (CLAIMS 5A–5F)

In claims 5a–5f, Barbee contends counsel provided ineffective assistance at punishment.   He argues that counsel presented a "halfhearted mitigation case" due to a lack of investigation and preparation.   He also complains that counsel failed to have the witnesses address the issue of future dangerousness.   Barbee asserts that trial counsel's explanatory affidavit was "nonsensical" and that the state court adopted this "nonsense" verbatim.   (Doc. 61, p. 255.) The Court will address each contention in turn.

#### A.   Susan Evans' testimony (claim 5a)

Barbee contends trial counsel's presentation of testimony from a former Texas prison warden was ineffective.   Respondent asserts that the claim is defaulted because it was raised in the subsequent writ application and dismissed as abusive.   Barbee responds, without elaborating, that any default is excused under *Trevino.*   He fails to demonstrate, however, that this claim is "substantial" such that the procedural bar exception in *Trevino* could apply.

Evans's testimony occupies over ninety pages of the trial record and was presented to support counsel's argument that Barbee could successfully serve a life sentence.   (27 RR 10–11.)   Evans explained the qualifications and training of prison employees, their defensive

tactics and training, "use of force" policies, and ongoing testing. She stated that prison employees are professionals trained to handle any type of offender and any type of situation. (26 RR 3-32.) She described the prison classification system and explained that Barbee, if given a life sentence, would never be classified in the least-restrictive category (G1) and would have to serve 10 years before he could be eligible for G2. (26 RR 33-43.) She described the restrictions and privileges related to various levels of security. (26 RR 45-70.) She testified that the inmates serving life sentences are not always the worst inmates because they are in a controlled environment with less stressors, and she testified that people in prison mellow with age. (26 RR 72.) She also testified that prison rules changes over time and often become more restrictive, not less, and that the prison does its best to recognize and address developing patterns among offenders. (26 RR 92-93.)

Barbee picks and chooses unidentified fragments of Evans's testimony on direct and cross examination and presents them in a list, out of context. He then concludes: "the presentation of these damaging facts to the jury can be explained only by a lack of investigation and preparation. It defies rational comprehension to imagine how any of Ms. Evans's testimony could have possibly been construed as helpful to the defense." (Doc. 61, p. 273.)

The presentation of witnesses is generally a matter of trial strategy. *Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010). Barbee

fails to acknowledge the overall strategy for this testimony--to show that Barbee could serve a life sentence and what that life sentence would be like.  Because Barbee fails to acknowledge counsel's overall strategy, he makes no argument for why that strategy was unreasonable. He also makes no argument to show prejudice under *Strickland*.

Claim 5a is procedurally defaulted because Barbee fails to show that this claim is "substantial."  Alternatively, the claim has no merit.  Claim 5a is denied.

### B.  Counsel's sentencing investigation (claims 5b, 5c)

Claims 5b and 5c assert that, during the sentencing phase of trial, counsel violated *Wiggins* by failing to present certain mitigating evidence as well as evidence negating future dangerousness. *Wiggins v. Smith*, 539 U.S. 510 (2003) (reiterating *Strickland's* rule that counsel has duty to make a reasonable investigation or a reasonable decision that makes particular investigations unnecessary). Because Barbee incorporates the analysis of claim 5c into claim 5b, the Court addresses them together. (Doc. 61, p. 287-88.)

Barbee appears to acknowledge that some portion of the claim may be subject to procedural default because it was dismissed in the subsequent state proceedings, but he asserts that *Trevino* excuses any default. (Doc. 61, p. 288.) Respondent appears to acknowledge that some portion of the claim was adjudicated on the merits in the first state proceeding, but to the extent the claim differs in "type or scope" from what was raised in the first proceedings, Respondent

asserts that any surplus claim is defaulted and *Trevino* does not excuse the default because the claim is not substantial. (Doc. 68, p. 109, 119.) The parties do not specify exactly which portion of the claim may be barred and which portion not.

The parties also disagree about what evidence the Court may consider. Respondent argues under *Pinholster* that the Court may consider only the evidence presented with Barbee's first application, when the claim was adjudicated on the merits. *See Pinholster*, 131 S. Ct. at 1398; (Doc. 68, p. 119.) But Barbee argues that the Court can also consider the evidence from the subsequent writ proceeding because it is "in the record" and the subsequent proceeding addressed counsel's alleged ineffectiveness due to a conflict of interest. To the extent the subsequent proceeding did not actually apply evidence to the *Wiggins* issue, Barbee seeks an evidentiary hearing in this Court. (Doc. 77, p. 38-39.)

It is clear that the *Wiggins* claim that was adjudicated in the first state habeas proceeding was both legally and factually enlarged in the subsequent proceedings and dismissed as abusive. It is also clear that much of the evidence adduced in the subsequent proceeding vis-a-vis the conflict-of-interest claim (claim 2) would be relevant to an evaluation of counsel's representation under *Wiggins*. But under *Pinholster*, only the evidence that was before the state court that adjudicated the *Wiggins* claim on the merits may be considered by this Court under § 2254(d). The evidence and the claims developed in the

initial and subsequent state proceedings overlap, however, making it impractical if not impossible to parse the claims and the facts between them.   Indeed, neither party attempts to identify and delineate the boundaries of the adjudicated claims and evidence.

For these reasons, and in the interest of addressing trial counsel's representation thoroughly and conclusively, the Court believes that claims 5b and 5c can be more easily resolved by looking past any procedural default. *See Busby v. Dretke*, 359 F.3d 708, 720 (5th Cir. 2004) (noting that habeas court may look past any procedural default if the claim may be resolved more easily on the merits). For purposes of the following discussion, therefore, the Court will (1) assume the claims are not barred, and (2) use the entire record, including the subsequent-writ evidence, in analyzing the state court's rejection of the *Wiggins* claim.   The Court will also review this claim de novo because if Barbee is correct that any procedural default is excused by initial state habeas counsel's ineffectiveness, then a plenary review would be appropriate. *See generally Woodfox*, 609 F.3d at 794; *Mercadel*, 179 F.3d at 275.

### 1.   The evidence at trial (claims 5b, 5c)

The State presented three witnesses at punishment: Barbee's ex-wife Theresa, Barbee's former co-worker, and the coach of Jayden's soccer team.   Theresa testified about her marriage to Barbee, four instances of domestic violence, and a road-rage incident on their first anniversary when Barbee followed another car to a dead end

street and punched the driver through the window.  She described the argument that ended their marriage on the Fourth of July in 2003 in which he threatened to put her through the wood chipper and she hit him.  She testified about their tree-trimming and concrete-cutting businesses, how the businesses were in debt, and how she had Barbee sign them over to her after his arrest. (25 RR 28-51.)  After their divorce, she began dating Dodd, who worked for Barbee, and Dodd moved into her house.  She stated that Dodd was arrested in connection with this case and faces twenty years' imprisonment.  (25 RR 51-55.)

She explained Dodd and Barbee's comings and goings on the night of Lisa's disappearance.  On the following Sunday morning, she saw Barbee at the office and told him the police had been at the house asking about him, his Corvette, and a girl that he used to date who was missing.  Barbee cried and said his life was over.  He told her to get the businesses out of his name, that he loved her, and had hurt her enough. She asked him to turn himself in and not make her call the police. (25 RR 90-94.) She talked to Barbee Monday night after he had confessed to the police, and he said he did not mean to kill Lisa and Jayden.  When she asked about Dodd's involvement, he said Dodd's mistake was picking him up. A day or two later, she visited him in jail with his family, and he told her she had it all wrong, that he did not do it.  (25 RR 94-98.) She visited him in jail every week for about seven months.  On the last visit, he held up a piece of paper saying they could get back together and try to have

86

a baby.  He also asked her to say that Dodd had "slipped" and was guilty of the murders.  She quit visiting him after that.  (25 RR 98-103.)

On cross-examination, Theresa conceded that she shared blame for the marital fights.  (25 RR 86-87.)  She confirmed that Barbee's sister and brother died tragically and that Barbee was close to them both.  (25 RR 56-58.)  She testified about the state of her businesses and how she had a lawyer prepare documents for Barbee to sign over his share without compensation. (25 RR 59-62.)  Theresa acknowledged that her house is the largest in their subdivision and that Barbee's mother had put up the collateral on a loan to build a pool.  (25 RR 63-64.)

Theresa conceded that she had told the grand jury that she did not take seriously Barbee's threat to put her through the wood chipper.  She admitted that she had told the grand jury they had three fights during their marriage, not four.  (25 RR 66-67.)   Theresa acknowledged that Dodd had been on parole, and he did not deny involvement but admitted he picked up Barbee.  (25 RR 71-72.)  Counsel also elicited testimony from Theresa about the crime-week stressors, specifically:  Barbee's horrible, worsening headaches; fighting between her and Barbee; fighting between Trish and Barbee; Barbee's dad's being diagnosed with cancer; and problems with the business when some of the crew quit and Dodd had to be taken off of concrete work to trim trees.  Theresa described the accident several weeks

earlier where a 400-500 pound pipe hit Barbee on the head, and he was knocked unconscious and admitted to the hospital. (25 RR 74-77.) Theresa also described a conversation she had with Barbee on the night of the murders about the pressure he was under. (25 RR 84-85.)

Under cross-examination, Theresa relayed a suicide attempt by Barbee in 2002 or 2003, when she found him "halfway in the water face down" in the pool. He was blue and cold and ended up spending the night in the hospital. (25 RR 77-81.) Theresa described their work, while they were married, with the children at Azle Bible Way Church, where Calvin and Nancy Cearley were pastors. They put on puppet shows and raised money for the kids. She said Barbee wanted to do it and was good with the kids. The program grew under them and she said "it was a wonderful thing." (25 RR 105-07.)

The State's second witness during the punishment phase was a woman who worked with Barbee at United Parcel Service in 2000 or 2001. She testified that Barbee called her often and claimed that he was not married. He once trimmed her trees for free without her knowledge, and when she later told him she was not interested in a relationship, Barbee responded with a "big outburst" and yelled and cursed at her. (25 RR 108-19.)

The State presented the testimony of Jayden's soccer coach, who testified that Lisa's bagel shop sponsored their soccer tournament every year. He also identified Jayden in a photograph of the soccer team. (26 RR 106-09.)

88

The first witness for the defense was Pastor Nancy Cearley. She had known the Barbee family since 1989. She performed Barbee and Theresa's wedding, and they became leaders of the children's church for about three years. She never had any complaints from parents about Barbee, and Barbee built up the children's church from about 10-15 children to about 75-80 children. Under cross-examination, Cearley said she sat through the trial and did not believe that Barbee killed the victims in this case. (25 RR 121-32.)

Barbee's mother testified next. She described the tragic deaths of her two older children, who died when Barbee was 14 and 16, one from a virus and other from a car accident. She described her work as a teacher's aid for 24 years and her husband's work at Bell Helicopter for 31 years. She said Barbee did not graduate from high school because he shut down after his brother died, but he earned a GED. Through her testimony, counsel admitted school photographs of Barbee. She described a time when Barbee wanted to earn money by mowing lawns, but he came home with nothing because he mowed a little old lady's yard for free. She said Barbee did not know what to do with himself after his brother died, but he decided he wanted to be a policeman. He went to community college, got a diploma, and worked as a volunteer reserve officer at Blue Mound Police Department. To earn money, he started his own tree-trimming business after cutting down a tree in his mother's yard that had been struck by lightning. He later hired Theresa to help out because he felt sorry for her.

Barbee's mother testified that Theresa paid the bills while Barbee did all the work.  Barbee's mother said that she and her husband, who is undergoing chemotherapy, visit Barbee in jail every week. She testified that they would support Barbee as best they can.  She told the victim's family she knew their pain, that her daughter was pregnant when she died, and that she wanted them to be forgiving and "not bitter" because she had "been there."  (25 RR 133-150.)

Barbee's aunt testified that Barbee visited her in South Carolina. Right before he got his GED, Barbee stayed with her for three or four months while he was looking for a job. She loves Barbee dearly and will support him. (25 RR 151-155.)

