IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

STEPHEN DALE BARBEE,          §
          *Petitioner,*        §
                              §
V.                            §
                              §    Civil Action No. 4:09-CV-074-Y
WILLIAM STEPHENS, Director,   §
Texas Department of Criminal  §         (death-penalty case)
Justice, Correctional         §
Institutions Division,        §
          *Respondent.*        §

**MEMORANDUM OPINION AND
ORDER DENYING MOTION TO ALTER OR AMEND THE JUDGMENT**

Before the Court is Stephen Dale Barbee's motion to alter or
amend the Court's judgment denying the relief requested in his amended
petition for writ of habeas corpus ("motion") [Doc. 85]. Respondent
opposes the motion. The Court assumes the parties' familiarity with
its opinion in this case. *See Barbee v. Stephens*, No. 4:09-CV-074-Y,
2015 WL 4094055 (N.D. Tex. July 7, 2015).

I.  Applicable Law

Barbee has moved, under Rule 59(e) of the Federal Rules of Civil
Procedure, to alter the judgment and correct what he contends are
errors of law and fact. The decision whether to reopen a case under
Rule 59(e) is within the district court's discretion. *See Johnson
v. Diversicare Afton Oaks LLC*, 597 F.3d 673, 677 (5th Cir. 2010).
It is an extraordinary remedy that should be used sparingly. *Templet
v. Hydrochem, Inc.*, 367 F.3d 473, 479 (5th Cir. 2004).

In particular, "[a] motion to alter or amend the judgment under
Rule 59(e) must clearly establish either a manifest error of law or
fact or must present newly discovered evidence and cannot be used

to raise arguments [that] could, and should, have been made before the judgment issued." *Schiller v. Physicians Res. Group Inc.*, 342 F.3d 563, 567 (5th Cir. 2003) (internal quotation marks and citations omitted).  Relief under Rule 59(e) is also appropriate when there has been an intervening change in the controlling law. *Id.*  A motion to alter or amend may also be granted if necessary to prevent manifest injustice.  *Amir-Sharif v. Comm'rs of Dallas*, No. 3:07-CV-0175-G, 2007 WL 1308314, at *1 (N.D. Tex. May 4, 2007) (Fish, C.J.) (citing *Fresh America Corp. v. Wal-Mart Stores, Inc.*, No. 3:03-CV-1299-M, 2005 WL 1253775, at *1 (N.D. Tex. May 25, 2005) (Lynn, J.)).

Respondent asserts that this Court lacks jurisdiction to decide Barbee's motion because, in this Circuit, a post-judgment motion that attacks the Court's merits determination is, in effect, a successive petition for which circuit-court authorization is required.  *See* 28 U.S.C. § 2244(b) (statute controlling second or successive habeas applications); *Gonzalez v. Crosby*, 545 U.S. 524, 530-31 (2005) (holding that Rule 60(b) motion attacking the substance of the district court's resolution of a claim on the merits is, in effect, a successive petition); *Williams v. Thaler*, 602 F.3d 291, 301-04 (5th Cir. 2010) (extending *Gonzalez* framework to motions under Rule 59(e)). Barbee acknowledges that there is a split among the circuits on this issue, and he argues that *Williams* was wrongly decided.  He also asserts that, even under the *Williams* rule, his motion is not the equivalent of a second or successive petition because it raises no new grounds for relief and presents no new evidence.

The Court assumes it has jurisdiction over the motion but denies it for lack of merit.  As stated above, a 59(e) motion must clearly establish either a manifest error of law or fact.  It is not a vehicle for rehashing evidence, legal theories, or arguments that could have been made before the judgment issued.  The motion does not meet these standards.

## II.   Claim 1 - Actual innocence

Barbee makes four distinct challenges to the Court's analysis of his actual-innocence claim.  Initially, the Court notes that Barbee's argument for actual innocence is in reality a challenge to his trial counsel's chosen defensive strategy.  The claim asserts that the State's theory at trial "made little sense" and that trial counsel should have presented a "Dodd did it" theory, based largely on evidence that was known to the defense team at the time of trial. He fails to acknowledge that there were no witnesses to say "Dodd did it" because Barbee refused to testify.  Thus, as discussed below, the claim relies upon opinion testimony from his family and friends, Dodd's criminal history, and anecdotal evidence suggesting why Dodd and ex-wife Theresa would want to frame Barbee for murder.

The Court, in addressing one reason why the claim fails, observed that the "Dodd did it" theory makes little sense because it does not account for the fact that Dodd could not have known Barbee would confess.  Barbee argues that his theory does not depend on Dodd's knowing beforehand that Barbee would confess because Dodd knew Barbee would be implicated in the murder anyway, based on his romantic relationship with the victim.  Barbee was, in fact, a prime suspect

3

even before he confessed. But this does not undermine the Court's conclusion that the frame-up theory lacks credibility.

