**FILED**
**November 23, 2016**
KAREN MITCHELL
CLERK, U.S. DISTRICT COURT

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

4:09-CV-74-Y

No. 15-70022

United States Court of Appeals
Fifth Circuit

**FILED**

November 23, 2016

Lyle W. Cayce
Clerk

STEPHEN DALE BARBEE,

> Petitioner - Appellant

v.

LORIE DAVIS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

> Respondent - Appellee

---

Appeals from the United States District Court
for the Northern District of Texas
USDC No. 4:09-CV-74

---

Before JOLLY, DENNIS, and PRADO, Circuit Judges.

PER CURIAM:[*]

Stephen Dale Barbee, a businessman in his mid-thirties with no criminal record, was convicted and sentenced to death in Texas for the capital murder of his former girlfriend, Lisa Underwood, who was seven and a half months pregnant,[1] and her seven-year-old son, Jayden. He requests a certificate of appealability (COA) to appeal the district court's denial of federal habeas relief.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] Lisa was unsure whether Barbee or another man, Ed Rogers, was the father of her unborn child. DNA evidence introduced at trial established that Rogers was the father.

We GRANT a COA for his claim that trial counsel rendered ineffective assistance at the guilt-innocence phase of trial by confessing his guilt to the jury during closing argument without his permission, and DENY a COA as to all other claims. We further hold that the district court did not abuse its discretion when it cited extra-record evidence in its order denying Barbee's motion to alter or amend the judgment.

## I.  Facts and Procedural History

The district court summarized the evidence presented at trial as follows:

Lisa Underwood owned a bagel shop in Fort Worth. She began dating Stephen Dale Barbee, a customer of the shop. Lisa became pregnant in July of 2004 and told Barbee that she believed he was the father of the unborn child. Lisa's family and friends had planned a baby shower for Lisa at 4 p.m. on Saturday, February 19, 2005, but she never arrived. The Fort Worth police were notified and began an investigation into her disappearance.

Unbeknownst to the Fort Worth detectives at that time, Barbee had been stopped by a deputy sheriff earlier that same morning while walking along a service road near a wooded area in another county. He was wet and covered in mud. He gave the deputy a false name and fled on foot.

Lisa's home, which she shared with her seven-year-old son Jayden, showed no signs of forced entry. Jayden's shoes were on top of the fireplace hearth, and his glasses were next to his bed. Lisa's blood was in the living room, on the rug, and on the furniture. Having learned that Barbee had been in a relationship with Lisa, the police inquired at the home of Barbee's ex-wife, Theresa. Although divorced, Theresa and Barbee still operated a tree-trimming business and a concrete-cutting business together. Theresa lived in their former marital home with an employee of the concrete business named Ron Dodd. Theresa told Barbee that the police were looking for him and asked what he had done. She urged him to turn himself in.

On Monday, Lisa's Dodge Durango was found in a creek approximately 300 yards from where Barbee had been stopped by

2

the deputy sheriff two days earlier. The windows were down, the hatchback was up, and there was a bottle of cleaning solution in the cargo area. On the same day, Fort Worth detectives traveled to Tyler to speak with Barbee, his wife, Trish, and Dodd. Barbee and Dodd were in Tyler working on a job trimming trees. They agreed to go to the Tyler Police Department for questioning.

Barbee initially gave a recorded interview stating that he had not seen or heard from Lisa in months. He then asked to use the bathroom. While in the bathroom with a detective, Barbee confessed that he killed Lisa by starting a fight with her and then holding her face down into the carpet until she stopped breathing. He also admitted that he held his hand over Jayden's mouth and nose until he stopped breathing. Barbee said he did it because Lisa was going to ruin his family and his relationship with his wife. He said that Dodd had helped him plan the murder, had dropped him off at Lisa's house beforehand, and had picked him up afterwards, near the area where he was stopped by the deputy. This "bathroom confession" was not recorded. Afterwards, Barbee gave another, recorded statement to police, which was ultimately suppressed. He then spoke with his wife, Trish, which was also recorded in the police interview room. The next day, Barbee took the police to the place where he had buried the bodies. Barbee recanted his confession a few days later.

The prosecution's case at the guilt phase relied primarily on Barbee's flight from the deputy sheriff, the bathroom confession, his recorded statement to Trish, and his knowledge of details about the burial site.

At the sentencing phase of trial, the State presented evidence from Theresa that, during the course of their marriage, Barbee had assaulted her on four occasions and had assaulted a driver in a road-rage incident. The State also presented evidence that Barbee had verbally abused a former coworker who had rejected his attempts to have a relationship. The defense presented testimony from a pastor at Barbee's church, Barbee's mother, his aunt, a niece, a church acquaintance, an ex-girlfriend, and the girlfriend of Barbee's ex-roommate. The defense also presented testimony from a prison security expert, a confinement

officer who had known Barbee his whole life, and the courtroom bailiff, who described Barbee's behavior in jail.

*Barbee v. Stephens*, No. 4:09-CV-074-Y, 2015 WL 4094055, at *1–2.

The jury found Barbee guilty of capital murder. The trial court sentenced him to death after the jury answered the special issue on future dangerousness affirmatively and the special issue on mitigation negatively. The Texas Court of Criminal Appeals (TCCA) affirmed his sentence and conviction on direct appeal, and the Supreme Court denied certiorari. *Barbee v. State*, No. AP-75359, 2008 WL 5160202 (Tex. Crim. App. Dec. 10, 2008), *cert. denied*, 130 S. Ct. 144 (Oct. 5, 2009).

In his first state habeas application filed in March 2008, Barbee raised four claims:

(1) Trial counsel rendered ineffective assistance at the pretrial stage by failing to properly challenge the veracity of the video recording of Barbee's interrogation and confession;

(2) Trial counsel abandoned him at the trial stage by confessing his guilt to the jury during closing argument without his knowledge or consent;

(3) Trial counsel rendered ineffective assistance at the punishment phase by failing to present significant mitigating evidence of his history of head injuries, failing to prepare witnesses for testimony, and presenting witnesses who challenged the jury's verdict, after defense counsel had admitted guilt in closing argument; and

(4) The police engaged in misconduct by withholding the complete video recording of Barbee's interrogation by the police, and providing a version that had been edited to remove portions of the interrogation in which Barbee was coerced into confessing to the murders.

Along with his habeas application, he submitted affidavits from Amanda Maxwell, the mitigation specialist retained by trial counsel; Dr. Stephen K.

Martin, a neuropsychologist; Nancy Cearley, a pastor; and Jackie Barbee, his mother. He also submitted a letter from a psychologist, Dr. Kelly R. Goodness, who had been retained by trial counsel.

The trial court ordered trial counsel to file affidavits responsive to Barbee's ineffective assistance claims. Trial counsel, Bill Ray and Tim Moore, submitted a joint affidavit.

Along with its response, the State submitted a handwritten statement from Barbee; a memorandum of understanding between trial counsel and Barbee; a letter from Barbee to Dr. Richard Leo, a false-confession expert; a letter from Dr. Leo to trial counsel; a letter from Dr. James G. Shupe, a psychiatrist, to trial counsel; a memorandum from Amanda Maxwell to trial counsel; an affidavit from Dr. Jack Randall Price, a psychologist; and an affidavit from one of the prosecutors at trial, Richard Kevin Rousseau.

The state habeas trial judge, who was not the same judge who presided at Barbee's trial, did not conduct an evidentiary hearing. The judge adopted the State's proposed findings of fact and conclusions of law and denied relief. The TCCA adopted the trial court's findings and conclusions and denied relief in 2009. *Ex parte Barbee*, No. WR-71070-01, 2009 WL 82360 (Tex. Crim. App. Jan. 14, 2009).

Barbee filed a petition for federal habeas relief in October 2010, presenting 21 claims for relief, many of which had not been presented in state court. The district court held the proceedings in abeyance and allowed Barbee to return to state court to exhaust the claims that he had not presented to the state court previously.

In his second state habeas application, Barbee presented the following claims:

(1) Actual innocence;

(2) Attorney conflict of interest;

(3) Trial counsel rendered ineffective assistance, pretrial, by (a) failing to properly challenge the veracity of the video recording of his interrogation and confession and to investigate whether it was coerced, and (b) failing to complete DNA testing prior to trial;

(4) Trial counsel rendered ineffective assistance at the guilt-innocence phase and completely abandoned Barbee by (a) failing to effectively present a case for actual innocence through expert testimony, (b) confessing Barbee's guilt without Barbee's permission, (c) failing to explain the cell phone records introduced into evidence, (d) failing to object to prejudicial speculation by the coroners;

(5) Trial counsel rendered ineffective assistance at the punishment phase by (a) presenting harmful testimony from Susan Evans, (b) failing to present mitigating evidence, (c) failing to present mitigating evidence regarding future dangerousness, (d) failing to present mitigating evidence of head injury and hydrocodone use, (e) failing to present evidence of low intelligence, (f) failing to present medical evidence of frontal lobe impairment, brain impairment, and neuropsychiatric evidence;

(6) His trial was conducted in an atmosphere that rendered it inherently unfair due to pervasive and extremely prejudicial pretrial and trial publicity;

(7) Trial counsel rendered ineffective assistance by failing to file a motion for change of venue;

(8) He was denied due process as a result of the state court's failure to hold an evidentiary hearing on substantial, controverted and unresolved issues of fact;

(9) The trial court erred by refusing to grant a challenge for cause to juror Denise Anderson;

(10) The trial court abused its discretion by denying Barbee's motion to suppress alleged statements made to Detective Carroll;

(11) Texas's 10-12 rule (prohibition against informing jurors that a single holdout juror will cause the imposition of a life sentence) violated his rights under the Eighth and Fourteenth Amendments;

(12) Lethal injection violates the Eighth Amendment;

(13) The second special issue on mitigation is unconstitutional because it omits a burden of proof and makes impossible any meaningful appellate review of the jury's determination;

(14) The trial court erred by denying a motion to inform the jury that failure to answer a special issue would result in a life sentence;

(15) The evidence supporting special issue 1 (future dangerousness) was insufficient;

(16) The jury was unconstitutionally selected because the jurors were death-qualified;

(17) His death sentence violates international law;

(18) Appellate counsel rendered ineffective assistance;

(19) He was deprived of due process and a fair trial when the police provided an edited version of the videotape of his confession and withheld the complete video;

(20) The testimony of the coroners, and their lack of authority to perform autopsies, deprived him of a fair trial; and

(21) The cumulative effect of all of these errors deprived him of due process.

Barbee claimed that his initial state habeas counsel was ineffective in failing to adequately brief claims, failing to investigate and coherently present extra-record evidence, failing to perform research sufficient to understand basic principles of post-conviction practice, failing to present proper post-conviction claims, and failing adequately to communicate with Barbee.

The TCCA remanded the conflict of interest claim to the trial court for an evidentiary hearing. *Ex parte Barbee*, No. WR-71,070-02, 2011 WL 2071985 (Tex. Crim. App. Sept. 14, 2011). The state habeas trial court conducted an evidentiary hearing on the conflict of interest claim on February 22–23, 2012. Following the hearing, the trial court adopted the State's proposed findings of fact and conclusions of law and recommended that relief be denied on Barbee's conflict of interest claim. The TCCA adopted the trial court's findings and conclusions and denied relief on the conflict of interest claim; it dismissed the remaining claims as abusive. *Ex parte Barbee*, 2013 WL 1920686 (Tex. Crim. App. May 8, 2013).

Barbee filed an amended federal habeas petition on October 2, 2013, raising the same 21 claims that he had presented in his subsequent state habeas application. The district court denied relief and denied a COA. *Barbee v. Stephens*, No. 4:09-CV-074-Y, 2015 WL 4094055 (N.D. Tex. July 7, 2015). The district court also denied Barbee's motion to alter or amend the judgment. *Barbee v. Stephens*, 2015 WL 5123356 (N.D. Tex. Sept. 1, 2015). Barbee timely appealed.