Barbee's niece, the daughter of Barbee's deceased older sister, testified that she was an infant when her mother died and two years old when her uncle died.  She and Barbee are more like brother and sister, and she loves him with all her heart.  (25 RR 155-57.)

Another witness testified that she met Barbee at church when she was thirteen.  Barbee would come to her house and work on trucks with her stepfather.  Her little sister adored Barbee and looked forward to going to church because of him.  She said that she was there to support Barbee and visits him in the jail. (25 RR 160-67.)

An ex-girlfriend testified that she met Barbee at an amusement park, and that they became romantically involved after his divorce. She testified that they contemplated getting married but Barbee wanted a child and she did not.  She visits Barbee almost every weekend in

jail, and they are still close friends.  She also said that Barbee was not the type of man who could murder two people, and she did not believe he did it.  (25 RR 168-175.)

Susan Evans testified about the prison conditions under which Barbee would live if given a life sentence.  (26 RR 2-96.)  Her testimony is summarized in claim 5a.

The ex-girlfriend of Barbee's former roommate testified that she got to know Barbee through her boyfriend and during Barbee's visits to his ex-girlfriend's family in Austin.  She testified that she was there to support him.  (26 RR 97-99.)

A confinement officer for the Tarrant County Sheriff testified that he dated Barbee's sister in high school and played pee-wee baseball with Barbee's brother.  He and his parents have known Barbee and his family his whole life.  He testified that they are people of strong faith, and this case has tested their faith.  (26 RR 99-102.)

The final witness for the defense was the court bailiff.  He testified that he was primarily responsible for transporting Barbee to court.  He said that over the course of trial, including jury selection, Barbee had not been a problem and had not made any threats.  (26 RR 102-05.)

## 2. Jury arguments (claims 5b, 5c)

The State's argument focused on the circumstances of the offense, Barbee's cruelty to his coworker at UPS, and his violence and

manipulative behavior with Theresa. (27 RR 2-5.) The State argued that all Barbee had to do was tell his wife about the pregnancy and that his failure to do so was a failure in his character. The prosecutor reasoned that Barbee will do whatever he needs to do to protect what he holds dear, even in prison. He replayed a portion of Barbee's recorded confession, pointing out that Barbee is "yukking it up" with the police right up until he knew he was caught, and only then goes into "I'm sorry" mode. The prosecutor emphasized the facts of the offense in detail. (27 RR 16-24.)

Tim Moore told the jury that a punishment based on revenge has no place in the law. He pointed out that the State had a year to "look high and low" for prior violent acts by Barbee and that all they brought were four occurrences from a jilted ex-wife, one of which was an accident. He guaranteed that Barbee had "no criminal history whatsoever," because the State would have brought it if he did.

Moore argued that if the State asks jurors to execute somebody, the jury ought to know that person. He said that three hours did not define Barbee's life and that there were 36 years before that when he was not a violent person. He summarized the testimony that Barbee came from a good family with hardworking parents and that the death of his siblings shut him down, but he overcame it, got a GED, when to college, and started a successful business. He argued that the witnesses who knew Barbee as a Sunday school teacher and had dinners with him knew his true character. While Moore acknowledged

92

that some of these witnesses questioned the jury's verdict, he asked the jury not to hold it against Barbee.  Counsel urged the jury to use that testimony to see the real Barbee, because those people believed him innocent even though some of them sat through the trial. Finally, Moore reminded the jury that Barbee had good behavior while incarcerated and can be controlled by the prison so that he would not present a future danger.  Counsel emphasized that Barbee would be almost 80 years old before he is eligible for parole.  (27 RR 6-11.)

Bill Ray discussed the connection between mitigation and moral blameworthiness.  He pointed out that Barbee's moral blameworthiness was reduced by the fact that he took the police to the victims' bodies so that they could have a decent burial.  He reminded the jurors that a unanimous vote was needed for a death sentence, and that they did not have to answer the special issues at all if they were not sure in their hearts.  He argued that the two State's witnesses were insufficient to meet the State's burden of proof beyond a reasonable doubt and reminded them of Susan Evans's testimony that people who have killed often make the best prisoners because the triggering circumstances do not repeat themselves in prison.  (27 RR 12-16.)

### 3.   Applicable law (claims 5b, 5c)

*Strickland* does not require counsel to present mitigating evidence in every case. *Wiggins*, 539 U.S. at 533.  Rather, the Court is concerned with whether the result of a particular proceeding is

unreliable because of a breakdown in the adversarial process that our system counts on to produce just results. *See Strickland*, 466 U.S. at 689, 696. The Constitution imposes "one general requirement: that counsel make objectively reasonable choices." *Bobby v. Van Hook*, 558 U.S. 4, 9 (2009). Counsel are "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Pinholster*, 131 S. Ct. at 1403 (quoting *Strickland*, 466 U.S. at 690)). This standard not only gives trial counsel the benefit of the doubt, but affirmatively entertains the range of possible reasons counsel may have had for proceeding as they did. *Id*. at 1407.

Regarding counsel's duty to investigate, strategic decisions made by counsel following a thorough investigation are "virtually unchallengeable." *Strickland*, 466 U.S. at 690. "[S]trategic choices made after a less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. *Id*. at 691.

Barbee must also demonstrate that there is a reasonable probability that he was prejudiced. *See Strickland*, 466 U.S. at 694. A "reasonable probability" of prejudice requires a substantial, not just a conceivable, likelihood of a different outcome. *Pinholster*, 131 S. Ct. at 1403. For claims that challenge counsel's sentencing investigation, the reviewing court reweighs the evidence in aggravation against the totality of available mitigating evidence and deter-

mines whether there is a probability, sufficient to undermine confidence in the outcome, that the jury would have assessed a life sentence. *See Wiggins*, 539 U.S. at 534.

Complaints based upon uncalled witnesses are not favored because such decisions are strategic, and speculation as to what the witnesses would have said in court is too uncertain. *See Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985).   A petitioner who raises such a complaint must demonstrate that the witness was available to testify and would have testified, and that the proposed testimony would have been favorable to the defense.   *See id.*

Under the AEDPA standard of review, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable," not whether defense counsel's performance fell below *Strickland*'s standard. *Richter*, 562 U.S. at 101. The review is "doubly deferential" and gives both the state court and the defense attorney the benefit of the doubt.   *Titlow*, 134 S. Ct. at 13.   A plenary or de novo review is appropriate, however, when a procedural default is excused by a showing of cause and prejudice. *E.g., Woodfox*, 609 F.3d at 794; *Mercadel*, 179 F.3d at 275.

### 5.   Discussion (claims 5b, 5c)

The Court understands claims 5b and 5c to allege that counsel were ineffective for failing to:

> (1) ask the witnesses who testified "their assessment of the likelihood of [Barbee's] committing future violent acts" (doc. 61, p. 274-75);

(2) present all the mitigating information found in (a) the declarations of Barbee's mother, Sallie Boyd, Mandy Carpenter, Tina Church, Calvin and Nancy Cearley, Barbee's brother-in-law, Barbee's niece, the friend of Barbee's mother, Tim Davis, Theresa's father, Barbee's aunt, the girlfriend of Barbee's former roommate, and Barbee's cousin and (b) the writ hearing testimony of Amanda Maxwell, Tim Davis, Calvin and Nancy Cearley, Barbee's brother-in-law, Barbee's niece, and the friend of Barbee's mother (doc. 61, p. 275-87); and

(3) present all the information negating Barbee's future dangerousness found in (a) the declarations of Bobby and Sallie Boyd, Barbee's brother-in-law, Barbee's niece, Calvin and Nancy Cearley, the friend of Barbee's mother, Tim Davis, Theresa's father, Barbee's aunt, the girlfriend of Barbee's former roommate, and Barbee's cousin, (b) the letter from Dr. Kelly Goodness to trial counsel, and (c) the writ hearing testimony of Maxwell, Tim Davis, Calvin and Nancy Cearley, Barbee's brother-in-law, Barbee's niece, and the friend of Barbee's mother.

(Doc. 61, p. 288-302.)

The Court categorizes the allegedly overlooked information into the following categories: (1) good character evidence; (2) Barbee's reaction, including academic struggles, to the loss of his siblings; (3) his head injuries and their effects, including headaches and hydrocodone abuse; (4) his suicidal ideation; (5) opinion testimony that he would not be a future danger; and (6) evidence discrediting Theresa. The last category included evidence that she: was mouthy, aggressive, and controlling; had ruined Barbee and changed him for the worst; once lied to police about Barbee's hitting her; was open about her sexual exploits with Dodd; once said she wished Barbee would die and leave the office; stole from the business; and failed to give

Barbee's niece enough hours to keep her employment after she informed Barbee of Theresa's business practices.

a. *Witnesses' availability.*  The Court notes that Sallie Boyd states in her declaration that she was asked to testify at trial, but she declined. (Doc. 66-3, p. 99.) Her husband, Bobby Boyd, does not state in his declaration that he was available and would have testified at trial. (Doc. 66-3, p. 97.) Thus, Barbee cannot show that counsel was ineffective for failing to present either of these witnesses. *See Alexander*, 775 F.2d at 602.

b. *Lack of future dangerousness.*  Barbee repeats his argument that counsel should have presented evidence of Barbee's lack of future dangerousness.  As previously discussed, Barbee's contention that counsel should have asked the punishment witnesses their opinion about Barbee's propensity for future dangerousness overlooks the fact that such a witness could have been impeached with good-faith questions about their knowledge of extraneous bad acts. *See, e.g., Wilson*, 71 S.W.3d 346.  Counsel stated in their affidavit and in their testimony that this might have opened the door to cross-examination about the road-rage incident, Barbee's setting fire to hamsters, vandalism, killing an animal while on a date, or bribing Daniel Painter.  Counsel emphasized that other people knew about these acts, and it was possible the State knew about them as well.[12]  (SHR 71.);

---

[12] Later in claim 7, Barbee contends that counsel's strategy was illogical because "The state's meager case for future dangerousness did not rely on cross-examining the defense witnesses." (Doc. 61, p. 315.) This argument puts the cart before the horse: had Barbee's trial counsel opened the door for inquiry into

(Doc. 66-8, p. 27-28, 57.) Counsel was, in fact, able to argue to the jury that Barbee had no criminal history and was not a juvenile delinquent because the jury did not learn about his acts of vandalism, theft, and animal cruelty which came to light at the writ hearing.

Barbee also contends that counsel should have presented the testimony of Dr. Goodness to show his lack of future dangerousness. (Doc. 61, p. 296.) Barbee fails to show that Dr. Goodness would have testified to this opinion, however. To clarify, Dr. Goodness prepared two reports for counsel, one was a "Dangerousness Risk Assessment" and the other was a letter evaluating possible mitigating facts and theories. (Doc. 66-8, p. 38; Doc. 66-3, p. 62.) Barbee does not present Dr. Goodness's risk assessment to support this claim. Although he states that she conducted a risk assessment, she cites the mitigation letter and selected facts within it, and then states that she "did not think Mr. Barbee would be a future danger," suggesting that this was her opinion. (Doc. 61, p. 296.)

The mitigation letter does not contain an opinion from Dr. Goodness as to Barbee's risk of future dangerousness. The mitigation letter states that she found no significant symptoms suggestive of a head injury, no developmental delay, no reading disability, no exposure to alcohol in the womb, no bipolar mood disorder, and no significant hydrocodone abuse. She found a diagnosis for Lyme's

---

Barbee's character by cross-examination, the State's case might well have relied more upon cross-examination.

Disease in his medical records, which can mimic bipolar disorder and trigger a severe aggressive episode but is treatable. Dr. Goodness concluded that this was a mitigating factor that also increased his dangerousness. (Doc. 66-3, p. 63.) Ray testified that Dr. Goodness's testimony was not helpful to the defense because it played into the State's theory of the murder. (Doc. 66-8, p. 39, 47.) Ray also testified that Dr. Goodness said that a defendant in his late thirties would present a low statistical risk of committing future violent acts. (Doc. 66-8, p. 30.) But Ray did not testify about Dr. Goodness's opinion as to Barbee's risk. Hence, the record does not show that Dr. Goodness believed Barbee presented a low risk of a future dangerousness.