According to Barbee's declaration presented in support of his amended petition, Dodd murdered the victims while Dodd's truck was parked, with Barbee inside, in the victims' driveway. When Dodd was finished, he returned to his truck, told Barbee, "Your problems are solved, go get her truck," and then left suddenly, leaving Barbee alone on the victims' doorstep. Upon finding his pregnant girlfriend and her seven year-old son murdered, Barbee did not send the police to Dodd's home (which he knew Dodd shared with Theresa) but loaded the bodies into the victim's truck and called Dodd for help. Dodd did not leave Barbee in this incriminating predicament but met Barbee in the woods with a shovel. Dodd left again but returned to assist Barbee in his evasion of the deputy sheriff. Dodd ultimately took Barbee home with him. (Doc. 66-3, p. 91-92.)[1] These are not the actions of a person trying to frame Barbee for murder. For that matter, Barbee's actions were not the actions of a person who fears he is being framed. If Dodd were trying to inculpate Barbee, Barbee's confessions to Trish, Theresa, and the police did more to accomplish that end than anything Dodd did. Yet Dodd could not have relied upon the confessions as part of his alleged plan.

Barbee next asserts that the Court improperly discounted Danny Dowling's statement to his father, Jerry, and to Tina Church that

_____

[1] Electronic documents are cited by the CM/ECF number and .pdf page number.

he, Danny, heard Dodd confess to murder.[2]  Danny is Theresa's brother, and Jerry Dowling is their father.  There is no declaration in the record from Danny.  Barbee relies upon Danny's statements as reported in the declarations of Jerry and a licensed investigator named Tina Church.  Tina Church is the founder of "The Other Victims Advocacy," and was contacted by Barbee's mother shortly after Barbee's arrest. Church provided Barbee's family with investigative and other services. As part of her investigation, Church spoke to Danny.  (Doc. 66-3, p. 109-12.)

The Court's opinion discounted Danny's statement as reliable evidence of innocence because Danny had accused *Barbee* of making the same incriminating remark.  Danny had also told Church that, when he saw the Amber Alert sign for the victims, he said to himself, "that's probably something that [Barbee] would do."  (Doc. 66-3, p. 112.)  These remarks, which call into question Danny's statement implicating Dodd, were omitted from Barbee's innocence argument. (Doc. 61, p. 132.)  Barbee now faults the Court for pointing out these remarks for what they are and complains that (1) the Court ignored the fact that Jerry is Theresa's father and would therefore have no motive to implicate Dodd, with whom Theresa was living, and (2) the Court overlooked statements in Church's declaration indicating that *Church* did not believe Danny's statements inculpating Barbee.

Barbee's argument that Jerry would have no motive to implicate Dodd is untrue, based on the record.  Jerry's declaration states that

---

[2] The statement Danny attributed to Dodd was something like: "I had to hit the bitch 25-26 times in the face before she would go down."  (66-3, p. 112, 134.)

his first impression of Dodd was that he was "a smart ass, loudmouth, and obnoxious," and that he told his daughter, Theresa, that he did not want to meet Dodd.  Jerry knew Dodd "was like a dog that would come up to the back door and Theresa was feeding him.  He was there for the money.  Big money was being thrown around."  Barbee, on the other hand, looked up to Jerry like a father and would seek his direction on personal and business matters.  Jerry praised Barbee as "a very hard worker, and a generous person," who came "from a very good stable family."  Jerry did not believe Barbee was responsible for the murders.  (Doc. 66-3, p. 133-34.)  Based on his declaration, the assertion that Jerry had no motive to implicate Dodd is untrue.

The Court also rejects Barbee's complaint that the opinion does not credit statements in Church's declaration indicating "the impossibility" that Barbee could have implicated himself to Danny.  The Court did not overlook this information; it is obvious from her declaration that Church believed Danny when he incriminated Dodd but did not believe Danny when he incriminated Barbee.  (Doc. 66-3, p. 112.)  But the Court is not obligated to accept Church's opinion about which of Danny's statements is true.  *Schlup v. Delo*, 513 U.S. 298, 330 (1995) (noting that the habeas court may have to make some credibility assessments).  More to the point, a petitioner making an innocence claim must support the claim with reliable evidence.  *Id.* at 324. The analysis is not this Court's independent determination about what likely occurred, but an assessment of how reasonable jurors would

6

react to the overall newly supplemented record. *See House v. Bell*, 547 U.S. 518, 538 (2006). Based on Church's report, Danny is a vacillating witness who ultimately could not remember whether Dodd or Barbee made the incriminating remark. Danny also made a separate statement indicating he believed that the victims' disappearance was "probably something that [Barbee] would do." For these reasons, Danny is not a reliable witness to Barbee's asserted innocence, Church's opinion notwithstanding.

Next, Barbee challenges the Court's rationale that evidence of head injuries or debilitating headaches is incompatible with innocence because that sort of evidence provides an excuse for wrongdoing. Barbee first contends that the Court misconstrued his claim because such mitigating evidence would have been offered at punishment when guilt has already been decided. It therefore appears that Barbee is in agreement with the Court that evidence of a head injury or debilitating headaches is the sort of evidence that would be used as mitigating evidence at punishment. Barbee appears to take issue, however, with the Court's conclusion that such evidence is inconsistent with actual innocence. Other than to say his trial counsel did not, in actuality, present an innocence theory to be "inconsistent" with (a matter addressed more fully in claim 4 below), Barbee fails to clearly explain his position and provides no rationale for revisiting this issue.