## II. Discussion of Claims

Barbee requests a COA from this court for the following claims:

(1) Trial counsel had a conflict of interest;

(2) Trial counsel rendered ineffective assistance at the guilt-innocence phase by confessing his guilt to the jury during closing argument without his permission; and

(3) Trial counsel rendered ineffective assistance at the punishment phase by (a) presenting the testimony of prison consultant Susan Evans; (b) failing to present mitigating evidence; and (c) failing to present evidence of head injuries and drug abuse.

Barbee contends further that he was denied due process when the
district court relied on extra-record evidence to discredit one of his declarants
in its order denying Barbee's motion to alter or amend the judgment.

In order to obtain a COA, Barbee must make a "substantial showing of
the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "Where a district
court has rejected the constitutional claims on the merits, the showing required
to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that
reasonable jurists would find the district court's assessment of the
constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473,
484 (2000). With respect to claims dismissed on procedural grounds, the
petitioner must show both "[1] that jurists of reason would find it debatable
whether the petition states a valid claim of the denial of a constitutional right
and [2] that jurists of reason would find it debatable whether the district court
was correct in its procedural ruling." *Id.*

When "reviewing [a] request for a COA, we only conduct a threshold
inquiry into the merits of the claims [the petitioner] raise[s] in his underlying
habeas petition." *Reed v. Stephens*, 739 F.3d 753, 764 (5th Cir. 2014) (citing
*Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003)). This "threshold inquiry" is not
a "full consideration of the factual or legal bases adduced in support of the
claims," but rather "an overview of the claims in the habeas petition and a
general assessment of their merits." *Miller-El*, 537 U.S. at 336. In generally
assessing the claims for relief in a COA application, "[t]he question is the
debatability of the underlying constitutional claim, not the resolution of that
debate." *Id.* at 342. And "in a death penalty case, 'any doubts as to whether a
COA should issue must be resolved in [the petitioner's] favor.'" *Ramirez v.
Dretke*, 398 F.3d 691, 694 (5th Cir. 2005) (alteration in original) (quoting
*Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000)).

For the reasons that follow, we DENY a COA for claims (1) and (3), because reasonable jurists would not debate the district court's denial of relief as to those claims. We also hold that the district court did not abuse its discretion by citing extra-record evidence in its order denying Barbee's motion to alter or amend the judgment.

Because this is a death penalty case and we are to resolve in Barbee's favor any doubts as to whether a COA should issue, we GRANT a COA for claim (2). Barbee may file a supplemental brief with respect to the merits of that claim within thirty days of the date of this order. The supplemental brief should address *only* matters, if any, that have not already been covered in his brief in support of the COA application. If Barbee files a supplemental brief, the State may file a response twenty days thereafter, to be similarly limited to matters that have not already been covered in its brief in opposition to Barbee's COA application.

We now turn to address Barbee's claim of actual innocence and the claims for which we deny a COA.

## A. Actual Innocence

Barbee claims that he is actually innocent. He explains that this is a "gateway" claim through which any of his otherwise procedurally barred claims may be considered on the merits.

Barbee contends that Ron Dodd, who was living with Barbee's ex-wife Theresa, committed the murders and framed Barbee so that Dodd could take over Barbee's businesses. He maintains that his confession was coerced by police threats of the death penalty, and Dodd's threats to harm his family. Barbee admits that he helped Dodd conceal the bodies. He argues that trial counsel failed to take any reasonable steps to establish his innocence or to investigate the possibility that Dodd had committed the murders.

Barbee's version of the facts is set out in his 2010 declaration: Lisa wanted Barbee to tell his new wife, Trish, about Lisa's pregnancy. Barbee wanted Lisa to have DNA testing to confirm his paternity. On the evening of Friday, February 18, 2005, Barbee asked Dodd to accompany him to Lisa's house. Dodd drove Barbee to Lisa's house and then left to have dinner with Theresa. Barbee later called Dodd to pick him up, and they returned to Theresa's house. When they got there, Dodd asked if Barbee wanted Dodd to talk to Lisa about getting a DNA test, and Barbee agreed. They drove back to Lisa's house. Barbee stayed in Dodd's truck while Dodd entered Lisa's house. Dodd came out after 15-20 minutes and said, "Your problems are solved, go get her truck." Barbee went to the door of Lisa's house and Dodd left. When Barbee went into the house, he saw Lisa and Jayden dead. He panicked because he thought he was going to be blamed. He dragged Lisa into the garage and put her and Jayden's bodies in her vehicle and drove away. He called Dodd, who met him at a deserted place and helped him remove the bodies from the vehicle. Dodd threw a shovel to Barbee and left. After burying the bodies, Barbee called Dodd, who agreed to pick him up on the highway. While on the way to meet Dodd, Barbee was stopped by a deputy sheriff. He gave the deputy a false name and fled. He met Dodd and they returned to Theresa's house where Theresa washed Dodd's clothing.

As the district court noted, in his federal habeas petition Barbee listed the following as evidence of his innocence and Dodd's guilt:

(1) A 2010 declaration from Theresa's father, Jerry Dowling, in which he stated that his son, Danny Dowling, told him that Dodd had said right after the murders that he had to punch Lisa in the face 25–26 times before she went down.

(2) The same quote from Jerry Dowling, repeated in the 2010 declaration of Tina Church, an investigator. Although Danny Dowling later stated that

Barbee, not Dodd, had made that statement, Church said that would have been impossible because Danny had not been in contact with Barbee at that time.

(3) Theresa's statement to Church that Dodd had his clothes washed at 4:00 a.m. on Saturday, February 19, and Dodd's admission that he power-washed his vehicle that morning.

(4) A 2010 declaration from Jennifer Cherry, Barbee's niece, in which she stated that Theresa had said how much she hated Barbee and wanted him gone, and that Theresa had said in Dodd's presence that she wished Barbee would just die and that there had to be a way to get him out of the office.

(5) Dodd's status as a parolee for aggravated assault, and his cohabitation with Theresa, who stood to gain the businesses as well as half a million dollars upon the demise of Barbee, and Dodd's arrests or convictions for the misdemeanor offenses of telephone harassment, driving with a suspended license, failure to appear, criminal mischief, unauthorized use of a motor vehicle, and assault.

(6) 2010 declarations by Barbee's mother, Jackie, in which she stated that soon after the murders, Theresa had Barbee sign over the businesses to Theresa, that Dodd was instrumental in causing a serious head injury to Barbee about a month before the murders, and that prior to the murders, Theresa had changed a $500,000 company bonding policy to a life insurance policy naming herself as the sole beneficiary.

(7) Church's 2010 confirmation of Theresa and Dodd's financial motive to have Barbee out of the way.

(8) Evidence of financial misdeeds by Theresa which were related to trial counsel, as described in the affidavit of mitigation specialist Amanda Maxwell.

(9) There was no forensic evidence connecting him to the murder.

Barbee submitted with his federal habeas petition the following character evidence as proof of his actual innocence:

12

(1) A 2010 declaration from the father of his best friend in middle school stating that Barbee was well-behaved.

(2) A 2010 declaration from Barbee's aunt, who said she has always known Barbee to walk away from any kind of confrontation.

(3) A 2010 declaration from a girlfriend of Barbee's former roommate, who said she never saw Barbee angry, that he was crazy about Trish's children, and it was hard to believe he was guilty.

(4) A 2010 declaration from his cousin stating that she did not believe Barbee was capable of such an act and that she believed him when he proclaimed his innocence to her.

Finally, he described in his federal habeas petition the following evidence of the falsity of his confession:

(1) His 2010 declaration, that his confession was false because the police had threatened him with the death penalty.

(2) A 2010 declaration from his niece, Jennifer Cherry, stating that Barbee told her he confessed because Dodd had threatened to hurt his family.

(3) A 2010 declaration from the author of a book about the murders, *Lethal Charmer*, stating that Barbee told her he confessed because Dodd threatened to hurt his family.

(4) A 2005 letter to trial counsel from false confession expert, Dr. Richard Leo, stating that Barbee maintained that the confession was coerced, the circumstances surrounding the bathroom confession were unusual, and the police selectively turned the recording device off and on.

In order to demonstrate actual innocence to excuse a procedural default, the petitioner must offer new, reliable evidence not presented at trial that establishes that, more likely than not, no reasonable juror would have found the petitioner guilty beyond a reasonable doubt. *Schlup v. Delo*, 513 U.S. 298, 327 (1995). The innocence determination is based on a consideration of "all the

evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted" at trial. *House v. Bell*, 547 U.S. 518, 538 (2006) (internal quotation marks omitted).

The district court began its analysis by describing the incriminating evidence in the record: Barbee was stopped by a deputy sheriff on the night of the murders about 300 yards from where the victim's vehicle was later found; he was wet and muddy below the waist, gave a false name, and fled on foot. Two days later, Barbee led the police to the place where the victims were buried. Lisa's business partner confirmed that Lisa had been in a relationship with Barbee and believed that he was the father of her unborn child. Barbee confessed to the police that he murdered Lisa because she was going to ruin his marriage to Trish. He explained that Dodd had dropped him off at Lisa's house to pick a fight with her, but she would not take the bait. Dodd picked him up and asked if they needed to hire a hitman. Barbee said no, he could do it, and Dodd took him back to Lisa's house, where he started a fight with her, punched her in the nose, and held her face down in the carpet until she stopped breathing. He said that when Jayden came into the room, he put his hand over Jayden's nose and mouth until the child stopped breathing. He put both bodies in Lisa's vehicle and drove them to a deserted area where he buried them together and said a prayer. He admitted to the police that he had tried to clean the house and had covered a blood stain on the floor with a piece of furniture.

The district court pointed out that the quotation that Barbee had described in his habeas petition as a portion of a letter from Dr. Leo was not in fact part of that letter. The court noted that Dr. Leo actually concluded that Barbee's confession was "far more likely to be true than to be false" because Barbee led the police to the bodies, Dodd had no motive to murder Lisa, Barbee did not recant his confession when his wife, Trish, came into the interrogation

room, and Barbee told his ex-wife, Theresa, that he had committed the murders.

The district court then described its review of the recording of Barbee's conversation with his wife, Trish, in the police station immediately after he had confessed:

> It begins with Trish, visibly shocked, stating, "You killed her? You killed her? Friday night?" and asking how Barbee did it. Barbee replies, "I held her down too long." He says that Lisa called and threatened him for months, and states at various times that he "made a bad decision," "it was an accident," and he "can't take it back." Trish silently calculates that Lisa was eight months' pregnant, that she and Barbee were dating eight months ago, and asks, "Why did you cheat on me?" and "How could you sleep with me and sleep with her?" She asks Barbee what she should tell his mom and dad. Barbee states that his life is over and he will "lose everything now." Near the end, he states that he is "so glad" he told her because it would have eaten him alive. She sits in Barbee's lap throughout most of the recording, holding his head, with Barbee's arms wrapped around her.

The district court found that a reasonable juror could "conclude that their unconstrained crying, moaning, hyperventilating, and Barbee's repeated expressions of regret and anxiety are genuine."

The district court also pointed to Theresa's testimony that Barbee had confessed to her the night after he had confessed to the police, but the following day, in the presence of his family, he said that they "had it all wrong," and that he did not do it.