Assuming she did have such an opinion, Dr. Goodness's testimony would have subjected her to potentially damaging cross-examination about Barbee's bad acts, as discussed above. In addition, it would have allowed the State to evaluate Barbee with its own expert, Dr. Price, which counsel did not want to allow. (SHR 72, 207.) (Doc. 66-8, p. 44.) *See generally Davis v. State*, 313 S.W.3d 317, 352 (Tex. Crim. App. 2010) (citing *Lagrone v. State,* 942 S.W.2d 602 (Tex. Crim. App. 1997)). This would have provided an opportunity for the State to obtain a damaging diagnosis or learn harmful things about Barbee's past. *See E.g., Yowell v. Thaler*, No. 10-70026, 2011 WL 4056707, *1-2 n.1 (5th Cir. Sept. 12, 2011) (noting defense attorney's statement that, "Based on my experience in the past, there's probably

no way on God's green earth that we're going to do anything to allow the State to examine our client with one of their own experts"). Barbee does not show that counsel's decision to avoid an evaluation by the State's expert was outside the wide range of reasonable professional assistance.

   *c. "Matters of degrees."* Some of the information that Barbee claims trial counsel should have presented is more of the same information the jury received at trial.  The jury knew Theresa was dating Dodd, that they were living in Barbee's former marital home, that Dodd was arrested in connection with this case, that Dodd had been on parole, and that Dodd did not deny assisting Barbee in moving the bodies.  Theresa acknowledged her share of the blame for their marital fights.  She testified that Barbee tragically lost his brother and sister with whom he been close, that she had Barbee transfer his interest in the businesses to her, that she owed Barbee's mother money, and that Barbee tried to commit suicide, and that he was hit on the head with a pipe and hospitalized weeks before the murders. Counsel elicited information about the crime-week stressors that Barbee faced, including headaches, his dad's cancer, arguments with Theresa and with Trish, and problems with the business.   Theresa described their participation in the youth ministry as "wonderful," and she said Barbee was good with the kids. Although Barbee minimizes this testimony because it was elicited from a state's witness rather than a defense witness (doc. 61, p. 283, n.137), the Court is not

100

persuaded.  Mitigating information can actually have more impact when elicited on cross-examination from a reticent state's witness.

In addition, Nancy Cearley provided information about the family and their church involvement.  Barbee's mother described the deaths of her older children, their affect on Barbee, and his failure to graduate from high school.  She described how Barbee picked himself up, got a GED, went to college, and started his own business.  She discussed his job at the Blue Mound Police Department and her husband's chemotherapy.  Other witnesses expressed their love and support for Barbee and his family.

Because the jury heard this information, Barbee's complaint regarding good character evidence, his stable family, the loss of his siblings, head injuries, suicidal ideation, and the negative character evidence about Theresa, comes down to a matter of degrees. Courts must be "particularly wary of arguments that essentially come down to a matter of degrees.  Did counsel investigate enough?  Did counsel present enough mitigating evidence?  Those questions are even less susceptible to judicial second-guessing." *Skinner v. Quarterman*, 576 F.3d 214, 220 (5th Cir. 2009) (quoting *Dowthitt*, 230 F.3d at 743).

d.  *Mildly mitigating evidence.*  A good deal of the information that Barbee claims counsel overlooked is only mildly mitigating, such as the opinions of his friends and family that he is of good character and from a stable family, his academic struggles, the loss of his siblings through illness and a car accident, head injuries (to which

101

no trial expert attributed any brain damage), voluntary short-term hydrocodone abuse, and evidence discrediting Theresa. Experienced counsel could have reasonably decided that the jury would be unimpressed with an attempt to humanize Barbee on account of these circumstances. *Cf. Wiggins*, 539 U.S. 535 (reciting "powerful" overlooked mitigation evidence of severe privation and abuse while in care of an alcoholic, absentee mother; physical torment; sexual molestation and repeated rape while in foster care; periods of homelessness; and diminished mental capacities).

  *e. Potentially harmful evidence.* Some of the information that Barbee contends counsel overlooked is double-edged or harmful. The Fifth Circuit has long denied claims of ineffective assistance based on counsel's tactical decision not to present "double-edged" evidence such as drug abuse. *See St. Aubin v. Quarterman*, 470 F.3d 1096, 1103 (5th Cir. 2006); *Hopkins v. Cockrell*, 325 F.3d 579, 586 (5th Cir. 2003). Thus, counsel could have reasonably decided that linking Barbee's offense to volitional abuse of his wife's painkillers would have been unwise. Counsel could have also reasonably decided (and apparently did decide) that presenting evidence to excuse Barbee's behavior at punishment, when Barbee refused to take any responsibility for the crime, would diminish their credibility before the jury.

  The supporting declarations also contain harmful information that the potential witnesses could have provided on cross-examination, specifically, evidence that reinforced the picture of Barbee as a

man who did not commit himself in his relationships with women and supported the State's theory of motive.  The girlfriend of Barbee's former roommate, for example, stated that Lisa would always show up at Barbee's apartment and obviously wanted more of a relationship than Barbee did.  (Doc. 66-3, p. 140.)  Barbee's niece stated that she believed Lisa expected to grow closer with Barbee, and that a visit from Lisa prompted Barbee to make an agreement with Theresa that his "girlfriends" would not come to the office.  (Doc. 66-3, p. 106.)  Barbee's mother stated that Barbee previously had a child with a coworker at the Blue Mound Police Department but he gave up his parental rights.  (Doc. 66-3, p. 72.)  Barbee's cousin stated that Barbee told her he had no problem with Theresa's dating Dodd because it kept Theresa "off his ass."  (Doc. 61, p. 142.) Tim Davis stated that Barbee could have any girl he wanted and could really "talk the talk."  (Doc. 66-3, p. 128.)

*f. Counsel's affidavit.* Barbee contends that the state-court ruling was based on an unreasonable determination of the facts because it relied on counsels' joint affidavit, which was deficient for several reasons.

Barbee first asserts that it demonstrates their disloyalty to Barbee by revealing client communications in order to defend themselves against Barbee's ineffective-assistance allegations. (Doc. 61, p. 303.)  He provides no authority for this contention.  To the contrary, defendants who claim their attorneys were ineffective waive

the privilege as to all communications necessary to defend the claim. *See United States v. Ballard*, 779 F.2d 287, 292 n.8 (5th Cir. 1986); *Laughner v. United States*, 373 F.2d 326, 327 (5th Cir. 1967). Counsel here did nothing more than defend the claim against them.

Barbee contends counsels' assertion that Barbee provided multiple versions of the murder, which made a consistent theory of defense difficult, was a "serious misrepresentation" because (1) Barbee gave different versions of the murder well before counsel were appointed in the case and (2) counsel state in their joint affidavit that Barbee "was steadfast in his assertion that he was innocent." (Doc. 61, p. 304.) This allegation was discussed in connection with claim 4b. The fact that Barbee gave different versions of the murder prior to the appointment of counsel and yet steadfastly maintained his innocence after counsel's appointment means nothing. Counsel had to contend with the prior inconsistent statements made by their client and known to the prosecution, whether or not counsel were appointed at the time they were made.

Barbee contends the Memorandum of Understanding between Ray and Barbee that was attached to counsel's affidavit is extremely troubling because it "was obviously prepared to use against their client at some future date." (Doc. 61, p. 304.) The Court has already concluded that the memorandum is no more than a method to preserve facts for inevitable post-conviction litigation, it contains Barbee's own deletions and edits, and he does not claim he signed it unknowingly.

104

If anything, this case demonstrates the necessity of memorializing the parties' understanding at the time of trial. Without it, the facts could be limited to a sanitized report by a mitigation specialist who destroys her handwritten notes in an attempt to *prevent* the discovery of truthful information during the post-conviction litigation. (Doc. 66-7, p. 32, 36-37, 39-40.)

Barbee also contends that counsel's assertion that they consulted with and interviewed witnesses concerning Barbee's family background belies the declarations attached to his federal petition in which the "declarants state that they had no interaction whatsoever with the attorneys." (Doc. 61, p. 305.) In fact, Maxwell's report shows the broad scope of her search for information upon counsel's request, and Barbee's mother wrote in her declaration that Maxwell "had all kinds of information about Stephens's whole life" with names and addresses for follow-up. (Doc. 66-3, p. 47-48, 68.) Barbee's mother testified that Maxwell "knew everything." (Doc. 66-7, p. 87.) In addition to Maxwell, counsel retained Dr. Goodness to look for mitigation information and comment upon the themes developed for the case. (Doc. 66-3, p. 62.) Maxwell's criticism during post-conviction litigation was that counsel did not present all the information she collected, not that her investigation was abbreviated or insufficient. The declarations attached to the petition do not delve into new, unexplored territory. It appears that this complaint is based on the distinction that Maxwell, rather than counsel, did the actual

interviewing. (Doc. 61, p. 305.) Lacking information to the contrary, the Court assumes that counsel were privy to the work generated by the defense team they assembled.  This argument is therefore semantic and lacks merit.

Barbee next disputes counsels' assertion that Barbee chose not to testify and calls it a "remarkable piece of sophistry" because it relies in part on a portion of the Memorandum of Understanding that Barbee had crossed out.  (Doc. 61, p. 305.)  This argument relates to counsels' explanation for why Barbee did not testify at the motion-to-suppress hearing. (Doc. 61, p. 306.) This particular claim for relief, however, relates to sentencing.

The memorandum aside, Barbee's complaint that counsel did not let him testify at sentencing is refuted in the trial record:

> MR. RAY: I need to put one thing on the record. . . .
> Steve, Judge Gill is letting me do this now, but we're
> doing it as if we did it before we had rested.  I told you
> just like we did in the guilt-innocence phase of your trial
> that you can testify in the punishment phase; is that
> correct?
>
> THE DEFENDANT: Yes.
>
> MR. RAY: Okay.  And if you want to testify, we can
> have that situation so that you can testify in this trial.
> Do you understand that?
>
> THE DEFENDANT: Yes.
>
> MR. RAY: And you indicated to me that you did not want
> to testify; is that correct?
>
> THE DEFENDANT: Yes.
>
> MR. RAY: So even though we are doing this after the
> fact, you don't want me to ask Judge Gill--and I assure

106

you he would allow me--to reopen for purposes of you testifying?

    THE DEFENDANT: Correct.

    MR. RAY: You do not want to testify?

    THE DEFENDANT: No.

    MR. RAY: No means, yes, you don't want to testify?

    THE DEFENDANT: I don't want to testify.

(26 RR 110-11.) The Court finds no evidence in the record to support Barbee's assertion that counsel did not let him testify at sentencing or elsewhere.

    Barbee takes issue with counsel's statement that if Barbee had taken some responsibility for his actions, he might have been able to receive a life sentence.   (Doc. 61, p. 306.)   Barbee again challenges counsel's stated belief that excuse-type evidence would be inconsistent with Barbee's assertion of innocence, because innocent people get head injuries.   Despite Barbee's asserted metaphysical confusion over this issue (doc. 61, p. 307-08), his own expert, Dr. Martin, corroborates counsels' view.   Considering the behavioral effects caused by frontal lobe impairment, Dr. Martin opined that "a broader and more accurate explanation for why Mr. Barbee could have engaged in a violent crime emerges."   In Dr. Martin's opinion, "Barbee's violent actions at the time of the offense would have been mediated by emotional factors as opposed to reason, due to the aforementioned damage to his frontal lobes." (Doc. 66-3, p. 59-60.) Barbee's present assertion that "innocent people get head injuries"

107

does not change the fact that a jury in a criminal case would view such evidence as an explanation for the commission of the crime. And without some acceptance of responsibility, a jury might see such evidence as simply aggravating or, at the least, a ploy for undeserved sympathy. Trial counsel reasonably concluded that the presentation of such evidence might do harm in this case.