Assuming without deciding that head injury and headaches are not inconsistent with innocence, as Barbee contends, the Court's decision is unaffected because the Court held, in the first instance, that Barbee's head injuries and headaches were not "new" evidence, as required by *Schlup*. *See Moore v. Quarterman*, 534 F.3d 454, 465 (5th Cir. 2008) (holding that evidence is not "new" if it was always within the reach of petitioner's personal knowledge or reasonable investigation).  There is no debate that trial counsel possessed evidence of Barbee's head injuries and headaches. (Doc. 27, p. 41; Doc. 66-7, p. 25; 25 RR 76-77.)

To the extent that this claim may rely upon the arguably new post-conviction opinion of Dr. Martin that Barbee is brain-impaired, the Court stands by its conclusion that Dr. Martin's opinion is inconsistent with actual innocence.[3] Assuming Dr. Martin's diagnosis is accurate,[4] the frontal-lobe impairment does not demonstrate innocence but provides a reason why Barbee murdered the victims. Dr. Martin noted that the frontal-lobe impairment provides "a broader and more accurate explanation for why Mr. Barbee could have engaged in a violent crime."  Dr. Martin opined that, "Mr. Barbee's violent

---

[3] The Court addresses the alleged brain-impairment separately from the head injuries and headaches out of an abundance of caution and due to its concern, previously explained in other orders, about identifying all the issues raised in Barbee's briefing, which was excessive and dependent on cross-referencing.  Barbee argued in claim 4(a) that frontal-lobe-impairment evidence should have been presented at the guilt phase of trial and incorporated by reference the facts and argument from the innocence claim.  (Doc. 61, p. 232-35.)

[4] Dr. Martin's post-conviction opinion conflicts with the opinions of the three mental health experts retained by trial counsel.

8

actions at the time of the offense would have been mediated by emotional factors as opposed to reason to due the aforementioned damage to his frontal lobes" and that the damaged frontal lobes "would have likely increased his impulsivity tendencies and reduced his ability to fully consider the consequences of his actions." (Doc. 27, p. 51-53.)  This evidence would have made it more apparent that Barbee intended to cause the victims' deaths.  *See, e.g., Jackson v. State*, 160 S.W.3d 568, 572 (Tex. Crim. App. 2005) (recognizing that evidence that the paranoid schizophrenic defendant thought his brother was out to get him only made it more apparent that he intended to cause his brother serious bodily injury or death).

Barbee's last complaint about the innocence analysis concerns the Court's conclusion that Barbee "presents no newly-discovered evidence required by *Schlup.*"  Barbee appears to take issue with the word "new," and argues that much of his evidence is newly discovered because it is contained in the 2010 declarations attached to his amended petition.  The Court disagrees with Barbee's unarticulated assumption that information within his knowledge at the time of trial becomes "new" simply because it is memorialized in a post-trial declaration.  But even if the evidence can be considered new, none of it is the sort of compelling evidence required by *Schlup*.  There is no scientific evidence, no eyewitness accounts, no critical physical evidence, no evidence questioning the credibility of a critical trial witnesses.  To generalize, Barbee's evidence consists of

Dodd's criminal history, the fact that Dodd washed his clothes and his truck on the night of the murders, the opinions of Barbee's family and friends about who is more likely to be the murderer, and weak[5] anecdotal evidence that Theresa, and by extension, Dodd, wanted Barbee out of their shared business arrangement and possibly stood to benefit financially from Barbee's death.

Barbee's evidence also consists of information from family and acquaintances, which originates from Barbee himself, that Barbee's confessions were false. Aside from the inherently self-serving nature of this information, Barbee has a history of attempting to fabricate evidence for his defense.  There is unrefuted evidence that Barbee tried to get Theresa to implicate Dodd (Doc. 66-7, p. 38-39; Doc. 66-8, p. 43; 25 RR 100-102), and that Barbee agreed to pay an inmate to testify that Dodd had confessed.  (Doc. 66-8, p. 41-42; Doc. 66-6, p. 62, 64.)  Thus, considering all the old and new evidence, both incriminating and exculpatory, without regard to its admissibility, it fails to demonstrate that, more likely than not, no reasonable juror would find him guilty beyond a reasonable doubt.

---

[5] At the time of the murders, Theresa and Dodd already resided in Barbee's grand former home, and shortly after his arrest, Barbee transferred the businesses (which were in debt) to Theresa for zero compensation.

### III.   <u>Claim 4 - Counsel's assistance at guilt phase</u>

Barbee challenges the Court's reasoning with respect to claim 4a and 4b that the presentation of head-injury or other excuse evidence at the guilt phase of trial presupposes that Barbee did something to excuse and would have been inconsistent with Barbee's assertion that he did not commit the offense. He contends this is incorrect because trial counsel did not present an "actual innocence" defense but only a "legal innocence" defense. He contends that the accidental killing theory presented by trial counsel is not inconsistent with a head injury, but would have supported it, and that the theory counsel argued to the jury did not relieve counsel of his obligation to present mitigating evidence of head injury.