The district court then turned to the evidence and argument that Barbee presented in support of his claim of innocence. It rejected Barbee's contention that the State's theory made little sense because he could not have "single-handedly placed the pregnant 166-pound Lisa in her SUV," noting that it was refuted by Barbee's own 2010 declaration in which he stated: "I dragged Lisa, who weighed about 170 pounds, into the garage and placed her in the

15

Durango." The court stated that Barbee's claim of innocence made little sense because it did not account for the fact that Dodd could not have known that Barbee would confess.

The district court found that the character evidence that Barbee submitted was not sufficient to show that no reasonable juror would have found him guilty beyond a reasonable doubt.

The district court stated that Barbee had presented no authority that the double-hearsay statements made by Danny Dowling to Tina Church and to Jerry Dowling are trustworthy evidence contemplated by *Schlup*. The district court pointed out that Danny Dowling had attributed the statement "I had to hit [her] 25-26 times" to Barbee as well as to Dodd and that he ultimately could not remember who said it. Furthermore, when Dowling first saw the "Amber Alert" for the missing victims, he said to himself, "That's probably something that [Barbee] would do."

The district court stated that the fact that Dodd washed his clothing and power-washed his vehicle immediately after the murders did not negate Barbee's involvement or necessarily prove that Dodd did anything more than help Barbee dispose of the bodies.

The court stated that Barbee's headaches and the head injury caused when Dodd dropped the pipe on his head would not prove Barbee did not commit murder. Instead, such evidence provided an excuse for wrongdoing and is therefore inconsistent with a claim of actual innocence.

The court held that the evidence of financial misdeeds by Theresa, the purported motive for Dodd to commit murder, was not new, because Amanda Maxwell had reported it to trial counsel. Even assuming Dodd and Theresa had financial reasons to want Barbee out of the way, it was Barbee, not Dodd, who had the motive for wanting Lisa out of the way, because she was

demanding that he tell Trish about her pregnancy even though she refused to take a paternity test.

The district court stated that the post-conviction declarations by a book author and Barbee's acquaintances that Barbee had confessed only because he was threatened merely repeated information originating from Barbee himself and are therefore neither new nor objectively reliable.

The district court stated that even if Barbee's evidence were considered "new," it was not the sort of compelling evidence required by *Schlup*. The court characterized Barbee's theory of innocence as unsound and in conflict with his own declaration. Considering all the old and new evidence, both incriminating and exculpatory, without regard to its admissibility, the district court concluded that Barbee had failed to demonstrate that, more likely than not, no reasonable juror would find Barbee guilty beyond a reasonable doubt.

In its order denying Barbee's motion to alter or amend, the district court stated that Barbee's argument that his counsel should have presented a "Dodd did it" theory failed to acknowledge that there were no witnesses to say "Dodd did it" because Barbee refused to testify. The court pointed out that Dodd's actions on the night of the murder were not those of a person trying to frame Barbee for murder, nor were Barbee's actions those of a person who fears he is being framed. The court stated that Danny Dowling was not a reliable witness to Barbee's asserted innocence. It pointed out that Danny did not submit an affidavit. Instead, Barbee relied on Church's description of what Danny told her. Although it was obvious from Church's declaration that she believed Danny when he incriminated Dodd but did not believe Danny when he incriminated Barbee, the court found that based on Church's report, Danny was a vacillating witness who ultimately could not remember whether Dodd or Barbee made the incriminating remark. Furthermore, Danny also made a

separate statement indicating he believed that the victims' disappearance was "probably something that [Barbee] would do."

Barbee argues that his theory of innocence does not depend on Dodd knowing that Barbee would later confess. He asserts that he would have been the prime suspect even if he had not confessed, because he was known to have been romantically involved with Lisa; he believed and told Dodd that Lisa may have been pregnant with his child; and he was in trouble with his wife because of his extramarital affairs. He contends that Dodd, knowing all of this, did not have to foresee that Barbee would confess in order to have a reasonable belief that an attempt to frame Barbee would be successful. He claims that when he helped Dodd conceal the bodies, he was unaware of Dodd's intention to frame him for the murders. He argues that, to the extent the district court denied the actual innocence claim based on its dismissal of Danny Dowling as a vacillating witness, that holding is debatable, because the district court ignored Church's explanation that Dowling could not have been referring to Barbee because he had not been in contact with Barbee at the time.

The evidence that Barbee offers as proof of his actual innocence, considered together with the evidence of his guilt, fails to establish that, more likely than not, no reasonable juror would have found him guilty beyond a reasonable doubt. Accordingly, we hold that the district court did not err when it held that actual innocence cannot serve as a gateway for consideration of the merits of Barbee's procedurally defaulted claims.

## B.  Claim 1 – Conflict of Interest

Barbee contends that his lead counsel, Bill Ray, received a large number of probation revocation appointments from Judge Gill, the trial judge in Barbee's case, based on a secret understanding that Ray would move the cases rapidly through the court process. According to Barbee, Judge Gill's appointment of Ray to represent Barbee in the capital murder case was made

with the same understanding that Ray would move the case quickly, either by having Barbee plead guilty or by putting up only a minimal defense. Barbee argues that Ray's financial interest in continuing to receive court appointments from Judge Gill created a conflict of interest that caused Ray to pressure him to plead guilty, fail to move for a change of venue despite prejudicial pretrial publicity, fail to investigate his innocence, confess his guilt to the jury, and fail to present significant mitigating evidence. Barbee asserts that there was no strategic reason for any of these failures and, therefore, the only reasonable explanation is that Ray and his co-counsel, Moore, wanted to move the case quickly through Judge Gill's court so that they would keep getting lucrative court appointments from Judge Gill.

As we have earlier noted, the TCCA remanded Barbee's conflict of interest claim to the trial court for an evidentiary hearing. We will now describe the evidence presented at that hearing.

Amanda Maxwell, the defense mitigation expert, testified that she obtained medical records which showed that Barbee had suffered a series of head injuries, had attempted suicide, and had been diagnosed with bipolar disorder. His most recent head injury occurred shortly before his arrest. He and Dodd were working on a site and Dodd dropped a 400-pound metal pipe on Barbee's head, splitting his hard hat. He was knocked to the ground and taken to the hospital. Maxwell testified that Barbee experienced a lot of pain and suffered intense migraines following that injury and began taking hydrocodone that had been prescribed for his wife. She said that Barbee told her it made him itch all over and kept him wide awake at night. Maxwell thought this history of drug use was of significant mitigating value, primarily due to the reaction he had to it.

Maxwell told trial counsel about hallucinations that Barbee was experiencing in jail (seeing spiders crawling on the walls). Maxwell felt that

Barbee's history of head injuries could be of significant mitigating value at the punishment phase and recommended to defense counsel that a functional MRI, a CT scan, and a neuropsychological evaluation be conducted. Trial counsel did not respond to her recommendation.

Maxwell testified that she found out that Barbee's ex-wife, Theresa, who was living with Ron Dodd at the time, had come to the jail and told Barbee that his DNA was all over the crime scene (which was not true) and that he had better sign over both businesses to her or the State would take them. Maxwell also found out that Theresa had been embezzling funds from the business and that she owed tens of thousands of dollars to Jackie Barbee.

Maxwell testified that defense counsel were pressuring Barbee to plead guilty and that was always the overriding issue at all of their meetings. Maxwell stated that Ray and Moore had conveyed to her that they found Barbee disgusting because he cried. She said that Ray wanted the case to be done and to close the books on it. After the case was over he said, "we will all end up in federal court answering for this case."

Maxwell completed her mitigation report at the end of January 2006 and delivered it to Ray. She never heard from him again. Ray had hired another investigator to re-interview all of the witnesses that she had previously interviewed.

Maxwell testified that she was present at trial. In her opinion, the mitigation testimony that was presented was not effective. Maxwell had prepared a document entitled "Crime Week Stressors," that was not presented at trial. It included the following: Barbee was about to default on a tree job because his employees had quit; one of his employees had been drinking and wrecked one of his tree trucks; he had caught Theresa stealing from the company and gotten into an argument with her about it; his wife Trish threatened to leave him unless he collected the divorce settlement from

Theresa and took control of his business; he learned that his father was dying of colon cancer; and he was having migraine headaches and severe pain, for which he was taking a large amount of hydrocodone.

On cross-examination, Maxwell admitted that some of the crime-week stressors could have also been aggravating. She acknowledged that she had learned both good and bad things about Barbee and that there were some negative things that Ray would not want to place before the jury. She was aware that Barbee's mother was very unhappy with Ray and Moore and that his mother had a lifelong pattern of running interference for Barbee, including paying for his past acts of vandalism and theft. Maxwell stated that she had interviewed Barbee's friend, Jeff Boyd, who provided negative information about Barbee regarding acts of vandalism and setting fires. Boyd also told her that Barbee had told him about pouring gasoline on baby hamsters and setting them on fire when he was a pre-teen.

Maxwell testified that she interviewed Tim Davis on November 12, 2005. She felt that the interview was very prejudicial, so she did not include that information in the Psychosocial History Report she prepared for defense counsel. According to Maxwell, Barbee and Davis were the victims of a road rage incident in which they were attacked by the two men in the other vehicle. She said that Davis did not tell her that Barbee had attempted to kill the driver of the other vehicle. However, she acknowledged that her report to Ray about the interview states that Davis said that Barbee "had no off button" and that "[w]hen he got started he didn't know how to stop." Further, Davis said that he had to pull Barbee off the older man to keep him from hurting the man "real bad."

Maxwell admitted that she had provided Ray and Moore with information about Barbee's girlfriends and a secret cell phone that he used to call another woman while he was married to Theresa. She also gave them

information about his behavioral problems in school, and his poor impulse control due to his ADHD diagnosis. Maxwell considered Barbee's acts of vandalism to be youthful mischief, or a grief reaction to the loss of his brother and sister. She considered his robbing of a bait-and-tackle store, his breaking into a concession stand, and his breaking of 47 windows at a school to be acts of teenage mischief.

Tim Davis testified at the state habeas evidentiary hearing that he and Barbee were best friends and co-workers for eight to ten years and that he was the best man at Barbee's wedding to Theresa. He described Barbee as easygoing, friendly, and respectful of others. He was not called to testify at trial but if he had been, he would have given his opinion that Barbee will not be a future danger to society. He said that Maxwell's report of her interview of him in 2005 was not truthful and twisted his words regarding the "road rage" incident. He described the incident, which occurred in 1996 or 1997, as follows: The highway was icy; he and Barbee were in the right lane going slow; a truck with two people came up behind them, and then swerved into them and ran them off the road; the two men got out of the truck and approached; he and Barbee got out to defend themselves; it was a simple fistfight and no one was hurt; the other men were the aggressors, and the police were not called. Davis testified that this is the only incident where he saw Barbee get physical with anyone. He said that he did not tell anyone on the defense team that Barbee had attempted to kill the driver of the other vehicle, as stated in counsels' joint affidavit presented in the initial state habeas proceeding.

Calvin Cearley, a pastor of a church Barbee attended, testified that he is married to Nancy Cearley, who testified at trial. He was not contacted by defense counsel. He testified that Barbee loved animals and children, and was polite and respectful. Had he been called as a witness at trial, he would have testified that Barbee would not be likely to commit future acts of violence.

Nancy Cearley, Calvin Cearley's wife and co-pastor, testified at the evidentiary hearing that Barbee was the children's church leader and the children loved him. She described him as easy-going, friendly, very likeable, polite, and respectful. When she testified at trial, Barbee's attorneys did not ask her anything about his character. If she had been asked, she would have testified that he is not likely to commit future acts of violence.

Mike Cherry testified at the evidentiary hearing that he was married to Barbee's older sister Kathy, who died at age 20. Barbee's older brother, David, also died at age 20, in a car accident. Barbee was close to his sister and brother and was devastated by their deaths. Cherry never saw Barbee physically abuse Theresa. He never talked to Barbee's attorneys, but would have been willing to testify at trial that Barbee is very reserved and can control himself. He only saw Barbee get into one fight, with a belligerent, drunk man who was behaving inappropriately in front of children at a party and refused to leave.