Barbee also challenges counsels' justification for not calling Davis as a witness. This matter was previously addressed in claim 2. It is based on counsel's use of the words "attempted to kill" to describe Barbee's behavior during the road-rage incident, while Maxwell reported only that Barbee had no "off switch" and that Davis had to pull Barbee off the son and the old man to keep him from hurting him "really bad." (Doc. 61, p. 309.) Counsel's choice of words describing this behavior as an "attempt to kill," even if inaccurate, does not undermine counsel's decision not to present Davis as a witness. Either way, it demonstrates Barbee's confrontational and aggressive nature. Counsel could reasonably decide not to risk exposing this event to the jury, especially given that Theresa testified about a very similar road-rage incident on their first wedding anniversary. (25 RR 49-51.) With two similar events, the jury would be unlikely to view them as anomolies.

Barbee also makes specific challenges to individual findings by the state court at both the original and subsequent writ proceedings. (Doc. 61, p. 317.) Many of them ignore the evidence

that supports the findings; others are based on erroneous assertions of fact, such as that Maxwell's report was provided to the prosecution before trial.  Most of them have been addressed elsewhere in this opinion.  The Court will not analyze the individual findings further because, for the reasons stated here and elsewhere, they did not result in an unreasonable adjudication.  *See Morrow*, 367 F.3d at 314 (holding that it is the state court's ultimate decision that is tested, not every jot of its reasoning). The record does not support Barbee's claim that counsel were deficient in their investigation or unreasonable in their strategy at sentencing.

   *g.  No prejudice.*  Even assuming counsel were deficient, the record does not demonstrate that the additional evidence presented by post-conviction counsel would have undermined confidence in the punishment verdict.  As Barbee repeatedly suggests, his lack of a criminal history was a strong argument for a life sentence.  Trial counsel capitalized on this. They argued that "three hours" did not define Barbee as a person.  They emphasized Barbee's lack of a juvenile record and the good people who supported Barbee throughout trial because they knew him as another person.  But counsel also believed (doc. 66-8, p. 183), and the record supports, that the State's strongest argument for the death penalty was the offense itself, in which Barbee ended the life of a pregnant woman, the seven year-old son who came to her defense, and an unborn child who Barbee knew might

be his own.[13]   It is beyond reasonable to conclude that the aggravating facts of the offense greatly outweigh any mitigating effect of the additional evidence counsel allegedly overlooked.

   *h. Conclusion for claims 5b and 5c.*  Barbee fails to demonstrate that it was necessarily unreasonable for the CCA to conclude (1) that he did not overcome the strong presumption of counsel's competence and (2) that he failed to undermine confidence in the jury's sentence of death. *See Pinholster*, 131 S. Ct. at 1403.  Even under a de-novo standard of review, the Court concludes that this claim fails for the reasons stated above.  Claim 5b and 5c have no merit and are denied.

## C.  Head injuries and hydrocodone use (claim 5d)

   Barbee contends that counsel were ineffective for failing to present evidence of his head injury and hydrocodone use at sentencing. (Doc. 61, p. 326.) Respondent argues that the state court's rejection of this claim during the initial state habeas proceedings was reasonable. (Doc. 61, p. 129.)

   As already stated, trial counsel retained two forensic psychologists (Drs. Goodness and Norman) and a forensic psychiatrist (Dr. Shupe).  Dr. Shupe's letter to trial counsel stated that Barbee had a history of closed head injuries, but that his failure to accept some responsibility impaired counsel's chance of obtaining a life

---

   [13] The autopsy and subsequent paternity testing apparently excluded Barbee as the father. (Doc. 66-6, p. 32)

sentence through mitigation.  Dr. Shupe stated that Barbee appeared fixated on how his mother would view him if she thought he was guilty and expressed that he would rather be executed than have his mother see him plead guilty.  (SHR 98.)  Dr. Goodness's report to trial counsel stated that Barbee "does not appear to have significant symptoms suggestive of a head injury" and that his report of hydrocodone use "does not suggest long-term significant abuse." (SHR 54.)  Maxwell also reported to counsel that Barbee had a history of head injuries, culminating in the work-site injury that led to his hospitalization about a month before the murders.  She reported that Barbee had been taking hydrocodone that had been prescribed for Trish.  Maxwell had found "through research" that hydrocodone is contraindicated for head injuries and she had requested that Barbee be examined by a neuropsychologist, which counsel did not arrange. (SHR 35.)

The state habeas evidence included a statement from Dr. Stephen Martin, previously discussed in claim 2, in which Dr. Martin concluded that Barbee had a "subtle to mild degree of diffuse neuropsychological impairment along with subtle bilateral hemisphere dysfunction" and frontal lobe damage. (SHR 39.)  The state's habeas expert, Dr. Price, opined that Dr. Martin erred in scoring and interpreting his raw test data and stated that the re-scored tests did not support a finding of generalized brain damage or frontal lobe damage.  (SHR 185.)

Trial counsel stated in their joint affidavit that, after discussing the matter, they did not hire a neuropsychologist because

they determined that a head-injury theory would necessitate that Barbee was guilty as charged, which contradicted his assertion that he was completely innocent.  They also believed that the overwhelming thought in mitigation is "some acceptance of responsibility."  Without some acceptance of responsibility, counsel believed the head injury and hydrocodone abuse would only serve to diminish mitigation. (SHR 71.)  The state court concluded that counsel's decision not to use "head injury" and "hydrocodone abuse" evidence was reasonable given Barbee's lack of significant symptoms and his unwillingness to accept responsibility.  (SHR 209-10.)

Barbee asserts the state-court ruling was unreasonable, but makes no real argument, restating only that innocent people can have head injuries and a head injury "is not in any way dependent or diminished by a claim of actual innocence."  (Doc. 61, p. 330-31.)  The Court has previously addressed this argument, noting that such evidence provides an explanation for violent conduct and is therefore inconsistent with Barbee's assertion of innocence.  In his reply, Barbee suggests that a head injury which did not result in brain damage (i.e., one that did not contribute to the criminal conduct) would have been presented by constitutionally effective counsel because, under *Tennard,* it is relevant even without a "nexus" to the offense, that is, even if it is unconnected to the crime. (Doc. 77, p. 48.) *Tennard v. Dretke*, 542 U.S. 274 (2004).  The Court is not persuaded.

*Tennard* does not purport to establish standards for counsel's representation under *Strickland.* Rather, it addresses the Eighth Amendment requirement that the states give the jury a vehicle for considering and giving effect to constitutionally relevant mitigating evidence, which it defines as evidence the sentencer could reasonably find justifies a sentence less than death. *Id.* at 285. *Strickland* does not require counsel to present all constitutionally relevant mitigating evidence; *Strickland* does not require counsel to present any mitigating evidence, as long as counsel acts reasonably. *Wiggins*, 539 U.S. at 533. The Court therefore rejects Barbee's implication that *Tennard* sets a standard for counsel's representation under the Sixth Amendment.

*Tennard* is distinguishable on its facts, moreover, because it deals with low IQ, which it concludes is inherently mitigating even when there is no evidence that it contributed to the crime. *See Tennard*, 542 U.S. at 287 (holding that low IQ evidence is constitutionally relevant irrespective of whether defendant establishes nexus between mental capacity and the crime). Barbee provides no authority that a blow to the head, without resulting brain damage, is similarly inherently mitigating. In fact, *Tennard* acknowledges that "evidence of a trivial feature of the defendant's character or circumstances of the crime is unlikely to have any tendency to mitigate the defendant's culpability." *Id*. at 286.

The state court could have reasonably decided that counsel's decision not to present head-injury and hydrocodone evidence was within the bounds of reasonable professional representation. Claim 5d is denied.

### D.  Low intelligence (claim 5e)

In this subclaim, Barbee contends that trial counsel were ineffective for failing to present, through his mother's testimony, evidence of Barbee's "sub-average intellectual functioning." (Doc. 61, p. 331.)  Barbee contends his mother could have testified about his difficulties in school with reading, his rank in the bottom 20% of the class, his requirement of "extra help," and struggles through his academic career, and the fact that it took him three attempts to pass the GED.  In support of this claim, he points to the testing of Dr. Martin with the Wechsler Adult Intelligence Scale-3, which placed his verbal IQ at 87 (low average), his performance IQ at 99 (average), and his full-scale IQ at 91 (average). He also relies on Dr. Martin's testing with the Wide Range Achievement Test-3, which placed Barbee's academic achievement in the 13th, 16th and 27th percentile for reading, spelling and arithmetic, respectively.  Barbee asserts, without argument, that *Trevino* excuses any procedural default of this claim because his counsel during the initial state habeas proceedings was ineffective.  (Doc. 61, p. 333.)

Respondent contends the claim is procedurally barred because it was presented for the first time in the subsequent state habeas

application and dismissed as abusive. (Doc. 68, p. 130.) Respondent argues that *Trevino* does not excuse the procedural bar because Barbee fails to show that the claim is substantial or that it would have provided relief in state habeas proceedings.

Barbee makes no argument in support of this claim, but simply states that it "overlaps" with subclaims 5d and 5f, and incorporates those arguments by reference. (Doc. 61, p. 332.) After carefully reviewing the record, the Court concludes that this claim is not substantial, as required by *Trevino*.

The Court first observes that there is little or no evidence Barbee has sub-average intellectual functioning. Barbee presents one "low-average" verbal IQ score. The remaining IQ scores are average. The test results on the Wide Range Achievement Test-3 place his academic achievement at the 7th- and 8th-grade levels, but as the name implies, the test measures Barbee's academic achievement not his intelligence. Further undermining Barbee's claim of low intelligence is the report of Dr. Goodness who found that Barbee suffered no developmental delay, does not possess a reading disability, and was not exposed to alcohol in the womb. (SHR 54.) Even Dr. Martin opined that Barbee's reading skills and, to a lesser degree, his spelling and math skills were consistent with his educational level. (Doc. 66-3, p. 56; SHR 42.) Low academic achievement can be caused by a number of factors other than low intelligence, such as excessive school absences or a personal tragedy,

115

such as a death in the family.  The jury heard about Barbee's struggles with school after the death of his siblings, how he "shut down," dropped out of school, but eventually earned his GED.  (25 RR 138, 144.)  These scores would simply be more details of what the jury already knew.

Even assuming trial counsel were ineffective, however, Barbee fails to demonstrate prejudice.  The jury knew Barbee received his GED, attended community college, earned a diploma that allowed him to become a police officer, operated two businesses with employees, drove a Corvette, and owned the largest home in his neighborhood which had a movie room and a pool. These circumstances suggest that Barbee has not been hindered by his allegedly low intelligence and that a reasonable juror would not find it significantly mitigating given the facts of this particular case.

In short, there is no little or no evidence of low intelligence, and the evidence Barbee does present fails to undermine confidence in the verdict.  Accordingly, claim 5e has "no merit" and is also procedurally barred.

### E.  Brain damage (claim 5f)

Barbee contends counsel was ineffective for failing to present expert testimony regarding the effects of Barbee's head injuries, including frontal lobe and brain impairment, as diagnosed by Dr. Martin.  (Doc. 61, p. 333.) Respondent argues that the state court's rejection of this claim was not unreasonable.  (Doc. 68, p. 138.)

116

"Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.  Barbee asserts that trial counsel's strategy was based on an unreasonable investigation because they did not retain a neuropsychologist.  "The selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made 'after thorough investigation of [the] law and facts,' is 'virtually unchallengeable.'" *Hinton*, 134 S. Ct. at 1089 (quoting *Strickland*, 466 U.S. at 690).  When counsel recognizes the possible issues regarding a client's mental capacity and the need for expert assistance and employs an expert at trial, counsel is not ineffective for failing to canvass the field to find a more favorable expert. *Dowthitt v.Johnson*, 230 F.3d 733, 748 (5th Cir. 2000), *abrogated on other grounds*, *Lewis v. Thaler*, 701 F.3d 783, 790 (5th Cir. 2012). This Circuit has held that "Counsel should be permitted to rely upon the objectively reasonable evaluations and opinions of expert witnesses without worrying that a reviewing court will substitute its own judgment" and in hindsight "rule that his performance was substandard for doing so." *Smith v. Cockrell*, 311 F.3d 661, 676 (5th Cir. 2002), *overruled on other grounds, Tennard*, 542 U.S. 274.