Barbee's argument that evidence of his head injuries would have supported the accidental-killing theory belies the fact that trial counsel, who had the assistance of three mental-health experts, possessed no evidence that Barbee was brain-impaired as a result of his head injuries. Barbee also fails to acknowledge that Texas law does not allow evidence of a mental defect less than insanity at the guilt phase of trial. *See Jackson*, 160 S.W.3d at 572 (holding that Texas law does not recognize a lesser form of insanity affirmative defense). While Texas *does* allow such evidence to negate the alleged mental state, there is no evidence that, due to his head injury (or alleged frontal-lobe impairment) Barbee did not know or intend the result of his actions. His alleged brain impairment, as discussed

11

above, only inhibited his ability to control his emotions, control his impulsivity, and fully consider the consequences of his actions, which are not defenses in Texas. *See Ruffin v. State*, 270 S.W.3d 586, 593 (Tex. Crim. App. 2008)(holding that Texas does not recognize diminished mental-state defenses that permit the exoneration or mitigation of an offense because of a person's supposed psychiatric compulsion or inability to engage in normal reflection or moral judgment).

In addition to the foregoing, Barbee's assertion that evidence of head injuries would have augmented trial counsel's accidental-death theory is dubious. Trial counsel elicited testimony from the assistant medical examiner that the victim's airway would have likely been more obstructed because her uterus was "bigger than a basketball" and that she would have had less cardiovascular reserve in her third trimester than at other times. The medical examiner agreed that the more pregnant the victim, the less time it would take for her to die. (23 RR 188-89.) Trial counsel then argued to the jury that Barbee simply held the victim down too long based on her physical condition, which was consistent with his confession to Trish. Thus, counsel's theory was based on the victim's physical state not Barbee's mental state, and it would not have been augmented by evidence of Barbee's head injuries.

IV.   <u>Claim 5 – Counsel's assistance at sentencing</u>

Barbee takes issue with the Court's discussion in claim 5 concerning trial counsel's decision not to elicit opinion testimony from punishment witnesses about Barbee's lack of future dangerousness. Barbee asserts that the "road rage" incident was wrongly termed "a history of violent behavior," which trial counsel then used as a rationale for not presenting "mitigation relating to future dangerousness" on the pretext that the State might somehow find out about it. This cannot past muster, he contends, because trial counsel did not investigate or ask potential witnesses about Barbee's past.   He contends the Court ruled against him only by denigrating much of his evidence as unreliable while crediting trial counsel's explanations "in all respects."[6]

---

[6]Barbee elaborates in a footnote that the Court found unreliable the declarations of the "disinterested" declarants Tina Church and Patricia Springer. Barbee's description of Church as "disinterested" is less than candid: Church is the founder of The Other Victims Advocacy ("TOVA") and assisted Barbee's family by conducting a fact investigation, providing Barbee's mother with a filing system and a copier/fax machine, and being a confidant on matters related to the case. Barbee regularly called Church collect from jail to express displeasure about his attorneys and talk about his relationship with Theresa and the events for which he was arrested. (Doc. 66-3, p. 109-10.) This information alone makes her an interested witness. But in addition, her biography on the TOVA website states that Church has "been on the front lines in the fight to abolish the death penalty since the early 90's [sic]." *See*   http://www.theothervictimsadvocacy.com/team.htm (*last visited* Aug. 20, 2105)(printed and attached as an exhibit to this Order). Barbee should know this, as his federal habeas counsel is part of the same TOVA team.

The problem with Springer's declaration, on the other hand, is that it is vague to the point of being irrelevant. Springer, while researching her book about the murders, stated that she had visited the Tyler Police Department at an unnamed time and asked to visit the bathroom where Barbee (according to the record) confessed. Upon her inquiry, an unnamed officer told Springer that, to his knowledge, no one had ever confessed in the bathroom. There is no indication that this officer was employed at the department when Barbee was arrested, was in a position to have known about the confession, or could even be identified by name. (Doc. 28, p. 28-29.)

The argument is factually incorrect. Trial counsel had information about a fight after a road-rage incident in which Barbee, then employed as a reserve police officer, had to be pulled off of an older man and his adult son. But trial counsel also had information about "some other things that Mr. Barbee had allegedly done" that the motion fails to acknowledge. (Doc. 66-8, p. 26, testimony of Ray.) They include setting baby hamsters on fire with gasoline,[7] extensive vandalism of a school building, stealing from a bait-and-tackle store and a concession stand, fire-setting, theft of jewelry and other items from a locker room, killing an animal while on a date with Michelle Cook, and bribing another inmate to testify that Dodd confessed. (Doc. 66-7, p. 34-36, 38, 49 (testimony of A. Maxwell); Doc. 66-8, p. 28 (testimony of Ray).) Any of the above information could have been the subject of cross-examination at trial had defense counsel elicited opinion testimony about Barbee's propensity for future dangerousness.