Jennifer Cherry, Barbee's niece (the daughter of Kathy and Mike Cherry), testified at the evidentiary hearing that she and Barbee are very close and that Barbee is more like a brother than an uncle to her. Barbee was very playful, always wanted to make her laugh, spoiled her, and took care of her. When he ran the children's church program, the kids loved him. She testified that she worked as Theresa's assistant at the Barbees' concrete cutting business from 2002–2004. She said that Theresa paid personal bills with company money, and deposited large sums of cash. She heard Theresa say that she wished Barbee would die, and also heard her claim falsely that Barbee had hit her. She was aware that Theresa and Barbee had borrowed money from Barbee's parents and that Theresa was still in debt when the murders occurred. She said that Barbee's trial attorneys were not interested in what anyone in the family had to say and did not prepare her to testify. Had she

been asked, she would have testified at trial that Barbee would not be likely to commit future acts of violence.

Sharon Colvin, who knew Barbee from church, testified at the evidentiary hearing that Barbee was friendly, jovial, and had a really good attitude. She talked to Barbee's attorneys shortly after he was arrested, and would have been willing to testify at trial, but was not asked to do so. Had she been asked, she would have testified that Barbee would not be likely to commit future dangerous acts.

Robert Gill, the trial judge (who was at that time an assistant criminal district attorney), testified at the evidentiary hearing that he appointed Ray in a lot of probation revocation cases in his court. He liked to appoint Ray because Ray prepared the cases and was available on Friday afternoons, when Gill liked to schedule revocation hearings. He admitted that a newspaper article had reported that a federal judge had criticized the way he handled plea bargaining in the revocation cases and had found that Ray rendered ineffective assistance in one revocation case. He admitted that Ray had contributed $1000 to his campaign and that Moore had contributed $300. He testified that he did not interfere with Ray and Moore's defense of Barbee and that there was no agreement between him and Ray about how Ray was to handle Barbee's case.

Barbee's mother, Jackie Barbee, testified at the evidentiary hearing that Ray and Moore came to her house once and talked to her on the telephone a couple of times prior to trial. Maxwell came to her house several times to discuss Barbee's background and education, but very little of her work was presented to the jury. Mrs. Barbee testified that Barbee is a giver and has a very loving heart, is a hard worker, was involved with the church, and was in Sunday school since he was three years old. When she called Barbee to wish him a happy 20th birthday, he cried and said it was the worst day of his life. She realized that he thought he would die at age 20 because his only sister and

brother had each died at that age.  She said that Barbee's problem at school was that he loved to be funny and make people happy.  He had some trouble completing his GED.  She helped him and Theresa financially, loaning them money to buy a house and build a cabana.  When Barbee and Theresa divorced, he let her have everything.  Theresa still owed her money.

Mrs. Barbee testified that Ray and Moore wanted to show her the recording of Barbee's confession, but she refused to watch it.  They said they might be able to save Barbee's life if he would plead guilty.  She testified that she would have liked to have been able to tell the jury that Barbee had a very strong sense of right and wrong, but his lawyers told her to just answer the questions.  She was shocked when Ray told the jury that Barbee was guilty.  She heard, later on, about the road rage incident involving Tim Davis and thought it "was no big deal."  She was aware of Barbee's breaking windows at the school, but was not aware of his involvement in the robbery of a fish and bait shop or breaking into a concession stand.  Had she been asked, she would have testified that Barbee would not be a future threat to anyone.  She described Barbee as "broken" after his lawyers visited him in jail.

William Ray, Barbee's lead counsel at trial, testified at the evidentiary hearing that about 70–80 percent of his criminal practice in four counties was court-appointed, and that 25–75 percent of his court-appointed practice came from Judge Gill's court.  Ray earned $710,000 from his court-appointed work in Judge Gill's court from 2001–2007.  He testified that making contributions to judges' campaigns was common practice and that he had contributed to the campaigns of more than ten judges in Tarrant County.  He testified that he did not have any agreement or understanding with Judge Gill as to how he was to represent Barbee.  He said that Judge Gill did not place any limitations on his handling of the defense, did not deny any requests for experts, and did not

make any threats, either implied or direct, that Ray would not receive future appointments.

Billing records introduced as exhibits at the hearing showed that Ray and Moore billed the court for 350 and 260 hours of out-of-court time, respectively. Ray hired Kathy Minnich as an investigator and when she moved out of state, he replaced her with Stanley Keaton. Amanda Maxwell was hired as the mitigation specialist. Ray hired as experts two forensic psychologists, a forensic psychiatrist, an expert on false confessions, a computer investigator, and a DNA expert.

According to Ray, the theory of the defense at the guilt-innocence stage was that Barbee should be acquitted of capital murder (he was charged with the intentional killing of more than one individual during the same criminal transaction) because the killing of Lisa Underwood was an accidental, unintended consequence of her advanced pregnancy. He said that when he talked to the medical examiner, he was told that because Lisa was pregnant, it would not take a lot of force to keep her from being able to breathe because the baby was taking up a part of her stomach and her diaphragm could not move. Because Barbee refused to testify, Ray felt this was the only option available to him. The defense strategy at the punishment phase was to show that the Texas prison system was able to handle violent offenders and that Barbee could live peacefully in prison. In support of that theory, he offered good-character and social-history testimony from Barbee's relatives and friends, testimony about prison security from a prison classification expert, and testimony about Barbee's good behavior in jail from the bailiff.

Ray testified that he and Moore considered a motion for change of venue, but he did not believe that the prejudice against Barbee would have been worse in Tarrant County than anywhere else. He said it has been his experience that when you have a change of venue, if you go to somewhere outside the area, the

people in the town get the impression that whoever you are trying is such a notorious criminal that he is actually not treated as fairly there.

Ray testified that he attempted to investigate Barbee's claim of actual innocence and his claim that Dodd committed the murders. He obtained Dodd's criminal records. He was aware that Dodd had served time for aggravated assault and talked to the victim of that offense. He was also aware that Dodd had dropped a pipe on Barbee's head. Ray obtained cell phone records through the use of sealed subpoenas. Those records showed that Barbee had placed a call to Dodd at 1:47 a.m. on the night of the murders, initiated from a cell tower near the Underwoods' home. Those records also showed that Barbee had placed calls to Dodd from a cell tower near the location where the bodies were found.

Ray testified that presenting a defense based on a theory that Dodd committed the murders was made difficult by Barbee's confessions to the police, his wife, and his former wife, by his refusal to testify, by Dodd invoking his Fifth Amendment right not to testify, by Dodd's lack of a motive for killing the victims, and by the lack of credibility in a motive based on Dodd framing Barbee. Although Barbee was steadfast in maintaining his innocence after he recanted his confessions, he had two or three different theories of how it happened. In a letter that Barbee wrote to Ray about his confession to the police, Barbee stated that both of the murders were accidental. The first time Ray met with Barbee in person, Barbee told Ray he did not commit the murders. Ultimately, Barbee said he was not there at all, that Dodd did it, and he only helped Dodd conceal the bodies.

Ray did not think he could prove that Dodd had a motive to kill the victims. He said that he would have wanted someone better than Barbee's niece to testify that Theresa was embezzling money from the businesses. The financial motive evidence was weak, he said, because Dodd was already living

with Theresa in Barbee's former home, and Barbee and Theresa were already divorced. Other than Barbee, who refused to testify, the defense had no way to show that Dodd had a motive to commit the murders. He did not want to call Theresa as a witness because he thought if she testified, she would repeat what she had told him—that Barbee simply "snapped" on the day of the murders. Ray's biggest concern with the "Dodd did it" theory was that it did not take into consideration the fact that Barbee would confess.

Ray was aware that Donald Painter, a prisoner in the Tarrant County Jail, was willing to testify that Dodd had admitted that he committed the murders. However, Ray's investigation revealed that Painter had agreed to give that testimony in exchange for a promise of payment from Barbee. Although Ray thought the payment was Painter's idea, he said that calling Painter as a witness would have been a bad idea.

Ray denied that he pressured Barbee to plead guilty. He testified that he recommended that Barbee consider a plea because Barbee's confessions made an innocence defense difficult. In any event, the State never offered a plea deal. Ray said that he attempted to get Barbee's family to view Barbee's recorded confession because they refused to believe that Barbee had confessed. Ray explained that he was not trying to convince them that Barbee was guilty, but only trying to demonstrate to them that the confessions were a problem.

At Barbee's request, Ray retained false-confession expert, Dr. Leo. Dr. Leo's report was not favorable to the defense because he concluded that Barbee's confession was more likely to be true than false. According to Ray, Dr. Leo's opinion was based on three things: (1) Barbee's leading the police to the bodies; (2) Dodd's lack of a motive; and (3) the fact that Barbee did not recant his confession when his wife, Trish, came into the room after he had confessed to the police.

Ray testified that he consulted with three mental health professionals: psychologists Dr. Kelly Goodness and Dr. Barry Norman, and psychiatrist Dr. James Shupe. He did not get any impression from any of them that a neuropsychological examination, as recommended by Amanda Maxwell, needed to be done.

Dr. Goodness examined Barbee and found no significant symptoms of head injury, no indication that Barbee had bipolar disorder, and no long-term or significant hydrocodone abuse. Dr. Goodness thought that Barbee had Lyme's Disease, which can cause mood swings that mimic bipolar disorder, as well as rage and violent tendencies. Ray did not think Dr. Goodness's testimony would be helpful to the defense. Dr. Shupe examined Barbee and his probable diagnosis was bipolar disorder and polysubstance abuse; some social stressors; history of closed-head injuries; and anti-social personality disorder. Dr. Shupe thought that Barbee was fixated on how his mother would view him and how it would kill her if she thought he had killed the Underwoods. Ray did not believe Dr. Shupe's testimony would be helpful. Dr. Norman examined Barbee twice and found that he suffered some mild depression, but did not think anything was wrong with Barbee, mentally, as a result of his head injury. Ray said that if the defense had called one of the mental health experts to testify, the State would have been entitled to have Barbee examined by its own expert, who would probably reach the same harmful conclusions that the defense experts reached.

Ray testified that he decided not to present evidence of Barbee's head injuries because none of the doctors found anything wrong with Barbee as a result of those injuries. Moreover, evidence of the head injuries, migraine headaches, and hydrocodone use would suggest a reason why Barbee committed the murders and undermine his claim of innocence. Ray said that, even at the punishment phase, he generally did not believe that "excuse"

evidence helped the client when the jury has just rejected the innocence defense and found the client guilty. Ray knew that the defense punishment witnesses were going to say that they believed that the jury had wrongly convicted Barbee, and he thought it would be inconsistent to offer evidence that excused the murders.

Ray testified that he did not call Tim Davis as a character witness because of the "road rage" incident. Ray thought the prosecutor was very well prepared and thought it likely that the prosecutor might know about that incident, as well as some other things that Barbee had allegedly done. Maxwell's report to Ray about her interview of Davis stated:

> Tim recollected that one day some men on the highway got angry because Steve had cut them off. The men gave them the finger and cut in front of their truck motioning them to pull over. Steve said "watch this." Steve pulled over on the median as did the two men. It turned out to be an older man and his son. They walked back to Steve's truck and reached in hitting Tim and Steve. They all ended up on the shoulder fighting. Tim said he had to pull Steve off of the old man to keep him from hurting him really bad. Then Steve started in on the son. Tim pulled Steve off of him as well and the two men left in Steve's truck. Steve had managed to grab the keys to the two men's truck. Steve threw them out the window about two miles down the road. "Steve had no off button. When he got started he didn't know how to stop." Tim had seen Steve fight on a couple of other occasions. "He could take care of himself." Tim also said that Steve was stronger than two men put together. He could lift a tree stump that two men together couldn't lift.