As stated above, trial counsel used two psychologists and a psychiatrist to evaluate Barbee.  Dr. Shupe met with Barbee for five hours and reviewed extensive medical records. (SHR 98.) Dr. Goodness conducted a risk assessment as well as a mitigation evaluation and

opined that Barbee did not appear to have significant symptoms suggestive of a head injury. (SHR 54.) The state court's conclusion that trial counsel conducted a reasonable investigation into psychiatric and psychological evidence was not unreasonable, and counsel was not ineffective for relying on the opinions of his experts that there was no evidence of brain damage to explore further.

Aside from the fact that the experts did not find evidence of brain damage, counsel faced the additional problem that such evidence would be inconsistent with Barbee's assertions of innocence and the belief and testimony of other punishment witnesses that he was innocent. Counsel also knew that the presentation of expert testimony would subject Barbee to an evaluation by the state's expert, (SHR 72,) which could lead to the disclosure of harmful information in his past or a harmful diagnosis. Under these circumstances, any disagreement with counsel's decision not to pursue a brain-damage theory is not a basis for finding counsel ineffective. *See Wesbrook v. Thaler*, 585 F.3d 245, 251 (5th Cir. 2009)(holding that court may not find ineffective assistance merely because it disagrees with counsel's trial strategy); *see also Williams v. Cain*, 125 F.3d 269, 278 (5th Cir. 1997) (concluding counsel is not deficient in failing to locate an expert to testify that his client was retarded or mentally ill when initial expert concluded otherwise, especially when counsel knows of the state's ability to rebut any such evidence with its own experts).

Barbee also fails to demonstrate that the state court's finding of no prejudice was unreasonable. Although Barbee's post-conviction expert, Dr. Martin, opined that he had mild or subtle brain damage, the State's expert would have provided the opposite opinion because he believed Dr. Martin erred in scoring and interpreting his raw test data. (SHR 185.) The state court's choice between two conflicting experts does not demonstrate an unreasonable ruling under the AEDPA's deferential standards of review. *Kately*, 704 F. 3d at 361 (state habeas court is entitled to credit evidence, even though it is contradicted).

Barbee contends, however, that the state-court ruling was unreasonable "on its face" because, despite the conflicting expert affidavits, the state court found that there were no controverted factual issues. (Doc. 61, p. 338.) In fact, the state court found that there were "no controverted, ***previously unresolved*** factual issues material to the legality" of Barbee's confinement and bypassed the opportunity to hold a live hearing. (SHR 197. Emphasis added.) The state court made this finding after receiving the parties' briefs and exhibits. Barbee provides no authority, and this Court is not aware of any, that such paper hearings render the state-court ruling unreasonable. *See Green v. Johnson*, 116 F.3d 1115, 1120 n.4 (5th Cir. 2012) (noting that the Fifth Circuit has consistently upheld the validity of paper hearings in state habeas proceedings).

Barbee fails to demonstrate that it was necessarily unreasonable for the CCA to conclude (1) that he did not overcome the strong presumption of counsel's competence and (2) that he failed to undermine confidence in the jury's sentence of death. *See Pinholster*, 131 S. Ct. at 1403.   Claim 5f is denied.

### IX.   PRETRIAL PUBLICITY AND COUNSEL'S FAILURE TO MOVE FOR CHANGE OF VENUE (CLAIMS 6 & 7)

In claim 6, Barbee contends that the county where his trial was held was so saturated with prejudicial and inflammatory media publicity that a fair jury could not be seated.  It created a hostile atmosphere in which a fair trial was impossible, he argues, such that prejudice is presumed and he need not show actual juror bias.  In claim 7, he contends trial counsel were ineffective in failing to move for a change of venue based on this unfair pretrial publicity. Barbee acknowledges that these claims were raised for the first time in his subsequent state application and dismissed as abusive.  He argues, however, that any default may be excused under *Trevino* because counsel who handled his first state writ was ineffective.  Respondent asserts that the claims are procedurally barred and have no merit.

As noted previously, the *Trevino* inquiry requires this Court to examine whether the claim against trial counsel has "some merit." *See Martinez*, 132 S. Ct. at 1318.  The question of whether trial counsel was ineffective for failing to move for a change of venue

120

(claim 7) depends on the viability of the pretrial publicity claim (claim 6).  The Court will therefore address claim 6 first.

## A.  Adverse pretrial publicity and change of venue (claim 6)

A petitioner seeking to challenge his conviction on the ground that he was denied a fair trial before an impartial jury because of adverse pretrial publicity ordinarily must demonstrate an actual, identifiable prejudice attributable to that publicity on the part of members of his jury.  *See Mayola v. Alabama*, 623 F.2d 992, 996 (5th Cir. 1980) (citing *Irvin v. Dowd*, 366 U.S 717, 723 (1961)). The constitutional standard for ensuring a fair trial in the face of prejudicial pretrial publicity can usually be satisfied through voir dire that ferrets out such prejudice.  *United States v. Lipscomb*, 299 F.3d 303, 344 (5th Cir. 2002). "Prominence does not necessarily produce prejudice, and juror *impartiality* . . . does not require *ignorance*." *Skilling v. United States*, 561 U.S. 358, 381 (2010) (emphasis in original).  The Constitution is satisfied if "the juror can lay aside his impression or opinion and render a verdict based upon the evidence presented in court." *See Irvin*, 366 U.S. at 723.

There are circumstances, however, such as media interference in the courtroom during trial or the repeated airing of a videotaped confession, that warrant a presumption of prejudice without any examination of the voir-dire transcript for actual juror prejudice. *E.g., Sheppard v. Maxwell*, 384 U.S. 333 (1966) (due process denied where 5-hour inquest of defendant without counsel was publicized live

121

from high school gymnasium and "bedlam reigned" during trial where newsmen took over practically the entire courtroom); *Estes v. Texas*, 381 U.S. 532 (1965) (due process violated where massive press clippings had given case national notoriety and at least 12 cameramen were engaged in courtroom throughout pretrial hearing, taking motion and still pictures); *Rideau v. Louisiana*, 373 U.S. 723 (1963) (due process violated by televising defendant in the act of confessing to the crime); *Irvin*, 366 U.S. at 727 (due process violated where 90% of prospective jurors entertained some opinion of defendant's guilt and 8 out of 12 jurors seated thought defendant was guilty). Although Barbee's claim relies on these cases, the Court does not find any factual support for such a presumption. *See Skilling*, 130 S. Ct. at 2915 (holding that a presumption of prejudice attends only the extreme case); *Murphy v. Florida*, 421 U.S. 794, 798 (1975) (characterizing the reversals in *Irvin, Rideau, Estes*, and *Sheppard* as based on a "trial atmosphere that had been utterly corrupted by press coverage").

Barbee's claim is based on eighteen Internet articles published by the Fort Worth Star Telegram between February 21 and 27th, 2005, and one article published February 18, 2006. (Doc. 66-2, p. 80-120.) Voir dire began in January of 2006. The articles contain fact-based reporting on Barbee's lack of a criminal record, Dodd's arrest for a parole violation, Barbee's incriminating statements to the police, events leading up to finding the bodies and the Durango, the pretrial

suppression hearing, and the allegations against Barbee.  They do not assume his guilt.  There are sympathetic articles about the victims as well.  But none of the articles contain blatantly prejudicial information of the type readers "could not reasonably be expected to shut from sight."  *Skilling*, 130 S. Ct. at 2916; *see Beck v. Washington*, 369 U.S. 541, 556 (1962) (contrasting "straight news stories" with "invidious articles which would tend to arouse ill will and vindictiveness").  These articles, many of which contain the same information republished over a week-long period, are far from showing that the media coverage was inflammatory or vindictive.

Barbee does not show that this is one of those extreme cases where press coverage has utterly corrupted the trial atmosphere, such that prejudice is presumed. He does not allege actual prejudice or otherwise attempt to demonstrate prejudice.  Accordingly, Barbee fails to show that a change of venue was required due to extensive pretrial publicity. *See Andrews v. Collins*, 21 F.3d 612, 632 (5th Cir. 1994) (finding no error in the denial of a venue change where publicity concerning the murder was largely factual in nature and defendant failed to uncover deep or widespread prejudice against him during voir dire).

### B.   Counsel's representation (claim 7)

Trial counsel were, therefore, not ineffective for failing to move for a change of venue.  See *Koch*, 907 F.2d 524, 527 (5th Cir. 1990)(counsel is not required to make futile motions or objections);

*United States v. Parker*, 877 F.2d 327, 330 (5th Cir. 1989) (holding that a change of venue should not be granted on the mere showing of widespread publicity).

The decision to forego a change of venue was professionally reasonable for the additional reasons that, in counsel's experience, a venue change often results in the trial being held in a smaller, more conservative county that is less favorable to the defense and that believes the defendant is a notorious criminal. Counsel also believed that publicity issues can be adequately resolved in jury selection, and this is supported by case law. (Doc. 66-8, p. 2, 49);*see Lipscomb*, 299 F.3d at 344 (prejudicial pretrial publicity can usually be ferreted out during voir dire).

Because trial counsel were not ineffective, habeas counsel did not render ineffective assistance by failing to challenge their representation. Claims 6 and 7 are procedurally barred and not subject to the exception in *Trevino* because the claims have no merit.[14]   The Court also denies claims 6 and 7 on the merits.

## X.   STATE COURT HEARING (CLAIM 8)

Relying on case law that predates the AEDPA, Barbee argues that the state court violated his constitutional rights when it concluded that there were no controverted, previously unresolved factual issues

---

[14] The procedural default of claim 6 is not excused for the additional reason that Barbee has not shown that the *Trevino* exception applies to pretrial publicity claims.

material to the legality of his confinement and refused to hold a live hearing on all but the conflict-of-interest claim. He also complains that the judge who presided over the proceedings was not the same judge who presided over trial (that is, the same judge alleged in claim 2 to have had a secret agreement with trial counsel), and that the habeas judge adopted verbatim the State's proposed findings and conclusions. Barbee concludes that the state court essentially abdicated its constitutional responsibilities and was a rubber stamp for the State. He contends its ruling is not entitled to any deference and suggests that this Court is now required to hold an evidentiary hearing under *Townsend v. Sain*, 372 U.S. 293 (1963). He also asserts that the matter must be remanded for another evidentiary hearing in state court. (Doc. 61, p. 361, 363, 365.)

An attack on a state habeas proceeding cannot serve as a basis for setting aside a valid conviction because it is "an attack on a proceeding collateral to the detention and not the detention itself." *Nichols v. Scott,* 69 F.3d 1255, 1275 (5th Cir. 1995) (quoting *Millard v. Lynaugh*, 810 F.2d 1403 (5th Cir. 1987).) Barbee's reliance on the "full and fair" hearing requirements in *Townsend* and the former statute are unpersuasive, moreover, given the subsequent amendments in the AEDPA and the Supreme Court opinion in *Pinholster*. *See Valdez v. Cockrell*, 274 F.3d 941, 949 (5th Cir. 2001) (stating that the AEDPA "jettisoned all references to a 'full and fair hearing' from the presumption of correctness accorded state court findings of fact,

125

along with the other situations which previously swept aside the presumption"); *see also McCamey v. Epps*, 658 F.3d 491, 497 (5th Cir. 2011)(noting that *Pinholster* narrows the circumstances under which federal habeas hearings may be held). Under the AEDPA's deferential standard, the state habeas court is "not required to hold a live evidentiary hearing or carry out any particular set of procedures; it must only act reasonably." *Garza v. Stephens*, 575 Fed. Appx. 404, 410 (5th Cir. 2014) (per curiam) (citing *Valdez*). The Fifth Circuit also rejects the contention that habeas findings adopted verbatim from those submitted by the State are not entitled to deference. *See Green*, 699 F.3d at 416 n.8. And it consistently upholds the validity of paper hearings in state court. *Green v. Johnson*, 116 F.3d at 1120 n.4.