---

[7] In another footnote, Barbee complains that the Court placed unfair emphasis on the "hamsters which may have been set on fire," because it "amounted to an unverified report" from "Mr. Boyd," and "Mr. Boyd's" declaration states that Barbee was a well-behaved young man, whose behavior was not out of the ordinary, and who would probably not commit future violent acts. Barbee also asserts that "Mr. Boyd" could not have testified to the animal cruelty because it was just a story, not something he observed. Barbee fails to acknowledge, however, that this was a story that "Mr. Boyd" heard from Barbee himself. (Doc. 66-7, p. 36, testimony of A. Maxwell.) The motion does not explain how, if asked on the witness stand, "Mr. Boyd" could avoid retelling the story without committing perjury.

Moreover, Barbee's use of the vague "Mr. Boyd" conflates Jeff Boyd with his father, Bobby Boyd. Jeff, a childhood friend, was the person Barbee told about his hamster burning, while Bobby was the declarant who did not think Barbee had a high probability of future violence. (Doc. 66-7, p. 35-36 (reporter's record pages 77-78); Doc. 27-1, p. 18.) Thus, Barbee's assertion that this Court unfairly failed to acknowledge the good things "Mr. Boyd" said about Barbee in his declaration is misleading at best: there is no declaration from Jeff. Efforts like this to beguile and mislead the Court are not appreciated and are subversive of Barbee's counsel's credibility with the Court.

Further, the suggestion that trial counsel feared the State might somehow find out about the road-rage incident from defense witnesses demonstrates a failure to grasp Texas law.  Trial counsel had reason to believe the State already knew about it.  (SHR 71; Doc. 66-8, p. 28, 57.)  Whether the defense witnesses themselves knew the information is beside the point; the State would have been entitled to test the witness's knowledge of prior bad acts and the jury would have heard the damaging questions. *Wilson v. State*, 71 S.W.3d 346, 350 (Tex. Crim. App. 2002)(unanimously holding that a witness who testifies to a defendant's good character may be cross-examined to test the witness's knowledge of relevant specific instances of conduct). Any witness who maintained the opinion that Barbee was not a future danger could have been impeached as either (1) uninformed, because he does not know Barbee's true behavior or (2) biased, because he knows about the behavior but it does not affect his opinion.  A third and arguably worse scenario is that the witness, after learning of these prior bad acts on cross-examination, changes his opinion.

## V.   Claim 5a - Counsel's assistance at sentencing

Next, Barbee challenges the Court's analysis of his complaint regarding Susan Evans's testimony.  Barbee asserts that the Court wrongly accused him of citing Evans's testimony out of context and of failing to acknowledge trial counsel's strategy in using Evans's testimony.  In his defense, he contends that "all of the 43 instances of Ms. Evans's testimony mentioned were clearly identified by both

volume and page number and were presented in strict chronological order of her testimony." This is correct; the petition cited to the record chronologically. Barbee misses the point, however, in that he presented only fragments of Evans's sentences in order to place them in a more ominous light. Under trial counsel's direct examination, Evans presented an overall picture of the prison disciplinary and classification system, the reality of prison violence, and the steps taken to deal with that violence, which focused on employee training. She also testified that murderers often make the best inmates because the triggering circumstances do not repeat themselves in prison. Barbee's amended petition presented the portions of Evans's testimony that involved matters of prison violence but ignored the rest. Had trial counsel failed to acknowledge the violence in prison, as Barbee suggests, the prosecution surely would have done so on cross-examination, with a greater impact on the jury. It could have also created the appearance that counsel was uninformed or trying to hoodwink the jury.

Despite the fact that federal counsel extensively questioned trial counsel in the state habeas hearing about his use of Evans's testimony, the amended petition fails to acknowledge counsel's asserted strategy. Trial counsel testified that his theory was to show that "the prison system has the ability to react to [the] violence of inmates," that "people on death row are not the only people that have committed violent acts and not the only people to

commit violent acts in prison," and that "the prison has a system in place to take care of those kind of problems," which are a "very small percentage of infractions, given who's there." (Doc. 66-8, p. 30-31.) Counsel also explained that he was trying to distinguish Barbee's behavior out of prison from his likely behavior in prison because the prosecution told the voir dire panel that the answer to the future dangerousness issue could be based on the facts of the offense alone. (Doc. 66-8, p. 31.) Barbee disagrees that he failed to acknowledge the strategy, pointing out that his amended petition asserts that Evans's testimony was unhelpful to counsel's stated "overall strategy," and was very damaging to Mr. Barbee's case for a life sentence. It is true that the amended petition asserts that Evans's testimony was "very damaging to Mr. Barbee's case for a life sentence," but nowhere does it mention counsel's strategy to demonstrate that the prison system has the ability to react to inmate violence. To the extent that the amended petition tacitly acknowledges, in its criticism of counsel, the general concept of having a strategy for securing a life sentence in a capital defense, his argument is one of semantics and quibbling over the Court's choice of words. Whether it is called a strategy or a purpose or something else, the amended petition failed to acknowledge why counsel presented the evidence.