Ray testified that he met with Davis in his office on February 20, 2006, and Davis's story did not differ from what Maxwell had reported. Although Maxwell stated in her report and in her testimony that she still thought Davis would be a good witness for Barbee, and although Davis had testified at the hearing that he did not say the things that Maxwell put into her report, Ray felt that it would be "malpractice or ineffectiveness, per se" to call Davis as a witness.

Ray testified that he did not present any other lay opinion testimony regarding Barbee's lack of future dangerousness, because that would have opened the witnesses up to cross-examination about whether they had heard of Barbee's prior bad acts. In addition to the "road rage" incident involving Tim Davis, Ray had information that Barbee had engaged in acts of vandalism and theft, had poured gasoline on baby hamsters and set them on fire, had killed an animal when on a date, and had offered to pay Painter to testify that Dodd had confessed to the murders.

Ray testified that what he was trying to show through Evans's testimony is that the prison system has the ability to react to inmate violence and had a way to take care of the problem if Barbee were to violate the rules. He also presented evidence that Barbee was going to be able to conform to the prison policies because he had not caused any trouble in the Tarrant County Jail. Ray said that if the jury had believed that, it would have been sufficient to negate the State's ability to prove future danger beyond a reasonable doubt.

Tim Moore, Ray's co-counsel, testified that he had been appointed by Judge Gill in two or three cases at the time of Barbee's trial, and had made campaign contributions to Judge Gill, as well as to every other criminal judge in Tarrant County. He testified that Judge Gill did not limit or direct how they conducted Barbee's defense and made no threats about withholding future appointments.

Moore's testimony generally corroborated Ray's testimony with regard to their decision not to file a motion for a change of venue, their investigation of Barbee's claim of innocence and his claim that Ron Dodd committed the murders, their reasons for wanting Barbee's family to view his videotaped confession, the reasons for their decision not to call Tim Davis as a witness and not to present testimony about Barbee's lack of future dangerousness, their

reasons for not presenting evidence of head injuries, headaches, and hydrocodone use, and Barbee's refusal to testify.

Dr. Stephen Martin did not testify, but his written statement submitted with Barbee's initial state habeas application was admitted into evidence. Dr. Martin conducted a neuropsychological evaluation of Barbee in 2007 and found frontal lobe damage that would have likely increased Barbee's impulsive tendencies and reduced his ability to fully consider the consequences of his actions. In his opinion, trial counsel were ineffective by not presenting the testimony of an expert such as himself at the punishment phase of Barbee's trial.

Dr. J. Randall Price, a psychologist, testified for the State. He reviewed all of the records and concluded that no expert had found evidence that Barbee had suffered a brain injury. He said that Dr. Martin's test results were scored incorrectly and did not suggest brain impairment or frontal lobe impairment when scored correctly. He pointed out that three mental health professionals conducted face-to-face evaluations of Barbee close to the time of trial and none of them saw evidence of a brain injury. There was material that could have been harmful to the defense if Dr. Martin had been called to testify. Although the psychosocial history contained considerable evidence that was mitigating, it also contained descriptions of past behaviors that were signs of aggression and violence. There were descriptions and characterizations of personality traits that would suggest poor control of his behavior, impulsivity, irresponsibility, and failure to accept responsibility for his actions. There was also a lot of evidence of juvenile delinquency—animal cruelty, vandalism, and stealing, from the age of early adolescence until the age of 20. Barbee was described as being cocky and arrogant. Dr. Price said that those kinds of traits are typically offered as aggravation and would likely be viewed by a jury as aggravating.

The state habeas court made the following findings with respect to Barbee's conflict of interest claim.  Judge Gill did not have any arrangement with Ray or Moore about how they would handle Barbee's defense, did not threaten to withhold future appointments if Ray and Moore did not handle Barbee's defense in a certain manner, and did not inhibit or interfere with their defense of Barbee.  Trial counsels' decision not to seek a change of venue, and their decisions about which witnesses and evidence to present, were not influenced by their relationship with Judge Gill, but were reasonable tactical decisions.  Their decision to rely on a theory that Lisa Underwood's death was accidental rather than a "Dodd-did-it" theory, was a matter of reasonable professional judgment because the Dodd-did-it theory was not consistent with other evidence of Barbee's guilt and would have been difficult because Barbee refused to testify.  Their efforts to defend Barbee were harmed by Barbee's changing version of events and his refusal to testify.  Their decision not to present evidence regarding mental health, head injuries, and Barbee's use of hydrocodone was a reasonable tactical decision because the defense experts did not find any mental-health related evidence that would have aided the defense, Barbee lacked significant symptoms from head injuries, and Barbee did not have a history of long-term drug abuse.  Tim Davis's testimony about the "road rage" incident at the hearing was not credible.  Ray and Moore did not elicit testimony from the defense's punishment phase witnesses about Barbee's low risk of committing future violent acts because they were worried that the prosecution might have known of the road rage incident and would use it to impeach their witnesses.  This was a reasonable tactical decision in the light of their knowledge of Barbee's past violence, and was not due to their relationship with Judge Gill.  The court concluded that there was no evidence of a conflict of interest; that Ray and Moore did not advance their own interests

to the detriment of Barbee's; and that their strategic and tactical decisions were not influenced by their relationship with Judge Gill.

To succeed on his conflict of interest claim, Barbee had to show that "an actual conflict of interest adversely affected" trial counsels' performance. *Cuyler v. Sullivan*, 446 U.S. 335, 348–49 (1980); *Beets v. Scott*, 65 F.3d 1258, 1271 (5th Cir. 1995). An "actual conflict" exists when counsel "is compelled to compromise his or her duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests." *Perillo v. Johnson*, 205 F.3d 775, 781 (5th Cir. 2000). An "adverse effect" requires proof that "'some plausible alternative defense strategy or tactic' could have been pursued but was not because of the actual conflict impairing counsel's performance." *Id.*

The district court stated that Barbee did not argue that the state court's decision is unreasonable in the light of the evidence but rather, "he picks and chooses from the facts in the record to support his claim and simply disagrees with the state-court ruling." The district court, after reviewing all of the evidence, concluded that Barbee failed to demonstrate that the state court's decision was based on an unreasonable determination of the facts. The district court held that Barbee failed to establish the existence of an actual conflict that forced counsel to choose between their self-interest and their duty to Barbee and that he did not present evidence that there was a plausible alternative defense strategy or tactic that could have been pursued but was not because of the alleged conflict. Accordingly, Barbee failed to show that the state court decision was based on an unreasonable application of clearly established federal law.

We conclude that reasonable jurists would not debate the district court's decision that Barbee failed to demonstrate an actual conflict of interest that

adversely affected trial counsels' performance.  We therefore DENY his request for a COA for this claim.

## C.  Claim 3, Ineffective Assistance of Counsel at Punishment Phase

Barbee requests a COA for his claims that trial counsel rendered ineffective assistance at the punishment phase of trial by (a) presenting the testimony of prison consultant Susan Evans; (b) failing to present mitigating evidence; and (c) failing to present evidence of head injuries and drug abuse. Barbee did not raise claim 3(a) in his first state habeas application.  When he presented it in his second state application, the TCCA dismissed it as abusive. Barbee presented Claim 3(b) in his initial state habeas application, but enlarged it, factually and legally, in his subsequent state habeas application, and the TCCA dismissed it as abusive.  Barbee presented Claim 3(c) in his initial state habeas application, and the TCCA denied relief on the merits.

The IATC claims that were dismissed as an abuse of the writ by the TCCA are procedurally defaulted, and federal review is barred unless Barbee can show cause for the default and actual prejudice as a result of the alleged violation of federal law, or that the failure to consider the claims will result in a fundamental miscarriage of justice (which requires that he show he is actually innocent of the crimes for which he was convicted).  *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Sawyer v. Whitley*, 505 U.S. 333, 339–40 (1992).

For the ineffective assistance claims not presented in his initial state habeas application, which the state court found abusive, Barbee claims that he is entitled to the exception to procedural default established in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012),  and *Trevino v. Thaler*, 133 S. Ct. 1911 (2013). In *Martinez*, the Supreme Court held that a petitioner may establish cause to excuse the procedural default of an IATC claim by showing that (1) his state habeas counsel was constitutionally deficient in failing to include the claim in

his first state habeas application; and (2) the underlying IATC claim is "substantial." 132 S. Ct. at 1318. For a claim to be "substantial," the petitioner "must demonstrate that the claim has some merit." *Id.* An IATC claim is "insubstantial" if it "does not have any merit" or is "wholly without factual support." *Id.* at 1319.

To establish ineffective assistance of his initial state habeas counsel, Barbee must show both that habeas counsel's performance—in failing to present the IATC claims in the first state habeas application—was deficient and that he was prejudiced by the deficient performance—that is, that there is a reasonable probability that he would have been granted state habeas relief had the claims been presented in the first state habeas application. *See Martinez*, 132 S. Ct. at 1318; *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The *Strickland* standard also applies to Barbee's underlying IATC claims.

Under *Strickland*, "the proper standard for attorney performance is that of reasonably effective assistance." 466 U.S. at 687. "[T]he defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688.

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the

> challenged action might be considered sound trial strategy. There
> are countless ways to provide effective assistance in any given
> case. Even the best criminal defense attorneys would not defend a
> particular client in the same way.

*Id.* at 689 (internal quotation marks and citations omitted).

> With respect to the duty to investigate,

> strategic choices made after thorough investigation of law and
> facts relevant to plausible options are virtually unchallengeable;
> and strategic choices made after less than complete investigation
> are reasonable precisely to the extent that reasonable professional
> judgments support the limitations on investigation. In other
> words, counsel has a duty to make reasonable investigations or to
> make a reasonable decision that makes particular investigations
> unnecessary. In any ineffectiveness case, a particular decision not
> to investigate must be directly assessed for reasonableness in all
> the circumstances, applying a heavy measure of deference to
> counsel's judgments.

*Id.* at 690–91; *see also Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005). The Supreme Court has stated that these three post-*Strickland* cases, each of which granted relief on ineffective assistance claims, did not establish "strict rules" for counsel's conduct "[b]eyond the general requirement of reasonableness." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1406–07 (2011). "An attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense." *Harrington v. Richter*, 131 S. Ct. 770, 789–90 (2011). Barbee's trial counsel, as well as his state habeas counsel, were "entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Id.* at 789.

To demonstrate prejudice, Barbee "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability

37

sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 131 S. Ct. at 792 (citation omitted). This showing is intentionally difficult to satisfy: "In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome. . . . Instead, *Strickland* asks whether it is 'reasonably likely' the result would have been different." *Id*. at 791–92 (citations omitted).

Even if Barbee can establish that ineffective assistance of his initial state habeas counsel constitutes cause for the default of his IATC claims, "[a] finding of cause and prejudice does not entitle [him] to habeas relief. It merely allows a federal court to consider the merits of a claim that otherwise would have been procedurally defaulted." *Martinez*, 132 S. Ct. at 1320.

The district court held that Claim 3(a) is not substantial and therefore the exception to the procedural bar does not apply. Alternatively, the district court denied relief on the merits. With respect to Claim 3(b), the district court observed that much of the evidence adduced in the subsequent habeas proceeding on Barbee's conflict of interest claim was also relevant to an evaluation of counsels' representation with respect to the mitigating evidence claim. The district court concluded that the evidence and the claims developed in the initial and subsequent state proceedings overlapped, making it impractical, if not impossible, to parse the claims and the facts between them. Accordingly, in the interest of addressing counsels' representation thoroughly and conclusively, the district court resolved Claim 3(b) by looking past any procedural default and reviewing the claim on the merits, de novo.