In his reply, Barbee cites to *Ford v. Wainwright*, 477 U.S. 399 (1986) and *Panetti v. Quarterman*, 551 U.S. 930 (2007) for his contention that a hearing is required when the petitioner makes a substantial showing of ineligibility for the death penalty due to insanity or incompetency and the state-court procedures provide an inadequate opportunity to develop the claim. In *Ford*, the Florida procedures were inadequate because they denied Ford the opportunity to present information relevant to his sanity, denied him the opportunity to challenge or impeach state-appointed experts, and placed the insanity decision wholly within the executive branch. *Ford*, 477 U.S. at 400. In *Panetti*, the state court conveyed false

information to Panetti's counsel, failed to provide notice and keep Panetti informed of his opportunity to present his case, and failed to provide Panetti the opportunity to submit expert evidence in response to court-appointed experts. *Panetti*, 551 U.S. at 950-51.

Barbee, on the other hand, does not make a claim that he is ineligible for the death penalty. He was not ignorant of the state-court procedures and was not restricted in the evidence he could attach to his state applications. He received expert assistance (Dr. Martin); he then received federal funds to re-investigate his mitigation case; and he was able to present a large quantity of additional witness declarations in state court during the abeyance. At the subsequent writ hearing, he examined trial counsel and the trial judge regarding his allegation that they had a secret agreement. He presented live testimony from his mitigation specialist and others. He was able to cross-examine the State's expert, Dr. Price, at the subsequent writ hearing, although the State was unable to cross-examine his expert, since Dr. Martin did not testify. Barbee's comparison of his case to *Ford* and *Panetti* is unpersuasive. The Court denies claim 8.

## XI.   DENIAL OF CHALLENGE FOR CAUSE (CLAIM 9)

In claim 9, Barbee contends the trial court erroneously denied a defense challenge for cause to Juror 126, a "biased, pro-death juror." Barbee argues that she had "misinformation" from various media outlets and a "glaring belief in Petitioner's guilt." He

127

contends that the trial court's belief that the juror could base her verdict strictly on the evidence presented at trial conflicts with the record.  (Doc. 61, p. 379-80.)  He argues that such juror bias requires automatic reversal.

Respondent contends the claim is barred because, although Barbee complained about the denial of the challenge for cause on direct appeal, his argument relied upon state law, not the federal Constitution.  And, when the federal claim was presented in state court during abeyance, it was dismissed as abusive.  (Doc. 68, p. 156-57.) The Court agrees that this claim is procedurally barred for these reasons. *See McGowen*, 675 F.3d at 499; *Barbee*, 2008 WL 5160202, at *7.  Barbee makes no argument to overcome the procedural bar.

Alternatively, the claim lacks merit.  Barbee relies on *Leonard v. United States* and *Smith v. Phillips* to argue that the seating of a biased juror violates the Sixth Amendment.  *See Leonard v. United States*, 378 U.S. 544 (1964) (reversing conviction where prospective jurors were sitting in courtroom and heard guilty verdict returned against defendant in similar type case); *Smith v. Phillips*, 455 U.S. 209, 217 (1982) ("Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrence when they happen").  In cases where, for example, the juror is an employee of the prosecuting agency, a close relative of a participant in the trial or the criminal

transaction, or a witness or somehow involved in the crime, the Sixth Amendment may require a presumption of juror bias. *See Brooks v. Dretke*, 444 F.3d 328, 330 (5th Cir. 2006).

Circumstances that may give rise to presumed bias are not present in this case. Nor does Barbee allege that he was denied the opportunity to prove actual bias. Indeed, he emphasizes his examination of Juror 126 during voir dire and counsel's argument on the challenge for cause. Barbee simply contends that the state judge made the wrong call when he denied the challenge as follows:

> The Court, when she began to go into all this, I took--I observed her completely and totally the whole time. I have listened to what she had to say. I vacillated as she vacillated. And I feel like frankly that based upon what I have observed that I am going to overrule the challenge and she will be juror number 42. And it's based strictly on what I saw today and what I observed her to do.

(21 RR 71.)

Juror 126 had stated that, at least a year before, she had heard two or three reports on television about a missing pregnant woman, her body being found in a field, and her boyfriend borrowing a truck and knowing where she was dumped. At the time, Juror 126 believed Barbee was involved because "most crimes are done by people that know you" but she did not trust her memory and lost interest in the story once the victim had been found. She repeatedly asserted that she did not have any opinions about Barbee because she did not know all the facts at the time and news reports can be wrong. (21 RR 41, 44-45, 47-60.)

129

Under questioning from both sides, Juror 126 maintained that she had no preconceived opinions about the case based on what she had heard in the news a year before, and the judge based his ruling on his personal observation of her testimony and demeanor.  Thus, there is support in the record for the judge's ruling.  *See Patton v. Yount*, 467 U.S. 1025, 1038-40 (1984) (upholding denial of challenge for cause because judge is best situated to determine juror's impartiality when the testimony is ambiguous and contradictory). Based on the foregoing, claim 9 is procedurally barred or, alternatively, denied on the merits.

## XII.  DENIAL OF MOTION TO SUPPRESS (CLAIM 10)

In claim 10, Barbee cites the Sixth, Eighth, Thirteenth and Fourteenth Amendments and contends that the trial court abused its discretion under state law when it denied the motion to suppress his unrecorded oral statements to the police. *See* Tex. Code Crim. Proc. Ann. art. 38.22, § 3 (Texas statute on admission of oral statements). (Doc. 61, p. 383-397.)

Respondent contends the claim is defaulted because, although Barbee complained about the denial of the motion to suppress on direct appeal, his appellate argument relied upon the Texas statute, not federal law. And, when the federal claim was presented in state court during abeyance, it was dismissed as abusive.  (Doc. 68, p. 160.) Barbee argues in his reply that Respondent's assertion is "massively false" but to the extent the claim was not presented as a federal constitutional claim on direct appeal, he contends it was due to appellate counsel's ineffectiveness.  (Doc. 77, p. 48.)

The Court agrees that the claim raised on appeal was based on Texas law only. (Appellant's Brief, p. 44, 62 (filed May 2, 2007).) The federal-law-based claim is procedurally barred because it was presented in the subsequent writ and dismissed as abusive.  (Doc. 66-1, p. 204.) Read *Barbee*, 2008 WL 5160202, at *10-13. See *McGowen*, 675 F.3d at 499. Furthermore, Barbee presents no argument or authority for his suggestion that the ineffective assistance of appellate counsel can excuse the procedural default.  (Doc. 77, p. 55.)

131

Assuming, however, that the claim is not defaulted, the Court would deny it on the merits.

In his Reply, Barbee's asserts that he "has very clearly spelled out the constitutional dimensions of this claim in his petition." (Doc. 77, p. 55.)  But the petition contains no argument that the trial court's ruling violates clearly established federal law, or any federal law.  It asserts that the trial court erroneously relied on the exception to the Texas statute prohibiting the admission of unrecorded oral statements because, although Barbee led police to the bodies, they would have found the bodies anyway based on what Dodd had already told them. (Doc. 61, p. 390-97.) Barbee provides no authority that a violation of this Texas statute is constitutional error.  In fact, the case law he cites holds the opposite: *Woods v. State*, 152 S.W.3d 105, 118-19 (Tex. Crim. App. 2004)(explaining that violation of the procedural rule in article 38.22, § 3 is non-constitutional error); *Nonn v. State*, 117 S.W.3d 874, 880-81 (Tex. Crim. App. 2003)(same). (Appellant's Brief, p. 60 (identifying error as ***nonconstitutional***).)  Barbee has merely reworded the argument on appeal without updating the research to include federal law.  He fails to present a cognizable constitutional violation. *See* § 2254(a); *Hughes v. Dretke*, 412 F.3d 582, 590 (5th Cir. 2005)(holding that petitioner seeking federal habeas review must assert a violation of a federal constitutional right). The Court will not make his arguments for him.

Based on the foregoing, claim 10 is procedurally barred or, alternatively, denied on the merits.

### XIII.   THE "12-10 RULE" (CLAIM 11)

In claim 11, Barbee asserts that Texas's "12-10 Rule" violates the Eighth and Fourteenth Amendments as well as the Texas constitution.[15]   (Doc. 61, p. 398-408.)   Respondent argues that this claim is defaulted because it was not presented in state court until the subsequent writ application, when it was dismissed as abusive. Respondent also argues that the claim has been previously rejected in this Circuit.   (Doc. 68, p. 162-64.)   Barbee makes no argument to overcome the procedural bar.

Claim 11 is procedurally barred because it was raised in state court during the subsequent writ proceedings and dismissed as abusive. *See McGowen*, 675 F.3d at 499.   Alternatively, claim 11 is denied on the merits.   *See Druery v. Thaler*, 647 F.3d 535, 543 (5th Cir. 2011) (rejecting claim that the "12-10 Rule" violates due process and the Eighth Amendment).

### XIV.   LETHAL INJECTION PROTOCOL (CLAIM 12)

In claim 12, Barbee contends that Texas' three-drug execution protocol violates the Eighth Amendment because it creates a risk of inflicting severe and unnecessary pain and suffering.   (Doc. 61, p.

---

[15] As stated in the previous claim, violations of state law do not provide a ground for federal habeas relief. The allegation made under the Texas Constitution will not be addressed.

410-424.) Respondent contends the claim is barred and, alternatively, lacks merit under *Baze v. Rees*, 553 U.S. 35 (2008). (Doc. 68, p. 164.)

This claim was raised in Barbee's subsequent state writ application and was dismissed as abusive. (Doc. 66-1, p. 231.) Read *Barbee*, 2013 WL 192068, at *1. Accordingly, claim 12 is barred from federal review. *See McGowen*, 675 F.3d at 499. In the alternative, claim 12 lacks merit. *See Kerr v. Thaler*, 384 Fed. Appx. 400, 405 (5th Cir. 2010) (holding that challenge to Texas' use of pancuronium bromide in the lethal injection process is foreclosed by *Baze v. Rees*).

## XV.   FAILURE TO ASSIGN BURDEN OF PROOF TO MITIGATION ISSUE (CLAIM 13)

In claim 13, Barbee asserts that Texas's mitigation special issue violates the Eighth Amendment because it fails to place a burden of proof on the State and fails to provide an opportunity for meaningful appellate review of the mitigation verdict. (Doc. 61, p. 425.) Respondent argues that the state court correctly denied this claim on appellate review. (Doc. 68, p. 165.)

The Court agrees that this claim was not unreasonably rejected by the state court. *See* § 2254(d); *Rowell v. Dretke*, 398 F.3d 370, 378 (5th Cir. 2005) (holding that no Supreme Court or circuit precedent requires that the mitigation issue be assigned a burden of proof and that circuit precedent rejects the argument that it be subject to appellate review by the state); *Woods v. Cockrell*, 307

F.3d 353, 359-60 (5th Cir. 2002) (explaining that Texas's death penalty statute is not constitutionally obligated to provide appellate review of mitigation special issue because jury may be given unbridled discretion to consider mitigating factors); *see also Kansas v. Marsh*, 548 U.S. 163, 173 (2006) (holding that a state death-penalty statute may place on the defendant the burden of proving that mitigation circumstances outweigh aggravating circumstances); *Penry v. Johnson*, 532 U.S. 782, 803 (2001) (referring to the Texas mitigating special issue as a helpful frame of reference for a "clearly drafted catchall instruction.").   Claim 13 is denied.

## XVI.   FAILURE TO INFORM JURY AS TO THE EFFECT OF A DEADLOCK (CLAIM 14)

In claim 14, Barbee contends that the trial court violated the Eighth Amendment by refusing to inform the jury that the failure to answer a special issue would result in a life sentence.  (Doc. 61, p. 440.)  Respondent contends the claim is barred and, alternatively, lacks merit.  Barbee makes no argument to avoid a procedural default.