17

VI.   Claims 5b and 5c - Counsel's sentencing investigation

Barbee next asserts that the Court did not properly acknowledge his challenge to trial counsel's "investigation" as opposed to trial counsel's "presentation."  On the contrary, the Court understands his claim to allege a "failure to investigate," as well as a "failure to present" the allegedly overlooked evidence in the declarations attached to his amended petition.  The fact of the matter is, however, that much of the evidence in the declarations was known to trial counsel, or elicited at trial, or both.  The complaint otherwise concerns trial counsel's alleged failure to investigate Barbee's "propensity for future dangerousness" by asking called and uncalled lay witnesses for their opinion on the matter.  This complaint fails to recognize the risky strategy of presenting such opinion testimony, as previously discussed, and trial counsel was not deficient for failing to pursue it.

Barbee complains the Court arrived at its conclusion by accepting, without any reason, trial counsel's explanations at face value while discounting or minimizing evidence favorable to Barbee.[8]  He is incorrect.  In the first place, the Court may not disregard any

---

[8] For example, Barbee complains in a footnote that the Court minimized the fact that Theresa had Barbee transfer the businesses after his arrest without compensation.  But the jury heard this evidence.  (25 RR 61-62.)  And Theresa explained that Barbee asked her to accept the transfer and that the businesses were in debt.  (25 RR 94.)  There is also no indication that Barbee transferred the businesses unwillingly, and it appears that the transfer may have allowed Barbee to qualify for appointed counsel, as company assets are not listed on his affidavit of indigency.  (1 CR 19.)  *See* doc. 66-3, p. 109 (Church's declaration stating that Barbee's family was in no position to pay retained counsel and Barbee "finally qualified as indigent").

factual issues determined by the state court unless they are rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). Secondly, with the exception of Dr. Goodness, whose "Dangerousness Risk Assessment" Barbee did not provide, the Court accepted the information in his declarations as true. The Court found the information unpersuasive evidence of ineffective assistance, however, for the many reasons explained in the opinion.

Barbee greatly overstates the value of his proffered declarations when he asserts, "Virtually all of the declarations attached to the petition show that these potential witnesses would have presented a dramatically different picture of the 'future dangerousness' special issue . . . as well as the general mitigation themes . . . ." Generally speaking, the declarations contain good character evidence, academic struggle, the loss of siblings to illness and accident, head injuries, headaches, voluntary hydrocodone abuse, suicidal ideation, opinion testimony from family and friends that Barbee would not be a future danger, and anecdotal evidence of Dodd's and Theresa's bad character. This case is a far cry from the investigations and over-looked evidence in the opinions cited by Barbee where counsel was deemed ineffective. *E.g., Sears v. Upton*, 561 U.S. 945 (2010) (finding ineffective counsel's "one day or less" investigation spent talking to witnesses selected by petitioner's mother, which overlooked evidence of his parents' physically abusive relationship, sexual abuse at the hands of a cousin, verbal abuse and inappropriate discipline,

significant frontal-lobe damage suffered during childhood, and drug and alcohol abuse in his teens); *Porter v. McCollum*, 558 U.S. 30 (2009) (finding counsel ineffective for failing to take even the first step of interviewing witnesses or requesting records, thereby failing to discover evidence that Porter suffered severe abuse from his father, dropped out of school at 12 or 13, jointed the military at age 17, served heroically in the Korean War and was injured twice, had long-term substance abuse, and impaired mental health and mental capacity); *Rompilla v. Beard*, 545 U.S. 374 (2005) (finding counsel ineffective for failing to examine court file which would have led to discovery of evidence of alcohol-related incarcerations, schizo-phrenia and other disorders, organic brain damage, childhood problems probably related to fetal alcohol syndrome, and an abusive home life); *Wiggins*, 539 U.S. at 517 (finding counsel ineffective for failing to uncover evidence that petitioner's mother was a chronic alcoholic who starved her children and left them alone for days, had sex with men while her children slept in the same bed, and once forced Wiggins's hand against a hot stove, and that Wiggins's foster families physically abused, molested, raped, and gang-raped him).

Barbee asserts that trial counsel failed to fully present his non-violent nature and low risk of future dangerousness to the jury. This is untrue.  Opinion testimony from family and friends, as suggested by Barbee, is only one way to litigate the future dangerous-ness issue and is dependent on the inherently biased opinions of

friends and loved ones.  It can also be unnecessarily risky for the reasons already discussed.  Counsel here held the State to its burden of proof and let the lack of evidence speak for itself.  Counsel guaranteed that Barbee had no prior convictions or juvenile history because the State did not offer any evidence of such.  Counsel summarized the previous 36 years of Barbee's non-violent life, including a good family life, the tragedies he endured and overcame, his strong work ethic, and his involvement in the church.  (27 RR 7-11.)  Counsel emphasized that the people who testified on Barbee's behalf and ate dinners with him (Pastor Cearley, Barbee's mother, aunt, and niece, a friend from church, an ex-girlfriend, the girl-friend of his former roommate, and a deputy sheriff who worked at the jail) knew the "real" Stephen Barbee.  Counsel presented testimony and argument that Barbee had good behavior in the jail and that he would be almost 80 years old before he was eligible for parole. Barbee fails to show that counsel's litigation of future dangerousness was deficient.