Because the district court addressed the merits of Barbee's procedurally defaulted IATC claims, it is arguable that Barbee has received the relief available to him under *Martinez* and *Trevino*. *See Preyor v. Stephens*, 537 F. App'x 412, 422 (5th Cir. 2013). We now turn to consider whether reasonable

jurists would debate the district court's decision that Barbee's IATC claims are without merit.

## 1. Claim 3(a) – Presentation of Evans's Testimony

At the punishment phase, the defense presented the testimony of Susan Evans, a former Texas prison warden, for the purpose of supporting counsels' argument that Barbee could successfully serve a life sentence. At the state habeas evidentiary hearing, Ray testified that he was trying to show that the prison system has the ability to react to the violence of inmates, that people on death row are not the only people who have committed violent acts and are not the only people who commit violent acts in prison, and that the prison has a system in place to take care of those kind of problems, which are a very small percentage of infractions, considering the inmates housed there.

As the district court noted, Evans's testimony occupies over 90 pages of the trial transcript. The district court summarized her testimony as follows:

> Evans explained the qualifications and training of prison employees, their defensive tactics and training, "use of force" policies, and ongoing testing. She stated that prison employees are professionals trained to handle any type of offender and any type of situation. (26 RR 3-32.) She described the prison classification system and explained that Barbee, if given a life sentence, would never be classified in the least-restrictive category (G1) and would have to serve 10 years before he could be eligible for G2. (26 RR 33-43.) She described the restrictions and privileges related to various levels of security. She testified that the inmates serving life sentences are not always the worst inmates because they are in a controlled environment with less stressors, and she testified that people in prison mellow with age. (26 RR 72.) She also testified that prison rules change over time and often become more restrictive, not less, and that the prison does its best to recognize and address developing patterns among offenders. (26 RR 92-93.)

Barbee argues that trial counsel were ineffective in presenting Evans's testimony because Evans emphasized prison violence and repeatedly pointed out the hazards and risks of placing Barbee in general population, which gave

the jury reasons to choose the more secure death row where such incidents can be minimized and controlled, rather than a life sentence in general population. Barbee claims that Evans's testimony about riots, disturbances, hostage situations, assaults on prison officers, gangs in the prison system, inappropriate sexual relations between staff and inmates, sexual assaults, extortion, escapes (including the escape of the "Texas Seven" from the Connally Unit, which ended in the killing of a police officer), and the fact that bad things happen even though there are policies and procedures in place to prevent them, is frequently presented by the prosecution in Texas capital cases to show that death row is the most safe and secure placement. According to Barbee, a jurist who read Evans's complete testimony, without having been informed which side presented it, would reasonably surmise that she was a prosecution witness.

The district court observed that Barbee's argument "picks and chooses unidentified fragments of Evans's testimony on direct and cross examination and presents them in a list, out of context." The court noted that Barbee failed to acknowledge the overall strategy for Evans's testimony, which was to show that Barbee could successfully serve a life sentence, and what that life sentence would be like. In its opinion denying Barbee's motion to alter or amend, the district court reiterated that under trial counsel's direct examination, Evans presented an overall picture of the prison disciplinary and classification system, the reality of prison violence, and the steps taken to deal with that violence, which focused on employee training. She also testified that murderers often make the best inmates because the triggering circumstances do not repeat themselves in prison. The court reasoned that if trial counsel had failed to acknowledge the violence in prison, as Barbee suggests, the prosecution surely would have done so on cross-examination, with a greater

impact on the jury.   Further, it may have led the jury to think that counsel were uninformed or trying to hoodwink the jury.

We conclude that reasonable jurists would not debate the district court's decision.   A complete reading of Evans's testimony, rather than the snippets Barbee has chosen to present, supports the district court's decision that Barbee failed to present a substantial ineffective assistance claim based on his disagreement with counsel's strategic decision to present Evans's testimony.

### 2.   Claim 3(b) – Failure to present mitigating evidence

Next, Barbee requests a COA for his claim that trial counsel were ineffective by failing to present mitigating evidence and evidence of his lack of propensity for future dangerousness.   He contends that counsels' admission that they did not ask the defense punishment witnesses about future dangerousness because of the "road rage" incident does not excuse their failure to investigate whether their potential witnesses knew of it.   He contends that the jury could have drawn an adverse inference from the fact that none of the defense witnesses at the punishment phase were asked to address specifically the future dangerousness issue.   He argues that given his lack of an arrest record, there is a likelihood of a different result had the evidence been investigated and presented.

Although Barbee's claim that trial counsel rendered ineffective assistance in failing to present mitigating evidence was fully litigated on the merits in Barbee's initial state habeas proceeding, the state habeas court allowed Barbee to present similar evidence at the evidentiary hearing on the conflict of interest claim in the subsequent state habeas proceedings, to show the impact of the alleged conflict of interest on counsels' representation.   The district court correctly noted that much of the evidence adduced at the state habeas evidentiary hearing on Barbee's conflict of interest claim, discussed in Part II.B., was also relevant in evaluating the mitigating evidence claim.

Thus, consideration of this claim requires an examination of all of the evidence presented at trial and in the initial and subsequent habeas proceedings. That evidence is described below.

a. *Evidence Presented at the Punishment Phase of Trial*

At the punishment phase, the State called Barbee's ex-wife, Theresa. She testified that Barbee had assaulted her four times during their marriage. She also testified about a road-rage incident when Barbee followed another car to a dead end street and assaulted the driver. She described an argument on July 4, 2003, in which Barbee threatened, as he had in the past, to put her through a wood chipper. She hit him, and he left. She testified that the businesses were in debt and about how she had Barbee sign them over to her after he was arrested. She testified that after she and Barbee divorced, she began dating Dodd, who worked for Barbee. Dodd eventually moved into her house. She said that Dodd was arrested and faced twenty years of imprisonment for his involvement in this case.

Theresa testified that on the Sunday morning after Lisa's disappearance, she saw Barbee at their office and told him that the police had been at her house asking about him, his Corvette, and a girl he used to date who was missing. She said that he cried, said that his life was over, and told her to get the businesses out of his name. She asked him to turn himself in and not make her call the police. She talked to Barbee again on the Monday night after he had confessed to the police, and he told her that he did not mean to kill Lisa and Jayden. She asked him about Dodd's involvement, and he told her Dodd's mistake was picking him up. A day or two later, she visited him in jail with his family, and he told her that she had it all wrong, that he did not do it. Theresa said that she visited Barbee in jail every week for about seven months. On her last visit, he held up a piece of paper saying they could get back together

42

and try to have a baby.  He asked her to say that Dodd had "slipped" and was guilty of the murders.

On cross-examination, Barbee's counsel elicited testimony that Barbee was close to his brother and sister, both of whom were dead, and that he had tried to commit suicide while he and Theresa were married.  Theresa conceded that she had told the grand jury that she did not take seriously Barbee's threats to put her through the wood chipper and that she had told the grand jury they had three, not four, fights during their marriage.  She admitted that not all of the fights were Barbee's fault, and that some of the blame was hers. She also testified about the stressors Barbee was facing the week of the murders:  he was upset because he had just learned that his father had colon cancer; he had been having horrible headaches after being struck in the head by a pipe; he was fighting with her and fighting with Trish; and they were having problems with the businesses.  She described their work as children's church leaders, including presenting puppet shows and raising money for the church.  She said Barbee was good with the children, that the program grew under their leadership, and that "it was a wonderful thing."

The State's second witness at the punishment phase was Marie Mendoza, Barbee's former co-worker.  She testified that Barbee called her frequently and claimed that he was not married.  She believed him until, during one of their last conversations, she overheard a female voice in the background.  She had asked him for an estimate to trim some trees at her home. Instead of giving her an estimate, he trimmed the trees. When he called a few days later, she told him she did not want a relationship with him and offered to pay for the work that he had done.  He became verbally abusive, and she had no more contact with him.  She thought he was a very mean, cruel person and that he had no respect for women.

The first witness for Barbee at the punishment phase was Pastor Nancy Cearley. She testified that she had known the Barbee family since 1989 and had officiated at Barbee and Theresa's wedding. Barbee and Theresa became leaders of the children's program at the church and served for about three years, growing the program from 10–15 children to 75–80 children. She never had any complaints from parents about Barbee. On cross-examination, she testified that she did not believe he had killed Lisa and Jayden Underwood.

Barbee's mother, Jackie Barbee, was the next witness. She testified that he lost his only sister when he was 14 and his only brother when he was 16. Both of them were 20 years old when they died. Barbee "shut down" after his brother died and did not graduate from high school, but obtained his GED. She described an incident when he and his brother were planning to make money by mowing lawns, but came home with nothing, because they had mowed a yard for "a poor little old lady" without charging her. Barbee wanted to become a police officer, so he went to community college and took courses. He worked as a reserve police officer for the Blue Mound Police Department for two and one-half years. She testified that he was a hard worker and described how he started his tree-trimming business after cutting down a tree in her yard that had been struck by lightning. Later, he hired Theresa to help with the business because she needed money and he felt sorry for her. Theresa paid the bills and Barbee did all the work. Mrs. Barbee said that she and her husband, who was undergoing chemotherapy, visited Barbee in jail every week. She testified that they would continue to support him when he goes to the penitentiary. She told the Underwood family that Barbee and she and her husband were very sorry and that she knew their pain because she had been there when she lost her daughter, who was pregnant when she died. She said that she wanted them to be forgiving and not bitter.

Barbee's aunt, Mary Hackworth, testified that Barbee visited her in South Carolina and stayed with her for three or four months while he was looking for a job, before he got his GED. She said that she loves Barbee dearly and was there to support him, notwithstanding her doctor's order not to travel.

Barbee's niece, Jennifer Cherry (the daughter of his deceased older sister), testified that she and Barbee are very close, that he is more like a brother than an uncle, and that she loves him with all her heart. She said that whether he ends up on death row or with a life sentence, she would do anything she could to maintain contact with him.

Ashley Vandever testified that she met Barbee in church when she was 13 and they were good friends for about four years, until she moved away. Her younger sister adored Barbee and he was the reason she looked forward to going to church. She testified that she visits him in jail every week because she loves him, and that he made her feel better every time she visited him.

Denise Morrison, a former girlfriend, testified that she became romantically involved with Barbee after his divorce. They talked about getting married, but Barbee wanted a child and she did not. They have remained close friends and she visited him at the jail almost every weekend. On cross-examination, she admitted that she became romantically involved with Barbee before he was divorced. She also testified that she did not believe he committed the murders.

Following Evans's testimony, described previously in Part II.C.1., Christy McKemson, the former girlfriend of Barbee's former roommate, testified that she visited her ex-boyfriend every weekend for about three months while he was living with Barbee. She was there to support Barbee.

Jerry Jones, a confinement officer for the Tarrant County Sheriff's Department, testified that he dated Barbee's sister in high school and played

baseball with his brother. He is a friend of Barbee's parents, who are people of strong faith, but this case has tested their faith and affected their health.

David Derusha, the court bailiff, was the final witness for Barbee. He testified that he was primarily responsible for transporting Barbee between the jail and court each day. He said that Barbee had not been a problem and had not made any threats.

In rebuttal, the State called Bruce Cummings, Jayden Underwood's soccer coach. He identified Jayden in a photograph of the team.

In closing argument, the State focused on the circumstances of the offense, Barbee's violent and manipulative behavior with Theresa, and his cruelty to his former co-worker. The prosecutor argued that the circumstances of the murders are overwhelming evidence that there is a probability that Barbee will commit more criminal acts of violence. The prosecutor told the jury that a simple paternity test could have prevented the crime, but Barbee did not wait, because violence is how he handles his problems.