This claim was raised in state court in Barbee's subsequent writ application and was dismissed as abusive. (Doc. 66-1, p. 219.)  Read *Barbee*, 2013 WL 192068, at *1.  Accordingly, claim 14 is barred from federal habeas review.  *See McGowen*, 675 F.3d at 499.  In the alternative, claim 14 lacks merit.  *See Jones v. United States*, 527 U.S. 373, 379-82 (1999) (rejecting argument that Eighth Amendment requires jurors to be instructed as to the effect of their inability to agree);

135

*Sprouse v. Stephens*, 748 F.3d 609, 623 (5th Cir. 2014) (noting that clear Supreme Court and Fifth Circuit precedent foreclose grant of COA on this issue).

## XVII.   EVIDENCE OF FUTURE DANGEROUSNESS (CLAIM 15)

In claim 15, Barbee contends the evidence supporting the jury's answer to the future-dangerousness special issue is legally insufficient under *Jackson v. Virginia*, 443 U.S. 307 (1979). (Doc. 61, p. 443.) Respondent contends the state court reasonably denied this claim on appeal. (Doc. 68, p. 167.) Barbee asserts that the ruling was unreasonable because he had no prior convictions and the assaults on his former wife were mutual arguments, were initiated by Theresa, or were accidental.   Barbee argues that the threat to run Theresa through the wood chipper was a joke that she did not take seriously, and the verbal abuse of his former co-worker did not indicate a propensity for violent acts. (Doc. 77, p. 55.)

The future-dangerousness issue asks the jury whether, beyond a reasonable doubt, there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. (2 CR 401.) The evidence is sufficient to support the jury's affirmative answer to this issue if, viewing the evidence in the light most favorable to the verdict, any rational juror could find the elements of the issue beyond a reasonable doubt.   *See Jackson*, 443 U.S. at 319; *Martinez v. Johnson*, 255 F.3d 229, 244 n. 21 (5th Cir. 2001) (noting that the Texas Court of Criminal Appeals

136

applies the *Jackson* standard to evaluate the sufficiency of future-dangerousness evidence).   The *Jackson* standard is used to determine if the amount of evidence satisfies the due process clause, while state law determines the substantive elements that must be proven. *See Coleman v. Johnson*, 132 S. Ct. 2060, 2064 (2012) (per curiam) (assessing evidence of guilt); *e.g., Miller v. Johnson*, 200 F.3d 274, 286 (5th Cir. 2000)(assessing evidence of future-dangerousness).   In Texas, factors that inform the future dangerousness determination include: the circumstances of the offense, including the defendant's state of mind and whether he was working alone or with other parties; the calculated nature of his acts; the forethought and deliberation exhibited by the crime's execution; the existence of a prior criminal record and the severity of the prior crimes; the defendant's age and personal circumstances at the time of the offense; whether the defendant was acting under duress or the domination of another at the time of the offense; psychiatric evidence; and character evidence. *Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987).   The state-court decision rejecting Barbee's insufficiency challenge may be overturned on habeas review only if the decision was objectively unreasonable. *See Johnson*, 132 S. Ct. at 2062.

Here, the state court unanimously concluded that the evidence was sufficient for any rational trier of fact to have found beyond a reasonable doubt that there is a probability Barbee would commit criminal acts of violence that would constitute a continuing threat

137

to society.  Read *Barbee*, 2008 WL 5160202, at *6-7.  The CCA cited the facts of the offense and Barbee's escalating pattern of violence, noting that the circumstances of the offense alone may be sufficient to support an affirmative answer to the future-dangerousness issue. In addition, Barbee verbally attacked a former co-worker, assaulted his ex-wife, and threatened to put her through the wood chipper. Unmentioned by the CCA, but certainly known to the jury, was a road-rage incident that occurred on Barbee and Theresa's first wedding anniversary, where Barbee followed a driver off the highway and threw a punch at him through the car window.  (26 RR 49-51.)  Barbee's minimization of the details of his prior violence with Theresa and his coworker does not demonstrate that the CCA's interpretation of those events was unreasonable.  The evidence is viewed in the light most favorable to the prosecution, and it is the jury's role to decide what conclusions should be drawn from the evidence at trial.  The evidence is insufficient only if "no rational trier of fact" could have agreed with the jury.  *Johnson*, 132 S. Ct. at 2062.

Barbee was thirty-six years old, not an immature young man who might be prone to rash decisions. He made a deliberate and calculated plan to kill Lisa in order to avoid the consequences of being named father of her baby.  He went to Lisa's house with the intent to kill her but could not do it.  Upon further reflection and discussion with Dodd, he did not abandon his plans, but steeled his resolve and returned to her home to try again.  The jury could reasonably conclude

that, at this point, Barbee knew Jayden was in the home and might witness his mother's murder.  The jury could also reasonably conclude that Barbee anticipated having to eliminate Jayden as a witness. The murders were not instantaneous, as compared to shooting deaths. *See Martinez*, 255 F.3d at 245 (noting that Martinez used knife, which forces the user be in close proximity to victim such that he is often touching him with each blow).  Barbee murdered both victims by suffocating them with his bare hands, a process that took between thirty seconds and seven minutes.  (23 RR 184-85, 201.)  He cleaned the crime scene and then concealed the bodies and the Durango in separate locations.

Barbee killed a pregnant woman and a child—two especially vulnerable types of victims.  Even given his lack of a criminal record, any rational jury could conclude that a man who seeks to avoid responsibility for a pregnancy by planning to kill the mother in front of her seven year old son, and then fails to take an opportunity to abandon that plan, has a propensity for violence with no internal restraints.  The state court's ruling that the evidence was sufficient under *Jackson* to support the jury's answer to the future-dangerousness special issue was not unreasonable.  *See Martinez*, 255 F.3d at 244-45 (upholding state-court challenge to future dangerousness based on facts of offense being a planned, violent murder).  Claim 15 is denied. § 2254(d).

## XVIII.   "DEATH QUALIFICATION" OF JURY (CLAIM 16)

In claim 16, Barbee argues for a change in the clearly established federal law approving the "death qualification" of jurors in death-penalty cases.  In claim 16a, Barbee contends that the death qualification of the potential jurors in this case violates due process and equal protection because the jury's duty at punishment is a "moral and sympathetic" determination, such that the removal of potential jurors for their moral views against the death penalty is illogical and irrational on its face.  (Doc. 61, p. 447-50.) Barbee argues that the removal of jurors who are morally opposed to the death penalty violates the Eighth Amendment because such jurors are the source of "objective information on the evolving standards" of decency that control Eighth Amendment jurisprudence.  (Doc. 61, p. 450-56.)

In claim 16b, Barbee argues that death qualification violates the Fourteenth Amendment because it skews juries towards voting for death, and because similarly situated defendants receive "vastly different juries," which violates the fundamental right to life. (Doc. 61, p. 457-60.)

In claim 16c, Barbee contends death qualification violates the Eighth Amendment's "heightened reliability" requirement because death-penalty defendants face skewed, conviction-prone and death-penalty prone juries that non-capital defendants do not.  (Doc. 61, p. 460-61.)

In 16d, Barbee contends the Supreme Court opinion in *Lockhart v. McCree*, 476 U.S. 162 (1986), upholding the death qualification of jurors, is based on "faulty analysis of scientific evidence, severe misunderstandings of the claims, and baffling logic." (Doc. 61, p. 461-63.)

Respondent contends the claim is procedurally defaulted, is *Teague*-barred, and lacks merit. (Doc. 68, p. 169-72.) Barbee replies that, "for the reasons discussed *supra*, procedural default is not appropriate." He provides no page number to identify the reasons to which he refers, however, and the Court finds no actual argument to avoid procedural default on this claim. (Doc. 61, p. 463.)

This claim was raised in state court in Barbee's subsequent writ application and was dismissed as abusive. (Doc. 66-1, p. 261.) Accordingly, claim 16 is barred from federal habeas review. *See McGowen*, 675 F.3d at 499.

Alternatively, the claim is *Teague*-barred and meritless. As the parties observe, a death-qualified jury is one in which prospective jurors are excluded for cause because their inability to set aside their views about the death penalty would prevent or substantially impair their ability to perform their duties in accordance with their instructions and oath. *See Buchanan v. Kentucky*, 483 U.S. 402, 407 n.6 (1987); *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). The Supreme Court held in *Lockhart* that "the Constitution does not prohibit the States from

141

'death qualifying' juries in capital cases." *Lockhart*, 476 U.S. at 173.

The cases relied upon by Barbee do not purport to overrule *Lockhart* and the Supreme Court has never adopted the minority view in *Lockhart*.  As such, Barbee is asking the Court to recognize and retroactively apply a new constitutional rule of criminal procedure that would violate *Teague v. Lane*, 489 U.S. 288, 310 (1989) (holding, with two exceptions, that new constitutional rules of criminal procedure are not applicable to cases which became final before the new rule was announced). *See Caspari v. Bohlen*, 510 U.S. 383, 390 (establishing procedure for federal courts to apply *Teague*). Claim 16 is *Teague*-barred.  To the extent Barbee contends current case law supports his position, the claim also lacks merit.

## XIX.   INTERNATIONAL LAW (CLAIM 17)

In claim 17, Barbee contends that the "improprieties of the [Texas] capital sentencing process" argued in this petition violate international law and the Eighth Amendment, to the extent that the Amendment's evolving standards of decency incorporate international legal norms. (Doc. 61, p. 464-68.) Respondent argues that this claim is barred because it was presented in state court in Barbee's subsequent writ application and dismissed as abusive.  (Doc. 68, p. 173.)  Barbee does not make an argument to avoid the procedural bar, but simply asserts that a de-novo standard of review applies because the state court did not address the claim on the merits.  (Doc. 61,

p. 468; Doc. 77, p. 55-56.)  Accordingly, federal habeas review is barred.  *See McGowen*, 675 F.3d at 499.

Alternatively, the claim lacks merit.  Barbee fails to identify clearly established Supreme Court precedent to support his argument that the International Covenant of Civil and Political Rights ("ICCPR") prohibits the death penalty as it is carried out in Texas. Even assuming that the text of the ICCPR does prohibit the death penalty, Barbee provides no authority that the treaty is self-executing and binding on the states.  In apparent acknowledgment of the absence of controlling authority, Barbee asks the Court to reconsider the circuit authority that forecloses his claim.  (Doc. 61, p. 465-66.) *Beazley v. Johnson*, 242 F.3d 248, 263-64 (5th Cir. 2001)(recognizing that when the United States Senate ratified the ICCPR, it reserved "the right, subject to its Constitutional constraints, to impose capital punishment on any person (other than a pregnant woman)" and declared that the ICCPR provisions were not self-executing); *United States v. Duarte-Acero*, 208 F.3d 1282, 1284-87 (11th Cir. 2000)(rejecting claim on direct appeal that ICCPR creates double jeopardy bar that is broader than Constitution's).

The Court may not forge a new rule for a procedurally barred claim, the recognition and retroactive application of which might violate *Teague*, 489 U.S. at 310.  The Court denies claim 17 as *Teague*-barred, procedurally barred, and lacking merit.

## XX.  ASSISTANCE OF APPELLATE COUNSEL (CLAIM 18)

143

In claim 18, Barbee makes a catch-all assertion that "any purely-record-based claims or sub-claims discussed herein could and should have been raised on the direct appeal if the basis for them was entirely present in the record itself," and that appellate counsel's failure to raise such claims or sub-claims amounts to ineffective assistance under *Strickland*.  Barbee does not identify any particular claim, sub-claim, or instance of ineffective representation on appeal. (Doc. 61, p. 469-71.) Barbee concludes instead that "should this or any subsequent court hold that any purely-record-based claims or sub-claims were not properly brought on the direct appeal Petitioner submits that although he had counsel on appeal, that counsel did not provide the representation mandated by the Constitution." (Doc. 61, p. 470.)