Barbee contends the Court's analysis conflicts with Supreme Court case law because trial counsel "by their own admission" abandoned their investigation of Barbee's background after having acquired only rudimentary knowledge of his history from a narrow set of sources. He fails to cite where, in the record, trial counsel made such an admission, and the Court can find none.

Barbee reasserts his challenge to trial counsel's decision not to present evidence of "head injuries, good character evidence, and lack of future dangerousness" because Barbee refused to accept responsibility. Barbee exaggerates the scope of counsel's reliance on this rationale. Trial counsel believed that the head injuries and some of Barbee's mental-health diagnosis could have been helpful at punishment only if Barbee had accepted some responsibility for his actions. (Doc. 66-8, p. 39.) This was in accordance with Dr. Shupe's evaluation. (SHR 98.) Counsel also believed, however, that the usefulness of the head-injury evidence and mental-health diagnosis was outweighed by the diagnosis of anti-social personality disorder and the fact that the State would have been entitled to an expert evaluation, which probably would have yielded the same harmful conclusions as Dr. Shupe. Trial counsel also believed that excuse evidence could solidify the guilt issue because it provided a reason why Barbee would "snap." He believed it could be aggravating when the defense theory at the guilt phase was "the State's whole case [is] a lie." And trial counsel did not want to be inconsistent with the punishment witnesses who would testify that Barbee was innocent. (Doc. 66-8, p. 24, 39, 44.) Barbee fails to show these decisions were unreasonable.

Finally, Barbee asserts that counsel's rationale contradicts case law holding that a sentencing strategy focused on the defendant's "direct responsibility" for the murder is not necessarily mutually

exclusive of a sentencing strategy focused on mitigation. *See Wiggins*, 539 U.S. at 535. The comparison to *Wiggins* is simply inapt. As noted, trial counsel did not pursue a sentencing strategy based on Barbee's lack of "direct responsibility" to the exclusion of mitigation evidence. Counsel presented mitigation testimony from Barbee's pastor, mother, aunt, niece, and five friends (one of whom was a deputy sheriff), as well as Barbee's ex-wife, Theresa, on cross-examination.

## VII.  Statement regarding briefing

The motion, as a final matter, argues that some of the misrepresentations and errors in Barbee's amended petition were wrongly identified as such and may, therefore, constitute a basis for altering or amending the Court's opinion. In his Reply, Barbee concludes, without explanation, that "many of the alleged 'misrepresentations and errors'" were in fact based on "the Court's misreading of the facts and/or the law." (Doc. 88, p. 9). Three of the arguments in the motion merit discussion.

Barbee first denies making the misrepresentation that trial counsel fired Amanda Maxwell in this case. He explains that trial counsel in fact "terminated his relationship" with Maxwell, which is the practical equivalent of firing her in this case. The Court disagrees that these are equivalent. Maxwell's post-conviction declaration against trial counsel in this case and the subsequent termination of her relationship with him, occurred more than a year

23

after Barbee was convicted.  (Doc. 27, p. 44; Doc. 66-7, p. 32; 2 CR 411.)  Counsel did not fire her in "this" case.  Yet Barbee's amended petition had asserted that trial counsel fired Maxwell while trial was pending in order to argue that counsel was operating under a conflict of interest due to a secret agreement with the trial judge to dispose of the case quickly.[9]  Terminating a relationship *after* the conviction, which is what actually happened, does not carry the same stain of disloyalty and is far from the practical equivalent of firing her before trial was over.

Barbee next denies making the misrepresentation that trial counsel gave Maxwell's mitigation report to the prosecution before trial.  He contends that the actual wording in his amended petition was vague enough to include the truth, which is that the report was given over *after conviction* during state habeas proceedings.  But Barbee only now acknowledges the truth, stating for the first time in his post-conviction motion that "it is clear" the report was disclosed during state habeas proceedings; the amended petition did not mention this "clear" fact.  Moreover, Barbee's apparent attempt to maintain plausible deniability fails because he made the false assertion in connection with his conflict-of-interest claim and *Wiggins* claim—his argument being that trial counsel was so disloyal and eager to move the case that he ordered his mitigation investigator

---

[9] The actual language in the amended petition is: "6) the mitigation expert, Amanda Maxwell, was fired by Mr. Barbee's attorneys and her findings were not presented, again for no apparent strategic reason."  (Doc. 61, p. 193-94).

to dig up negative information about his client and put it in a written report, which he then gave to the prosecution to use against his own client.[10]  This contention would have little probative force vis-a-vis the disloyalty and ineffectiveness allegations if the petition had acknowledged the truth: that the report was given over to *habeas* prosecutors by *state habeas* counsel.