Barbee's counsel, Moore, presented the following argument. The State did not meet its burden of proving beyond a reasonable doubt that Barbee would be a continuing threat to commit criminal acts of violence in the penitentiary. Punishment based on revenge has no place in the law. It can be guaranteed that Barbee had no criminal history because if it existed, the State would have presented it. Barbee was 37 years old when it happened and for three hours, he was not a very nice human being. But there were 36 years before that when he was not violent. He was raised in a good family with hardworking parents. He lost his brother and sister and that set him back, but he overcame it, got his GED, was a police officer, started a successful business, and was a contributing member of society. Barbee has not caused any problems while in jail, and he will continue to behave well in the

penitentiary.  Barbee will be almost 80 years old before the parole board can even consider the possibility of releasing him.

Ray argued that Barbee's leading the police to the bodies so that they could have a decent burial, after he had already confessed, was mitigating because it reduces his moral blameworthiness.  He reminded them of Evans's testimony that people who have killed are often the best prisoners because the triggering circumstances do not repeat themselves in prison, and argued that is the case with respect to Barbee.

b. *Evidence Presented in the Initial State Habeas Proceeding*

In his initial state habeas proceeding, Barbee presented the statements of Amanda Maxwell, Dr. Stephen Martin, Nancy Cearley, and Jackie Barbee; and Dr. Goodness's report.

Maxwell's statement covers essentially the same information that she testified about in the state habeas evidentiary hearing, described previously in Part II.B.  Dr. Martin's statement was also described previously in Part II.B.

In her statement, Nancy Cearley said that if she had been asked whether Barbee would be a future threat to society, her answer would have been a definite no.  Jackie Barbee's statement covers essentially the same information that she testified about at the state habeas evidentiary hearing, described in Part II.B.  She said that if she had been asked whether her son would be a future threat to society, her answer would have been "of course not—never."

In her report to Barbee's trial counsel, Dr. Goodness described discussions with corrections officers who told her that Barbee had done nothing to be a problem during his incarceration and that they believed it unlikely that he would be any sort of a security problem within a structured penal institution.  She noted that Barbee's medical records indicated that he had been diagnosed with Lyme's disease, which causes rages and mood swings that mimic bipolar disorder, but is treatable with antibiotics.  She observed that

Barbee's mother had assisted him in remaining immature and emotionally dependent upon her. Dr. Goodness stated that Barbee did not appear to have significant symptoms suggestive of a head injury, that she did not believe he has a bipolar mood disorder, and that his use of hydrocodone does not suggest long-term significant abuse. She identified as secondary themes of mitigation his lack of a criminal history, "good guy" information, and his parents' ill health.

The state habeas court also had before it the joint affidavit of Ray and Moore. In their affidavit, counsel stated that they had tried to show that Barbee had acted in a fit of rage and that such anger was rare. They knew of other incidents of violence in Barbee's past and tried to keep that evidence from the jury. Their affidavit contains essentially the same information that they later testified about at the state habeas evidentiary hearing, which has been described previously in Part II.B. Counsel attached to their affidavit Amanda Maxwell's notes regarding her interview of Tim Davis about the road rage incident.

The state habeas court found that counsels' actions were reasonable, that counsel offered reasonable mitigating evidence and tried to limit damaging evidence, and that counsel presented as thorough and positive a mitigation case as possible. It found, however, that counsels' efforts were undercut by Barbee's unwillingness to accept responsibility for his actions. The TCCA adopted the trial court's findings and conclusions and denied the claim on the merits.

*c. Evidence Presented in the Second State Habeas Proceeding*

In his second state habeas application, Barbee presented additional declarations attesting to mitigation evidence that could have been presented. In his COA application, he described this evidence as follows:

His mother, Jackie Barbee, if she had been properly prepared, could have offered detailed information about Barbee's reading comprehension problems and academic struggles, his grief at the deaths of his sister and brother, his service as a reserve police officer, his hard work at his businesses, a serious head injury caused by Ron Dodd just a few months prior to his arrest, his suicidal ideation in jail, his history of severe migraine headaches, which were a factor in his "confession", the motivation of Ron Dodd and Theresa to blame the murders on him, and his lack of a history of violence.

Bobby Boyd, former Assistant Superintendent of the Azle Independent School District, and his wife, Sallie, could have testified to Barbee's good character and low probability of committing future dangerous acts.

Mandy Carpenter, who had known Barbee for 21 years, could have testified to his non-violent character, generosity, lack of anger, and low risk of future dangerousness.

In addition to the testimony that she gave at trial, Barbee's niece, Jennifer Cherry, could have testified about Barbee's non-violent nature and Theresa's aggressiveness, Theresa's embezzlement from Barbee's company, Theresa's romantic involvement with Ron Dodd and her wishing for Barbee's death, and Barbee's leadership of the church children's program, including putting on puppet shows for the children. In her declaration, Cherry stated that she felt that trial counsel were not interested in what any of them had to say, and that they did not prepare her to testify. Had she been asked her opinion of the likelihood of Barbee committing future acts of violence, she would have testified that the risk was low.

Tina Church, an investigator, offered her services, without charge, to trial counsel, but Ray refused. Church stated in her declaration that she thought trial counsel were more interested in having Barbee plead guilty than in investigating his innocence or mitigating evidence. Church stated that she

discovered that Theresa had changed the company bonding policy to a life insurance policy for which she was the beneficiary.

Pastor Calvin Cearley did not testify at trial, but if he had been called, he would have told the jury that Barbee was very congenial, honest, caring, respectful of others, very friendly and outgoing, kind and loving, and that he liked to make people laugh. His wife, Nancy, the former co-pastor of the church that Barbee attended, testified at trial, but could have provided much more detail about Barbee's activities with the church children's group. She stated in her declaration that he was a very hard worker, dedicated to his job, and the children loved him. She felt that trial counsel were just going through the motions, because they did not question her in depth about her knowledge of Barbee's character, family, efforts for the church, and non-violent nature. If asked, she would have testified that she never knew him to commit any acts of violence and she did not think he would be likely to do so.

Mike Cherry, Barbee's brother-in-law, could have testified to Barbee's non-violent nature and his love of animals and children, and could have testified that Barbee was not likely to commit violent acts in the future.

Sharon Colvin, another pastor, was not contacted by the defense. She could have testified to Barbee's friendly, jovial and non-violent nature and would have testified that Barbee probably would not be a future danger.

Tim Davis, Barbee's former business partner and his best friend, was not asked to testify. He could have discredited Theresa's testimony about Barbee's violence and told the jury about Barbee's low propensity for future dangerousness.

Jerry Dowling could have testified to Barbee's family tragedies, good character and work ethic. He also could have testified that Barbee would not be a future threat to anyone.

Mary Hackworth, Barbee's aunt, testified at trial, but was not asked about the death of his brother and sister and his good and generous character. She could have testified that he was a hard worker, was fond of animals, was always a gentleman around women, that children loved him, and that he would not be likely to commit future violent acts.

Christy Mackemson testified at trial, but she was not asked about Barbee's positive rapport with children. She could have testified that she never saw him angry and did not think he had a high risk of committing future acts of violence.

Melody Novak was not called to testify at trial, but would have been willing to testify about Barbee's good character and devastation at the death of his brother and sister. She could have testified that Barbee loved children and they loved him, and that he would not be a future danger to society.

At the state habeas evidentiary hearing on the conflict of interest claim that Barbee presented in his subsequent habeas application, the state court received testimony from Amanda Maxwell, Tim Davis, Calvin Cearley, Nancy Cearley, Mike Cherry, Jennifer Cherry, Sharon Colvin, and Jackie Barbee, which was described previously in Part II.B. All of them testified that they were not asked about the likelihood that Barbee would commit future violent acts, but if they had been asked, they would have said he did not pose a danger.

As we previously noted in the discussion of the conflict of interest claim in Part II.B., Ray testified at the state habeas evidentiary hearing that he did not call Tim Davis as a character witness because of the "road rage" incident, and did not present any other lay opinion testimony regarding Barbee's lack of future dangerousness, because that would have opened the witnesses up to cross-examination about whether they had heard of Barbee's prior bad acts. In addition to the "road rage" incident involving Tim Davis, Ray had information that Barbee had engaged in acts of vandalism and theft; had poured gasoline

on baby hamsters and set them on fire; had killed an animal when on a date; and had offered to pay an inmate, Donald Painter, to testify that Dodd had confessed to the murders.

### d. The District Court Decision

The district court held that Barbee could not show that trial counsel rendered ineffective assistance by failing to present the testimony of Bobby and Sallie Boyd because Mrs. Boyd stated in her declaration that she was asked to testify at trial but declined, and Mr. Boyd did not state in his declaration that he was available and would have testified at trial.

The district court rejected Barbee's challenge to trial counsel's justification for not calling Tim Davis as a witness, based on the statement in their joint affidavit that Davis said that Barbee had "attempted to kill" the driver of the other vehicle.  The district court stated that counsel's choice of words describing Barbee's behavior as an "attempt to kill," even if inaccurate, did not undermine their decision not to call Davis as a witness.  Maxwell had reported to counsel that Davis told her that Barbee had no "off button" and that Davis had to pull Barbee off the old man to keep Barbee from hurting the man "really bad."  The court stated that counsel could reasonably decide not to risk exposing the jury to evidence that demonstrated Barbee's confrontational and aggressive nature, especially in the light of Theresa's testimony about a similar road rage incident on their first wedding anniversary, because the jury would be unlikely to view two such similar events as anomalies.

The district court held that Barbee's contention that trial counsel should have asked the punishment witnesses their opinion about Barbee's propensity for future dangerousness overlooked the fact that the witnesses could have been impeached with good-faith questions about their knowledge of Barbee's extraneous bad acts, including the road-rage incident, Barbee's setting baby hamsters on fire with gasoline, vandalism of a school building, stealing from a

bait-and-tackle store and a concession stand, fire-setting, theft of jewelry and
other items from a locker room, killing an animal while on a date with Michelle
Cook, and bribing another inmate, Donald Painter, to testify that Dodd had
confessed.  The court pointed out that as a result of counsels' strategy, the jury
did not learn about his acts of vandalism, theft, and animal cruelty, and
counsel were able to argue to the jury that Barbee had no criminal history and
was not a juvenile delinquent.

The district court stated that Barbee's criticism of trial counsel for not
investigating whether the defense witnesses knew about the road rage incident
involving Davis demonstrated a failure to understand Texas law.  Whether the
defense witnesses knew about the incident was beside the point; if the
prosecution knew about it, the State would have been entitled to ask them
about it and the jury would have heard the damaging questions.  Any witness
who maintained the opinion that Barbee was not a future danger could have
been impeached as either (1) uninformed, because he did not know Barbee's
true behavior, or (2) biased, because he knew about the behavior but it did not
affect his opinion.  Third, and arguably worse, the witness might have changed
his opinion after learning of the prior bad acts on cross-examination.

With respect to Dr. Goodness, the district court noted that the record did
not show that Dr. Goodness believed Barbee presented a low risk of future
dangerousness.  Even assuming she had that opinion and so testified, however,
she would have been subject to potentially damaging cross-examination about
Barbee's bad acts.  Also, it would have allowed the State to have its own expert
evaluate Barbee, which counsel did not want to allow, because it would have
provided an opportunity for the State to obtain a damaging diagnosis or learn
harmful things about Barbee's past.  The district court held that Barbee had
failed to show that counsels' decision to avoid an evaluation by the State's
expert was outside the wide range of reasonable professional assistance.