As with previous claims, Barbee raised this claim in his subsequent state habeas application, and it was dismissed as abusive. He makes no argument to overcome the procedural bar. (Doc. 61, p. 471.) He simply asserts in his Reply, "As discussed *supra*, procedural default is not appropriate for any of petitioner's claims." (Doc. 77, p. 56.)  Barbee does not identify the page or part of his Reply to which "supra" refers.

The claim is procedurally barred.  *See McGowen*, 675 F.3d at 499. Moreover, the claim fails to identify facts which, if true, would entitle Barbee to relief.  Specifically, the claim is conclusory because it fails to set forth the nature of counsel's alleged errors

and fails to identify any resulting prejudice.  *See Miller*, 200 F.3d at 282 (holding that district court properly denied claims of ineffective assistance as conclusory where Miller failed to set forth nature of errors and did not assert any resulting prejudice). Claim 18 is denied because it is procedurally barred and conclusory.

### XXI.  MEDICAL EXAMINERS' QUALIFICATIONS (CLAIM 20)

In claim 20, Barbee asserts that one and perhaps both assistant medical examiners who testified about the victims' autopsy results were "not operating properly as a medical examiner and should not have been allowed to testify in this case."  (Doc. 61, p. 481.) Barbee appears to allege that Dr. Krause was not operating under the color of Texas law because his employer, the chief medical examiner of Tarrant County, is actually a corporation and a corporation cannot hold public office.  He claims this denied him due process and a fair trial.  Respondent argues that the claim is barred because it was raised in Barbee's subsequent state habeas application and dismissed as abusive.  (Doc. 68, p. 182.)  Barbee acknowledges this but does not assert cause to excuse the procedural bar.  The Court agrees that the claim is barred.  *See McGowen*, 675 F.3d at 499.

Alternatively, the claim lacks merit.  Barbee provides no authority for his position that the experts could not occupy their positions as assistant medical examiners under Texas law.  The case he relies upon, *Garcia v. State*, 868 S.W.2d 337, 339-42 (Tex. Crim. App. 1993) holds only that the medical examiner's office is a public

145

office and that autopsy reports prepared by the medical examiner are not excluded by the Texas hearsay rule.

Furthermore, while "certain egregious evidentiary error may be redressed by the due process clause," Barbee's allegation, even if it were true, does not rise to this level of error. *Little v. Johnson*, 162 F.3d 855, 860 (5th Cir. 1998) (quoting *Barefoot v. Estelle*, 697 F.2d 593, 597 (5th Cir. 1983).) Barbee challenges the experts' qualifications under state law to hold public office, not their qualifications in their field of expertise. Nor did he challenge their qualifications at the time of trial.  (23 RR 137 (counsel stating that he had no problem with Dr. Krouse's credentials or education), 24 RR 167-68). Barbee's complaint is a legal technicality which he fails to show undermines the reliability of their testimony.

To the extent he complains that their testimony harmed him because it was "speculative and conjectural," this matter has already been addressed in claim 4d.  The indictment alleged two alternative manner and means for each victims' death.  (1 CR 2.) The testimony that Barbee describes as "speculative and conjectural" was offered to prove the various alternative manner and means that were alleged. *See Sanchez*, 376 S.W.3d at 774 (holding that because indictment permitted a conviction under four alternative manner and means, the State could obtain a conviction if any of the alternatives were proven).

Finally, Barbee claims he has not been able to fully develop the prejudice component of this claim or show that the experts' testimony was flawed because this Court denied funding for a coroner/pathologist. (Doc. 61, p. 484; Doc. 23.) Despite being given the opportunity to supplement his request for funds prior to abeyance, Barbee's request for a coroner/pathologist failed to identify a theory under which the testimony was erroneous, let alone constitutionally erroneous. He complained only that the testimony was "speculative" and that he needed to retest or re-examine unidentified trial evidence in relation to an ineffective-assistance claim against trial counsel. (Doc. 19, p. 13; Doc. 22, p. 13.) This request does not even appear to be relevant to this claim, which challenges the witnesses' qualification to hold office under state law. At the time, moreover, this claim was unexhausted. Barbee then raised it in his subsequent state habeas application, where it was dismissed, and he filed no further funding requests in this Court post-abeyance. The Court remains convinced that it properly denied funding.

This claim is procedurally barred and, alternatively, lacks merit. The Court denies claim 20.

## XXII.   CUMULATIVE ERROR (CLAIM 21)

In claim 21, Barbee alleges that he was denied due process by the cumulative effect of all the alleged errors briefed in his petition, even though each may be harmless or not found to be a constitutional violation. He acknowledges that this claim was raised

147

in his subsequent state habeas application and dismissed as abusive. (Doc. 61, p. 486-88.) Respondent argues that the claim is barred under *Coleman*, and Barbee does not argue any cause to excuse the default. The Court agrees the claim is barred. *See McGowen*, 675 F.3d at 499.

Alternatively, the claim lacks merit. "[F]ederal habeas corpus relief may only be granted for cumulative errors in the conduct of a state trial where (1) the individual errors involved matters of constitutional dimension rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors "so infected the entire trial that the resulting conviction violates due process." *Derden v. McNeel*, 978 F.2d 1453, 1454 (5th Cir. 1992) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). Although Barbee alleges cumulative error, he fails to identify the errors upon which he relies and fails to explain how the alleged errors work together to deny him a fair trial. The Court has not found any error in this case. His claims are procedurally barred, conclusory, non-cognizable or lack merit. The Court has reviewed the record in its entirety and finds no cumulative error that so infected the entire trial that the resulting conviction violates due process. *Id.* Claim 21 is denied because it is procedurally barred and lacks merit.

## XXIII.  REQUEST FOR HEARING

The Court previously denied without prejudice Barbee's motion for an evidentiary hearing because the motion was unhelpful to the

Court.   In doing so, the Court stated that it would revisit the hearing request when it addressed the petition in full.   Having considered the full briefing on these issues, the Court now determines that the request for a hearing should be denied.

The Court has discretion to grant a hearing if one is not barred under § 2254(e)(2). *Schriro v. Landrigan*, 550 U.S. 465, 468 (2007). In exercising that discretion, the Court considers whether a hearing could enable petitioner to prove the petition's factual allegations which, if true, would entitle him to relief. *Landrigan*, 550 U.S. at 474.   The Court also must consider the deferential standards in § 2254(d), which limit the Court's ability to grant habeas relief. *Id.* In practical effect, if the state-court record precludes habeas relief under § 2254(d), a district court is not required to hold an evidentiary hearing. *Id.*

Barbee's innocence claim (claim 1) is not a substantive claim for relief.   The Court further found that it lacks new evidence of innocence and is unsound.   The Court has concluded that the state court did not unreasonably deny on the merits claims 2, 3a, 4b, 5d, 5f, 13, 15, and 19, thereby precluding relief under § 2254(d).   The Court assumed claims 5b and 5c were not defaulted, and denied relief on the merits under § 2254(d) as well as on de-novo review.   The Court determined the following claims were procedurally barred and, in the alternative, lacked merit:   3b, 4a, 4c, 4d, 5a, 5e, 6, 7, 9-12, 14, 20, and 21.   The Court found claims 16 and 17 to be procedurally

149

defaulted, lacking merit, and *Teague*-barred.  Finally, claim 18 is procedurally barred and fails to allege facts that would entitle Barbee to relief.

In short, habeas relief is precluded because the claims are either barred, were not unreasonably adjudicated under § 2254(d), or fail to allege a viable claim of federal constitutional merit. A hearing is inappropriate, and the Court therefore denies Barbee's request for a hearing.

## XXIV.   CONCLUSION

Based on the foregoing, the Court **DENIES** Barbee's petition for a writ of habeas corpus.

In accordance with Federal Rule of Appellate Procedure 22(b) and 28 U.S.C. § 2253(c), the Court **DENIES** Barbee a certificate of appealability because he has (1) failed to make a substantial showing of the denial of a constitutional right, and (2) failed to show that jurists of reason would find it debatable (a) whether the petition states a valid claim of the denial of a constitutional right and (b) whether the Court was correct in its procedural rulings. *See Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003); *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000); 28 U.S.C. § 2253(c)(2).  If Barbee files a notice of appeal, he may proceed in forma pauperis on appeal.  18 U.S.C. § 3006A(7).

## XXV. STATEMENT REGARDING BRIEFING AND
## ORDER TO COMPLY WITH LOCAL PAGE LIMIT RULES

Barbee's first federal petition exceeded 300 pages, excluding exhibits. (Doc. 24.)  The amended petition filed after abeyance was 492 pages long, also exclusive of exhibits. (Doc. 61.) His motion for hearing was 46 pages.  (Doc. 73.)  The State's answer was 191 pages. (Doc. 68.)  In a motion requesting additional time to file his reply, Barbee cited the length of the petition and the answer as one of the reasons why he needed more time.  (Doc. 69.)  The Court granted the extension of time, but limited the reply to 25 pages. (Doc. 70.)  Barbee filed a 102-page reply with a motion for leave to exceed the page limit.  (Doc. 72.)  The Court granted leave to file a reply not exceeding 50 pages and ordered that all future filings comply with the page limits in the local rules.  (Doc. 74.) In that order, the Court noted that Barbee's excessive and careless briefing interfered with the adjudication of the case and the functioning of the Court.  The Court's initial concern was that the excessive length and heavy reliance on boilerplate and cross-referencing would obscure important points in inconspicuous places. But the Court's concerns go deeper.

While habeas proceedings are used to challenge presumptively valid state-court convictions, many of Barbee's arguments are not designed to overcome this presumption.  Rather, they assume he is innocent and from this premise conclude that what occurred in state court is, therefore, error. In other places, the amended petition

simply reasserts the argument that was presented in state court, citing only favorable facts. The arguments frequently fail to acknowledge contrary facts and contain misrepresentations.[16] The multiple claims against trial counsel are in large part duplicative. Many claims are conclusory. Some claims rely upon multiple constitutional provisions that are not briefed.[17] The facts often are not joined to the boilerplate law, leaving the reader to make the argument by following ambiguous references to other sections. The writing contains hyperbole and denigrates trial counsel. (Doc. 61, p. 255-56.) In short, the "kitchen sink" approach and lack of editing have resulted in a pleading that is not merely vexing and unhelpful to the Court, but untrustworthy.

The petition does not meet the requirement that filings be non-frivolous, reasonably accurate, and not needlessly increase the cost of litigation. *See* Fed. R. Civ. P. 11(b). Counsel is warned that future filings of this caliber may result in the imposition of sanc-

---

[16] *E.g.,* false quote in confession expert's letter (p. 140-41); suggestion that trial counsel fired the mitigation specialist from this case (p. 194); suggestion that Mr. Ray did not tell Dr. Leo that Barbee admitted moving the bodies and suggestion that Mr. Ray did not correct false information initially given about cell phone records (p. 180-81); assertion that Maxwell's mitigation report was given to the prosecution and used against Barbee (p. 208, 318-19); assertion that Barbee did not tell Trish he committed the murders, but only told her he moved the bodies (p. 225).

[17] For example, the ineffective-assistance allegations in claim three state that Barbee's "conviction, judgment, sentence and confinement are illegal and were obtained in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights to a fair and impartial jury, the presumption of innocence, a fair trial, freedom from self-incrimination, effective assistance of counsel, due process of law, and reliable guilt and penalty determinations, because trial counsel failed adequately to prepare for trial." The attending argument, however, cites only to the Sixth Amendment. (Doc. 61, p. 216, 217).

tions.  *Id.*  Judges are "like other mortals" with a "finite supply of time and trust." *See Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989).

It is apparent that these problems are facilitated and exacerbated by the sheer length of the documents filed by counsel.  As such, the Court's order to comply with the page limits imposed by local rules remains in effect.  **Post-judgment filings that exceed the page limits will be stricken.**

SIGNED July 7, 2015.

_Terry R. Means_
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE

TRM/ks:bb