Barbee also points out that, when he litigated this issue in state court during abeyance, Maxwell testified she "thought" the report was provided pre-trial.  Barbee then criticizes the Court for crediting the testimony of the trial attorneys that it was not, complaining that the Court "gives no reason for favoring the word of the trial attorneys over Maxwell."  In the first instance, Maxwell had no first-hand knowledge of the matter, while counsel did.  Secondly, the state court made a specific finding that, "Neither Mr. Ray nor Mr. Moore provided the psychosocial history report to the prosecutors before trial." (Doc. 66-5, p. 142, ¶ 93.)  The Court may not disregard this presumptively correct finding absent clear and convincing evidence to the contrary, which Barbee did not provide. § 2254(e)(1).

Barbee next denies misrepresenting the accuracy of the information given by trial counsel to Dr. Leo.  He explains that this alleged

---

[10] The actual language in the amended petition is: "The problem here is not that Ms. Maxwell was asked to learn positive and negative information, but that Mr. Ray told her to write up and put the negative information in a report that was in fact later given to the prosecution and used against Mr. Barbee." (Doc. 61, p. 208, 318-19.)

misrepresentation was merely part of a factual summary of the direct examination of trial counsel during the state-court hearing, and not part of his argument. He also asserts that his summary did, in fact, concede that trial counsel sent a corrective letter to Dr. Leo. Several things are wrong with this argument. First, in acknowledging that his factual summary focused only on the helpful direct-examination testimony from the state-court hearing, he proves the point that he is misrepresenting the record by omitting the cross-examination testimony against his claim. Second, while the amended petition certainly acknowledges that trial counsel sent a corrective letter regarding the cellphone records, the implication was that it was done after Dr. Leo had already rendered the unhelpful opinion and so was to no avail.[11]  Barbee utterly fails to mention trial counsel's testimony on cross-examination that Dr. Leo said the corrected information about Barbee's cellphone records *would not change his opinion* that Barbee's confession was true. (Doc. 66-8, p. 36.)  Instead, Barbee states at the end of the paragraph that Dr. Leo's unfavorable report was due to trial counsel's omissions. (Doc. 61, p. 181).  This is either argument improperly presented within a factual summary, or it is a false assertion of fact.

Barbee fails to demonstrate manifest error in law or fact.  The Court DENIES Barbee's motion to alter or amend the judgment.

---

[11] The actual language in the amended petition is: "Mr. Ray sent a corrective letter to Dr. Leo after he had rendered his opinion that the confession was true." (Doc. 61, p. 181.)

SIGNED September 1, 2015.


TERRY R. MEANS
UNITED STATES DISTRICT JUDGE

TRM/ks:bb

27

EXHIBIT



# TOVA - The Other Victims Advocacy
## Balancing the Scales of Justice

 Meet the TovaTeam

 About Tova

 Contact Us

Home

### TOVA TEAM

**Tina Church**
Tina Church is the founder of The Other Victims Advocacy and is the President of the organization. Tina is a licensed private detective in the State of indiana and has worked many criminal cases at trial as well as the appellate process.

Tina brings over 20 years of experience. Tina has worked many death penalty cases at trial level as well as post-conviction level, and has been successful in being a part of the exonerations of death row inmates, as well as being a part of achieving many stays of execution.

Tina has been in the front lines in the fight to abolish the death penalty since the early 90's in the State of Texas where most executions have taken place. In 2000 Tina was responsible for the first inmate under then Governor Bush in receiving the first stay of execution for post-conviction DNA testing which resulted in law that allows for post-conviction DNA testing.

Tina has worked with many of the best attorneys in the country, including Barry Sheck. Tina has appeared on the Leeza Show, 60 Minutes 11, Court TV as well as being in Newsweek Magazine. Tina has also appeared in local media as well as in other publications including true crime books.

Tina is married to Rod Church and they live in Mishawaka, IN. Tina and her husband have two grown sons and two grand-daughters.

Tina is a member of the Indiana Public Defender's Council Association and the American Society of Professional Investigators.

**Richard Ellis**
Richard Ellis is an attorney whose practice is entirely devoted to the defense of capital cases, primarily habeas corpus matters. He received his undergraduate degree in 1970 (B. A., McGill University), his law degree in 1973 (J. D., University of Oklahoma), and a post-law degree in 1975 (M.B.A., University of California, Los Angeles). He has been practicing law since 1975 and is admitted in California, Colorado, Florida, Hawaii, Missouri, Nebraska, Texas, and the District of Columbia. Since 1992, he has been involved in the litigation of post-conviction capital cases, primarily in Texas. He currently represents death-sentenced individuals in Texas, Nevada and California.

**Lois Requena**
Lois Requena has a BS degree in Criminal Justice, and Social work, currently lives in Texas.

**Dr. Glenn Larkin**
Dr. Larkin is a Forensic Pathologist, and former medial examiner of Pittsburgh, PA. He has conducted well over 2,000 autopsy's, and we are very pleased to have him as a consultant on our Tova team. He currently resides in North Carolina.

©2013 The Other Victims Advocacy

The Other Victims Advocacy is a tax-exempt, non profit 501(c)(3) organization. Gifts are tax deductible for income and estate tax purposes to the extent allowed by law.

HOME | ABOUT TOVA | THE TOVA TEAM | CONTACT

Web Hosting & Design by Starlight Technologies , Inc.