The district court observed that some of the information that Barbee claimed trial counsel should have presented regarding his good character, his stable family, the loss of his siblings, head injuries, suicidal ideation, the crime-week stressors that Barbee faced, and the negative character evidence about his ex-wife, Theresa, was more of the same information the jury heard at trial. It cited Fifth Circuit precedent holding that courts must be "particularly wary of arguments that essentially come down to a matter of degrees. Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing." *Skinner v. Quarterman*, 576 F.3d 214, 220 (5th Cir. 2009) (internal quotation marks and citation omitted).

The district court characterized some of the mitigating evidence that Barbee criticized counsel for not presenting, such as the opinions of his family and friends that he is of good character and from a stable family, his academic struggles, the loss of his siblings through illness and a car accident, head injuries that no trial expert believed caused any brain damage, voluntary short-term hydrocodone abuse, and evidence discrediting Theresa, as only "mildly mitigating." The court held that experienced counsel reasonably could have decided that the jury would not be impressed with an attempt to humanize Barbee with such evidence.

In addition, the district court noted that some of the declarations presented by Barbee contain harmful information that could have been brought out on cross-examination, such as evidence that reinforced the picture of Barbee as a man who did not commit himself in his relationships with women and supported the State's theory of motive. For example, Barbee's mother stated in her declaration that Barbee previously had a child with a co-worker at the Blue Mound Police Department but gave up his parental rights.

The district court rejected Barbee's contention that trial counsel contradicted themselves in their joint affidavit by claiming that their efforts to prepare and present a defense were hampered by Barbee's ever-changing version of the murders and his involvement in them, while stating in the same affidavit that Barbee consistently maintained his innocence from the beginning of their representation. The district court pointed out that counsel had to contend with Barbee's prior inconsistent statements that were known to the prosecution regardless of whether they had been appointed to represent him when the inconsistent statements were made.

The district court concluded that Barbee had failed to show that counsel performed deficiently in presenting Barbee's mitigation case at punishment. The court pointed out that counsel held the State to its burden of proof and let the lack of evidence speak for itself. Counsel capitalized on Barbee's strongest argument for a life sentence, his lack of criminal history. Counsel guaranteed that Barbee had no prior convictions or juvenile history because the State did not offer any evidence of such. They argued that "three hours" did not define Barbee as a person, emphasizing the good people who had supported Barbee throughout the trial because they knew him as a different person, and summarizing the previous 36 years of his good family life, the tragedies he endured and overcame, his strong work ethic, and his involvement in the church. Counsel presented evidence and argument that Barbee behaved well in the jail and that he would be almost 80 years old before he was even eligible for parole.

The district court held that, even if it presumed deficient performance, Barbee failed to demonstrate a reasonable probability that the additional evidence Barbee presented post-conviction would have undermined confidence in the verdict. The court stated that it is "beyond reasonable" to conclude that the aggravating facts of the offense, in which Barbee took the life of a pregnant

woman, the seven-year-old son who came to her defense, and an unborn child who Barbee knew might be his own, greatly outweigh any mitigating effect of the additional evidence counsel allegedly overlooked.

Barbee argues that even if the State had found out about the unreported road rage incident, it was not so threatening as to excuse trial counsels' failure to present evidence regarding the lack of future dangerousness of a 38-year-old successful businessman with no criminal record.   He maintains that because the prosecution did not present the "road rage" incident at trial or list it in any pretrial notice of aggravating evidence, the State either did not know about it or did not consider it to be aggravating.   He contends that the district court's rejection of this claim on the ground that presentation of mitigating evidence would be inconsistent with his claims of innocence is unreasonable, because his attorneys did not argue innocence but, instead, conceded his guilt and argued that the killing was accidental.   Finally, Barbee argues that the district court's inconsistency in praising counsel for relying on Barbee's lack of criminal history, while citing Barbee's violent past behavior to denigrate his argument that the witnesses should have been asked about future dangerousness, strongly suggests that the district court is biased.

Reasonable jurists would not debate the district court's decision, and we therefore deny Barbee's request for a COA for this claim.   Barbee's suggestion that the district court was biased overlooks the fact that his counsel probably would not have been able to rely on his lack of criminal history and juvenile delinquency if they had done what Barbee argues they should have done.   If they had presented lay opinion testimony about Barbee's low risk of committing future violent acts, the witnesses would have been subject to cross-examination about Barbee's acts of theft, vandalism, and animal cruelty, which would have been very harmful to his case.

### 3.  Claim 3(c) – Failure to present evidence of head injuries and drug abuse

Finally, Barbee requests a COA for his claim that trial counsel rendered ineffective assistance by failing to present evidence of head injuries and hydrocodone use at the punishment phase. He contends that such evidence would have been supportive of the defense argument that the killing of Lisa Underwood was accidental.  He argues that trial counsels' decision not to present this evidence because it was inconsistent with his claim of innocence is flawed, because innocent people suffer from head injuries, and an acceptance of responsibility has nothing to do with counsels' duty to thoroughly and completely investigate and present mitigating evidence.

As support for this claim in his initial state habeas proceedings, Barbee submitted mitigation specialist Amanda Maxwell's report in which she stated that Barbee's medical records showed a history of head injuries.  The most recent was in January 2005, when Ron Dodd dropped a 400-pound metal pipe on Barbee's head at a work site.  The impact split his hard hat and resulted in a loss of consciousness.  The frequency and intensity of his migraine headaches increased after that injury, and he began taking hydrocodone that had been prescribed for his wife.  Barbee also supported the claim with a report from psychologist Dr. Kelly Goodness, who noted that Barbee had been diagnosed with Lyme's Disease, and a letter from Dr. James Shupe, a psychiatrist, who suggested a probable diagnosis of "polysubstance dependence" and a "history of closed head injuries."

In their affidavit, trial counsel said that they had discussed the information developed by Maxwell, Dr. Goodness, and Dr. Shupe, but concluded that the head-injury and drug-use evidence would have been mitigating only for a guilty man.  They decided that the evidence would not be helpful because Barbee refused to accept any responsibility for the murders.

Ray testified at the state evidentiary hearing that he did not believe that "excuse" evidence helped a client at the punishment phase, when the jury had just rejected the innocence defense and found the client guilty. Furthermore, Ray knew that the witnesses who were going to testify for Barbee at the punishment phase believed that the jury had wrongly convicted Barbee, and he thought it would be inconsistent with their testimony to offer evidence that suggested a reason why Barbee committed the murders.

The state habeas court held that trial counsels' decision not to present evidence of Barbee's head injuries and drug use was a reasonable tactical decision and was not adverse to Barbee's interests, given Barbee's lack of significant symptoms and his unwillingness to accept responsibility for the murders. It also concluded that he could not show prejudice.

The district court held that the state court reasonably could have decided that counsels' decision not to present evidence of head injuries and hydrocodone use was within the bounds of reasonable professional representation. The district court rejected Barbee's argument that evidence of his head injuries would have supported the accidental killing theory because trial counsel, who had the assistance of three mental health experts, had no evidence that Barbee was brain-impaired as a result of his head injuries. Dr. Shupe, a forensic psychiatrist, stated in a letter to counsel that Barbee had a history of closed head injuries, but that his failure to accept some responsibility for the offense impaired the use of that evidence for mitigation purposes. Dr. Shupe also stated that Barbee appeared to be "fixated" on how his mother would view him if she thought he was guilty, and had said he would rather be executed than have his mother see him plead guilty. Dr. Goodness reported to counsel that Barbee did not appear to have significant symptoms suggestive of a head injury and that his report of hydrocodone use did not suggest long-term significant abuse.

The district court further noted that counsels' theory that Lisa's death was accidental was based on her physical state rather than Barbee's mental state. Barbee's trial counsel elicited testimony from the assistant medical examiner that Lisa's airway would have likely been more obstructed because her uterus was "bigger than a basketball" and that she would have had less cardiovascular reserve in her third trimester than at other times. The medical examiner agreed that the more pregnant the victim, the less time it would take for her to die. Trial counsel then argued to the jury that Barbee simply held her down too long based on her physical condition, which was consistent with Barbee's confession to Trish. Because the argument was based on Lisa's advanced pregnancy and not Barbee's mental state when he held her down, the district court reasoned that the evidence of Barbee's head injuries would not have supported the argument.

The district court pointed out that Barbee's own post-conviction expert, Dr. Martin, corroborated trial counsels' view that evidence of Barbee's head injuries would not be helpful because he had refused to accept responsibility. Dr. Martin stated that the behavioral effects caused by frontal lobe impairment provided "a broader and more accurate explanation for why Mr. Barbee could have engaged in a violent crime" and that "Barbee's violent actions at the time of the offense would have been mediated by emotional factors as opposed to reason, due to the aforementioned damage to his frontal lobes." The district court stated that Barbee's assertion that "innocent people get head injuries" does not change the fact that a jury in a criminal case would view such evidence as an explanation for the commission of the crime. Without some acceptance of responsibility, the jury might see such evidence as aggravating or a ploy for undeserved sympathy. It held that trial counsel reasonably concluded that the presentation of such evidence might do harm in this case.

In its opinion denying Barbee's motion to alter or amend, the district court stated that Barbee exaggerated the scope of trial counsels' reliance on his refusal to accept responsibility.  Trial counsel believed that the head injuries and some of Barbee's mental health diagnosis could have been helpful at punishment only if Barbee had accepted some responsibility for his actions. They also believed, however, that the usefulness of the head injury evidence and mental health diagnosis was outweighed by the diagnosis of anti-social personality disorder and the fact that the State would have been entitled to an expert evaluation, which probably would have yielded the same harmful conclusions as Dr. Shupe.  Counsel also did not want to be inconsistent with the punishment witnesses who all believed that Barbee was innocent.  The district court held that Barbee failed to show that these decisions were unreasonable.

Barbee argues that the mitigating evidence would have been offered at the punishment phase, after his guilt had already been determined.  Therefore, it was not dependent on, and did not diminish, the claim of innocence that was never presented to the jury and was not dependent on him accepting responsibility for the murders.

Reasonable jurists would not debate the district court's decision.  Barbee ignores Ray's explanation for why they did not present evidence of Barbee's head injuries, migraine headaches, and hydrocodone use.  Trial counsels' reasons for not presenting this evidence are reasonable, especially their wanting to avoid having Barbee examined by the State's expert.  Barbee is essentially just second-guessing their strategy.  We therefore deny his request for a COA for this claim.

### D.  Claim 4 – Denial of Motion to Alter or Amend

In his motion to alter or amend, Barbee cited reports from investigator Tina Church, who was described by Barbee as a "disinterested" witness.  In its

opinion denying Barbee's motion to alter or amend, the district court attached as an exhibit a web page of Church's organization, "The Other Victim's Advocacy," to show that she was not "disinterested" because of her anti-death penalty views. Barbee argues that the district court's reliance on this extra-record information to rule against him violated due process and deprived him of a fair hearing on his claim of actual innocence.

Tina Church's declaration did not play a large role in the district court's denial of Barbee's motion to alter or amend. Furthermore, Barbee arguably invited the court's investigation and comment when he described Church in his motion as "disinterested." In any event, even if we assume that the district court was wrong to cite the extra-record evidence, any error is harmless and does not show that the district court abused its discretion in denying the motion to alter or amend.

### III.  CONCLUSION

To sum up, we GRANT Barbee's request for a COA for Claim 2 (ineffective assistance of counsel for confessing guilt during closing argument). With respect to Claims 1, 3(a), 3(b), and 3(c), Barbee has not made "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), because the district court's denial of relief is not debatable and Barbee's claims are not adequate to deserve encouragement to proceed further. We therefore DENY a COA for those claims. We further hold that the district court did not abuse its discretion when it cited extra-record evidence in its order denying Barbee's motion to alter or amend.

COA GRANTED in part and DENIED in part.